**No. 23-1769**

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

CAUSAM ENTERPRISES, INC.,
*Appellant*,

v.

INTERNATIONAL TRADE COMMISSION,
*Appellee*,

ECOBEE TECHNOLOGIES ULC, dba ecobee, ITRON, INC., RESIDEO SMART HOMES TECHNOLOGY (TIANJIN), ADEMCO, INC., ALARM.COM HOLDINGS, INC., ALARM.COM INCORPORATED, ENERGYHUB, INC.,
*Intervenors.*

On Appeal from the United States International Trade Commission, Investigation No. 337-TA-1277

**NONCONFIDENTIAL VERSION**

# CORRECTED OPENING BRIEF OF CAUSAM ENTERPRISES, INC.

Christopher C. Campbell
KING & SPALDING LLP
1650 Tysons Boulevard
Suite 400
McLean, VA 22102

Britton F. Davis
KING & SPALDING LLP
1401 Lawrence Street
Suite 1900
Denver, CO 80202

Jeffrey M. Telep
*Counsel of Record*
Joshua N. Mitchell
Jonathan Weinberg
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500
jmitchell@kslaw.com

*Counsel for Appellant*

November 7, 2023

## U.S. Patent No. 10,394,268 B2 Claim 1

**1.** A method for managing an electric power flow within an electric power grid, comprising:

a client device receiving a power control message from a load management server, the power control message indicating at least one of an amount of electric power to be reduced and an identification of at least one controllable device to be instructed to disable the electric power flow to at least one associated power consuming device;

the client device issuing a power management command to the at least one controllable device, the power management command causing the at least one controllable device to disable the electric power flow to the at least one associated power consuming device to provide a reduction in consumed power; and

generating measurement and verification data corresponding to the reduction in consumed power.

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, counsel for Appellant certifies the following:

1. The full name of the party represented by me: Causam Enterprises, Inc.

2. The names of the real parties in interest represented by me: N/A.

3. Parent corporations and publicly held companies that own 10% or more of stock in the party: Causam Holdings, LLC.

4. The names of all firms and the partners or associates that appeared for the party now represented by me in the trial court or are expected to appear in this Court (and who have not or will not enter an appearance in this case) are:

   - Joseph D. Eng, Jr. – King & Spalding LLP
   - Brian Eutermoser – King & Spalding LLP
   - Brian D. Hill – King & Spalding LLP
   - Dara Kurlancheek – King & Spalding LLP
   - Abby L. Parsons – King & Spalding LLP
   - John D. Reohrick – King & Spalding LLP
   - Rahul Sarkar – King & Spalding LLP
   - Peter Sauer – King & Spalding LLP
   - Noah Stid – King & Spalding LLP
   - Katherine Vessels – King & Spalding LLP
   - Matthew Wood – King & Spalding LLP

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

- *Causam Enterprises, Inc. v. Alarm.com, Inc.*, No. 6:21-cv-00751 (W.D. Tex.)
- *Causam Enterprises, Inc. v. ecobee, Inc.*, No. 6:21-cv-00748 (W.D. Tex.)
- *Causam Enterprises, Inc. v. Itron, Inc.*, No. 6:21-cv-00750 (W.D. Tex.)
- *Causam Enterprise, Inc. v. Resideo Technologies, Inc.*, No. 6:21-cv-00749 (W.D. Tex.)
- *Causam Enterprises, Inc. v. Xylem, Inc.*, No. 6:21-cv-00752 (W.D. Tex.)

6. The organizational victims and bankruptcy cases applicable to this appeal: N/A.

Date: November 7, 2023

*/s/ Joshua N. Mitchell*
Joshua N. Mitchell

*Counsel for Appellant Causam Enterprises, Inc.*

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ............ viii

INTRODUCTION ............ 1

JURISDICTIONAL STATEMENT ............ 3

ISSUES ............ 4

STATEMENT OF THE CASE ............ 5

A. Background of the patents and technology ............ 5

B. The Accused Products ............ 7

C. Causam's ownership of the Asserted Patents ............ 8

D. Procedural history ............ 11

1. Complaint and proceedings ............ 11

2. The Initial Determination ............ 12

3. Commission review ............ 14

SUMMARY OF THE ARGUMENT ............ 16

ARGUMENT ............ 18

I. Causam has standing because it owns the '268 Patent ............ 18

A. Standard of review ............ 18

B. Causam owns the '268 Patent ............ 19

1. The 2007 Assignment did not assign away rights to the '268 Patent ............ 21

2. The 2013 Agreement confirms that Causam owns the '268 Patent ............ 23

II. The ITC found non-infringement based on the incorrect construction of two claim terms ............ 27

A. Standard of review ........ 27

B. The Commission misconstrued "measurement and verification data" to exclude runtime data provided to measurement and verification vendors ........ 28

1. The proper construction of "measurement and verification data" is "data *for* measurement and verification" ........ 30

2. The Commission misconstrued "measurement and verification data" as "data *sufficient* for measurement and verification" ........ 33

3. Under the proper construction, Resideo generates "measurement and verification data" ........ 36

C. The Commission misconstrued the "power control message" requirement ........ 41

1. The Commission misconstrued "at least one of" to mean "both" ........ 42

2. The Commission construed "identification of at least one controllable device" to require an explicit identification of *only one* controllable device ........ 48

CONCLUSION ........ 55

NONCONFIDENTIAL ADDENDUM

**Confidential Material Omitted**

Appx20–255:
The material redacted from the Commission's Final Initial Determination consists of trade-secret information concerning the operation of Intervenors' and nonparty Landis+Gyr's products and is subject to the Commission's order granting the motion for entry of a protective order.

## TABLE OF AUTHORITIES

### Cases

*Agility Logistics Servs. Co. KSC v. Mattis*,
887 F.3d 1143 (Fed. Cir. 2018)....................19

*Amarin Pharma, Inc. v. ITC*,
923 F.3d 959 (Fed. Cir. 2019)....................3

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
457 F.3d 1293 (Fed. Cir. 2006)....................30

*Bai v. L&L Wings, Inc.*,
160 F.3d 1350 (Fed. Cir. 1998)....................28

*Beloit Corp. v. Valmet Oy*,
742 F.2d 1421 (Fed. Cir. 1984)....................18

*Cabela's LLC v. Wellman*,
2018 WL 5309954 (Del. Ch. Oct. 26, 2018)....................26

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
289 F.3d 801 (Fed. Cir. 2002)....................52

*Corus Grp. PLC v. ITC*,
352 F.3d 1351 (Fed. Cir. 2003)....................18

*Digitalis Educ. Sols., Inc. v. United States*,
664 F.3d 1380 (Fed. Cir. 2012)....................19

*Fujifilm Corp. v. Motorola Mobility LLC*,
2015 WL 1265009 (N.D. Cal. Mar. 19, 2015)....................47

*Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*,
339 U.S. 605 (1950)....................52

*In re Power Integrations, Inc.*,
884 F.3d 1370 (Fed. Cir. 2018)....................30

*InterDigital Commc'ns, LLC v. ITC*,
690 F.3d 1318 (Fed. Cir. 2012)....................54

*Inventio AG v. ThyssenKrupp Elevator Ams. Corp.*,
2014 WL 129799 (D. Del. Jan. 14, 2014) ............................................ 45

*IpVenture, Inc. v. Prostar Comput., Inc.*,
503 F.3d 1324 (Fed. Cir. 2007)............................................................ 25

*Kelly v. United States*,
69 F.4th 887 (Fed. Cir. 2023) ....................................................... 44, 54

*Kewanee Oil Co. v. Bicron Corp.*,
416 U.S. 470 (1974) ............................................................................ 22

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .............................................................................. 44

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)...................................................... 36, 40

*Salamone v. Gorman*,
106 A.3d 354 (Del. 2014) .................................................................... 24

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947) ............................................................................ 44

*Sequoia Tech., LLC v. Dell, Inc.*,
66 F.4th 1317 (Fed. Cir. 2023) ............................................................ 40

*SuperGuide Corp. v. DirecTV Enters., Inc.*,
358 F.3d 870 (Fed. Cir. 2004).............................................................. 47

*Swagway, LLC v. ITC*,
934 F.3d 1332 (Fed. Cir. 2019)............................................................ 27

*Tri-Star Elecs. Int'l, Inc. v. Prec-Dip Durtal SA*,
619 F.3d 1364 (Fed. Cir. 2010).............................................................. 3

*Trs. of Columbia Univ. v. Symantec Corp.*,
811 F.3d 1359 (Fed. Cir. 2016)............................................................ 40

*Univ. of W. Va., Bd. of Trs. v. VanVoorhies*,
342 F.3d 1290 (Fed. Cir. 2003)...................................................... 21, 23

*Vanderlande Indus. Nederland BV v. ITC*,
366 F.3d 1311 (Fed. Cir. 2004)....................27

**Statutes**

19 U.S.C. § 1337....................3

28 U.S.C. § 1295....................3

35 U.S.C. § 101....................19

35 U.S.C. § 261....................3

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellant Causam Enterprises, Inc. states that the following cases may affect or be affected by the decision in this appeal:

- *Causam Enters., Inc. v. Alarm.com, Inc.*, No. 6:21-cv-00751 (W.D. Tex.)
- *Causam Enters., Inc. v. ecobee, Inc.*, No. 6:21-cv-00748 (W.D. Tex.)
- *Causam Enters., Inc. v. Itron, Inc.*, No. 6:21-cv-00750 (W.D. Tex.)
- *Causam Enters., Inc. v. Resideo Techs., Inc.*, No. 6:21-cv-00749 (W.D. Tex.)
- *Causam Enters., Inc. v. Xylem, Inc.*, No. 6:21-cv-00752 (W.D. Tex.)

Additionally, on October 25, 2023, this Court ordered that *Causam Enterprises, Inc. v. Unified Patents, LLC*, No. 23-2410 (Fed. Cir.) be treated as a companion case to this appeal and assigned to the same merits panel.

## INTRODUCTION

The International Trade Commission determined that Intervenors' importation of certain Internet-connected thermostats does not infringe U.S. Patents Nos. 8,805,552, 9,678,522, 10,394,268, and 10,396,592. Causam seeks review only of the Commission's determination that Intervenor Resideo does not infringe claim 1 of the '268 Patent.

A threshold issue is whether the Court has jurisdiction. Resideo has argued that Causam's chain of title is defective because the inventor had purportedly assigned the '268 Patent to another entity in 2007, before assigning it to Causam. That is wrong because the 2007 assignment was only of certain *ancestors* of the '268 Patent. That conclusion is plain from (1) the language of the 2007 assignment, which assigned to the third party only certain ancestors of the '268 Patent, and (2) a 2013 agreement wherein the same third party paid the inventor for a license to a more proximate ancestor of the '268 Patent.

The two merits issues are claim construction: (1) whether the runtime data collected from Resideo's thermostats and sent to "measurement and verification vendors" is "measurement and verification data," and (2) whether the demand response messages sent

to Resideo's thermostats to temporarily lower energy consumption are "power control messages" indicating a "controllable device." The answer to both questions is yes.

*First*, the runtime data sent to "measurement and verification vendors" and described as a key input for measurement and verification by the International Performance Measurement and Verification Protocol is "measurement and verification data" because it is data *for* measurement and verification. The Commission was wrong to limit "measurement and verification data" to data *sufficient for* measurement and verification, and it provided no explanation of that decision.

*Second*, the demand response messages IP addressed directly to Resideo's thermostats (and by implication, to the thermostat's relays) are "power control messages" indicating a "controllable device to be instructed to disable the electric power flow to at least one associated power consuming device" such as an HVAC system. The Commission disagreed, *but it provided no explanation.*

The Commission's non-infringement determination is wrong and unsupported. The Court should confirm its jurisdiction, correct the claim constructions, reverse on non-infringement, and remand.

## JURISDICTIONAL STATEMENT

The U.S. Trade Commission had authority under Section 337 to investigate and reach a determination regarding Causam's allegations regarding Intervenors' unfair trade practices. *See* 19 U.S.C. § 1337(b)-(c). The decision below is a final determination, *see* Appx260, and so this Court has jurisdiction to review the Commission's order. 28 U.S.C. § 1295(a)(6); *e.g.*, *Amarin Pharma, Inc. v. ITC*, 923 F.3d 959, 962 (Fed. Cir. 2019).

Although Intervenors challenged Causam's standing to assert claims of infringement of the Asserted Patents, the Commission took no position on the question of standing. Appx260. Causam owns the Asserted Patents by assignment from their inventor, Joseph Forbes, and so has standing to bring this appeal. *See* 35 U.S.C. § 261; *Tri-Star Elecs. Int'l, Inc. v. Prec-Dip Durtal SA*, 619 F.3d 1364, 1366-67 (Fed. Cir. 2010).

## ISSUES

1. Does the Court have jurisdiction to hear this appeal because Causam own the asserted patents by assignment from Joseph Forbes?

2. Did the Commission err by determining that Resideo did not infringe claim 1 of the '268 Patent based on erroneous constructions of (i) "measurement and verification data" and (ii) "power control message indicating at least one of an amount of electric power to be reduced and an identification of at least one controllable device to be instructed to disable the electric power flow to at least one associated power consuming device?"

## STATEMENT OF THE CASE

### A. Background of the patents and technology

Causam owns a portfolio of patents claiming improved systems and techniques of implementing utility "demand response" functionality. That functionality allows utility providers to automatically ration power in times of high demand.

Causam's '268 Patent discloses a method of performing "load management … over large geographies" by taking "real time (active) control of residential and commercial electrical devices" and reporting back information regarding the effectiveness of the intervention. *See* Appx333 (1:44); Appx335 (6:49-56). During a demand response event—a period of high utility demand—the utility uses a server, which the patent calls an "active load director," to decrease system-wide power demand. Appx343 (22:58-59); *see* Appx336 (8:1-3). Through the server, the utility sends "power control message[s]" to "client device[s]" (*e.g.*, Internet-connected thermostats) at residential or commercial properties. Appx343 (22:58-59). The power control messages identify either (1) a power-consuming device to turn off (*e.g.*, an AC unit), (2) an amount of power to

be reduced, or (3) both. Appx343 (22:59-64), Appx342-343 (20:14-21:20), Appx338 (11:28-37).

The client device (referred to in the specification as the "active load client" or "ALC") responds to the power control message by issuing a "power management command" instructing a "controllable device" to disable power to an associated "power consuming device." Appx343 (22:63-67). Disclosed examples of a "controllable device" include the built-in "power control module" of a smart appliance or an intermediary, such as a residential load center with "smart breaker[s]." Appx336 (8:29-9:6).

To help the utility estimate "the reduction in consumed power by the power consuming device(s)," the client device generates "measurement and verification" data ("M&V" data). Appx336 (7:31-34). For example, the specification discloses that the client device may generate and report time-stamped runtime data indicating when a power-consuming device was turned on or off. Appx343 (21:42-22:15).

Claim 1 of the '268 Patent is at issue here:

> **1.** A method for managing an electric power flow within an electric power grid, comprising:
>
> a client device receiving a power control message from a load management server, the power control message indicating at least one of an amount of electric power to

> be reduced and an identification of at least one controllable device to be instructed to disable the electric power flow to at least one associated power consuming device;
>
> the client device issuing a power management command to the at least one controllable device, the power management command causing the at least one controllable device to disable the electric power flow to the at least one associated power consuming device to provide a reduction in consumed power; and
>
> generating measurement and verification data corresponding to the reduction in consumed power.

Appx343-344 (22:55-23:5).

### B. The Accused Products

Resideo manufactures and sells Internet-connected thermostats with demand response capabilities. Appx67. Those thermostats participate in demand-response events by (1) receiving demand-response messages from utilities, such as commands to change the temperature setpoint (Appx67-68); (2) responding by issuing firmware commands to close or open relays that control power consuming devices, such as AC units, fans, heaters, compressors, *etc.* (Appx70); and (3) generating timestamped runtime data indicating when those devices were powered on or off during the demand response event (Appx70). Resideo makes the runtime data available to the utilities and their "M&V vendors." *See*

Appx22427 (Q/A 221) (Resideo's expert testifying on behalf of all respondents that runtime data is made "available to the utility and its EM&V vendor"); Appx22528 (Q/A 112) (Respondent Itron's corporate representative testifying that runtime data is "made available to the utility and its EM&V vendor").

### C. Causam's ownership of the Asserted Patents

In 2007, the inventor (Mr. Joseph Forbes) assigned U.S. Patent Application No. 11/895,909 to America Connect. Appx21594-21596. The scope of that assignment included the application and "all divisions, reissues, continuations, and extensions thereof." Appx21595.

In 2008, Mr. Forbes co-founded what eventually became Consert, Inc. Appx40. Consert bought America Connect's assets, including the '909 Application. Appx40.

In 2010, Mr. Forbes signed an updated employment and IP agreement with Consert (the "2010 Employment Agreement" and "2010 Inventions Agreement"), wherein he assigned to Consert rights to certain inventions he had created in Consert's employ. Appx21762-21766, Appx21767-21773; *see also* Appx21765 (incorporating inventions agreement in employment agreement). The parties soon disputed the

validity of that agreement; Mr. Forbes contended that Consert failed to provide the promised consideration. Appx22327.

In 2011, Mr. Forbes was terminated from Consert. Appx22319. Mr. Forbes and Consert continued to dispute the validity of the 2010 employment and IP agreement and, consequently, ownership of the intellectual property Mr. Forbes created while at Consert. Appx22327. While that dispute was ongoing, Toshiba bought Consert and merged it with Landis+Gyr ("L+G"). Appx22330.

On May 8, 2013, Mr. Forbes and Consert (by then owned by Toshiba) signed an agreement resolving their IP dispute (the "2013 Agreement"). Appx21880-21890. The 2013 Agreement's express purpose was to delineate ownership of the disputed patent rights between Mr. Forbes and Consert. Appx21880 ("WHEREAS, the Parties desire to clearly delineate their ownership of the patent rights listed herein.").

The 2013 Agreement identified (1) "Consert Patents" (which, notwithstanding Mr. Forbes's inventorship, would be owned by Consert) and (2) "Excluded Patents" (which Mr. Forbes owned). Appx21881; Appx21883. As part of the 2013 Agreement, Consert paid $300,000 for a license to use the Excluded Patents. Appx21885.

The "Consert Patents" included patents that were invented by Mr. Forbes during his tenure at Consert, including the '909 Application, but they "exclud[ed] the Excluded Patents." Appx21881-21883. The list of "Excluded Patents" included the "new inventions, claims and related rights of the patent applications" conceived by Mr. Forbes and filed *after* his separation from Consert. Appx21883.

The 2013 Agreement included a merger clause stating that it superseded the parties' prior agreements, including the disputed 2010 Employment Agreement and 2010 Inventions Agreement (and thus, by necessary implication, the 2007 Assignment). Appx21888.

After the 2013 Agreement, Mr. Forbes filed and prosecuted the application that eventually become the '268 Patent. Appx21883-21884; Appx320-321. That patent claimed priority to a patent application expressly listed in the 2013 Agreement as an "Excluded Patent"—Application No. 13/463,761, which issued as U.S. Patent No. 8,805,552. Appx21883-21884; *see* Appx265-266; Appx320-321. The '761 Application was a continuation-in-part of a continuation of a division of the '909 Application. *See* Appx265-266.

In February 2022, months after Causam filed its complaint in the ITC, L+G executed a quitclaim assignment by which it purported to assign its "rights, titles, and interests, *whatever they may be*," to Resideo. Appx21717 (emphasis added). Based on that assignment, Resideo challenged Causam's standing to assert the '268 Patent.

## D. Procedural history

### 1. Complaint and proceedings

On July 28, 2021, Causam filed an ITC complaint alleging that Resideo and the other Intervenors had violated Section 337 by selling for importation, importing, and selling after importation certain smart thermostats or other devices that infringed U.S. Patents Nos. 8,805,552; 9,678,522, 10,394,268, and 10,396,592 (collectively the Asserted Patents). *See* Appx437-438. The investigation was initially assigned to ALJ Shaw but reassigned to CALJ Cheney two weeks before the evidentiary hearing. Appx4017.

The evidentiary hearing took place from June 28 through July 1, 2022. There, Causam showed that Resideo's thermostats infringe at least claim 1 of the '268 Patent because they (1) receive demand-response messages from a utility's server, (2) respond by issuing power control

messages to controllable devices, and (3) generate timestamped runtime data that indicates how long those controllable devices were powered during the demand response event. *See* Appx67-71 (overview of Resideo's Accused Products).

Causam also introduced evidence that it owns the '268 Patent and therefore had standing to assert its claims. Resideo had argued that the quitclaim assignment from L+G had vested Resideo with ownership of that patent. Causam explained that the 2007 Assignment was irrelevant because the '268 Patent was not within its scope, as confirmed by the 2013 Agreement wherein Mr. Forbes licensed the ancestor of the '268 Patent to L+G for $300,000 and other consideration.

**2. The Initial Determination**

On November 16, 2022, CALJ Cheney issued an initial determination ("ID") finding no violation of Section 337 for two reasons.

*First*, the CALJ ruled that Causam lacked standing. The CALJ reasoned that the 2007 Assignment had operated to transfer all rights in the Asserted Patents (all of which were invented *years* after the 2007 Assignment) to Consert, and that there was no subsequent assignment reassigning those rights to Mr. Forbes. Appx42-48.

*Second*, the CALJ found no infringement based on certain claim constructions, including of the limitations of generating "measurement and verification data," Appx78-89, and receiving a "power control message," Appx74-78.

Regarding the measurement and verification data, the CALJ ruled that the runtime data Resideo generates is not "measurement and verification data" because it is *insufficient* alone (*i.e.*, without accompanying power measurements) for performing measurement and verification. Appx78-79. That holding contradicted the CALJ's domestic industry analysis, which held that L+G's Gridstream product "generates measurement and verification data" because it generates "runtime data," which is "*for* measurement and verification." Appx155-156 (emphasis added).

On "power control message," the CALJ ruled that, (1) rather than having to indicate "*at least one*" of an "amount of electrical power … and … an identification of [a] controllable device," a "power control message" must convey *both*; and (2) Resideo's demand response messages indicate *neither*, either literally or under the doctrine of equivalents. Appx74-78 (emphasis added). Relevant here, the CALJ ruled that,

despite including the IP address indicating the targeted Resideo thermostat and its relays, Resideo's demand response messages do not indicate a "controllable device." Appx74-78. The CALJ provided *no explanation* for why he had rejected Causam's argument on this point.

*Finally*, the CALJ ruled that Intervenors had failed to prove that any of the Asserted Patents are invalid. Appx199.

### 3. Commission review

Causam petitioned the Commission for review of the ID, and Intervenors filed a conditional petition for review. Both sides cited the conflicting reasoning in the infringement and domestic-industry analyses as a reason to review.

Causam sought review of the CALJ's incorrect standing decision, including his incorrect reading of the 2007 Assignment and 2013 Agreement, and the CALJ's incorrect infringement decisions. The Intervenors sought review of the CALJ's domestic industry ruling and its ruling that the patents were not invalid.

The Commission determined that it would review "(1) the final ID's findings as to Causam's standing to assert infringement of the asserted

patents; (2) the final ID's findings on obviousness; and (3) the final ID's domestic industry findings." Appx260.

Ultimately though, the Commission took "no position" on *any* of those issues. Appx260. Instead, it "adopt[ed] all findings in the final ID that are not inconsistent with the Commission's determination." Appx260. That left only the non-infringement determination, which the Commission thus adopted.

Causam timely petitioned this Court for review. *See* Doc. 1.

## SUMMARY OF THE ARGUMENT

**I.** Causam has standing to appeal because it owns the ’268 Patent. The 2007 Assignment of the ’909 Application did not assign away rights in the ’268 Patent because (1) it assigned only immediate descendants of the ’909 Application (which the ’268 Patent is not), and (2) it excluded continuations-in-part of the ’909 Application (which the ’268 Patent is, though multiple generations removed). The 2013 Agreement confirms this understanding of the 2007 Assignment by listing the ancestor of the ’268 Patent in a class of “Excluded Patents” that Consert *paid* to license from Mr. Forbes and thus acknowledged it did not own. Moreover, the 2013 Agreement *supersedes* the 2007 Assignment (as well as the 2010 Employment Agreement) and makes clear that the ’268 Patent was not assigned to Consert. Causam thus owns the ’268 Patent and has standing.

**II**. The Court should vacate and remand the Commission’s determination that Resideo’s products do not infringe claim 1 of the ’268 Patent because the determination is based on incorrect constructions of (1) “measurement and verification data” and (2) “power control message

indicating at least one of an amount of electric power to be reduced and an identification of at least one controllable device."

*First*, the Commission erred in finding that timestamped runtime data is not "measurement and verification data," within the meaning of claim 1. Rather than construe "measurement and verification data" as data "*for*" M&V, the Commission erred by construing the term as data "*sufficient* for" M&V. The Commission's construction contradicts the plain claim language and is unsupported by any intrinsic or extrinsic evidence. The construction also contradicts the CALJ's determination that the DI product (L+G's Gridstream) "generates measurement and verification data" because it generates "runtime data," which is "*for* measurement and verification." Appx155-156 (emphasis added).

*Second*, the Commission misconstrued the "power control message" limitations by improperly ruling that "at least one of" (1) an amount of power and (2) a controllable device means *both* of those things, and then failing to provide *any* rationale for rejecting Causam's argument that Resideo's messages identify controllable devices and their internal relays by IP address. Those are procedural and substantive errors.

The Commission's order should be vacated and the case remanded.

# ARGUMENT

## I. Causam has standing because it owns the ’268 Patent.

Causam owns the ’268 Patent, and it therefore has standing to pursue this appeal.

This Court “does not sit to review what the Commission has not decided.” *Beloit Corp. v. Valmet Oy*, 742 F.2d 1421, 1423 (Fed. Cir. 1984). Accordingly, this Court lacks jurisdiction to review the Commission’s non-decisions on domestic industry and obviousness. However, even though the Commission similarly took no position on Causam’s ownership of the asserted patents, this Court has an obligation to assure itself of its subject-matter jurisdiction over this appeal. *E.g.*, *Corus Grp. PLC v. ITC*, 352 F.3d 1351, 1357 (Fed. Cir. 2003). Accordingly, Causam addresses the question of standing. *Id.* (“Since the question of standing goes to this Court’s jurisdiction[,] we must decide the issue even though the court below passed over it without comment.” (cleaned up)).

### A. Standard of review

Because the Commission made no ruling on standing, this Court of necessity must make a standing determination in the first instance on a blank slate. The standard of review would be no different if the Court were to consider the vacated standing ruling in the ID. The Court

"review[s] determinations of standing *de novo*." *Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012). The CALJ's standing reasoning hinged on the interpretation of the contracts between the parties, and this Court reviews *de novo* a lower tribunal's interpretation of a contract. *Agility Logistics Servs. Co. KSC v. Mattis*, 887 F.3d 1143, 1148 (Fed. Cir. 2018), *as amended* (June 11, 2018).

**B. Causam owns the '268 Patent.**

Mr. Forbes is the sole inventor of the '268 Patent. Appx320; *see also* Appx265, Appx294, Appx347. Thus, barring some assignment either by agreement or operation of law, he owned that patent when it issued. 35 U.S.C. § 101. Because Mr. Forbes then assigned the patent to Causam, Causam is its sole owner. Appx320; *see* Appx265, Appx294, Appx347 (listing Causam as the patents' assignee).

Resideo argued that the 2007 Assignment reached and assigned the '268 Patent, and that as a result, absent some re-assignment of that patent back to Mr. Forbes, the patent's ownership was vested first in Consert (through its purchase of America Connect's assets) and then in Resideo by its quitclaim purchase of Consert successor L+G's interests. In Resideo's view, the language of the 2007 Assignment reached far

beyond its narrow-on-its-face scope and assigned every future invention claiming priority to any portion of the ’909 Application to Consert (or its successors), for all time.

The 2007 Assignment could not reach the ’268 Patent for two independent reasons. *First*, under this Court’s precedent, an assignment using the words used in the 2007 Assignment assigns only the immediate (*i.e.*, first-generation) descendants of the assigned application. *Second*, the 2007 Assignment did not reach continuations-in-part, and the ’268 Patent is a descendant of a continuation-in-part.

The only other document that could have operated to assign the patents to Consert (and through it to Intervenors) is the 2010 employment agreement’s incorporated intellectual-property agreement. But the 2013 Agreement expressly superseded that 2010 agreement (and also the 2007 Assignment), and it reflected that both Mr. Forbes and Consert properly understood the 2007 Assignment’s scope to exclude Mr. Forbes’s later inventions. Because Causam owns the ’268 Patent, it has standing to assert it against Resideo.

### 1. The 2007 Assignment did not assign away rights to the '268 Patent.

Resideo argued that Causam lacked standing due to the 2007 Assignment, by which Mr. Forbes assigned the "right, title, and interest in and to any and all patents which may be granted" for the "Invention"—to wit, "System and Method for Active Power Load Management," U.S. Patent Application No. 11/895,909—and "all divisions, reissues, continuations and extensions thereof." Appx21595. Resideo argued that this last phrase meant that the 2007 Assignment assigned *every* descendant patent of the '909 Application, no matter how many generations removed from—and no matter how tenuous its relationship to—the '909 Application.

That argument rested on two legal errors. First, an assignment using the language of the 2007 Assignment operates to cover only "the exact invention embodied by the … [a]pplication; its reissues or extensions; and its *immediate* lineal descendants, including divisionals [and] continuations." *Univ. of W. Va., Bd. of Trs. v. VanVoorhies*, 342 F.3d 1290, 1295 (Fed. Cir. 2003) (emphasis added). As this Court held in *VanVoorhies*, that language does not assign further generations beyond those immediate, first-generation descendants. *Id.* at 1295-96.

Accordingly, the 2007 Assignment did not grant Consert or its assignees any interest in the ’268 Patent, which is not an immediate descendant of the ’909 Application.

The open-ended construction of the 2007 Assignment Resideo advanced would chill innovation. Patents are the reward for inventors’ time, research, and development of new inventions. *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 480 (1974). Here, Mr. Forbes continued to develop new inventions related to the subject matter of the ’909 Application even after he left Consert—including the inventions claimed in the ’268 Patent. If the patents covering inventions Mr. Forbes developed after leaving Consert all belong *ab initio* and for all time to a company that no longer employs him, he would have no incentive to continue inventing new demand response technologies.

The second error in Intervenors’ contention is that the ’268 Patent descended from a continuation *in part* of the non-immediate descendants of the ’909 application. *See* Appx265-266; Appx294-295; Appx320-321; Appx347-348. Thus, even if the 2007 Assignment could be construed to reach past the immediate descendants of the ’909 Application, that assignment cannot reach the ’268 patent because the 2007 Assignment

omitted continuations-in-part from its scope. *See VanVoorhies*, 342 F.3d at 1297 (explaining that a continuation-in-part "partly continues subject matter disclosed in a prior application, but it adds new subject matter not disclosed in the prior application").

The parties' other agreements demonstrate that they appreciated this significant distinction between continuations and continuations-in-part: in those later agreements, the parties expressly chose to *include* continuations-in-part among their definitions of patents to which assignments applied. *See* Appx21881 (2013 Agreement); Appx21769 (2010 Agreement ¶ 3(e)). Consequently, if this Court concludes that—contrary to precedent—the 2007 Assignment reaches beyond the first generation of descendants of the '909 application, it should nevertheless still reject Resideo's position because the scope of the assignment did not reach continuations-in-part. Either way, Resideo's contention—that the 2007 Assignment reached inventions Mr. Forbes did not invent until over half a decade after that assignment was executed—cannot stand.

### 2. The 2013 Agreement confirms that Causam owns the '268 Patent.

**a.** Following the disputes surrounding Mr. Forbes's departure from Consert, the parties entered into the 2013 Agreement, expressly

*licensing*—for significant consideration—a collection of "Excluded Patents" to Consert. The Excluded Patents were so called because they fell *outside* the scope of the "Consert Patents," which the parties agreed would belong to Consert.

The 2013 Agreement unequivocally stated that those Excluded Patents were Mr. Forbes's property. The grandparent of the '268 Patent was listed among the Excluded Patents. Appx21883 (listing the '761 application); *see* Appx265 ('552 Patent). Thus, according to the 2013 Agreement—the parties' binding last word on the patents' ownership—Mr. Forbes owned the '268 Patent when he assigned it to Causam.

When interpreting a contract, courts "give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) (quotation marks omitted). Here, the parties' intentions could not be clearer: they negotiated and executed the 2013 Agreement to "clearly delineate their ownership of the patent rights listed" in the agreement, because Consert "desire[d] sole ownership of certain United States patents and patent

applications," and Mr. Forbes "desire[d] to grant non-exclusive license rights to other patent applications" to Consert. Appx21880.

Here, moreover, the 2013 Agreement reflects Consert's awareness that it *did not own* the Excluded Patents, because it agreed to pay hundreds of thousands of dollars for a license to use them. Appx21885-21886. Such an express recognition of a lack of ownership rights "serves to remove any uncertainty arising from the language" of a prior agreement. *See IpVenture, Inc. v. Prostar Comput., Inc.*, 503 F.3d 1324, 1327 (Fed. Cir. 2007).

**b.** Resideo cannot plausibly argue that any other agreement—for example, Mr. Forbes's contested 2010 employment agreement—gave it any ownership rights in the '268 Patent. The 2013 Agreement contained an integration clause that expressly stated that it superseded all prior agreements between the parties—even going so far as to expressly identify the 2010 Agreement (and its incorporated intellectual property agreement) as one such superseded contract. Appx21888.

Even if the contract had not specified as much, Delaware law (which governs interpretation of the 2013 Agreement, Appx21888) compels the same result by operation of law: it "recognizes that where a

new, later contract between the parties covers the same subject matter as an earlier contract, the new contract supersedes and controls that issue, if the two agreements conflict." *Cabela's LLC v. Wellman*, 2018 WL 5309954, at *4 & n.63 (Del. Ch. Oct. 26, 2018) (collecting cases). Indeed, under that principle, even if the scope of the earlier 2007 Assignment could be read as sufficiently ambiguous to possibly encompass the Asserted Patents (and it cannot), the 2013 Agreement clarifies that the parties did not view them as within the scope of that earlier assignment, because it recognizes that Mr. Forbes owned them from the time he invented them.

**c.** Further, to the extent any ambiguity remained concerning the parties' intentions in executing the 2013 Agreement, Causam introduced unrebutted extrinsic evidence at the evidentiary hearing. Mr. Forbes testified that the purpose of the agreement was to vest Consert with the rights in patents created while he was employed at Consert but to clarify that he maintained ownership of the patents he invented after he left. Consert/L+G's contemporaneous email correspondence confirmed that it shared that intent, explaining that Mr. Forbes "owns … and would grant a license" to Consert/L+G in the Excluded Patents. Appx22377. In the

years since the 2013 Agreement, it has been Mr. Forbes—not Consert—who has paid the patent maintenance fees for the Excluded Patents.

In short, both the express words of the parties' binding agreements and the extrinsic evidence show that Mr. Forbes owned the '268 Patent when he assigned it to Causam. Causam thus owns that patent, and it may assert it against Resideo.

## II. The ITC found non-infringement based on the incorrect construction of two claim terms.

The Commission's non-infringement determination turns on claim construction errors related to the phrases (1) "measurement and verification data" and (2) "power control message." The Court should correct the erroneous constructions, reverse the non-infringement determination based on them, and remand for resolution of any remaining issues.

### A. Standard of review

Claim constructions are legal conclusions. *Vanderlande Indus. Nederland BV v. ITC*, 366 F.3d 1311, 1318 (Fed. Cir. 2004). This Court reviews the Commission's legal conclusions *de novo* and any underlying factual findings for substantial evidence. *Swagway, LLC v. ITC*, 934 F.3d 1332, 1338 (Fed. Cir. 2019), *as modified* (Aug. 14, 2019). A determination

of infringement, whether literal or under the doctrine of equivalents, is a question of fact. *Bai v. L&L Wings, Inc.,* 160 F.3d 1350, 1353 (Fed. Cir. 1998).

### B. The Commission misconstrued "measurement and verification data" to exclude runtime data provided to measurement and verification vendors.

The Commission erred when it ruled that the "runtime data" Resideo's accused devices generate is not "measurement and verification" data. Appx78-79.

Claim 1 of the '268 Patent requires that an infringing device "generat[e] measurement and verification data." Appx344 (23:4).

Resideo generates "runtime data" indicating "when the HVAC equipment [was] running." Appx79; Appx22427-22428 (Q/A 221, 222).

As one of Resideo's co-respondents ultimately admitted, this "runtime information is the M&V data." Appx20886. Indeed, the "International Performance Measurement and Verification Protocol"—the "de-facto protocol for measurement and verification," Appx22688—describes "runtime" data as an input for measurement and verification. Appx22759. And that is why Resideo and its co-respondents make their runtime data "available for the utility and its EM&V vendor"—because

those entities can "use … [the] runtime information … to come up with the actual results of [the] EM&V valuation." Appx22427-22428 (Q/A 221, 222).

Nevertheless, the Commission ruled that runtime data is *not* M&V data. It reasoned that "measurement and verification data" is not data "*for* measurement and verification"—as the CALJ had held in his DI analysis, Appx155 (emphasis added)—but data *sufficient for* measurement and verification. *See* Appx78-79 (rejecting runtime data as M&V data because it is "*insufficient* for measurement and verification") (emphasis added). Because runtime data is only one input for measurement and verification, the Commission held that runtime data is not "measurement and verification data," as recited.

The Commission erred because (1) the proper construction of "measurement and verification data" is "data *for* measurement and verification," not "data *sufficient* for measurement and verification," (2) nothing in the Commission's analysis justifies a contrary conclusion, and (3) the runtime data Resideo generates is "data *for* measurement and verification."

### 1. The proper construction of "measurement and verification data" is "data *for* measurement and verification."

"[C]laim construction must begin with the words of the claims themselves." *In re Power Integrations, Inc.*, 884 F.3d 1370, 1376 (Fed. Cir. 2018) (quoting *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 457 F.3d 1293, 1301 (Fed. Cir. 2006)). Here, the plain English meaning of "measurement and verification data" is "data *for* measurement and verification," not data *sufficient for* measurement and verification. Consider an analogy. If a college admissions office evaluates applicants using two inputs—grades and test scores—then one input alone (*e.g.*, grades) is "applicant evaluation data." That is so even though the grades *alone* are insufficient to fully evaluate an applicant. Likewise, if a utility measures and verifies power savings using two inputs (runtime data and power measurements), then one input alone (*e.g.*, runtime data) is "measurement and verification data." And that is so even though the runtime data *alone* is insufficient to perform measurement and verification. The plain language meaning of the phrase "measurement and verification data" is therefore data *for* measurement and verification.

Nothing in the specification of the ’268 Patent suggests otherwise. The written description does not define “measurement and verification data” in any way, let alone limit it to data *sufficient* to perform measurement and verification. Rather, the specification only describes the “measurement and verification” *process* used to “calculate the amount of power (*e.g.*, in megawatts per hour) that was saved for each active load client.” Appx336 (7:11-35); Appx343 (21:46-56). That process, as described in the specification, requires recording the baseline power consumption of each device (Appx336 (7:11-27)), and later comparing that data to *runtime data* to determine the amount of power used. (Appx343 (21:46-56)). Because the runtime data is used for measurement and verification, it is “measurement and verification data.” The specification includes no disclaimer or disavowal defining “measurement and verification data” as *all* the data necessary for measurement and verification.

Nor does the extrinsic record suggest any such definition. The patent discloses that “measurement and verification methods may be determined by the appropriate governing body or authority for the electric power grid(s).” Appx336 (7:34-36). The “International

Performance Measurement and Verification Protocol"—which is the "de-facto protocol for measurement and verification," Appx22688—discloses that "runtime" data may be used alongside "power measurement[s]" to perform measurement and verification as described in the patent, Appx22759. That Protocol nowhere suggests that this runtime data is not "measurement and verification data."

Further, witnesses on both sides testified that runtime data is "measurement and verification data." For example, though Itron's corporate representative (Mr. Ng) insisted in his witness statement that runtime information is *not* measurement and verification data, Appx22528, he admitted at deposition and during live testimony at trial that "runtime information is the M&V data." Appx20886 ("Q. Okay. And so we just spoke about lines 4 through 9 of your deposition on page 55, and in that section the question asked: 'What is M&V data?' And you testified that runtime information is the M&V data. Is that correct? A. That's correct."). Likewise, Causam's expert (Dr. Madisetti) testified that the "[r]untime data generated by the Resideo smart thermostat is measurement and verification data because it is used by demand

response platforms and programs to measure and verify demand response savings." Appx22113.

Thus, nothing in either the intrinsic or extrinsic record justifies deviating from the plain English meaning of the phrase "measurement and verification data," which is simply "data for measurement and verification." There is no basis to further require that "measurement and verification data" include *all* data necessary to perform the measurement and verification.

#### 2. The Commission misconstrued "measurement and verification data" as "data *sufficient* for measurement and verification."

None of the reasoning and evidence cited by the Commission justified its construction of "measurement and verification data" as data *sufficient* to perform measurement and verification.

*First*, the Commission cited the specification's disclosure that a utility (*i.e.*, "the control center") can use "measurement and verification" procedures to calculate a "power supply value" ("PSV") reflecting "the reduction in consumed power." Appx73, Appx78 (citing Appx336 (7:28-63)). The Commission held that, because calculating the PSV requires

"meter data," "measurement and verification" data must include meter data (not only runtime data). Appx78.

That reasoning begs the question. Although performing "measurement and verification" (*e.g.*, calculating a PSV) does require some actual power measurements (*e.g.*, meter data), that does not mean that the *other* data used in the calculation (*e.g.*, runtime data) is not "measurement and verification data." The Commission simply assumed that conclusion without justifying it.

*Second*, the Commission relied on its misunderstanding that the inventor (Mr. Forbes) had testified "that 'measurement' is taking a raw measurement *from a meter*." Appx78 (citing Appx20357-20358) (emphasis added). That was not Mr. Forbes's testimony. Here is the testimony the Commission cited:

> Q. And so the first step to performing measurement and verification is that you have to have an accurate power measurement; is that right?
>
> A. Again, the measurement can be in the form of an actual KW measurement. ***It can be in the form of a runtime data measurement.*** It can be in the form of a duty cycle measurement. But, yes.

Appx20357 (ll. 15-21) (emphasis added). Thus, Mr. Forbes did not testify "that 'measurement' is taking a raw measurement *from a meter*." Appx78

(emphasis added). To the contrary, he testified expressly that meter data was only one type of "measurement" and that "runtime data" is another. Appx20357. The Commission's mischaracterization of Mr. Forbes's testimony is unsupported by substantial evidence.

*Finally*, when the Commission applied its construction to determine non-infringement, it cited the non-infringement opinion of Resideo's expert, Mr. Paradiso. Appx79 (citing Appx22428 at Q/A 226-228). The Commission appears to have cited this testimony only to support its non-infringement determination—not its claim construction. Indeed, the cited portions of Mr. Paradiso's testimony contain no opinions related to claim construction. Instead, they merely show Mr. Paradiso applying the same erroneous construction as had the Commission—namely, concluding that runtime data is not "measurement and verification data" because "runtime data is *insufficient* for measurement and verification." Appx22428 (Q/A 228).

To whatever extent this testimony could be understood as an opinion about claim construction, it carries no weight because "unsupported assertions by experts as to the definition of a claim term are not useful." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir.

2005). And here, Mr. Paradiso provided no explanation for why a skilled artisan would have understood the phrase "measurement and verification data," read in light of the specification, to be "data *sufficient* for measurement and verification."

As shown above, the Commission provided no reasoning or fact finding sufficient to justify its legal conclusion that—contrary to the plain language of the claims—the phrase "measurement and verification data" in the '268 Patent refers to data *sufficient* for M&V, rather than to data *for* M&V.

**3. Under the proper construction, Resideo generates "measurement and verification data."**

When "measurement and verification data" is properly construed as data *for* measurement and verification, the runtime data Resideo generates plainly qualifies. Resideo's own expert Mr. Paradiso testified that "Resideo tracks runtime data." Appx22428 (Q/A 226). Causam's expert Dr. Madisetti agreed. Appx22113-22116. And so did the Commission. Appx70.

The runtime data Resideo generates is data *for* M&V because (1) the patent describes such runtime data as data for M&V, (2) so does

the International Performance Measurement and Verification Protocol, and (3) Resideo (and other respondents) send runtime data to M&V vendors so they can use that data for M&V. On the other side, nothing in the record shows that runtime data is not data *for* M&V.

*First*, as noted above, the specification expressly teaches using runtime data for M&V (*e.g.*, by multiplying baseline power consumption measurements by the outage lengths indicated by the runtime data). Specifically, the system first records a baseline energy consumption for each device. Appx336 (7:11-27). Then, to calculate the power saved during a "Cut" event, the system uses (1) the baseline to determine "the actual amount (or average amount) of power that would have been used by the active load client during the last 'Cut' event," and (2) the runtime data to determine "the amount of time that each controllable device associated with the active load client was turned off." Appx343 (21:46-56). "The power savings application uses this information to calculate the amount of power (e.g., in megawatts per hour) that was saved for each active load client." Appx343 (21:46-56); This disclosure plainly shows that runtime is data *for* M&V.

*Second*, the extrinsic record confirms that runtime data is used for M&V, as described in the patent. As highlighted above, the International Performance Measurement and Verification Protocol discloses that "runtime" data may be used alongside "power measurements" to perform M&V, just as the patent describes. Appx22759 ("Determination of energy savings may involve measuring the time that a piece of equipment is on, and then multiplying it by a short term power measurement.... This ... provides a reasonably priced, simple to install approach for energy savings calculations."). That evidence confirms that runtime data is data *for* M&V.

*Third*, the testimony of respondents' expert and corporate representative confirms that runtime data is *for* M&V because that testimony showed that Resideo and the other respondents provide runtime data *to M&V vendors*. *See* Appx22427 (Q/A 221) (Mr. Paradiso testifying that Itron "makes [runtime data] available for the utility and its EM&V vendor"); Appx22528 (Q/A 112) (Itron's corporate representative testifying that runtime data is "made available to the utility and its EM&V vendor"). None of those witnesses explained why the Intervenors provide runtime data to M&V vendors if not *for* M&V.

At one point, Mr. Paradiso did opine that runtime data is not "measurement and verification data" because "[r]untime is not an accepted parameter for doing M&V." Appx22428 (Q/A 224).

The Commission did not even cite that testimony, let alone adopt either its factual premise (that runtime data is not an accepted parameter for doing M&V) or its legal conclusion (that runtime data is therefore not "measurement and verification data" within the meaning of the '268 Patent). For the sake of completeness, we explain why the Commission could not have adopted either the factual premise or the legal conclusion.

*First*, the Commission could not have found the factual premise (that runtime data is not an accepted M&V parameter) because that premise contradicts the extrinsic record, including at least (1) the International Performance Measurement and Verification Protocol's description of using runtime data for M&V (Appx22759), (2) Mr. Paradiso's and Mr. Ng's testimony that the respondents send runtime data to M&V vendors (Appx22427 (Q/A 221) and Appx22528 (Q/A 112)), and (3) Mr. Ng's express admission that "runtime information is the M&V data" (Appx20886).

*Second*, even if the Commission *had* found as a fact that runtime data is not an accepted M&V parameter in the industry (it did not), that would still not have supported the *legal* conclusion that runtime data is therefore not for M&V *in the context of the '268 Patent*. "The only meaning that matters in claim construction is the meaning in the context of the patent." *Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016). And here, the patent specification itself suggests using runtime data for M&V. Appx336 (7:11-27). Consequently, runtime data is M&V data *in the context of the patent*, notwithstanding *any* extrinsic evidence, including Mr. Paradiso's testimony. *See Phillips*, 415 F.3d at 1324 (extrinsic evidence may not contradict the intrinsic record); *Sequoia Tech., LLC v. Dell, Inc.*, 66 F.4th 1317, 1324-25 (Fed. Cir. 2023) (finding that the "district court clearly erred in considering … expert testimony, which is [] inconsistent with the intrinsic evidence").

In sum, the runtime data Resideo generates and makes available to M&V vendors is data *for* M&V. The runtime data is therefore "measurement and verification data" under the correct construction.

### C. The Commission misconstrued the "power control message" requirement.

The Commission erred by determining that Resideo's Internet-connected thermostats do not receive "power control message[s]" within the meaning of the '268 Patent.

Claim 1 recites that the "power control message" must indicate "at least one of" (1) "an amount of electric[al] power" and (2) "an identification of at least one controllable device." Appx343-344.

It was undisputed that Resideo's smart thermostats receive demand response messages over the Internet, including both temperature-based instructions (to either set the temperature to a given setpoint or adjust an existing setpoint by a given amount) and "duty cycle" instructions (to limit the percentage of time that the thermostat can run the HVAC equipment during the demand response event). Appx4198-4203.

Causam argued that both types of demand response messages indicate both "an amount of electric power" and "a controllable device," either literally or under the doctrine of equivalents. The Commission rejected *all eight* arguments. Appx74-78.

The Commission's analysis includes at least two errors that demand remand or reversal. *First*, in a direct contradiction of the CALJ's construction for purposes of DI (Appx148), the Commission misconstrued "*at least one of*" an "[1] amount of electrical power … and [2] an identification of at least one controllable device" to mean *both* an "amount of electric[al] power … and an identification of a controllable device." Appx74, *see* Appx343 (emphasis added). It provided no justification of why it had adopted that construction. *Second*, the Commission ruled that Resideo's demand response messages do not indicate a "controllable device," but it provided no explanation of that conclusion either. Appx74-78; Appx4201-4202. At minimum, these errors require a remand.

**1. The Commission misconstrued "at least one of" to mean "both."**

The Commission construed the phrase "indicating *at least one of* [1] an amount of electric power to be reduced and [2] an identification of at least one controllable device," Appx343 (emphasis added), to require indicating *both* of those things. Appx74; *see also* Appx4106-4108. That construction is procedurally deficient because it contradicts the CALJ's construction of that same phrase in the DI analysis *and* is unsupported by *any* reasoning. The construction is also wrong on the merits because

it contradicts the claim language, its context, and the specification. The Court should modify the construction.

For purposes of the DI analysis, the CALJ correctly ruled that

> [the] "power control message" must indicate "at least one of" **<u>two possible options</u>**: (1) "an amount of electric power to be reduced," **<u>or</u>** (2) "an identification of at least one controllable device to be instructed to disable the electric power flow to the at least one associated power consuming device."

Appx148 (emphasis added). Yet, for the infringement analysis, the same CALJ ruled that

> [t]he "power control message" limitations have **<u>two requirments</u>** [*sic*]: (1) an identification of an amount of electric power to be reduced, disabled, or enabled, **<u>and</u>** (2) an identification of at least one controllable device to be instructed to enable or disable a flow of electric power to one or more associated power consuming devices.

Appx74 (emphasis added).

The CALJ provided no explanation of why either construction was correct, let alone attempted to reconcile the facial contradiction.

In its petition for review, Causam argued that the disjunctive construction used in the DI analysis is the correct one. Appx4433-4435. Nevertheless, the Commission adopted the infringement analysis, and

thereby, the conjunctive construction used in it. Again, the Commission provided no explanation for that choice.

As a threshold matter, the Commission erred by offering no analysis supporting its decision to construe "at least one of" to mean both. *See* Appx74. The Court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Kelly v. United States*, 69 F.4th 887, 895 (Fed. Cir. 2023) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) & *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). Consequently, at a minimum, remand is necessary for the Commission to explain its decision.

The Commission's chosen construction is also wrong on the merits because it contradicts the claim language, the context in which that language appears, and the teachings of the specification.

*First*, the Commission's construction is contrary to the claim language as a simple matter of syntax. The phrase "one of" refers to a single member of the group following that phrase. Thus, if a bowl holds an apple and a pear, "one of the fruits in the bowl" refers to *either* the apple *or* the pear. The phrase retains this same meaning when the group is defined as a list instead of by a collective name. Thus, "one of the apple

and the pear in the bowl" still refers to *either* the apple *or* the pear, not to both. The expanded "*at least* one of" simply means that multiple members of the group can be chosen (*e.g.*, the apple, the pear, or both). And indeed, this is how other courts have interpreted this claim language. *See Inventio AG v. ThyssenKrupp Elevator Ams. Corp.*, 2014 WL 129799, at *3 (D. Del. Jan. 14, 2014) (resolving dispute over the phrase "at least one of [A] and [B]" and ruling "it is evident to the Court that the plain meaning of the disputed phrase means the presence of [A], [B], or [A] and [B]").

*Second*, the surrounding context confirms this understanding of the claim scope because the claim drafter used the same phrase structure ("at least one of [A] *and* [B]") in other claims to signify "*either* [A] *or* [B] or both." For example, claim 4 requires generating a report indicating "a compensation," wherein the compensation includes "at least one of: capacity compensation, energy compensation, operating reserves compensation, ancillary services compensation, compensation for other grid stabilizing services, voltage support, black start, cold load pick up, conservation voltage reduction, **and** other reserve services." Appx344 (emphasis added). It would be unreasonable to interpret that claim

language to require the report to include every one of the at least ten listed measures. It is yet more unreasonable to understand the purpose of the phrase “at least one of” in this claim to contemplate that a single report would include *multiple instances* of each of the eleven measures.

*Third*, the Commission’s construction is contrary to the specification. In every disclosed embodiment, the client device receives *either* (1) an amount of electric power to be reduced *or* (2) an identification of at least one controllable device to be instructed to disable the electric power flow—not both. For example, in one embodiment, the client device (*i.e.*, the “active load client”) receives only “a list of the devices to be turned off and a ‘change state to off’ indication for each device in the list”—*i.e.*, only “an identification of at least one controllable device to be instructed to disable the electric power flow to at least one associated power consuming device.” Appx342 (20:41-45). The power control message in that embodiment does not include any indication of “an amount of electric power to be reduced.” Thus, requiring the recited “power control message” to always indicate *both* the amount of power to be reduced *and* a “controllable device” excludes every disclosed embodiment.

The use of "at least one of [A] or [B]" in other claims and the specification's teachings of "power control messages" that identify either an "amount of electricity" or a "controllable device" but not both distinguish this case from the one instance where this Court did construe "at least one of [A and B]" to mean "one of [A] and one of [B]." *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 884-85 (Fed. Cir. 2004). As other courts have frequently observed, the holding in *SuperGuide* was "based on the particular facts of the particular patent at issue there." *Fujifilm Corp. v. Motorola Mobility LLC*, 2015 WL 1265009, at *8 (N.D. Cal. Mar. 19, 2015) (collecting cases). In *SuperGuide*, both items listed after the "at least one of" phrase were themselves "categories," and "[e]very disclosed embodiment [taught] that the user must choose a value for each designated category." 358 F.3d at 887. The situation here is the opposite, where the specification discloses embodiments where the "power control message" includes *either* "an amount of electricity to be reduced" *or* "identification of at least one controllable device to be instructed" rather than both.

Thus, consistent with the plain meaning of the phrase "at least one of," and with the '268 Patent's specification, "a power control message

indicating *at least one of* [1] "an amount of electric power to be reduced" and [2] "an identification of at least one controllable device" means a "power control message" indicating either an amount of electrical power or one controllable device or both—but not necessarily both.

#### 2. The Commission construed "identification of at least one controllable device" to require an explicit identification of *only one* controllable device.

The Commission erroneously construed "an identification of at least one controllable device" to exclude an identification of multiple controllable devices—both literally and under the doctrine of equivalents. Once again, the Commission's ruling lacked *any* reasoned basis for its legal conclusion and factual finding. Appx74. And again, the Commission's conclusions were wrong on the merits.

**a.** The '268 Patent discloses that each residential or commercial site includes an Internet-connected "active load client" ("ALC"), which receives power management commands and responds by manipulating electrical flow to "power-consuming devices." Appx336-337 (7:5-6, 8:29-9:6). The power management commands can instruct the ALC "to turn off all or some of the devices under the [its] control." Appx338 (11:28-37).

Claim 1 captures both possibilities by reciting that the ALC receives a "power control message *indicating* … at least one controllable device to be instructed to disable the electric power flow to at least one associated power consuming device." Appx343 (22:59-64) (emphasis added). As Causam argued below, "indicat[ing]" a controllable device does not require identifying the device "by name and address." Appx4107-4108. Instead, the controllable device can be identified implicitly, such as by identifying an associated device. *Id.*

It is undisputed that Resideo's thermostats receive demand response messages over the Internet. Appx67. It is thus undisputed that those messages identify the thermostats (and thus, the subcomponents of those thermostats) by IP address. It is further undisputed that the messages instruct the thermostats to reduce power consumption, which is done by disabling power to all or some power-consuming devices associated with the thermostats (*e.g.*, HVAC equipment). Appx75. Finally, it is undisputed that Resideo's thermostats disable that power by manipulating internal "relays" associated with the power-consuming devices. Appx69-70.

Causam argued that the demand response messages received by Resideo's thermostats over the Internet are power control messages "indicat[ing] … at least one controllable device," both literally and under the doctrine of equivalents. Specifically, it argued that the messages include an IP address identifying the target thermostat, and by implication, the internal relays the thermostat uses "to disable the electric power flow to at least one associated power consuming device." Appx4201. Those relays—like the thermostats in which they are housed—are identified by the thermostat's IP address. The thermostat may adjust only its own relays, not those associated with another thermostat, and thus, another IP address.

That the IP address may identify *multiple* relays is permissible under claim 1 because that claim recites that the singular "identification" is "*of at least* one controllable device." Thus, claim 1 does not require that each "controllable device" is *individually* addressable.

The demand response messages Resideo's thermostats receive are therefore "power control message[s]" that include "an identification of at least one controllable device to be instructed to disable power the electric power flow to at least one associated power consuming device." Resideo's

servers (the "load management server[s]") send messages IP addressed to the thermostats (the "client device[s]") and instructing them to open or close relays (implicitly identified "at least one controllable device" corresponding to the thermostat's IP address) to enable or disable power flow to those HVAC units ("at least one associated power consuming device"). *See* Appx69-70 (noting that software within the thermostat's processor "turns on or off virtual relays in response to a demand" message and that when "[a]ll of the virtual relays [are] off," the "physical relay [will] be open").

Both the Commission and Intervenors made much of the fact that, in some Resideo products, the "relays are not a *separate* device"—*i.e.*, they are within the thermostat's housing. Appx69 (emphasis added). But nothing in the claim language requires the "controllable device" to be physically separate from the "client device" (*see generally* Appx343 cl. 1).

**b.** Even if claim 1 requires that the "controllable device" be individually addressed (it does not), Resideo's power control messages still infringe under the doctrine of equivalents. Appx22108 (expert testimony); Appx4202-4203. "An element in the accused product is equivalent to a claim limitation if the differences between the two are

'insubstantial' to one of ordinary skill in the art." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 813 (Fed. Cir. 2002). Equivalence "does not require complete identity for every purpose and in every respect." *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 609 (1950). Rather, equivalence "may be determined by whether the accused device 'performs substantially the same function in substantially the same way to obtain the same result' as the claim limitation." *Catalina*, 289 F.3d at 813. Proof of equivalence "can be made in any form," including, as here, "through testimony of experts." *Graver Tank*, 339 U.S. at 609.

Here, Resideo's implicit identification is a legal equivalent. Resideo's power control messages perform substantially the same ***function*** as the recited power control messages: both messages identify at least one controllable device to be instructed to disable the electronic power flow to at least one associated power consuming device.

Resideo's power control messages accomplish that function in substantially the same ***way***: they include an IP address that unambiguously identifies the "controllable device." Appx95 (the ALJ opining that the '268 Patent "contemplate[s] that 'the identification of at

least one controllable device' to be instructed is via an IP address" (quoting Appx22439); *see also* Appx22440 (Mr. Paradiso opining that "the power control message would need to contain an identification such as an IP address"). That Resideo's IP address is assigned to the thermostat containing the "controllable device" rather than to the "controllable device" directly is not a substantial difference. Appx22108.

Finally, Resideo's power management message accomplishes the same ***result***: it informs the client device (thermostat) of the identity of the "controllable device" that is to be instructed. Resideo's power control messages (which impliedly identify the "controllable device") are therefore legally equivalent to power control messages that expressly identify the "controllable device."

**c.** The Commission rejected Causam's argument, but it offered *no* explanation of why. Appx74. The Commission's infringement analysis regarding "power control message" analyzed only Causam's argument that Resideo's power control messages identify an "amount of electric power to be reduced." *See* Appx74-78. The Commission thus analyzed neither Causam's literal infringement argument respecting the

identification of a controllable device nor Causam's doctrine of equivalents argument.

Because the Commission failed to analyze this issue, its decision leaves this Court with nothing to review. As with the Commission's unexplained decision to misconstrue "at least one of," here, the Court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Kelly*, 69 F.4th at 895. Consequently, a remand is necessary on this issue alone. *InterDigital Commc'ns, LLC v. ITC*, 690 F.3d 1318, 1329 (Fed. Cir. 2012) (The Court may not "uphold the agency's decision on a ground not ruled on by the agency.").

In sum, because a "power control message" (as recited in claim 1) is merely a message "indicating … an identification of at least one controllable device," and because Resideo's demand response messages use an IP address to identify a thermostat and its attendant relays (which are controllable devices that control power to power-consuming devices), Resideo's messages are "power control messages," within the meaning of claim 1.

## CONCLUSION

The Court should hold that Causam has standing, vacate the Commission's decision on infringement, and remand for resolution of the remaining issues.

Respectfully submitted,

*/s/Joshua N. Mitchell*
Jeffrey M. Telep
*Counsel of Record*
Joshua N. Mitchell
Jonathan Weinberg
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500
jmitchell@kslaw.com

Christopher C. Campbell
KING & SPALDING LLP
1650 Tysons Boulevard
Suite 400
McLean, VA 22102

Britton F. Davis
KING & SPALDING LLP
1401 Lawrence Street
Suite 1900
Denver, CO 80202

*Counsel for Appellant*

November 7, 2023

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned counsel for Appellant certifies that this brief:

(i) complies with the type-volume limitation of Federal Circuit Rule 32(a) because it contains 9,587 words, including footnotes and excluding the parts of the brief exempted by Federal Circuit Rule 32(b) and Federal Rule of Appellate Procedure 32(f); and

(ii) complies with the typeface and style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because this document has been prepared using Microsoft Office Word 365 ProPlus and is set in 14-point Century Schoolbook font.

Date: November 7, 2023

*/s/Joshua N. Mitchell*
Joshua N. Mitchell

# NONCONFIDENTIAL ADDENDUM

**PUBLIC VERSION**

**UNITED STATES INTERNATIONAL TRADE COMMISSION**

**Washington, D.C.**

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN SMART THERMOSTATS, LOAD CONTROL SWITCHES, AND COMPONENTS THEREOF** | **Inv. No. 337-TA-1277** |

**INITIAL DETERMINATION ON VIOLATION OF SECTION 337 AND RECOMMENDED DETERMINATION ON REMEDY AND BOND**

Chief Administrative Law Judge Clark S. Cheney

(November 16, 2022)

Pursuant to the Notice of Investigation, 86 Fed. Reg. 49345 (Sept. 2, 2021), and 19 C.F.R. §§ 210.10(b), 210.42(a)(1)(i), this is the final initial determination in the matter of *Certain Smart Thermostats, Load Control Switches, and Components Thereof*, Investigation No. 337-TA-1277.

For the reasons stated herein, I have determined that no violation of section 337 of the Tariff Act of 1930, as amended, has been demonstrated in the record of this investigation.

**PUBLIC VERSION**

**TABLE OF CONTENTS**


| | | |
|---|---|---|
| **I.** | **INTRODUCTION ……………………………………………………….….** | **1** |
| **II.** | **IMPORTATION, JURISDICTION, AND STANDING …………….……** | **16** |
| **III.** | **LEVEL OF ORDINARY SKILL IN THE ART …..…………………….….** | **27** |
| **IV.** | **CLAIM CONSTRUCTION – ALL ASSERTED PATENTS ……………** | **27** |
| **V.** | **INFRINGEMENT – ALL ASSERTED PATENTS ……………………..…..** | **40** |
| **VI.** | **DOMESTIC INDUSTRY – TECHNICAL PRONG ………….…………..** | **120** |
| **VII.** | **DOMESTIC INDUSTRY – ECONOMIC PRONG …………..……………** | **165** |
| **VIII.** | **VALIDITY ………..…………………………………………………..…….** | **177** |
| **IX.** | **OTHER DEFENSES ………..………………………………..…………..……** | **212** |
| **X.** | **CONCLUSIONS OF LAW ……………………………………………..……** | **224** |
| **XI.** | **RECOMMENDED DETERMINATION ON REMEDY AND BONDING** | **225** |
| **XII.** | **INITIAL DETERMINATION ON VIOLATION …………………………** | **232** |
| **XIII.** | **ORDER ……………………………………………………………...……..** | **232** |

**Table of Abbreviations**

| | |
|---|---|
| **CDX** | Complainant's demonstrative exhibit |
| **CIB** | Complainant's initial post-hearing brief |
| **CPX** | Complainant's physical exhibit |
| **CRB** | Complainant's responsive post-hearing brief |
| **CX** | Complainant's exhibit |
| **Dep.** | Deposition |
| **JX** | Joint Exhibit |
| **RDX** | Respondents' demonstrative exhibit |
| **RIB** | Respondents' initial post-hearing brief |
| **RPX** | Respondents' physical exhibit |
| **RWS** | Rebuttal Witness Statement |
| **RX** | Respondents' exhibit |
| **Tr.** | Transcript |
| **WS** | Witness Statement |

**PUBLIC VERSION**

# I. Introduction

## A. Procedural History

On July 28, 2021, complainant Causam Enterprises, Inc. ("Causam" or "Complainant"), filed a complaint alleging violations of section 337 based on the importation into the United States, the sale for importation, and the sale within the United States after importation of certain smart thermostats, load control switches, and components thereof. 86 Fed. Reg. 41991 (Aug. 4, 2021).

On September 2, 2021, the Commission instituted Investigation No. 337-TA-1277 to determine:

> [W]hether there is a violation of subsection (a)(1)(B) of section 337 in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain products identified in paragraph (2) by reason of infringement of one or more of claims 1–9, 16, 19–21, 23–28, and 30 of the '5,552 patent [U.S. Patent No. 8,805,552], claims 1–8, 10, 13–17, 19– 23, and 25–29 of the '8,522 patent [U.S. Patent No. 9,678,522], claims 1–11, 13–16, and 18–19 of the '268 patent [U.S. Patent No. 10,394,268], and claims 1–2, 8–9, 11, 13–14, and 17 of the '592 patent [U.S. Patent No. 10,396,592]; and whether an industry in the United States exists as required by subsection (a)(2) of section 337.

86 Fed. Reg. 49345 (Sept. 2, 2021) (hereinafter, "Notice of Investigation").

The plain language description of the accused products in the complaint defines the scope of the investigation. 19 C.F.R. § 210.10(b)(1). The products are described as "smart thermostats and load control switches with Demand Response functionality and components thereof." Notice of Investigation.

The Notice of Investigation named the following entities as respondents:

1. Alarm.com Holdings, Inc., of Tysons, Virginia;
2. Alarm.com Inc. of Tysons, Virginia;
3. Ecobee, Inc., of Toronto, Ontario, Canada;
4. EnergyHub, Inc., of Brooklyn, New York;
5. Itron, Inc., of Liberty Lake, Washington;

**PUBLIC VERSION**

6. Itron Distributed Energy Management, Inc., of Liberty Lake, Washington;
7. Resideo Smart Homes Technology (Tianjin) of Tianjin, China;
8. Resideo Technologies, Inc., of Austin, Texas; and
9. Xylem Inc. of Rye Brook, New York.

*Id.*

The Office of Unfair Import Investigations is not a party to this investigation. *Id.*

On October 14, 2021, the target date for this investigation was set at approximately 18.5 months, which makes this final initial determination due no later than November 16, 2022. Order No. 3 (Initial Determination Setting Target Date) (Oct. 14, 2021), *aff'd*, Commission Determination Not to Review an Initial Determination Setting the Target Date for Completion of the Investigation at Approximately 18.5 Months (Nov. 3, 2021).

The Commission affirmed the following initial determinations:

- Order No. 5 (Initial Determination Granting Motion to Intervene) (Oct. 22, 2021), *aff'd*, Commission Determination Not to Review an Initial Determination Granting a Motion by Alston and Bird LLP to Intervene in this Investigation for a Limited Purpose (Nov. 5, 2021);

- Order No. 7 (Initial Determination Granting Motion to Terminate the Investigation As to Xylem Inc. Based on Settlement Agreement) (Dec. 10, 2021), *aff'd*, Commission Determination Not to Review an Initial Determination Granting a Joint Motion to Terminate the Investigation as to Respondent Xylem Inc. (Jan. 10, 2022); and

- Order No. 12 (Initial Determination Granting Motion to Amend the Complaint and Notice of Investigation to Add Proposed Respondent Ademco Inc. and to Partially Withdraw the Complaint) (Apr. 21, 2022),[1] *aff'd*, Commission Determination Not to Review an Initial Determination Granting an Unopposed Motion to Amend the Complaint and Notice of Investigation and to Terminate the Investigation as to a Respondent and Certain Patent Claims (May 17, 2022).

[1] As a result of Order No. 12, (1) respondent Itron Distributed Energy Management, Inc., was terminated; (2) respondent Resideo Technologies, Inc., was terminated, and (3) Ademco Inc. was added as a new respondent. Hereinafter, "Respondents" refers to Alarm.com Holdings, Inc.; Alarm.com Inc.; Ecobee, Inc.; EnergyHub, Inc.; Itron, Inc.; Resideo Smart Homes Technology (Tianjin); and Ademco Inc.

On June 17, 2022, the investigation was reassigned to me. *See* Reassignment to CALJ Cheney; Setting Case Management Conference (June 17, 2022) (EDIS Doc. ID No. 773378).

A prehearing conference was held on June 28, 2022, with the evidentiary hearing commencing immediately thereafter. The hearing concluded on July 1, 2022. *See* Order No. 19 (June 24, 2022); P.H. Tr. 1-29; Tr. 1-1006. The parties were requested to file initial post-hearing briefs not to exceed 300 pages in length, and to file responsive briefs not to exceed 100 pages in length. *See* Tr. 957. On July 21, 2022, the parties filed a joint outline of the issues to be decided in the final initial determination. *See* Joint Outline of Issues to be Decided in the Initial Determination ("Initial Joint Outline") (EDIS Doc. ID No. 775939). On August 3, 2022, the parties filed a joint outline for the responsive briefs. *See* Final Joint Outline of Issues to Be Decided in the Initial Determination ("Final Joint Outline") (EDIS Doc. ID No. 777024).

## B. The Parties

### 1. Complainant Causam

Complainant Causam Enterprises, Inc. ("Causam" or "Complainant") is a Delaware corporation having its principal place of business at 8480 Honeycutt Road, Suite 200, Raleigh, NC 27615. Complaint, ¶ 9.[2]

### 2. Respondents

#### a. Alarm.com Respondents

Alarm.com Holdings, Inc., and wholly owned subsidiary Alarm.com, Inc., are Delaware corporations with a principal place of business at 8281 Greensboro Drive, Suite 100, Tysons, Virginia. EnergyHub, Inc., is in turn a wholly owned subsidiary of Alarm.com, Inc., and is a

[2] Additional details concerning the history of corporate entities predating Causam are provided in the Standing section below.

Delaware corporation with its principal place of business at 41 Flatbush Ave., Suite 400A, Brooklyn, New York.[3] *See* Alarm.com Respondents' Response to the Complaint and Response to the Notice of Investigation, ¶¶ 12, 14, 16, EDIS Doc. ID No. 753373 (Oct. 4, 2021).

**b. Respondent ecobee**

ecobee, Inc. ("ecobee"), is a corporation existing under the federal laws of Canada with its principal place of business at 25 Dockside Drive, Suite 600, Toronto, Ontario, M5A OB5, Canada. *See* Response of ecobee, Inc. to Complaint of Causam Enterprises, Inc. under Section 337 of the Tariff Act of 1930 and to the Notice of Investigation, ¶ 16, EDIS Doc. ID No. 753367 (Oct. 4, 2021).

**c. Respondent Itron**

Itron, Inc. ("Itron") is a Delaware corporation with principal place of business at 2111 N. Molter Road, Liberty Lake, Washington, 99019. *See* The Itron Respondents' Response to the Complaint and Notice of Investigation, ¶ 18, EDIS Doc. ID No. 753370 (Oct. 4, 2021).

**d. Resideo Respondents**

Ademco Inc. is a Delaware corporation with its principal place of business at 263 Old Country Road, Melville, NY, 11747-2712. *See* Proposed Amended Complaint (Ex. B to Motion Docket No. 1277-20), ¶ 22. Resideo Smart Home Technology (Tianjin) is a corporation existing under the laws of the People's Republic of China with its principal place of business at Building 30, No. 156 Nanhai Road, Tianjin Province, 300457, China. *See* The Resideo Respondents' Response to the Complaint and Notice of Investigation, ¶ 24, EDIS Doc. ID No. 753364 (Oct. 4,

[3] Hereinafter, Alarm.com Holdings, Inc.; Alarm.com, Inc.; and EnergyHub, Inc., are referred collectively as "Alarm.com Respondents."

2021). Ademco Inc. and Resideo Smart Home Technology (Tianjin) (collectively, "Resideo Respondents") are corporate affiliates under common ownership. *See* CIB at 2; Order No. 12 at 2.

### C. The Asserted Patents

As noted above, Causam asserts four patents in this investigation: the'552 patent, the'522 patent, the'268 patent, and the '592 patent (the "Asserted Patents"). As discussed in the Overview of the Technology section below, the '552, '522, and ''268 patents are related.

#### 1. U.S. Patent No. 8,805,552

The '552 patent, titled "Method and apparatus for actively managing consumption of electric power over an electric power grid," issued on August 12, 2014, and names Joseph W. Forbes, Jr., as the inventor. JX-0001 ('552 Patent) at Cover. The '552 patent issued from Application No. 13/463,761 ('761 Application), filed on May 3, 2012. The '761 Application is a continuation-in-part of application No. 13/172,389, filed on June 29, 2011, now U.S. Patent No. 8,315,717. The earliest priority date for each of the asserted claims of the '552 patent is May 3, 2012.

Causam asserts claims 19 and 23 of the '552 patent. *See* CIB at 5. The asserted claims read as follows:

> 19. A client device for use in a system that manages electric power on an electric grid, wherein the power is supplied to a plurality of power consuming devices, wherein power flow over the electric grid to at least some of the plurality of power consuming devices is enabled and disabled by a plurality of controllable devices, wherein at least one controllable device operates under the control of the client device, and wherein the client device receives power control messages from a remote load management server, and wherein a power control message received from the load management server is responsive to a power reduction request issued by a control center,
>
> the client device comprising:

> at least one controllable device interface facilitating communication of power control instructions to the at least one controllable device,
>
> the power control instructions causing the at least one controllable device to selectively enable and disable a flow of electric power to at least one power consuming device of the plurality of power consuming devices;
>
> and a device control manager operably coupled to the at least one controllable device interface,
>
> the device control manager issuing a power control instruction to the at least one controllable device through the at least one controllable device interface responsive to the received power control message,
>
> the power control instruction causing the at least one controllable device to disable a flow of electric power to at least one associated power consuming device so as to achieve a reduction in consumed power as requested by the control center, and based upon the reduction in consumed power, generating at the control center a power supply value (PSV) corresponding to the reduction in consumed power.
>
> 23. The client device of claim 19, wherein the received power control message indicates at least one of an amount of electric power to be reduced and an identification of a controllable device to be instructed to disable a flow of electric power to one or more associated power consuming devices.

JX-0001 ('552 Patent) at claims 19, 23.

### 2. U.S. Patent No. 9,678,522

The '522 patent, titled "Method and apparatus for actively managing consumption of electric power over an electric power grid," issued on June 13, 2017, and names Joseph W. Forbes, Jr., as the inventor. JX-0002 ('522 Patent) at Cover. The '522 patent issued from Application No. 14/456,306, filed on August 11, 2014. The '522 patent is a continuation of the '552 patent. The earliest priority date for each of the asserted claims of the '522 patent is May 3, 2012.

Causam asserts method claim 1 and apparatus claims 15, 19, and 22 of the '522 patent. *See* CIB at 6. The asserted claims read as follows:

1. A method for a client device to manage a flow of power within an electric power grid to a plurality of power consuming devices, the client device being responsive to power control messages issued by a load management server and controlling at least one controllable device that selectively enables and disables electric power to flow to at least one of a plurality of power consuming devices, the method comprising the steps of:

receiving a power control message from the load management server, the power control message being responsive to a power control request and indicating at least one of an amount of electric power to be reduced, disabled, or enabled and an identification of at least one controllable device to be instructed to enable or disable a flow of electric power to at least one associated power consuming device;

responsive to the power control message, issuing a power management command to a controllable device, the power management command causing the controllable device to disable a flow of electric power to at least one associated power consuming device to provide a reduction in consumed power; and

generating a power supply value (PSV) corresponding to the reduction in consumed power.

15. A client device for use in a system that manages electric power on an electric grid, wherein the power is supplied to a plurality of power consuming devices, wherein power flow over the electric grid to at least some of the plurality of power consuming devices is enabled and disabled by a plurality of controllable devices, wherein at least one controllable device operates under the control of the client device, wherein the client device receives power control messages from a remote load management server, and wherein a power control message received from the load management server is responsive to a power reduction request, the client device comprising:

at least one controllable device interface facilitating communication of power control instructions to the at least one controllable device, the power control instructions operable to cause the at least one controllable device to selectively enable and disable a flow of electric power to at least one power consuming device of the plurality of power consuming devices; and

a device control manager operably coupled to the at least one controllable device interface, the device control manager operable to issue power control instructions to the at least one

controllable device through the at least one controllable device interface responsive to the received power control message, the power control instruction operable to cause the at least one controllable device to disable or enable a flow of electric power to at least one associated power consuming device, and based upon the reduction in consumed power for disabled flow of electric power, generating a power supply value (PSV) corresponding to the reduction in consumed power.

19. The client device of claim 15, wherein the received power control message indicates at least one of an amount of electric power to be reduced and an identification of a controllable device to be instructed to disable a flow of electric power to one or more associated power consuming devices.

22. The client device of claim 15, further including a communications interface comprising an Internet Protocol (IP)-based interface.

JX-0002 (’522 Patent) at claims 1, 15, 19, 22.

**3. U.S. Patent No. 10,394,268**

The ’268 patent, titled “Method and apparatus for actively managing consumption of electric power over an electric power grid,” issued on August 27, 2019, and names Joseph W. Forbes, Jr., as the inventor. JX-0003 (’268 Patent) at Cover. The ’268 patent issued from Application No. 15/618,981, filed on June 9, 2017. *Id.* The ’268 patent is a continuation of the ’522 patent. The earliest priority date for claims 1, 6, 7, 14, and 18 of the ’268 patent is Aug. 28, 2007. The earliest priority date for claims 2 and 15 of the ’268 patent is May 3, 2012.

Causam asserts method claims 1, 2, 6, and 7 and system claims 14, 15, and 18 of the ’268 patent. *See* CIB at 4-5. The asserted claims read as follows:

1. A method for managing an electric power flow within an electric power grid, comprising:

a client device receiving a power control message from a load management server, the power control message indicating at least one of an amount of electric power to be reduced and an identification of at least one controllable device to be instructed

to disable the electric power flow to at least one associated power consuming device;

the client device issuing a power management command to the at least one controllable device, the power management command causing the at least one controllable device to disable the electric power flow to the at least one associated power consuming device to provide a reduction in consumed power; and

generating measurement and verification data corresponding to the reduction in consumed power.

2. The method of claim 1, further comprising generating a power supply value (PSV) corresponding to the reduction in consumed power.

6. The method of claim 1, wherein the measurement and verification data is associated with individual power consuming devices.

7. The method of claim 1, further including aggregating the measurement and verification data for a multiplicity of power consuming devices.

14. A system for managing electric power on an electric power grid, comprising:

a client device comprising at least one controllable device interface facilitating communication of power control instructions to at least one controllable device, the power control instructions operable to cause the at least one controllable device to selectively enable and disable a flow of electric power to at least one power consuming device; and

a device control manager operably coupled to the at least one controllable device interface, the device control manager operable to issue power control instructions to the at least one controllable device through the at least one controllable device interface responsive to the received power control instructions, and based upon a reduction in consumed power for disabled flow of electric power, generate measurement and verification data corresponding to the reduction in consumed power;

wherein the client device receives a power control message from a remote load management server, and wherein the power control message received from the remote load management server is responsive to a power reduction request.

> 15. The system of claim 14, wherein a power supply value (PSV) is generated corresponding to the reduction in consumed power, and wherein the PSV indicates a compensation provided for power supply associated with the reduction in consumed power.
>
> 18. The system of claim 14, wherein the power control message indicates at least one of an amount of electric power to be reduced and an identification of a controllable device to be instructed to disable the flow of electric power to the at least one power consuming device.

JX-0003 ('268 Patent) at claims 1, 2, 6-7, 14-15, 18.

#### 4. U.S. Patent No. 10,396,592

The '592 patent, titled "System and method for estimating and providing dispatchable operating reserve energy capacity through use of active load management," issued on August 27, 2019, and names Joseph W. Forbes, Jr., as the inventor. JX-0004 ('592 Patent) at Cover. The '592 patent issued from Application No. 15/594,219, filed on May 12, 2017. The '592 patent is a continuation of application No. 14/517,399, filed on October 17, 2014, now United States Patent No. 9,651,973, which is a division of application No. 13/466,725, filed on May 8, 2012, now United States Patent No. 8,890,505. The earliest priority date for the asserted claim of the '592 patent is May 8, 2012.

Causam asserts dependent system claim 13 (which depends from claim 1) of the '592 patent. *See* CIB at 6. Non-asserted claim 1 and asserted claim 13 read as follows:

> 1. A system for managing power on an electric power grid, comprising:
>
> at least one power consuming device, at least one controllable device, and at least one client device constructed and configured in network communication;
>
> wherein the at least one controllable device is operably coupled to the at least one power consuming device;
>
> wherein the at least one controllable device is operable to control a power flow from the electric power grid to the at least one power consuming device responsive to power control

> instructions from the at least one client device;
>
> wherein the at least one power consuming device has an actual value of power reduced based on revenue grade metrology, and confirmed by measurement and verification; and
>
> wherein the actual value of power reduced is a curtailment value as supply equivalence and provides operating reserve for the electric power grid.
>
> 13. The system of claim 1, wherein the actual value of power to be reduced is a power supply value (PSV); wherein the PSV is generated at a control center, a meter, a submeter, a building control system, or any device or controller that measures power within the standard as supplied by regulatory bodies that govern regulation of the electric power grid.

JX-0004 ('592 Patent) at claims 1, 13.

### D. Overview of the Technology

The Field of the Invention section of each of the related '552, '522, and '268 patents states, "The present invention relates generally to the field of electrical power load control systems and more particularly to a method and system for actively controlling power load management for individual customers and optionally tracking power savings for both the individual customer as well as the overall electric utility." JX-0001 ('552 Patent) at 1:20-25; JX-0002 ('522 Patent) at 1:24-29; JX-0003 ('268 Patent) at 1:27-32.

Prior art shortcomings with respect to power load management are described by the '552, '522, and '268 patents:

> The increased awareness of the impact of carbon emissions from the use of fossil fueled electric generation combined with the increased cost of producing peak power during high load conditions has increased the need for alternative solutions utilizing load control as a mechanism to defer, or in some cases eliminate, the need for the deployment of additional generation capacity by electric utilities. Existing electric utilities are pressed for methods to defer or eliminate the need for construction of fossil-based electricity generation. Today, a patchwork of systems exist to implement demand response load management programs, whereby various radio subsystems in various frequency bands utilize "one-way" transmit only methods of communication. Under these programs, RF controlled relay switches

> are typically attached to a customer's air conditioner, water heater, or pool pump. A blanket command is sent out to a specific geographic area whereby all receiving units within the range of the transmitting station (e.g., typically a paging network) are turned off during peak hours at the election of the power utility. After a period of time when the peak load has passed, a second blanket command is sent to turn on those devices that have been turned off.
>
> ….
>
> While one-way devices are generally industry standard and relatively inexpensive to implement, the lack of a return path from the receiver, combined with the lack of information on the actual devices connected to the receiver, make the system highly inefficient for measuring the actual load shed to the serving utility. While the differential current draw is measurable on the serving electric utility's transmission lines, the actual load shed is approximate and the location of the load deferral is approximated at the control center of the serving utility.
>
> ….
>
> Attempts have been made to bridge the gap between one-way, un-verified power load control management systems and positive control verified power load control management systems. However, until recently, technologies such as smart breakers and command relay devices were not considered for use in residential and commercial environments primarily due to high cost entry points, lack of customer demand, and the cost of power generation relative to the cost of implementing load control.

JX-0001 ('552 Patent) at 1:27-2:56.

The '552, '522, and '268 patents thus conclude that "a need exists for a system and method for active power load management for individual customers that is optionally capable of tracking power savings for the individual customer as well as the electric utility to thereby overcome the shortcomings of the prior art." JX-0001 ('552 Patent) at 3:30-34.

The '592 patent, which has a different specification than the other three asserted patents, describes the Field of the Invention as follows: "The present invention relates generally to the field of electric power supply and generation systems and, more particularly, to a system and method for estimating and/or providing dispatchable operating reserve energy capacity for an electric utility using active load management so that the reserve capacity may be made available

to the utility or to the general power market (e.g., via a national grid)." JX-0004 ('592 Patent) at 2:9-15.

Prior art shortcomings with respect to power load management are described by the '592 patent:

> Energy demand within a utility's service area varies constantly. Such variation in demand can cause undesired fluctuations in line frequency if not timely met. To meet the varying demand, a utility must adjust its supply or capacity (e.g., increase capacity when demand increases and decrease supply when demand decreases). However, because power cannot be economically stored, a utility must regularly either bring new capacity on-line or take existing capacity off-line in an effort to meet demand and maintain frequency. Bringing new capacity online involves using a utility's reserve power, typically called "operating reserve."
>
> ….
>
> The Federal Energy Reliability Commission (FERC) and NERC [North American Electric Reliability Corporation] have proposed the concept of Demand Side Management (DSM) as an additional approach to account for changes in demand. DSM is a method in which a power utility carries out actions to reduce demand during peak periods. Examples of DSM include encouraging energy conservation, modifying prices during peak periods, direct load control, and others.
>
> Current approaches for using DSM to respond to increases in demand have included using one way load switches that interrupt loads, as well as statistics to approximate the average amount of projected load removed by DSM. A statistical approach is employed because of the utility's inability to measure the actual load removed from the grid as a result of a DSM load control event. In addition, current DSM approaches have been limited to use of a single power measuring meter among every one hundred (100) or more service points (e.g., residences and/or businesses). Accordingly, current DSM approaches are inadequate because they rely on statistical trends and sampling, rather than on empirical data, to make projections and measure actual load removal events.
>
> More recently, FERC and NERC have introduced the concept of flexible load-shape programs as a component of DSM. These programs allow customers to make their preferences known to the utility concerning timing and reliability of DSM load control events. However, DSM approaches utilizing load-shaping programs do not meet all of the criteria for implementing regulating reserve or spinning reserve, such as being dispatchable within 15 minutes or less. Additionally, in order for a generating source to be considered dispatchable energy, it must be forecasted twenty-four (24) hours prior to being delivered to a utility. Current DSM

> approaches do not facilitate accurate forecasting twenty-four (24) hours in advance due to their heavy reliance on statistics.

JX-0004 ('592 Patent) at 2:19-4:53.

The '592 patent thus concludes "there is a need for utilities to be able to create operating reserve … by using accurate forecasting and flexible load shaping techniques," and there is a further need to "involve the consumer in a two-way approach in which the consumer can make their energy consumption preferences known and the utility can make use of those preferences to respond to increased demand and maintain line frequency regulation." JX-0004 ('592 Patent) at 4:54-61.

### E. The Accused Products

#### 1. Alarm.com Accused Products

The Alarm.com Accused Products are the ADC-T2000 and ADC-T3000 smart thermostats. JX-0015C.6 (Alarm.com Import Stipulation). The ADC-T2000 is also marketed as the Smart Thermostat, Intelligent Thermostat, InTouch Thermostat, ADT Smart Thermostat, or Dreamstat. The ADC-T3000 is also marketed as the Smart Thermostat or Thermostat 2.0. CIB at 7.

#### 2. ecobee Accused Products

The ecobee Accused Products are the ecobee Smart Thermostat with voice control and ecobee3 lite smart thermostats. JX-0023C.5 (ecobee Stipulation); CIB at 7.

#### 3. Itron Accused Products

The Itron Accused Products are the IntelliPEAK DirectLink WiFi, LTE, and GSM smart thermostats and the IntelliTEMP DirectLink load control switches. JX-0016C.5 (Itron Import Stipulation); CIB at 7.

#### 4. Resideo Accused Products

The Resideo Accused Products are smart thermostats from the following product families:

- Prestige IAQ 2.0;
- T10 Pro Smart Thermostat;
- T5 Programmable Thermostat;
- T5+ Programmable Thermostat;
- T6 Pro Smart Thermostat;
- T6 Pro Z-Wave Thermostat;
- T9 Smart Thermostat;
- Round Smart Thermostat;
- WiFi FocusPro;
- VisionPro 8000 Wi-Fi Programmable Thermostat;
- VisionPro 8000 RedLINK Programmable Thermostat;
- 9000 Smart WiFi Smart Thermostat; and
- WiFi Touchscreen Thermostat.

JX-0018C.5 (Resideo Import Stipulation); CIB at 7.[4]

### F. The Domestic Industry Products

Causam relies on investments made by its licensee Landis+Gyr ("L+G") to satisfy the domestic industry requirement of section 337. The Domestic Industry Products are L+G's demand response load control systems, which include radio frequency (RF) load control switches, smart meters, and load management software. The components of these systems are as follows:

[4] Alarm.com Accused Products; ecobee Accused Products; Itron Accused Products; and Resideo Accused Products are collectively referred to as "Accused Products."

| Category | Component |
|---|---|
| RF load control switches | L530 series<br>L570 series |
| Electric AMI smart meters | • E331/E351 FOCUS AXe/AXRe/RXRe<br>• LTE-M Cellular FOCUS AXe/AXe-SD |
| Load management software | • Power Center<br>• Command Center<br>• Gridstream Network |

CIB at 6.

## II. IMPORTATION, JURISDICTION, AND STANDING

### A. Importation

A violation of section 337 based on patent infringement requires "[t]he importation into the United States, the sale for importation, or the sale within the United States after importation by the owner, importer, or consignee" of infringing products. 19 U.S.C. §§ 1337(a)(1)(A)–(B). All Respondents have stipulated that they have imported the Accused Products into the United States, imported, sold for importation, or sold after importation at least one Accused Product. *See* JX-0015C (Stipulation Between Complainant and Alarm.com Regarding Importation; JX-0017C (Stipulation Between Complainant and ecobee Regarding Importation; JX-0016C (Stipulation Between Complainant and Itron Regarding Importation; JX-0018C (Stipulation Between Complainant and Resideo Regarding Importation); RIB at 12 ("Respondents do not contest importation of the products identified in the parties' respective stipulations."). I determine the importation requirement of section 337 has been satisfied.

### B. In Rem Jurisdiction

Respondents do not dispute that the Commission has *in rem* jurisdiction over the Accused Products. *See* Final Joint Outline (jurisdiction is not a disputed issue). I therefore find the Commission has *in rem* jurisdiction over the Accused Products in this Investigation. *See Sealed Air Corp. v. Int'l Trade Comm'n*, 645 F.2d 976, 985–86 (C.C.P.A. 1981) (noting the Commission has jurisdiction over imported goods).

### C. Personal Jurisdiction

By filing a complaint and amended complaint and participating in the investigation, Causam has consented to personal jurisdiction at the Commission. *See Certain Toner Cartridges, Components Thereof, and Systems Containing the Same*, 337-TA-1174, Initial Determination at 35, *not reviewed*, Comm'n Determination Not to Review an Initial Determination Granting Complainants' Motion for Summary Determination of a Violation of Section 337, EDIS Doc. ID 728235 (Dec. 17, 2020). By appearing and participating in this investigation and not contesting the Commission's jurisdiction over it, Respondents have consented to personal jurisdiction at the Commission. *See* Final Joint Outline (jurisdiction is not a disputed issue). I therefore determine that the Commission has personal jurisdiction over all parties. *See, e.g.*, *Certain Strontium-Rubidium Radioisotope Infusion Systems, and Components Thereof Including Generators*, Inv. No. 337-TA-1110, Initial Determination at 9, USITC Pub. No. 5025 (Feb. 2021), *not reviewed in pertinent part*, EDIS Doc. ID 689653 ("*Radioisotope Infusion Systems*").

### D. Standing

#### 1. History of Assignments

Ownership of the intellectual property claimed in the Asserted Patents has transferred several times. The history begins in 2000 with Causam's CEO Mr. Forbes. That year Mr. Forbes

founded America Connect, Inc. ("America Connect") in Atlanta, Georgia. CX-0779C (Forbes WS) at Q/A 17. While employed at America Connect, Mr. Forbes was named a co-inventor on U.S. Patent Application 11/895,909 ("the '909 Application"), filed on Aug. 28, 2007, which ultimately issued as U.S. Patent No. 7,715,951. The other named co-inventor on the '909 Application was Joel Webb, who was then an employee of Mr. Forbes. *See* CX-0779C (Forbes WS) at Q/A 105. On August 24, 2007, Mr. Forbes and Mr. Webb signed an Assignment of Application to Be Filed ("2007 Assignment"), in which both inventors assigned to America Connect their entire right, title, and interest to the invention disclosed in the '909 Application, including "all divisions, reissues, continuations and extensions thereof." CX-0225.2 (2007 Assignment).

In 2008, Mr. Forbes co-founded Cleartricity, Inc. ("Cleartricity"), with two other America Connect executives. CX-0779C (Forbes WS) at Q/A 17-22. The assets of America Connect, including the then-pending '909 Application, were transferred to Cleartricity in exchange for common shares of Cleartricity stock. CX-0779C (Forbes WS) at Q/A 21; RX-0024.1-2 (2008 Assignment). In 2009, Cleartricity changed its name to Consert, Inc. ("Consert"). Tr. (Forbes) at 82:21-23.

In May 2010, Consert and Mr. Forbes entered into two new agreements, an Employment Agreement and a Propriety Information and Inventions Agreement. *See* CX-0502C (2010 Employment Agreement); CX-0503C (2010 Inventions Agreement). The 2010 Inventions Agreement assigned Mr. Forbes's rights in certain intellectual property to Consert, Inc., including the '909 Application and "all continuations, divisions, and continuation-in-parts thereof." CX-0503C (2010 Inventions Agreement) at § 3(e).

In the second half of 2011, after a disagreement with Consert management, Mr. Forbes was

terminated from Consert. CX-0779C (Forbes WS) at Q/A 89-90. During and immediately after Mr. Forbes' separation, Mr. Forbes and Consert disputed a variety of issues, including the validity of the 2010 Agreement and (as a result) the ownership of intellectual property Mr. Forbes created while at Consert and its predecessor entities. *Id.* at Q/A 94.[5]

Meanwhile, on May 3, 2012, Mr. Forbes filed U.S. Patent Application No. 13/463,761 ("the '761 Application"), which claimed priority in part to the '909 Application Mr. Forbes had assigned to his employer back in 2007. Mr. Forbes recorded an assignment of this application from himself to his holding company, BCIP Ventures LLC, dated November 6, 2012. JX-0011.

In January of 2013, with the dispute between Mr. Forbes and Consert still unresolved, Toshiba Corporation and its subsidiary L+G acquired Consert for approximately [redacted] CX-0779C (Forbes WS) at Q/A 94. During the acquisition, Consert informed Toshiba and L+G of the pending dispute, but the dispute was not resolved before Toshiba bought Consert and integrated it with L+G. CIB at. 13.

On May 8, 2013, Mr. Forbes, BCIP Ventures LLC ("BCIP"),[6] and Consert entered into a "Forbes, BCIP Ventures LLC and Consert Inc. Patent Assignment and License Agreement" ("2013 Assignment Agreement").[7] CX-0505C (2013 Assignment Agreement). As discussed in more detail below, Mr. Forbes and his holding company assigned any interest they had in certain patents

---

[5] Mr. Forbes contended that the 2010 Inventions Agreement was void for lack of consideration and that he therefore retained ownership of intellectual property created while he was employed at Consert and its predecessor entities. *See* Tr. (Forbes) at 166:1-17; CX-0779C (Forbes WS) at Q/A 78, 92, and 95. Consert contended the 2010 Inventions Agreement was valid.

[6] BCIP is a holding company owned by Mr. Forbes. CIB. at 5.

[7] The parties also entered into a settlement agreement stating that the 2013 Assignment Agreement contained all of the assignment terms relevant to the settlement. *See* RX-0006C (Settlement Agreement and Mutual Release), ¶ 8 ("The Parties acknowledge that the ownership of Company's and Employee's related intellectual property rights is addressed in the Assignment Agreement).

and patent applications to Consert. CX-0505C (2013 Assignment Agreement), ¶ 1.3. The agreement listed these patents and applications as the "Consert Patents." *Id.*

All four of the Asserted Patents ultimately claim priority, in whole or in part, to the '909 Application, which (1) Mr. Forbes assigned to his employer America Connect back in 2007, and (2) Mr. Forbes also purported to assign to Consert in the 2013 Assignment Agreement.

Mr. Forbes founded Causam Ventures, Inc., in 2012. Causam Ventures, Inc., became Causam Energy, Inc. CX-0779C (Forbes WS) at Q/A 32. From 2012-2014, Mr. Forbes registered with the Patent Office documents purporting to assign to Causam Energy, Inc., all right, title, and interest in each of the applications leading to each of the Asserted Patents. *See* JX-0011 ('552 Assignment History); JX-0012 ('522 Assignment History); JX-0009 ('268 Assignment History); JX-0010 ('592 Assignment History). On January 18, 2018, Causam Energy, Inc., was renamed Causam Enterprises, Inc., the complainant in this investigation.

**2. Analysis**

Causam's assertion of patent ownership rises or falls with Mr. Forbes's title at the time when he purported to transfer ownership to Causam. As shown below, Mr. Forbes had no ownership in the Asserted Patents when he attempted to assign them to Causam.

**The 2007 Assignment transferred ownership of the '909 Application from Mr. Forbes to America Connect**

It is undisputed that on August 24, 2007, Mr. Forbes and Mr. Webb executed the 2007 Assignment, which concerned the invention disclosed in the '909 Application. CX-0225.1 (2007 Assignment). The 2007 Assignment provides in relevant part:

> [T]he Inventors have sold, assigned, and transferred, and by these presents do ***sell, assign, and transfer***, unto said Assignee ***the full and exclusive right to*** the said Invention in the United States and its territorial possessions and in all foreign countries and ***the entire right, title, and interest in and to any and all patents***

> ***which may be granted therefor*** in the United States and its territorial possessions and in any and all foreign countries ***and in and to all divisions, reissues, continuations and extensions thereof***."

CX-0225.2 (2007 Assignment) (emphasis added); *see* Tr. (Forbes) at 79:16-19, 80:4-6.

Thus, in the 2007 Assignment, Mr. Forbes and Mr. Webb assigned to America Connect their entire right, title, and interest to the '909 Application and all progeny thereof. The record contains no assignment of any intellectual property, patents, or applications from America Connect back to Mr. Forbes. Thus, the 2007 Assignment vested ownership of the '909 Application and any progeny with America Connect.

**The 2008 Assignment transferred ownership of the '909 Application from America Connect to Cleartricity, which was renamed Consert**

On August 19, 2008, America Connect transferred its rights under the 2007 Assignment to Cleartricity, a new and different company that Mr. Forbes had founded. RX-0024.1-2 (2008 Assignment); Tr. (Forbes) at 82:9-20. In 2009, Cleartricity changed its name to Consert. Tr. (Forbes) at 82:21-23. Thus, by the end of 2009, Consert owned the rights from the 2007 Assignment, which included title to the '909 Application and all progeny of the '909 Application. Tr. (Forbes) at 82:24-83:4. While Mr. Forbes may have had ownership rights in the business entities Cleartricity and Consert, nothing in the record indicates he had personal title to the '909 Application after 2007.

**The 2010 Employment Agreement and the 2010 Inventions Agreement did *not* transfer ownership of the '909 Application back to Mr. Forbes**

In 2010, while Mr. Forbes was working for Consert, Consert was in the process of "raising capital," so "[i]t was important for Consert to, at that time, own the intellectual property that was being produced by all the employees . . . ." Tr. (Forbes) at 87:8-13. In that context, Consert and Mr. Forbes entered into the 2010 Employment Agreement and the 2010 Inventions Agreement in

May 2010. *See* CX-0502C (2010 Employment Agreement); CX-0503C (2010 Inventions Agreement). Mr. Forbes described the 2010 Inventions Agreement as "a catch-all for all IP to be contributed to the company." Tr. (Forbes) at 86:5-8. Pursuant to the 2010 Inventions Agreement, Mr. Forbes and all other employees "assigned to Consert the rights to all intellectual property that [they] had developed or would develop while at Consert." Tr. (Forbes) at 85:25-86:4. Specifically, Mr. Forbes agreed that all inventions and patent applications that he developed, alone or jointly with others, during his employment with Consert would be the property of Consert, including any divisions, continuations and continuations-in-part that issued from those applications. CX-0503C (2010 Inventions Agreement) at § 3(d)–(e).

Neither the 2010 Employment Agreements nor the 2010 Inventions Agreement changed ownership of the '909 Application; Consert continued to own the rights to the '909 Application and all progeny of the '909 Application. The record contains no assignment of any intellectual property, patents, or applications from Consert back to Mr. Forbes personally in 2010.

**The 2013 Assignment Agreement did *not* transfer ownership in the '909 Application back to Mr. Forbes**

In 2012, Mr. Forbes approached Consert and expressed his belief that he still owned rights in certain intellectual property he had developed while employed by Consert. *See* CX-0779C (Forbes WS) at QA 92-95. Mr. Forbes believed that the 2010 Inventions Agreement with Consert was void because Consert failed to make certain payments to which Mr. Forbes believed he was entitled.[8] *See* Tr. (Forbes) at 88:25-89:2, 104:7-10. Consert did not agree with Mr. Forbes' claim

[8] No court has ever ruled that the 2010 agreements are void. By his own account, Mr. Forbes intentionally chose not to file a lawsuit seeking a declaration that the 2010 Inventions Agreement was void because, even after Consert's supposed breach, he remained an equity holder in Consert and he did not want to negatively impact the company. *See* Tr. (Forbes) at 105:3-8. In any event,

of ownership rights. *See* RX-0010C, RX-0011C (Forbes Dep. Tr.) at 194:15-18, 505:13-507:6, 508:14-509:3.

To settle the dispute, on May 8, 2013, Mr. Forbes, BCIP, and Consert entered into the 2013 Assignment Agreement. CX-0505C (2013 Assignment Agreement). In the 2013 Assignment Agreement, in exchange for receiving a $300,000 payment (among other consideration) from Consert, Mr. Forbes and BCIP assigned certain patent rights ***to Consert***:

> Assignor [Mr. Forbes and BCIP] hereby assigns to Assignee [Consert] any and all ownership rights in the above listed Consert Patents, any continuations or divisionals related to any of the listed patents and applications, including the right to claim priority under all applicable international treaties, arrangements and agreements … and all related intellectual property, excluding the Excluded Patents.

CX-0505C (2013 Assignment Agreement), ¶¶ 4, 5. First on the list of assigned applications defined as Consert Patents is the '909 Application, to which all Asserted Patent in this investigation claim priority. *Id.*, ¶ 1.3.

Significantly, the 2013 Assignment Agreement does not contain any language similar to the language quoted above that transfers ownership of any patents, patent applications, or inventions from Consert to Mr. Forbes or BCIP. Mr. Forbes agreed at the hearing that "Consert was the assignee in the 2013 agreement," and that, "in fact, Consert was the ***only*** assignee in the 2013 agreement." Tr. (Forbes) at 109:18 – 110:1 (emphasis added). Thus, Mr. Forbes did not obtain ownership of any patents or applications through the 2013 Assignment Agreement.

Causam points to several provisions in the 2013 Assignment Agreement as supporting evidence of Mr. Forbes's ownership of the Asserted Patents after that agreement. These arguments

---

whether the 2010 agreements are void for failure to pay is immaterial; there is no evidence that Mr. Forbes would have had personal title to the Asserted Patents in the absence of the 2010 agreements.

are addressed below.

First, Causam argues, "If Consert had already perfected an ownership interest in the Consert Patents by operation of the 2007 and 2010 Agreements, it would have had no need to negotiate for and secure their assignment from Mr. Forbes" with the 2013 Assignment Agreement. CIB at 18.

But the record indicates that Consert had multiple objectives with the 2013 Assignment Agreement, including resolving discrimination and benefits disputes relating to Mr. Forbes separation in 2011. *See* RX-0006C.0004-.0005. Regardless of the reasons that Consert entered into the 2013 Assignment Agreement, Mr. Forbes could not assign to Consert rights he did not have. And, as traced above, Mr. Forbes had no rights in the '909 Application in 2013; he had already given up those rights in the 2007 Assignment.

Next, Causam argues the 2013 Assignment Agreement vests title in a list of so-called "Excluded Patents" in Mr. Forbes. *See* CIB at 10. But, as has already been noted, the 2013 Assignment Agreement has no clear assignment of any intellectual property directed ***to*** Mr. Forbes. The agreement states that Mr. Forbes assigned "any" of his rights in the Consert Patents to Consert, "only excluding the Excluded Patents." CX-0505C (2013 Assignment Agreement), ¶ 3. The fact that Mr. Forbes's assignment to Consert does not include a transfer of rights to the Excluded Patents does not resolve who in fact owns the Excluded Patents. To illustrate the point, if the agreement stated that the assignment from Mr. Forbes did not include an assignment of ownership of the Statue of Liberty, that carve-out would not confirm that Mr. Forbes owned the Statue of Liberty.

The 2013 Assignment Agreement *does* state that Mr. Forbes grants Consert a license to the Excluded Patents "to the extent necessary"—but those words raise more doubt than they settle as

to Mr. Forbes's title in the Excluded Patents. CX-0505C (2013 Assignment Agreement), ¶ 5. The burden to prove standing rests with Causam, and that language does not indicate that Mr. Forbes owned the necessary bundle of rights for standing to bring suit. *Lone Star Silicon Innovations v. Nanya Technology*, 925 F.3d 1225, 1229 (Fed. Cir. 2019) (to determine the intention of the parties, a tribunal must consider the "totality" of the agreement).

Causam next contends that when the parties purportedly "waived all claims to ownership of the other party's patents" in the 2013 Assignment Agreement, they "recognized that Mr. Forbes was the sole owner of the Excluded Patents." CIB at 16. But the provision in question actually says both parties release each other from all "disputes as to ownership of the Consert Patents or the Excluded Patents." CX-0505C (2013 Assignment Agreement), ¶ 11. That cuts both ways. If Consert (or its successor) were to assert that it owns both the Consert Patents and the Excluded Patents, Mr. Forbes cannot dispute that position. While Mr. Forbes retains the right to "enforce the agreement," that enforcement appears limited to the payment provision and the right to list certain priority information on patent applications.[9]

Causam also contends that the integration clause in the 2013 Assignment Agreement "nullified all prior agreements between the parties concerning the ownership of all the patents and applications contemplated in the agreement," which means that the agreement resulting in "divesting Consert of any interest assigned by Mr. Forbes to it or its predecessors" and "revesting Mr. Forbes with those interests" because he was the inventor. CIB at 17 (citing CX-0505C (2013

---

[9] It is not at all clear that there is any legal benefit to claiming priority to a patent application to which an inventor has no title. If such a maneuver were efficacious, nothing would appear to prohibit an inventor from claiming priority to any number of patent applications filed years before but owned by others. But I need not determine the effect of claiming priority to an application an inventor does not own to resolve the standing dispute here.

Assignment Agreement), ¶ 21). That argument fails for multiple reasons. First, the 2013 Assignment Agreement expressly states the ownership of the ’909 Application and all progeny of the ’909 Application belong to Consert; it did not simply return the parties to some supposed status quo ante. Second, the 2013 Assignment Agreement was not reached with the consent of Mr. Webb, another inventor named on the ’909 Application. Consert and Mr. Forbes could not agree among themselves to undo Mr. Webb’s assignment to America Connect in 2007. Causam provides no explanation as to how Mr. Forbes acquired Mr. Webb’s rights to the ’909 Application after Mr. Webb’s assignment in 2007.[10]

For at least the reasons above, I find the 2013 Assignment Agreement did not vest ownership of the Asserted Patents with Mr. Forbes. Consert owned the rights to the ’909 Application and all progeny of the ’909 Application the day before and the day after the 2013 Assignment Agreement.

* * *

In sum, Mr. Forbes gave up his rights in the ’909 Application and all its progeny in 2007 and never got them back. He had no rights to transfer to the Causam at the time of the purported assignments recorded with the applications Asserted Patents.

I find that Causam has not demonstrated that it has standing to assert a claim of infringement for any of the Asserted Patents.[11]

---

[10] Causam’s argument that the integration clause in the 2010 agreements also revested Mr. Forbes will all necessary rights in the Asserted Patents fails for the same reasons given here.

[11] In view of this finding, the following two post-hearing motions related to the standing issue are denied as moot: Motion Docket No. 1277-49 (Respondent Ecobee, Inc.’s Motion to Strike Argument in Causam’s Post-Hearing Rebuttal Brief That Ecobee Has Conceded Ownership of the

## III. LEVEL OF ORDINARY SKILL IN THE ART

The parties have agreed that a person of ordinary skill in the art at the time of the alleged invention of the Asserted Patents would have had (1) a Bachelor's degree in engineering, computer science, or a comparable field of study and (2) at least three years of experience in energy management systems. Additional relevant industry experience may compensate for lack of formal education or vice versa. CIB at 22; RIB at 14.

For the purposes of this final initial determination, I adopt the agreed level of skill as the appropriate standard for the hypothetical ordinary artisan.

## IV. CLAIM CONSTRUCTION – ALL ASSERTED PATENTS

"An infringement analysis entails two steps. The first step is determining the meaning and scope of the patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device accused of infringing." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*) (internal citations omitted), *aff'd*, 517 U.S. 370 (1996). Claim construction resolves legal disputes between the parties regarding claim scope. *See Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1319 (Fed. Cir. 2016).

Evidence intrinsic to the application, prosecution, and issuance of a patent is the most significant source of the legally operative meaning of disputed claim language. *See Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (*en banc*); *see also Markman*, 52 F.3d at 979. As the Federal Circuit explained in *Phillips*, courts examine the intrinsic evidence

---

'268 Patent) (Aug. 11, 2022); and Motion Docket No. 1277-50 (Causam Enterprises, Inc.'s Contingent Motion to Strike Portions of Respondents' Reply Brief) (Aug. 22, 2022).

to determine the "ordinary and customary meaning of a claim term" as understood by a person of ordinary skill in the art at the time of the invention. *Phillips*, 415 F.3d at 1313.

"[T]he claims themselves provide substantial guidance as to the meaning of particular claims terms." *Id.* at 1314; *see Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) ("In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to 'particularly point[ ] out and distinctly claim[ ] the subject matter which the patentee regards as his invention.'"). The context in which a term is used in an asserted claim can be "highly instructive." *Phillips*, 415 F.3d at 1314. Additionally, other claims in the same patent, asserted or un-asserted, may also provide guidance as to the meaning of a claim term. *Id.*

The specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Id.* at 1316. "In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor." *Id.* As a general rule, however, the particular examples or embodiments discussed in the specification are not to be read into the claims as limitations. *Id.* at 1323. In the end, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be . . . the correct construction." *Id.* at 1316 (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

Only when the evidence intrinsic to the patent record does not establish the meaning of a claim may extrinsic evidence like treatises, inventor testimony, or expert testimony be considered.

*Phillips*, 415 F.3d at 1317. Extrinsic evidence is generally viewed as less reliable than the patent itself and its prosecution history in determining how to define claim terms. *Id.* "The court may receive extrinsic evidence to educate itself about the invention and the relevant technology, but the court may not use extrinsic evidence to arrive at a claim construction that is clearly at odds with the construction mandated by the intrinsic evidence." *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 977 (Fed. Cir. 1999).

### A. Asserted Claims

The parties dispute two terms in the asserted claims: "power supply value," or "PSV," which appears in claims of all the Asserted Patents, and "revenue grade metrology," which is an element of the invention described in claim 13 of the '592 patent. The disputed claim terms are highlighted below in the context of each asserted claim.

#### 1. '552 Patent Claims

Causam asserts claims 19 and 23 of the '552 patent. The disputed '552 patent claim terms are shown in context below with emphasis:

> 19. A client device for use in a system that manages electric power on an electric grid, wherein the power is supplied to a plurality of power consuming devices, wherein power flow over the electric grid to at least some of the plurality of power consuming devices is enabled and disabled by a plurality of controllable devices, wherein at least one controllable device operates under the control of the client device, and wherein the client device receives power control messages from a remote load management server, and wherein a power control message received from the load management server is responsive to a power reduction request issued by a control center,
>
> the client device comprising:
>
> at least one controllable device interface facilitating communication of power control instructions to the at least one controllable device,
>
> the power control instructions causing the at least one controllable device to selectively enable and disable a flow of electric power

to at least one power consuming device of the plurality of power consuming devices;

and a device control manager operably coupled to the at least one controllable device interface,

the device control manager issuing a power control instruction to the at least one controllable device through the at least one controllable device interface responsive to the received power control message,

the power control instruction causing the at least one controllable device to disable a flow of electric power to at least one associated power consuming device so as to achieve a reduction in consumed power as requested by the control center, and based upon the reduction in consumed power, generating at the control center a **power supply value (PSV)** corresponding to the reduction in consumed power.

23. The client device of claim 19, wherein the received power control message indicates at least one of an amount of electric power to be reduced and an identification of a controllable device to be instructed to disable a flow of electric power to one or more associated power consuming devices.

JX-0001 ('552 Patent) at claims 19, 23 (emphasis added).

**2. '522 Patent Claims**

Causam asserts method claim 1 and apparatus claims 15, 19, and 22 of the '522 patent.

The disputed '522 patent claim terms are shown in context below with emphasis:

1. A method for a client device to manage a flow of power within an electric power grid to a plurality of power consuming devices, the client device being responsive to power control messages issued by a load management server and controlling at least one controllable device that selectively enables and disables electric power to flow to at least one of a plurality of power consuming devices, the method comprising the steps of:

receiving a power control message from the load management server, the power control message being responsive to a power control request and indicating at least one of an amount of electric power to be reduced, disabled, or enabled and an identification of at least one controllable device to be instructed to enable or disable a flow of electric power to at least one associated power consuming device;

responsive to the power control message, issuing a power management command to a controllable device, the power management command causing the controllable device to disable a flow of electric power to at least one associated power consuming device to provide a reduction in consumed power; and

generating a **power supply value (PSV)** corresponding to the reduction in consumed power.

15. A client device for use in a system that manages electric power on an electric grid, wherein the power is supplied to a plurality of power consuming devices, wherein power flow over the electric grid to at least some of the plurality of power consuming devices is enabled and disabled by a plurality of controllable devices, wherein at least one controllable device operates under the control of the client device, wherein the client device receives power control messages from a remote load management server, and wherein a power control message received from the load management server is responsive to a power reduction request, the client device comprising:

at least one controllable device interface facilitating communication of power control instructions to the at least one controllable device, the power control instructions operable to cause the at least one controllable device to selectively enable and disable a flow of electric power to at least one power consuming device of the plurality of power consuming devices; and

a device control manager operably coupled to the at least one controllable device interface, the device control manager operable to issue power control instructions to the at least one controllable device through the at least one controllable device interface responsive to the received power control message, the power control instruction operable to cause the at least one controllable device to disable or enable a flow of electric power to at least one associated power consuming device, and based upon the reduction in consumed power for disabled flow of electric power, generating a **power supply value (PSV)** corresponding to the reduction in consumed power.

19. The client device of claim 15, wherein the received power control message indicates at least one of an amount of electric power to be reduced and an identification of a controllable device to be instructed to disable a flow of electric power to one or more associated power consuming devices.

22. The client device of claim 15, further including a

> communications interface comprising an Internet Protocol (IP)-based interface.

JX-0002 ('522 Patent) at claims 1, 15, 19, 22 (emphasis added).

#### 3. '268 Patent Claims

Causam asserts method claims 1, 2, 6, and 7, and system claims 14, 15, and 18 of the '268 patent. The disputed '268 patent claim terms are shown in context below with emphasis:

> 1. A method for managing an electric power flow within an electric power grid, comprising:
>
> a client device receiving a power control message from a load management server, the power control message indicating at least one of an amount of electric power to be reduced and an identification of at least one controllable device to be instructed to disable the electric power flow to at least one associated power consuming device;
>
> the client device issuing a power management command to the at least one controllable device, the power management command causing the at least one controllable device to disable the electric power flow to the at least one associated power consuming device to provide a reduction in consumed power; and
>
> generating measurement and verification data corresponding to the reduction in consumed power.
>
> 2. The method of claim 1, further comprising generating a **power supply value (PSV)** corresponding to the reduction in consumed power.
>
> 6. The method of claim 1, wherein the measurement and verification data is associated with individual power consuming devices.
>
> 7. The method of claim 1, further including aggregating the measurement and verification data for a multiplicity of power consuming devices.
>
> 14. A system for managing electric power on an electric power grid, comprising:
>
> a client device comprising at least one controllable device interface facilitating communication of power control instructions to at least one controllable device, the power control instructions operable to cause the at least one controllable device to selectively enable and disable a flow of electric power to at least

> one power consuming device; and
>
> a device control manager operably coupled to the at least one controllable device interface, the device control manager operable to issue power control instructions to the at least one controllable device through the at least one controllable device interface responsive to the received power control instructions, and based upon a reduction in consumed power for disabled flow of electric power, generate measurement and verification data corresponding to the reduction in consumed power;
>
> wherein the client device receives a power control message from a remote load management server, and wherein the power control message received from the remote load management server is responsive to a power reduction request.
>
> 15. The system of claim 14, wherein a **power supply value (PSV)** is generated corresponding to the reduction in consumed power, and wherein the **PSV** indicates a compensation provided for power supply associated with the reduction in consumed power.
>
> 18. The system of claim 14, wherein the power control message indicates at least one of an amount of electric power to be reduced and an identification of a controllable device to be instructed to disable the flow of electric power to the at least one power consuming device.

JX-0003 ('268 Patent) at claims 1, 2, 6-7, 14-15, 18 (emphasis added).

#### 4. '592 Patent Claims

Causam asserts dependent system claim 13 (which depends from claim 1) of the '592 patent. The disputed '592 patent claim terms are shown in context below with emphasis:

> 1. A system for managing power on an electric power grid, comprising:
>
> at least one power consuming device, at least one controllable device, and at least one client device constructed and configured in network communication;
>
> wherein the at least one controllable device is operably coupled to the at least one power consuming device;
>
> wherein the at least one controllable device is operable to control a power flow from the electric power grid to the at least one power consuming device responsive to power control instructions from the at least one client device;

> wherein the at least one power consuming device has an actual value of power reduced based on **revenue grade metrology**, and confirmed by measurement and verification; and
>
> wherein the actual value of power reduced is a curtailment value as supply equivalence and provides operating reserve for the electric power grid.
>
> 13. The system of claim 1, wherein the actual value of power to be reduced is a **power supply value (PSV)**; wherein the **PSV** is generated at a control center, a meter, a submeter, a building control system, or any device or controller that measures power within the standard as supplied by regulatory bodies that govern regulation of the electric power grid.

JX-0004 ('592 Patent) at claims 1, 13 (emphasis added).

## B. Construction of Disputed Claim Terms

### 1. "power supply value (PSV)"

The disputed term "power supply value (PSV)" or "PSV" appears in asserted claim 19 of the '552 patent, claims 1 and 15 of the '522 patent, claims 1 and 15 of the '268 patent, and claim 13 of the '592 patent. The parties have proposed the following constructions:

| Complainant's Construction | Respondents' Construction |
|---|---|
| "a value corresponding to a reduction in consumed power by a power consuming device(s) that is confirmed by measurement and verification"<br>*See, e.g.*, '268 patent at 7:28-63 | "an actual value that includes measurement and verification of the reduction in consumed power that is calculated at the meter or submeter, at a building control system, or at a device or controller that measures power" |

*See* CIB at 23-29; RIB at 15-18.

Based on the parties' proposed constructions above, the parties' dispute over the interpretation of "power supply value (PSV)" centers on (1) whether the value is "a value corresponding to" or "an actual value"; and (2) whether the value must be "calculated at the meter or submeter, at a building control system, or at a device or controller that measures power."

**PUBLIC VERSION**

It is undisputed that at the time of the Asserted Patents, the term "power supply value" (PSV) was not a known term of art. Tr. at 307:4–11 (Madisetti). Indeed, the inventor of the Asserted Patents, Mr. Forbes, testified that generating a PSV was one of his purported innovations. Tr. at 58:18–22 (Forbes). The meaning of the term "PSV" was thus expressly defined in the specification of all of the Asserted Patents, which states that:

> Importantly, **the PSV is an actual value that includes measurement and verification of the reduction in consumed power**; such measurement and verification methods may be determined by the appropriate governing body or authority for the electric power grid(s). Power Supply Value (PSV) is calculated at the meter or submeter or at building control system or at any device or controller that measures power within the standard as supplied by the regulatory body(ies) that govern the regulation of the grid**.**

(JX-0003 ('268 Patent) at 7:28-63 (emphasis added); *see also* JX-0001 ('552 Patent) at 7:19–28; JX-0002 ('522 Patent) at 7:29–38; and JX-0004 ('592 Patent) at 9:2–12. Thus, the Asserted Patents expressly define a "power supply value" as "an actual value that includes measurement and verification of the reduction in consumed power."

Respondents contend that "power supply value" should be construed to include the additional requirement that it is "calculated at the meter or submeter, at a building control system, or at a device or controller that measures power." While the term "power supply value (PSV)" or "PSV" appears in various asserted claims of all four Asserted Patents, the only asserted claim that specifically requires that "the PSV is generated at a control center, a meter, a submeter, a building control system, or any device or controller that measures power" is claim 13 of the '592 patent. The full text of claim 13 is shown below with emphasis:

> 13. The system of claim 1, wherein the actual value of power to be reduced is a **power supply value (PSV)**; wherein the **PSV** is generated at a control center, a meter, a submeter, a building control system, or any device or controller that measures power within the standard as supplied by regulatory bodies that govern regulation of the electric

power grid.

JX-0004 ('592 Patent) at claim 13 (emphasis added). In contrast, other instances of term "power supply value" in the asserted claims merely describe the value as "corresponding to the reduction in consumed power" and do not recite a set of devices or systems that generate the value. *See, e.g.*, JX-0002 ('522 Patent) at claims 1, 15; JX-0003 ('268 Patent) at claims 2, 15.

The fact that most of the asserted claims recite no limitation on the device or system that generates the "power supply value," while claim 13 of the '592 patent *does* include such a limitation, creates a presumption that the term "power supply value" is not limited in the manner Respondents suggest. *Tandon Corp. v. United States Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987) ("[T]he doctrine of claim differentiation states the presumption that the difference between claims is significant."); *see also Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004) (if an "express requirement . . . is found only in certain claims," it "substantially undermines" a contention that all claims include that requirement). Respondents cite no other record evidence that overcomes this presumption.

To the contrary, other intrinsic evidence is consistent with the definition given by the inventor in the common specification. For example, during prosecution of the '552 patent, the patentee distinguished the prior art by arguing that it failed to disclose "'a power supply value corresponding to the amount of electric power reduced,' thereby providing an **actual value** for awarding supply equivalence compensation." JX-0005 ('552 Patent File History) at 226 (emphasis added). That argument is consistent with the way the inventor used the term in the specification and the asserted claims.

Considering the evidence intrinsic to the relevant patents, I will construe "power supply value" and "PSV" in the '552, '522, '268, and '592 patents as "an actual value that includes

measurement and verification of the reduction in consumed power."

**2. "revenue grade metrology"**

The disputed term "revenue grade metrology" appears in non-asserted independent system claims 1 and 18 of the '592 patent. Asserted claim 13 depends from claim 1. The parties have proposed the following constructions:

| Complainant's Construction | Respondents' Construction |
|---|---|
| No construction necessary.<br>If the ALJ determines a construction is necessary, the term should be given its plain and ordinary meaning, which is "metrology conforming to revenue grade requirements." | Plain and ordinary meaning:<br>"metrology using a meter conforming to the revenue grade requirements of ANSI C12" |

*See* CIB at 29; RIB at 18-20.

The parties agree that the term "revenue grade metrology" should be given its plain and ordinary meaning. The parties also agree that "revenue grade metrology" must be subject to revenue grade requirements. The parties' disagreement centers on whether the meter device used for metrology must satisfy the revenue grade requirements of ANSI C12 as contended by Respondents.

As noted, Causam asserts dependent system claim 13 (which depends from claim 1) of the '592 patent. The term "revenue grade metrology" appears three times in the '592 patent: in non-asserted claims 1 and 18 and in the Abstract. The disputed '592 patent claim term is shown in context below with emphasis:

> 1. A system for managing power on an electric power grid, comprising:
>
> at least one power consuming device, at least one controllable device, and at least one client device constructed and configured

> in network communication;
>
> wherein the at least one controllable device is operably coupled to the at least one power consuming device;
>
> wherein the at least one controllable device is operable to control a power flow from the electric power grid to the at least one power consuming device responsive to power control instructions from the at least one client device;
>
> wherein the at least one power consuming device has an actual value of power reduced based on **revenue grade metrology**, and confirmed by measurement and verification; and
>
> wherein the actual value of power reduced is a curtailment value as supply equivalence and provides operating reserve for the electric power grid.
>
> 13. The system of claim 1, wherein the actual value of power to be reduced is a power supply value (PSV); wherein the PSV is generated at a control center, a meter, a submeter, a building control system, or any device or controller that measures power within the standard as supplied by regulatory bodies that govern regulation of the electric power grid.

JX-0004 ('592 Patent) at claims 1, 13 (emphasis added); *see also* claim 18 ("actual value of power reduced and/or to be reduced at each of the at least one load is calculated based on **revenue grade metrology**, and confirmed by measurement and verification") (emphasis added).

Consistent with non-asserted claims 1 and 18, the Abstract states:

> Systems for providing operating reserves to an electric power grid are disclosed. In one embodiment, a system comprises at least one power consuming device, at least one controllable device, and a client device constructed and configured in network communication. The at least one controllable device is operably coupled to the at least one power consuming device. The at least one controllable device is operable to control a power flow from the electric power grid to the at least one power consuming device responsive to power control instructions from the client device. Each of the at least one power consuming device has an actual value of power reduced and/or to be reduced based on **revenue grade metrology**, and confirmed by measurement and verification. The actual value of power reduced and/or to be reduced is a curtailment value as supply equivalence and provides operating reserve for the electric power grid.

JX-0004 ('592 Patent) at Abstract (emphasis added).

Read in full context, it is clear the disclosure in the Abstract is nearly identical to the disclosures of disputed term "revenue grade metrology" in the claims. Those disclosures demonstrate that a power consuming device (or a load) has an actual value of power reduced based on revenue grade metrology that is confirmed by measurement and verification.

Respondents argue that the term "revenue grade metrology" should be construed as "metrology using a meter conforming to the revenue grade requirements of ANSI C12" because "the applicable standard for revenue grade metrology in the United States is published as ANSI C12." RIB at 19. However, neither the claims nor the specification of the '592 patent limit the type of protocol that must be used to conform to revenue grade requirements. The only disclosure of ANSI C12 in the '592 patent is in a list of potential wireless communication protocols that may be used as part of the invention. JX-0004 ('592 Patent) at 10:31-56 ("For example, the ALD 100 may communicate using RF systems operating via one or more base stations 90 (one shown) using one or more wireless communication protocols, such as GSM, **ANSI C12**.22, Enhanced Data GSM Environment (EDGE), HSPA, LTE, Time Division Multiple Access (TDMA), or CDMA data standards, including CDMA 2000, CDMA Revision A, CDMA Revision B, and CDMA EVDO Rev. A.") (emphasis added).

No party has cited any evidence intrinsic to the '592 patent that limits the term "revenue grade metrology" to conformance with one protocol given as an example in the specification. *See JVW Enterprises, Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1335 (Fed. Cir. 2005) (a tribunal must "not import limitations into claims from examples or embodiments appearing only in a patent's written description . . . unless the specification makes clear that 'the patentee . . . intends for the claims and the embodiments in the specification to be strictly coextensive'" (quoting

*Phillips v. AWH Corp*., 415 F.3d 1303, 1323 (Fed. Cir. 2005) (en banc)).[12] Accordingly, I will interpret this claim term according to its plain and ordinary meaning, which is "metrology conforming to revenue grade requirements," without requiring conformity with the ANSI C12 standard.

## V. INFRINGEMENT – ALL ASSERTED PATENTS

The asserted patents and claims at issue in this investigation are as follows: claims 19 and 23 of the '552 patent; claims 1, 15, 19, and 22 of the '522 patent; claims 1, 2, 6-7, 14-15, and 18 of the '268 patent; and claim 13 of the '592 patent.

To prove infringement of a given claim, Causam must show every element of the claim in an accused device. I find that Causam has failed to demonstrate Respondents infringed any of the asserted claims of the Asserted Patents. The tables below summarize the claim elements not proved to be present in the respective Accused Products:

| All Asserted Patents | | | | |
|---|---|---|---|---|
| **Claim Element** | **Resideo** | **Itron** | **Alarm.com** | **ecobee** |
| "power supply value (PSV)" | Not Proved | Not Proved | Not Proved | Not Proved |
| "power consuming device(s)" | | Not Proved | | |
| "controllable device(s)" or "controllable device interface" | | Not Proved | | Not Proved |

[12] As for the differences between the constructions advanced by Causam and the Respondents, neither party has explained how those differences are material to the investigation. *See U.S. Surgical Corp. v. Ethicon, Inc*., 103 F.3d 1554, 1570 (Fed. Cir. 1997) (neither the Federal Circuit nor the Supreme Court have held "that the trial judge must conduct such a rote exercise" as construing claims "whether or not there is an issue in material dispute as to the meaning").

**PUBLIC VERSION**

| ’552 Patent | | | | |
|---|---|---|---|---|
| **Claim Element** | **Resideo** | **Itron** | **Alarm.com** | **ecobee** |
| “power supply value (PSV)” | Not Proved | Not Proved | Not Proved | Not Proved |
| “power consuming device(s)” | | Not Proved | | |
| “controllable device(s)” or “controllable device interface” | | Not Proved | | Not Proved |
| “power control message” | Not Proved | Not Proved | Not Proved | Not Proved |
| “disable the electric power flow” / “disable a flow of electric power” | | | Not Proved | |
| “power control instruction” | | | | Not Proved |
| “device control manager” | | | | Not Proved |
| “control center” | Not Proved | Not Proved | | |

| ’522 Patent | | | | |
|---|---|---|---|---|
| **Claim Element** | **Resideo** | **Itron** | **Alarm.com** | **ecobee** |
| “power supply value (PSV)” | Not Proved | Not Proved | Not Proved | Not Proved |
| “power consuming device(s)” | | Not Proved | | |
| “controllable device(s)” or “controllable device interface” | | Not Proved | | Not Proved |
| “power control message” | Not Proved | Not Proved | Not Proved | Not Proved |
| “disable the electric power flow” / “disable a flow of electric power” | | | Not Proved | |
| “power control instruction” | | | | Not Proved |
| “device control manager” | | | | Not Proved |
| “a communications interface comprising an Internet Protocol (IP)-based interface” | | | Not Proved | |

**PUBLIC VERSION**

| ’268 Patent | | | | |
|---|---|---|---|---|
| **Claim Element** | **Resideo** | **Itron** | **Alarm.com** | **ecobee** |
| “power supply value (PSV)” | Not Proved | Not Proved | Not Proved | Not Proved |
| “power consuming device(s)” | | Not Proved | | |
| “controllable device(s)” or “controllable device interface” | | Not Proved | | Not Proved |
| “power control message” | Not Proved | Not Proved | Not Proved | Not Proved |
| “disable the electric power flow” / “disable a flow of electric power” | | | Not Proved | |
| “power control instruction” | | | | Not Proved |
| “device control manager” | | | | Not Proved |
| “measurement and verification” | Not Proved | Not Proved | Not Proved | Not Proved |
| “compensation” “associated with the reduction in consumed power” | | | Not Proved | |

**PUBLIC VERSION**

| ’592 Patent | | | | |
|---|---|---|---|---|
| **Claim Element** | **Resideo** | **Itron** | **Alarm.com** | **ecobee** |
| “power supply value (PSV)” | Not Proved | Not Proved | Not Proved | Not Proved |
| “power consuming device(s)” | | Not Proved | | |
| “controllable device(s)” or “controllable device interface” | | Not Proved | | Not Proved |
| “configured in network communication” | Not Proved | Not Proved | Not Proved | Not Proved |
| “the PSV is generated at a control center, a meter, a submeter, a building control system, or any device or controller that measures power” | Not Proved | Not Proved | | Not Proved |
| “actual value of power reduced based on revenue grade metrology, and confirmed by measurement and verification” | Not Proved | Not Proved | Not Proved | Not Proved |
| “a curtailment value as supply equivalence that provides operating reserve for the electric power grid” | Not Proved | Not Proved | | |
| “controllable device is operable to control a power flow” | | | | Not Proved |
| “measurement and verification” | Not Proved | Not Proved | Not Proved | Not Proved |
| “compensation” “associated with the reduction in consumed power” | | | Not Proved | |

**PUBLIC VERSION**

### A. Alleged Infringement by RESIDEO ACCUSED PRODUCTS

I find that Causam has failed to demonstrate Resideo infringed any of the asserted claims of the asserted patents with the Resideo Accused Products. My reasoning follows.

#### 1. Overview of the Resideo Accused Products

Resideo manufactures and sells thermostats, including Internet-connected thermostats, that have several features and functions. Resideo's thermostats, regardless of whether they are connected to the Internet or not, receive information from several sources and use that information to control heating, ventilation, and air conditioning ("HVAC") equipment to maintain a residence or a building at a selected temperature. RX-0396C (Amundson WS) at Q/A 14. The thermostats take in information such as the current temperature, the selected temperature setpoint, scheduling information, the fan mode selected (on, off, or auto), and whether heat mode or cool mode has been selected. *Id*. Resideo's Internet connected thermostats also connect to Resideo's cloud systems via two different application programming interfaces ("APIs"). *Id*. at Q/A 15. Certain of Resideo's thermostats receive messages from the Total Connect Comfort ("TCC") system while other thermostats receive messages from the Lyric Connect Comfort ("LCC") cloud systems. *Id*. These two cloud systems differ in operation. *Id*.

With the exception of Resideo's Z-Wave thermostats, Resideo's Internet-connected thermostats are capable of receiving messages, including demand response messages. RX-0396C (Amundson WS) at Q/A 16. Demand response messages are only received if a customer is enrolled by their utility in a demand response program. *Id*.

**Demand Response Messages**

Resideo's platform for executing and processing demand response programs is called Connected Savings. RX-0388C (Paradiso RWS) at Q/A 93. The goal of the platform is to leverage

features of Resideo's Internet-connected thermostats to shift energy consumption to periods of lower overall energy demand. *Id.* at Q/A 94. The Resideo Connected Savings platform includes the Connected Savings Insight ("CSI") Portal. *Id.* at Q/A 95. A utility can access the portal to provide certain information about a demand response event (such as start and end time) and actions to take during the event (such as changing the temperature setpoint for a thermostat or changing the duty cycle of HVAC equipment). *Id.* The actions are then executed by the Demand Response Management System ("DRMS") Server. *See, e.g.*, RX-0911C (Customer CSI Instructions).

In Resideo's system, the demand response process begins with a message sent from a TCC server and LCC server to the TCC and LCC APIs. RX-0396C (Amundson WS) at Q/A 22, 30. The TCC and LCC APIs do not manage energy or loads; they are simply communications hubs. Certain of Resideo's thermostats receive messages from the TCC API and other Resideo thermostats receive messages from the LCC API. RX-0396C (Amundson WS) at Q/A 15. The processor on the customer's thermostat receives and processes the messages received from the TCC and LCC APIs. *Id.* at Q/A 19. In the case of a demand response message, [redacted] *Id.* Messages from both the TCC and LCC APIs may [redacted] but messages from neither system identify a particular thermostat, identify any relays on the thermostat, or include an amount of electric power to be reduced. *Id.* at Q/A 21, 24–27, 29, 32–34; *see also* Tr. 632:1–25 (Amundson).

A setpoint offset event changes the thermostat setpoint by a pre-determined number of degrees during the course of the event. RX-0388C (Paradiso RWS) at Q/A 97. A duty cycle event sets the duty cycle percentage of the thermostat for the duration of the event. *Id.* A duty cycle

event is intended to lock out the setpoint for a percentage of time in the duty cycle period. *Id*. For example, a 50% duty cycle generally means that the HVAC appliance is not operating for 50% of the time and is operating normally for 50% of the time. *Id*. at Q/A 99. Using the CSI Portal, a utility can set 0%, 25%, 50%, and 75% duty cycles. RX-0398C (Robbins WS) at Q/A 18. The CSI Portal does not [redacted] of the demand response event. RX-0388C (Paradiso RWS) at Q/A 101; RX-0398C (Robbins WS) at Q/A 21. Neither a setpoint offset message nor a change in duty cycle message contains an instruction to reduce the power used at the customer address by a specified amount. RX-0388C (Paradiso RWS) at Q/A 98. Indeed, the messages may not result in any reduced power consumption if the customer thermostat is turned off when a demand response message is sent out. Moreover, additional parameters received by the customer thermostat [redacted] *Id*. at Q/A 278.

**Relays on Resideo Thermostats**

Many Resideo thermostats contain relays that open and close when voltage is applied to the relays, turning on and off aspects of the HVAC system. RX-0396C (Amundson WS) at Q/A 70. In such thermostats the relays are not a separate device. *Id*. at Q/A 73. However, two Resideo products are exceptions. Resideo's RedLINK products may operate with a separate Equipment Interface Module ("EIM") that has relays. *Id*. at Q/A 77. The Lyric Round contains no relays at all. Instead, it contains FETs. *Id*. at Q/A 79.

The processor on the thermostat receives a great deal of information that is relevant to how the relays will ultimately be set. RX-0388C (Paradiso RWS) at Q/A 108; *see also* Tr. 632:1–25 (Amundson). For example, in addition to a demand response event message, the processor also receives the indoor temperature at the thermostat, the outdoor temperature, humidity, current state

PUBLIC VERSION

CONFIDENTIAL MATERIAL OMITTED

of the system, temperature setpoint limits, and user-specified temperature setpoint schedules. *Id.* All of this information is processed [redacted] *Id.*

Software within the processor [redacted] in response to a demand. In response to software operations, the processor [redacted] on the thermostat. RX-0388C (Paradiso RWS) at Q/A 109. There are multiple [redacted]. *Id.* All of the [redacted] must be off for the [redacted] *Id.* The thermostat does not have any information regarding the specifics of the HVAC equipment and therefore it does not have any information regarding the amount of power that the HVAC equipment uses. *Id.* at Q/A 27.

**<u>Information Reported from the Thermostat</u>**

There is no status or other information sent [redacted] It is a simple [redacted]. RX-0396C (Amundson WS) at Q/A 74–75. The thermostat processor does know, however, that a [redacted] *Id.* at Q/A 87–88. The Resideo thermostats send this [redacted] back to the TCC or LCC cloud-based systems, where this information can then be used [redacted] *Id.* at Q/A 83, 86. This [redacted] of an HVAC appliance connected to the thermostat. *Id.* at Q/A 87.

**<u>Performance of a Demand Response Event</u>**

The Resideo Connected Savings platform receives the information reported to the TCC and LCC cloud-based systems and uses this information [redacted] RX-0396C (Amundson WS) at Q/A 86. The performance metrics corresponding

**PUBLIC VERSION**

**CONFIDENTIAL MATERIAL OMITTED**

to a demand response event [redacted] RX-0393C (Hashmi WS) at Q/A 35-44. This source code is part of the Resideo Connected Savings Platform and is separate and independent from the source code running on the Resideo thermostats. Thus, the [redacted] source code is not located on the thermostat.

The performance metrics of a demand response event are [redacted] RX-0393C (Hashmi WS) at Q/A 35-41. To calculate the first number, [redacted] from the thermostats. *Id.* at Q/A 42. The server source code [redacted] *Id.* Aggregating the [redacted] provides the [redacted] for the demand response event. *Id.* at Q/A 42. The [redacted] the participating thermostats are [redacted]. *Id.* This [redacted] for every thermostat in a particular demand response event. *Id.* at Q/A 43.

The [redacted] is calculated by identifying several days that are not weekends, holidays, or previous demand response event days. RX-0393C (Hashmi WS) at Q/A 44. Typically, [redacted] *Id.* The average of the estimated energy data over the [redacted] *Id.* The difference between the average data over the [redacted] of the demand response event. *Id.*

PUBLIC VERSION

CONFIDENTIAL MATERIAL OMITTED

#### 2. Direct Infringement

##### a. All Asserted Patents

###### i. "power supply value (PSV)"

Claim 19 of the '552 patent, claims 1 and 15 of the '522 patent, claims 1 and 15 of the '268 patent, and claim 13 of the '592 patent all require a "power supply value (PSV)."

The Resideo Accused Products do not infringe the claims requiring a "power supply value." RX-0388C (Paradiso RWS) at Q/A 146, 157-162. This is at least because the numbers that Causam identifies as corresponding to the claimed power supply value are not actual values: they do not correspond to a reduction in consumed power and they do not include (and are not confirmed by) measurement and verification. *Id.* at Q/A 147; *see also* Tr. 730:21-731:4 (Paradiso).

First, Causam relied on the "[redacted]" calculation shown in CX-0327C (Native Spreadsheet) to show a "power supply value." The "[redacted]" calculation that Causam cites is [redacted]. RX-0388C (Paradiso RWS) at Q/A 158. Additionally, the CX-0327C (Native Spreadsheet) does not show the current methodology the Resideo system uses to calculate the performance of a demand response event. *Id.* at Q/A 159. The current methodology (as described above in the overview of the Resideo Accused Products) can be found in the DRMS the source code Resideo produced. RX-0393C (Hashmi WS) at Q/A 35-44. Indeed, it is the unrebutted testimony of Dr. Hashmi that the current methodology relies on both (1) [redacted] that are calculated based on [redacted] provided by the thermostat (the only information the thermostats provide) and (2) [redacted] for every participant in the demand response event, regardless of the equipment that the customer actually uses. *Id.*

**PUBLIC VERSION**

**CONFIDENTIAL MATERIAL OMITTED**

Second, Causam relied on CX-0326C (NY Program Report). CX-0326 is a document from Consolidated Edison of New York, not a Resideo document. RX-0388C (Paradiso RWS) at Q/A 160. The document does not depict Resideo data and does not show that Resideo generates any power supply value. *Id.* The data in Appendix E of CX-0326C was generated by Consolidated Edison relying on their own meter data. *Id.*; *see also* Tr. 667:5–669:18 (Robbins). Moreover, Resideo does not have access to meter data. *Id.*

Third, Causam relied on CX-0277 (Resideo Connected Savings DR Platform). CX-0277C merely shows that the Resideo Connected Savings platform performs calculations [redacted] RX-0388C (Paradiso RWS) at Q/A 161. As a specific example, Dr. Madisetti cited to "[redacted]." The "[redacted]" is a calculation based on an [redacted]. *Id.* The definition itself describes that calculation as [redacted].

Lastly, as discussed above in the overview of the Resideo Accused Products, the Resideo Accused Products themselves perform no calculations. They merely report [redacted] back to the LCC and TCC cloud-based systems. RX-0396C (Amundson WS) at Q/A 83–88. The only information available to the thermostat is that a [redacted] *Id.* at Q/A 88. The thermostat does not have any information about the HVAC appliance. *Id.*

**<u>"a compensation provided for power supply associated with the reduction in consumed power"</u>**

Claim 15 of the '268 patent requires a power supply value that "indicates a compensation provided for power supply associated with the reduction in consumed power."

The Resideo Accused Products have not been shown to provide "compensation" for a power supply value. RX-0388C (Paradiso RWS) at Q/A 204. Beyond a conclusory statement by

their expert, Causam identified no evidence to support its contention that Resideo "will generate a power supply value [ ], which indicates a compensation provided for power supply." *Compare* CX-0776C (Madisetti WS) at Q/A 600 *with* RX-0388C (Paradiso RWS) at Q/A 210-11.

### b. Direct Infringement Issues Common to the '268, '552 and '522 Patents

#### i. "power control message"

Claims 19 and 23 of the '552 patent, claims 1, 15, and 19 of the '522 patent, and claims 1, 14, and 18 of the '268 patent require a "power control message."

The "power control message" limitations have two requirments: (1) an identification of an amount of electric power to be reduced, disabled, or enabled, and (2) an identification of at least one controllable device to be instructed to enable or disable a flow of electric power to one or more associated power consuming devices. RX-0388C (Paradiso RWS) at Q/A 255.

The accused Resideo products do not meet this limitation as the accused power control message in those products has *neither* (1) an identification of an amount of electric power to be reduced, disabled, or enabled *nor* (2) an identification of a controllable device. Causam cites no evidence to the contrary.

**"amount of electric power to be reduced"**

The Resideo Accused Products do not have any message that indicates "an amount of electric power to be reduced." RX-0388C (Paradiso RWS) at Q/A 258–261, 264–267. As explained below, Causam identifies instructions that alter duty cycle or alter temperature setback, but those messages do not specify an amount of power to be reduced. *Id*.

Causam alleges that the Resideo TCC and LCC demand response messages include an amount of power to be reduced. RX-0388C (Paradiso RWS) at Q/A 265–266. But the TCC and

**PUBLIC VERSION**

**CONFIDENTIAL MATERIAL OMITTED**

LCC messages do not include an amount of power to be reduced. *Id.* The TCC and LCC message merely alter duty cycle or perform a temperature offset. For example, as shown in the diagram below, the TCC message used in the 9000 Wi-Fi Smart Thermostat conveys information related to [redacted] of a Resideo demand response event, [redacted]. *Id.* at Q/A 265. In the diagram, [redacted] which is an input to the control algorithm of the thermostat that will [redacted] *Id.* [redacted]. *Id.* [redacted]. *Id.* [redacted] *Id.* [redacted] is an alternative demand response strategy where Resideo can [redacted] *Id.* None of these parameters include any amount of power to be reduced. *Id.*

[redacted]

Similarly, the LCC message, which contains the parameters for the LCC demand response message, also does not have any indication of an amount of power to be reduced. *Id.* at Q/A 266;

**PUBLIC VERSION**

**CONFIDENTIAL MATERIAL OMITTED**

*see also* CX-0281C (LCC Message).

Indeed, in many scenarios there may be no power reduction at all in response to these messages. As a first example, some events have a pre-conditioning phase. Pre-conditioning is a portion of a demand response event that involves a period of pre-cooling in the summer or pre-heating in the winter. RX-0398C (Robbins WS) at Q/A 23). Pre-conditioning shifts the first portion of the event, such that the later stages of the event do not need to make an additional change to the operation of a utility customer's HVAC appliance. *Id*. This means that if, for example, there is a demand response event in the summer, a pre-conditioning event would pre-cool the home to a comfortable temperature for the resident. *Id*. 24. Thereafter, in the later stages of the event, the operation of the HVAC application does not need to be adjusted further. *Id*. Even the reports that are sent to the utility recognize that the amount energy used during an event may in fact go *up*. *Id*. at Q/A 34–36; *see also* RX-0911C.14 (Customer CSI Instructions).

A second example is the [redacted]. The [redacted] source code[13] in the Resideo thermostats programs the processor to check if the current room temperature has exceeded [redacted]. RX-0393C (Hashmi WS) at Q/A 26–27.

Causam asserted an alternative theory of infringement under the doctrine of equivalents. Causam's theory fails for at least the following reasons.

First, duty cycling and temperature setbacks perform a different function, in a different way, to achieve a different result, than indicating an amount of electric power to be reduced, as is

---

[redacted]

required by the claims in question. RX-0388C (Paradiso RWS) at Q/A 275. For example, the function of duty cycling or implementing a temperature setback is not the same as the function of indicating "an amount of electric power to be reduced," as the claim requires. RX-0388C (Paradiso RWS) at Q/A 279. A message that merely indicates that a thermostat should perform duty cycling or temperature setbacks does not indicate any amount of power to be reduced. *Id*. In fact, there might be no power reduction at all. *Id*. This sort of message will at best do one of three things: (1) nothing at all (for example, if the setpoint of a thermostat is already beyond the requested setpoint), (2) cycle a device off as instructed during a portion of an event, or (3) shift a temperature setpoint. *Id*. Nothing in any of these three options indicates the amount of power to be reduced. *Id*. Indeed, in the first scenario, there would be no power reduction at all. *Id*. The message does not indicate an amount of electric power to be reduced. Again, the Resideo documents cited by Causam specifically contemplate that the amount of power used during an event can actually increase. RX-0398C (Robbins WS) at Q/A 34–36; *see also* RX-0911C.14 (Customer CSI Instructions).

Causam's doctrine of equivalents theory also fails the insubstantial differences test. Instructing a device to participate in cycling-based control strategies or temperature-based control strategies is very different than instructing a device regarding "an amount of electric power to be reduced," as the claim requires. *Id*. 276. A message that requests duty cycling or temperature setback does not actually give any insight into whether any electric power will actually be reduced, and it certainly doesn't indicate "an amount of electric power to be reduced," as the claim requires. RX-0388C (Paradiso RWS) at Q/A 277. More specifically, if a duty cycling message is sent to control a power consuming device that is not operating, there will be no power reduction at all. *Id*. 278. Similarly, if a temperature setback message is sent to control a thermostat that was off or

already set at a higher temperature than the setback, there will be no power reduction at all. *Id*. None of the Resideo Accused Products actually reduce a known amount of power. *Id*. Instead, requests are made consistent with the normal operation of a thermostat, which may or may not affect the amount of power used or reduced. *Id*.

#### c. Direct Infringement Issues Common to the ’268 and ’592 Patents

##### i. “measurement and verification”

Claims 1, 6, 7, and 14 of the ’268 patent and non-asserted claim 1 of the ’592 patent require “measurement and verification.”

The Asserted Patents associate “measurement and verification” with a “power supply value.” RX-0388C (Paradiso RWS) at Q/A 216. The Asserted Patents explain that a power supply value includes “measurement and verification” and that “measurement and verification methods may be determined by the appropriate governing body or authority for the electric power grid(s).” *Id*.; *see also* JX-0003 (’268 Patent) at 7:28–63.

Mr. Forbes explained that “measurement” is taking a raw measurement from a meter or submeter or from a device that’s capable of performing measurement, and he testified that “verification” is then taking that information and running it through an algorithm in order to verify the information. Tr. 61:2-62:17 (Forbes); RX-0011C (Forbes Tr. 637:21–638:18.

First, Resideo does not infringe claims requiring measurement and verification at least because it does not have access to meter data, and therefore cannot provide “measurement and verification” or any accurate data regarding actual power savings. RX-0398C (Robbins WS) at Q/A 43, 56.

Second, the documents and source code Causam relied on do not establish that Resideo

**PUBLIC VERSION**

**CONFIDENTIAL MATERIAL OMITTED**

performs "measurement and verification." First, Causam relied on CX-0288C (DR Event Report Detailed), but all CX-0288C shows is that Resideo calculates [redacted]. RX-0388C (Paradiso RWS) at Q/A 226. Runtime data is insufficient for measurement and verification at least because measurement and verification requires an actual measurement of power. *Id*. at Q/A 226–228; *see also* RX-0011C (Forbes Tr. 637:21–638:18). Causam also relies on CX-0237C (Resideo DR Experience on Thermostat). But CX-0327C shows that [redacted] *Id*. at Q/A 229. Measurement and verification is different than an estimate; it requires an actual measurement. *Id*. This is not shown in CX-0327C. *Id*. Lastly, Causam relied on [redacted]. But as explained by Dr. Hashmi, this function is not used by the Resideo Accused Products at all. RX-0388C (Paradiso RWS) at Q/A 230; RX-0393C (Hashmi WS) at Q/A 29. Therefore, the thermostat is not capable of creating and saving [redacted]

Lastly, Resideo executes demand response events at the request of utilities, and only [redacted] about the relative performance of any given event. RX-0398C (Robbins WS) at Q/A 44. Measurement and verification is performed solely by the utility based on information that is only available to the utility (meter data) in order to meet the utilities' reporting obligations to the utility commission. *Id.*

**"measurement and verification data is associated with individual power consuming devices" and "aggregating the measurement and verification data for a multiplicity of power consuming devices"**

Claim 6 of the '268 patent requires that the "measurement and verification" data be associated with individual power consuming devices. Claim 7 of the '268 patent requires that the measurement and verification data be aggregated for a multiplicity of power consuming devices.

Causam only provided conclusory statements regarding the additional limitations of claims

6 and 7 and does not cite to evidence that Resideo aggregates measurement and verification for a multiplicity of power consuming devices and provides no rational for such contention. RX-0388C (Paradiso RWS) at Q/A 247-248. Causam merely referenced other claims that neither include nor infer such a requirement. *Id.*; CX-0776C (Madisetti WS) at Q/A 415, 434. Causam has not met its burden to show that these limitations are met.

#### d. Direct Infringement Issues Specific to the ’552 Patent

##### i. “control center”

Independent claim 19 of the ’552 patent requires the power supply value be generated “at the control center.” Causam did not identify any Resideo control center, and Causam did not identify or even contend that the alleged “power supply value” is generated at a control center. *Id.* at Q/A 173–180. Causam did not meet its burden to show that this limitation is met.

#### e. Direct Infringement Issues Specific to the ’592 Patent

Causam contends that the Resideo Accused Products infringe claim 13 of the ’592 patent (which depends from claim 1) for the same reasons as set forth for claims 1 and 2 of the ’268 patent. CIB at 248 (“For the same reasons set forth above for claims 1 and 2 of the ’268 patent, the Resideo Accused Products infringe claim 13 of the ’592 patent”). Accordingly, because I determined the Resideo Accused Products do not to infringe claims 1 and 2 of the ’268 patent, they also do not infringe claim 13 of the ‘592 patent. The Resideo Accused Products also do not infringe claim 13 of the ‘592 patent for the additional reasons below.

##### i. “configured in network communication”

Claim 1 of the ’592 patent requires “at least one power consuming device, at least one controllable device, and at least one client device constructed and configured in network

communication." As noted, Causam no longer asserts claim 1 but continues to assert claim 13, which depends from claim 1.

The Resideo Accused Products do not have "at least one power consuming device, at least one controllable device, and at least one client device constructed and configured in network communication." RX-0388C (Paradiso RWS) at Q/A 344–349, 351; *see also* Tr. 714:18-716:5 (Paradiso). The fact that the Accused Products are connected to the internet via "WiFi," "RedLINK Frequency," and "Z-Wave" communication protocols is not sufficient to satisfy this limitation. *Id*. at Q/A 351. The claims require network communication between the accused Resideo thermostats (the alleged client device), the controllable device (the alleged relay), and a power consuming device. No such network communication has been shown.

**ii. "the PSV is generated at a control center, a meter, a submeter, a building control system, or any device or controller that measures power"**

Asserted claim 13 of the '592 patent requires that the power supply value be generated "at a control center, a meter, a submeter, a building control system, or any device or controller that measures power within the standards as supplied by regulatory bodies that govern regulation of the electric power grid."

As noted above, Causam did not identify any Resideo control center . RX-0388C (Paradiso RWS) at Q/A 177. Nor is there any evidence that the Resideo Accused Products generate a power supply value "at a control center, a meter, a submeter, a building control system, or any device or controller that measures power within the standards as supplied by regulatory bodies that govern regulation of the electric power grid." *Id*. at Q/A 179. Causam did not identify any control center, and Causam did not identify or even contend that the alleged "power supply value" is generated at a control center (or at any of the other claim 13 locations). *Id*. at Q/A 173–180.

#### iii. "actual value of power reduced based on revenue grade metrology, and confirmed by measurement and verification"

Independent claim 1 of the '592 patent requires an "actual value of power reduced based on revenue grade metrology, and confirmed by measurement and verification." Causam no longer asserts claim 1 but continues to assert claim 13, which depends from claim 1.

First, as explained with respect to "power supply value" above, the Resideo Accused Products do not have an "actual value of power reduced." RX-0388C (Paradiso RWS) at Q/A 184–185; *see also* Tr. 730:21-731:4 (Paradiso). Second, the Resideo Accused Products do not have an actual value of power reduced "based on revenue grade metrology." RX-0388C (Paradiso RWS) at Q/A 186-191. I construed "revenue grade metrology" according to its plain and ordinary meaning, which is "metrology conforming to revenue grade requirements," without requiring conformity with the ANSI C12 standard. Causam did not attempt to show that this limitation is met. *Id*. at Q/A 190–191.

Lastly, the Resideo Accused do not have an actual value of power reduced based on revenue grade metrology and "confirmed by measurement and verification." RX-0388C (Paradiso RWS) at Q/A 192. As explained below with respect to "measurement and verification," the Resideo Accused Products do not perform measurement and verification.

#### iv. "a curtailment value as supply equivalence that provides operating reserve for the electric power grid"

Independent claim 1 of the '592 patent requires "a curtailment value as supply equivalence that provides operating reserve for the electric power grid." As noted, Causam no longer asserts claim 1 but continues to assert claim 13, which depends from claim 1.

In the context of the '592 patent, "operating reserve" refers to a utility's reserve power. It

is typically broken into three categories: regulating reserve, spinning reserve, and non-spinning reserve. RX-0388C (Paradiso RWS) at Q/A 197; *see also* JX-0004 ('592 Patent) Figure 1.

The Resideo Accused Products do not have "a curtailment value as supply equivalence [that] provides operating reserve for the electric power grid." RX-0388C (Paradiso RWS) at Q/A 201. Causam merely stated, without any analysis or support, that the Accused Products achieve a power reduction, and the power reduction provides operating reserves. *Id*. Causam did not meet its burden to show the presence of this limitation.

#### 3. Indirect Infringement

Causam alleges Resideo induces its customers to infringe claim 1 of the '268 patent. Resideo does not indirectly infringe for two reasons. RX-0388C (Paradiso RWS) at Q/A 372–381. First, there is no direct infringement. *Id*. at Q/A 373. Second, Resideo does not have the specific intent to induce its customers, [redacted] it does not infringe any of the Asserted Patents. *Id*. at Q/A 379–381; *see also* Tr. 655:18–667:4 (Robbins).

### B. Alleged Infringement by Itron Accused Products

I find that Causam has failed to demonstrate Itron infringed any of the asserted claims of the asserted patents with the Itron Accused Products. My reasoning follows.

#### 1. Overview of the Itron Accused Products

Causam accuses two Itron products of infringing the Asserted Patents: IntelliPEAK DirectLink and IntelliTEMP DirectLink. RX-0437C (List of Respondents' Accused Products) at 1. IntelliPEAK DirectLink is a load control switch that includes a WiFi version, a GSM version, and an LTE version. Both the WiFi version and the GSM version are end-of-life products that are

no longer sold, while the LTE version is still being sold. The other accused product, IntelliTEMP DirectLink, is a smart thermostat that consists of a communication module designed by Itron and an OEM thermostat designed and manufactured by a company called Pro1. IntelliTEMP DirectLink is an end-of-life product that is no longer sold.

Itron's software platform, IntelliSOURCE, is used for numerous functions, but as pertinent here, it remotely interacts with IntelliPEAK DirectLink and IntelliTEMP DirectLink devices during demand response events. IntelliSOURCE is ***not*** an Accused Product. *See, e.g.*, Tr. 351:13–352:6 (Madisetti) (agreeing that IntelliSOURCE is not an Accused Product). The IntelliPEAK DirectLink device, the IntelliTEMP DirectLink device, and the IntelliSOURCE platform were developed at Comverge, which Itron acquired in 2017. *See, e.g.*, RX-0394C (Ng RWS) at Q/A 17. The two DirectLink products date back to approximately 2013, and IntelliSOURCE dates back to approximately 2009. *Id.* These have been Itron products ever since the Comverge acquisition. *Id.*

**<u>IntelliPEAK DirectLink</u>**

IntelliPEAK DirectLink is a load control switch that includes relays for controlling power to an associated appliance such as an HVAC compressor, an electric water heater, or a pool pump. When a voltage is applied or not applied to the relay(s), they will either open to prevent power or will close to allow power to the associated load. IntelliPEAK is used only for cycling-based control strategies. IntelliPEAK does not have temperature capabilities. IntelliPEAK does not include any current or voltage sensors capable of measuring electrical current or voltage to any attached load. Thus, neither electrical current nor voltage (nor power) are ever sent to the IntelliSOURCE platform. *See generally* RX-0388C (Paradiso RWS) at Q/A 63–66; RX-0394C (Ng WS) at Q/A 30–43.

**IntelliTEMP DirectLink**

IntelliTEMP DirectLink is a smart thermostat that consists of a communication module designed by Itron and an OEM thermostat designed and manufactured by a company called Pro1. IntelliTEMP can be used for both cycling-based (duty cycle) control strategies and temperature-based control strategies during a demand response event. IntelliTEMP includes only WiFi functionality, not cellular functionality, and the IntelliTEMP communication module by Itron does not include any relays. The thermostat chassis, designed and manufactured by Pro1, contains relays, but for temperature-based control strategies those relays are controlled by the thermostat's microprocessor (not the microprocessor in Itron's communication module). IntelliTEMP does not disrupt AC power to an HVAC; instead, the Pro1 thermostat has the ability to send a signal to a relay inside a furnace or an HVAC condenser pump, and if the relay opens as a result of the signal, this can disrupt power to the furnace or the HVAC condenser pump. *See generally* RX-0388C (Paradiso RWS) at Q/A 67–71; RX-0394C (Ng WS) at Q/A 44–64.

**IntelliSOURCE**

IntelliSOURCE—which is not an accused product—is Itron's software platform that resides domestically in several modules in an Itron-hosted data center located in Las Vegas, Nevada. IntelliSOURCE can remotely interact with IntelliPEAK and IntelliTEMP devices to implement control strategies, such as cycling-based control strategies and (in the case of IntelliTEMP DirectLink) temperature-based control strategies.

IntelliPEAK and IntelliTEMP can periodically (such as every 15 minutes) send certain information to IntelliSOURCE, and IntelliSOURCE can store that data. But none of that information includes power, energy, current, or voltage (or reductions in any of these parameters). Instead, IntelliPEAK can send [redacted]

PUBLIC VERSION

CONFIDENTIAL MATERIAL OMITTED

[redacted] and other information. *See, e.g.*, Tr. 585:16–22 (Ng). And IntelliTEMP can send [redacted] and other information. *See generally* RX-0388C (Paradiso RWS) at Q/A 62, 72–76; RX-0394C (Ng WS) at Q/A 65–75.

### 2. Direct Infringement

#### a. All Asserted Patents

##### i. "power supply value (PSV)"

Claim 19 of the '552 patent, claims 1 and 15 of the '522 patent, claims 1 and 15 of the '268 patent, and claim 13 of the '592 patent require a "power supply value (PSV)."

The Itron Accused Products do not infringe claims with limitations requiring a "power supply value." RX-0388C (Paradiso RWS) at Q/A 146, 157–162. The information that Causam relies on to prove a power supply value is not an actual value of any reduction in consumed power; it is not calculated at the meter or submeter, at a building control system, or at a device or controller that measures power; and the information does not measurement and verification. *Id.* at Q/A 147.

The Itron Accused Products have no capability to measure or determine power usage or amounts of power that may be reduced during a demand response event, and likewise they have no capability to generate any "power supply value." *See* RX-0394C (Ng WS) at Q/A 76–79; Tr. 609:24–610:5 (Ng); Tr. 730:21–731:4 (Paradiso). Instead, Itron only estimates amounts of power [redacted] RX-0394C (Ng WS) at Q/A 83–89; Tr. 703:10–14 (Paradiso). For example, Itron's customers, which are utility companies, decide how they want to set [redacted] *See* Tr. 610:11–611:8 (Ng). [redacted]

**PUBLIC VERSION**

**CONFIDENTIAL MATERIAL OMITTED**

[redacted] for an HVAC. RX-0394C (Ng WS) at Q/A 86. This means that [redacted] without any regard for how large or small any particular HVAC unit is, or how efficient or inefficient it is. The [redacted] *Id.* at Q/A 87; RX-0388C (Paradiso RWS) at Q/A 154; RX-0394C (Ng WS) at Q/A 81–88. As Dr. Paradiso explains in detail, estimates are not a power supply value. RX-0388C (Paradiso RWS) at Q/A 12, 137, 139–144, 147–149, 153–154. Even Mr. Forbes testified that using a proxy value does not comply with the claim requirement. Tr. 74:4–23 (Forbes). Thus, neither of the Itron Accused Products (nor the unaccused IntelliSOURCE software platform relied on by Dr. Madisetti) satisfies any of the power supply value limitations. RX-0388C (Paradiso RWS) at Q/A 150.

Causam (and Dr. Madisetti) recognize that the Asserted Patents distinguish estimated values from the "actual values" required for a power supply value. *See* CX-0776C (Madisetti WS) at Q/A 67, 104. Yet they point only to estimates (generated by Itron [redacted] as the alleged power supply value. RX-0388C (Paradiso RWS) at Q/A 149. Specifically, Dr. Madisetti relies on four Itron documents as allegedly demonstrating generation of a power supply value. *See* CX-0776C (Madisetti WS) at Q/A 368–380 (discussing CX-0299C, CX-0305C, CX-0180C, and CX-0208C. Three of those documents concern estimates generated from data stored in IntelliSOURCE (which is not an accused product), while the fourth document (CX-0208C) has nothing to do with the Itron Accused Products.

As Mr. Ng explained, the data in the first document relied on by Dr. Madisetti "are projected estimates of megawatts of power" reflecting mere "estimated capacity" to reduce power. RX-0394C (Ng WS) at Q/A 82 ("It's just an estimate."). Regarding the second document, Mr. Ng explained that CX-0299C "[redacted]" for one particular program, and the

**PUBLIC VERSION**

**CONFIDENTIAL MATERIAL OMITTED**

document [redacted] *Id.* at Q/A 91–93. Regarding the third document, Mr. Ng explained that CX-0305C refers to values that [redacted] *Id.* at Q/A 96–97. Thus, while Dr. Madisetti opines that "both" the Accused Products "and" the unaccused IntelliSOURCE platform generate the alleged power supply value, in fact, Dr. Madisetti points only to information generated from IntelliSOURCE—not from either of the products that are Accused Products. *See* Tr. 351:13–352:6 (Madisetti).

Separate from his reliance on mere "estimates" as the alleged power supply value, Dr. Madisetti relies on a "Curtailment Report" in a fourth document that has nothing to do with the Itron Accused Products. CX-0208C (Entergy RFP and DRMS RFI) at 65. As Mr. Ng explained, "the data used in this report comes directly from the meter or SCADA system, *which has nothing to do with IntelliPEAK DirectLink or IntelliTEMP DirectLink*." RX-0394C (Ng WS) at Q/A 102 (emphasis added); *see also id.* at Q/A 104 ("Data from the [IntelliPEAK and IntelliTEMP] DirectLink devices under question are not used for this calculation."); Tr. 604:19–605:23 (Ng); RX-0388C (Paradiso RWS) at Q/A 156.

Neither IntelliTEMP nor IntelliPEAK generates any power supply value. They are simply a load control switch (IntelliPEAK) and a smart thermostat (IntelliTEMP) without any capability to generate any value that corresponds to a reduction in consumed power by a power-consuming device. *See* Tr. 609:24–610:5 (Ng); Tr. 730:21–731:4 (Paradiso); RX-0394C (Ng WS) at Q/A 42–43, 63–64. Specifically, IntelliPEAK simply allows power or disrupts power to an associated appliance such as an HVAC unit, electric water heater, or pool pump. RX-0388C (Paradiso RWS) at Q/A 64. And IntelliTEMP simply cycles an HVAC furnace or condenser pump off for

designated periods of time, or it changes the temperature setpoint for the thermostat, depending on what is requested for the control event. *Id*. at Q/A 75. Both Itron Accused Products lack information as to whether there has been any reduction in power at all, let alone how much power is being used or how much power may have been reduced during a control event. *Id*. at Q/A 77, 153. Neither Accused Product can measure or determine power, and likewise neither can measure or determine any power reductions or power savings. *Id*. There is simply no metrology processor or circuit in either device that can measure actual current or any other parameter that relates to power usage, power reductions, or power savings. Tr. 609:24–610:5, 611:9-612:1 (Ng); RX-0394C (Ng WS) at Q/A 43, 64.

**“compensation provided for power supply associated with the reduction in consumed power”**

Claim 15 of the ’268 patent requires a power supply value that “indicates a compensation provided for power supply associated with the reduction in consumed power.” The Itron Accused Products do not provide “compensation” for a power supply value. RX-0388C (Paradiso RWS) at Q/A 204–209. Dr. Madisetti provides no opinion as to either Itron Accused Product. Instead, Causam interprets “compensation” as “incentives” and says that IntelliSOURCE uses an “incentive-based model” that includes “savings from reduced wholesale capacity need.” RX-0388C (Paradiso RWS) at Q/A 206, 208. The Itron load control switches and smart thermostats have no capability whatsoever to determine or indicate compensation. RX-0388C (Paradiso RWS) at Q/A 209; *see also* RX-0394C (Ng WS) at Q/A 27–28 (confirming that Itron does not calculate or determine compensation for participants in the utilities’ demand response programs).

#### ii. "power consuming device(s)"

Claims 19 and 23 of the '552 patent, claims 1, 15, and 19 of the '522 patent, claims 1, 6, 7, 14, and 18 of the '268 patent, and non-asserted claim 1 of the'592 patent require "power consuming device(s)." For example, claim 13 of the '592 patent depends from claim 1, which is directed to a system that expressly requires "at least one power consuming device." JX-0004 ('592 Patent) at claim 1. However, there is no "power consuming device" in any of the Itron Accused Products. Rather, "power consuming devices" are provided by others (typically homeowners). *See, e.g.*, JX-0001 ('552 Patent) at 20:43–45 (stating that examples of power consuming devices include appliances and HVAC units); RX-0388C (Paradiso RWS) at Q/A 359; *see also* CIB at 99 (identifying "HVAC units, A/C units, furnaces, heat pumps, boilers, pool pumps, water heaters, etc." as examples of power consuming devices); *see generally* RX-0388C (Paradiso RWS) at Q/A 358–362. No enabling or disabling of electric flow to "power consuming devices" has been shown in connection with the Itron Accused Products, as required by many claims (*see, e.g.*, JX-0001 ('552 Patent) at claims 19, 30; *see also* JX-0002 ('522 Patent) at claims 1, 15, 19; JX-0003 ('268 Patent) at claims 1, 14, 18); there is no "measurement and verification data associated with [one or more] power consuming devices" (*see* JX-0003 ('268 Patent) at claims 6 and 7); there is no "measurement and verification data be aggregated for a multiplicity of power consuming devices" (*see* JX-0003 ('268 Patent) at claim 7); and there is no "power consuming device ha[ving] an actual value of power reduced based on revenue grade metrology, and confirmed by measurement and verification" (*see* JX-0004 ('592 Patent) at claim 1). This is particularly true because performing measurement and verification is a prerequisite for satisfying both claim 6 and 7 of the '268 patent, and Itron does not perform measurement and verification. *See, e.g.*, Tr. 608:14–609:23 (Ng).

Thus, Causam has not shown Itron infringed claims requiring a "power consuming device." *See generally* RX-0388C (Paradiso RWS) at Q/A 358–362.

**iii. "controllable device(s)" or "controllable device interface"**

Claims 19 and 23 of the'552 patent, claims 1, 15, and 19 of the '522 patent, claims 1, 14, and 18 of the '268 patent, and non-asserted claim 1 of the '592 patent require a "controllable device(s)," or a "controllable device interface." Itron's IntelliTEMP DirectLink communication module does not satisfy the claims requiring one or more of a "controllable device," or a "controllable device interface."

Causam (and Dr. Madisetti) assert that "relays" within the client device itself qualify as the required "controllable device." RX-0388C (Paradiso RWS) at Q/A 301; CX-0776C (Madisetti WS) at Q/A 227. However, IntelliTEMP DirectLink is merely an Itron communication module inserted into an OEM thermostat that is designed and manufactured by Pro1. Itron's IntelliTEMP communication module does not include any relays. RX-0394C (Ng WS) at Q/A 50. As explained by Mr. Ng in his witness statement, the thermostat chassis, designed and manufactured by Pro1, contains relays, and when there is a temperature-based control strategy, *those* relays are controlled by the thermostat logic, meaning the microprocessor in the Pro1 thermostat, ***not*** the processor in the Itron communication module. RX-0394C (Ng WS) at Q/A 50–51, 55, 72; RX-0388C (Paradiso RWS) at Q/A 286–287. Also, as described earlier, Causam and Dr. Madisetti rely on CX-0343C.12 (IntelliTEMP Communications Interface Protocol) as allegedly demonstrating that IntelliTEMP issues commands to the relays in the Pro1 thermostat chassis, but they misinterpret that document. CX-0343C.12 is only for cycling-based control, not temperature-based control using IntelliTEMP. RX-0394C (Ng WS) at Q/A 56–57. When IntelliTEMP is used in a control

event with temperature-based control strategies, Itron does not direct, control, or instruct how the relays in the Pro1 thermostat chassis operate. RX-0394C (Ng WS) at Q/A 48–51; RX-0388C (Paradiso RWS) at Q/A 287, 368–369; *see also* Tr. 714:18–716:5 (Paradiso).

Dr. Madisetti also opines that the "controllable device interface" in IntelliTEMP is a "device driver of the microprocessor that drives the relays." CX-0776C (Madisetti WS) at Q/A 495, 497, 501–506. However, the processor he refers to is the processor of the Pro1 thermostat—not the processor of the IntelliTEMP communication module. RX-0394C (Ng WS) at Q/A 50. Similarly, the only microprocessor that interfaces with the relays (which are in the Pro1 thermostat chassis) is the microprocessor of the Pro1 thermostat—not the microprocessor in IntelliTEMP. *Id.* at Q/A 51. Accordingly, there is no "controllable device interface" in the Itron Accused Products. *See generally* RX-0388C (Paradiso RWS) at Q/A 280–287, 300–312, 322–337, 367–371.

### b. Direct Infringement Issues Common to the '268, '552 and '522 Patents

#### i. "power control message"

Claims 19 and 23 of the '552 patent, claims 1, 15, and 19 of the '522 patent, and claims 1, 14, and 18 of the '268 patent require a "power control message."

The "power control message" limitations require (1) an amount of electric power to be reduced (or some claims require an amount of electric power to be reduced, disabled, or enabled) and (2) an identification of at least one controllable device to be instructed to enable or disable a flow of electric power to one or more associated power consuming devices. RX-0388C (Paradiso RWS) at Q/A 255.

**PUBLIC VERSION**

**CONFIDENTIAL MATERIAL OMITTED**

**"amount of electric power to be reduced"**

Neither IntelliPEAK nor IntelliTEMP meets any of the claim limitations requiring, or stemming from, a "power control message." RX-0388C (Paradiso RWS) at Q/A 261–263. Messages sent by IntelliSOURCE do not indicate any amount of power reduced. They can restrict runtime of a power-consuming device or alter a thermostat's temperature setpoint, but no message ever indicates an amount of electric power to be reduced. RX-0388C (Paradiso RWS) at Q/A 80–82, 260–261.

Nothing in the documents that Dr. Madisetti cites, nor any other documents or evidence, show that any messaging from IntelliSOURCE to the Accused Products indicates an amount of power to be reduced. Dr. Madisetti relies on Itron's [redacted] (CX-0214C and CX-0212C), but [redacted] *See* RX-0388C (Paradiso RWS) at Q/A 262–263; RX-0394C (Ng WS) at Q/A 70–71.

Causam asserts an alternative theory of infringement under the doctrine of equivalents. According to Causam, the "function" of this claim requirement is indicating at least one of an amount of electric power to be reduced, for example instructing a reduction in the duty cycle or a change in the temperature setpoint for HVAC units. RX-0388C (Paradiso RWS) at Q/A 273. Causam alleges that the "way" that function is performed is by sending a message. *Id.* And Causam alleges that the "result" is a reduction in the amount of electric power used. *Id.*

Causam's analysis fails for at least three reasons. RX-0388C (Paradiso RWS) at Q/A 273–279. First, duty cycling and temperature setbacks perform a different function, in a different way, to achieve a different result than what is required by the claim. *Id.* at Q/A 275. For example, the function of duty cycling or implementing a temperature setback is not the same as the function of

indicating "an amount of electric power to be reduced," as the claim requires. *Id.* at Q/A 279. A message that merely indicates that a load control switch or thermostat should perform duty cycling or temperature setbacks does not indicate any amount of power to be reduced. *Id.* In fact, as noted, there might be no power reduction at all. *Id.* This sort of message will at best do one of three things: (1) nothing at all (for example, if the power-consuming device was already off during the demand response event, or if the setpoint of a thermostat is already beyond the requested setpoint), (2) cycle a device off as instructed during the duration of an event, or (3) shift a temperature setpoint. *Id.* Nothing in any of these three options indicates any amount of power to be reduced. *Id.*

Causam's doctrine of equivalents theory also fails the insubstantial differences test. Instructing a device to participate in cycling-based control strategies or temperature-based control strategies is very different than instructing a device regarding "an amount of electric power to be reduced," as the claim requires. *Id.* at Q/A 276. A message that requests duty cycling or temperature setback does not actually give any insight into whether any electric power will actually be reduced, and it certainly does not indicate "an amount of electric power to be reduced" as the limitation requires. *Id.* at Q/A 277. Indeed, if a duty cycling message is sent to control a power consuming device that is not operating, there will be no power reduction at all. *Id.* at Q/A 278. Similarly, if a temperature setback message is sent to control a thermostat that was off or already set at a higher temperature than the setback, there will be no power reduction at all. *Id.*

**"controllable device to be instructed"**

Causam contends that the "relays" within the Itron Accused Products are the required "controllable devices." RX-0388C (Paradiso RWS) at Q/A 280. In the context of the Asserted Patents, a relay cannot be a "controllable device." Tr. 714:18–715:9 (Paradiso); RX-0388C

(Paradiso RWS) at Q/A 281. The Asserted Patents contemplate that "the identification of at least one controllable device" to be instructed is via an IP address. RX-0388C (Paradiso RWS) at Q/A 281–283; *see also* Tr. 714:18–715:9 (Paradiso). The relays do not have any identifiers such as an IP address. RX-0388C (Paradiso RWS) at Q/A 284. They merely have a voltage line for the relays to receive a voltage, or not, in order to open or close the relay. RX-0388C (Paradiso RWS) at Q/A 304; Tr. 714:18–715:9 (Paradiso). Also, as explained below, Itron's IntelliTEMP DirectLink communication module does not include any relays at all.

Causam contends, in the alternative, that this limitation is met under the doctrine of equivalents. RX-0388C (Paradiso RWS) at Q/A 295–299. Causam contends that the "function" of this claim requirement is "indicating an identification of at least one controllable device to be instructed to enable or disable a flow of electric power to one or more power consuming devices. RX-0388C (Paradiso RWS) at Q/A 297. The "way" the function is performed is "by sending a message with information identifying at least one controllable device. *Id.* And the "result" is "identifying the power controlling device." *Id.* But this time Causam's description of the "function," "way," and "result" simply mimics the claim language with no explanation or discussion. RX-0388C (Paradiso RWS) at Q/A 298. Causam's theory fails at least because Itron's IntelliTEMP DirectLink communication module does not include any relays that might map to the "controllable device" limitation. RX-0394C (Ng WS) at Q/A 50. Thus, the limitation is entirely missing, which violates the doctrine of equivalents. RX-0388C (Paradiso RWS) at Q/A 298.

**c. Direct Infringement Issues Common to the '268 and '592 Patents**

**i. "measurement and verification"**

Claims 1, 6, 7, and 14 of the '268 patent and non-asserted claim 1 of the '592 patent require "measurement and verification." The Asserted Patents also associate "measurement and verification" with a "power supply value." RX-0388C (Paradiso RWS) at Q/A 216. The Asserted Patents explain that a power supply value includes "measurements and verification" and that "measurement and verification methods may be determined by the appropriate governing body or authority for the electric power grid(s)." *Id.* at Q/A 216. Mr. Forbes explained that "measurement" is taking a raw measurement from a meter or submeter or from a device that's capable of performing measurement, and that "verification" is then taking that information and running it through an algorithm in order to verify the information. *See id.* at Q/A 217; Tr. 61:2–62:17 (Forbes).

The Itron Accused Products do not perform "measurement and verification" for a variety of reasons. Causam (and Dr. Madisetti) rely on certain Itron documents that use the terms "measurement" and "verification" as allegedly demonstrating that the Accused Products perform measurement and verification. *See* CX-0776C (Madisetti WS) at Q/A 257–269. First, these documents merely refer to the possibility that a utility company or the utility company's event measurement and verification vendor ("EM&V vendor") may choose to use certain data when they perform measurement and verification. *See* Tr. 583:1-9, 608:21–609:23, 610:11–611:8 (Ng); RX-0388C (Paradiso RWS) at Q/A 221, 222 ("Any measurement and verification that may occur is performed post event and is done by a third party. Itron does not control what data the EM&V vendor may use."). Typically, the EM&V vendor will use actual meter data that is collected by

other systems—not by Itron or any Itron Accused Product—to perform the measurement and verification. *Id.* Itron captures the raw data, such as runtime, and makes it available for the utility and its EM&V vendor, but Itron does not itself perform any measurement and verification. *Id.*

Second, these documents do not discuss "measurement and verification" as that term is used in the Asserted Patents. The Asserted Patents state that a power supply value includes "measurement and verification" and that "measurement and verification methods may be determined by the appropriate governing body or authority for the electric power grid(s)." *See, e.g.*, JX-0003 ('268 Patent) at 7:32–37. Itron does not perform measurement or verification. *See, e.g.*, Tr. 608:14–609:23 (Ng). Causam's expert Mr. Donohoe agreed that in order to have measurement and verification, the system needs to measure "the amount of load reduction in kilowatts." RX-0268C (Donohoe Dep. Tr. Vol. I), 157:19-158:8. The Itron Accused Products have no capability to measure any reductions in power, nor verify such measurements. The products merely assist with *estimating* reductions of power (not any measurement). *See, e.g.*, Tr. 608:14–609:23 (Ng). Measuring the amount of power reduction in kilowatts (required by the Asserted Patents) is distinctly different from generating an estimate of power reduction (as Itron does). *See id.*

Causam and Dr. Madisetti rely on "runtime data" as the alleged "measurement and verification data." Again, Itron only *estimates* power reduction based on such runtime data; Itron's system has no information about—and certainly does not measure or verify—any amounts of power reduction. RX-0388C (Paradiso RWS) at Q/A 80–82; *see also* Tr. 594:10–14 (Ng). In fact, not only is Itron's data itself not measurement and verification data, but runtime data in particular (relied on by Dr. Madisetti) is ***not*** an accepted parameter for performing measurement and verification because of its inaccuracy. RX-0388C (Paradiso RWS) at Q/A 148; Tr. 608:14–20

(Ng); RX-0394C (Ng WS) at Q/A 42–43, 78–79, 111. Causam's expert Mr. Donohoe agreed that runtime information is not sufficient to determine how much power has been reduced and that, instead, the amount of power reduced depends on the type of HVAC, its size, efficiency, and other parameters. *See* RX-0268C (Donohoe Dep. Tr. Vol. I), 211:20–212:13.

**"measurement and verification data is associated with individual power consuming devices" and "aggregating the measurement and verification data for a multiplicity of power consuming devices"**

Claim 6 of the '268 patent requires that the "measurement and verification" data be associated with individual power consuming devices. Claim 7 of the '268 patent requires that the measurement and verification data be aggregated for a multiplicity of power consuming devices. For claim 6, Causam states that Itron satisfies this limitation because the Accused Products generate telemetry data such as a "device serial number." RX-0388C (Paradiso RWS) at Q/A 245–246. But Causam cites no evidence linking "device serial numbers" to "measurement and verification" data that is associated with individual power consuming devices. *Id.* For claim 7, Causam incorporates by reference its discussions for other claims that neither include nor infer the requirement of claim 7. Causam has not met its burden to show that these limitations are met.

**d. Direct Infringement Issues Specific to the '552 Patent**

**i. "control center"**

Claim 19 of the '552 patent requires a "control center." However, there is no "control center" in any of the Itron Accused Products. Neither the IntelliSOURCE platform, IntelliPEAK DirectLink, nor IntelliTEMP DirectLink have a "control center" as required by the claims. For example, there is no power reduction request issued by a "control center" and there is no "power control instruction" in which the power control instruction "caus[es] the at least one controllable device to disable a flow of electric power as to achieve a reduction in consumed power as requested

by the control center." *See, e.g.*, JX-0001 ('552 Patent), claim 19. Further, there is no power supply value generated "at the control center" as required. *See, e.g.*, *id.* (requiring "generating at the control center a power supply value (PSV)"); *see generally* RX-0388C (Paradiso RWS) at Q/A 173–180, 354–357. Causam did not meet its burden to show that this limitation is met.

**e. Direct Infringement Issues Specific to the '592 Patent**

Causam contends that the Itron Accused Products infringe claim 13 of the '592 patent (which depends from claim 1) for the same reasons as set forth for claims 1 and 2 of the '268 patent. CIB at 248 ("For the same reasons set forth above for claims 1 and 2 of the '268 patent, the Itron Accused Products infringe claim 13 of the '592 patent"). Accordingly, because I determined the Itron Accused Products do not to infringe claims 1 and 2 of the '268 patent, they also do not infringe claim 13 of the '592 patent. The Itron Accused Products also do not infringe claim 13 of the '592 patent for the additional reasons below.

**i. "configured in network communication"**

Asserted claim 13 of the '592 patent (through its dependency on non-asserted claim 1) requires "at least one power consuming device, at least one controllable device, and at least one client device constructed and configured in network communication." The Itron Accused Products do not have "at least one power consuming device, at least one controllable device, and at least one client device constructed and configured in network communication." *Id.* at Q/A 350. There is no network communication between IntelliTEMP/IntelliPEAK and any controllable device or any power consuming device. Rather, relays in the Itron Accused Products are connected via a voltage line that does not have any communication-based protocol or networking capability. RX-0388C (Paradiso RWS) at Q/A 349; Tr. 714:18–716:5 (Paradiso). Causam did not meet its burden

to show that this limitation is met.

**ii. "the PSV is generated at a control center, a meter, a submeter, a building control system, or any device or controller that measures power"**

Asserted claim 13 of the '592 patent requires that the power supply value be generated "at a control center, a meter, a submeter, a building control system, or any device or controller that measures power within the standards as supplied by regulatory bodies that govern regulation of the electric power grid." There is no evidence that the Itron Accused Products generate a power supply value "at a control center, a meter, a submeter, a building control system, or any device or controller that measures power within the standards as supplied by regulatory bodies that govern regulation of the electric power grid." *Id.* at Q/A 179. Causam did not meet its burden to show that this limitation is met.

**iii. "actual value of power reduced based on revenue grade metrology, and confirmed by measurement and verification"**

Asserted claim 13 of the '592 patent (through its dependency on non-asserted claim 1) requires an "actual value of power reduced based on revenue grade metrology, and confirmed by measurement and verification." The Itron Accused Products do not have an "actual value of power reduced based on revenue grade metrology, and confirmed by measurement and verification." RX-0388C (Paradiso RWS) at Q/A 182–194. First, as explained above, the Itron accused products do not have an "actual value of power reduced." Itron merely uses estimates. *See, e.g.*, Tr. 703:10–14 (Paradiso). Estimated values are the antithesis of the required "actual" value. RX-0388C (Paradiso RWS) at Q/A 184–185.

**PUBLIC VERSION**

Second, the Itron Accused Products do not have an actual value of power reduced "based on revenue grade metrology." *Id.* at Q/A 186–191. I construed "revenue grade metrology" according to its plain and ordinary meaning, which is "metrology conforming to revenue grade requirements," without requiring conformity with the ANSI C12 standard. Causam did not attempt to show that this limitation is met, nor did Causam show that the Itron Accused Products are revenue grade. *Id*. at Q/A 190–191.

Lastly, the Itron Accused Products do not have an actual value of power reduced based on revenue grade metrology and "confirmed by measurement and verification." *Id.* at Q/A 192. As explained below (regarding "measurement and verification"), the Itron Accused Products do not perform measurement and verification. Causam did not meet its burden to show that this limitation is met.

**iv. "a curtailment value as supply equivalence that provides operating reserve for the electric power grid"**

Asserted claim 13 of the '592 patent (through its dependency on non-asserted claim 1) requires "a curtailment value as supply equivalence that provides operating reserve for the electric power grid." In the context of the '592 patent, "operating reserves" refers to a utility's reserve power. It is typically broken into three categories: regulating reserve, spinning reserve, and non-spinning reserve. RX-0388C (Paradiso RWS) at Q/A 197.

The Itron Accused Products do not have "a curtailment value as supply equivalence [that] provides operating reserve for the electric power grid." *Id.* at Q/A 200. Causam's expert merely stated, without any analysis or support, that the Accused Products achieve a power reduction that provides operating reserves. *Id.* at Q/A 196–200. Causam did not meet its burden to show the presence of this limitation.

PUBLIC VERSION

CONFIDENTIAL MATERIAL OMITTED

### 3. Indirect Infringement

As described above, Causam has not shown direct infringement of any asserted claim by Itron. Because direct infringement is a prerequisite for indirect infringement, Causam has not shown indirect infringement.

Causam makes a conclusory allegation that Itron "infringes the asserted claims both directly and indirectly" and that "there has been at least one underlying instance of direct infringement of the asserted method claims at the inducement of Itron." However, Causam makes no argument and cites no evidence regarding how Itron allegedly induces infringement. Causam's expert Dr. Madisetti admitted at the hearing that he does not know whether Itron had an intent to induce infringement by its customers. Tr. 359:18–360:4 (Madisetti). Additionally, the record shows [redacted] the Itron Accused Products do not infringe any of the Asserted Patents. *See* Tr. 517:9–13, 518:4–14 (Reeves); RX-0395C (Reeves WS) at Q/A 21–28. Viewing the record evidence as a whole, Causam has not met its burden to intent to induce infringement by Itron, which is a necessary requirement for inducement liability.

## C. Alleged Infringement by Alarm.com Accused Products

I find that Causam has failed to demonstrate Alarm.com infringed any of the asserted claims of the asserted patents. My reasoning follows.

### 1. Overview of the Alarm.com Accused Products

**<u>The ADC Products</u>**

Causam accuses only the ADC-T2000 and T3000 (the "ADC thermostats" or the ADC Accused Products") in its complaint. *See* Complaint Exs. 12–15. Causam's expert, Dr. Madisetti, appears to accuse the functionality of the ADC thermostats together with two unaccused cloud

platforms, the ADC backend and Mercury.

**<u>The ADC Accused Products</u>**

As Mr. Craig Heffernan, Chief Technology Officer at Building36, testified, the ADC thermostats are thermostats with technological capabilities similar to other "connected" thermostats. RX-0617C (Heffernan WS) at Q/A 18–20; *see also* Tr. 373:13–17 (Madisetti) (admitting ADC Accused Products are "smart thermostats"). The ADC thermostats are not smart breakers or load control switches. They do not contain any device for measuring power, such as a power meter. RX-0617C (Heffernan WS) at Q/A 58–61; Tr. 817:3–5 (Rosing). The ADC thermostats can be connected to HVAC via low voltage electrical wires and can signal HVACs by opening and closing thermostat relays. RX-0617C (Heffernan WS) at Q/A 50–51.

The ADC thermostats exclusively send and receive messages on a local, short-range mesh network using the Z-Wave protocol.[14] When configured to do so, the thermostat communicates with a "Z-Wave controller"—usually a "security panel" or a "hub"—over the Z-Wave network. RX-0617C (Heffernan WS) at Q/A 22–24; RX-0618C (Hutz WS) at Q/A 22. The ADC thermostats are in network communication only with other devices using the Z-Wave protocol; they do not communicate using the Internet Protocol (IP). RX-0617C (Heffernan WS) at Q/A 21; *see also* RX-0618C (Hutz WS) at Q/A 24–25.

The ADC thermostats are designed to signal to connected HVACs exclusively through a set of relays, which, when opened or closed, can send a signal to an external device wired to the thermostat relay terminals. RX-0617C (Heffernan WS) at Q/A 50–52. The thermostat relays do

[14] Z-Wave is a short-range, wireless communications protocol primarily utilized in home automation applications. Z-Wave allows local devices connected to the same Z-Wave network to communicate wirelessly within a range of a few hundred feet. RX-0617C (Heffernan WS) at Q/A 20.

not have the ability to control or disable the flow of electric power to a connected device. Unlike the smart breakers described by the Asserted Patents which sit in the direct line of power to power-consuming devices, the actual power supply to the HVAC does not and cannot pass through the ADC thermostats. Tr. 814:3–24 (Rosing); RX-0617C (Heffernan WS) at Q/A 74. The thermostat relays also do not exert direct control over the HVAC. Rather, the relays send signals that are processed by a separate set of logic controls internal to the HVAC. RX-0617C (Heffernan WS) at Q/A 52; Tr. 814:17–24; 815:10–25 (Rosing). The ADC-T2000 and T3000 do not receive any communication or data back from the HVAC. RX-0617C (Heffernan WS) at Q/A 57.

**The ADC Backend**

The ADC backend is a set of servers that host and run ADC software programs and databases. RX-0618C (Hutz WS) at Q/A 10. As Mr. David Hutz, ADC's Chief Systems Architect, testified, all ADC features and functionalities that are not hosted on local hardware in a consumer's home are enabled by backend software. RX-0618C (Hutz WS) at Q/A 10. The ADC backend enables user to, *inter alia*, remotely monitor and control thermostats, including by changing the setpoints of a connected thermostat remotely, using a mobile app. RX-0618C (Hutz WS) at Q/A 9, 28.

The ADC backend cannot communicate directly with the ADC thermostats because it does not communicate using the Z-Wave protocol; the ADC backend requires a local Z-Wave controller to act as an intermediary. RX-0617C (Heffernan WS) at Q/A 30; RX-0618C (Hutz WS) at Q/A 22. Accordingly, the ADC backend is not in the same "network" as either ADC Accused Product. Tr. 812:24–813:3 (Rosing).

While the ADC backend can receive data reported by the ADC-T2000 and T3000, that data is only sent ***through*** the intermediary Z-Wave controller. RX-0618C (Hutz WS) at Q/A 33.

Thermostats may respond to data queries (*e.g.*, a request asking for the current setpoint of the thermostat) or may be configured to send reports (*e.g.*, report the current measured inside temperature). RX-0618C (Hutz WS) at Q/A 33. In all cases, there is no direct communication between ADC thermostats and ADC backend. RX-0618C (Hutz WS) at Q/A 33. In fact, the ADC thermostats are unaware of the ADC backend. *Id.*; RX-0617C (Heffernan WS) at Q/A 30.

The ADC backend supports demand response functionality through an API made available to Mercury. RX-0618C (Hutz WS) at Q/A 44–45. Mercury can use the API to request that the ADC backend execute a demand response event. RX-0618C (Hutz WS) at Q/A 44; RX-0620C (Zawacki WS) at Q/A 22. During a demand response event—but at no other time—the ADC backend collects operational data from the ADC thermostats, including [redacted] runtime of the thermostat (*i.e.*, how long the thermostat has been calling for heat and cool), and participation data (*i.e.*, data reflecting whether a customer opted out of the demand response event). RX-0618C (Hutz WS) at Q/A 56, 57, 63. ADC shares participation data with EnergyHub, [redacted]. RX-0620C (Zawacki WS) at Q/A 36; *see also* Tr. 809:12–810:8 (Rosing); RX-0618C (Hutz WS) at Q/A 62.

**<u>EnergyHub Mercury Platform</u>**

Mercury provides a web portal for utilities to create demand response events, view those events and access data associated with the events. *Id.* Mercury supports a "bring-your-own-device" ("BYOD") program, in which utility customers can enroll their own connected devices (*e.g.*, smart thermostats) into a utility company's demand response platform.[15] RX-0620C

[15] EnergyHub offers two programs for demand response, a BYOD program and a "commercial

PUBLIC VERSION

(Zawacki WS) at Q/A 18.

Mr. Bradley Zawacki, the Principal Software Engineer and Technical Lead for the Utility Experience Team for EnergyHub, testified that Mercury's BYOD feature allows utilities to schedule demand response events that Mercury will execute by dispatching requests to a thermostat platform, like the ADC backend. RX-0620C (Zawacki WS) at Q/A 22. For the ADC thermostats, the demand response feature works by requesting that the thermostat temperature setpoint be offset by a specified degree amount (*e.g.*, increasing the setpoint by 3 degrees Fahrenheit). *Id.* Utilities specify parameters for a demand response, including the start and end times of the event and how many degrees to increase or decrease the setpoint. RX-0620C (Zawacki WS) at Q/A 28. Notably, the utility company cannot specify any amount of power consumption to be reduced. RX-0620C (Zawacki WS) at Q/A 29; RX-0618C (Hutz WS) at Q/A 46.

Mercury's BYOD program is compatible with many thermostats, including ADC. RX-0620C (Zawacki WS) at Q/A 24; RX-0618C (Hutz WS) at Q/A 43. However, a customer must actively choose to enroll her thermostat in the program to participate. RX-0620C (Zawacki WS) at Q/A 24. And even when an ADC thermostat is enrolled in the program, Mercury does not communicate with the thermostat. RX-0620C (Zawacki WS) at Q/A 31. Mercury sends a request to the ADC backend that identifies the utility customers to include in the event. RX-0618C (Hutz WS) at Q/A 44–45. The ADC backend is then responsible for automating adjustments to each specified customer's thermostat setpoint, and for restoring the normal setpoint at the end of the event. RX-0618C (Hutz WS) at Q/A 44–45.

Mercury's user interface for utilities estimates "load shed" statistics. RX-0620C (Zawacki

---

and industrial" program. Only the BYOD program works with the ADC thermostats. RX-0620C (Zawacki WS) at Q/A 15.

WS) at Q/A 52–53. These load shed estimates attempt to show the difference between the estimated power consumption during a demand response event and the estimated baseline power consumption for the same period. RX-0620C (Zawacki WS) at Q/A 62. But Mercury does not collect any data about HVAC power or power consumption. RX-0620C Zawacki WS) at Q/A 34; RX-0618C (Hutz WS) at Q/A 59, 61). Instead, for ADC thermostats, Mercury uses estimated thermostat runtime data and a utility-supplied estimate of power consumption to create an estimated baseline curve and a load shed curve. RX-0620C (Zawacki WS) at Q/A 59, 62–64. The area between those curves is used as a rough estimate of the load shed. RX-0620C (Zawacki WS) at Q/A 62.

Mercury's load shed estimate for ADC thermostats does not use any runtime data from the ADC thermostats. RX-0620C (Zawacki WS) at Q/A 63–64. Mercury does not collect any historical runtime data for ADC thermostats, so Mercury baseline power curve is estimated based on [redacted]. RX-0620C (Zawacki WS) at Q/A 63–64. Similarly, to create the load shed curve for ADC thermostats, Mercury uses [redacted]. RX-0620C (Zawacki WS) at Q/A 63–64. The ADC participation data is used only to [redacted]. RX-0620C (Zawacki WS) at Q/A 65. Runtime data from ADC's Accused Products is never used by EnergyHub in any calculation. RX-0620C (Zawacki WS) at Q/A 66.

As for the other variable used in estimating the load shed statistic, the utility-supplied power estimate is a single, predetermined constant value for all thermostats. RX-0620C (Zawacki WS) at Q/A 62.

**PUBLIC VERSION**

### 2. Direct Infringement

#### a. All Asserted Patents

##### i. "power supply value (PSV)"

Claim 19 of the '552 patent, claims 1 and 15 of the '522 patent, claims 1 and 15 of the '268 patent, and claim 13 of the '592 patent require a "power supply value (PSV)." The ADC thermostats do not generate a power supply value as required by limitations 19i of the '552 patent, limitations 1f and 15i of the '522 patent, and claims 2 and 15 of the '268 patent. A power supply value requires—at a minimum—either measurement and/or verification of the reduction in consumed power during a demand response event. Because there is no measurement or verification data corresponding to a reduction in consumed power, ADC does not practice these limitations. RX-0391C (Rosing WS) at Q/A 81, 97–109, 146, 158–62; RDX-0008C (Rosing Demos.) at 40–44; RX-0620C (Zawacki WS) at Q/A 39, 42, 45, 54, 59, 64–68.

#### b. Direct Infringement Issues Common to the '268, '552 and '522 Patents

##### i. "disable the electric power flow" / "disable a flow of electric power"

The ADC thermostats do not "disable the electric power flow" or "disable a flow of electric power" as required by claim 19 of the '552 patent, claims 1 and 15 of the '522 patent, and claims 1 and 14 of the '268 patent. The power supply to the HVAC system does not and cannot flow through the ADC accused thermostats. Tr. 814:3–11 (Rosing). Therefore, the Alarm.com Accused Products—and the relays contained therein—are incapable of disabling the electric power flow to a power consuming device. Tr. 814:3–16 (Rosing); RX-0391C (Rosing WS) at Q/A 91–96; RDX-0008C (Rosing Demos.) at 35; RX-0617C (Heffernan WS) at Q/A 51–53, 73; CX-0400 (Bldg36 Spec. at 26; JX-0001 ('552 Patent); JX-0002 ('522 Patent); JX-0003 ('268 Patent); JX-

0004 ('592 Patent).

Smart breakers—which sit in the direct line of power to a given appliance, and can interrupt the flow of current to that appliance—offer an instructive contrast to the ADC Accused Products: Unlike smart breakers, the ADC thermostats do not control the flow of electricity into the HVAC unit. Causam's own expert does not dispute that "[t]he power supply current [for the HVAC] does not run through" the thermostat. Tr. 377:11–15 (Madisetti).[16]

Causam, without refuting that the HVAC's main power supply is separate from the thermostat, contends that the ADC thermostats satisfy these limitations because they send a "signal" to the HVAC system to turn off through the thermostat relays. CX-0776C (Madisetti WS) at Q/A 117–23. Even if a power-consuming device were deactivated in response to a relay signal, this does not mean that power flow to the power-consuming device is disabled, because the HVAC can continue drawing idle power. And because HVACs have their own logic systems, a thermostat (unlike a smart breaker) cannot disable the electric power flow.

Additionally, thermostat relays are not "controllable devices" that "selectively enable[ ] and disable[ ] electric power." The ADC thermostat relays are internal to the thermostat (the accused "client device"). (RX-0617C (Heffernan WS) at Q/A 53. Causam argues that this is irrelevant because there is no intrinsic evidence requiring that the client device be separate from the controllable device. But this argument misses the point. Causam's theory fails because the physical location of the thermostat relays makes it impossible for relays to control the flow of electric power to the HVAC unit, which does not run through the thermostat.

Further, no ADC system command refers to a specific relay. As Dr. Rosing testified,

[16] Dr. Madisetti did not study any HVAC in forming his opinions in this case. RX-0267C (Madisetti Dep. Tr. Vol. II) 618:10–20; *see also* RX-0391C (Rosing WS) at Q/A 92.

thermostat relays cannot be controlled by a command from the ADC backend or the Z-Wave controller. Instead, they are controlled exclusively by the thermostat's own microprocessor, which contains its own, specific logic. Tr. 793:14–794:12 (Rosing).

**ii. "power control message"**

Claims 19 and 23 of the '552 patent, claims 1, 15, and 19 of the '522 patent, and claims 1, 14, and 18 of the '268 patent require a "power control message."

Neither the ADC Accused Products nor the broader ADC System send or receive a "power control message" that includes "at least one of an amount of electric power to be reduced and an identification of a controllable device to be instructed to disable a flow of electric power to one or more associated power consuming devices", as required by limitations 19f and 23 of the '552 patent, limitations 1d and 19 of the '522 patent, and limitations 1c, 1d and 18 of the '268 patent. Because the accused thermostat command includes no information about an amount of power to be reduced and does not identify specific relays, these limitations are not satisfied literally or under the doctrine of equivalents. *See* RX-0391C (Rosing WS) at Q/A 110–23; RDX-0008C (Rosing Demos.) at 47, 59; RX-0617C (Heffernan WS) at Q/A 53, 68, 76, 84–88 ; RX-0618C (Hutz WS) at Q/A 52, 65, 68–69.

**<u>"indication of an amount of electric power to be reduced"</u>**

Causam identifies the ADC thermostat commands as the claimed "power control messages." The accused setpoint set command, however, does not contain any value of electric power, nor does it indicate "an amount of electric power to be reduced." RX-0617C (Heffernan WS) at Q/A 84, 85, 88.

ADC thermostat commands convey only information about temperature setpoint or thermostat mode (*i.e.*, heat, cool, off or auto). In the ADC System, demand response requests are

exclusively executed by commands to change temperature setpoint (*i.e.*, setpoint set commands). RX-0618C (Hutz WS) at Q/A 52. Setpoint set commands contain a temperature value (including precision, an acceptable range of values, and scale, like Celsius or Fahrenheit), in units of degrees. They do not include any measurement of power in, for example, watts, horsepower, or calories.[17] *See* RX-0391C (Rosing WS) at Q/A 111; RPX-0004C-SC at 373:4888–4900.

Moreover, setpoint set commands are not indicative of an adjustment to the operating state of the thermostat. Dr. Rosing's unrebutted testimony established that there are multiple, independent processing steps at the thermostat level that determine how, if at all, the thermostat will act on a setpoint command. Tr. 788:15–789:6, 793:14–794:12 (Rosing). The setpoint command is first stored in the thermostat's local memory. It is then subject to processing by the thermostat state machine. If, and only if, the thermostat state machine concludes a change is warranted, after comparing the command and various other parameters (*e.g.*, the current thermostat state, the ambient temperature), then will a relay configuration change be saved to local memory (to be subsequently executed by the relay processor). *Id.*

Even if the thermostat state changes in response to the command, the HVAC operates independently, and its own logic may result in the HVAC running in a state different from what the thermostat signal indicates. RX-0391C (Rosing WS) at Q/A 92. Thus, the accused thermostat command does not indicate that power is to be reduced at all—let alone indicate an amount of power to be reduced.

Causam and Dr. Madisetti have also alleged that the accused thermostat command infringes

---

[17] At the Hearing, Dr. Madisetti identified (incorrectly) several potential units for power, including joules (the SI unit for energy), therms (a non-SI unit of heat energy). Tr. 425:9–16, 426:14–20 (Madisetti). Setpoint commands also do not contain any data in these units.

under the doctrine of equivalents. CX-0776C (Madisetti WS) at Q/A 106, 112. But Causam's conclusory allegations are insufficient: they amount to little more than generalized argument that the ADC Accused Products achieve a similar end result. As the Federal Circuit has observed, "a patentee must . . . provide particularized testimony and linking argument as to the 'insubstantiality of the differences' between the claimed invention and the accused device or process, or with respect to the function, way, result test when such evidence is presented to support a finding of infringement under the doctrine of equivalents." *Tex. Instruments, Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996) (generalized testimony as to overall similarity "will not suffice").

At bottom, Causam has failed to satisfy the function-way-result test. RX-0391C (Rosing WS) at Q/A 110–116; RDX-0008C (Rosing Demos.) at 59. Dr. Madisetti opines that the "function" performed by the setpoint set command is "indicating at least one of an amount of electric power to be reduced." CX-0776C (Madisetti WS) at Q/A 106, 112. But the actual function of the setpoint set command is to change the setpoint, i.e., the target temperature for the HVAC to achieve. It does not perform the function of indicating any amount of power to be reduced.[18] RX-0617C (Heffernan WS) at Q/A 84–88. Dr. Madisetti opines that the "way" the claimed invention performs the limitation is by "sending a message" identifying an amount of power to be reduced. CX-0776C (Madisetti WS) at Q/A 106, 112. But the setpoint set command does not operate in that way; it does not contain information about power usage by the HVAC. Instead, it specifies a temperature in degrees. RX-0617C (Heffernan WS) at Q/A 84–88. As to the "result",

[18] Dr. Madisetti also accuses an unnamed command concerning "a reduction in duty cycle." CX-0776C (Madisetti WS) at Q/A 106. However, he fails to cite any evidence that the ADC Accused Products even recognize such a command. Indeed, the only thermostat command used by ADC in demand response functionality is the setpoint set command. RX-0618C (Hutz WS) at Q/A 50–51.

Dr. Madisetti offers nothing more than a conclusory allegation that the setpoint set command results in a "reduction in the amount of electric power used", without any detailed explanation of how that is related to the alleged claimed "way." CX-0776C (Madisetti WS) at Q/A 106, 112. In reality, the accused thermostat command achieves a totally different result: it merely changes the setpoint; it does not dictate (or guarantee) a reduction in power consumption. In short, for the same reasons the ADC Accused Products do not infringe literally, they cannot infringe under the doctrine of equivalents.

**"identification of at least one controllable device"**

Just as the ADC thermostat commands never indicate an "amount of power", they also do not identify any "controllable device." Causam accuses ADC thermostat relays of being the "controllable devices." CX-0776C (Madisetti WS) at Q/A 109–12. But no command sent between ADC products can identify thermostat relays. RX-0617C (Heffernan WS) at Q/A 53; *see also* RX-0618C (Hutz WS) at Q/A 65, 68–69. Put differently, the relays are not identifiable by the ADC backend or Z-Wave controller; they are known only to the thermostat's own microprocessor. Causam never disputes this point.

Instead, Causam argues that because thermostat commands identify specific thermostats, they "necessarily identify at least one of their constituent relays." CX-0776C (Madisetti WS) at Q/A 109–12. The record shows that there is no 1:1 correspondence between particular thermostat commands, thermostat states or relay states. To the contrary, relay states are determined by a combination of factors, of which thermostat commands are just one. Tr. 793:14–794:12 (Rosing). As Dr. Rosing testified, whether and when a thermostat relay state will change is determined

**PUBLIC VERSION**

**CONFIDENTIAL MATERIAL OMITTED**

entirely by the thermostat's own internal state machine.[19] *Id.*; *see also* RX-0617C (Heffernan WS) at Q/A 68, 76, 84. "[I]n some cases the relays will change, but not in all cases." Tr. 794:16–17 (Rosing). Causam has failed to offer any evidence addressing this flaw in its theory.

Causam also advances a theory that this claim limitation is satisfied under the doctrine of equivalents. But Causam's allegations amount to nothing more than the type of generalized testimony about overall similarity that has been rejected by the Federal Circuit. *Tex. Instruments*, 90 F.3d at 1567. Additionally, Causam's equivalents theory finds no record support. RX-0391C (Rosing WS) at Q/A 122–23; RDX-0008 (Rosing Demos. 47. Dr. Madisetti opines that the function performed by the accused setpoint set command is to identify "at least one controllable device." CX-0776C (Madisetti WS) at Q/A 106, 112. But the variables that Dr. Madisetti identifies—[redacted] and [redacted]—refer to thermostats, not to relays. RX-0391C (Rosing WS) at Q/A 123. And there are no commands in the ADC System that identify a thermostat relay. RX-0617C (Heffernan WS) at Q/A 68. Dr. Madisetti also claims that the "way" this is performed is by "sending a message." CX-0776C (Madisetti WS) at Q/A 106, 112). But Dr. Madisetti's theory is flawed because the setpoint set command does not identify in the specific way he alleged: they do not identify a relay. RX-0617C (Heffernan WS) at Q/A 85–88. Finally, Dr. Madisetti opines that the "result" is to identify the power controlling device. CX-0776C (Madisetti WS) at Q/A 106, 112. But the result of the setpoint set command is simply to change the setpoint of the thermostat, not to identify any power consuming device that might be connected to it. For the

[19] The parties dispute whether a controllable device may be "part of" the client device. However, Causam's theory fails irrespective of how that issue is resolved. The controllable device must be "identified" by the power control message. No matter how the relays are conceptualized, they are never identified by any commands. Rather, and as Dr. Rosing explained on cross-examination, relay configurations are selected by the thermostat state machine after it undertakes a processing step that is entirely internal to the thermostat. Tr. 793:14–794:12 (Rosing).

same reason the ADC Accused Products do not infringe literally, they cannot infringe under the doctrine of equivalents: thermostat commands are incapable of identifying a controllable device such as a relay.

**c. Direct Infringement Issues Common to the ’268 and ’592 Patents**

**i. “measurement and verification”**

Claims 1, 6, 7, and 14 of the ’268 patent and non-asserted claim 1 of the ’592 patent require “measurement and verification.” The ADC Accused Products do not generate “measurement and verification data corresponding to the reduction in consumed power” as required by limitation 1f of the ’268 patent because the ADC Accused Products do not generate any data that is used to measure, verify, or even estimate the reduction in consumed power. RX-0391C (Rosing WS) at Q/A 81, 97–109, 142–45; RDX-0008C (Rosing Demos.) at 105–110; RX-0620C (Zawacki WS) at Q/A 59, 63–66; RX-0401C (Frader-Thompson WS) at Q/A 13–15, 23; CX-0536 (Austin Energy Cooling Event) at 1.

Causam alleges that the ADC Accused Products generate “measurement and verification data” because Mercury generates a load shed estimate using thermostat runtime data. CX-0776C (Madisetti WS) at Q/A 124–28. However, for ADC thermostats, neither thermostat runtime nor the utility-supplied power estimate—the two inputs to Mercury’s load shed estimate—are generated by the ADC thermostats. RX-0620C (Zawacki WS) at Q/A 59, 62–64. No data generated by the ADC thermostats, including thermostat runtime data, is used even to estimate the “reduction in consumed power” and, therefore, no data “corresponding to the reduction in consumed power” is generated by the ADC thermostats. RX-0620C (Zawacki WS) at Q/A 59, 62–64, 77–78.

With respect to the first input, thermostat runtime, Mercury never uses any thermostat

PUBLIC VERSION

CONFIDENTIAL MATERIAL OMITTED

runtime data generated by the ADC Accused Products to estimate the load shed statistics. Rather, to estimate the load shed for ADC thermostats, Mercury calculates an estimate based on [redacted]. RX-0620C (Zawacki WS) at Q/A 63–65. As Dr. Tajana Rosing, ADC's non-infringement expert, testified, for ADC thermostats "[t]he baseline data that EnergyHub uses is from [redacted]." Tr. 808:25–809:6 (Rosing). The same is true of the thermostat runtime data during the demand response event. RX-0391C (Rosing WS) at Q/A 107. EnergyHub's software expressly shows that the thermostat runtime is estimated for the ADC thermostats. *See* CX-0536 (Austin Energy Cooling Event) at 1 (indicating "[b]aseline and load activity include estimated load for devices that are missing data (Alarm Panel) or offline" beneath load shed estimate graph); RX-0620C (Zawacki WS) at Q/A 77–78; RPX-0004C-SC1 at 580 69–72.

Causam argues that because *some* data generated by the ADC thermostats is sent to the ADC backend and Mercury, ADC thermostat runtime data is used to estimate the EnergyHub load shed statistic. (*E.g.* Tr. 441:9–23 (Madisetti). Causam contends that ADC runtime data is "measurement and verification" data.

But no data from ADC thermostats, including thermostat runtime data, is actually used by Mercury to estimate the load shed statistic. Because Mercury does not have the necessary thermostat runtime data from the ADC thermostats,[20] instead, Mercury uses participation data

[20] Although ADC thermostats send thermostat runtime data that was collected during a demand response event to EnergyHub, that data is never used by Mercury to estimate the load shed statistics. RX-0620C (Zawacki WS) at Q/A 64, 66. Mercury cannot and does not use any of the ADC thermostat runtime data for various reasons, including because [redacted] and because [redacted]. RX-0620C (Zawacki WS) at Q/A 36, 59.

**PUBLIC VERSION**

**CONFIDENTIAL MATERIAL OMITTED**

about ADC thermostats to [redacted]. RX-0620C (Zawacki WS) at Q/A 64. Participation data is "basic data about the participants in a demand response event," such as "whether a device was online during the event." RX-0620C (Zawacki WS) at Q/A 37. As Dr. Rosing testified in unrebutted testimony, participation data is distinct from thermostat runtime data (Tr. 809:12–810:8 (Rosing)), and in any event, Causam never contends that participation data is "measurement and verification" data. The record is clear that Mercury does not use any data generated by the ADC Accused Products, nor does it use participation data about the ADC Accused Products, to calculate the load shed estimate. RX-0620C (Zawacki WS) at Q/A 59, 64–66; RX-0391C (Rosing WS) at Q/A 105–09.

With respect to the second input to the load shed estimate—the power value—there is similarly no measurement and verification. In place of an actual measurement of HVAC power, Mercury uses a single, utility-supplied power estimate. RX-0620C (Zawacki WS) at Q/A 62; Tr. 810:9–14 (Rosing). Relying on a single EnergyHub document, Dr. Madisetti, asserts that Mercury uses "estimates of the compressive [*sic*] load value" based on the specific make and model of the HVAC in a customer's house. Tr. 444:19–445:20 (discussing CX-0155C); 496:4–18 (Madisetti). But, as Dr. Madisetti admitted, his opinion is an "inference from circumstantial evidence." Tr. 497:23–498:7 (Madisetti).

Dr. Madisetti's inference is refuted by the evidence in the record. First, the Mercury uses a BYOD program, which means that Mercury simply does not have access to any information about the make and model of the HVAC; there is no "installation" where that data could be centrally collected. RX-0401C (Frader-Thompson WS) at Q/A 23. Second, in unrebutted testimony, Mr. Frader-Thompson, the CEO of EnergyHub, confirmed that this functionality—incorporating compressor size data to calculate kW savings—was something the company

"envisioned pursuing at one point," but ultimately EnergyHub "did not take this route." RX-0401C (Frader-Thompson WS) at Q/A 23. Mr. Frader-Thompson noted that the document showed "how [EnergyHub] [redacted]" (*id.* at Q/A 15), and was prepared before EnergyHub even supported ADC thermostats (*id.* at Q/A 13–14). In any event, Dr. Madisetti cites no record evidence showing that Mercury ever obtained or currently obtains this HVAC-by-HVAC information.

**"associated with individual power consuming devices"**

The ADC Accused Products do not generate "measurement and verification data" "associated with individual power consuming devices," as recited by claim 6 of the '268 patent. As discussed above, the ADC Accused Products do not "generat[e] measurement and verification data" as required by, *inter alia*, limitation 1f of the '268 patent. Additionally, there is no measurement and verification data associated with "individual power consuming devices." RX-0391C (Rosing WS) at Q/A 147–48; RDX-0008C (Rosing Demos.) at 118–20.

Causam relies exclusively on the conclusory suggestion that "runtime data" is associated with individual power consuming devices. CX-0776C (Madisetti WS) at Q/A 397–400. This assertion is unsupported by the evidentiary record. Mercury does not use ADC thermostat runtime data to generate its load shed estimate. But even if it used such data, thermostat runtime data is only an indicator of how long a thermostat has been in a given operating state. RX-0391C (Rosing WS) at Q/A 60; RX-0617C (Heffernan WS) at Q/A 63. As Dr. Rosing testified, "when we measure runtime of the thermostat, that doesn't tell us anything about how much power HVAC actually consumes." Tr. 798:7–18 (Rosing); *see also* RX-0391C (Rosing WS) at Q/A 82–83; RX-0617C (Heffernan WS) at Q/A 64.

**<u>"aggregate measurement and verification data for a multiplicity of power consuming devices"</u>**

The ADC Accused Products do not aggregate "measurement and verification data for a multiplicity of power consuming devices," as required by claim 7 of the '268 patent. As discussed above, the ADC Accused Products do not "generat[e] measurement and verification data" as required by, *inter alia*, limitation 1f of the '268 patent. Because no measurement and verification data has been shown, no aggregate of such data has been shown. RX-0391C (Rosing WS) at Q/A 151–54; RDX-0008C (Rosing Demos.) at 122–26.

Causam contends that thermostat runtime data satisfies this limitation "when it is sent up to Alarm.com backend and EnergyHub demand response servers." CX-0776C (Madisetti WS) at Q/A 417–20. This position is unsubstantiated by evidence. Mercury does not use ADC thermostat runtime data to calculate load shed estimates. But even if it did, thermostat runtime data concerns the amount of time that a thermostat has been in different operating states; it is not a measurement of power. Tr. 798:7–18 (Rosing); *see also* RX-0391C (Rosing WS) at Q/A 82–83, 154; RX-0617C (Heffernan WS) at Q/A 63–64.

**ii. "compensation" "associated with the reduction in consumed power"**

The ADC Accused Products do not generate a power supply value that indicates "compensation" "associated with the reduction in consumed power," as required by claim 15 of the '268 patent. As explained above with respect to "power supply value (PSV)," the ADC System does not generate measurement and verification data and does not generate a power supply value. There is no power supply value that could indicate a "compensation" associated with the reduction in consumed power. RX-0391C (Rosing WS) at Q/A 159–62; RDX-0008C (Rosing Demos.) at 140–44.

Further, there is no measure of compensation anywhere in the ADC Accused Products (or the broader ADC System). Causam posits that "per-device kW savings" generated by the ADC thermostats are readily translated into a demand response incentive that lowers the relevant customer's bill" and therefore "indicate a compensation." CX-0776C (Madisetti WS) at Q/A 570–72. But these conclusory assertions are insufficient to show infringement: there is no evidence to show that Mercury's load shed statistics could be translated into a compensation value, let alone any evidence that they actually have been. RX-0391C (Rosing WS) at Q/A 159–62; RX-0620C (Zawacki WS) at Q/A 62.

**d. Direct Infringement Issues Specific to the '522 Patent**

ADC Accused Products do not infringe claim 22 of the '522 patent because the ADC thermostats do not use the Internet Protocol. It is undisputed that the ADC-T2000 and ADC-T3000 communicate exclusively using a local, short-range, Z-Wave network, and that the Z-Wave protocol is not the same thing as the Internet Proto*col*. RX-0391C (Rosing WS) at Q/A 44–45, 86, 134–37; RDX-0008C (Rosing Demos.) at 91; RX-0617C (Heffernan WS) at Q/A 21, 30–31; RX-0618C (Hutz WS) at Q/A 22, 24–25; Tr. 812:24–813:3 (Rosing).

**e. Direct Infringement Issues Specific to the '592 Patent**

Causam contends that the ADC Accused Products infringe claim 13 of the '592 patent (which depends from claim 1) for the same reasons as set forth for claims 1 and 2 of the '268 patent. CIB at 248 ("For the same reasons set forth above for claims 1 and 2 of the '268 patent, the ADC Accused Products infringe claim 13 of the '592 patent."). Accordingly, because I determined the ADC Accused Products do not to infringe claims 1 and 2 of the '268 patent, they also do not infringe claim 13 of the '592 patent. The ADC Accused Products also do not infringe

claim 13 of the ’592 patent for the additional reasons below.

**i. “actual value of power reduced”**

The ADC Accused Products do not satisfy limitation 1e of the ’592 patent (from which asserted claim 13 depends) because they are not revenue grade metrology instruments and do not contain a power meter. I construed “revenue grade metrology” according to its plain and ordinary meaning, which is “metrology conforming to revenue grade requirements,” without requiring conformity with the ANSI C12 standard. The ADC Accused Products do not satisfy this limitation. RX-0391C (Rosing WS) at Q/A 170–73; RDX-0008C (Rosing Demos.) at 160–62.

On cross examination, Dr. Madisetti failed to explain how the ADC thermostats satisfied revenue grade requirements. Indeed, he did not appear to know whether or not the ADC thermostats possessed the internal components of power meters. For example Dr. Madisetti was unable to answer whether the ADC-T2000 is equipped with a power meter that measures power in watts. Tr. 374:9–11 (Madisetti); *see also id.* at 374:24–375:12 (unable to answer yes or no whether Accused Products measure current in amps).

The record makes clear that there is no device for measuring power (i.e., a power meter) in the ADC accused thermostats. *E.g.*, Tr. 817:3–5 (Rosing) (“Alarm.com thermostats cannot measure power.”); RX-0391C (Rosing WS) at Q/A 50. Additionally, it is undisputed that the ADC Accused Products are in one-way communication with the HVAC, so they are unable to collect or calculate any data from the HVAC, let alone an actual value of power consumption. *E.g.*, RX-0391C (Rosing WS) at Q/A 48–49; RX-0617C (Heffernan WS) at Q/A 57. Because the accused ADC thermostats do not receive any data from a connected power-consuming deice, they have no ability to calculate an “actual value” of power reduced.

The ADC Accused Products do not satisfy claim 1 of the ’592 patent (from which asserted

claim 13 depends), which recites "at least one power consuming device has an actual value of power reduced" "confirmed by measurement and verification." RX-0391C (Rosing WS) at Q/A 174; RDX-0008C (Rosing Demos.) at 160–62.

The ADC Accused Products do not calculate an "actual value" of power reduced based on revenue grade metrology. Further, no component of the ADC System is capable of performing "measurement and verification." Still further, Causam has failed to point to any evidence that any value calculated by Mercury is "confirmed" in some way. Nor could it, given that the ADC Accused Products (and, as a logical consequence, the ADC backend and Mercury) do not receive any data from the purported power-consuming device (the HVAC). RX-0391C (Rosing WS) at Q/A 48–50. Accordingly, there can be no confirmation by measurement and verification based on revenue grade metrology.

The ADC Accused Products do not satisfy claim 1 of the '592 patent (from which asserted claim 13 depends), which recites "wherein the actual value of power reduced is a curtailment value as supply equivalence and provides operating reserve for the electric power grid." The Accused Products do not generate an "actual value of power reduced," and therefore there is no actual value that is a "curtailment value as supply equivalence." RX-0391C (Rosing WS) at Q/A 175–78; RDX-0008C (Rosing Demos.) at 163–67.

The ADC Accused Products do not satisfy claim 13 of the '592 patent, which recites "wherein the actual value of power reduced" is a power supply value. The ADC Accused Products do not generate a power supply value, nor do they generate an "actual value of power reduced." *See* RX-0391C (Rosing WS) at Q/A 179; RDX-0008C (Rosing Demos.) at 168–73.

PUBLIC VERSION

CONFIDENTIAL MATERIAL OMITTED

#### ii. "at least one power consuming device, at least one controllable device, and at least one client device constructed and configured in network communication"

The ADC System does not include a "power consuming device," a "controllable device," and a "client device" in "network communication", as required by limitation 1b of the '592 patent (from which asserted claim 13 depends) because there is no network communication among the HVAC (the accused "power consuming device"), the thermostat relays (the accused "controllable device"), and the thermostat (the accused "client device"). RX-0391C (Rosing WS) at Q/A 165–168; RDX-0008C (Rosing Demos.) at 155–56; RX-0617C (Heffernan WS) at Q/A 53, 68; RX-0618C (Hutz WS) at Q/A 47, 54; RX-0620C (Zawacki WS) at Q/A 32.

Contrary to Complainant's allegations, the communication between the various components of the system identified by Causam is sequential and limited. Thermostat relays are entirely internal to the thermostats. They cannot communicate with the Z-Wave controller, the ADC backend or Mercury directly. RX-0617C (Heffernan WS) at Q/A 53. There are no commands that can directly instruct an ADC thermostat to open or close a relay. RX-0617C (Heffernan WS) at Q/A 53, 68; RX-0618C (Hutz WS) at Q/A 47, 54; RX-0620C (Zawacki WS) at Q/A 32; Tr. 793:14–794:17 (Rosing). Further, the purported "communication" between the relays and the HVAC is unidirectional and entirely analog: the relays send signals to the HVAC but receive no data or communication from the HVAC in return. RX-0391C (Rosing WS) at Q/A 48–50.

Causam's expert Dr. Madisetti has opined that various ADC products are "configured in network communication via the Accused Products' 'Z-Wave antenna' and 'Z-Wave module'." CX-0776C (Madisetti WS) at Q/A 989–91. But this opinion does not address the actual claim

limitation or the specific ADC Accused Products. The Z-Wave antenna connects only the thermostat and the Z-Wave controller. RX-0391C (Rosing WS) at Q/A 168. Causam has offered no explanation as to its allegations of "network communication" with respect to the relays.

### 3. Indirect Infringement

To prove induced infringement of a patent under § 271(b), the patentee must show direct infringement, knowing inducement and specific intent. *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1363 (Fed. Cir. 2012). Causam's expert opines that ADC induces infringement of claim 1 of the '268 patent and claim 1 of the '522 patent. Specifically, Dr. Madisetti opines that ADC induces its customers to use the Accused Products to perform a single limitation of each of those claims. CX-0776C (Madisetti WS) at Q/A 94, 784. The fundamental differences between the claimed inventions and the ADC System preclude direct infringement. Accordingly, there is no indirect infringement.

Causam has not shown that ADC induces its customers to use the ADC Accused Products to perform "a method for managing an electric power flow within an electric power grid" as required by claim 1 of the '268 patent. Causam alleges that ADC induces its customers to infringe this element by "encouraging its customers to enroll the accused Products in demand response events." CX-0776C (Madisetti WS) at Q/A 94. However, customers enroll in utilities' demand response programs, not specific demand response events. Further, the evidence shows how customers can opt out of a demand response event, if they wish to do so, so mere enrollment in demand response programs does not mean customers will participate. RX-0620C (Zawacki WS) at Q/A 27, 30, 72. Put differently, customers receive notifications giving them the option to avoid participation altogether.

No part of the process of dispatching demand response events from Mercury to the ADC

Accused Products infringes the Asserted Patents, including limitation 1a of the ’268 patent. Therefore, ADC does not induce customers to infringe 1a of the ’268 patent.

Neither has Causam shown that ADC induces its customers to use the Accused Products to perform “a method for a client device to manage a flow of power within an electric power grid to a plurality of power consuming devices” as required by claim 1 of the ’522 patent. Causam alleges ADC induces its customers to infringe this limitation by “encouraging its customers to enroll the accused Products in demand response events.” CX-0776C (Madisetti WS) at Q/A 784. However, and for the same reasons discussed with respect to claim 1 of the ’268 patent, this theory is unsupported by evidence. Customers enroll in utilities’ demand response programs; not events, and customers have the ability to opt out. RX-0620C (Zawacki WS) at Q/A 27, 30, 72. Also, no part of the process of dispatching demand response events from EnergyHub to the ADC Accused Products infringes the asserted claims, including limitation 1a of the ’522 patent. Thus, ADC does not induce customers to infringe limitation 1a of the ’522 patent.

### D. Alleged Infringement by ecobee Accused Products

I find that Causam has failed to demonstrate ecobee infringed any of the asserted claims of the asserted patents with the ecobee Accused Products. My reasoning follows.

#### 1. Source Code Version

ecobee raised contends that the source code Causam relied upon to prove infringement by ecobee is not used in the ecobee Accused Products. But neither source code version at issue—version [redacted] cited by Causam’s expert Dr. Madisetti and [redacted] used in the ecobee Accused Products—shows infringement.

### 2. Direct Infringement

#### a. All Asserted Patents

##### i. "power supply value (PSV)"

Claim 19 of the '552 patent, claims 1 and 15 of the '522 patent, claims 1 and 15 of the '268 patent, and claim 13 of the '592 patent require a "power supply value (PSV)."

Claims 1 and 15 of the '522 patent, claim 19 of the '552 patent, and claims 2 and 15 of the '268 patent require generating a "power supply value (PSV) corresponding to the reduction in consumed power." *See, e.g.,* JX-0001 ('552 Patent) element 19[i]; JX-0002 ('522 Patent) elements 1[f] and 15[i]; and JX-0003 ('268 Patent) elements 2 and15[a].[21] The ecobee Accused Products do not generate a power supply value or provide information to any other entity from which a power supply value can be generated. *See* RX-0390C (D'Andrade WS) at Q/A 90-96,126-130, 163-164, 197-198, 202-203. As conceded by Causam's own expert, Mr. Donohoe, "in order to have [measurement and verification] and [power supply value]," the devices must measure "the amount of load reduction in kilowatts," but the ecobee Accused Products never "generate[ ] anything in kilowatts." *Id.*; RDX-0005C-025–026 (citing RX-0268C (Donohoe Dep. Tr. Vol. I), 155:2–9; RX-0269C (Donohoe Dep. Tr. Vol. II), 506:8–20); RX-0268C (Donohoe Dep. Tr. Vol. I), 157:19–22. Indeed, there is no evidence in the record of any power measurements generated by the ecobee Accused Products, and certainly no calculations of an amount of power that is reduced during a demand response event. That is because the ecobee Accused Products have no such capability. RX-0399C (Malchiondo RWS) at Q/A 38-42, 55-57. As Mr. Malchiondo

---

[21] Due to the differences in claim element labeling used by Complainant and Respondents, the claim element labels used herein may not necessarily correspond to the specific claim element labels referred to in the expert witness statements of record.

explained, they do not measure or record power consumed by the HVAC equipment. *Id.* at Q/A 38, 39. They do not calculate a reduction in power consumed by HVAC equipment. *Id.* at Q/A 40. And they do not obtain power values corresponding to a reduction in power consumed by HVAC equipment. *Id.* at Q/A 41.[22] Causam's expert Dr. Madisetti never identified any value calculated by ecobee—actual or estimated—relating to the amount of power reduced for a demand response event. *Cf.* RX-0399C (Malchiondo RWS) at Q/A 38-41.

**ii. "controllable device(s)"**

Claims 19 and 23 of the'552 patent, claims 1, 15, and 19 of the '522 patent, claims 1, 14, and 18 of the '268 patent, and non-asserted claim 1 of the '592 patent require a "controllable device(s)." Those claims require a "controllable device" to "disable" the flow of electric power to a power consuming device. *See, e.g.,* JX-0001 ('552 Patent) elements 19[c], 19[g]; JX-0002 ('522 Patent) elements 1[c], 15[c], 15[g]; and JX-0003 ('268 Patent) elements 1[c]. 1[e], 14[b]. Causam contends that these limitations are practiced because the ecobee Accused Products have relays—which Causam asserted are the "controllable device"—that call for heating for cooling.

The ecobee thermostat relays do not "enable or disable" the flow of electric power to another device. The relays simply call for heating or cooling to an HVAC control board, which in turn, then decides as to how (if at all) to act on those calls to control various HVAC equipment. RX-0390C (D'Andrade WS) at Q/A 77-80, 145-146, 155-156, 183-184, 203; RX-0399C (Malchiondo RWS) at Q/A 35, 36; CX-0116C (Malchiondo Dep. Tr.) at 160:18-161:13; 204:20-

[22] At the hearing, Dr. Madisetti opined that the "accused products from ecobee, in conjunction with the load management server, practice this limitation." Tr. at 414:3-16 (Madisetti). That contention is waived because it was in neither Causam's Pre-Hearing Brief nor in Dr. Madisetti's witness statement. *See* CX-0776C (Madisetti WS) at Q/A 357–364.

205:5. The ecobee Accused Products do not supply power to any aspect of the HVAC system. *Id.* Nor does the power supplied to the HVAC system flow through the ecobee Accused Products, which are thermostats, not breakers. *Id.* Instead, the HVAC equipment is powered by a separate high-voltage system. RX-0399C (Malchiondo RWS) at Q/A 36). The thermostat relays thus do not have the capability to disable the flow of electric power to the HVAC equipment. *Id.*; RX-0390C (D'Andrade WS) at Q/A 77-80;) As Dr. D'Andrade explained, regardless of whether ecobee relays are engaged or disengaged, the flow of electric power to the HVAC system will still be enabled. *Id*. The ecobee Accused Products do not practice this limitation.

Causam's assertion that opening or closing relays may cause certain HVAC equipment to be turned on or off is irrelevant. The claims do not recite turning devices on or off; rather, they specifically require "selectively enabl[ing] and disabl[ing]" the "flow of electric power" to a power consuming device. As discussed above, the accused ecobee thermostats cannot disable the flow of electric power. Indeed, neither Causam nor its expert have ever identified a single instance in which an ecobee thermostat caused the flow of electric power to be disabled to an HVAC system, or to any component of an HVAC system. RX-0390C (D'Andrade WS) at Q/A 78-80, 146, 156, 184, 203. Accordingly, the ecobee Accused Products do not infringe claims with this requirement.

#### b. Direct Infringement Issues Common to the '268, '552 and '522 Patents

##### i. "power control message"

Claims 19 and 23 of the '552 patent, claims 1, 15, and 19 of the '522 patent, and claims 1, 14, and 18 of the '268 patent require a "power control message." Claim 19 of the '552 patent, claims 1 and 15 of the '522 patent, and claims 1 and 14 of the '268 patent require that the client device receives a "power control message(s)" from a "load management server." *See, e.g.,* JX-

0001 (’552 Patent) element 19[e]; JX-0002 (’522 Patent) elements 1[d], 15[e]; and JX-0003 (’268 Patent) elements 1[b], 14[e]. Claim 19 of the ‘522 patent, claim 23 of the ‘552 patent and claims 1 and 18 of the ‘268 patent also require that the power control message “indicat[es] at least one of an amount of electric power to be reduced and an identification of a controllable device to be instructed to disable a flow of electric power to one or more associated power consuming devices.” *See, e.g.,* JX-0001 (’552 Patent) claim 23; JX-0002 (’522 Patent) claim 19; and JX-0003 (’268 Patent) element 1[c] and claim 18. The ecobee Accused Products do not practice these limitations. In fact, as discussed below, there is no evidence of any purported “power control message” in the ecobee Accused Products.

Relative to the ecobee, Dr. Madisetti never identified any specific message that purportedly constitutes the claimed “power control message.” RX-0390C (D’Andrade WS) at Q/A 57–60, 118-119, 149-150, 185-186, 202-203. With respect to ecobee, Dr. Madisetti never identified or analyzed any message or communication—in the code or otherwise—that he believed to be a “demand response message.” *Id.*

Causam contends that because ecobee thermostats can participate in a demand response event, it would be “illogical” to believe that a thermostat command is not received by the thermostat. But the issue here is not whether ecobee’s thermostats participate in a demand response event, or whether they receive some kind of command. The issue is whether the ecobee Accused Products receive a particular message (a “power control message”) from a particular server (a “load management server”). Causam has not shown that ecobee Accused Products operate in this manner. RX-0390C (D’Andrade WS) at Q/A 57-60, 118-119, 149-150, 185-186, 202-203. Indeed, as discussed below, the ecobee Accused Products do not control power when implementing a demand response event.

PUBLIC VERSION

CONFIDENTIAL MATERIAL OMITTED

**<u>"at least one of an amount of electric power to be reduced"</u>**

Dr. Madisetti opined that a demand response message received by an ecobee thermostat has "operating instructions for a demand response event" that would indicate "at least one of an amount of electric power to be reduced." CX-0776C (Madisetti WS) at Q/A 151, 756. As noted above, however, Dr. Madisetti did not analyze the content of any message between an ecobee server and an ecobee thermostat. RX-0390C (D'Andrade WS) at Q/A 61-64, 133-134, 169-170, 206-207. Thus, his opinions as to what operating instructions are contained in such messages carry little weight.

Moreover, as Dr. D'Andrade explained, Dr. Madisetti's witness statement avoided discussing the messages that Dr. Madisetti had referred to in his expert report. RX-0390C (D'Andrade WS) at Q/A 61. As explained by Dr. D'Andrade, "even a cursory of those messages shows that they do not indicate any information regarding the amount of power to be reduced, but rather simply identify [redacted] and [redacted] information." *Id.;* RDX-0005C-016). This is not surprising given that "implementing demand response events through adjusting temperature setpoints for participating thermostats does not require any indication of any 'amount of electric power to be reduced' by the event." RX-0390C (D'Andrade WS) at Q/A 62. And, as discussed above, commands about a [redacted] or [redacted] do not indicate an amount of power reduced. Indeed, as explained above, the same temperature setpoint change in two different buildings can result in different amounts of power saving (or no power saving at all).

Causam argues that because the claim language refers to an "indication" of the power to be reduced, the power control message itself need not identify a specific amount of power. But even under Causam's expansive interpretation of "indication," Causam's infringement theory fails as to ecobee because, as explained above, ecobee's messages do not provide any information

corresponding to an "amount of electric power to be reduced." RX-0390C (D'Andrade WS) at Q/A 63. To practice the claim, the power control message must provide an indication of the "amount of power to be reduced." But for the ecobee Accused Products, there is no message that directly or indirectly indicates the amount of power that is to be reduced.

Causam contends that the ecobee Accused Products would infringe this limitation under the doctrine of equivalents. But Dr. Madisetti's conclusory opinion on the doctrine of equivalents cannot support a finding of infringement; he failed to identify which functionality he considers to be equivalent. RX-0390C (D'Andrade WS) at Q/A 65. Dr. Madisetti merely opined that the demand response message received by the ecobee Accused Products "performs substantially the same function ... in substantially the same way ... to obtain the same result." CX-0776C (Madisetti WS) at Q/A 161. But Dr. Madisetti never identified a specific message sent or received by the ecobee Accused Products that would purportedly be equivalent. RX-0390C (D'Andrade WS) at Q/A 65, 169. His conclusory statements are therefore insufficient to support a finding infringement under the doctrine of equivalents. Moreover, even under Dr. Madisetti's function, way, result analysis, a power control message must still perform the function of indicating an amount of electric power to be reduced, and, as explained above, for the ecobee Accused Products Causam has not identified any such message. RX-0390C (D'Andrade WS) at Q/A 65, 169.

**"a controllable device to be instructed to disable a flow of electric power to one or more associated power consuming devices"**

For the reasons discussed above, the ecobee Accused Products do not include "a controllable device" that can "disable a flow of electric power to one or more associated power consuming devices." Consequently, there necessarily can be no message that identifies a controllable device to be instructed to disable a flow of electric power. But even assuming

*arguendo* that a relay can be a "controllable device" that disables electric power flow, Causam's argument still fails because the claim requires the controllable device to be identified by the "power control message." As explained above, Dr. Madisetti identified no power control message in the ecobee Accused Products that would satisfy the claims, nor instructions within any such message that would identify a relay. RX-0390C (D'Andrade WS) at Q/A 66-71, 135-136, 171-172, 208-209.

Causam argues that a thermostat command's identification of a particular ecobee thermostat constitutes an identification of a subset of relays. But given that Dr. Madisetti has not identified any commands at all, Causam's contention is not premised on *evidence* of how the thermostat is identified in those commands—rather, it is based entirely on speculation about how the ecobee Accused Products function. RX-0390C (D'Andrade WS) at Q/A 69-71. Moreover, the identification of a thermostat would at best be an identification of the claimed "client device" and not the "controllable device" as the claims require. Accordingly, there is no evidence that the Accused Products send any message or command that literally identifies a "controllable device."

Nor has Causam shown that the ecobee Accused Products practice this limitation under the doctrine of equivalents. Once again, Dr. Madisetti failed to even identify which functionality he considers to be equivalent. RX-0390C (D'Andrade WS) at Q/A 72. He simply provides a conclusory assertion that the demand response message received by the ecobee Accused Products performs substantially the same function, in substantially the same way, to obtain the same result as the claimed power control message. CX-0776C (Madisetti WS) at Q/A 168. But Dr. Madisetti failed to identify any specific message sent or received by the ecobee Accused Products that would constitute the claimed power control message. His conclusory statements are insufficient to support a finding of infringement under the doctrine of equivalents. Moreover, even under Dr.

Madisetti's own function, way, result analysis, a power control message must still perform the function of identifying a controllable device to be instructed to disable a flow of electric power, but as already explained, no such functionality has been shown in the ecobee Accused Products. RX-0390C (D'Andrade WS) at Q/A 72.

**ii. "power control instruction"**

Claim 19 of the '552 patent, claim 15 of the '522 patent, and claim 14 of the '268 patent require a "controllable device interface facilitating communication of power control instructions to the at least one controllable device" to selectively enable and disable a flow of electric power. *See, e.g.,* JX-0001 ('552 Patent) element 19[g]; JX-0002 ('522 Patent) element 15[g]; and JX-0003 ('268 Patent) element 14[b].

No "controllable device interface" has been shown in the ecobee Accused Products that facilitates "communication of power control instructions" to the relays. RX-0390C (D'Andrade WS) at Q/A 108, 153-154, 202-203. Dr. Madisetti contended that the controllable device interface is a "device driver(s) of the CPU that drive the relays," and that the power control instructions are "firmware instructions that turn relays on/off." CX-0776C (Madisetti WS) at Q/A 468. But as Dr. D'Andrade explained, "the relays within the ecobee thermostat are integrated devices embedded within the hardware of the ecobee thermostat, and thus there is no 'interface facilitating communication' between the ecobee thermostat and these relays." RX-0390C (D'Andrade WS) at Q/A 108. "The CPU merely actuates the relays by changing the output pin voltage from a microcontroller." *Id.* Thus, there is no "'interface' between the CPU and the relays that handles communication" and no "'communicated instruction' as per the claim since it is merely the physical act of actuating the relays." *Id.*

PUBLIC VERSION

#### iii. "device control manager"

Claim 19 of the '552 patent, claim 15 of the '522 patent, and claim 14 of the '268 patent require "a device manager operably coupled to the at least one controllable device interface." *See, e.g.,* JX-0001 ('552 Patent) element 19[h]; JX-0002 ('522 Patent) element 15[h]; and JX-0003 ('268 Patent) element 14[d]. According to Dr. Madisetti, the "device control manager" is "e.g., hardware and software component of the CPU" that is operably coupled to device driver(s) of the CPU that drive the relays (which, as noted above, is what Dr. Madisetti opines is the "controllable device interface"). But as explained above, the "device driver(s) of the CPU that drive the relays" are not a "controllable device interface" at least because they do not facilitate communication of the claimed power control instructions. RX-0390C (D'Andrade WS) at Q/A 112, 157, 202-203. Furthermore, Dr. Madisetti identified no specific "hardware" or "software" component of the CPU that is purportedly the device control manager, let alone a "hardware and software component of the CPU" that is "operably coupled" to any specific "device driver(s) of the CPU." RX-0390C (D'Andrade WS) at Q/A 113, 158, 202-203. Accordingly, Causam has not met its burden to show that the ecobee Accused Products have a device control manager that is coupled to a controllable device interface.

### c. Direct Infringement Issues Common to the '268 and '592 Patents

#### i. "measurement and verification"

Claims 1, 6, 7, and 14 of the '268 patent and non-asserted claim 1 of the '592 patent require "measurement and verification."

The ecobee Accused Products do not "generat[e] measurement and verification data corresponding to the reduction in consumed power," as required by limitations 1[f] and 14[d] of

**PUBLIC VERSION**

**CONFIDENTIAL MATERIAL OMITTED**

the '268 patent (JX-0003). RX-0390C (D'Andrade WS) at Q/A 81–86, 116-117. The ecobee Accused Products do not measure or record power consumed by the HVAC equipment. RX-0399C (Malchiondo RWS) at Q/A 38-42; RX-0390C (D'Andrade WS) at Q/A 81-84. They do not calculate or otherwise obtain a reduction in power consumed by HVAC equipment. *Id.* And the data that ecobee makes accessible to utilities does not include or correspond to the power consumption of HVAC equipment. RX-0399C (Malchiondo RWS) at Q/A 46-57; RX-0390C (D'Andrade WS) at Q/A 81-84.

Dr. Madisetti opines that various other metrics, such as [redacted] and [redacted] can constitute the claimed measurement and verification data. CX-0776C (Madisetti WS) at Q/A 191-192. But none of this data is a measurement of power, let alone a value for the reduction in consumed power for an individual HVAC system controlled by an ecobee thermostat. RX-0390C (D'Andrade WS) at Q/A 81-83. As Dr. D'Andrade explained, "[t]he data generated by the ecobee Accused Products does not constitute the claimed measurement and verification data because it provides no indication of power at all, let alone an indication of the reduction in power consumption." RX-0390C (D'Andrade WS) at Q/A 83. Moreover, Dr. D'Andrade also explained that the ecobee runtime information is not a measure of the time that the HVAC system was actually running, but rather the time for which heating or cooling is "called for by the thermostat." RX-0390C (D'Andrade WS) at Q/A 81. Thus, ecobee's runtime data is not a measurement of any kind.

The fact that the ecobee Accused Products do not infringe this limitation was also confirmed by Causam's expert, Mr. Donohoe. *See* RX-0390C (D'Andrade WS) at Q/A 82; RDX-0005C-018 (citing RX-0597C (Madisetti Opening Report) at p. 11). As Mr. Donohoe conceded, "measurement and verification" in the context of the Asserted Patents are the "measurement and

verification of the reduction in power used"; therefore, to constitute "measurement and verification," "you have to know the amount of power used and there has to be a reduction that is somehow measured and verified." RX-0390C (D'Andrade WS) at Q/A 82–83; RDX-0005C-019 (citing RX-0268C (Donohoe Dep. Tr. Vol. I), 152:9–154:2); *see also* RDX-0005C-021 (citing RX-0268C (Donohoe Dep. Tr. Vol. I), 114:5–11; 115:10–19); RDX-0002C-0031 (citing RX-0011C (Forbes Tr. at 637:21–638:18) (explaining requirements of measurement and verification). Mr. Donohoe further acknowledged that to determine the reduction in power used, a baseline load must also be determined. RX-0390C (D'Andrade WS) at Q/A 82; RDX-0005C-020 (citing RX-0268C (Donohoe Dep. Tr. Vol. I), 156:10–158:8.

The ecobee Accused Products have no information about the amount of power used by the HVAC system (which can vary widely from one system to another). The ecobee Accused Products do not have the capability of connecting to or communicating with a smart meter, and thus do not collect data such as kWh consumption. RX-0399C (Malchiondo RWS) at Q/A 26–29; CX-0116C (Malchiondo Dep. Tr.) at 215:2–216:20, 219:13–20. Nor do the ecobee Accused Products measure or determine a baseline load, so they lack any means to generate measurement and verification data corresponding to the reduction in consumed power. RX-0390C (D'Andrade WS) at Q/A 82. Indeed, the DSA report discussed above confirms that the data collected by ecobee is insufficient to allow for measurement and verification of actual power savings for any individual thermostat. RX-0390C (D'Andrade WS) at Q/A 83, RDX-0005C-023 (citing RX-0933C (DSA Report); RX-0399C (Malchiondo RWS) at Q/A 58–61; RX-0933C.0014–16, 0039 (DSA Report)).

There is also no merit to Causam's argument that ecobee can be found to practice this limitation merely because some ecobee data can hypothetically be used by a utility to support some aspect of "EM&V" (evaluation, measurement and verification). Claims 1 and 14 of the '268 patent

expressly require generating measurement and verification data corresponding to the reduction in consumed power. ecobee's data is never used in this manner. As Mr. Malchiondo explained, ecobee does not measure or calculate information corresponding to a reduction in power consumption for a demand response event, nor does ecobee provide data to utilities that corresponds to the power consumption of HVAC equipment. RX-0399C (Malchiondo RWS) at Q/A 38-51, 56-57). Indeed, there is no evidence that ecobee or any utility has actually used ecobee's data to perform measurement of the reduction in consumed power and verification of the reduction in consumed power, both of which are required by the claims. RX-0390C (D'Andrade WS) at Q/A 83. To the contrary, as discussed above, ecobee data such as thermostat runtime is not, and cannot be, used to measure and verify the reduction in consumed power.

**"measurement and verification data is associated with individual power consuming devices" and "aggregating the measurement and verification data for a multiplicity of power consuming devices"**

Claim 6 the '268 patent (JX-0003) requires that "the measurement and verification data is associated with individual power consuming devices," and claim 7 of the '268 patent (JX-0003) requires "aggregating the measurement and verification data for a multiplicity of power consuming devices." As explained above, the ecobee Accused Products do not generate any measurement and verification data corresponding to the reduction in consumed power. As such, the ecobee Accused Products also do not generate measurement and verification data that is associated with an "individual power consuming device" such as HVAC units, A/C units, furnaces, boilers, etc. RX-0390C (D'Andrade WS) at Q/A 98. Indeed, there is no evidence that ecobee data is associated with any specific items of individual HVAC equipment. *Id.*

Nor has Causam shown that ecobee aggregates data "for a multiplicity of power consuming devices." RX-0390C (D'Andrade WS) at Q/A 101. Without measurement and verification data

in the first instance, there can be no aggregate measurement and verification data. The ecobee Accused Products have not been shown to practice claims 6 or 7 of the ’268 patent.

#### d. Direct Infringement Issues Specific to the ’592 Patent

Causam contends that the ecobee Accused Products infringe claim 13 of the ’592 patent (which depends from claim 1) for the same reasons as set forth for claims 1 and 2 of the ’268 patent. CIB at 248 (“For the same reasons set forth above for claims 1 and 2 of the ’268 patent, the ecobee Accused Products infringe claim 13 of the ’592 patent.”). Accordingly, because I determined the ecobee Accused Products do not to infringe claims 1 and 2 of the ’268 patent, they also do not infringe claim 13 of the ‘592 patent. The ecobee Accused Products also do not infringe claim 13 of the ’592 patent for the additional reasons below.

##### i. “at least one power consuming device, at least one controllable device, and at least one client device constructed and configured in network communication”

Limitation 1[b] of the ’592 patent requires “at least one power consuming device, at least one controllable device, and at least one client device constructed and configured in network communication.” As Dr. D’Andrade explained, the ecobee thermostat relays are actuated by voltages, which then engage or disengage conducting pathways between pairs of terminals. RX-0390C (D’Andrade WS) at Q/A 221–222. As such, “the ecobee relays within the ecobee thermostat are not configured in network communication with either the ecobee thermostat or the HVAC equipment.” *Id.*

**PUBLIC VERSION**

**CONFIDENTIAL MATERIAL OMITTED**

#### ii. "controllable device is operable to control a power flow"

Limitation 1[d] of the '592 patent requires that the "controllable device is operable to control a power flow from the electric power grid to the at least one power consuming device responsive to power control instructions from the at least one client device." As discussed above for the '522, '552, and '268 patents, the ecobee Accused Products do not enable or disable the flow of power to an HVAC system, nor do they receive instructions commanding them to do so. Thus, the ecobee Accused Products do not practice this limitation. *See also* RX-0390C (D'Andrade WS) at Q/A 225–226.

#### iii. "actual value of power reduced"

Limitation 1[e] of the '592 patent requires that "the at least one power consuming device has an actual value of power reduced based on revenue grade metrology, and confirmed by measurement and verification." Claim 13, which depends on claim 1, further requires that the "the actual value of power to be reduced is a power supply value (PSV)." The ecobee Accused Products have not been shown to practice these limitations for several reasons.

First*,* the ecobee Accused Products do not calculate or generate a power supply value for at least the reasons explained above. *See also* RX-0390C (D'Andrade WS) at Q/A 227-228, 238-239.[23]

[23] In his opinions concerning the '592 patent, Dr. Madisetti suggests that ecobee thermostats provide [redacted] and [redacted] data. CX-0776C (Madisetti WS) at Q/A 1025. However, neither [redacted] nor [redacted] are collected by the ecobee Accused Products at issue in this investigation, and ecobee does not provide either the [redacted] or [redacted] data to utility providers. RX-0390C (D'Andrade WS) at Q/A 228; RX-0399C (Malchiondo RWS) at Q/A 28–29. None of the other data cited by Dr. Madisetti corresponds to any measurement of power or the reduction in consumed power. RX-0390C (D'Andrade WS) at Q/A 228.

Second, there is no evidence that any purported power supply value is "based on revenue grade metrology." I construed "revenue grade metrology" according to its plain and ordinary meaning, which is "metrology conforming to revenue grade requirements," without requiring conformity with the ANSI C12 standard. Causam's expert Dr. Madisetti did not consider or discuss revenue grade requirements when providing his opinion as to ecobee. RX-0390C (D'Andrade WS) at Q/A 227–228.

Third, there is no evidence that any purported power supply value is "confirmed by measurement of verification." On this point, Dr. Madisetti merely provided a conclusory statement that "the Alarm.com network platform that operates with the Accused Products [ ] generate[s] measurement and verification data based upon a reduction in consumed power" CX-0776C (Madisetti WS) at Q/A 1023. Dr. Madisetti, however, provides no explanation or analysis as to how the "Alarm.com network platform" purportedly "operates with the Accused Products" or how any purported power supply value calculated by such a platform is confirmed by measurement and verification. RX-0390C (D'Andrade WS) at Q/A 227.

**"the actual value of power reduced is a curtailment value as supply equivalence and provides operating reserve for the electric power grid"**

Limitation 1[f] of the '592 patent requires that "the actual value of power reduced is a curtailment value as supply equivalence and provides operating reserve for the electric power grid." As discussed above, the ecobee Accused Products do not generate the "actual value of power reduced." RX-0390C (D'Andrade WS) at Q/A 229–230; RX-0399C (Malchiondo RWS) at Q/A 38–42, 56–57.

Although Causam's expert Dr. Madisetti testified "the 'Demand Savings (kW)' (curtailment value as supply equivalence) corresponding to the 'demand reduction' (actual value

of power reduced) conducted by the ecobee Accused Products provides operating reserve for the electric power grid," there is little record evidence to support that conclusion. *See* CX-0776C (Madisetti WS) at Q/A 1028. Causam cites no evidence that the ecobee Accused Products generate any "Demand Savings (kW)" or "demand reduction," nor does the record show how the ecobee Accused Products purportedly provide "operating reserve for the electric power grid." RX-0390C (D'Andrade WS) at Q/A 229–230. To the contrary, the evidence indicates that the ecobee Accused Products never generate any value in kilowatts for demand response. *See, e.g.,* RX-0390C (D'Andrade WS) at Q/A 91-92; RX-0269C (Donohoe Dep. Tr. Vol. II), 506:8–20.

##### iv. "the PSV is generated at a control center, a meter, a submeter, a building control system, or any device or controller that measures power"

The ecobee Accused Products do not calculate a power supply value that "is generated at a control center, a meter, a submeter, a building control system, or any device or controller that measures power within the standard as supplied by regulatory bodies that govern regulation of the electric power grid" (as required by claim 13 of the '592 patent) for at least the reasons discussed above. *See also* RX-0390C (D'Andrade WS) at Q/A 231–237. Moreover, as Dr. D'Andrade explained, the ecobee Accused Products do not include any meter, submeter, building control system, or any other device or controller that "measures power." *Id.* at Q/A 235. The ecobee Accused Products have not been shown to satisfy the claims with this limitation.

### 3. Indirect Infringement

Causam asserts that ecobee induces infringement of claim 1 of the '268 patent. But in order to establish inducement, Causam "must show, first that there has been direct infringement," and also that ecobee "knowingly induced infringement and possessed specific intent to encourage

another's infringement." *See Minnesota Min. & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1304–05 (Fed. Cir. 2002).

Causam failed to show that ecobee is liable for induced infringement. RX-0390C (D'Andrade WS) at Q/A 14–17, 87–89, 122–123, 165–166, 199–200, 238–239. *First*, as described above, the ecobee Accused Products do not directly infringe any asserted claim. *Second*, there is no persuasive evidence that ecobee acted with specific intent to induce infringement. RX-0390C (D'Andrade WS) at Q/A 89; RX-0399C (Malchiondo RWS) at Q/A 15.

## VI. TECHNICAL PRONG OF THE DOMESTIC INDUSTRY REQUIREMENT

The technical prong of the domestic industry requirement is satisfied when the complainant in a patent-based section 337 investigation establishes that it is practicing or exploiting the patents at issue. *See* 19 U.S.C. § 1337(a)(2) and (3); *Certain Microsphere Adhesives, Process for Making Same and Prods. Containing Same, Including Self-Stick Repositionable Notes*, Inv. No. 337-TA-366, Comm'n Op. at 8, USITC Pub. No. 2949 (Jan. 1996). "The test for satisfying the 'technical prong' of the industry requirement is essentially [the] same as that for infringement, *i.e.*, a comparison of domestic products to the asserted claims." *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1375 (Fed. Cir. 2003). To prevail, the patentee must establish by a preponderance of the evidence that the domestic product practices one or more valid claims of the patent. *See id.*; *Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1349 (Fed. Cir. 2010); *Certain Vision-Based Driver Assistance System Cameras and Components Thereof*, Inv. No. 337-TA-907, Comm'n Op. at 36, USITC Pub. No. 4866 (Feb. 2019).

The Domestic Industry Products at issue in this investigation are L+G's systems that practice the asserted claims of the Asserted Patents. This includes L+G L530 and L570 series RF

Load Control Switches, L+G Electric AMI Smart Meters (*e.g.*, the E331/E351 FOCUS AXe/AXRe/RXRe and LTE-M Cellular FOCUS AXe/AXe-SD meters), the L+G Power Center and Command Center load management software, and the L+G Gridstream RF network. *See* CX-0776C (Madisetti WS) at Q/A 1088.

It is undisputed that these L+G system components are used together. Dr. Madisetti testified—and the evidence shows—that the L+G smart meters are used with the L+G load control switches and with the L+G Gridstream network. *See* Tr. (Madisetti) 322:1-8, 16-25; CX-0776C (Madisetti WS) at Q/A 46, 1088, 1089; CX-0804C (Madisetti Suppl. WS) at Q/A 3-6; CX-0846C.4-10 (Gridstream OPS).

Respondents contend Causam's Domestic Industry Products should be "limited to the L530 and L570 load control switches." RIB at 38.

For the reasons discussed below, I find that Causam's Domestic Industry Products include more than the L+G L530 and L570 load control switches and that L+G's demand response system had been shown to practice the asserted claims of the Asserted Patents.

### A. '268 Patent – Claims 1, 2, 6-7, 14-15, and 18

#### 1. Independent Claim 1

##### a. [1a] – "A method for managing an electric power flow within an electric power grid, comprising:"

The Domestic Industry Products practice claim element 1a of the '268 patent. An L+G brochure states that "[d]emand management provides a cost-effective alternative to traditional capacity expansion, as well as a means to integrate intermittent renewables. A robust load management program that includes a demand response can benefit both utilities and their customers." *See* CX-0510C.1 (Advanced Load Mgmt. Brochure); CX-0776C (Madisetti WS) at

Q/A 1093. In addition, it explains that L+G's "Power Center" is "a cloud-based, near real-time control system…[that] takes advantage of two-way communication to help utilities manage their load control devices, create and execute demand management strategies, and analyze the effectiveness of demand management events." CX-0510C.2 (Advanced Load Mgmt. Brochure). The reference to "two-way communication to help utilities manage their load control devices" indicates that the Power Center software provides the utilities with a way to control or manage the load—and therefore the electric power flow—in an electric power grid.

Further evidence that the Domestic Industry Products practice claim element 1a of the '268 patent is found in CX-0087 (L530 Product Specs.) and in CX-0088 (L570 Product Specs.), which are product overviews of the L530 Series and the L570 Series Load Control Switches, respectively. *See* CX-0776C (Madisetti WS) at Q/A 1095-97. Product specifications for the L530 RF Load Control Switch state that the L+G system provides a flexible direct load control solution for managing peak demand. CX-0087 (L530 Product Specs.). The L530 RF Load Control Switch is equipped with two relays that can be configured to control various residential and commercial loads, from HVAC appliances to water heating." CX-0087.1 (L530 Product Specs.); CX-0776C (Madisetti WS) at Q/A 1095. The L+G Gridstream platform provides two-way communications to manage the power loads. *See* CX-0776C (Madisetti WS) at Q/A 1095. Furthermore, CX-0087 (L530 Product Specs.) states that "[t]he L530 RF Load Control Switch gives utilities a robust and cost-effective option to implement demand response and realize a greater return on smart grid investments." *Id*. Similar statements are made in the L570 RF Load Control Product specification. *See* CX-0088 (L570 Product Specs) CX-0088.3; CX-0776C (Madisetti WS) at Q/A 1097. These statements indicate that the L530 and L570 RF Load Control Switches control the electric power in an electric power grid and therefore practice "a method for managing an electric power flow

within an electric power grid."

Additional evidence that the Domestic Industry Product practice claim element 1a is provided by an L+G website relating to load management. The website states that "Landis+Gyr's load management technologies can help you dynamically manage your grid." CX-0095.1 (L+G web pages). The ability of these products to "help you dynamically manage your grid" and to "determine … what order to shut off appliances or turn them back on" indicates that these products are able to control the electric power flow in an electric grid. *Id*. This is also consistent with an L+G brochure on Advanced Load Management, which states that "Landis+Gyr's Gridstream® solution relies on state-of-the-art software and intelligent sensors and control switches to provide direct control of large residential and light commercial loads, while automating the scheduling of load reduction to dynamically meet utility requirements." *See* CX-0091.1 (L+G web pages); CX-0776C (Madisetti WS) at Q/A 1107.

**b. [1b] – "a client device receiving a power control message from a load management server"**

The Domestic Industry Products practice claim element 1b of the '268 patent. The User's Guide for the L+G Power Center discloses that the utility may initiate "conservation events" by sending a signal (a "power control message") to shut off certain devices, including "[w]ater heaters, pool pumps, and other devices controlled by the load control switch" and the HVAC systems controlled by L+G smart thermostats. *See* CX-0511C.10 (L+G User Guide); CX-0776C (Madisetti WS) at Q/A 1107-08. In particular,

> customers give the utility permission to override normal operation of managed equipment to curtail energy usage. The utility operator accomplishes this by using Power Center to reduce power usage through a conservation event. A conservation event sends instructions to the customers' managed devices, turning them off and on as needed to obtain the desired load reduction.

CX-0511C.9-10 (L+G User Guide). Thus, the devices that are controlled by load control switches (each switch, an example of a "client device") are turned off by the utility company during the conservation event or consume less power than under normal operation due to the receipt of a "power control message."

Furthermore, the L+G Command Center User's Guide discloses that "[d]irect load control commands such as thermostat temperature adjustments and load based duty cycling can be sent via Integration Suite." CX-0517C.244 (L+G User Guide). This confirms that direct commands to control the load can be sent during the conservation events mentioned in the L+G Power Center User's Guide (CX-0511C (L+G User Guide)) discussed above. L+G's Power Center software can send an instruction (a "power control message") to the L530 and L570 load control switches. *See* CX-0776C (Madisetti WS) at Q/A 1112; CX-0089.1 (L+G Releases 3.6). Further confirmation is provided by the L570 Load Control Product Specification, which states that "[t]he L570 Load Control Switch is designed to control large loads as part of a demand response program using the Gridstream® RF network…[including] controlling high energy demand applications, such as irrigation and municipal water pumps." CX-0088.1 (L570 Product Specs.). Because the L570 Load Control Switch enables one to "control large loads as part of a demand response program" and to do so over a network indicates that a "power control message" is sent from a "load management server" to the L570 RF Load Control Switch ("client device").

A printout of a L+G webpage concerning Command Center Software (CX-0093 (L+G web pages)), states that "Landis+Gyr's Gridstream® solution relies on state-of-the-art software and intelligent sensors and control switches to provide direct control of large residential and light commercial loads, while automating the scheduling of load reduction to dynamically meet utility requirements." CX-0093 (L+G web pages). The ability for a utility to have "direct control of

large residential and light commercial loads" and to have "direct load control" indicates that the utility can send a power control message from a load management server to a client device. *See* CX-0776C (Madisetti WS) at Q/A 1119-22.

The L+G Gridstream RF network technology that connects the L+G load control switches to the L+G Gridstream platform enables the transmission of a "power control message" from a "load management server" to a "client device." Furthermore, "Gridstream® RF network technology [is] used in L+G's L530 and L570 load control switches…" CX-0089.1 (L+G Releases 3.6). The product specifications for the L530 and L570 Load Control Switches indicate that both models are equipped with a 900 MHz radio frequency antenna for two-way communication with the utility during a conservation event. *See* CX-0513C.16 (L530 Prod. Spec.); CX-0509C.17 (L570 Prod. Spec.); CX-0512C.12 (L570 Prod. Spec.). The incorporation of RF antennas into the L530 and L570 Load Control Switches provides further evidence that these switches receive a "power control message from a load management server" as required by claim element 1b of the '268 patent. CX-0776C (Madisetti WS) at Q/A 1113-18.

The operations code of the Gridstream platform confirms that the Domestic Industry Products receive power control messages from a load management server. *See* CX-0804C (Madisetti Suppl. WS) at Q/A 31-35; CX-0846.11 (Gridstream OPS). The Gridstream OPS document explains that Load Control Events are initiated by Load Control Messages ("power control messages") received by the L+G load control switches and thermostats from a remote server ("load management server"). CX-0804C (Madisetti Suppl. WS) at Q/A 33.

**c. [1c] – "the power control message indicating at least one of an amount of electric power to be reduced and an identification of at least one controllable device to be instructed to disable the electric power flow to at least one associated power consuming device"**

Claim element 1c of the '268 patent requires a "power control message" and specifies that the "power control message" must indicate "at least one of" two possible options: (1) "an amount of electric power to be reduced," or (2) "an identification of at least one controllable device to be instructed to disable the electric power flow to the at least one associated power consuming device." The evidence shows that the Domestic Industry Products practice both options. Numerous L+G User's Guides show that the Domestic Industry Products practice the first option ("the power control message indicating at least one of an amount of electric power to be reduced"). As an example, the L+G Power Center User's Guide discloses that "VPP Events are targeted Conservation Events where the utility attempts to conserve a specific target MW or a percentage of available running load at the time of the event start." CX-0511C.10 (L+G User Guide). The reference to conserving "a percentage of available running load at the time of the event start" indicates that the power control message specifies the amount of electrical power that should be reduced. *See* CX-0776C (Madisetti WS) at Q/A 1124-25.

The L+G Command Center User's Guide states that "[d]irect load control commands such as thermostat temperature adjustments and load-based duty cycling can be sent via Integration Suite." CX-0517C.244 (L+G User Guide). The ability to send "direct load control commands" that include "load-based duty cycling" indicates that the "power control message" in the direct load control command will include an amount of electrical power to be reduced by specifying the duty cycle of the device. CX-0776C (Madisetti WS) at Q/A 1126. The term "duty cycling" refers to intermittently running a device over a period of time by using a relay in the load control switch

to disable the power flow to the device in question, thereby meeting the requirements of claim 1c of the '268 patent. *See* CX-0776C (Madisetti WS) at Q/A 1133; CX-0804C (Madisetti Suppl. WS) at Q/A 33-35; CX-0846.11 (Gridstream OPS Doc).

The Gridstream User Guide states that "load adjustment commands" can be sent to "thermostats, other energy-consuming appliances, or load control devices" via the Gridstream RF platform. CX-0508C.136 (Gridstream User Guide). It also states that the "load control devices adjust temperature, or cycle devices on and off." *Id*. By cycling a load control device, the load adjustment command indicates the amount of electrical power to be reduced, as required by claim element 1c. *See* CX-0776C (Madisetti WS) at Q/A 1127; CX-0804C (Madisetti Suppl. WS) at Q/A 33-35; CX-0846.11 (Gridstream OPS Doc).

In addition, the evidence shows that the Domestic Industry Products practice the second option recited in this claim element (*i.e.*, "the power control message indicating…an identification of at least one controllable device to be instructed to disable the electric power flow to at least one associated power consuming device"). Dr. Madisetti testified that the "controllable device" in the Domestic Industry Products may be, for example, the relay that is found within the load control switch. CX-0776C (Madisetti WS) at Q/A 1131. Additional support is found in the L+G Power Center User's Guide, which explains that during a conservation event, "[o]nly accounts with devices that are running during the event will be included to achieve and maintain the desired load shed throughout the duration of the conservation event." CX-0511C.10 (L+G User Guide). The L+G Power Center User's Guide also states that "[w]ater heaters, pool pumps, and other devices controlled by the load control switch are turned off for the duration of the conservation event." *Id*. Thus, the load control switch—or more particularly, the relay therein—is instructed to disable the electric power flow to power consuming devices, such as water heaters, pool pumps, and the like.

*See* CX-0776C (Madisetti WS) at Q/A 1131, CX-0511C (L+G User Guide).

The Gridstream RF Generation 5 (G5) FOCUS AXe Endpoint User's Guide, which relates to L+G's FOCUS AXe Smart Meters, discloses that load adjustment commands can be sent to home area network (HAN) devices, including "thermostats, other energy-consuming appliances, or load control devices." CX-0508C.136 (Gridstream User Guide); CX-0776C (Madisetti WS) at Q/A 1132. Thus, the load adjustment command can be sent to the relay (a "controllable device") of a load control device to cause the load control device to cycle off a device (*i.e.*, "disable the electric power flow to at least one associated power consuming device"). The L+G Command Center User's Guide discloses that "[d]irect load control commands such as thermostat temperature adjustments and load-based duty cycling can be sent via Integration Suite." CX-0517C.244 (L+G User Guide).

Based on the foregoing, both options of claim element 1c are literally met by the Domestic Industry Products. But, even if the Domestic Industry Products do not meet literally meet either or both of the two options recited in claim element 1c, these options are alternatively met under the doctrine of equivalents. CX-0776C (Madisetti WS) at Q/A 1128. With respect to the first option, the identified "power control message" of the Domestic Industry Products performs substantially the same function (indicating an amount of electric power to be reduced, for example, by instructing a reduction in the duty cycle), in substantially the same way (by sending a message), to obtain the same result (a reduction in the amount of electric power used) as the claimed power control message. CX-0776C (Madisetti WS) at Q/A 1128. With respect to the second option, the identified "power control message" of the Domestic Industry Products performs substantially the same function (indicating an identification of at least one controllable device to be instructed to enable or disable a flow of electric power to one or more power consuming devices), in

substantially the same way (by sending a message with information identifying at least one controllable device), to obtain the same result (identifying the power controlling device) as the claimed power control message. CX-0776C (Madisetti WS) at Q/A 1134.

Respondents argue that the Domestic Industry Products do not have any "power control message" that "indicate[s] an amount of power to be reduced" because Causam has identified no value having megawatt units in satisfaction of this limitation. In support, Respondents cite to a passage in the '552 patent that specifies that a "Cut" transaction identifies "the amount of power (e.g., in megawatts) that must be removed from the power system supplied by the utility." RX-0388C (Paradiso WS) at Q/A 258-59, citing RDX-0002C.21. Respondents also cite to Figure 8 of the '552 patent, which shows a flowchart with a step that sends a "Cut" transaction "with number of megawatts to be removed from the system." *Id*.

Respondents' argument that this claim limitation requires identification of a value having megawatt units is not persuasive. First, Respondents did not raise this as a claim construction issue, so arguments relating to the proper interpretation of "power control message" have been forfeited. Even if the argument were to be considered at this late stage, Respondents have not shown why the claim limitation "power control message" should be limited to the format of an example in the specification. *See* Phillips, 415 F.3d at 1323 ("As a general rule, however, the particular examples or embodiments discussed in the specification are not to be read into the claims as limitations."). The specification of the '552 patent describes "the amount of power (e.g., in megawatts)…" Use of the abbreviation "e.g." clearly indicates that expressing the "amount of power" in megawatts is only an exemplary embodiment. The claimed power control message is broader than a single value having the units of megawatts.

Respondents also argue that, in the context of the Asserted Patents, a relay cannot be a

"controllable device." RIB at 48, 99-100, 122-23. Here again Respondents' claim construction argument is not timely and has been forfeited. But even if it were considered, Respondents' argument falls short because none of the asserted claims require the "controllable device" to be a separate device. Indeed, Respondents fail to point to a single line of intrinsic evidence or any authority to support the argument that the "controllable device[s]" must be separate from the "client device."

Respondents also argue that claim element 1c of the '268 patent is not met under the doctrine of equivalents. According to Respondents' expert, Dr. Paradiso, instructing a change in duty cycle or a change to the temperature setpoint of a thermostat is "very different" from a "power control message…indicating an amount of electric power to be reduced" because "it does not employ the same precision as required by the claim language." RX-0388C (Paradiso WS) at Q/A 277. Specifically, Dr. Paradiso opined that "[a] message that requests duty cycling or temperature setback does not give insight into whether any electric power will actually be reduced, and it certainly doesn't indicate 'an amount of electric power to be reduced.'" *Id*.

Respondents' arguments against application of the doctrine of equivalence are not persuasive. Claim element 1c only requires the claimed "power control message" to "indicat[e] an amount of power *to be* reduced" (emphasis added); it does require the system to accomplish reduction of a specific amount of power consumption.

#### d. [1d] – "the client device issuing a power management command to the at least one controllable device"

Claim element 1d of the '268 patent is practiced by the Domestic Industry Products. The L570 Load Control Switch (an example of a "client device") is equipped with a single load control relay (*i.e.*, an example of a "controllable device"). CX-0509C.18 (L570 Prod. Spec.). Similarly,

another L570 Load Control Switch product specification discloses that the L570 Load Control Switch "can control a single load with an internal relay where the two external RED wires are connected." CX-0512C.19 (L570 Prod. Spec.). The L570 Load Control Switch instructs the relay to open and close (*i.e.*, "issuing a power management command to the at least one controllable device."). Accordingly, when the L570 Load Control Switch is operated in this way, it meets the limitation of "the client device issuing a power management command to the at least one controllable device" as required by claim element 1d of the '268 patent. *See* CX-0776C (Madisetti WS) at Q/A at 1137, 1139. Similarly, the L530 Load Control Switch (an example of a "client device") is equipped with two relays, K1 and K2 (each an example of a "controllable device"). CX-0513C.14 (L530 Prod. Spec.). The L530 Load Control Switch instructs the K1 and K2 relays to open and close (*i.e.*, "issuing a power management command to the at least one controllable device"). CX-0776C (Madisetti WS) at Q/A at 1138.

Respondents' expert Dr. Paradiso opined that transmission of a voltage over a line to a relay by the L570 or L530 load control switches does not constitute a "power management command" because the voltage is not "data." *See* RX-0388C (Paradiso WS) at Q/A 311, 320. But Dr. Paradiso does not cite to any evidence to support this opinion, but only makes a vague reference to "the general understanding in the art of an instruction/command." *Id*. at Q/A 311. And Dr. Paradiso does not explain what the so-called "general understanding in the art of an instruction/command" is, or how it is meaningfully different from a voltage signal that is transmitted from the load control switch to the relay to disable a power consuming device. Dr. Paradiso's testimony on this point holds little weight.

**PUBLIC VERSION**

**e. [1e] – "the power management command causing the at least one controllable device to disable the electric power flow to the at least one associated power consuming device to provide a reduction in consumed power; and"**

The Domestic Industry Products practice claim element 1e of the '268 patent. As noted above with respect to claim element 1d, the L570 Series and L530 Series Load Control Switches instructs one or more relays to open and close. When the relay switch is opened due to a power management command, current cannot flow and "the power management command caus[es] the at least one controllable device to disable the electric power flow to the at least one associated power consuming device to provide a reduction in consumed power" as required by claim element 1e. *See* CX-509C (L570 Prod. Spec); CX-0512C (L570 Prod. Spec); CX-0776C (Madisetti WS) at Q/A 1142-44; CX-0513C (L530 Prod. Spec.).

**f. [1f] – "generating measurement and verification data corresponding to the reduction in consumed power"**

The Domestic Industry Products practice claim element 1f. Both the L530 Series and L570 Series Load Control Switches include a metrology processor that is designed to measure voltages, current, and power consumption. *See* CX-0776C (Madisetti WS) at Q/A 1148, 1149. The measurement of voltages, current, and power consumption permits "generating measurement and verification data corresponding to the reduction in consumed power" during a conservation event. *See* CX-0776C (Madisetti WS) at Q/A 1144-53.

The L530 Load Control Switch is equipped with a metrology processor that measures voltages, current and power consumption. *See* CX-0513C.15-16 (L530 Prod. Spec.) (measuring voltages ($V_{RMS}$), currents ($I_{RMS}$), active/reactive power consumption (PACT) and active/reactive energy (E) consumption); *id.* at 23 ("measur[ing] on-board voltage and two current sources from

two different external loads.); CX-0087.2 (L530 Product Specs.). Similarly, the L570 Load Control Switch is "designed to measure voltages($V_{RMS}$) and currents ($I_{RMS}$) with a single metrology processor." *See* CX-0509C (L570 Prod. Spec.); CX-0512C.17, 25 (L570 Prod. Spec.). Because the voltage and current of the load are proportional to the consumed power, the measurement of voltage and current "generat[es] measurement and verification data corresponding to the reduction in consumed power" required by claim element 1g.

Furthermore, a product brochure for the L570 Switch states that "[t]he switch uses a remote measurement method, where the back-office system estimates the amount of available load and provides measurement and verification of the curtailed load from the data sent by the switch." CX-0088.3 (L570 Product Specs.). This provides additional direct evidence that the L570 Switch meets the limitation of "generating measurement and verification data corresponding to the reduction in consumed power." CX-0776C (Madisetti WS) at Q/A 1152.

In addition, the L+G Command Center software is configured to "generat[e] measurement and verification data corresponding to the reduction in consumed power" as required by claim element 1f. L+G Command Center User Guide indicates that the home area networks (HAN) devices "can receive usage information, such as kWh and kW, as values are updated by the meter." CX-0517C.244 (L+G User Guide). The measurement of energy ("kWh") and power ("kW") by the Command Center Software during conservation events and normal usage indicates that the Command Center Software "generates measurement and verification data corresponding to the reduction in consumed power" as required by claim element 1f. In addition, the Gridstream platform can be used to transmit data for measurement and verification. *See* CX-0804C (Madisetti Suppl. WS) at Q/A 40-46; CX-0846C.6, 10, 24-26, 33 (Gridstream OPS Doc). At trial, Dr. Madisetti testified that the Gridstream OPS Doc provides additional evidence as to how the L+G

**PUBLIC VERSION**

**CONFIDENTIAL MATERIAL OMITTED**

system generate measurement and verification data. *See* Tr. (Madisetti) at 464:2-8 *citing* CX-0846.24 (Gridstream OPS Doc). [redacted] Tr. (Madisetti) at 464:2-465:8.

**2. Dependent Claim 2 – "The method of claim 1, further comprising generating a power supply value (PSV) corresponding to the reduction in consumed power."**

The Domestic Industry Products practice claim 2 of the '268 patent. As noted above with respect to claim element 1f of the '268 patent, the L530 and L570 Load Control Switches are capable of measuring the current, and/or voltage of the load, as well as the load power. The Gridstream platform transmits data used for measurement and verification to generate the power supply value. *See* CX-0804C (Madisetti Suppl. WS) at Q/A 40-46; CX-0846C.6, 10, 24-26, 30 (Gridstream OPS Doc); CX-0092 (L+G web pages), CX-0096 (L+G web pages). Moreover, with respect to CX-0096, Dr. Madisetti testified at trial that L+G's system "includes a baseline calculation, and it provides specific evidence that it looks at a particular baseline so that it can calculate the savings based on this confirmed M&V data." Tr. (Madisetti) 468:3-11. Dr. Madisetti also testified that CX-0092 provides "explicit results from testing by Landis+Gyr of their PSV calculations. It refers to specific tests done at different [utility and electric distribution system companies] around the country, including Colorado Springs [Utilities]…where they calculate the specific savings per device for a DR event." Tr. (Madisetti) 469:1-8.

Respondents' expert Dr. Paradiso opined that Dr. Madisetti has not shown that the "measurement and verification" performed by the Domestic Industry Products generates a power supply value. RX-0388C (Paradiso WS) at Q/A 165. According to Dr. Paradiso, "measurement and verification" methods can be used for various values, not just a power supply value. But Dr.

Paradiso fails to identify those other "various values" and cites to no evidence to support any of his opinions questioning the proof of a power supply value. Dr. Paradiso is silent on the teachings of CX-0092 (L+G web pages) and CX-0096 (L+G web pages) relating to generating a power supply value corresponding to the reduction in consumed power. Dr. Paradiso's testimony on this point holds little weight.

#### 3. Dependent Claim 6 – "The method of claim 1, wherein the measurement and verification data is associated with individual power consuming devices."

The Domestic Industry Products practice claim 6 of the '268 patent. As noted above with respect to claim element 1d of the '268 patent, the L530 and L570 Load Control are connected to one or more loads (each an "individual power consuming device"). Furthermore, each load is monitored with a metrology processor to provide measurement and verification data, as noted above with respect to claim element 1f. *See* CX-0509C (L570 Prod. Spec.), CX-0513C (L530 Prod. Spec.), CX-0512C (L570 Prod. Spec.), CX-0517C (L+G User Guide), CX-0088 (L570 Product Specs.) and CX-0087 (L530 Product Specs.); CX-0776C (Madisetti WS) at Q/A 1155; CX-0804C (Madisetti Suppl. WS) at Q/A 40-46; CX-0846C.6, 10, 24-26, 30 (Gridstream OPS Doc); CX-0092 (L+G web pages).

In addition, the L+G Power Center User Guide discloses that several different types of reports may be generated that gives information about specific loads. CX-0511C.49 (L+G User Guide). The "DeviceLevelSummary" report lists all accounts participating in the conservation event, including "how much power they had initially to be removed, the device ID and location." The ability to generate reports for specific loads provides further evidence that the Domestic Industry Products practice a method in which "the measurement and verification data is associated with individual power consuming devices" as required by claim 6 of the '268 patent. *See* CX-

0511C.49 (L+G User Guide); CX-0776C (Madisetti WS) at Q/A 1155.

#### 4. Dependent Claim 7 – "The method of claim 1, further including aggregating the measurement and verification data for a multiplicity of power consuming devices."

The L530 and L570 Load Control Switches are connected to one or more loads (each an "individual power consuming device"). Furthermore, each of these loads is monitored with a metrology processor to provide measurement and verification data, as discussed for claim element 1[f]. *See* CX-0509C (L570 Prod. Spec.); CX-0513C (L530 Prod. Spec.); CX-0512C (L570 Prod. Spec.); CX-0517C (L+G User Guide); CX-0088 (L570 Product Specs.); CX-0087 (L530 Product Specs.); CX-0776C (Madisetti WS) at Q/A 1156. The Gridstream platform transmits data used for measurement and verification to generate the PSV. *See* CX-0804C (Madisetti Suppl. WS) at Q/A 40-46; CX-0846C.6, 10, 24-26, 30 (Gridstream OPS Doc); CX-0092 (L+G web pages).

Additionally, L+G Power Center User Guide discloses that several different types of reports may be generated that gives aggregated measurement and verification data for a multiplicity of power consuming devices. The "ControlEventSummary" report includes "the number of participants, and load shed, average load shed, and average reduction by device type." As another example, the "DeviceDataSummary" report includes "previous and current kW load and reduction information by device type as well as average kW per device and account." The ability to provide average values across different users and devices indicates that the Domestic Industry Products "aggregate[e] the measurement and verification data for a multiplicity of power consuming devices." CX-0511C.49 (L+G User Guide).

### 5. Independent Claim 14

#### a. [14a] – "A system for managing electric power on an electric power grid, comprising:"

Claim 14 of the '268 patent is the system-claim equivalent to the method claim of claim 1. The Domestic Industry Products practice claim 14a of the '268 patent. The Domestic Industry Products manage electric power flow within an electric power grid, for example, by controlling the flow of electric power to power consuming devices in conjunction with demand response programs for reducing power consumption. Examples of such power consuming devices include furnaces, boilers, pumps, and the like. CX-0776C (Madisetti WS) at Q/A 1157.

This includes L+G L530 and L570 series RF Load Control Switches, L+G Electric AMI Smart Meters (*e.g.*, the E331/E351 FOCUS AXe/AXRe/RXRe and LTE-M Cellular FOCUS AXe/AXe-SD meters), the L+G Power Center and Command Center load management software, and the L+G Gridstream RF network. *See* CX-0776C (Madisetti WS) at Q/A 1088. Collectively, these components form a "system for managing electric power on an electric power grid." *See id*. at Q/A 1157; *see also* CX-0510C (Advanced Load Mgmt.); CX-0087 (L530 Product Specs.); CX-0088 (L570 Product Specs.); CX-0095 (L+G web pages); CX-0091 (L+G web pages) (for substantially the same reasons provided in connection with claim element 1a of the '268 patent); CX-0776C (Madisetti WS) at Q/A at 1157.

**b. [14b] – "a client device comprising at least one controllable device interface facilitating communication of power control instructions to at least one controllable device, the power control instructions operable to cause the at least one controllable device to selectively enable and disable a flow of electric power to at least one power consuming device; and"**

The Domestic Industry Product practice claim element 14b of the '268 patent. As noted above with respect to claim elements 1d and 1e of the '268 patent, the Domestic Industry Products include load control switches (*e.g.*, the L530 and L570 Load Control Switches) that issue instructions (a "power management command") to relays (each, a "controllable device") to cause them to open during a power conservation event to disable power to the load. CX-0776C (Madisetti WS) at Q/A 1159. Upon completion of the conservation event, the relay closes and power is restored the load. In this way the relay can selectively enable and disable a flow of electric power to the load (the "at least one power consuming device"). Furthermore, some of L+G's load control switches are equipped with more than one relay, so that they can control more than one load (i.e., "at least one power consuming device"). *See, e.g.*, CX-0513C.33 (L530 Prod. Spec.); CX-0512C.19 (L570 Prod. Spec.). In addition, as discussed in detail below in connection with claim element 14c, the load control switches ("client device") include a "controllable device interface" in the form of a "RLY CTRL" (Relay Control) line that transmits instructions to the relays to open or close.

**PUBLIC VERSION**

**CONFIDENTIAL MATERIAL OMITTED**

c. **[14c] – "a device control manager operably coupled to the at least one controllable device interface, the device control manager operable to issue power control instructions to the at least one controllable device through the at least one controllable device interface responsive to the received power control instructions, and"**

The Domestic Industry Products practice claim element 14c of the '268 patent. To control the relay, L+G load control switches include a main processor and a metrology processor (collectively, a "device control manager") that sends instructions to the relay ("operably coupled to the at least one controllable device." A block diagram for the L570 Load Control Switch with color annotations to identify the main processor, metrology processor, and their connection to relay is shown below.

[redacted]

CX-0509C.11 (L570 Prod. Spec.). The L530 Load Control Switch is similar, but features two relays. *See* CX-0513C.11 (L530 Prod. Spec.); CX-0776C (Madisetti WS) at Q/A 1160. The main processor and metrology processor control the relay in the load control switch. *See* CX-0776C (Madisetti WS) at Q/A 1161. In fact, the block diagram contains the abbreviation "RLY CTRL" (Relay Control), which describes the nature of the connection ("controllable device interface") between relay and the main processor and metrology processor ("device control manager"). This

confirms that the main processor and metrology processor ("device control manager") are configured to issue power control instructions during a conservation event to the relay ("controllable device") through its connection ("controllable device interface"). *See* CX-0509C.11 (L570 Prod. Spec.); CX-0513C.11 (L530 Prod. Spec.); CX-0776C (Madisetti WS) at Q/A 1161.

Respondents' expert Dr. Paradiso opined that transmission of a voltage over a line to a relay does not constitute a "power control instruction" because it is not "data." *See* RX-0388C (Paradiso WS) at Q/A 311, 320. But Dr. Paradiso's analysis is unpersuasive for the same reasons set forth above with respect to claim element 1d of the '268 patent. Moreover, the "power control instruction" of claim 14c is satisfied for the same reasons described above in connection with the "power control management command" in claim element 1d of the '268 patent.

#### d. [14d] – "based upon a reduction in consumed power for disabled flow of electric power, generate measurement and verification data corresponding to the reduction in consumed power"

The Domestic Industry Products practice claim element 14d of the '268 patent. As noted above with respect to claim element 1f of the '268 patent, L+G's load control switches, such as the L570 Load Control Switch, can measure—using a metrology processor—the voltage, current, and power during a conservation event to confirm the reduction in consumed power by the load. *See* CX-0509C (L570 Prod. Spec.); CX0512C (L570 Prod. Spec.); CX-0513C (L530 Prod. Spec.); CX-0776C (Madisetti WS) at Q/A 1162. The measurement of voltage and current during a conservation event "generate[s] measurement and verification data corresponding to the reduction in consumed power." *Id*. The Gridstream platform transmits data used for measurement and verification to generate the power supply value. *See* CX-0804C (Madisetti Suppl. WS) at Q/A 40-46; CX-0846C.6, 10, 24-26, 30 (Gridstream OPS Doc); CX-0092 (L+G web pages).

**e. [14e] – "wherein the client device receives a power control message from a remote load management server, and wherein the power control message received from the remote load management server is responsive to a power reduction request"**

The Domestic Industry Products practice claim element 14e of the '268 patent. As noted above with respect to claim element 1b of the '268 patent, the L+G load control switches, such as the L570 and L530 Load Control Switches, are equipped with an antenna that receives instructions to reduce power (a "power control message") during a conservation event. *See* CX-0509C.11 (L570 Prod. Spec.); CX-0513C.11 (L530 Prod. Spec.); CX-0776C (Madisetti WS) at Q/A 1163. The digital instructions to reduce power during a conservation event are sent by the L+G server ("remote load management server") and received by the antenna.

The L+G Power Center User's Guide discloses that "VPP Events are targeted Conservation Events where the utility attempts to conserve a specified target MW or a percentage of available running load at the time of the event start." CX-0511C.10 (L+G User Guide). In other words, when it is deemed necessary to reduce the consumed power ("power reduction request") the server ("remote load management system") sends instructions ("power control message") to load control switches, such as the L570 Load Control Switch, which then respond to the power reduction request. *See* CX-0511C.10 (L+G User Guide); CX-0776C (Madisetti WS) at Q/A 1165. This is accomplished using the Gridstream platform. *See* CX-0804C (Madisetti Suppl. WS) at Q/A 32-35; CX-0846C.5, 11 (Gridstream OPS Doc). The operations code of the Gridstream platform confirms that the Domestic Industry Products receive power control messages from a load management server. *See* CX-0804C (Madisetti Suppl. WS) at Q/A 31-35; CX-0846.11 (Gridstream OPS Doc.). The Gridstream OPS document explains that Load Control Events are initiated by Load Control Messages ("power control messages") received by the L+G load control

switches and thermostats from a remote server ("load management server"). CX-0804C (Madisetti Suppl. WS) at Q/A 33.

**6. Dependent Claim 15 – "The system of claim 14, wherein a power supply value (PSV) is generated corresponding to the reduction in consumed power, and wherein the PSV indicates a compensation provided for power supply associated with the reduction in consumed power."**

The Domestic Industry Products practice claim 15a of the '268 patent. As noted above with respect to claim 2 of the '268 patent, the Domestic Industry Products generate a power supply value corresponding to the reduction in consumed power. Furthermore, the L+G Command Center User's Guide indicates that the home area networks (HAN) devices "can receive usage information, such as kWh and kW, as values are updated by the meter." CX-0517C.244 (L+G User Guide). Usage information during a conservation event generates a "power supply value" that corresponds to the reduction in consumed power. CX-0776C (Madisetti WS) at Q/A 1167. Furthermore, the Gridstream User Guide for the L+G Smart AXe Meters states:

> The utility sends downstream pricing information and text messages via Command Center (or 3rd party integrated application) to the module, which uses the ZigBee radio to push down the information to the devices. Because the solution is bi-directional, the devices already also pulling meter data and accurate time that is maintained at the endpoint.

This disclosure establishes that: (1) the devices are reading power (pulling meter data); and (2) the utility is sending updated pricing information. *See* CX-0508.18 (Gridstream User Guide); CX-0776C (Madisetti WS) at Q/A 1167. When the devices are making such power measurements during a conservation event, the devices are generating a "power supply value" that corresponds to the reduction in consumed power.

L+G's Gridstream RF G5 FOCUS AXe smart meter also provides for different pricing

depending on the power consumed. The Gridstream User Guide for L+G Smart AXe Meters reports:

> The Gridstream RF G5 FOCUS AXe module refreshes data from the meter every 30 seconds and makes it available to all devices.… It sorts up to five provisioned devices and makes available five tiers for pricing events to align with the meter's number of rates.

CX-0508.18 (Gridstream User Guide), CX-0776C (Madisetti WS) at Q/A 1170. This disclosure also confirms that the Domestic Industry Products include a power supply value that indicates a compensation provided for power supply associated with the reduction in consumed power. In addition, the L570 Load Control Switch sends "measurement and verification of the curtailed load from data sent by the switch," including parameters such as "Apparent power." CX-0088.1 (L570 Product Specs.). The Gridstream platform transmits data used for measurement and verification to generate the power supply value. *See* CX-0804C (Madisetti Suppl. WS) at Q/A 40-46; CX-0846C.6, 10, 24-26, 30 (Gridstream OPS Doc); CX-0092 (L+G web pages).

Furthermore, CX-0096 (L+G web pages) is a L+G web page that describes a "Peak Time Rewards" (PTR) program that adjusts the billing based on the measured power consumption. It states that "[a]fter the completion of the event, the baseline calculations are compared to event day consumption to generate specialized billing determinants to be used by the billing system." *Id*. This indicates that: (1) the L+G system establishes a baseline usage amount, and (2) the L+G system calculates the difference between the actual usage amount during a conservation event and the baseline amount and then adjusts the billing to provide compensation for the reduction in consumed power during a conservation event. *Id*. This confirms that the devices generate a power supply value corresponding to a reduction in consumed power during a conservation event. CX-0096 (L+G web pages).

In addition, the Gridstream platform transmits data used for measurement and verification to generate the power supply value. *See* CX-0804C (Madisetti Suppl. WS) at Q/A 40-46; CX-0846C.6, 10, 24-26, 30 (Gridstream OPS Doc); CX-0092 (L+G web pages).

**7. Dependent Claim 18 – "The system of claim 14, wherein the power control message indicates at least one of an amount of electric power to be reduced and an identification of a controllable device to be instructed to disable the flow of electric power to the at least one power consuming device."**

The Domestic Industry Products practice claim 18 of the '268 patent. The L+G User Guides and the Gridstream User Guides teach that the Domestic Industry Products utilize power control messages to adjust the duty cycle of a power consuming device, which indicates an "identification of a controllable device to be instructed to disable the flow of electric power to the at least one power consuming device." *See* discussion regarding claim element 1c of the '268 patent, *supra*; CX-0511C (L+G User Guide); CX-0517C (L+G User Guide); CX-0508C (Gridstream User Guide); CX-0776C (Madisetti WS) at Q/A 1170-1174; CX-0804C (Madisetti Suppl. WS) at Q/A 40-46; CX-0846C.6, 10, 24-26, 30 (Gridstream OPS Doc); CX-0092 (L+G web pages).

## B. '552 Patent – Claims 19 and 23

### 1. Independent Claim 19

#### a. [19a] – "A client device for use in a system that manages electric power on an electric grid"

The Domestic Industry Product practice claim element 19a of the '552 patent. As discussed above in connection with claim elements 14a and 14b of the '268 patent, the Domestic Industry Products include a "client device" that is "for use in a system that manages electric power on an electric grid." The L+G L570 and L530 Load Control Switches (each a "client device") are part

of a system that includes the meters and control software. CX-0776C (Madisetti WS) at Q/A 1177. This system is connected to an electrical grid that supplies power to multiple power consuming devices, and the L+G load control switches control the power consumption of the power consuming devices attached to the grid. *Id*. Product specifications for the L570 RF Load Control Switch also state that the switch "gives utilities a robust and cost-effective option to implement demand response and realize a greater return on smart grid investments." CX-0088.1 (L570 Product Specs.). The Gridstream RF platform is used with the load control switches to control the power consuming devices. *See* CX-0804C (Madisetti Suppl. WS) at Q/A 37-39; CX-0846.4, 11 (Gridstream OPS).

**b. [19b] – "wherein the power is supplied to a plurality of power consuming devices"**

The Domestic Industry Products practice claim element 19b of the '552 patent. As noted above with respect to claim element 19a, the L+G L570 and L530 Load Control Switches (each a "client device") are part of a system that includes the meters and control software. CX-0776C (Madisetti WS) at Q/A 1177. This system is connected to an electrical grid that supplies power to multiple power consuming devices, and the L+G load control switches control the power consumption of the power consuming devices attached to the grid. *Id*.

**c. [19c] – "wherein power flow over the electric grid to at least some of the plurality of power consuming devices is enabled and disabled by a plurality of controllable devices"**

The Domestic Industry Products practice claim element 19c of the '552 patent. As discussed above in connection with claim element 1e of the '268 patent, an L+G load control switch ("client device") may send instructions (a "power management command") to a relay

("controllable device") to disable electrical power flow to an associated power consuming device. Furthermore, as noted by Dr. Madisetti, within any commercial electrical grid, there are many connected power consuming devices, such as air conditioners, fans, pumps, and the like. Many of these power consuming devices are controlled by relays ("a plurality of controllable devices"). *See* CX-0776C (Madisetti WS) at Q/A 1178 (working with the Gridstream platform); CX-0804C (Madisetti Suppl. WS) at Q/A 37-39; CX-0846.4, 11 (Gridstream OPS).

#### d. [19d] – "wherein at least one controllable device operates under the control of the client device, and"

The Domestic Industry Products practice claim element 19d of the '552 patent for substantially the same reasons as set forth above with respect to claim element 1d of the '268 patent. The L570 Load Control Switch contains one relay ("at least one controllable device") that is controlled by the load control switch. The relay is annotated with the color red in the block diagram provided below:

[redacted]

CX-0509C.11 (L570 Prod. Spec.). The L530 Load Control Switch is similar, except that it has two relays. *See* CX-0513C (L530 Prod. Spec.); CX-0776C (Madisetti WS) at Q/A 1179.

**e. [19e] – "wherein the client device receives power control messages from a remote load management server, and"**

The Domestic Industry Products practice claim element 19e of the '552 patent for substantially the same reasons as set forth above with respect to claim 1b and 14e of the '268 patent. As noted in the discussion of claim element 14e of the '268 patent, L+G Load Control Switches, such as the L570 and L530 Load Control Switch ("client device"), are each equipped with an antenna to receive power reduction instructions ("power control messages") from a server ("remote load management server") during a conservation event. CX-0776C (Madisetti WS) at Q/A 1180.

The operations code of the Gridstream platform confirms that the Domestic Industry Products receive power control messages from a load management server. *See* CX-0804C (Madisetti Suppl. WS) at Q/A 31-35; CX-0846.11 (Gridstream OPS). The Gridstream OPS document explains that Load Control Events are initiated by Load Control Messages ("power control messages") received by the L+G load control switches and thermostats from a remote server ("load management server"). CX-0804C (Madisetti Suppl. WS) at Q/A 33.

**f. [19f] – "wherein a power control message received from the load management server is responsive to a power reduction request issued by a control center, the client device comprising:"**

The Domestic Industry Products practice claim element 19f of the '552 patent. In particular, the instructions received by the load control switch from the L+G server are responsive to a power reduction request by a control center, such as the utility company. Evidence that utilities issue power reduction requests is provided by the L+G Power Center User's Guide, which discloses that "VPP Events are targeted Conservation Events where the utility attempts to conserve

a specific target MW or a percentage of available running load at the time of the event start." *See* CX-0511C.10 (L+G User Guide); CX-0776C (Madisetti WS) at Q/A 1181.

**g. [19g] – "at least one controllable device interface facilitating communication of power control instructions to the at least one controllable device, the power control instructions causing the at least one controllable device to selectively enable and disable a flow of electric power to at least one power consuming device of the plurality of power consuming devices; and"**

The Domestic Industry Products practice claim element 19g. As shown in the block diagram provided above with respect to claim element 14c of the '268 patent, the relay in the L570 Load Control Switch is electrically connected to a main processor and a metrology processor. This connection ("at least one controllable device interface") communicates the power control instructions received by the main processor or metrology processor to the relay. *See* CX-0509C.11 (L570 Prod. Spec.). The L530 Load Control Switch is similar, except that the controllable device interface connects to two controllers, K1 and K2. *See* CX-0513C.11 (L530 Prod. Spec.); CX-0776C (Madisetti WS) at Q/A 1182.

Additionally, as noted in the block diagram included above with respect to claim element 14c of the '268 patent, the relay of the L570 Load Control Switch is connected to a main processor and a metrology processor which control the opening and closing of the relay in response to power control instructions received by the main processor or metrology processor. CX-0509C.11 (L570 Prod. Spec.). When this happens, and the relay is connected to a power consuming device, the power control instructions cause the relay ("at least one controllable device") to "selectively enable and disable a flow of electric power to at least one power consuming device of the plurality of power consuming devices." CX-0509C.11 (L570 Prod. Spec.). The L530 Load Control Switch is

similar. *See* CX-0513C.11 (L530 Prod. Spec.); CX-0776C (Madisetti WS) at Q/A 1183. The Gridstream platform is used with the load control switches to control the power consuming devices. *See* CX-0804C (Madisetti Suppl. WS) at Q/A at 37-39; CX-0846.4, 11 (Gridstream OPS Doc).

Respondents' expert Dr. Paradiso opined that transmission of a voltage over a line to a relay does not constitute a "power control instruction" because it is not "data." *See* RX-0388C (Paradiso WS) at Q/A 311, 320. But Dr. Paradiso's opinion on this point is not persuasive for the same reasons set forth above with respect to claim element 1d of the '268 patent.

**h. [19h] – "a device control manager operably coupled to the at least one controllable device interface, the device control manager issuing a power control instruction to the at least one controllable device through the at least one controllable device interface responsive to the received power control message, the power control instruction causing the at least one controllable device to disable a flow of electric power to at least one associated power consuming device so as to achieve a reduction in consumed power as requested by the control center, and"**

The Domestic Industry Products practice claim 19h of the '552 patent because they include a main processor and a metrology processor (collectively, a "device control manager") that is electrically connected to a conductive line ("at least one controllable device interface) and that sends instructions to the relay via an electrical connection. Because relay operation depends upon the connection of the main processor and metrology processor and the conductive line, the processors are "operably coupled to the at least one controllable device interface." CX-0509C.11 (L570 Prod. Spec.). Like the L570 Load Controller, the L530 Control also has a main processor and a metrology processor. *See* CX-0513C (L530 Prod. Spec.); CX-0776C (Madisetti WS) at Q/A 1184; *see also* CX-0509C.11 (L570 Prod. Spec.) (identifying the main processor, metrology

processor, and their connection to relay via the "RLY CTRL"). The power control instruction sent by the main processor or metrology processor to the relay is in response to a power control message that is received by the antenna (identified with the label "ANT" in the block diagram) ("responsive to the received power control message"). The L530 Load Control Switch meets this limitation for substantially the same reasons. *See* CX-0513C.11 (L530 Prod. Spec.); CX-0776C (Madisetti WS) at Q/A 1185.

Also, when the L530 Load Control Switch receives an instruction to reduce power ("power control instruction"), it opens the relay during a power conservation event and causes the relay ("controllable device") to disable power to the load. CX-0776C (Madisetti WS) at Q/A 1186. Upon completion of the conservation event, the relay closes and power is restored to the load. In this way the relay can selectively enable and disable a flow of electric power to the load (the "at least one associated power consuming device"). *Id.*; *see also* CX-509C.11 (L570 Prod. Spec.); CX-0513C.11 (L530 Prod. Spec.). Moreover, the "power control instruction" of claim 19h is satisfied for the same reasons described above in connection with the "power control management command" of claim elements 1d and 1e of the '268 patent.

#### i. [19i] – "based upon the reduction in consumed power, generating at the control center a power supply value (PSV) corresponding to the reduction in consumed power"

The Domestic Industry Products practice claim 19i of the '552 patent. As noted above with respect to claim element 1f of the '268 patent, the L570 Load Control Switch and the L530 Load Control Switch are capable of measuring the current, and/or voltage of the load, as well as the load power. Accordingly, when these parameters are measured during a conservation event, they correspond to "a value corresponding to a reduction in consumed power by a power

consuming device(s) that is confirmed by measurement and/or verification." CX-0776C (Madisetti WS) at Q/A 1187. *See also* the discussion of claim 2 of the '268 patent, *supra*. The Gridstream platform transmits data used for measurement and verification to generate a power supply value. *See* CX-0804C (Madisetti Suppl. WS) at Q/A 40-46; CX-0846C.6, 10, 24-26, 30 (Gridstream OPS Doc); CX-0092 (L+G web pages). Furthermore, CX-0096 (L+G web pages) states the L+G system establishes a baseline usage amount, and the L+G system calculates the difference between the actual usage amount during a conservation event and the baseline amount and adjusts the billing to compensate for the reduction in consumed power during a conservation event. CX-0096 (L+G web pages).

**2. Dependent Claim 23 – "The client device of claim 19, wherein the received power control message indicates at least one of an amount of electric power to be reduced and an identification of a controllable device to be instructed to disable a flow of electric power to one or more associated power consuming devices."**

For the same reasons as set forth for claim 18 of the '268 patent, the Domestic Industry Products practice claim 23 of the '552 patent. The L+G User Guides and the Gridstream User Guides teach that the Domestic Industry Products disclose power control messages that can be used to adjust the duty cycle to a power consuming device, which indicates an "identification of a controllable device to be instructed to disable the flow of electric power to the at least one power consuming device." *See* discussion regarding claim element 1c of the '268 patent, *supra*; CX-0511C (L+G User Guide); CX-0517C (L+G User Guide); CX-0508C (Gridstream User Guide); CX-0776C (Madisetti WS) at Q/A 1170-1174; CX-0804C (Madisetti Suppl. WS) at Q/A 40-46; CX-0846.6, 10, 24-26, 30 (Gridstream OPS); CX-0092 (L+G web pages).

### C. ’522 Patent – Claims 1, 15, 19, and 22

#### 1. Independent Claim 1

##### a. [1a] A method for a client device to manage a flow of power within an electric power grid to a plurality of power consuming devices

The Domestic Industry Products practice claim element 1a of the ’522 patent. Claim element 1a of the ’522 patent is similar to that of claim element 1a of the ’268 patent, which is directed to “[a] method for managing an electric power flow within an electric power grid” but does not specify that the method relies on a “client device” to manage flow of power “to a plurality of power consuming devices.” The Domestic Industry Products include load control switches, such as the L570 and L530 Load Control Switches. CX-0776C (Madisetti WS) at Q/A 1194. These switches are examples of a “client device” and their ability to control the flow of power to loads (“a plurality of power consuming devices”) has the effect of “manag[ing] the flow of power within an electric power grid.” *See* CX-0510C (Advanced Load Mgmt.); CX-0087 (L530 Product Specs.); CX-0088 (L570 Product Specs.); CX-0095 (L+G web pages); CX-0091 (L+G web pages). Furthermore, load control switches (such as the L570 and L530 Load Control Switches) receive a power control message. CX-0776C (Madisetti WS) at Q/A 1194. The response of these load control switches (“client device”) to the power control message “manages a flow of power within an electric power grid to a plurality of power consuming device.” *See* CX-0511C (L+G User Guide); CX-0517 (L+G User Guide); CX-0508C (Gridstream User Guide); CX.0513C (L530 Prod. Spec.); CX-0509C (Gridstream Spec.); CX-0512C (L570 Prod. Spec.); CX-0091 (L+G web pages); CX-0093 (L+G web pages); CX-0088 (L570 Product Specs.); CX-0089 (L+G Releases 3.6) 1-2; CX-0804C (Madisetti Suppl. WS) at Q/A 37-39; CX-0846C.4, 11 (Gridstream OPS Doc).

**b. [1b] the client device being responsive to power control messages issued by a load management server and**

The Domestic Industry Product practice claim element 1b. The L+G load control switches, such as the L570 and L530 Load Control Switches, receive a power control message. *See* CX-0511C (L+G User Guide); CX-0517 (L+G User Guide); CX-0508C (Gridstream User Guide); CX.0513C (L530 Prod. Spec.); CX0509C (Gridstream Spec.); CX-0512C (L570 Prod. Spec.); CX-0091 (L+G web pages); CX-0093 (L+G web pages); CX-0088 (L570 Product Specs.); CX-0089.1-2 (L+G Releases 3.6); CX-0776C (Madisetti WS) at Q/A 1195; CX-0804C (Madisetti Suppl. WS) at Q/A 32-35; CX-0846.5, 11 (Gridstream OPS Doc).

Furthermore, the L+G load control switches, such as the L570 and L530 Load Control Switches, are equipped with an antenna that receives instructions to reduce power (a "power control message issued by a load management server") during a conservation event. *See* discussion of claim element 1b of the '268 patent, *supra*.

**c. [1c] controlling at least one controllable device that selectively enables and disables electric power to flow to at least one of a plurality of power consuming devices, the method comprising the steps of**

The Domestic Industry Products practice claim element 1c of the '522 patent. For substantially the same reasons as set forth above for claim elements 1d and 1e of the '268 patent, the L+G load control switches include at least one relay ("at least one controllable device") which can be opened or closed to enable or disable the electrical power flow to at least one load ("at least one of a plurality of power consuming devices." *See* CX-0511C (L+G User Guide); CX-0508C (Gridstream User Guide); CX-0517 (L+G User Guide); CX-0509C (L570 Prod. Spec); CX.0513C (L530 Prod. Spec.); CX-0512C (L570 Prod. Spec.); CX-0776C (Madisetti WS) at Q/A 1196; CX-0804C (Madisetti Suppl. WS) at Q/A 37-39; CX-0846C.4, 11 (Gridstream OPS Doc).

**d. [1d] receiving a power control message from the load management server, the power control message being responsive to a power control request and indicating at least one of an amount of electric power to be reduced, disabled, or enabled and an identification of at least one controllable device to be instructed to enable or disable a flow of electric power to at least one associated power consuming device**

The Domestic Industry Products practice claim element 1d of the '522 patent, for substantially the same reasons as set forth above with respect to claim element 1b ("power control message from a load management server") and 1c ("power control message indicating at least one of an amount of electric power…and an identification of at least one controllable device") of the '268 patent (*see supra*). Moreover, the L570 Load Control Switch and the L530 Load Control Switch are equipped with an antenna to receive instructions ("power control messages") from a server ("load management server") during a conservation event. Thus, during operation of these load control switches, they practice the step of "receiving a power control message from the load management server." *See* CX-0511C (L+G User Guide; CX-0517 (L+G User Guide); CX-0508C (Gridstream User Guide); CX-0513C (L530 Prod. Spec.); CX-0509C (Gridstream Spec.); CX-0512C (L570 Prod. Spec.); CX-0091 (L+G web pages); CX-0093 (L+G web pages); CX-0088 (L570 Product Specs.); CX-0089 (L+G web pages); CX-0776C (Madisetti WS) at Q/A 1198; CX-0776C (Madisetti WS) at Q/A 1195; CX-0804C (Madisetti Suppl. WS) at Q/A 32-35; CX-0846C.5, 11 (Gridstream OPS Doc).

The operations code of the Gridstream platform confirms that the Domestic Industry Products receive power control messages from a load management server. *See* CX-0804C (Madisetti Suppl. WS) at Q/A 31-35; CX-0846.11 (Gridstream OPS). The Gridstream OPS document explains that Load Control Events are initiated by Load Control Messages ("power

control messages") received by the L+G load control switches and thermostats from a remote server ("load management server"). CX-0804C (Madisetti Suppl. WS) at Q/A 33.

In addition, the instructions received by the load control switch from the server are responsive to a power reduction request by the utility company. Evidence that utilities issue power reduction requests is provided by the L+G Power Center User's Guide, which discloses that "VPP Events are targeted Conservation Events where the utility attempts to conserve a specific target MW or a percentage of available running load at the time of the event start." *See* CX-0511C.10 (L+G User Guide); CX-0776C (Madisetti WS) at Q/A 1198.

The Domestic Industry Products practice claim element 1d of the '522 patent for substantially the same reasons as set forth above with respect to claim element 1e of the '268 patent. The software that is used in connection with the load control switches meet this claim limitation because they can send commands to the load control switches to enable or disable the flow of power to a particular power consuming device ("at least one associated power consuming device"). *See* CX-511C (L+G User Guide); CX-0508C (Gridstream User Guide); CX-0517 (L+G User Guide); CX-0776C (Madisetti WS) at Q/A 1200; CX-0776C (Madisetti WS) at Q/A 1195; CX-0804C (Madisetti Suppl. WS) at Q/A 32-35; CX-0846.5, 11 (Gridstream OPS Doc).

**e. [1e] responsive to the power control message, issuing a power management command to a controllable device, the power management command causing the controllable device to disable a flow of electric power to at least one associated power consuming device to provide a reduction in consumed power; and**

The Domestic Industry Products practice claim element 1e of the '522 patent for substantially the same reasons as set forth in discussion of claim elements 1b, 1d, and 1e of the '268 patent (*see supra*). The L+G load control switches, such as the L530 Load Control Switch

and L570 Load Control Switch, issue commands from the main processor or metrology processor to the relay ("controllable device") to instruct it (via a "power management command") to disable power during a conservation event that is initiated by the utility company (via a "power control message"). *See* CX-509C.11 (L570 Prod. Spec.); CX-0512C (L570 Prod. Spec.); CX-0513C.11 (L530 Prod. Spec.); CX-0776C (Madisetti WS) at Q/A 1201.

Furthermore, when the main processor or metrology processor of the L570 or L30 Load Control Switch sends a signal to the relay during a conservation event, the relay will disable power to the load ("associated power consuming device") thereby providing "a reduction in consumed power." *See* CX-0509C.11 (L570 Prod. Spec.); CX-0512C (L570 Prod. Spec.); CX-0513C.11 (L530 Prod. Spec.); CX-0776C (Madisetti WS) at Q/A 1202.

Respondents' expert Dr. Paradiso opined that transmission of a voltage over a line to a relay does not constitute a "power management command" because it is not "data." *See* RX-0388C (Paradiso WS) at Q/A 311, 320. But Dr. Paradiso's opinion on this point is not persuasive for the same reasons set forth above with respect to claim element 1d of the '268 patent.

#### f. [1f] generating a power supply value (PSV) corresponding to the reduction in consumed power

The Domestic Industry Product practice claim element 1f of the '522 patent. The L530 and L570 Load Control Switches measure the current, voltage, and power of the load, as discussed above in connection with claim element 1f of the '268 patent. That analysis shows that the Domestic Industry Products are capable of measurement and verification. *See* CX-0776C (Madisetti WS) at Q/A 1148, 1149, 1203.

Furthermore, CX-0096 (L+G web pages) states that "[a]fter the completion of the event, the baseline calculations are compared to event day consumption to generate specialized billing

determinants to be used by the billing system." This indicates that the L+G system establishes a baseline usage amount and calculates the difference between the actual usage amount during a conservation event and the baseline amount and then adjusts the billing to provide compensation for the reduction in consumed power during a conservation event. *See* CX-0096 (L+G web pages); CX-0776C (Madisetti WS) at Q/A 1203. The Gridstream platform transmits data used for measurement and verification to generate a power supply value. *See* CX-0804C (Madisetti Suppl. WS) at Q/A 40-46; CX-0846.6, 10, 24-26, 30 (Gridstream OPS Doc); CX-0092 (L+G web pages).

**2. Independent Claim 15**

**a. [15a] A client device for use in a system that manages electric power on an electric grid**

The Domestic Industry Product practice claim element 15a of the '522 patent. As discussed above in connection with claim elements 14a and 14b of the '268 patent, the Domestic Industry Products include a "client device" that is "for use in a system that manages electric power on an electric grid." The L+G L570 and L530 Load Control Switches (each a "client device") are part of a system that includes the meters and control software. CX-0776C (Madisetti WS) at Q/A 1177. This system is connected to an electrical grid that supplies power to multiple power consuming devices, and the L+G load control switches control the power consumption of the power consuming devices attached to the grid. *Id*. The L570 RF Load Control Product specification also states that "[t]he L570 RF Load Control Switch gives utilities a robust and cost-effective option to implement demand response and realize a greater return on smart grid investments." CX-0088.1 (L570 Product Specs.). The Gridstream RF platform is used with the load control switches to control the power consuming devices. *See* CX-0804C (Madisetti Suppl. WS) at Q/A 37-39; CX-0846.4, 11 (Gridstream OPS Doc).

**b. [15b] wherein the power is supplied to a plurality of power consuming devices**

The Domestic Industry Products practice claim element 15b of the ’522 patent. As noted above with respect to claim element 15a, the L+G L570 and L530 Load Control Switches (each a “client device”) are part of a system that includes the meters and control software. CX-0776C (Madisetti WS) at Q/A 1177. This system is connected to an electrical grid that supplies power to multiple power consuming devices, and the L+G load control switches control the power consumption of the power consuming devices attached to the grid. *Id*.

**c. [15c] wherein power flow over the electric grid to at least some of the plurality of power consuming devices is enabled and disabled by a plurality of controllable devices**

The Domestic Industry Products practice claim element 15c of the ’522 patent. As discussed above in connection with claim element 1e of the ’268 patent, an L+G load control switch (“client device”) may send instructions (a “power management command”) to a relay (“controllable device”) to disable electrical power flow to an associated power consuming device. Furthermore, as noted by Dr. Madisetti, within any commercial electrical grid, there are many connected power consuming devices, such as air conditioners, fans, pumps, and the like. Many of these power consuming devices are controlled by relays (“a plurality of controllable devices”). *See* CX-0776C (Madisetti WS) at Q/A 1178; CX-0804C (Madisetti Suppl. WS) at Q/A 37-39; CX-0846.4, 11 (Gridstream OPS Doc).

**d. [15d] wherein at least one controllable device operates under the control of the client device**

The Domestic Industry Products practice claim element 15d of the ’522 patent for substantially the same reasons as set forth above with respect to claim element 1d of the ’268

patent. The L570 Load Control Switch contains one relay ("at least one controllable device") that is controlled by the load control switch. *See* CX-0509C.11 (L570 Prod. Spec.) (showing relay). The L530 Load Control Switch is similar, except that it has two relays. *See* CX-0513C.11 (L530 Prod. Spec.); CX-0776C (Madisetti WS) at Q/A 1179.

**e. [15e] wherein the client device receives power control messages from a remote load management server**

The Domestic Industry Products practice claim element 15e of the '522 patent for substantially the same reasons as set forth above with respect to claim 1b and 14e of the '268 patent. As noted in the discussion of claim element 14e of the '268 patent, L+G Load Control Switches, such as the L570 and L530 Load Control Switch ("client device"), are each equipped with an antenna to receive power reduction instructions ("power control messages") from a server ("remote load management server") during a conservation event. CX-0776C (Madisetti WS) at Q/A 1180.

The operations code of the Gridstream platform confirms that the Domestic Industry Products receive power control messages from a load management server. *See* CX-0804C (Madisetti Suppl. WS) at Q/A 31-35, CX-0846.11 (Gridstream OPS). The Gridstream OPS document explains that Load Control Events are initiated by Load Control Messages ("power control messages") received by the L+G load control switches and thermostats from a remote server ("load management server"). CX-0804C (Madisetti Suppl. WS) at Q/A 33.

**f. [15f] and wherein a power control message received from the load management server is responsive to a power reduction request**

The Domestic Industry Products practice claim element 15f of the '522 patent. In particular, the instructions received by the load control switch from the L+G server are responsive

to a power reduction request by a control center, such as the utility company. Evidence that utilities issue power reduction requests is provided by the L+G Power Center User's Guide, which discloses that "VPP Events are targeted Conservation Events where the utility attempts to conserve a specific target MW or a percentage of available running load at the time of the event start." *See* CX-0511C.10 (L+G User Guide); CX-0776C (Madisetti WS) at Q/A 1181.

**g. [15g] the client device comprising: at least one controllable device interface facilitating communication of power control instructions to the at least one controllable device, the power control instructions operable to cause the at least one controllable device to selectively enable and disable a flow of electric power to at least one power consuming device of the plurality of power consuming devices; and**

The Domestic Industry Products practice claim element 15g of the '522 patent. As shown in the block diagram provided above with respect to claim element 14c of the '268 patent, the relay in the L570 Load Control Switch is electrically connected to a main processor and a metrology processor. This connection ("at least one controllable device interface") communicates the power control instructions received by the main processor or metrology processor to the relay. CX-0509C.11 (L570 Prod. Spec.). The L530 Load Control Switch is similar, except that the controllable device interface connects to two controllers, K1 and K2. *See* CX-0513C.11 (L530 Prod. Spec.); CX-0776C (Madisetti WS) at Q/A 1182.

Additionally, in the block diagram included above with respect to claim element 14c of the '268 patent, the relay of the L570 Load Control Switch is connected to a main processor and a metrology processor which control the opening and closing of the relay in response to power control instructions received by the main processor or metrology processor. CX-0509C.11 (L570 Prod. Spec.). When this happens, and the relay is connected to a power consuming device, the

power control instructions cause the relay ("at least one controllable device") to "selectively enable and disable a flow of electric power to at least one power consuming device of the plurality of power consuming devices." CX-0509C.11 (L570 Prod. Spec.). The L530 Load Control Switch is similar. *See* CX-0513C.11 (L530 Prod. Spec.); CX-0776C (Madisetti WS) at Q/A 1183. The Gridstream platform is used with the load control switches to control the power consuming devices. *See* CX-0804C (Madisetti Suppl. WS) at Q/A at 37-39; CX-0846.4, 11 (Gridstream OPS Doc). Moreover, the "power control instruction" of claim 15g is the same as the "power control management command" of claim elements 1d and 1e of the '268 patent.

Respondents' expert Dr. Paradiso opined that transmission of a voltage over a line to a relay does not constitute a "power control instruction" because it is not "data." *See* RX-0388C (Paradiso WS) at Q/A 311, 320. But Dr. Paradiso's opinion on this point is not persuasive for the same reasons set forth above with respect to claim element 1d of the '268 patent.

**h. [15h] a device control manager operably coupled to the at least one controllable device interface, the device control manager operable to issue power control instructions to the at least one controllable device through the at least one controllable device interface responsive to the received power control message, the power control instruction operable to cause the at least one controllable device to disable or enable a flow of electric power to at least one associated power consuming device, and**

The Domestic Industry Products practice claim 15h of the '522 patent because they include a main processor and a metrology processor (collectively, a "device control manager") that is electrically connected to a conductive line ("at least one controllable device interface") and that sends instructions to the relay via an electrical connection. Because relay operation depends upon the connection of the main processor or metrology processor and the conductive line, the

processors are "operably coupled to the at least one controllable device interface." CX-0509C.11 (L570 Prod. Spec.). Like the L570 Load Controller, the L530 Control also has a main processor and a metrology processor. *See* CX-0513C.11 (L530 Prod. Spec.); CX-0776C (Madisetti WS) at Q/A 1184; *see also* CX-0509C.11 (L570 Prod. Spec.) (identifying main processor, metrology processor, and their connection to relay via the "RLY CTRL"). The power control instruction sent by the main processor or metrology processor to the relay is in response to a power control message that is received by the antenna (identified with the label "ANT" in the block diagram) ("responsive to the received power control message"). The L530 Load Control Switch meets this limitation for substantially the same reasons. *See* CX-0513C.11 (L530 Prod. Spec.); CX-0776C (Madisetti WS) at Q/A 1185.

Also, the instructions received to reduce power ("power control instruction") opens the relay during a power conservation event and causes the relay ("controllable device") to disable power to the load. CX-0776C (Madisetti WS) at Q/A 1186. Upon completion of the conservation event, the relay closes and power is restored the load. In this way the relay can selectively enable and disable a flow of electric power to the load (the "at least one associated power consuming device"). *Id.*; *see also* CX-509C.11 (L570 Prod. Spec.); CX-0513C.11 (L530 Prod. Spec.).

**i. [15i] based upon the reduction in consumed power for disabled flow of electric power, generating a power supply value (PSV) corresponding to the reduction in consumed power**

The Domestic Industry Products practice claim 15i of the '522 patent. As noted above with respect to claim element 1f of the '268 patent, the L570 Load Control Switch and the L530 Load Control Switch are capable of measuring the current, and/or voltage of the load, as well as the load power. Accordingly, when these parameters are measured during a conservation event,

they correspond to "a value corresponding to a reduction in consumed power by a power consuming device(s) that is confirmed by measurement and/or verification." CX-0776C (Madisetti WS) at Q/A 1187; *see also* the discussion of claim 2 of the '268 patent, *supra*. The Gridstream platform transmits data used for measurement and verification to generate a power supply value. *See* CX-0804C (Madisetti Suppl. WS) at Q/A 40-46; CX-0846C.6, 10, 24-26, 30 (Gridstream OPS Doc); CX-0092 (L+G web pages). Furthermore, CX-0096 (L+G web pages) states the L+G system establishes a baseline usage amount, and the L+G system calculates the difference between the actual usage amount during a conservation event and the baseline amount and adjusts the billing to compensate for the reduction in consumed power during a conservation event. CX-0096 (L+G web pages).

**3. Dependent Claim 19 - The client device of claim 15, wherein the received power control message indicates at least one of an amount of electric power to be reduced and an identification of a controllable device to be instructed to disable a flow of electric power to one or more associated power consuming devices**

For the same reasons as set forth for claim 18 of the '268 patent, the Domestic Industry Products practice claim 19 of the '522 patent. The L+G User Guides and the Gridstream User Guides teach that the Domestic Industry Products utilize power control messages to adjust the temperature setting on a thermostat ("amount of electric power to be reduced"). *See* CX-0511C (L+G User Guide); CX-0517C (L+G User Guide); CX-0508C (Gridstream User Guide); CX-0776C (Madisetti WS) at Q/A 1188-1192; CX-0804C (Madisetti Suppl. WS) at Q/A 31-35; CX-0846.11 (Gridstream OPS); CX-0776C (Madisetti WS) at Q/A 1195; CX-0804C (Madisetti Suppl. WS) at Q/A 32-35; CX-0846.5, 11 (Gridstream OPS Doc).

In addition, the L+G User Guides and the Gridstream User Guides teach that the Domestic Industry Products utilize power control messages to adjust the duty cycle of HVAC equipment ("disable a flow of electric power to one or more associated power consuming devices"). *See* CX-0511C (L+G User Guide); CX-0517C (L+G User Guide); CX-0508C (Gridstream User Guide); CX-0776C (Madisetti WS) at Q/A 1188-92; CX-0804C (Madisetti Suppl. WS) at Q/A 31-35; CX-0846C.11 (Gridstream OPS).

#### 4. Dependent Claim 22 - The client device of claim 15, further including a communications interface comprising an Internet Protocol (IP)-based interface

The Domestic Industry Products practice claim 22 of the '522 patent. The User's Guide for the L+G Power Center states that the L+G's Advanced Load Management (ALM) feature:

> uses a wireless network to manage devices that consume electrical energy in the home or small business, including HVAC systems, electric water heaters, pool pumps, and irrigation pumps, among others. The customer may manage the operation of this equipment through a secure, Web-based portal and account.

CX-0511C.9 (L+G User Guide). This reference to a "wireless network" and "operation of this equipment through a secure, Web-based portal" indicates that the Domestic Industry Products "includ[e] a communications interface comprising an Internet Protocol (IP)-based interface" as required by claim 22 of the '522 patent.

Further evidence that the Domestic Industry Products have "a communications interface comprising an Internet Protocol (IP)-based interface" is found in the L+G Command Center User's Guide, which discloses that:

> Command Center supports IP addressability for endpoints. IP has been identified as one of the key protocols that will serve as the foundation to build interoperability within the smart grid. In reflection of this, the RF Mesh solution has the ability to assign IP addresses to each node in the network (endpoints, Routers, Collectors) as well as supporting IP commands.

CX-0517C.59 (L+G User Guide). The L+G Command Center User's Guide also discloses "Command Center acts as an IP-operations center by managing all IP exchange between external applications (i.e., HP Open View, Advent Net, etc.) and the endpoints." *Id*. These references in CX-0517C (L+G User Guide) to Internet Protocol (IP)-based interfaces in the Command Center Software further confirm that the Domestic Industry Products include an IP-based communications interface as required in claim 22 of the '522 patent.

### D. '592 Patent – Claim 13

For the same reasons set forth above for claims 1 and 2 of the '268 patent, the Domestic Industry Products practice claim 13 of the '592 patent.

## VII. ECONOMIC PRONG OF THE DOMESTIC INDUSTRY REQUIREMENT

For a patent-based complaint, a violation of section 337 can be found "only if an industry in the United States, relating to the articles protected by the patent . . . exists or is in the process of being established." 19 U.S.C. § 1337(a)(2). The complainant bears the burden of establishing that the domestic industry requirement is satisfied. *John Mezzalingua Assocs., Inc. v. Int'l Trade Comm'n*, 660 F.3d 1322, 1331 (Fed. Cir. 2011). The domestic industry requirement of section 337 is often described as having an economic prong and a technical prong. *InterDigital Commc'ns, LLC v. Int'l Trade Comm'n*, 707 F.3d 1295, 1298 (Fed. Cir. 2013); *Certain Stringed Musical Instruments and Components Thereof*, Inv. No. 337-TA-586, Comm'n Op. at 12–14, USITC Pub. No. 4120 (Dec. 2009). "The technical prong concerns whether complainant practices at least one claim of the asserted patents. The economic prong concerns domestic activities with respect to the patent or patented article." *Certain Printing and Imaging Devices and Components Thereof*, Inv.

No. 337-TA-690, Comm'n Op. at 25, USITC Pub. No. 4289 (Nov. 2011) ("*Certain Printing and Imaging Devices*").

Section 337(a)(3) sets forth the following economic criteria for determining whether the economic prong of the domestic industry requirement is satisfied in such investigations:

> [A]n industry in the United States shall be considered to exist if there is in the United States, with respect to the articles protected by the patent, copyright, trademark, mask work, or design concerned –
>
> (A) significant investment in plant and equipment;
>
> (B) significant employment of labor or capital; or
>
> (C) substantial investment in its exploitation, including engineering, research and development, or licensing.

19 U.S.C. § 1337(a)(3). Given that these criteria are listed in the disjunctive, satisfaction of any one of them will be sufficient to meet the economic prong of the domestic industry requirement. *See Certain Printing and Imaging Devices*, Comm'n Op. at 26.

### A. Economic Prong of the Domestic Industry Requirement

Complainant Causam relies on investments made by its licensee L+G.

For the reasons that follow, I find that Causam satisfies the economic prong of the domestic industry requirement.

#### 1. Findings of Fact Relating to the Domestic Industry

The findings of fact below concern the economic prong of the domestic industry requirement.

L+G serves over 780 utilities in the Americas and holds the largest market share for Smart Electricity Meters, with 31% share of the market. *See* CX-0778C.11 (Herrington WS) at Q/A 42; CX-0520.20 (2020 Annual Report). Further, L+G serves "many investor-Owned Utilities in North America, including over 21 million endpoints managed via cloud solutions." *Id.*

L+G's North American Regional headquarters building is located in Alpharetta, Georgia, and it has two regional offices in the United States in Lafayette, Indiana, and in Pequot Lakes, Minnesota. CX-0520.42, 45 (2020 Annual Report). In 2017, L+G conducted research and development at all three of those locations. Square footage information for each facility is shown in the chart below.

| Location | Primary Use | Square Footage |
|---|---|---|
| Alpharetta, GA | R&D | 84,000 |
| Pequot Lake, MN | R&D | 50,000 |
| Lafayette, IN | R&D | 148,000 |

CX-0522C.181 (2017 Supplement to Public Offering). L+G identified the "main competencies" of those offices as "AMI meters; communications platforms and devices; ICG meters; Smart-Grid; HES; software platforms; AMI tools and apps; Software platform; HES; validation and SIT; communications devices." *Id.* at 176. These research and development activities relate to and support the Domestic Industry Products.

There is no dispute that L+G invested the following amounts in Research and Development ("R&D"), Quality Control and Testing, and Technical Support in the United States in 2019 and 2020:

**PUBLIC VERSION**

**CONFIDENTIAL MATERIAL OMITTED**

[redacted]

CDX-0002.3; CX-0519C (L+G Financials); Tr. (Mulhern) at 525:6-7, 12, 17-19, 525:24-526:1, 526:5-8, 15-16 (admitting no dispute with the investment figures shown in CX-0519C). These investments include R&D, Quality Control and Testing, and U.S. Technical Support related to the Domestic Industry Products. These R&D investments in the United States accounted for approximately [redacted] and [redacted] of L+G's total worldwide research and development investments for fiscal years 2019 and 2020, respectively. *See* Tr. (Herrington) at 253:21-254:4; CX-0778C.12 (Herrington WS) at Q/A 44.

Supplemental U.S. Investment Data produced by L+G confirm that approximately [redacted] of L+G R&D investments are associated with labor expenditures, including L+G Personnel and Professional Services, as shown in the chart below:

PUBLIC VERSION
CONFIDENTIAL MATERIAL OMITTED

[redacted]

CX-0845 (L+G Total Investments); Tr. (Herrington) at 242:9-14.

As indicated in L+G's 2020 annual report, the "research and development activities primarily consist of the development and design of new meters, network equipment and related software and are expensed as incurred" and the "costs primarily consist of salaries and payroll taxes, third-party contracting fees, depreciation and amortization of assets used in research and development activities, and other overhead infrastructure costs." CX-0520.121 (2020 Annual Report).

### 2. Labor and Capital

I find that Causam has demonstrated [redacted] in labor expenses from 2019 to 2021 with respect to articles protected by the Asserted Patents.

From April 1, 2019, through March 31, 2021, L+G invested [redacted] in labor or capital expenditures in the United States related to R&D, Quality Control and Testing, and U.S. Technical Support. *See* CX-0519C (L+G Financials); Tr. (Mulhern) at 525:6-7, 12, 17-19, 525:24-526:1, 526:5-8, 15-16. There is no dispute that nearly [redacted] of those R&D investments are tied to labor, with the remainder being related to expenditures of capital, such as materials and rent. *See* CX-

0845C (L+G Total Investments); Tr. (Mulhern) at 525:6-7, 12, 17-19, 525:24-526:1, 526:5-8, 15-16.

These expenditures include investments directly related to the Domestic Industry Products. First, L+G recognized Consert's technology represented its "first true demand response platform" and demand response has gained importance in the industry as well as to L+G's business. *See* CX-0814 (eepower.com). Second, L+G's "research and development activities primarily consist of the development and design of new meters, network equipment and related software and are expensed as incurred." *See* CX-0520 (2020 Annual Report). Third, based on job postings, L+G performs at least R&D, quality control and testing, and technical support activities at its United States facilities in Georgia; Indiana; and Minnesota related to the Domestic Industry Products. *See* CX-0778C.14-15 (Herrington WS) at Q/A 52; RX-0478–RX-0498 (technical job descriptions in the United States related to, *inter alia*, AMI meters, smart metering, grid edge intelligence, and smart infrastructure). Further, LinkedIn profiles of employees working at these facilities refer to qualifying activities related to the Domestic Industry Products. *See* CX-0385 (Fabrizzio Campos LinkedIn); CX-0386 (Jgenisius Harris LinkedIn); CX-0387 (Y. He Linked In). The 2017 Prospectus produced by L+G further confirms the relationship between L+G's domestic activities and the Domestic Industry Products. *See* CX-0778C.15 (Herrington WS) at Q/A 53.

L+G's domestic investments in labor or capital attributable to the Domestic Industry Products can be determined through a sales allocation (*e.g.*, the proportion of sales related to the Domestic Industry Products in relation to L+G's overall product sales). *See* CX-0778C.16 (Herrington WS) at Q/A 54-56; CX-0519C.2 (L+G Financials). Here, one appropriate sales-based allocation is reflected by the ratio of: (1) L+G's total sales of the practicing product (load control switch and electric AMI meter pairs) in the United States; and (2) L+G's total sales of all products

PUBLIC VERSION

CONFIDENTIAL MATERIAL OMITTED

in the United States. *See* CX-0776C.258 (Madisetti WS) at Q/A 1088; CX-0778C.20 (Herrington WS) at Q/A 66-67.

To determine the appropriate sales allocation, Mr. Herrington divided the U.S. sales revenue of load control switches from April 1, 2019, through March 31, 2021, by L+G's total U.S. sales of all products for each year over the same time period. *See* CX-0778C.16 (Herrington WS) at Q/A 57. Mr. Herrington determined that the sales of load control switches having demand response functionality constituted approximately [redacted] of total United States product sales revenue for FY 2019 and FY 2020, respectively. *See id.*; CDX-0002C.5-6; CX-0519C (L+G Financials); CX-0520 (2020 Annual Report). Mr. Herrington then employed the allocations to L+G's total domestic investments in FY 2019 and FY 2020 to determine that L+G spent approximately [redacted] in qualifying domestic labor and capital expenditures for the load control switches that allegedly practice each of the Asserted Patents from April 1, 2019, through March 31, 2021. *See* CX-0778C.17 (Herrington WS) at Q/A 59-60; CDX-0002.3C; CX-0519C (L+G Financials).

The domestic industry load control switches are used together with L+G's electric AMI smart meters to practice the claims of the Asserted Patents. *See, e.g.*, CX-0776C.258 (Madisetti WS) at Q/A 1088. Thus, as noted above, sales revenue corresponding to an equivalent number of L+G electric AMI smart meters should also be included in the allocation. *See* CX-0778C.20 (Herrington WS) at Q/A 66-67. Based on the testimony from Mr. Forbes that AMI smart meters are at least as expensive as load control switches and sold on a one-to-one basis, L+G's qualifying domestic labor and capital expenditures for the Domestic Industry Products that practice each of the Asserted Patents from April 1, 2019, through March 31, 2021, can be calculated as [redacted] *See* CX-0779C.6 (Forbes WS) at Q/A 29; CX-0778C.20 (Herrington WS) at Q/A 66-67.

**PUBLIC VERSION**
**CONFIDENTIAL MATERIAL OMITTED**

### 3. Engineering, Research and Development

Causam relies on L+G's investments in engineering, research, and development ("ER&D") to show a domestic industry exists with respect to all four Asserted Patents under 19 U.S.C. § 1337(C). The total amount Causam claims for ER&D from 2019 to 2021 is [redacted]

Under sub-prong (C) of the statute, "the Commission requires that the complainant establish a nexus between the asserted patent and the U.S. investment in its exploitation." *Certain Integrated Circuit Chips & Prod. Containing the Same* ("*Integrated Circuit Chips*"), Inv. No. 337-TA-859, Comm'n Op. at 38, USITC Pub. No. 4849 (Nov. 2018).

Causam satisfies the economic prong for sub-prong (C) through investments in ER&D in the amount of [redacted] from 2019 to 2021.

It is undisputed that from April 1, 2019, through March 31, 2021, L+G invested [redacted] in R&D in the United States. *See* CX-0778C.20 (Herrington WS) at Q/A 69; CX-0519C (L+G Financials); Tr. (Mulhern) at 525:6-7, 12, 17-19, 525:24-526:1, 526:5-8, 15-16. These expenditures include investments directly related to the Domestic Industry Products. *See* CX-0778C.20 (Herrington WS) at Q/A 70.

As with L+G's investments in labor and capital, the amount of L+G's domestic investments in R&D attributable to the Domestic Industry Products can be estimated through a sales allocation (*e.g.*, the proportion of sales related to the Domestic Industry Products in relation to L+G's overall product sales). *See* CX-0778C.20-21 (Herrington WS) at Q/A 71; CX-0519C (L+G Financials). Mr. Herrington used the same sales-based allocation discussed above to determine that L+G's qualifying domestic R&D expenditures attributable to the Domestic Industry Products from April 1, 2019, through March 31, 2021, is approximately [redacted]. *See* CX-0778C.21 (Herrington WS) at Q/A 72-73.

L+G's R&D expenditures bear a nexus to the Asserted Patents. *See* CX-0778C.21 (Herrington WS) at Q/A 74. The Asserted Patents relate to fundamental technology that is critical to the performance and competitiveness of all products sold as part of L+G's demand response product line. *See id.* at Q/A 75. L+G also performs R&D in the United States directly related to the patented technologies. As discussed above, L+G maintains several facilities in the United States that are primarily dedicated to R&D. The facility in Alpharetta, Georgia, is approximately 84,000 square feet and the "main use" of that facility is "R&D"; the facility in Lafayette, Indiana, is approximately 148,000 square feet and the "main use" of that facility is "R&D"; and the facility in Pequot Lakes, Minnesota, is approximately 50,000 square feet and the "main use" of that facility is "R&D." *Id.* at Q/A 77; CX-0522C.181 (2017 Supplement to Public Offering). And L+G identified the "main competencies" of those offices as "AMI meters; communications platforms and devices; ICG meters; Smart-Grid; HES; software platforms; AMI tools and apps; Software platform; HES; validation and SIT; communications devices." CX-0522C.176 (2017 Supplement to Public Offering). These categories of R&D relate to the patented technologies.

L+G's R&D activities in the United States directly relate to the inventions of the Asserted Patents. For example, L+G confirmed its primary focus is on utility customers as related to smart metering and smart grids, of which demand response is a critical component. *See* CX-0522C.155 (2017 Supplement to Public Offering) ("As the global leader in electricity metering, a global player in low/medium voltage Smart-Grid and a leading player in smart gas, we distinguish ourselves through technological innovation across the energy management value chain, assisting utilities in tackling the various and complex challenges they face, from billing and revenue assurance to distributed energy resource management and demand response"). L+G has also reported that establishing a stable power grid requires demand response programs. *See id.* at 147. In addition,

**PUBLIC VERSION**

**CONFIDENTIAL MATERIAL OMITTED**

L+G identified demand response as its focus within United States market. *Id*. at 150. Finally, L+G reported demand response as a component of its Gridstream Solution. *Id*. at 161. According to L+G, these solutions provide their primary customers, utilities, with "near real-time, unprecedented access to energy usage data." *Id*. at 28.

#### 4. Labor and Capital Investments Are Significant and R&D Investments Are Substantial

As discussed below, I find that L+G's investments of [redacted] in labor and capital expenses with respect to articles protected by the Asserted Patents are qualitatively and quantitatively significant under 19 U.S.C. § 1337(a)(1)(B). Further, I find that L+G's investment of [redacted] in ER&D related to exploitation of the Asserted Patents is substantial, both qualitatively and quantitatively.

Determining whether an investment is "significant" under 19 U.S.C. § 1337(a)(3) is context dependent. *Certain Printing and Imaging Devices and Components Thereof*, Inv. No. 337-TA-690, Comm'n Op. at 31 (Nov. 2011). "Activities can be shown to be 'significant,' for example, by demonstrating their importance to the articles protected by the patent in the context of the company's operations, the marketplace, or the relevant industry." *Certain Batteries and Electrochemical Devices and Products Containing Same*, Inv. No. 337-TA-1087, 2018 WL 4048056, Order No. 32 at *3 (Aug. 8, 2018).

Similarly, whether an investment in domestic industry is "substantial" is a fact-dependent inquiry for which the complainant bears the burden of proof. *Certain Stringed Musical Instruments & Components Thereof,* Inv. No. 337-TA-586, Comm'n Op. at 14 (May 16, 2008). There is no need to define or quantify an industry in absolute mathematical terms. *Id*. at 26. Rather, "the requirement for showing the existence of a domestic industry will depend on the industry in question, and the complainant's relative size." *Id*. at 25-26. The Commission has held

that past expenditures can be used "to support a domestic industry claim so long as … the complainant is continuing to make qualifying investments at the time the complaint is filed." *Certain Television Sets, Television Receivers, Television Tuners & Components Thereof*, Inv. No. 337-TA-910, Comm'n Op. at 68 (Oct. 30, 2015). The Commission has also found that investments in discontinued products can support a Domestic Industry finding if there are ongoing investments in warranty, customer support, and software development. *See Certain Marine Sonar Imaging Devices*, Inv. No. 337-TA-921, Comm'n Op. at 55-57 (Jan. 7, 2016).

Causam adduced evidence demonstrating L+G's domestic labor and capital investment for the Domestic Industry Products is significant, and its qualifying domestic R&D investment for the Domestic Industry Products is substantial. CX-0778C.23 (Herrington WS) at Q/A 80.

L+G views R&D as a "key focus" and continues to invest heavily in R&D in order to "expand [its] technology leading position." For example, L+G invested [redacted] and [redacted] of its total net revenues in R&D for fiscal years 2016, 2017, 2018, 2019, and 2020, respectively. *See* CX-0778C.22 (Herrington WS) at Q/A 76; CX-0520.93 (2020 Annual Report). L+G incurred approximately [redacted] in R&D investments in the United States in FY2020, which is approximately over [redacted] of its total worldwide R&D investments made in FY2020. *See* CX-0519C (Financials); CX-0778C.22 (Herrington WS) at Q/A 76. And the "main use" for L+G's collective 282,000 square feet of facilities in the United States is R&D. *See* CX-0522C.181 (2017 Supplement to Public Offering); CX-0778C.22 (Herrington WS) at Q/A 77.

The importance of demand response to the energy industry and to L+G's business also demonstrates the significance of the investments. A 2019 survey from Smart Electric Power Alliance ("SEPA") indicated that "only 32 of the 190 utilities that participated in this year's survey had no D[emand] R[esponse] programs (16.8% of survey participants)." *See* CX-0828.11 (2019

**PUBLIC VERSION**

**CONFIDENTIAL MATERIAL OMITTED**

SEPA Survey). Further, in a L+G marketing document, L+G states a "robust load management program that includes demand response can benefit both utilities and their customers." CX-0510.1 (ALM Brochure). Additionally, Toshiba Corporation's acquisition of Consert, along with rights to practice the inventions claimed in the Asserted Patents, spurred the growth of L+G's demand response product line. L+G's domestic industry expenditures enable the Domestic Industry Products which, in turn, represent an important and considerable portion of L+G's demand response product line. *See* CX-0778C.23 (Herrington WS) at Q/A 81; CX-0814 (eepower.com).

Based on the 2017 L+G Prospectus, it is clear that L+G has been conducting considerable operations in the United States for many years. In addition, throughout the 2017 L+G Prospectus, L+G discussed the importance of demand response and disclosed additional information about their United States operations and investments. *See* CX-0778C.13-14 (Herrington WS) at Q/A 49; *see also* CX-0522C (2017 Supplement to Public Offering). For example, L+G provided an overview of their operations confirming their primary focus is on utility customers as related to smart metering and smart grids of which demand response is a critical component. *See* CX-0522C.155 (2017 Supplement to Public Offering). L+G reported that its total United States labor force was approximately [redacted] of its [redacted] employees globally. *See* CX-0522.43 (2017 Supplement to Public Offering).

The record does not reflect any foreign expenditures associated with these categories of investments specific to the Domestic Industry Products. *See* CX-0778C.23 (Herrington WS) at Q/A 79. Moreover, as discussed above, approximately [redacted] of L+G's R&D investments occurs in the United States. *See* Tr. (Herrington) at 253:21-254:4; CX-0778C.12 (Herrington WS) at Q/A 44. Therefore, even using this conservative estimate, at least [redacted] of the R&D supporting the Domestic Industry Products occurs in the United States. *See* Tr. (Herrington) at 253:23-254:4; *see*

*also Certain Male Prophylactic Devices*, Inv. No. 337-TA-546, Comm'n Op. at 43 (June 21, 2007) (finding economic domestic industry significant and substantial where domestic operations reflected a U.S. value added of 34 percent).

News reports also show that at the time of Consert's acquisition by Toshiba Corporation in January 2013, Consert employed 60 people in San Antonio, Texas, and occupied 18,000 square feet of office space. *See* CX-0778C.22 (Herrington WS) at Q/A 78; CX-0805 (Consert-opens-SA HQ press release); CX-0815 (Toshiba-buys-SA-based-Consert-Inc website). At the time of Consert's acquisition, Consert had no foreign activity. The most reasonable inference is that a significant portion of the associated investment activity has remained in the United States.

In sum, the record demonstrates L+G's labor and capital investments are significant and L+G's R&D investments are substantial.

## VIII. VALIDITY

For the reasons provided below, Respondents have not shown by clear and convincing evidence that the asserted claims of the Asserted Patents are invalid.

### A. Written Description and Enablement

Respondents contend the asserted claims of the Asserted Patents are invalid under 35 U.S.C. § 112 because they lack an adequate written description of the claimed invention and do not enable a person of skill in the art to make and use the claimed invention. *See* RIB at 253-64.

#### 1. Written Description

Respondents allege that the '552 and '522 patents do not contain any written description of an algorithm or process for generating a power supply value. Respondents' argument is not persuasive.

Section 112 of the Patent Act (Pre-AIA) requires that a patent specification "shall contain a written description of the invention . . . in . . . full, clear, concise, and exact terms." 35 U.S.C. § 112, First Paragraph. The written description requirement has several policy objectives. One purpose is to convey to the public what the applicant claims as the invention. *See Regents of the Univ. of Cal. v. Eli Lilly*, 119 F.3d 1559, 1566 (Fed. Cir. 1997), *cert. denied*, 523 U.S. 1089 (1998). Another objective is to "ensure that the inventor had possession, as of the filing date of the application relied on, of the specific subject matter later claimed." *Application of Wertheim*, 541 F.2d 257, 262 (C.C.P.A. 1976); *Billups-Rothenberg, Inc. v. Associated Reg'l & Univ. Pathologists, Inc.*, 642 F.3d 1031, 1036 (Fed. Cir. 2011) ("[t]he written description requirement exists to ensure that inventors do not attempt to preempt the future before it has arrived").

When evaluating a written description defense, the Commission conducts "an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art" to determine whether "the inventor actually invented the invention claimed." *Rivera v. Int'l Trade Comm'n*, 857 F.3d 1315, 1319 (Fed. Cir. 2017) (quoting Ariad, 598 F.3d at 1351). To satisfy the statute, an applicant need not describe "every conceivable and possible future embodiment" of the invention. *Cords Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1365 (Fed. Cir. 2003). Whether a specification complies with the written description requirement of § 112(a) is a question of fact. *Rivera*, 857 F.3d at 1319. When raising a written description defense, the accused party "must show a lack of written description by clear and convincing evidence." *Id.*

The '552 and '522 patents disclose that the claimed power supply value is (1) an actual numerical value, and (2) is determined based on measurement of and verification of the reduction in consumed power by the power consuming device(s). JX-0001 ('552 Patent) at 7:17-21. The patents further disclose possible comparisons that would indicate a reduction in consumed power.

For example, the patents describe "varying percentages" of "the utility's current power consumption during any particular power management period (*e.g.*, one hour)" that "must be removed from the utility's power system." JX-0001 ('552 Patent) at 18:43-45, 55. Given examples include a reduction of "1 % when power consumption is at system maximum and 10% when power consumption is at only 50% of system maximum." *Id*. at 18:49-51. The patents also describe a context for generating a power supply value that would have been understood those in the art. Specifically, the patents note that the power supply value enables a "reduction in power at the device level" by systems such as "a power generating entity or an entity allowed to control power consuming devices as permitted by the governing body of the electric power grid, e.g., FERC . . . " JX-0001 ('552 Patent) at 7:30-37. Furthermore, the '552 and '522 patents disclose what system components can be used to calculate the power supply value. *See* CX-0848C (Madisetti RWS) at Q/A 68; JX-0001 ('552 Patent) at 7:24-27; JX-0002 ('522 Patent) at 7:34-38.

In light of the disclosures in the specifications of the '552 and '522 patents, Respondents have not shown by clear and convincing evidence that the asserted claims of those patents are invalid fail to comply with the written description requirement of § 112.

Respondents also argue that the '268 and '592 patents do not contain adequate written description of the claim limitation "generate measurement and verification data corresponding to the reduction in consumed power during a demand response event." Again Respondents' argument is not persuasive. The '268 patent discloses that a sensor on each device measures the amount of current consumed, and this value is then multiplied by the operating voltage of the device to obtain the power consumption of the device. *See* CX-0848C (Madisetti RWS) at Q/A 75; JX-0003 ('268 Patent) at 7:14-19. The '268 patent also discloses that the amount of power

consumed by each specific load is known. *See* CX-0848C (Madisetti RWS) at Q/A 75; JX-0003 ('268 Patent) at 7:23-27.

Figures 9 and 11 of the '592 patent provides flow charts that describe the measurement and verification process. For example, in Figure 9 of the '592 patent, element 962 determines the baseline based on repository records of a device and "[t]he power consumption behavior of the device is used to determine the amount of energy that would be expected to be used by the device if the control event did not occur." JX-0004 ('592 Patent) 18:45-48. In relation to Figure 11, the '592 patent states that "both the expected amount of power consumed during normal operation (i.e., in the absence of any control event) and the expected amount of power consumed during the control event are determined to accurately assess any possible power savings as a result of the control event." JX-0004 ('592 Patent) 20:63-67. The '592 patent further explains that each customer may have an active load client that controls and monitors the state of individual smart breaker modules or intelligent appliances. JX-0004 ('592 Patent) 11:4-10. These devices may be used in accordance with the flow charts in Figures 9 and 11 of the '592 patent to generate measurement and verification data corresponding to a reduction in power.

In light of the disclosures in the specifications of the '268 and '592 patents, Respondents have not shown by clear and convincing evidence that the asserted claims of those patents are invalid fail to comply with the written description requirement of § 112.

**2. Enablement**

The enablement requirement is satisfied when one skilled in the art, after reading the specification, could practice the claimed invention without undue experimentation. *AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234, 1244 (Fed. Cir. 2003) (citing *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988)). "[A] considerable amount of experimentation is permissible, if it is merely

routine, or if the specification in question provides a reasonable amount of guidance with respect to the direction in which the experimentation should proceed." *PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1564 (Fed. Cir. 1996). Enablement is determined from the viewpoint of persons of ordinary skill in the field of the invention at the time the patent application was filed. *Ajinomoto Co., Inc. v. Archer-Daniels-Midland Co.*, 228 F.3d 1338, 1345 (Fed. Cir. 2000). In evaluating whether experimentation rises to the level of undue, courts often consider the factors articulated in *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988). The burden is with the challenger to show by clear and convincing evidence that the specification in its entirety is not enabling.

**a. '552 and '522 Patents: "Power supply value (PSV) corresponding to the reduction in consumed power"**

Respondents argue that the asserted claims of the '552 and '522 patents are invalid under 35 U.S.C. § 112 because they do not provide sufficient disclosure to enable a person of ordinary skill in the art to generate the claimed "power supply value." Respondents cite testimony from their expert Dr. Auslander, who testified that the Asserted Patents "only describe[] some vague parameters of a power supply value" and "not any description of how to generate such a value using the system of the claims." RX-0673C (Auslander WS) at Q/A 102.

Respondents also argue that the so-called *Wands* factors indicate that an ordinary artisan would not have been able to calculate a power supply value at the time of the invention without undue experimentation. The Wands factors consider "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims." *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).

Here, contrary to Respondents' arguments, the record evidence relating to the *Wands* factors weighs against a finding of invalidity.

Respondents primarily rely on the written testimony provided by their expert Dr. Auslander. *See* RX-0673C (Auslander WS) at Q/A 102. The entire testimony is reproduced below.

> As shown in RDX-0001-062 and RDX-0001-071, I considered the patent claims and specification for the following factors (1) quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) nature of the invention, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims. JX-0001 ('552 patent) and JX-0002 ('522 patent) are abstract in nature, as they are directed to the generation of a power supply value that is itself an abstraction with no concrete example given in the specification. Instead, the specification only describes some vague parameters of a power supply value (such as that it "may be provided in units of electrical power flow, monetary equivalent, and combinations thereof") and not any description of how to generate such a value using the system of the claims. There is no description of any formula or algorithm for doing so, nor any guidance or working examples. In addition, a workable baseline would have been necessary to determine a "reduction in consumed power," but no such baseline or description of how a workable baseline could be determined was provided. The invention is therefore incomplete and theoretical. In my opinion, this indicates that a large amount of experimentation would have been necessary to practice the claims. Thus, factors (1), (2), (3), and (4) weigh against enablement.
>
> Moreover, the field of the invention involves a highly distributed system containing numerous components not under the control of the PHOSITA implementing it. For example, the claimed invention seeks to work with power consuming devices and controllable devices installed in individual homes and businesses. Therefore, attempting to implement the claims would require working with a potentially unbounded set of devices installed in homes and businesses that have different characteristics that would not be knowable in advance. Particularly important is the data required to be collected about the power consuming devices and reported back to a client device and/or server in order to achieve the stated result of generating a power supply value corresponding to the reduction in consumed power. Although the patents do not specify how this is to be done, a PHOSITA would have been well aware of the issue of data quality. Data quality involves at least the accuracy, timeliness, consistency, and methodology involved in the collection. The quality of data received from the varied devices the invention purports to work with makes the invention unpredictable. Thus, factor (7) weighs against enablement.
>
> Finally, the claims are very broad and only recite the result of generating a power supply value corresponding to a reduction in consumed power without reciting the steps involved in doing so. The claims just purport to capture all ways of generating a

> power supply value for a demand response event for all types of power consuming devices. The claims are not limited to particular device types, algorithms, or implementations. Thus, factor (8) weighs against enablement.

RX-0673C (Auslander WS) at Q/A 102; *see also* RIB at 260-62 (essentially same arguments).

The evidentiary gaps in Dr. Auslander's conclusory analysis limit the relevance of his *Wands* analysis. I find Dr. Auslander's testimony to be contradicted by the teachings of the '552 and '522 patents, as discussed below.

The '552 and '522 patents give examples of how the invention calculates a power supply value. For instance, "a current sensor on each smart appliance or within each smart breaker may measure the amount of current consumed by each monitored device." JX-0001 ('552 Patent) at 7:1-3. The invention "multiplies the amount of current consumed by the operating voltage of the device to obtain the power consumption." *Id.* at 7:3-6. "[T]he system can determine precisely which loads to turn off" during a given event. *Id.* at 7:11-12. A "time stamp indicating when the power was reduced" for a given device may be recorded. *Id.* at 20:8-9. By knowing "the actual amount (or average amount) of power that would have been used by the active load client . . ., along with the amount of time that each controllable device . . . was turned off," the invention "calculate[s] the amount of power (e.g., in megawatts per hour) that was saved for each active load client." *Id.* at 21:8-15.

Furthermore, the '552 and '522 patents disclose system components that can be used to calculate the power supply value. The patents state, for example, that the power supply value can be "calculated at the meter or submeter or at building control system or at any device or controller that measures power within the standard as supplied by the regulatory body(ies) that govern the regulation of the grid." *See* CX-0848C (Madisetti RWS) at Q/A 68; JX-0001 ('552 Patent) at 7:24-27; JX-0002 ('522 Patent) at 7:34-38. As Causam's expert Dr. Madisetti testified, the '552 and

’522 patents also teach that the power consumed by smart appliances—such as smart thermostats connected to HVAC units—or devices connected to smart breakers can be used to determine the actual power consumed during the demand response event without undue experimentation. *See* CX-0848C (Madisetti RWS) at Q/A 68; JX-0001 (’552 Patent) at 7:1-6, 8:50-57; JX-0002 (’522 Patent) at 7:11-16, 8:64-9:3. A person of ordinary skill at the time of the invention would have been able to determine the baseline power consumption of a given electrical grid—without undue experimentation—by using these meters, submeters, and other measurement devices to average power consumption levels of a given electrical grid over times when there is no demand response event. CX-0848C (Madisetti RWS) at Q/A 68.

In sum, Respondents have not shown clear and convincing evidence that the asserted claims of the ’552 and ’522 patents are invalid for failure to meet the enablement requirement of 35 U.S.C. § 112.

#### b. ’268 and ’592 Patents: “Generate measurement and verification data corresponding to the reduction in consumed power during a demand response event”

Respondents argue that the asserted claims of the ’268 and ’592 patents are invalid under 35 U.S.C. § 112 because they do not provide sufficient disclosure to enable a person of ordinary skill in the art to “generate measurement and verification data corresponding to the reduction in consumed power during a demand response event.” RIB at 262-264. Respondents contend that the *Wands* factors weigh against enablement. *Id*.

Contrary to Respondents’ arguments, the record evidence relating to the *Wands* factors weighs against a finding of invalidity.

PUBLIC VERSION

Respondents primarily rely on the written testimony provided by their expert Dr. Auslander. *See* RX-0673C (Auslander WS) at Q/A 110. The entire testimony is reproduced below.

> As shown in RDX-0001-080 and RDX-0001-090, I considered the patent claims and specification for the following factors (1) quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) nature of the invention, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims. The Asserted Claims of JX-0003 ('268 patent) and JX-0004 ('592 patent) are abstract in nature, as they are directed to the generation of measurement and verification data with no concrete procedure for doing so given in the specification. Instead, the specification only suggests that a method may be "determined by the appropriate governing body or authority for the electric power grid(s)." JX-0003 ('268 patent) at 7:34-37. There is no description of any formula or algorithm for doing so, nor any guidance or working examples. The invention is therefore incomplete and theoretical. In my opinion, this indicates that a large amount of experimentation would have been necessary to practice the claims. Thus, factors (1), (2), (3), and (4) weigh against enablement.
>
> Moreover, the field of the invention involves a highly distributed system containing numerous components not under the control of the PHOSITA implementing it. For example, the claimed invention seeks to work with power consuming devices and controllable devices installed in individual homes and businesses. Therefore, attempting to implement the claims would require working with a potentially unbounded set of devices installed in homes and businesses that have different characteristics that would not be knowable in advance. Particularly important is the data required to be collected about the power consuming devices and reported back to a client device and/or server in order to achieve the stated result of generating measurement and verification data corresponding to the reduction in consumed power. Although the patents do not specify how this is to be done, a PHOSITA would be well aware of the issue of data quality. Data quality involves at least the accuracy, timeliness, consistency, and methodology involved in the collection. The quality of data received from the varied devices the invention purports to work with makes the invention unpredictable. Thus, factor (7) weighs against enablement.
>
> Finally, the claims are very broad and only recite the result of generating measurement and verification data corresponding to a reduction in consumed power without reciting the steps involved in doing so. The claims just purport to capture all ways of generating a power supply value for a demand response event for all types of power consuming devices. The claims are not limited to particular device types, algorithms, or implementations. Thus, factor (8) weighs against enablement.

RX-0673C (Auslander WS) at Q/A 110; *see also* RIB at 262-64 (essentially same arguments).

The evidentiary gaps in Dr. Auslander's conclusory analysis limit the relevance of his *Wands* analysis. I find Dr. Auslander's testimony to be contradicted by the teachings of the '268 and '592 patents, as discussed below.

The '268 patent discloses that "a current sensor on each smart appliance or within each smart breaker may measure the amount of current consumed by each monitored device. An active load client then multiplies the amount of current consumed by the operating voltage of the device to obtain the power consumption, and transmits the power consumption to the ALD server." *See* CX-0848C (Madisetti RWS) at Q/A 75; JX-0003 ('268 Patent) at 7:14-19. The '268 patent also teaches that during a demand response event, "the amount of power consumed by each specific load is known, [and] the system can determine precisely which loads to turn off and tracks the power savings generated by each customer as a result of this short-term outage." *See* CX-0848C (Madisetti RWS) at Q/A 75; JX0003 ('268 Patent) at 7:23-27.

The record demonstrates that, at the time of the invention, a person of ordinary skill would have known how to use the meters and smart devices disclosed in the '268 patent to measure the supplied power of various known HVAC loads using data relating to the on and off times of those loads. *See* JX-0003 ('268 Patent) at 7:23-27,8:67-9:6, 21:48-53; JX-0001 ('552 Patent) at 7:1-6, 7:24-27; JX-0002 ('522 Patent) at 7:11-16, 7:34-38. As explained by Dr. Madisetti, averaging power consumption levels over time would have been well within the abilities of a person of ordinary skill at the time of the invention. *See* CX-0848C (Madisetti RWS) at Q/A 69.

Figures 9 and 11 of the '592 patent provides flow charts that describe the measurement and verification process. For example, in Figure 9 of the '592 patent, element 962 determines the baseline based on repository records of a device and "[t]he power consumption behavior of the device is used to determine the amount of energy that would be expected to be used by the device

if the control event did not occur." JX-0004 ('592 Patent) 18:45-48. In relation to Figure 11, the '592 patent states that "both the expected amount of power consumed during normal operation (i.e., in the absence of any control event) and the expected amount of power consumed during the control event are determined to accurately assess any possible power savings as a result of the control event." JX-0004 ('592 Patent) 20:63-67. The '592 patent further explains that each customer may have an active load client that controls and monitors the state of individual smart breaker modules or intelligent appliances. JX-0004 ('592 Patent) 11:4-10. These devices may be used in accordance with the flow charts in Figures 9 and 11 of the '592 patent to generate measurement and verification data corresponding to a reduction in power.

In sum, Respondents have not shown clear and convincing evidence that the asserted claims of the '268 and '592 patents are invalid for failure to meet the enablement requirement of 35 U.S.C. § 112.

### B. Indefiniteness

Paragraph 2 of Section 112 of the Patent Act requires that the patent claims particularly point out and distinctly claim the subject matter that the patentee regards to be the invention. *See* 35 U.S.C. § 112, ¶ 2 (pre-AIA). A patent claim is invalid for indefiniteness if it fails to inform those skilled in the art about the scope of the invention "with reasonable certainty" when it is viewed in light of the specification and prosecution history. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). An accused infringer has the burden of proving indefiniteness by clear and convincing evidence. *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017).

Respondents contend (1) claims 14, 15, and 18 of the '268 patent, claims 19 and 23 of the '552 patent, and claims 15, 19, and 22 of the '522 patent are invalid under § 112, ¶ 2 because

the term "device control manager" is indefinite; and (2) claim 13 of the '592 patent is invalid under § 112, ¶ 2 because the term "curtailment value as supply equivalence" is indefinite. *See* RIB at 264-69.

### 1. "device control manager"

Respondents contend that the term "device control manager" should be construed as a means-plus-function term under 35 U.S.C. § 112, ¶ 6 because it does not connote a sufficiently definite structure. RIB at 265. Because there is no structure in the specification that is clearly linked to the function of "device control," Respondents continue, the claims using the phrase "device control manager" are indefinite. *Id.*

If a claim does not use the word "means," there is a rebuttable presumption that § 112, ¶ 6, does not apply. *Williamson v. Citrix Online*, 792 F.3d 1339, 1349 (Fed. Cir. 2015) (en banc in relevant part to "abandon characterizing as 'strong' the presumption that a limitation lacking the word 'means' is not subject to § 112, para. 6"). If "the claim term fails to 'recite[ ] sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function,'" the presumption may be rebutted and the statute may be applied. *Id.* (quoting *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000)). "The standard is whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Id.*

The "device control manager" limitation at issue here does not use the word means, so there is a presumption that 35 U.S.C. § 112, ¶ 6, does not apply.

Respondents ignore clear examples from the Asserted Patents that provide structure for this term. For example, the Asserted Patents make clear that the claimed invention can be embodied using conventional processors and unique stored program instructions that control the

one or more processors. In describing the embodiment shown in Figure 3, the '552 patent discloses:

> The ***device control manager*** **314** processes power management commands for various controllable devices logically connected to the active load client **300**. The devices can be either smart breakers **402-412** or other IP based devices **420**, such as smart appliances with individual control modules (not shown). The ***device control manager*** **314** also ***processes "Query Request"*** or equivalent commands or messages from the ALD server **100** by querying a status response generator **304** which maintains the type and status of each device controlled by the active load client **300**, and providing the statuses to the ALD server **100**. The "Query Request" message may include information other than mere status requests, such as temperature set points for thermally controlled devices, time intervals during which load control is permitted or prohibited, dates during which load control is permitted or prohibited, and priorities of device control (e.g., during a power reduction event, hot water heater and pool pump are turned off before HVAC unit is turned off). If temperature set points or other non-status information are included in a "Query Request" message and there is a device attached to the active load client **300** that can process the information, the temperature set points or other information are sent to that device **420** via a smart device interface **324**.

JX-0002 ('522 Patent) at 14:40-62; *see also* 5:3-33, 6:37-44, 6:63-7:24, 8:26-46, 11:64-12:14, 13:32-67, 14:63-16:19, 17:52-18:20, 19:51-21:27, and Figures 3, 5, 7; CX-0848C (Madisetti RWS) at Q/A 84.

As shown above, and as explained by Dr. Madisetti, it would have been clear to a person of ordinary skill in the art that the claimed "device control manager" was being performed by stored program instructions that control "at least one controllable device" as recited in the claims. CX-0848C (Madisetti RWS) at Q/A 84. The Asserted Patents also explain how the device control manager processes "query requests" from the ALD server by querying a status response generator to ultimately provide status of each controlled device to the ALD server. *See*, *e.g.*, JX-0002 ('522 Patent) at 14:40-16:19. Collectively, this disclosure describes the structure and the connections of

the "device control manager." This term is not indefinite and not "structurally neutral" such that a means-plus-function analysis applies.

### 2. "a curtailment value as supply equivalence"

Respondents argue that claim 13 of the '592 patent is indefinite because a person of skill in the art at the time of the invention would have "no reasonably certain understanding" of what constitutes "a curtailment value as supply equivalence," a phrase found in independent claim 1 and incorporated into dependent claim 13. *See* RIB at 269 (citing RX-0673C (Auslander WS) at Q/A 122-124).

Claim 1 of the '592 patent recites:

> 1. A system for managing power on an electric power grid, comprising:
>
> ….
>
> wherein the at least one power consuming device has an actual value of power reduced based on revenue grade metrology, and confirmed by measurement and verification; and
>
> wherein the actual value of power reduced is a **curtailment value as supply equivalence** and provides operating reserve for the electric power grid.

JX-0004 ('592 Patent) at claim 1 (emphasis added).

The record demonstrates that the phrase "a curtailment value as supply equivalence" contains terms that would have been commonly understood within the demand response industry at the time of the invention. First, both claim 1 and the '592 patent specification link "curtailment" with a reduction in power. Claim 1 expressly says "the actual value of power reduced is a curtailment value" and column 9 of the '592 specification speaks of "curtailment or reduction in power" as alternatives. *See* JX-0004 ('592 Patent) at 9:14-15. As to "supply equivalence," the '592 patent explains that "[t]he actual value of the power reduced and/or to be reduced is a

curtailment value, also viewed as a supply equivalence and provides an operating reserve for the electric power grid." *Id.* at Abstract.

Moreover, in stating the reasons for allowance of the '552 patent, the patent examiner understood the meaning of "a curtailment value as supply equivalence," noting that a power grid governing entity "award[s] supply equivalence compensation" for "curtailment or reduction in power" "at a market rate." *See* JX-00005.226 (May 22, 2014 Response to Office Action for '552 Patent App.). The examiner found the prior art lacked transformation of curtailment or reduction in power at the device level into "an actual value for awarding supply equivalence compensation." *Id*.

The record intrinsic to the '552 patent demonstrates that a person of ordinary skill in the art at the time of the invention would had reasonable certainty as to the meaning of "a curtailment value as supply equivalence." Respondents have not shown by clear and convincing evidence that claim 13 of the '592 is invalid for failing the definiteness requirement of § 112.

### C. Eligibility Under § 101

Respondents contend each of the Asserted Patent claims is directed to processing data according to a mathematical algorithm, a type of abstract idea ineligible for patenting under 35 U.S.C. § 101. RIB at 269-75.

Section 101 of the Patent Act permits patenting of "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. Prohibited, however, are patents claiming "[l]aws of nature, natural phenomena, and abstract ideas" because they "are basic tools of scientific and technological work." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 70 (2012). While these narrow exceptions to the broad scope of patentability are necessary to "promote the progress of science

and useful arts," as stated in Art. I., Sec. 8, Cl. 8, of the U.S. Constitution, "too broad an interpretation of this exclusionary principle could eviscerate patent law." *Mayo*, 566 U.S. at 70. Caution in an analysis under § 101 is warranted because "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Id.*

To determine whether a patent's claims fall within one of the narrow exemptions to patentability, a tribunal must engage in a two-step inquiry. First, the tribunal must "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014). If not, the inquiry ends, and the claims are not directed to ineligible subject-matter under § 101. *Id*. This inquiry "focus[es] on the language of the Asserted Claims themselves . . . considered in light of the specification." *See TecSec, Inc. v. Adobe Inc*., 978 F.3d 1278, 1292 (Fed. Cir. 2020) (cleaned up).

Only if one or more claims are found to be directed to a patent-ineligible concept does the inquiry then turn to the second step: examination of the elements of each claim "both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 573 U.S. at 217 (quoting *Mayo*, 566 U.S. at 79). A patent is directed to ineligible subject-matter only if it fails both steps. *See id*.

Respondents seem to argue that if a system practicing the asserted claims would make a mathematical calculation, the claims ineligible for patenting, citing a raft of cases from 1972 onward. However, the asserted claims are not directed simply to mathematical algorithms. All of the asserted claims recite physical structures that can connect or disconnect power in response to messages. The claimed systems and methods generate measurement and verification data corresponding to a reduction in consumed power or generate a power supply value corresponding to a reduction in consumed power. While mathematical calculations might be involved in

generating those values, the claims themselves do not recite a particular formula or calculation. Thus, there is no risk here that the claims "would wholly pre-empt" any particular mathematical formula. *Cf. Gottschalk v. Benson*, 409 U.S. 63, 71-72 (1972).

The Federal Circuit has upheld similar claims as eligible under the first step of the *Alice* inquiry. For example, in *Thales Visionix Inc. v. United States*, 850 F.3d 1343 (Fed. Cir. 2017), the court considered a system for tracking the motion of an object relative to a moving reference frame. Id. at 1344. The system included sensors, such as accelerometers and gyroscopes, that measured the specific forces associated with changes in a sensor's position and orientation relative to a known starting position. Like the inventions at issue here, the patented system in *Thales Visionix* "reduce[d] errors" and "eliminate[d] many 'complications' inherent in previous solutions." *See id.* at 1348. Also like the claims here, the system in *Thales Visionix* "specif[ied] a particular configuration of . . . sensors and a particular method of using the raw data from the sensors in order to more accurately calculate" certain effects. *See id*.

Respondents' arguments fail to show illegible subject matter at the first step of *Alice*, and so the eligibility inquiry under § 101 ends.

But even if the claims were directed to an abstract idea under the first step of Alice, Respondents' argument fails the second step of *Alice* when the elements of each asserted claim are considered "both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 573 U.S. at 217 (quoting *Mayo*, 566 U.S. at 79).

The patent specifications teach that previous power management systems did not have the capability of determining which loads to remove in order to satisfy a power reduction command. *E.g.*, JX-0003 ('268 patent) at 3:11-13. Nor did they have the ability to accurately track the

reduction in consumed power (*e.g.*, by measuring the reduction at each service point). *Id.* at 3:29-32. Prior art one-way, "push and pray" systems "were not effective in providing a utility any kind of idea as to what it was curtailing." Tr. (Forbes) at 55:19-56:21.

The inventions at issue here, as described in the asserted claims, allow positive control and verification at the service point, which enables the system to disable particular power consuming devices and measure the power saved by doing so. The system can thus generate verifiable and quantifiable electrical reserves in the power grid. That, in turn, enables the utilities to manage the power consumption of the system more efficiently. Specifically, it allows the electric utility to accurately track its power savings for later reimbursement, sale of the power into the secondary market, compliance with regulatory mandates, and/or avoidance of the need to generate or acquire additional power during peak load times.

Thus, the claimed systems and methods recite new structures, operations, and configurations that were unconventional at the time of the invention. Respondents' arguments fail to show illegible subject matter if the second step of *Alice* is considered.

### D. Obviousness

A patent may be found invalid as obvious if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a) (pre-AIA). Because obviousness is determined at the time of invention, rather than the date of litigation, "[t]he great challenge of the obviousness judgment is proceeding without any hint of hindsight." *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1375 (Fed. Cir. 2011).

The critical inquiry in determining the differences between the claimed invention and the prior art is whether there is an apparent reason to combine the known elements in the fashion claimed by the patent at issue, and a reasonable expectation of success in doing so. *See KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 417-418 (2007). Obviousness is a determination of law based on underlying determinations of fact. *Star Scientific*, 655 F.3d at 1374.

Respondents contend the asserted claims of the Asserted Patents are rendered obvious by various combinations of purported prior art references addressed below. Respondents assert three distinct combinations of purported prior art:

(a) Ehlers (RX-0225) in view of Chen (RX-0224), Framework (RX-0185), and/or Briese (RX-0183);

(b) Montalvo (RX-0211) in view of Silverman (RX-0222); and

(c) Forbes 148 (RX-0227) in view of AEIC (Association of Edison Illuminating Companies) (RX-0089).

Respondents also challenge claim 13 of the '592 patent as obvious over Forbes 148 in view of ANSI (RX-0090). *See* RIB at 189-238, 248-53.

As discussed below, Respondents' invalidity theories fail because no prior art reference or combination teaches or suggests a system or method having all of the limitations of the asserted patent claims. Central among the missing limitations are (1) generating measurement and verification data corresponding to the reduction in consumed power and (2) generating a power supply value corresponding to the reduction in consumed power elements. *See, e.g.*, CDX-0003.3-4 (Madisetti Reb. Demos.) (Dr. Madisetti's demonstratives demonstrating why each of the prior art fails to teach or suggest at least these elements of the asserted claims). One or both of which are required by each of the asserted claims. Further, Respondents failed to demonstrate why a

person of ordinary skill in the art would have been motivated to combine disparate references, some of which are unrelated to the field of the invention.

**Generating Measurement and Verification Data**

Each of the asserted claims of the Asserted Patents require a step of "generating measurement and verification data corresponding to the reduction in consumed power," or some variation thereof. *See, e.g.*, JX-0003 ('268 Patent) element 1[g]. The claims require the generation of measurement and verification data corresponding to the reduction of power accomplished during a particular demand response event, and in response to a particular demand response message or set of messages.

The data generated in the claims, could include, for example, runtime data for an HVAC, a change in thermostat set point, event start and stop time, etc. Generating this kind of measurement and verification data provides the necessary information to generate a baseline for the load as well as the information necessary to calculate the reduction in consumed power during a demand response event.

As discussed in more detail below with respect to the specific combinations of the references, none of the prior art teaches or describes generating this kind of measurement and verification data. At best, the prior art measures power consumption, or the amount of power used by a home or device. This data, however, says nothing about how much power has been saved as a result of a demand response event. Moreover, measuring consumption fails to provide real-time information about the reduction in consumed power, measured in a quantity that is specific, accurate, and reliable enough to be considered by utilities as a supply equivalence. Accordingly, the prior art does not teach or suggest generating measurement and verification data, including JX-0003 ('268 Patent) elements 1[g], 2, 6, 7, 14[f], 15[a], 15[b], 18[a], 18[b]; JX-0001 ('552 Patent)

element 19[k]; JX-0002 ('522 Patent) elements 1[j] and 15[k]; and JX-0004 ('592 Patent) element 13[a].

**Generating a Power Supply Value Using Measurement and Verification Data**

As discussed above, none of the prior art teaches or suggests generating measurement and verification data corresponding to a reduction in consumed power. Instead, each reference relied upon by Respondents focuses on measuring consumed power. The Asserted Patents, however, require the use of generated measurement and verification data to further generate a power supply value. Without this data, generated by the devices during the demand response events, a person of ordinary skill at the time of the invention could not compare the power savings against a baseline of historical information. For the same reasons, the prior art fails to teach or suggest generating a power supply value. *See* JX-0003 ('268 Patent) at claims 2, 15; JX-0001 ('552 Patent) at claims 19 and 23; JX-0002 ('522 Patent) claims 1, 15; and (JX-0004 ('592 Patent) at claim 13.

The various combinations of purported prior art references are addressed below.

**1. Ehlers (RX-0225), Chen (RX-0224), Framework (RX-0185), and Briese (RX-0183)**

Ehlers and Chen were considered by the U.S. Patent and Trademark Office ("Patent Office") multiple times during the prosecution of multiple Causam patents, including two of the patents asserted here, the '268 and '592 patents. Ehlers fails to teach or suggest at least two of the elements of the asserted claims, including generating measurement and verification data and generating a power supply value.[24] For example, Ehlers teaches "a thermostat device for controlling a heating and/or cooling system through interaction with a user," and that such "device

[24] Ehlers also fails to teach a client device issuing a power management command. *See* CX-0848C (Madisetti RWS) at Q/A 143.

is adapted to receive a characteristic of the energy being supplied and for displaying the characteristic on the display." RX-0225.21 (Ehlers). Ehlers describes generating data regarding consumption of energy, including, for example, various reports relating to temperature or electricity consumption/usage. *See id.* at 14 (Figs. 4N, 4M). These reports can include "a graph of energy consumption for a given period of time for a given device or set of devices" including the "total hourly consumption" for a given day. *Id.* at 47. The "programs" are the focus of Ehlers, however, and the data generated relates to "how many customers have signed up for the given program, how many customers are actively contributing to the given PROGRAM, and how many customers have opted out of the program." *Id.*

None of the secondary references, including Framework, Chen, or Briese, discloses the missing concept of generating measurement and verification data.

For example, although Framework discloses "field measurements taken to help identify how much energy is used before the program actions are taken, [and] how much energy is being used after the actions are taken," Framework does not disclose a device controlled "to provide a reduction in consumed power" and "generating measurement and verification data corresponding to the reduction in consumed power." Indeed, Framework does not describe data produced by any device. RX-0185.161 (Framework).[25]

Chen discloses the use of smart meters ("meter device") that "may be used to measure an amount of consumption" (RX-0224.34 (Chen)), and a "monitor module" that "may receive monitor data" that may "monitor a level of consumption." *Id.* at 37. In Chen, an "Adjustment

[25] Framework also fails to teach a system or method for managing the flow of power within an electric power grid and selectively enabling/disabling the flow of power in response to a request to reduce power consumption. *See* CX-0848C (Madisetti RWS) at Q/A 150.

Module may balance the operation, state or other characteristic of the devices based at least in part on an assessed consumption amount and/or an assessed supply amount." *Id.* at 38.[26] Chen does not describe, however, a device controlled "to provide a reduction in consumed power" and "generating measurement and verification data corresponding to the reduction in consumed power."

Briese has nothing to do with demand response and teaches the use of a "revenue meter" (*i.e.*, a smart meter) to measure power consumption. RX-0183.29 (Briese). Briese's device is "preferably integrated into a solid state revenue meter," like those outside of a home. Its purpose is to verify accuracy of the meter, and collects information, including "preselected meter self-checks, preferably once per day, and/or when power is restored to the meter following an outage, and/or when a full meter reconfiguration is performed[.]" RX-0183.30 (Briese). Briese does not describe a device controlled "to provide a reduction in consumed power" and "generating measurement and verification data corresponding to the reduction in consumed power."

Dr. Madisetti identified other missing limitations from the proposed combinations:

- '552 patent, claim elements 19[g], 19[h], 23 (*see* CX-0848C (Madisetti RWS) at Q/A 165-168, 184);
- '522 patent, claim elements 1[c], 1[d], 1[e], 15[g], 15[h], 15[i], 19, 22 (*see* CX-0848C (Madisetti RWS) at Q/A 193-195, 199-201, 204-205);
- '268 patent, claim elements 1[c], 1[d], 1[e], 14[b], 14[c], 15, 18 (*see* CX-0848C (Madisetti RWS) at Q/A 209-213, 232-233, 241-242); and
- '592 patent, claim element 1[e] (*see* CX-0848C (Madisetti RWS) at Q/A 246-256).

[26] Chen also fails to disclose managing an electric flow of power within an electric power grid and disabling the electric power flow to a power consuming device. *See* CX-0848C (Madisetti RWS) at Q/A 151.

**PUBLIC VERSION**

Even assuming, arguendo, that the combinations Respondents suggest disclose each of the elements in the asserted claims, the obviousness contention still would fail because there is no motivation for a person of ordinary skill to combine the prior art references with a reasonable expectation of success. *See, e.g.*, *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1374–75 (Fed. Cir. 2011); *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1326–28 (Fed. Cir. 2009).

Dr. Madisetti testified that a person of ordinary skill would not be motivated to combine Ehlers with Chen, at least because Chen and Ehlers occupy distinct fields of endeavor and accomplish different objectives. *See* CX-0848C (Madisetti RWS) at Q/A 187. For example, Ehlers attempts to "manage delivery of energy from a distribution network" through the use of a "node" that "controls the supply of energy to [a] device." RX-0225 (Ehlers) at Abstract. Chen "remotely monitors electrical or mechanical equipment where a user my interactively alter the operation of a piece of equipment remotely." RX-0224 (Chen) at Abstract. Adjusting or altering the operation of a piece of equipment is not the same as controlling the supply of energy to it. Thus, a person of ordinary skill would not have understood that a message indicating an "amount of adjustment" could be applied to Ehlers to control a supply of energy. *See* CX-0848C (Madisetti RWS) at Q/A 187.

Dr. Madisetti further testified that a person of ordinary skill would not be motivated to rely on the teachings of Framework to improve Ehlers because they are from different fields of endeavor and directed to solving entirely different problems. *See* CX-0848C (Madisetti RWS) at Q/A 176. Framework "provides background and references for policy makers, evaluation managers, and evaluators new to this field but with some knowledge of M[easurement] & V[erification] issues" and "is not meant to provide a 'how-to' manual." RX-0185C.148

(LADWP/SCPPA Presentation). Framework at 148 is a generic description of "[t]he purpose of M&V activities" and does not disclose or teach the generating measurement and verification data limitation. Framework at 148 does not "disclose[ ] . . . models that would have been implemented to predict hourly or sub-hourly energy consumption" and merely discusses elsewhere "includ[ing] regression and artificial neural networks (ANN)." *Id.* at 174. In addition to being in a different field than the Asserted Patents, Framework is directed to "[l]argescale data acquisition systems," such as whole-building energy efficiency retrofits, using "complicated analysis techniques generally requir[ing] someone with a graduate degree in mechanical or architectural engineering." *Id.* at 148.

Finally, Dr. Madisetti testified that a person of ordinary skill would not have been motivated to rely on the teachings of Briese to improve Ehlers because they are from different fields of endeavor and directed to solving entirely different problems. *See* CX-0848C (Madisetti RWS) at Q/A 254. Dr. Auslander's citation of Briese merely discloses use of an electric meter for billing. Further, simply "measuring the electricity usage" and billing the customer is not the same thing as providing an actual value of the reduction in consumed power and transforming it to supply equivalence. RX-0183 (Briese) at 1:49-50. Ehlers was not missing a means of measuring consumption, so there is no motivation to combine it with Briese for a meter. *See* CX-0848C (Madisetti RWS) at Q/A 254.

Dr. Madisetti confirmed that a person of ordinary skill would not have had a reasonable expectation of success to combine any of these purported combinations to arrive at the claimed invention. *See* CX-0848C (Madisetti RWS) at Q/A 177-78, 188-89, 255-56. This is true at least because the combinations themselves fail to teach or suggest generating measurement and verification data or generating a power supply value. *Id.*

### 2. Whether Montalvo (RX-0211), Silverman RX-0222), Forbes 148 (RX-0227), AEIC (RX-0089) and ANSI (RX-0090) are Prior Art

On its face, the ’268 patent claims priority to the ’909 Application filed on August 28, 2007. Respondents argue that the asserted ’268 patent claims are not entitled to that priority date because (1) Causam listed the claims as having a 2012 priority date in its pre-hearing brief, and (2) the claims contain subject matter not present in the ’909 Application.

As to the first point, Respondents contend that Causam waived the 2007 priority date "by failing to demonstrate its entitlement to an earlier priority date in its Pre-Hearing Brief." RIB at 185. This argument appears to be based on a single typographical error in which Causam stated that all the asserted claims of the ’268 patent are entitled to a May 3, 2012,[27] priority date. *See* CPB at 5. Causam made Respondents aware of the typographical error at multiple meet-and-confer sessions in the days prior to the evidentiary hearing, but Respondents pursued a motion *in limine* on this argument (which was denied) and have sought to treat Causam's typographical error as an admission.

There has been no prejudice to Respondents based on Causam's typographical error in Causam's pre-hearing brief. Indeed, other portions of Respondents' post-hearing brief acknowledge Respondents understood that "Causam asserted that claims 1, 6, 7, 14, and 18 of the ’268 Patent are entitled to a 2007 priority date (based on the common parent application)." RIB at 240. Causam did not waive assertion of a 2007 priority date for claims 1, 6–7, 14, and 18 of the ’268 patent in its pre-hearing brief.

[27] In its post-hearing brief, Causam states: "The earliest priority date for claims 1, 6, 7, 14, and 18 of the ’268 Patent is Aug. 28, 2007. The earliest priority date for claims 2 and 15 of the ’268 Patent is May 3, 2012." CIB at 5.

Turning to Respondents' second argument, Respondents contend that claims 1, 6–7, 14, and 18 of the '268 patent are not entitled to an August 28, 2007, priority date because the '909 Application filed on that date does not support generating "measurement and verification data." RIB at 182. Respondents' argument on this point is contradicted by other parts of the record. For example, one of the prior art references cited by Respondents is Forbes '148. Respondents' expert Dr. Auslander acknowledged that Forbes '148 and the '909 Application share a common specification and make the same disclosures. *See* RX-0673.91, (Auslander WS) at Q/A 310. Dr. Auslander stated repeatedly in his expert report that "Forbes '148 discloses 'generating measurement and verification data corresponding to the reduction in consumed power.'" *See e.g.,* Auslander (Expert Report) at 683, ¶ 1877. Respondents state elsewhere in their post-hearing brief that Forbes '148 (RX-0227) "is substantially similar to the Asserted Patents." RIB at 183. Respondents also acknowledge that there are "passages of the ['909] parent application (disclosing 'measurement and verification') that mirror the claims" of the '268 patent, confirming that there is written description support for those claims as far back as the August 2007 filing date of the '909 Application.

A review of the '909 Application confirms that the inventors possessed the "measurement and verification data" recited in claims 1, 6–7, 14, and 18 of the '268 patent at least as of the filing date of that application. *See e.g.*, CX-0850 ("909 Application) at [0027], [0047]. Respondents' argument that those claims should only have a 2012 priority date is rejected. Consequently, Montalvo (RX-0211), Silverman RX-0222), Forbes 148 (RX-0227), AEIC (RX-0089) and ANSI (RX-0090) references are not prior art to claims 1, 6–7, 14, and 18 of the '268 patent.

### 3. Montalvo (RX-0211) and Silverman (RX-0222)

As discussed above, Montalvo is not prior art to claims 1, 6, 7, 14, and 18 of the ’268 patent, which have the 2007 priority date of the ’909 Application. Additionally, Montalvo fails to teach or suggest at least two of the elements of the asserted claims, including generating measurement and verification data and generating a power supply value. Montalvo describes a “monitor” that may be connected to appliances, to “generate or collect data representative of the environmental information available at the sensors … which may be provided as energy consumption information from a conventional or ‘smart’ energy meter included as part of the appliance.” RX-0211.21 (Montalvo). This consumption data is not the same as a power supply value corresponding to a reduction in consumed power, nor does Montalvo explain how such data could be used to calculate a power supply value. *See* CS-0848C (Madisetti RWS) at Q/A 273.

As discussed above, Silverman is not prior art to claims 1, 6, 7, 14, and 18 of the ’268 patent, which have the 2007 priority date of the ’909 Application. In any event, Silverman does not fill the gap left by Montalvo. Instead, Silverman discloses a “verification process” whereby “electricity utilization,” is measured before and after, *e.g.*, a contractually agreed upon change to the air conditioner’s setting has been made, is merely a “fraud prevention mechanism” in Silverman’s “Points” system to “ensure that someone has not tried to fool the system by allowing the change to be made by the system but attempting to override the settings manually.” RX-0673C (Auslander WS) at Q/A 73; RX-0222.89-90 (Silverman).

Dr. Madisetti further detailed other missing limitations from the combination of Montalvo and Silverman, and they include the following:

- ’552 patent, claim elements 23[a] and 23[b] (*see* CX-0848C (Madisetti RWS) at Q/A 279-280);
- ’522 patent, claim elements 1[e], 1[f], 1[g], 1[j], 19[a], 19[b], 22 (*see* CX-0848C

(Madisetti RWS) at Q/A 284-287, 297-298, 301);

- ’268 patent, claim elements 1[c], 1[d], 18[a], 18[b] (*see* CX-0848C (Madisetti RWS) at Q/A 305-306, 330-331); and
- ’592 patent, claim elements 1[e], 1[f] (*see* CX-0848C (Madisetti RWS) at Q/A 335-336).

Even assuming, arguendo, that the combination of Montalvo and Silverman would disclose each of the elements in the asserted claims, Respondents’ obviousness contention still would fail because there is no motivation for a person of ordinary skill to combine the prior art references with a reasonable expectation of success.

Dr. Madisetti testified that a person of ordinary skill would not be motivated to rely on the teachings of Silverman to improve Montalvo because they are from different fields of endeavor and directed to solving entirely different problems. Montalvo is directed to the elimination of “human involvement to implement actions to achieve . . . demand reduction” (RX-0211 (Montalvo) at 2:36-41), and thus to the automation of such actions. Silverman is directed to a fraud prevention system that incentivizes end users for signing up for demand response programs by awarding them “conservation points.” *See* RX-0222.90 (Silverman); CX-0848C (Madisetti RWS) at Q/A 275. Respondents’ expert Dr. Auslander fails to substantively address why an artisan concerned about the automation of actions to achieve demand reduction would investigate a “Points”-based incentivization system for encouraging and rewarding users to sign up for demand response programs coupled with fraud prevention capability. *See* CX-0848C (Madisetti RWS) at Q/A 275.

Respondents have not shown by clear and convincing evidence that Montalvo and Silverman, alone or in combination, would have rendered obvious the invention disclosed in the asserted claims of the ’268 patent.

#### 4. Forbes 148 (RX-0227) and AEIC (RX-0089)

Forbes 148 (RX-0227) is a publication of the work of Mr. Forbes and shares a similar (but not identical) specification with the Asserted Patents. Respondents assert that Forbes 148 in combination with AEIC renders obvious all asserted claims of the ’268 patent. *See* RIB at 237.

As discussed above, AIEC is not prior art to claims 1, 6, 7, 14, and 18 of the ’268 patent, which have a priority date of 2007 based on the ’909 Application. With respect to claims 2 and 15, neither AEIC nor Forbes 148 disclose generating a power supply value as required by those two claims.

AEIC discloses a general definition of measurement and verification: “Measurement and Verification (M&V) refers to the application of appropriate statistical and load research techniques to measure and verify the load reduction impact resulting from the utilization of a Demand Response program” and “Measurement quantifies this load reduction and Verification provides evidence that the reduction is reliable.” RX-0089.11 (AEIC). Although AEIC discloses measurement and verification as a statistical process, it does not disclose “disable[ing] the electric power flow to the at least one associated power consuming device to provide a reduction in consumed power” and “generating measurement and verification data corresponding to the reduction in consumed power” of that device, as required by all asserted claims of the ’268 patent. *See* CX-0848C (Madisetti RWS) at Q/A 384.

Even assuming, arguendo, that the combination of Forbes 148 (RX-0227) and AEIC (RX-0089) would disclose each of the elements in the asserted claims, Respondents’ obviousness contention still would fail because there is no motivation for a person of ordinary skill to combine the prior art references with a reasonable expectation of success. *See* CX-0848C (Madisetti RWS) at Q/A 390.

Respondents have not shown by clear and convincing evidence that Forbes 148 (RX-0227) and AEIC (RX-0089), alone or in combination, would have rendered obvious the invention disclosed in the asserted claims of the ’268 patent.

#### 5. Forbes 148 (RX-0227), AEIC (RX-0089) and ANSI (RX-0090)

Claim 13 of the ’592 patent is dependent upon claim 1 and thus requires, “wherein the at least one power consuming device has an actual value of power reduced based on revenue grade metrology.” Respondents assert that Forbes 148 (RX-0227) in view of ANSI (RX-0090) render the invention in this claim obvious.[28]

Neither Forbes 148 nor ANSI disclose reducing power based on revenue grade metrology. ANSI is a general reference document for meters and does not disclose or teach metrology or measurements conforming to revenue grade requirements. Dr. Auslander cites ANSI merely for an “Accuracy Performance Check” and not actual revenue grade metrology. Dr. Auslander fails to show how this discloses or teaches revenue grade metrology.

Respondents have not shown by clear and convincing evidence that Forbes 148 (RX-0227), AEIC (RX-0089) and ANSI (RX-0090), alone or in combination, would have rendered obvious the invention disclosed in the asserted claims of the ’268 patent. *See* CX-0848C (Madisetti RWS) at Q/A 363.

#### 6. Secondary Considerations

The objective evidence, also known as “secondary considerations,” includes commercial success, long felt need, and failure of others. *Graham v. John Deere Co.*, 383 U.S. 1, 13-17 (1966);

[28] As discussed above, however, Forbes 148 (RX-0227) in combination with AEIC (RX-0089) does not teach or disclose generating a power supply value. ANSI (RX-0090) does not fill that gap.

*Dystar Textilfarben GmbH v. C.H. Patrick Co.*, 464 F.3d 1356, 1361 (Fed. Cir. 2006). "[E]vidence arising out of the so-called 'secondary considerations' must always when present be considered en route to a determination of obviousness." *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983).

Causam offers evidence of secondary considerations of non-obviousness to show that the prior art combinations asserted by Respondents do not render obvious the asserted claims of the Asserted Patents. CIB at 273-77. I have weighed the secondary consideration evidence in my obviousness analysis and I discuss it below. *Apple Inc. v. Samsung Elec. Co., Ltd.*, 839 F.3d 1034, 1048 (Fed. Cir. 2016) (*en banc*).

**a. Nexus**

As discussed above in Section VI (Technical Prong), the record evidence establishes that L+G Domestic Industry Products embody the inventions claimed in the Asserted Patents. I must presume, therefore, that there is a nexus between the secondary considerations and the non-obviousness of the Asserted Patents. *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1330 (Fed. Cir. 2016).

**b. Commercial Success**

The novel inventions described and claimed in the Assert Patents appear to provide the foundation for the commercial success of the Domestic Industry Products produced by L+G. *See* CX-0848C (Madisetti RWS) at Q/A 483. The claimed inventions allow clients to optimize energy consumption of their HVAC, lighting, and more. Clients can analyze their energy systems data, see trends, keep history logs, schedule hours of operation, and troubleshoot their equipment—all

of which is enabled by the measurement and verification and power supply value functionality of the claimed inventions.

For example, by April 2012, approximately 626,000 L+G smart meters, using the two-way communications systems in the claimed inventions, were installed across the entire service territory. In addition, commercial success can be found in the acquisition of L+G for $2.3B by Toshiba. *See* CX-0848C (Madisetti RWS) at Q/A 484.

This factor weighs against a conclusion that the inventions in the Asserted Patents are obvious.

#### c. Long-Felt But Unmet Need

The claimed technology of the Asserted Patents satisfied a long-felt but unresolved need in the demand response industry. CX-0848C (Madisetti RWS) at Q/A 485. Prior to the inventions, attempts were made to bridge the gap between one-way, unverified power load control management systems and positive control verified power load control management systems. None of these attempts achieved the results of the inventions claimed in the Asserted Patents.

Until the inventions in the Asserted Patents were developed, there was a long-felt but unmet need for accurate, closed-loop, two-way demand response systems measurement and verification capabilities. At the time of the invention of the Asserted Patents, the state-of-the-art was generally one-way, opened-ended, proprietary communications systems using proprietary that lacked time coordination or accurate measurement and verification capabilities. For example, in 2010, NIST (National Institute of Standards and Technology) stated, there was "an urgent need to establish protocols and standards for the Smart Grid" and to leverage "various Smart Grid elements, including smart sensors on distribution lines, smart meters in homes, and widely dispersed sources

of renewable energy….” CX-0859 (NIST Framework and Roadmap for Smart Grid Interoperability Standards, Release 1.0).

Moreover, Mr. Forbes testified that the utility industry was very deficient when it came to demand response and handling data. For example, Mr. Forbes testified that demand response was built around one-way communication, and a utility was unable to tell how much capacity would gained when restricting power during a demand response event. Mr. Forbes testified that he utilized his background in telecommunications to address these problems in the utility industry.

The record demonstrates a significant long-felt need that was met by Mr. Forbes' invention. This factor weighs against a conclusion that the inventions in the Asserted Patents are obvious.

**d. Praise by Others**

Example of industry praise for the claimed inventions can be found in news articles and industry publications lauding the L+G Domestic Industry Products. The measurement and verification capability and the two-way communications utilized in the L+G system makes possible customer rebating, incentive programs, demand response operation reserve creation, monetizing excess energy capacity, and achieving environmental benefits through reduced need for power generation and power plant construction. *See* CX-0848C (Madisetti RWS) at Q/A 487.

For example, a news article described that "[t]he roll-out of smart grid technologies, including smart meters and communication systems are likely to propel growth in the global smart demand response market." CX-0853 (Demand Response Market Report). The article also stated that the industry considers L+G as one of the "[k]ey players" in the smart meter market. L+G has been recognized as "one of the world's top smart metering and grid networking providers" and as one of 20 companies "that are transforming the electrical power sector" through its acquisitions of "meter data management software" and "demand response platform." CX-0853 (Top 20 Demand

Response Companies). Also, L+G markets that it "delivers solutions that enable utilities to verify, monitor and forecast load control activity like never before." CX-0091 (L+G web pages).

In several of its marketing materials for the Domestic Industry Products, L+G highlights the functionalities that are in the claimed inventions. CX-0088 (L570 Product Specs.) ("near real-time metrological data collection"); CX-0087 (L530 Product Specs.) ("two relay options for load management" and "near real-time data metrological data collection"); CX-0085 (L410 Product Specs.) ("demand response ready"); CX-0086 (L430 Product Specs.) ("demand response ready"); CX-0855 (L+G Solutions) (using its load management technologies that include the two-way communications can "give your consumers the power to manage their own energy consumption with a smart thermostat"); CX-0856 (L+G Smart Thermostat Options For Utilities) (promoting that "[s]mart thermostats are the future for utility-initiated demand response (DR) programs"); CX-0857 (L+G Benefits For Utilities) (promoting that "[w]ith the ability to fine tune and verify exact load shedding during peak and the opportunities for consumer engagement, [utilities] can more easily monitor performance and meet efficiency goals").

This factor weighs against a conclusion that the inventions in the Asserted Patents are obvious.

* * *

As a whole, I find that the objective indicia support a finding of non-obviousness.

### E. Obviousness-Type Double Patenting

Respondents assert that because certain claims of the Asserted Patents claim priority to the '909 application they are necessarily invalid for obviousness-type double patenting in view of other Forbes patents that issued from that application. *See* RIB at 239-48.

Obviousness-type double patenting "prohibits an inventor from obtaining a second patent for claims that are not patentably distinct from the claims of the first patent." *In re Lonardo*, 119 F.3d 960, 965 (Fed. Cir. 1997). Respondents acknowledge that the claims of the earlier Forbes patent claims do ***not*** recite "measurement and verification," which is a limitation found in all asserted claims of the '268 and '592 patents. RIB at 241-42, -47. Respondents also acknowledge that the earlier Forbes patent claims do ***not*** recite a "power supply value," which is a limitation found in all asserted claims of the '552 and '522 patent. RIB at 244-46. The Patent Office already considered whether the Asserted Patents were obvious over prior Forbes patents and found that they were not. *See, e.g.*, CX-0848C.120 (Madisetti RWS) at Q/A 464. The record evidence in this proceeding does not persuade a different outcome.

Respondents have not met their burden of providing clear and convincing evidence that the asserted claims are invalid for obviousness-type double patenting.

## IX. OTHER DEFENSES

### A. Improper Inventorship

Respondents contend that "Mr. Forbes and Mr. Webb are co-inventors of each of the Asserted Claims of the Asserted Patents." RIB at 284; *see id.* at 275-85. Respondents contend, "Both Mr. Webb and Mr. Forbes testified that Mr. Webb significantly contributed to the subject matter of the parent '909 Application." *Id.* at 276. However, all four Asserted Patents list Mr. Forbes as the sole inventor, and, as discussed below, Respondents have failed to meet the heavy burden to show that Mr. Webb is a missing co-inventor. *See BJ Servs. Co. v. Halliburton Energy Servs., Inc.*, 338 F.3d 1368, 1373–74 (Fed. Cir. 2003) ("The burden of showing misjoinder or nonjoinder of inventors is a heavy one.").

Respondents begin by noting that Mr. Webb is a named co-inventor on U.S. Patent Application 11/895,909 ("the '909 Application"), which issued as U.S. Patent No. 7,715,951 ("the '951 patent"), and all of the Asserted Patents in this investigation claim continuation-in-part priority to the '909 Application. Because of the overlapping subject matter between the Asserted Patents and the '909 Application, Respondents contend Mr. Webb is necessarily a co-inventor of the Asserted Patents. *See* RIB at 284.

Respondents' argument fails for numerous reasons, but most notably because Respondents fail to identify what, if anything, Mr. Webb purportedly invented. Instead, Respondents assume Mr. Webb co-invented the ***entirety*** of the disclosure in the '909 Application, and therefore any subject matter appearing in both the '909 Application and the Asserted Patents must be jointly credited to Mr. Webb. But Respondents do not identify any contribution that Mr. Webb allegedly made to the Asserted Patents or explain how that contribution confers upon Mr. Webb the status of a co-inventor.

As detailed below, Mr. Webb was a software engineer, with no background in demand response technology, hired by Mr. Forbes to build the software associated with Consert's commercial embodiments of the invention disclosed in the '909 Application. *See* CX-0779C.18 (Forbes WS) at Q/A 105-106, 108. The weight of the evidence does not persuasively show that Mr. Webb contributed to the inventions claimed in the Asserted Patents.

**Mr. Webb's Testimony**

Respondents argue that Mr. Webb testified that he "significantly contributed" to the subject matter of the '909 Application, and that he conceived, with Mr. Forbes, the subject matter disclosed and claimed in the '951, '233, and '717 patents. *See* RIB at 276, 278 (citing RX-0012 (Webb Dep.

Tr.) at 34:20–35:16, 183:2–184:18; and 34:5–35:16, 143:16–144:10, 43:16-44:12, and 49:4-50:1). The record shows otherwise.

For instance, Mr. Webb was never asked whether he invented (or co-invented) any subject matter of the Asserted Patents, or to describe his contribution to the ’909 Application. Instead, Respondents repeatedly asked Mr. Webb whether various *non-asserted* patents “covered the solution” that he “conceived, designed, and deployed” while he was employed at Consert. But Mr. Webb’s acquiesce that various *non-asserted* patents covered the solution that he “conceived, designed, and deployed” while at Consert is not testimony that he invented (or co-invented) the invention recited in the claims of the *Asserted* Patents. While Mr. Webb testified about designing or deploying certain software, he never testified that he *conceived* of any specific feature of disclosed in the ’909 Application, let alone any features recited in the claims of the Asserted Patents. And “[c]onception is the touchstone of invention, the completion of the mental part of invention.” *Burroughs Wellcome Co. v. Barr Labs. Inc.*, 40 F.3d 1223, 1227-28 (Fed. Cir. 1994).

Respondents also contend that “Mr. Webb testified that he contributed to the concepts of ‘measurement and verification’ of energy saved during a control event and measuring usage of energy to calculate energy savings over a time period, which are present throughout the Asserted Patents and their claims.” *See* RIB at 284 (citing RX-0012C (Webb Dep. Tr.) at 150:20–153:5). The record shows otherwise.

Mr. Webb did not testify that he “contributed to” the concept of “measurement and verification” recited in the Asserted Patents. Mr. Webb was merely asked whether the concept of measurement and verification was “***captured*** in the patents that [he was] responsible for when [he was] working at Consert.” *See* RX-0012C (Webb Dep. Tr.) at 150:20-151:1. Specifically, Mr. Webb testified:

> Q. Was the concept of measurement and verification, is that something that was ***captured in the patents that you were responsible for*** when you were working at Consert?
>
> A. Yes. And verification in that context is verification of energy saved during a particular control event. Being able to verify that you actually saved what you said you did.

*Id.* (emphasis added). This is not the same as testifying that he "contributed to" the concept of measurement and verification.

The testimony cited by Respondents makes clear that Mr. Webb was not holding himself out as the inventor of any particular feature recited in the Asserted Patents. For example, Respondents cite to portions of Mr. Webb's testimony where he agreed that the '951 patent "covers work that [Mr. Webb] did at Consert" (*see* RX-0012 (Webb Dep. Tr.) at 34:20–35:16), and that at the time of signing his declaration, he understood himself to be a co-inventor of the invention disclosed in the '909 Application (*id.* at 183:2–184:18). Nowhere in any of the testimony cited by Respondents was Mr. Webb asked the direct question of whether he invented anything. *See, e.g.*, RX-0012 (Webb Dep. Tr.) at 43:16-44:12 ("Q. And [U.S. Patent No. 8,032,233] covers the solution that you conceived, designed, and deployed while you were working at Consert. Correct? A. Yes."); *id.* at 49:4-50:1 ("Q. And [U.S. Patent No. 8,315,717] covers the solution that you conceived, designed, and deployed while you were working at Consert. Right? A. Yes."). This testimony does not demonstrate that Mr. Webb was an inventor of the subject matter in the Asserted Patents.

**Mr. Forbes' Testimony**

Respondents also assert that Mr. Forbes testified that Mr. Webb co-invented "the claimed subject matter of the '951, '233, and '717 Patents," and that Mr. Forbes "corroborated Mr. Webb's significant contributions to" the inventions in those patents. *See* RIB at 279 (citing RX-0010C

(Forbes Dep. Tr.) at 92:2–15, 238:13–239:8, 240:3–16. Respondents also assert that, during the evidentiary hearing, Mr. Forbes confirmed that Mr. Webb is a co-inventor of the invention disclosed in the '909 Application. *See* RIB at 278 (citing Tr. (Forbes) at 114:1-4).

But Mr. Forbes did not testify that Mr. Webb made any contribution to the Asserted Patents. Respondents identify portions of Mr. Forbes' deposition where he states that he is not contesting the inventorship of the '951 patent: "[i]f Mr. Webb's name is on the patent, he contributed something to the patent;" "[i]f Mr. Webb is on the patent, then it was determined that he should be a coinventor;" and "[i]f Joel[ Webb]'s name is on the patent, he contributed something." *See* RX-0010C (Forbes Dep. Tr.) at 92:2–15, 238:13–239:8, 240:3–16. The fact that Causam and Mr. Forbes do not contest the inventorship of the subject matter in the '951 patent (or in the '909 Application which lead to it) does not mean that Mr. Webb co-invented subject matter of any Asserted Patent in this investigation, all of which are only continuations-in-part of the '909 Application.

To the contrary, Mr. Forbes testified that the decision to name Mr. Webb as a co-inventor was made by an attorney, and that he was unable to identify any contribution by Mr. Webb. *See* Tr. (Forbes) at 111:15-19 ("I couldn't tell you what Mr. Webb added to the application because primarily most of the invention was mine, but Mr. Webb was deemed to be a co-inventor by prosecuting counsel, and so he was added."); *id.* at 184:7-14 ("Q. What was Mr. Webb's role, if any, in helping you with the implementation of the disclosure that is in the '909 application? A. I'm, quite honestly, not sure. The prosecuting attorney looked at the application, decided that Mr. Webb was a co-inventor, and so we put Mr. Webb on as a coinventor."). Mr. Forbes also testified that he was the sole inventor of the Asserted Patents and that he could not identify any specific contribution by Mr. Webb to the inventions claimed in any asserted patent or any related patent,

including the '909 Application. *See* CX-0779C.19-20 (Forbes WS) at Q/A 114-130. Thus, contrary to Respondents' contention, Mr. Forbes' testimony does not show that Mr. Webb co-invented the subject matter of the Asserted Patents.

**<u>Alleged Corroborating Evidence</u>**

Respondents identify three documents that allegedly corroborate Mr. Webb's involvement in the development of Consert's commercial embodiment of the system described in the '909 Application. *See* RIB at 277 (identifying RX-0057C (Overview of Project GreenShed), RX-0058C (ALD System and Software Description), RX-0060C (Duke Proposal)). The record associated with these documents does not show that Mr. Webb co-invented anything recited in the Asserted Patents:

- RX-0057C (Overview of Project GreenShed): Mr. Webb testified that he could not identify this document (RX-0012C.0065 (Webb Dep. Tr.) at 64:12-13), that he did not know whether he had seen it before (*id.*), that he did not know what it would have been used for (*id.* at 65:4-6), that he could not say who drafted it although he thought it was probably drafted by Mr. Forbes (*id.* at 65:7-12).
- RX-0058C (ALD System and Software Description): Mr. Webb testified that he could not say what the document was (*id.* at 76:19-20), did not remember creating this document (*id.* at 77:15), that he didn't have any context for it (*id.* at 78:1-2), and that that he couldn't identify it (*id.* at 78:2-3).
- RX-0060C (Duke Proposal): Mr. Webb testified that he could not identify this document (*id.* at 87:3-4), that the Consert patents were not intended to capture the system described in this document, and that he wasn't sure if the Consert system had the functionality described in this document (*id.* at 96:19-21).

Respondents also identify two documents that Mr. Webb allegedly authored during his time at Consert: "Active Load Director System Software Description," and "System and Method for Voluntary or Involuntary WiMax Based Active Load Director System With Carbon Credit Reporting System By Joseph W. Forbes, Jr., dated May 17, 2007." *See* RIB at 282. The first – "Active Load Director System Software Description" (RX-0058C)—was discussed above and

could not be identified by Mr. Webb. The second—"System and Method for Voluntary or Involuntary WiMax Based Active Load Director System With Carbon Credit Reporting System"—is not in the evidentiary record, but the byline quoted by Respondents appears to indicate that it was authored by Mr. Forbes, not Mr. Webb. Mr. Webb could not identify that document either:

> Q. So I'd like to go back to Exhibit 18, Mr. Webb. And there is a document, I believe, identified in the first paragraph on the first page of Exhibit 18. It says, "System and Method for Voluntary or Involuntary WiMax Based Active Load Director System With Carbon Credit Reporting System By Joseph W. Forbes, Jr., dated May 17, 2007." Do you see that?
>
> A. I do.
>
> Q. Do you know what that document is?
>
> A. No.
>
> Q. Okay. And my next question, maybe I can presuppose the answer, but do you have a copy of that document?
>
> A. No.

RX-0012 (Webb Dep. Tr.) at 82:19-83:10.

In summary, the weight of the record as a whole does not indicate that Mr. Webb conceived or contributed to the inventions recited in the Asserted Patents.

### B. Inequitable Conduct

Respondents contend the Asserted Patents are unenforceable because Mr. Forbes committed inequitable conduct during prosecution of the Asserted Patents. *See* RIB at 285-92. Specifically, Respondents contend Mr. Forbes intentionally failed to disclose to the Patent Office an Order No. 745 from the Federal Energy Regulatory Commission ("FERC") titled "Demand Response Compensation in Organized Wholesale Energy Markets" and issued on March 15, 2011. RX-0032 ("FERC 745").

The Introduction section of FERC 745 reference states:

> This Final Rule addresses compensation for demand response in Regional Transmission Organization (RTO) and Independent System Operator (ISO) organized wholesale energy markets, i.e., the day-ahead and real-time energy markets. As the Commission has previously recognized, a market functions effectively only when both supply and demand can meaningfully participate. The Commission, in the Notice of Proposed Rulemaking (NOPR) issued in this proceeding on March 18, 2010, proposed a remedy to concerns that current compensation levels inhibited meaningful demand-side participation. After nearly 3,800 pages of comments, a subsequent technical conference, and the opportunity for additional comment, we now take final action.

RX-0032.0005 (FERC 745) (footnote omitted).

Inequitable conduct is a judicially created equitable defense to patent infringement. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1285 (Fed. Cir. 2011) (en banc). When a court determines that inequitable conduct has occurred as to one or more claims of a patent, the entire patent is rendered unenforceable. *Id*. at 1287; *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 877 (Fed. Cir. 1988). Inequitable conduct generally requires a showing of (1) specific intent to deceive the Patent Office and (2) "but-for materiality," meaning that the patent would not have issued but for the misrepresentation or omission. *Therasense*, 649 F.3d at 1287. The Federal Circuit has also recognized an exception to the materiality requirement. "[A]ffirmative acts of egregious misconduct," such as filing an "unmistakably false affidavit," has been held to be material even if the misconduct would not have influenced the issuance of the patent. *Therasense*, 649 F.3d at 1292.

Under the intent prong of the standard two-part test, a party can prove intent to deceive the Patent Office based on direct evidence or on circumstantial evidence "with the collection of inferences permitting a confident judgment that deceit has occurred." *McKesson Info. Sols., Inc. v. Bridge Med., Inc.*, 487 F.3d 897, 913 (Fed. Cir. 2007) (internal quotation marks omitted); *see also Merck & Co., Inc. v. Danbury Pharmacal, Inc.*, 873 F.2d 1418, 1422 (Fed. Cir. 1989) ("Intent

need not, and rarely can, be proven by direct evidence."). In evaluating intent, the factfinder must consider evidence that the patent applicants withheld information from the Patent Office in good faith. *See Purdue Pharma L.P. v. Endo Pharm. Inc.*, 438 F.3d 1123, 1134 (Fed. Cir. 2006). "Intent to deceive cannot be inferred simply from the decision to withhold the reference where the reasons given for the withholding are plausible." *Dayco Prod., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1367 (Fed. Cir. 2003). In short, a factfinder should only infer intent to deceive when the evidence is clear and convincing. "[T]he inference [of intent to deceive] must not only be based on sufficient evidence and be reasonable in light of that evidence, but it must also be the single most reasonable inference able to be drawn from the evidence to meet the clear and convincing standard." *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008) (alterations added).

I find that Mr. Forbes did not commit inequitable conduct during prosecution of the Asserted Patents.

First, the record does not demonstrate that FERC 745 meets the "but-for materiality" standard. Respondents rely on a passage from the FERC order that requires a utility:

> to include as part of the compliance filing required herein, an explanation of how its measurement and verification protocols will continue to ensure that appropriate baselines are set, and that demand response will be continued to be adequately measured and verified as necessary to ensure the performance of each demand response resource.

RIB at 290 (quoting RX-0011C (Forbes Dep. Tr.) at 481:4–482:15, which in turn quotes RX-0032 (FERC 745) at 72-73).

Causam's expert Dr. Madisetti explained the difference between the disclosures in FERC 745 and the claims of the Asserted Patents. He noted FERC 745 failed to teach any way of generating measurement and verification data or a power supply value according to the claimed

invention. Tr. (Madisetti) at 464:16-21. In contrast, the Asserted Patent claims require generating measurement and verification data or a power supply value. Mr. Forbes, too, stated that FERC 745 was not material to his inventions, at least because in the FERC document "the measurement and verification portion is pretty thin in terms of like defining how measurement and verification must be accomplished. It just says it has to be accomplished." Tr. (Forbes) at 142:4-8. Mr. Forbes' beliefs about the shortcomings of FERC 745 were corroborated by Mr. Stephen Knapp, a consultant with more than 40 years of experience in the energy industry. Mr. Knapp testified that "the technical know-how for utility companies to comply with FERC 745 was first provided by these [Asserted] [P]atents." Tr. (Knapp) at 315:18-316:15.

At the Hearing, Mr. Forbes testified how FERC 745 would have been important to a patent examiner:

> CHIEF JUDGE CHENEY: And would FERC 745 have been important to the patent examiner in understanding your invention?
>
> THE WITNESS: I don't necessarily think that FERC 745 was necessary for patent disclosure because it was a public government order that was available for anyone to go and actually see, certainly from the perspective of the intent of 745, which was to make supply act like – demand act like supply, that is important for anyone who wanted to be in the demand response business to understand, but I'm not sure that I would specifically require FERC 745 as an order to be part of an IDS.
>
> CHIEF JUDGE CHENEY: What would an examiner do with FERC 745 when reviewing your description of the invention in your patent applications?
>
> THE WITNESS: Well, FERC 745 has a short section on measurement and verification, but it does not specify in the rulemaking how each RTO and ISO is supposed to implement that. And so that's left up to each one of those individual jurisdictions to come up with a methodology, then FERC then approved for measurement and verification. So, in fact, FERC 745, the measurement and verification portion is pretty thin in terms of like defining how measurement and verification must be accomplished. It just says it has to be accomplished. And that it has to make load act like supply.

> CHIEF JUDGE CHENEY: And your invention, in the claims to your invention, also refers to measurement and verification; is that right?
>
> THE WITNESS: Yes, Your Honor.
>
> . . .
>
> CHIEF JUDGE CHENEY: And I recall you testifying that you said that FERC 745 "would have been picked up by the examiner in the IDS." What did you mean by that?
>
> THE WITNESS: I think because we were using terms in the art, such as measurement and verification, that an examiner would have the ability to understand that that was something that dealt with regulatory matters and would have been able to pick that up without necessarily us having to disclose it in an IDS.

Tr. (Forbes) 141:8–142:12, 143:2–11.

Although Mr. Forbes testified that FERC 745 would have been important to a patent examiner, Mr. Forbes' testimony during the evidentiary hearing weighs against finding the requisite "specific intent to withhold" material information to the Patent Office. He testified, "Well, FERC 745 was a public document. So it would have been picked up by the examiner in the IDS." Tr. (Forbes) at 118:2-6. He further stated that "I don't necessarily think that FERC 745 was necessary for patent disclosure because it was a public government order that was available for anyone to go and actually see." Tr. (Forbes) at 141:4-19. He testified that "FERC 745, the measurement and verification portion is pretty thin in terms of like defining how measurement and verification must be accomplished. It just says it has to be accomplished." Tr. (Forbes) at 142:4-7. Mr. Forbes stated he did ***not*** intend to deceive the Patent Office because he believed they already knew about the order.

Respondents also contend that Mr. Forbes committed inequitable conduct by (1) affirming to the PTO that "he was the *sole* inventor of the subject matter of the CIPs, despite knowing that he had *jointly* conceived the claimed subject matter with Mr. Webb," and (2) telling "the PTO (via an oath) that he was the *sole* owner of the CIPs, despite knowing that Consert was at least a co-owner." RIB at 285 (emphasis in original).

Respondents have not shown that Mr. Forbes had the intent to deceive when he stated he was the sole inventor of the subject matter in the applications at issue. Although Mr. Forbes signed a declaration that identified Mr. Webb as a co-inventor of the earlier '909 Application, Mr. Forbes testified that the decision to name Mr. Webb as an inventor on the '909 Application was made by the prosecuting patent attorney. Additionally, Respondents have not shown that the specific subject matter that Mr. Forbes claimed to solely invent, in applications that were only continuations in part of the '909 application, was in fact subject matter jointly invented by Mr. Webb. Resolution of that issue requires an analysis lacking in this record.

As discussed above in the Standing section in detail, Consert and Mr. Forbes disputed ownership of the Asserted Patents in 2012. CX-0779C (Forbes WS) at Q/A 89-94. That is why Mr. Forbes and his former employer entered in to the 2013 Agreement, to settle the intellectual property rights of both parties. Tr. (Forbes) at 109:8-17 ("The purpose of the 2013 agreement was to make sure that there was a clear delineation as to who owned what."); *id*. at 170:4-17, 173:5-13; CX-0779C.16 (Forbes WS) at Q/A 96-97. Respondents have offered no evidence that suggests that Mr. Forbes did not believe he was the sole owner of the CIPs at the time the statement was made in 2012, during Mr. Forbes dispute with his former employer.

To meet the clear and convincing evidence standard, Respondents' must show that "the single most reasonable inference able to be drawn from the evidence" is that the inventors intended

to deceive the Patent Office. *Therasense*, 649 F.3d at 1290 (quoting Star Scientific Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d 1357, 1365 (Fed. Cir. 2008). The weight of the evidence here does not meet that standard.

Weighing the record evidence as a whole, Respondents have not shown by clear and convincing evidence that Mr. Forbes had specific intent to deceive the Patent Office. Without that showing, Respondents have not demonstrated that the Asserted Patents are unenforceable based on inequitable conduct.

## X. CONCLUSIONS OF LAW

1. The Commission has subject matter, personal, and *in rem* jurisdiction in this investigation.

2. The importation requirement has been satisfied.

3. Complainant has standing to assert the Asserted Patents.

4. Claims 19 and 23 of the ’552 patent have not been shown to be infringed.

5. Claims 1, 15, 19, and 22 of the ’522 patent have not been shown to be infringed.

6. Claims 1, 2, 6-7, 14-15, and 18 of the ’268 patent have not been shown to be infringed.

7. Claim 13 of the ’592 patent has not been shown to be infringed.

8. Claims 19 and 23 of the ’552 patent have not been shown invalid as obvious in view of the prior art under 35 U.S.C. § 103.

9. Claims 1, 15, 19, and 22 of the ’522 patent have not been shown invalid as obvious in view of the prior art under 35 U.S.C. § 103.

10. Claims 1, 2, 6-7, 14-15, and 18 of the ’268 patent have not been shown invalid as obvious in view of the prior art under 35 U.S.C. § 103.

11. Claim 13 of the ’592 patent has not been shown invalid as obvious in view of the prior art under 35 U.S.C. § 103.

12. No claim of the Asserted Patents has been shown invalid as failing to satisfy the requirements of 35 U.S.C. § 112.

13. No claim of the Asserted Patents has been shown to be directed to subject matter ineligible for patenting under 35 U.S.C. § 101.

14. No claim of the Asserted Patents has been shown invalid for obviousness-type double patenting.

15. No claim of the Asserted Patents has been shown invalid as invalid for Improper Inventorship.

16. The Asserted Patents have not been shown to be unenforceable based on inequitable conduct.

17. The technical prong of the domestic industry requirement has been satisfied with respect to all Asserted Patents.

18. The economic prong of the domestic industry requirement has been satisfied with respect to all Asserted Patents if the Domestic Industry Products practice those patents.

## XI. RECOMMENDED DETERMINATION ON REMEDY AND BOND

### A. Limited Exclusion Order

The Commission has broad discretion in selecting the form, scope, and extent of the remedy in a section 337 proceeding. *Viscofan, S.A. v. U.S. Int’l Trade Comm’n*, 787 F.2d 544,

548 (Fed. Cir. 1986). A limited exclusion order directed to a respondent's infringing products is among the remedies that the Commission may impose. *See* 19 U.S.C. § 1337(d).

Because I have determined that there has been no violation of section 337, I do not recommend that the Commission issue a limited exclusion order.

Should the Commission determine that a violation did occur, I recommend entry of a limited exclusion order against the Respondents that would bar importation of infringing articles.

Respondents request exemption for "Respondents' non-accused products and/or components for which Causam failed to prove representativeness or infringement." RIB at 294. I do not recommend that the Commission include Respondents' request for a carve-out for products supposedly falling outside of the scope of this investigation. The standard exclusion order language is sufficient to address Respondents' concern because it excludes only articles that infringe except under license or authority of the patent holder, or with the permission of the patent owner. *See Certain Electric Skin Care Devices, Brushes and Charges Therefor, and Kits Containing the Same*, Inv. No. 337-TA-959, Comm'n Op. at 19 (Feb. 13, 2017) (EDIS Doc. ID No. 603444).

Respondents request "an exemption for products manufactured solely in the U.S. using imported components." RIB at 294. Exclusion orders are intended to bar respondents "from importing components of its devices and then assembling those devices into infringing products." *Certain Network Devices, Related Software & Components Thereof (II)*, Inv. No. 337-TA-945, Comm'n Op. at 123 (June 1, 2017). Any other rule would allow manufacturers of infringing products to circumvent the order by simply importing the components instead of the finished products and assembling the finished products once the components are already in the United

States. *See Certain Road Milling Machines and Components Thereof*, Inv. No. 337-TA-1067, Comm'n Op. at 13 (Aug. 7, 2019).

Respondents request "a service, warranty, and repair exemption provision to prevent disrupting existing customers." RIB at 294. Respondents offered no evidence that they actually maintain any service, warranty, or repair program. *See id.* at 293-94 (lacking any discussion). Exempting imports for repair and replacement is not warranted when a respondent has not established that a repair or replacement program exists.

Respondents request "a quarterly certification requirement for Causam regarding its Domestic Industry assertions." RIB at 294. The record evidence demonstrates Causam's licensee, L+G, continues to maintain operations in the United States (Tr. (Mulhern) at 531:21-532:9), and Respondents have not identified any evidence that the domestic industry regarding the Domestic Industry Products is likely to change. Accordingly, I do not recommend a reporting requirement for the domestic industry.

I recommend the inclusion of a certification provision in any exclusion order entered in this investigation whereby Respondents can certify imported products or components are not covered. *See Certain Movable Barrier Operator Sys. & Components Thereof*, Inv. No. 337-TA-1209, Comm'n Op. at 68 (Mar. 11, 2022); RIB at 294 (certification provision is appropriate). The certification provision will reduce the burden of U.S. Customs in enforcing the exclusion order.

**B. Cease and Desist Order**

Section 337 provides that in addition to, or in lieu of, the issuance of an exclusion order, the Commission may issue a cease and desist order as a remedy for a violation of section 337. 19 U.S.C. § 1337(f)(1). The Commission may issue a cease and desist order when it has personal

**PUBLIC VERSION**

**CONFIDENTIAL MATERIAL OMITTED**

jurisdiction over the party against whom the order is directed. *Gamut Trading Co. v. U.S. Int'l Trade Comm'n*, 200 F.3d 775, 784 (Fed. Cir. 1999).

Under Commission precedent, "[c]ease and desist orders are generally issued when, with respect to the imported infringing products, respondents maintain commercially significant inventories in the United States or have significant domestic operations that could undercut the remedy provided by an exclusion order." *Certain Air Mattress Systems, Components Thereof, and Methods of Using the Same*, Inv. No. 337-TA-971, Comm'n Op. at 49 (May 17, 2017) (citations and footnote omitted).

Because I find there has been no violation, I do not recommend entry of a cease and desist order. In the alternative, however, I make the following recommendation.

The evidence shows that Alarm.com maintained significant domestic inventories of the Alarm.com Accused Products and has significant domestic operations in the United States. *See* CX-0778C.23-24 (Herrington WS) at Q/A 82. Alarm.com stipulated that it maintains an inventory of the Alarm.com Accused Products [redacted] during the relevant period. *See* JX-0015C (ADC Import Stipulation) at 3. Alarm.com's documents show that as of December 31, 2021, its facility at [redacted] maintained inventories of the Alarm.com Accused Products in the United States on behalf of Alarm.com Inc. in the amount of [redacted] units with a value of $[redacted] JX-0015C (Alarm.com Import Stipulation) at Exhibit C. Of this amount, [redacted] units valued at $[redacted] are accused ADC-T2000 and ADC-T3000 devices which are manufactured overseas and imported into the United States. *See* JX-0015C (Alarm.com Import Stipulation) at Exhibit C; CX-0784C (Olinger Email); CX-0783C (Import Spreadsheet); CX-0176C (Olinger Import Spreadsheet). This level of domestic inventory is commercially significant. *See* CX-0778C.24 (Herrington WS) at Q/A 83-85.

**PUBLIC VERSION**

**CONFIDENTIAL MATERIAL OMITTED**

Alarm.com also maintains significant domestic operations, including a 178,737 square foot facility at 8281 Greensboro Drive, Suite 100, Tysons, Virginia 22102, that serves as the primary location for activities related to Alarm.com's Accused Products, and is used for sales and marketing, research and development, customer service and administrative purposes. *See* CX-0817.86 (Alarm 2020 10-K). Alarm.com also leases office space in Bloomington, Minnesota; Redwood City, California; and Brooklyn, New York in addition to owning a commercial building in Liberty Lake, Washington. *Id*. These facilities are used for sales and training, research and development, technical support, warehousing, and administrative purposes. The Alarm.com Accused Products are warehoused by [redacted] at its facility in [redacted] JX-0015C.3 (ADC Import Stipulation) at ¶¶ 6-7. Alarm.com's ability to stockpile and warehouse a significant inventory of Accused Products could facilitate circumvention of an exclusion order in this investigation. Accordingly, a cease and desist order against Alarm.com would be appropriate in the event a violation by Alarm.com is found.

ecobee maintains significant domestic inventories of the ecobee Accused Products and has significant domestic operations in the United States, *See* CX-0778C.25 (Herrington WS) at Q/A 87; JX-0017C.2 (ecobee Import Stipulation). In addition, ecobee's documents show that it maintains inventories of the Accused Products in the United States sufficient to circumvent an exclusion order in this Investigation. *See* CX-0778C.25 (Herrington WS) at Q/A 88; CDX-0002C.7 (Herrington Demo.); JX-0017C (ecobee Import Stipulation) at Exhibit C; CX-0714C.7, 12, 21-22 (ecobee Resp. to 1st ROGs). A cease and desist order against ecobee would be appropriate in the event a violation by ecobee is found.

Itron maintains significant domestic operations in the United States with respect to the Itron Accused Products. *See* CX-0778C.26 (Herrington WS) at Q/A 90; JX-0016C.2 (Itron Import

**PUBLIC VERSION**

**CONFIDENTIAL MATERIAL OMITTED**

Stipulation). Itron operates eight facilities in California, Maryland, Minnesota, Texas, North Carolina, and South Carolina. Itron also owns and leases two manufacturing facilities in Oconee, South Carolina, and Waseca, Minnesota, and 45% of its over 6,100 global employees are located in North America. Itron stated it "[redacted]" in a "Charlotte, NC warehouse;" a "Lexington, KY warehouse," and in "technician vehicles." *See* CX-0778C.26 (Herrington WS) at Q/A 91; CX-0800.7, 24 (Itron 2020 10-K); CX-0721C.21-22 (Itron 3rd Supp. to 1st ROGs). Itron has the ability to stockpile inventory of the Accused Products in the United States sufficient to circumvent an exclusion order. A cease and desist order against Itron would be appropriate in the event a violation by Itron is found.

Resideo maintains significant domestic inventories of the Resideo Accused Products and has significant domestic operations in the United States. CX-0778C.27 (Herrington WS) at Q/A 93. Resideo stipulated that Ademco Inc. maintains inventory of the Resideo Accused Products in the United States. JX-0018C.2 (Resideo Import Stipulation). Resideo's inventory levels are commercially significant in that Resideo is able to consistently meet customer demand by maintaining [redacted] *See* CX-0778C.27 (Herrington WS) at Q/A 94; JX-0018C (Resideo Import Stipulation). A cease and desist order against Resideo would be appropriate in the event a violation is found.

### C. Bond During Presidential Review

Pursuant to section 337(j)(3), the administrative law judge and the Commission must determine the amount of bond to be required of a respondent during the 60-day Presidential review of any permanent relief. The purpose of the bond is to protect the complainant from any injury. 19 U.S.C. § 1337(j)(3); 19 C.F.R. §§ 210.42(a)(1)(ii), 210.50(a)(3).

When reliable price information is available, the Commission has often set the bond by eliminating the differential in sales prices between the domestic product and the imported, infringing product. *Certain Microsphere Adhesives, Process for Making Same, and Products Containing Same, Including Self-Stick Repositionable Notes*, Inv. No. 337-TA-366, Comm'n Op. at 24, USITC Pub. No. 2949 (1995). In other cases, the Commission has turned to alternative approaches, especially when the level of a reasonable royalty rate could be ascertained. *See Certain Integrated Circuit Telecommunication Chips and Products Containing Same, Including Dialing Apparatus*, Inv. No. 337-TA-337, Comm'n Op. at 41-43, USITC Pub. No. 2670 (1995). A 100% bond has been required when no effective alternative existed. *See, e.g.*, *Certain Flash Memory Circuits and Products Containing Same*, Inv. No. 337-TA-382, USITC Pub. No. 3046, Comm'n Op. at 26-27 (July 1997) (imposing a 100% bond when a price comparison was not practical because the parties sold products at different levels of commerce and the proposed royalty lacked adequate support in the record).

Calculating a sales price differential is impractical in this investigation because Causam's licensee and the Respondents sell products at varying prices and at different levels of commerce. CX-0778C.28-29 (Herrington WS) at Q/A 100. For example, L+G sells its products primarily to utility providers while Alarm.com sells the ADC- T2000 and ADC-T3000 to certain of its dealers and distributors. *See* CX-0520 (L+G 2020 Annual Report); CX-0817 (Alarm.com 2020 10-K); CX-0111C (Goodman Tr.) at 31:3-6 ("Q. How do you market the accused products? A. So Building 36 markets them directly to the professional HVAC trades"). ecobee sells its products at least directly to consumers through its own website as well as through retailers such as Best Buy, The Home Depot, and Lowes. Resideo sells its products directly to consumers through its own website as well as through retailers such as Amazon.com, The Home Depot, Lowes, and others.

*See* CX-0798 (Resideo 2020 10-K). Further, Respondents did not provide any data that would allow for the calculation of a reliable average sales price. *See* CX-0778C.28-29 (Herrington WS) at Q/A 100.

To prevent any harm to Causam, as the statute requires, it is my recommendation that the Commission set a 100% bond for any importations of infringing products during the Presidential review period.

## XII. INITIAL DETERMINATION ON VIOLATION

For the reasons set forth herein, it is my initial determination that no violation of section 337 of the Tariff Act, as amended, has occurred in the importation into the United States and the sale within the United States after importation of certain smart thermostats, load control switches, and components thereof based on infringement of U.S. Patent No. 8,805,552; U.S. Patent No. 9,678,522; U.S. Patent No. 10,394,268; and U.S. Patent No. 10,396,592.

I hereby certify to the Commission this initial determination and the recommended determination. The Secretary shall serve the confidential version of this initial determination upon counsel who are signatories to the Amended Protective Order (Order No. 10) issued in this investigation. A public version will be served at a later date upon all parties of record.

Pursuant to 19 C.F.R. § 210.42(h), this initial determination shall become the determination of the Commission unless a party files a petition for review pursuant to 19 C.F.R. § 210.43(a) or the Commission, pursuant to 19 C.F.R. § 210.44, orders on its own motion a review of the initial determination or certain issues therein.

## XIII. ORDER

Within seven days of the date of this document, the parties shall jointly submit a single proposed public version with any proposed redactions indicated in red. If the parties submit

excessive redactions, they may be required to provide declarations from individuals with personal knowledge, justifying each proposed redaction and specifically explaining why the information sought to be redacted meets the definition for confidential business information set forth in 19 C.F.R. § 201.6(a). To the extent possible, the proposed redactions should be made electronically, in a single PDF file using the "Redact Tool" within Adobe Acrobat. The proposed redactions should be submitted as "marked" but not yet "applied." The proposed redactions should be submitted via email to Cheney337@usitc.gov and not filed on EDIS.

All pending motions not otherwise disposed of in this order are denied as moot.

**SO ORDERED**.

Clark S. Cheney
Chief Administrative Law Judge

**CERTAIN SMART THERMOSTATS, LOAD CONTROL SWITCHES AND COMPONENTS THEREOF** **Inv. No. 337-TA-1277**

## CONFIDENTIAL CERTIFICATE OF SERVICE

I, Katherine M. Hiner, hereby certify that the attached **INITIAL DETERMINATION** has been served upon the following parties as indicated, on **November 16, 2022**.

Katherine M. Hiner, Acting Secretary
U.S. International Trade Commission
500 E Street, SW, Room 112
Washington, DC 20436

**On Behalf of Complainant Causam Enterprises, Inc.:**

Jeffrey M. Telep, Esq.
**KING AND SPALDING LLP**
1700 Pennsylvania Avenue NW
Washington, DC 20006
Email: jtelep@kslaw.com

☐ Via Hand Delivery
☐ Via Express Delivery
☐ Via First Class Mail
☒ Other: Email Notification of Availability for Download

**On Behalf of Respondents Ademco, Inc.. Resideo Smart Homes Technology (Tianjin), and Itron, Inc.:**

M. Scott Stevens, Esq.
**ALSTON & BIRD LLP**
The Atlantic Building
950 F Street NW
Washington, DC 20004
Email: scott.stevens@alston.com

☐ Via Hand Delivery
☐ Via Express Delivery
☐ Via First Class Mail
☒ Other: Email Notification of Availability for Download

**On Behalf of Respondent Ecobee, Inc.:**

Megan S. Woodworth, Esq.
**VENABLE LLP**
600 Massachusetts Ave, N.W.
Washington, DC 20001
Email: mswoodworth@Venable.com

☐ Via Hand Delivery
☐ Via Express Delivery
☐ Via First Class Mail
☒ Other: Email Notification of Availability for Download

Certificate of Service – Page 2

**On Behalf of Respondents Alarm.com Holdings, Inc., Alarm.com Incorporated, and EnergyHub, Inc.:**

Deanna Tanner Okun, Esq.
**AMS TRADE LLP**
1133 Connecticut Avenue, N.W., 12th Floor
Washington, DC 20036
Email: okun@adduci.com

☐ Via Hand Delivery
☐ Via Express Delivery
☐ Via First Class Mail
☒ Other: Email Notification of Availability for Download

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**Washington, D.C.**

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN SMART THERMOSTATS, LOAD CONTROL SWITCHES, AND COMPONENTS THEREOF** | **Investigation No. 337-TA-1277** |

# NOTICE OF A COMMISSION DETERMINATION TO REVIEW IN PART A FINAL INITIAL DETERMINATION FINDING NO VIOLATION OF SECTION 337, AND ON REVIEW, TO AFFIRM WITH CERTAIN MODIFICATIONS; TERMINATION OF THE INVESTIGATION

**AGENCY:** U.S. International Trade Commission.

**ACTION:** Notice.

**SUMMARY:** Notice is hereby given that the U.S. International Trade Commission ("Commission") has determined to review in part a final initial determination ("ID") of the presiding administrative law judge ("ALJ"), finding no violation of section 337, and on review, to affirm with certain modifications set forth herein. The investigation is terminated.

**FOR FURTHER INFORMATION CONTACT**: Panyin A. Hughes, Office of the General Counsel, U.S. International Trade Commission, 500 E Street, S.W., Washington, D.C. 20436, telephone (202) 205-3042. Copies of non-confidential documents filed in connection with this investigation may be viewed on the Commission's electronic docket (EDIS) at *https://edis.usitc.gov*. For help accessing EDIS, please email *EDIS3Help@usitc.gov*. General information concerning the Commission may also be obtained by accessing its Internet server at *https://www.usitc.gov*. Hearing-impaired persons are advised that information on this matter can be obtained by contacting the Commission's TDD terminal, telephone (202) 205-1810.

**SUPPLEMENTARY INFORMATION**: On September 2, 2021, the Commission instituted this investigation based on a complaint filed by Causam Enterprises, Inc. ("Causam") of Raleigh, North Carolina. 86 FR 49345-46 (Sept. 2, 2021). The complaint alleged violations of section 337 based on the importation into the United States, the sale for importation, or the sale within the United States after importation of certain smart thermostats, load control switches, and components thereof by reason of infringement of one or more of claims 1–9, 16, 19–21, 23–28, and 30 of U.S. Patent No. 8,805,552 ("the '552 patent"); claims 1–8, 10, 13–17, 19–23, and 25–29 of U.S. Patent No. 9,678,522 ("the '522 patent"); claims 1–11, 13–16, 18, and 19 of U.S. Patent No. 10,394,268 ("the '268 patent"); and claims 1, 2, 8, 9, 11, 13, 14, and 17 of U.S. Patent No. 10,396,592 ("the '592 patent") (collectively, "Asserted Patents"). *Id.* The Commission's notice of investigation named the following nine entities as respondents: Alarm.com Holdings, Inc. of Tysons, Virginia; Alarm.com Inc. of Tysons, Virginia; Ecobee, Inc. of Toronto, Ontario,

Canada; EnergyHub, Inc. of Brooklyn, New York; Itron, Inc. of Liberty Lake, Washington; Itron Distributed Energy Management, Inc. of Liberty Lake, Washington ("Itron Distributed"); Resideo Smart Homes Technology (Tianjin) of Tianjin, China; Resideo Technologies, Inc. of Austin, Texas ("Resideo Technologies"); and Xylem Inc., of Rye Brook, New York ("Xylem"). The Office of Unfair Import Investigations was not named as a party in this investigation. *Id.*

On December 10, 2021, the ALJ issued an ID granting a motion to terminate the investigation as to Xylem based upon settlement. Order No. 7 (Dec. 10, 2021), *unreviewed by* Comm'n Notice (Jan. 10, 2022).

On April 21, 2022, the ALJ issued an ID granting a motion (1) to amend the complaint and notice of investigation to substitute new respondent Ademco Inc. of Melville, New York for respondent Resideo Technologies and (2) to terminate the investigation as to respondent Itron Distributed; claim 21 of the '552 patent; claims 5, 14, and 17 of the '522 patent; claims 5, 13, and 16 of the '268 patent; and claims 8 and 9 of the '592 patent based upon withdrawal of the allegations in the complaint. Order No. 12 (Apr. 21, 2022), *unreviewed by* Comm'n Notice (May 17, 2022).

The Chief ALJ ("CALJ") held an evidentiary hearing from June 28-July 1, 2022 and received post-hearing briefs thereafter (this investigation was reassigned from ALJ Shaw to Chief ALJ Cheney on June 17, 2022).

On November 16, 2022, the CALJ issued the final ID finding no violation of section 337 as to the asserted patent claims. The ID found that by appearing and participating in the investigation and not contesting jurisdiction, the parties have consented to personal jurisdiction at the Commission. ID at 17. The ID also found that the Commission has *in rem* jurisdiction over the accused products. *Id.* The ID further found that the importation requirement under 19 U.S.C. 1337(a)(1)(B) is satisfied. *Id.* at 16 (citing JX-0015C, JX-0016C, JX-0017C, JX-0018C (stipulations between the parties as to importation)). The ID, however, found that Causam failed to demonstrate that it has standing to assert a claim of infringement for any of the Asserted Patents. *Id.* at 17-26. The ID also found that Causam failed to prove infringement of the asserted claims, and that Respondents failed to show that any of the asserted claims are invalid. *Id.* at 40-120, 177-224. Finally, the ID found that Causam proved the existence of a domestic industry that practices the Asserted Patents as required by 19 U.S.C. 1337(a)(2). *Id.* at 120-177. The ID included the CALJ's recommended determination on remedy and bonding ("RD"). The RD recommended that, should the Commission find a violation, issuance of a limited exclusion order and cease and desist orders would be appropriate. ID/RD at 225-230. The RD also recommended imposing a bond in the amount of one hundred percent (100%) of entered value for covered products imported during the period of Presidential review. *Id.* at 230-32.

On November 28, 2022, Causam filed a petition for review of the ID and Respondents filed a contingent petition for review of the ID. On December 6, 2022, the parties filed responses to the petitions.

Having reviewed the record of the investigation, including the final ID, the parties' submissions, the petitions for review, and the response thereto, the Commission has determined to review the final ID in part. Specifically, the Commission has determined to review (1) the final ID's findings as to Causam's standing to assert infringement of the asserted patents; (2) the final ID's findings on obviousness; and (3) the final ID's domestic industry findings.

The Commission, upon review, takes no position on (1) whether Causam has standing to assert infringement of the asserted patents; (2) whether the asserted patent claims are invalid for obviousness; and (3) whether Causam satisfied the technical or economic prongs of the domestic industry requirement. The Commission adopts all findings in the final ID that are not inconsistent with the Commission's determination.

The investigation is terminated with a finding of no violation of section 337.

The Commission vote for this determination took place on February 16, 2023.

The authority for the Commission's determination is contained in section 337 of the Tariff Act of 1930, as amended (19 U.S.C. 1337), and in Part 210 of the Commission's Rules of Practice and Procedure (19 CFR Part 210).

By order of the Commission.

Lisa R. Barton
Secretary to the Commission

Issued: February 16, 2023

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



Boundary, City, Vicinity, Reference Number.

**ARIZONA**

**Yavapai County**

Schuerman Homestead House, 120 Loy Ln., Sedona vicinity, SG100008708

**CALIFORNIA**

**Calaveras County**

Chinatown Gardens Archaeological District, (Asian Americans and Pacific Islanders in California, 1850–1970 MPS), 8435 East Center St., Mokelumne Hill, MP100008712

**Orange County**

Fullerton College Historic District, 321 East Chapman Ave., Fullerton, SG100008709

New Lynn Theater, 154–162 South Coast Hwy., Laguna Beach, SG100008710

**COLORADO**

**Chaffee County**

Chaffee County Courthouse and Jail Buildings (Boundary Increase), 506 and 516 East Main St.; 113 and 205 North Court St., Buena Vista, BC100008735

**Elbert County**

First National Bank of Elizabeth, 188 South Main St., Elizabeth, SG100008713

**Lake County**

Golden Burro Cafe and Lounge, 710 Harrison Ave., Leadville, SG100008732

**Pueblo County**

St. Paul African Methodist Episcopal (AME) Church, 613 West Mesa Ave., Pueblo, SG100008733

**Teller County**

Crystola Bridge, (Highway Bridges in Colorado MPS), .06 mi. north of Crystola on Teller Cty. Rd. 21, Crystola vicinity, MP100008724

**MICHIGAN**

**Berrien County**

Clark Equipment Company Administrative Complex, 301–324 East Dewey St. and 204–302 North Red Bud Trail, Buchanan, SG100008725

**MISSOURI**

**Lafayette County**

Douglass School, 215 West 16th St., Higginsville, SG100008715

**MONTANA**

**Powell County**

Hillcrest Cemetery, West Milwaukee Ave., approx. .1 mi. west of Deer Lodge, Deer Lodge vicinity, SG100008723

**NEW JERSEY**

**Mercer County**

New Jersey Division of Motor Vehicles Building, 25 South Montgomery St., Trenton, SG100008729

**Passaic County**

Garritse-Doremus-Westervelt House, Park Dr., Clifton City, SG100008730

**NEW YORK**

**Onondaga County**

Amphion Piano Player Factory, (Industrial Resources in the City of Syracuse, Onondaga County, NY MPS), 689 North Clinton and 156 Solar Sts., Syracuse, MP100008717

St. Paul's Methodist Episcopal Church and Parsonage, 300–306 West Seneca Tpk., Syracuse, SG100008718

**OHIO**

**Butler County**

Oakland Residential Historic District, Bounded by 1st' Curtis, Woodlawn, Parkview, and Calumet Aves., Grove, Garfield, and Richmond Sts., Middletown, SG100008736

**VIRGINIA**

**Petersburg Independent City**

Walnut Hill Historic District, Roughly bounded by Johnson Rd., North, East, and South Blvds., Mount Vernon, Fleur de Hundred, and East Tuckahoe Sts., Petersburg, SG100008702

An owner objection has been received for the following resource:

**NORTH DAKOTA**

**Grand Forks County**

DeRoche Block, 624 5th Ave. North Apt 1–8 (formerly 612–626 and 624 Dakota Ave.), Grand Forks, SG100008731

A request to move has been received for the following resource:

**WISCONSIN**

**Fond Du Lac County**

Little White Schoolhouse, 1074 West Fond du Lac St., Ripon, MV73000079

Additional documentation has been received for the following resources:

**COLORADO**

**Chaffee County**

Chaffee County Courthouse and Jail Buildings (Additional Documentation), 506 and 516 East Main St.; 113 and 205 North Court St., Buena Vista, AD79000575

**UTAH**

**Sanpete County**

Neilson, N. S., House (Additional Documentation), 179 West Main St., Mt. Pleasant, AD82004160

*Authority:* Section 60.13 of 36 CFR part 60.

Dated: February 8, 2023.

**Sherry A. Frear,**

*Chief, National Register of Historic Places/ National Historic Landmarks Program.*

[FR Doc. 2023–03701 Filed 2–22–23; 8:45 am]

BILLING CODE 4312–52–P

## INTERNATIONAL TRADE COMMISSION

**[Investigation No. 337–TA–1277]**

## Certain Smart Thermostats, Load Control Switches, and Components Thereof; Notice of a Commission Determination To Review in Part a Final Initial Determination Finding No Violation of Section 337, and on Review, To Affirm With Certain Modifications; Termination of the Investigation

**AGENCY:** U.S. International Trade Commission.

**ACTION:** Notice.

**SUMMARY:** Notice is hereby given that the U.S. International Trade Commission (''Commission'') has determined to review in part a final initial determination (''ID'') of the presiding administrative law judge (''ALJ''), finding no violation of section 337, and on review, to affirm with certain modifications set forth herein. The investigation is terminated.

**FOR FURTHER INFORMATION CONTACT:** Panyin A. Hughes, Office of the General Counsel, U.S. International Trade Commission, 500 E Street SW, Washington, DC 20436, telephone (202) 205–3042. Copies of non-confidential documents filed in connection with this investigation may be viewed on the Commission's electronic docket (EDIS) at *https://edis.usitc.gov.* For help accessing EDIS, please email *EDIS3Help@usitc.gov.* General information concerning the Commission may also be obtained by accessing its internet server at *https://www.usitc.gov.* Hearing-impaired persons are advised that information on this matter can be obtained by contacting the Commission's TDD terminal, telephone (202) 205–1810.

**SUPPLEMENTARY INFORMATION:** On September 2, 2021, the Commission instituted this investigation based on a complaint filed by Causam Enterprises, Inc. (''Causam'') of Raleigh, North Carolina. 86 FR 49345–46 (Sept. 2, 2021). The complaint alleged violations of section 337 based on the importation into the United States, the sale for importation, or the sale within the United States after importation of certain smart thermostats, load control switches, and components thereof by reason of infringement of one or more of claims 1–9, 16, 19–21, 23–28, and 30 of U.S. Patent No. 8,805,552 (''the '552 patent''); claims 1–8, 10, 13–17, 19–23, and 25–29 of U.S. Patent No. 9,678,522 (''the '522 patent''); claims 1–11, 13–16, 18, and 19 of U.S. Patent No. 10,394,268

(''the '268 patent''); and claims 1, 2, 8, 9, 11, 13, 14, and 17 of U.S. Patent No. 10,396,592 (''the '592 patent'') (collectively, ''Asserted Patents''). *Id.* The Commission's notice of investigation named the following nine entities as respondents: Alarm.com Holdings, Inc. of Tysons, Virginia; Alarm.com Inc. of Tysons, Virginia; Ecobee, Inc. of Toronto, Ontario, Canada; EnergyHub, Inc. of Brooklyn, New York; Itron, Inc. of Liberty Lake, Washington; Itron Distributed Energy Management, Inc. of Liberty Lake, Washington (''Itron Distributed''); Resideo Smart Homes Technology (Tianjin) of Tianjin, China; Resideo Technologies, Inc. of Austin, Texas (''Resideo Technologies''); and Xylem Inc., of Rye Brook, New York (''Xylem''). The Office of Unfair Import Investigations was not named as a party in this investigation. *Id.*

On December 10, 2021, the ALJ issued an ID granting a motion to terminate the investigation as to Xylem based upon settlement. Order No. 7 (Dec. 10, 2021), *unreviewed by* Comm'n Notice (Jan. 10, 2022).

On April 21, 2022, the ALJ issued an ID granting a motion (1) to amend the complaint and notice of investigation to substitute new respondent Ademco Inc. of Melville, New York for respondent Resideo Technologies and (2) to terminate the investigation as to respondent Itron Distributed; claim 21 of the '552 patent; claims 5, 14, and 17 of the '522 patent; claims 5, 13, and 16 of the '268 patent; and claims 8 and 9 of the '592 patent based upon withdrawal of the allegations in the complaint. Order No. 12 (Apr. 21, 2022), *unreviewed by* Comm'n Notice (May 17, 2022).

The Chief ALJ (''CALJ'') held an evidentiary hearing from June 28–July 1, 2022 and received post-hearing briefs thereafter (this investigation was reassigned from ALJ Shaw to Chief ALJ Cheney on June 17, 2022).

On November 16, 2022, the CALJ issued the final ID finding no violation of section 337 as to the asserted patent claims. The ID found that by appearing and participating in the investigation and not contesting jurisdiction, the parties have consented to personal jurisdiction at the Commission. ID at 17. The ID also found that the Commission has *in rem* jurisdiction over the accused products. *Id.* The ID further found that the importation requirement under 19 U.S.C. 1337(a)(1)(B) is satisfied. *Id.* at 16 (citing JX–0015C, JX–0016C, JX–0017C, JX–0018C (stipulations between the parties as to importation)). The ID, however, found that Causam failed to demonstrate that it has standing to assert a claim of infringement for any of the Asserted Patents. *Id.* at 17–26. The ID also found that Causam failed to prove infringement of the asserted claims, and that Respondents failed to show that any of the asserted claims are invalid. *Id.* at 40–120, 177–224. Finally, the ID found that Causam proved the existence of a domestic industry that practices the Asserted Patents as required by 19 U.S.C. 1337(a)(2). *Id.* at 120–177. The ID included the CALJ's recommended determination on remedy and bonding (''RD''). The RD recommended that, should the Commission find a violation, issuance of a limited exclusion order and cease and desist orders would be appropriate. ID/RD at 225–230. The RD also recommended imposing a bond in the amount of one hundred percent (100%) of entered value for covered products imported during the period of Presidential review. *Id.* at 230–32.

On November 28, 2022, Causam filed a petition for review of the ID and Respondents filed a contingent petition for review of the ID. On December 6, 2022, the parties filed responses to the petitions.

Having reviewed the record of the investigation, including the final ID, the parties' submissions, the petitions for review, and the response thereto, the Commission has determined to review the final ID in part. Specifically, the Commission has determined to review (1) the final ID's findings as to Causam's standing to assert infringement of the asserted patents; (2) the final ID's findings on obviousness; and (3) the final ID's domestic industry findings.

The Commission, upon review, takes no position on (1) whether Causam has standing to assert infringement of the asserted patents; (2) whether the asserted patent claims are invalid for obviousness; and (3) whether Causam satisfied the technical or economic prongs of the domestic industry requirement. The Commission adopts all findings in the final ID that are not inconsistent with the Commission's determination.

The investigation is terminated with a finding of no violation of section 337.

The Commission vote for this determination took place on February 16, 2023.

The authority for the Commission's determination is contained in section 337 of the Tariff Act of 1930, as amended (19 U.S.C. 1337), and in Part 210 of the Commission's Rules of Practice and Procedure (19 CFR part 210).

By order of the Commission.

Issued: February 16, 2023.

**Lisa Barton,**

*Secretary to the Commission.*

[FR Doc. 2023–03703 Filed 2–22–23; 8:45 am]

BILLING CODE 7020–02–P

## INTERNATIONAL TRADE COMMISSION

**[Investigation No. TA–201–076 (Evaluation)]**

## Large Residential Washers: Evaluation of the Effectiveness of Import Relief

**AGENCY:** United States International Trade Commission.

**ACTION:** Institution and scheduling of an investigation under section 204(d) of the Trade Act of 1974.

**SUMMARY:** Pursuant to section 204(d) of the Trade Act of 1974 (''the Act''), the Commission has instituted investigation No. TA–201–076, Large Residential Washers: Evaluation of the Effectiveness of Import Relief, for the purpose of evaluating the effectiveness of the relief action imposed by the President on imports of large residential washers and parts thereof under section 203 of the Act, which terminated on February 7, 2023.

**DATES:** February 7, 2023.

**FOR FURTHER INFORMATION CONTACT:** Kristina Lara (202–205–3386), Office of Investigations, U.S. International Trade Commission, 500 E Street SW, Washington, DC 20436. Hearing-impaired persons can obtain information on this matter by contacting the Commission's TDD terminal on 202–205–1810. Persons with mobility impairments who will need special assistance in gaining access to the Commission should contact the Office of the Secretary at 202–205–2000. General information concerning the Commission may also be obtained by accessing its internet server (*https://www.usitc.gov*). The public record for this investigation may be viewed on the Commission's electronic docket (EDIS) at *https://edis.usitc.gov.*

**SUPPLEMENTARY INFORMATION:**

*Background.*—On January 23, 2018, the President, pursuant to section 203 of the Act (19 U.S.C. 2253), issued Proclamation 9694, imposing a safeguard measure on imports of certain large residential washers and parts thereof in the form of tariff-rate quotas. The proclamation was published in the **Federal Register** on January 25, 2018 (83 FR 3553). The measure took effect on February 7, 2018, for a period of three years and one day, or through February 7, 2021, as modified by Proclamation 9887 of May 16, 2019 (84

# Exhibit 1

U 8084830

# THE UNITED STATES OF AMERICA

TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

April 05, 2021

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *8,805,552*
ISSUE DATE: *August 12, 2014*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

SYLVIA HOLLEY
Certifying Officer

US008805552B2

(12) **United States Patent**
**Forbes, Jr.**

(10) **Patent No.: US 8,805,552 B2**
(45) **Date of Patent: Aug. 12, 2014**

(54) **METHOD AND APPARATUS FOR ACTIVELY MANAGING CONSUMPTION OF ELECTRIC POWER OVER AN ELECTRIC POWER GRID**

(75) Inventor: **Joseph W. Forbes, Jr.**, Raleigh, NC (US)

(73) Assignee: **Causam Energy, Inc.**, Raleigh, NC (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 281 days.

(21) Appl. No.: **13/463,761**

(22) Filed: **May 3, 2012**

(65) **Prior Publication Data**

US 2012/0221162 A1 Aug. 30, 2012

**Related U.S. Application Data**

(60) Continuation-in-part of application No. 13/172,389, filed on Jun. 29, 2011, now Pat. No. 8,315,717, which

(Continued)

(51) **Int. Cl.**

| | |
|---|---|
| ***G05B 11/01*** | (2006.01) |
| ***G05D 3/12*** | (2006.01) |
| ***G05D 5/00*** | (2006.01) |
| ***G05D 9/00*** | (2006.01) |
| ***G05D 11/00*** | (2006.01) |
| ***G05D 17/00*** | (2006.01) |
| ***G01D 4/00*** | (2006.01) |
| ***G06Q 50/06*** | (2012.01) |
| ***G06Q 10/06*** | (2012.01) |
| ***H02J 3/14*** | (2006.01) |
| *G01R 21/00* | (2006.01) |
| *G01R 21/06* | (2006.01) |
| *G05F 5/00* | (2006.01) |
| *G05F 3/00* | (2006.01) |
| *G05F 3/02* | (2006.01) |
| *G05F 1/00* | (2006.01) |

(52) **U.S. Cl.**

CPC ................. ***G01D 4/004*** (2013.01); *Y04S 20/40* (2013.01); ***G06Q 50/06*** (2013.01); *Y04S 20/222* (2013.01); *Y02B 90/245* (2013.01); *Y02B 70/3225* (2013.01); *Y02B 90/242* (2013.01); *Y04S 20/322* (2013.01); ***G06Q 10/06*** (2013.01); ***H02J 3/14*** (2013.01); *Y04S 10/54* (2013.01)

USPC ............. **700/22**; 700/286; 700/291; 700/295; 700/297; 702/60; 702/61; 702/62; 323/299; 323/304; 323/318; 713/300; 713/310; 713/320; 713/340

(58) **Field of Classification Search**

USPC ........ 700/22, 286, 291, 295, 297; 702/60–62; 713/310, 320, 340; 323/299, 304, 318

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,906,242 | A | 9/1975 | Stevenson |
| 4,023,043 | A | 5/1977 | Stevenson |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 1729223 | A | 12/2006 |
| JP | 2000078748 | A | 3/2000 |

(Continued)

OTHER PUBLICATIONS

Automated power exchange. (2000). Energy Markets, 19. Retrieved from http://search.proquest.com/docview/228731930?accountid=14753.

(Continued)

*Primary Examiner* — Ramesh Patel

(74) *Attorney, Agent, or Firm* — Triangle Patents, PLLC

(57) **ABSTRACT**

A client device manages consumption of power supplied by an electric utility to multiple power consuming devices. Power flow to the power consuming devices is selectively enabled and disabled by one or more controllable devices controlled by the client device. The client device receives a power control message from a load management server. In one embodiment, the power control message indicates at least one of an amount of electric power to be reduced and an identification of at least one controllable device to be instructed to disable a flow of electric power to one or more associated power consuming devices. Responsive to the power control message, the client device issues a power management command or instruction to one or more controllable devices under the client device's control. The power management command causes the controllable device(s) to disable a flow of electric power to at least one associated power consuming device.

**42 Claims, 8 Drawing Sheets**



**Related U.S. Application Data**

is a continuation of application No. 12/715,195, filed on Mar. 1, 2010, now Pat. No. 8,032,233, which is a division of application No. 11/895,909, filed on Aug. 28, 2007, now Pat. No. 7,715,951.

(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | |
|---|---|---|---|
| 4,589,075 | A | 5/1986 | Buennagel |
| 4,799,059 | A | 1/1989 | Grindahl et al. |
| 4,819,180 | A | 4/1989 | Hedman et al. |
| 4,819,229 | A | 4/1989 | Pritty et al. |
| 5,237,507 | A | 8/1993 | Chasek |
| 5,361,982 | A | 11/1994 | Liebl et al. |
| 5,388,101 | A | 2/1995 | Dinkins |
| 5,481,546 | A | 1/1996 | Dinkins |
| 5,502,339 | A | 3/1996 | Hartig |
| 5,544,036 | A | 8/1996 | Brown, Jr. et al. |
| 5,570,002 | A | 10/1996 | Castleman |
| 5,592,491 | A | 1/1997 | Dinkins |
| 5,640,153 | A | 6/1997 | Hildebrand et al. |
| 5,644,173 | A | 7/1997 | Elliason et al. |
| 5,675,503 | A | 10/1997 | Moe et al. |
| 5,696,695 | A | 12/1997 | Ehlers et al. |
| 5,721,936 | A | 2/1998 | Kikinis et al. |
| 5,926,776 | A | 7/1999 | Glorioso et al. |
| 5,973,481 | A | 10/1999 | Thompson et al. |
| 6,018,690 | A * | 1/2000 | Saito et al. .................... 700/295 |
| 6,078,785 | A | 6/2000 | Bush |
| 6,102,487 | A | 8/2000 | Oevreboe |
| 6,115,676 | A | 9/2000 | Rector et al. |
| 6,154,859 | A * | 11/2000 | Norizuki et al. ............. 714/47.1 |
| 6,216,956 | B1 | 4/2001 | Ehlers et al. |
| 6,233,327 | B1 | 5/2001 | Petite |
| 6,254,009 | B1 | 7/2001 | Proffitt et al. |
| 6,304,552 | B1 | 10/2001 | Chapman et al. |
| 6,366,217 | B1 | 4/2002 | Cunningham et al. |
| 6,374,101 | B1 | 4/2002 | Gelbien |
| 6,437,692 | B1 | 8/2002 | Petite et al. |
| 6,512,966 | B2 | 1/2003 | Lof et al. |
| 6,519,509 | B1 | 2/2003 | Nierlich et al. |
| 6,535,797 | B1 | 3/2003 | Bowles et al. |
| 6,577,962 | B1 | 6/2003 | Afshari |
| 6,601,033 | B1 | 7/2003 | Sowinski |
| 6,621,179 | B1 | 9/2003 | Howard |
| 6,622,097 | B2 | 9/2003 | Hunter |
| 6,622,925 | B2 | 9/2003 | Carner et al. |
| 6,633,823 | B2 | 10/2003 | Bartone et al. |
| 6,671,586 | B2 | 12/2003 | Davis et al. |
| 6,681,154 | B2 | 1/2004 | Nierlich et al. |
| 6,687,574 | B2 | 2/2004 | Pietrowicz et al. |
| 6,732,055 | B2 | 5/2004 | Bagepalli et al. |
| 6,778,882 | B2 | 8/2004 | Spool et al. |
| 6,784,807 | B2 | 8/2004 | Petite et al. |
| 6,832,135 | B2 | 12/2004 | Ying |
| 6,834,811 | B1 | 12/2004 | Huberman et al. |
| 6,836,737 | B2 | 12/2004 | Petite et al. |
| 6,862,498 | B2 | 3/2005 | Davis et al. |
| 6,865,450 | B2 | 3/2005 | Masticola et al. |
| 6,868,293 | B1 | 3/2005 | Schurr et al. |
| 6,879,059 | B2 | 4/2005 | Sleva |
| 6,891,838 | B1 | 5/2005 | Petite et al. |
| 6,904,336 | B2 | 6/2005 | Raines et al. |
| 6,906,617 | B1 | 6/2005 | Van Der Meulen |
| 6,909,942 | B2 | 6/2005 | Andarawis et al. |
| 6,914,533 | B2 | 7/2005 | Petite |
| 6,914,893 | B2 | 7/2005 | Petite |
| 6,934,316 | B2 | 8/2005 | Cornwall et al. |
| 6,961,641 | B1 * | 11/2005 | Forth et al. .................... 700/295 |
| 6,990,593 | B2 | 1/2006 | Nakagawa |
| 7,003,640 | B2 | 2/2006 | Mayo et al. |
| 7,019,667 | B2 | 3/2006 | Petite et al. |
| 7,035,719 | B2 | 4/2006 | Howard et al. |
| 7,039,532 | B2 | 5/2006 | Hunter |
| 7,053,767 | B2 | 5/2006 | Petite et al. |
| 7,088,014 | B2 | 8/2006 | Nierlich et al. |
| 7,103,511 | B2 | 9/2006 | Petite |
| 7,123,994 | B2 | 10/2006 | Weik et al. |
| 7,133,750 | B2 | 11/2006 | Raines et al. |
| 7,141,321 | B2 | 11/2006 | McArthur et al. |
| 7,177,728 | B2 | 2/2007 | Gardner |
| 7,181,320 | B2 | 2/2007 | Whiffen et al. |
| 7,184,861 | B2 | 2/2007 | Petite |
| 7,200,134 | B2 | 4/2007 | Proctor, Jr. et al. |
| 7,206,670 | B2 | 4/2007 | Pimputkar et al. |
| 7,209,804 | B2 | 4/2007 | Curt et al. |
| 7,209,840 | B2 | 4/2007 | Petite et al. |
| 7,233,843 | B2 | 6/2007 | Budhraja et al. |
| 7,263,073 | B2 | 8/2007 | Petite et al. |
| 7,274,975 | B2 | 9/2007 | Miller |
| 7,289,887 | B2 | 10/2007 | Rodgers |
| 7,295,128 | B2 | 11/2007 | Petite |
| 7,305,282 | B2 | 12/2007 | Chen |
| 7,313,465 | B1 | 12/2007 | O'Donnell |
| 7,343,341 | B2 | 3/2008 | Sandor et al. |
| 7,345,998 | B2 | 3/2008 | Cregg et al. |
| 7,346,463 | B2 | 3/2008 | Petite et al. |
| 7,366,164 | B1 | 4/2008 | Habib et al. |
| 7,397,907 | B2 | 7/2008 | Petite |
| 7,406,364 | B2 | 7/2008 | Andren et al. |
| 7,412,304 | B2 | 8/2008 | Uenou |
| 7,424,527 | B2 | 9/2008 | Petite |
| 7,440,871 | B2 | 10/2008 | Mcconnell et al. |
| 7,451,019 | B2 | 11/2008 | Rodgers |
| 7,468,661 | B2 | 12/2008 | Petite et al. |
| 7,480,501 | B2 | 1/2009 | Petite |
| 7,486,681 | B2 | 2/2009 | Weber |
| 7,528,503 | B2 | 5/2009 | Rognli et al. |
| 7,536,240 | B2 | 5/2009 | Mcintyre et al. |
| 7,541,941 | B2 | 6/2009 | Bogolea et al. |
| 7,565,227 | B2 * | 7/2009 | Richard et al. ................ 700/291 |
| 7,650,425 | B2 | 1/2010 | Davis et al. |
| 7,697,492 | B2 | 4/2010 | Petite |
| 7,711,796 | B2 | 5/2010 | Gutt et al. |
| 7,715,951 | B2 * | 5/2010 | Forbes et al. ................. 700/291 |
| 7,738,999 | B2 | 6/2010 | Petite |
| 7,739,378 | B2 | 6/2010 | Petite |
| 8,010,812 | B2 * | 8/2011 | Forbes et al. ................. 713/300 |
| 8,032,233 | B2 * | 10/2011 | Forbes et al. ................... 700/22 |
| 8,145,361 | B2 * | 3/2012 | Forbes et al. ................. 700/291 |
| 8,260,470 | B2 * | 9/2012 | Forbes et al. ................. 700/295 |
| 8,307,225 | B2 | 11/2012 | Forbes, Jr. et al. |
| 8,315,717 | B2 | 11/2012 | Forbes, Jr. et al. |
| 8,359,124 | B2 | 1/2013 | Zhou et al. |
| 8,364,609 | B2 | 1/2013 | Ozog |
| 8,417,569 | B2 | 4/2013 | Gross |
| 8,457,802 | B1 | 6/2013 | Steven et al. |
| 8,473,111 | B1 | 6/2013 | Shankar et al. |
| 8,571,930 | B1 | 10/2013 | Galperin |
| 8,583,520 | B1 | 11/2013 | Forbes, Jr. |
| 8,588,991 | B1 * | 11/2013 | Forbes, Jr. ..................... 700/295 |
| 2001/0030468 | A1 | 10/2001 | Anderson et al. |
| 2001/0038343 | A1 | 11/2001 | Meyer et al. |
| 2002/0019758 | A1 | 2/2002 | Scarpelli |
| 2002/0019802 | A1 | 2/2002 | Malme et al. |
| 2002/0035496 | A1 | 3/2002 | Fukushima et al. |
| 2002/0109607 | A1 | 8/2002 | Cumeralto et al. |
| 2002/0138176 | A1 | 9/2002 | Davis et al. |
| 2002/0143693 | A1 | 10/2002 | Soestbergen et al. |
| 2002/0161648 | A1 | 10/2002 | Mason et al. |
| 2002/0198629 | A1 | 12/2002 | Ellis |
| 2003/0009705 | A1 | 1/2003 | Thelander et al. |
| 2003/0036820 | A1 | 2/2003 | Yellepeddy et al. |
| 2003/0083980 | A1 | 5/2003 | Satake |
| 2003/0144864 | A1 | 7/2003 | Mazzarella |
| 2003/0149937 | A1 | 8/2003 | Mcelfresh et al. |
| 2003/0176952 | A1 | 9/2003 | Collins et al. |
| 2003/0225483 | A1 | 12/2003 | Santinato et al. |
| 2003/0229572 | A1 | 12/2003 | Raines et al. |
| 2003/0233201 | A1 | 12/2003 | Horst et al. |
| 2004/0006439 | A1 | 1/2004 | Hunter |
| 2004/0024483 | A1 | 2/2004 | Holcombe |
| 2004/0044571 | A1 | 3/2004 | Bronnimann et al. |
| 2004/0088083 | A1 | 5/2004 | Davis et al. |

(56) **References Cited**

U.S. PATENT DOCUMENTS


2004/0107025 A1 6/2004 Ransom et al.
2004/0128266 A1 7/2004 Yellepeddy et al.
2004/0153170 A1 8/2004 Santacatterina et al.
2004/0158478 A1 8/2004 Zimmerman
2004/0162793 A1 8/2004 Scott et al.
2004/0193329 A1 9/2004 Ransom et al.
2004/0225514 A1 11/2004 Greenshields et al.
2004/0230533 A1 11/2004 Benco
2005/0021397 A1 1/2005 Cui et al.
2005/0033481 A1 2/2005 Budhraja et al.
2005/0055432 A1 3/2005 Rodgers
2005/0065742 A1 3/2005 Rodgers
2005/0080772 A1 4/2005 Bem
2005/0096856 A1 5/2005 Lubkeman et al.
2005/0096857 A1* 5/2005 Hunter ............................ 702/60
2005/0096979 A1 5/2005 Koningstein
2005/0097204 A1 5/2005 Horowitz et al.
2005/0125243 A1 6/2005 Villalobos
2005/0127680 A1 6/2005 Lof et al.
2005/0138432 A1* 6/2005 Ransom et al. ............... 713/201
2005/0192711 A1 9/2005 Raines et al.
2005/0192713 A1 9/2005 Weik et al.
2005/0216302 A1 9/2005 Raji et al.
2005/0216580 A1 9/2005 Raji et al.
2005/0234600 A1 10/2005 Boucher et al.
2005/0240314 A1 10/2005 Martinez
2005/0240315 A1 10/2005 Booth et al.
2005/0246190 A1 11/2005 Sandor et al.
2005/0267642 A1 12/2005 Whiffen et al.
2005/0276222 A1 12/2005 Kumar et al.
2005/0288954 A1 12/2005 Mccarthy et al.
2006/0020544 A1 1/2006 Kaveski
2006/0020596 A1 1/2006 Liu et al.
2006/0022841 A1 2/2006 Hoiness et al.
2006/0025891 A1 2/2006 Budike
2006/0031934 A1 2/2006 Kriegel
2006/0064205 A1 3/2006 Ying
2006/0069616 A1 3/2006 Bau
2006/0106635 A1 5/2006 Ulrich et al.
2006/0142900 A1 6/2006 Rothman et al.
2006/0142961 A1 6/2006 Johnson et al.
2006/0161450 A1 7/2006 Carey et al.
2006/0168191 A1 7/2006 Ives
2006/0190354 A1 8/2006 Meisel et al.
2006/0195334 A1 8/2006 Reeb et al.
2006/0212350 A1 9/2006 Ellis et al.
2006/0224615 A1 10/2006 Korn et al.
2006/0271244 A1 11/2006 Cumming et al.
2006/0271314 A1 11/2006 Hayes
2006/0276938 A1 12/2006 Miller
2006/0282328 A1 12/2006 Gerace et al.
2007/0021874 A1 1/2007 Rognli et al.
2007/0038563 A1 2/2007 Ryzerski
2007/0058453 A1 3/2007 Shaffer et al.
2007/0058629 A1 3/2007 Luft
2007/0070895 A1 3/2007 Narvaez
2007/0085702 A1 4/2007 Walters et al.
2007/0091900 A1 4/2007 Asthana et al.
2007/0100503 A1 5/2007 Balan et al.
2007/0150353 A1 6/2007 Krassner et al.
2007/0156621 A1 7/2007 Wright et al.
2007/0156887 A1 7/2007 Wright et al.
2007/0174114 A1 7/2007 Bigby et al.
2007/0192333 A1 8/2007 Ali
2007/0203722 A1 8/2007 Richards et al.
2007/0204176 A1 8/2007 Shaffer et al.
2007/0213878 A1 9/2007 Chen
2007/0214118 A1 9/2007 Schoen et al.
2007/0214132 A1 9/2007 Grubb et al.
2007/0255457 A1 11/2007 Whitcomb et al.
2007/0260540 A1 11/2007 Chau et al.
2007/0286210 A1 12/2007 Gutt et al.
2007/0291644 A1 12/2007 Roberts et al.
2007/0299562 A1 12/2007 Kates
2008/0010212 A1 1/2008 Moore et al.
2008/0015976 A1 1/2008 Sandor et al.
2008/0040223 A1 2/2008 Bridges et al.
2008/0091625 A1 4/2008 Kremen
2008/0104026 A1 5/2008 Koran
2008/0109387 A1 5/2008 Deaver et al.
2008/0130673 A1 6/2008 Cregg et al.
2008/0147465 A1 6/2008 Raines et al.
2008/0154801 A1 6/2008 Fein et al.
2008/0165714 A1 7/2008 Dettinger et al.
2008/0172312 A1 7/2008 Synesiou et al.
2008/0177423 A1 7/2008 Brickfield et al.
2008/0177678 A1 7/2008 Di Martini et al.
2008/0195462 A1 8/2008 Magdon-Ismail et al.
2008/0224892 A1 9/2008 Bogolea et al.
2008/0231114 A1 9/2008 Tolnar et al.
2008/0238710 A1 10/2008 Tolnar et al.
2008/0249832 A1 10/2008 Richardson et al.
2008/0255899 A1 10/2008 Mcconnell et al.
2008/0263025 A1 10/2008 Koran
2008/0270223 A1 10/2008 Collins et al.
2008/0281473 A1* 11/2008 Pitt ............................... 700/291
2008/0306824 A1 12/2008 Parkinson
2008/0306830 A1 12/2008 Lasa et al.
2008/0319893 A1 12/2008 Mashinsky et al.
2009/0012996 A1 1/2009 Gupta et al.
2009/0018884 A1 1/2009 Mcconnell et al.
2009/0024718 A1 1/2009 Anagnostopoulos et al.
2009/0043519 A1 2/2009 Bridges et al.
2009/0043520 A1 2/2009 Pollack et al.
2009/0045804 A1 2/2009 Durling et al.
2009/0055031 A1* 2/2009 Slota et al. .................... 700/287
2009/0062970 A1 3/2009 Forbes, Jr. et al.
2009/0063228 A1 3/2009 Forbes, Jr.
2009/0088907 A1 4/2009 Lewis et al.
2009/0112701 A1 4/2009 Turpin et al.
2009/0112758 A1 4/2009 Herzig
2009/0124241 A1 5/2009 Krishnaswamy et al.
2009/0125462 A1 5/2009 Krishnaswamy et al.
2009/0135836 A1 5/2009 Veillette
2009/0138362 A1 5/2009 Schroedl et al.
2009/0187344 A1 7/2009 Brancaccio et al.
2009/0187499 A1 7/2009 Mulder et al.
2009/0198384 A1 8/2009 Ahn
2009/0228335 A1 9/2009 Niyogi et al.
2009/0240381 A1 9/2009 Lane
2009/0240677 A1 9/2009 Parekh et al.
2009/0281673 A1 11/2009 Taft
2009/0319415 A1 12/2009 Stoilov et al.
2010/0076835 A1 3/2010 Silverman
2010/0106575 A1 4/2010 Bixby et al.
2010/0106641 A1 4/2010 Chassin et al.
2010/0138452 A1 6/2010 Henkin et al.
2010/0169175 A1 7/2010 Koran
2010/0191862 A1 7/2010 Forbes, Jr. et al.
2010/0217452 A1 8/2010 Mccord et al.
2010/0217549 A1 8/2010 Galvin et al.
2010/0217550 A1 8/2010 Crabtree et al.
2010/0217642 A1 8/2010 Crubtree et al.
2010/0218108 A1 8/2010 Crabtree et al.
2010/0235008 A1 9/2010 Forbes, Jr. et al.
2010/0274407 A1 10/2010 Creed
2010/0293045 A1 11/2010 Burns et al.
2010/0306033 A1 12/2010 Oved et al.
2010/0332373 A1 12/2010 Crabtree et al.
2011/0025556 A1 2/2011 Bridges et al.
2011/0055036 A1 3/2011 Helfan
2011/0060474 A1 3/2011 Schmiegel et al.
2011/0080044 A1 4/2011 Schmiegel
2011/0106729 A1 5/2011 Billingsley et al.
2011/0115302 A1* 5/2011 Slota et al. ...................... 307/87
2011/0133655 A1* 6/2011 Recker et al. ................. 315/159
2011/0145061 A1 6/2011 Spurr et al.
2011/0161250 A1 6/2011 Koeppel et al.
2011/0172841 A1* 7/2011 Forbes, Jr. ..................... 700/292
2011/0185303 A1 7/2011 Katagi et al.
2011/0196546 A1 8/2011 Muller et al.
2011/0204717 A1 8/2011 Shaffer
2011/0208366 A1 8/2011 Taft
2011/0235656 A1 9/2011 Pigeon

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 2011/0251730 | A1* | 10/2011 | Pitt | 700/291 |
| 2011/0257809 | A1* | 10/2011 | Forbes et al. | 700/297 |
| 2011/0258022 | A1* | 10/2011 | Forbes et al. | 705/7.39 |
| 2012/0196482 | A1 | 8/2012 | Stokoe | |
| 2012/0205977 | A1 | 8/2012 | Shin et al. | |
| 2012/0221162 | A1 | 8/2012 | Forbes, Jr. | |
| 2012/0223840 | A1 | 9/2012 | Guymon et al. | |
| 2012/0232816 | A1 | 9/2012 | Oh et al. | |
| 2012/0239218 | A1* | 9/2012 | Forbes, Jr. | 700/295 |
| 2012/0259760 | A1 | 10/2012 | Sgouridis et al. | |
| 2012/0296799 | A1 | 11/2012 | Playfair et al. | |
| 2012/0316697 | A1 | 12/2012 | Boardman et al. | |
| 2013/0035802 | A1 | 2/2013 | Khaitan et al. | |
| 2013/0079939 | A1* | 3/2013 | Darden et al. | 700/291 |
| 2013/0079943 | A1* | 3/2013 | Darden et al. | 700/297 |
| 2013/0144768 | A1 | 6/2013 | Rohrbaugh | |
| 2014/0025486 | A1 | 1/2014 | Bigby et al. | |
| 2014/0039703 | A1* | 2/2014 | Forbes, Jr. | 700/286 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| JP | 2001306839 | A | 11/2001 |
| JP | 2004180412 | A | 6/2004 |
| JP | 2004248174 | A | 9/2004 |
| JP | 2006060911 | A | 3/2006 |
| JP | 2007132553 | A | 5/2007 |
| KR | 2005001584 | | 1/2005 |
| KR | 2006001584 | | 1/2005 |
| KR | 20050045272 | A | 5/2005 |
| KR | 20060036171 | A | 4/2006 |
| KR | 20070008321 | A | 1/2007 |
| KR | 100701298 | B1 | 3/2007 |
| KR | 20070098172 | A | 10/2007 |
| KR | 20080112692 | A | 12/2008 |
| WO | 2007136456 | A | 11/2007 |
| WO | 2008125696 | A | 10/2008 |

OTHER PUBLICATIONS

Cazalet, E. G. & Samuelson, R. D. 2000, "The power market: E-commerce for all electricity products", Public Utilities Fortnightly, vol. 138, No. 3, pp. 42-47.

Kamat R, Oren S. Two-settlement Systems for Electricity Markets under Network Uncertainty and Market Power. Journal of Regulatory Economics [serial online]. Jan. 2004; 25(1): 5-37.

Thomas, K. 2000, "Energy e-commerce takes off", Energy Markets, vol. 5, No. 4, pp. 26.

Amendment and Response dated Oct. 15, 2009, U.S. Appl. No. 11/895,909 (14 pages).

B.J. Kirby, Spinning Reserve from Responsive Loads, Oak Ridge National Laboratory, United States Dept. of Energy, Mar. 2003 (54 pages).

C.W. Gellings and W.M. Smith, Integrating Demand-Side Management into Utility Planning, Proceedings of the IEEE, vol. 77, Issue: 6, Jun. 1989, pp. 908-918 (Abstract only).

Eric Hirst and Brendan Kirby, Opportunities for Demand Participation in New England Contingency-Reserve Markets, New England Demand Response Initiative, Feb. 2003 (15 pages).

Eric Hirst and Richard Cowart, Demand Side Resources and Reliability, New England Demand Response Initiative, Mar. 20, 2002 (32 pages).

International Search Report and Written Opinion dated Dec. 20, 2010 issoed by the United States Patent and Trademark Office as International Searching Authority in connection with related International Application No. PCT/US10/02676 (20 pages).

International Search Report and Written Opinion dated Dec. 21, 2010 issued by the Korean Intellectual Property Office as International Searching Authority in connection with related International Application No. PCT/US2010/034247 (7 pages).

International Search Report and Written Opinion dated Dec. 22, 2010 issued by the Korean Intellectual Property Office as International Searching Authority in connection with related International Application No. PCT/US2010/034418 (7 pages).

International Search Report and Written Opinion dated Dec. 22. 2010 issued by the Korean Intellectual Property Office as International Searching Authority in connection with related International Application No. PCT/US2010/034409 (7 pages).

International Search Report and Written Opinion dated Feb. 25, 2009 issued by the Korean Intellectual Property Office as International Searching Authority in connection with international Application No. PCT/US2008/01099 (7 pages).

International Search Report and Written Opinion dated Feb. 25, 2009 issued by the Korean Intellectual Property Office as International Searching Authority in connection with International Application No. PCT/US2008/010199 (7 pages).

International Search Report and Written Opinion dated Jul. 15, 2010 issued by the United States Patent and Trademark Office as International Searching Authority in connection with International Application No. PCT/US10/01354 (10 pages).

International Search Report and Written Opinion dated Jul. 23, 2010 issued by the United States Patent and Trademark Office as International Searching Authority in connection with International Application No. PCT/US10/01489 (11 pages).

International Search Report and Written Opinion dated Mar. 6, 2009 issued by the United States Patent and Trademark Office as International Searching Authority in connection with related International Application No. PCT/US10/010200 (8 pages).

International Search Report and Written Opinion dated May 31, 2011 issued by the Korean Intellectual Property Office as International Searching Authority in connection with related International Application No. PCT/US2010/002709 (7 pages).

International Search Report and Written Opinion dated Nov. 30, 2010 issued by the Korean Intellectual Property Office as International Searching Authority in connection with related International Application No. PCT/US2010/034395 (8 pages).

Kathleen Spees and Lester B. Lave, Demand Response and Electricity Market Efficiency, The Electricity Journal, vol. 20, Issue 3, Apr. 2007 (online Mar. 27, 2007), pp. 69-85 (Abstract only).

L.T. Anstine, R.E. Burke, J.E. Casey, R. Holgate, R.S. John, and H.G. Stewart, Application of Probability Methods to the Determination of Spinning Reserve Requirements for the Pennsylvania-New Jersey-Maryland Interconnection; IEEE Transactions on Power Apparatus and Systems, vol. 82, Issue 68, Oct. 1963, pp. 726-735 (Abstract only).

M. Rashidi-Nejad, Y.H. Song, and M.H. Javidi-Dasht-Bayaz, Operating Reserve Provision in Deregulated Power Markets, IEEE Power Engineering Society Winter Meeting, vol. 2, 2002, pp. 1305-1310 (Abstract only).

Mashiro Inoue, Toshiyasu Higuma, Yoshiaki Ito, Noriyuki Kushiro and Hitoshi Kubota, Network Architecture for Home Energy Management System, IEEE Transactions on Consumer Electronics, vol. 49, Issue 3, Aug. 2003, pp. 606-613 (8 pages).

Michael Ahlheim and Friedrich Schneider; "Allowing for Household Preferences in Emission Trading, A Contribution to the Climate Policy Debate"; Environmental and Resource Economics, vol. 21, pp. 317-342; Kluwer Academic Publishers; The Netherlands; 2002.

Notice of Allowability dated Aug. 31, 2010, as entered in related U.S. Appl. No. 12/715,124 (5 pages).

Notice of Allowability dated Dec. 23, 2009, U.S. Appl. No. 11/895,909 (4 pages).

Office Action dated Jan. 7, 2011 as issued by the Australian Patent Office (Australian Government IP Australia) in connection with related Australian Application No. 2008296979 (2 pages).

Office Action dated Jul. 17, 2009, U.S. Appl. No. 11/895,909 (11 pages).

Office Action dated May 10, 2011 as issued by the Japanese Patent Office in connection with counterpart Japanese Applicatioin No. 2010/522953 (3 pages).

Olivier Rousse; "Environment and economic benefits resulting from citizens' participation in CO.sub.2 emissions trading: An efficient alternative solution to the voluntary compensation of CO.sub.2 emissions", Energy Policy 36 (2008), pp. 388-397; Oct. 29, 2007 (online).

(56) **References Cited**

OTHER PUBLICATIONS

Pablo A. Ruiz and Peter W. Sauer, Valuation of Reserve Services, IEEE Proceedings of the 41 .sub.st Hawaii International Conference on System Sciences, 2008 (9 pages).
Paul Darbee, Insteon Compared, SmartLabs, Inc., Jan. 2, 2006, 69 pages.
Paul Darbee, Insteon The Details, Smarthome, Inc., Aug. 11, 2005, 68 pages.
Zhu Jinxiang, G. Jordan, and S. Ihara, The Market for Spinning Reserve and Its Impacts on Energy Prices, IEEE Power Engineering Society Winter Meeting, vol. 2, 2000, pp. 1202-1207 (Abstract Only).
Byers J. Risk Management and Monetizing the Commodity Storage Option. Natural Gas & Electricity [serial online]. Jul. 2005; 21 (12):1-8. Available from: Business Source Complete, Ipswich, MA.
Galvin Electricity Institute: Frequently Asked Questions, printed Apr. 23, 2014, same page available through archive.org unchanged Mar. 1, 2008.
GE Digital Energy Residential Electrical Metering Brochure. Sep. 12, 2012. https://web.archive.org/web/20120912144353/http://www.gedigitalenergry.com/products/brochures/1210-Family.pdf.
Illinois General Assembly: Public Act 094-0977, Effective Date: Jun. 30, 2006.
Kamat R., Oren S. Two-Settlement Systems for Electricity Markets under Network Uncertainty and Market Power Journal of Regulatory Economics [serial online]. Jan. 2004; 25(1):5-37.
Lobsenz G. Maryland Regulators Reject BG&E Smart Grid Proposal. Energy Daily [serial online]. Jun. 23, 2010; (118): 3. Available from: Business Source Complete, Ipswich, MA.

* cited by examiner


10
90
20
80
400
BPL, Ethernet, or RF Control
Residential or Smart Breaker Load Center
Network
Active Load Client
300
60
100
Smart Appliance
Active Load Director Server
70
Washer/ Dryer
Hot Water Heater
HVAC Unit
Pool Pump
200
Utility (s) Data Energy Control Center
30
40
50

FIG. 1


100
Active Load Director Server
Customer Reports Application
118
Service Dispatch Manager
126
Trouble Ticket Generator
128
Call Center Manager
130
Carbon Savings Application
132
Utility P&C Data Base
134
Customer Rewards Program
150
Web Browser Interface
114
Customer Sign Up Application
116
Customer Personal Settings
138
Active Load Director Data Base
124
Power Savings Application
120
Active Load Client Diagnostic Manager
122
Read Meter Application
136
UCC Command Processor
104
Security I/F
102
Master Event Manager
106
Active Load Client Manager
108
Security Device Mgmt
140
Security Interface
110
Active Load Client Interface
112
Utility Control Center
200
Active Load Client
300

FIG. 2


Current Sensor
450
452
Smart Meter
460
300
Smart Meter Interface
322
Security Device Interface
328
IP Device Interface
330
Local IP Connected Device(s)
440
To/From ALD Server 100
Communications Interface
308
IP Layer 3 Router
320
Security Interface
310
IP Based Communication Converter
312
Device Control Manager
314
B1-BN Counter Manager
316
Report Trigger
318
Active Load Client
Smart Breaker Module Controller
306
Smart Device Interface
324
Linux
302
Status Response
304
400
B1
402
B2
404
B3
406
B4
408
B5
410
B6
412
SMART BREAKER MODULE
420
One or More Power Management Enabled Devices

*FIG. 3*



ENTER
500
502
RECEIVE TRANSACTION
503
NEW SERVICE
TRANSACTION TYPE?
SERVICE
504
SCHEDULE SERVICE PERSON FOR INITIAL INSTALLATION
512
SCHEDULE SERVICE PERSON FOR SERVICE CALL
506
NOTIFY SERVICE PERSON OF SERVICE CALL VIA EMAIL OR INSTANT MESSAGING
514
SEND "DIAGNOSE" TRANSACTION TO ALC DIAGNOSTIC MANAGER
508
RECEIVE INSTALLATION COMPLETE REPORT FROM SERVICE PERSON
516
NOTIFY SERVICE PERSON OF SERVICE CALL AND RESULTS OF DIAGNOSTIC PROCEDURE USING TROUBLE TICKET
510
SEND "UPDATE" TRANSACTION TO ALC MANAGER
EXIT


*FIG. 4*


600
ENTER
602
RECEIVE "UPDATE" TRANSACTION FROM SERVICE DISPATCH MANAGER
604
SEND QUERY REQUEST TO ALC AT SPECIFIED IP ADDRESS
606
RECEIVE REPLY TO QUERY REQUEST
608
UPDATE ALD DATABASE WITH LATEST STATUS INFORMATION OBTAINED FROM ALC
610
IS ALC FUNCTIONING PROPERLY?
NO
YES
612
SET CUSTOMER STATE TO ACTIVE
614
SEND "SERVICE" TRANSACTION TO SERVICE DISPATCH MANAGER
EXIT

*FIG. 5*



ENTER
700
TRACK CURRENT POWER USAGE WITHIN EACH UTILITY
702
RECEIVE TRANSACTION
704
TRANSACTION TYPE?
706
"CUT"
"END EVENT"
"HOW MUCH"
PLACE UTILITY IN MANAGED STATE
708
DETERMINE AMOUNT OF POWER THAT MAY BE REMOVED BY ACCESSING CURRENT USAGE INFORMATION FOR UTILITY
712
SEND "CUT" TRANSACTION TO ALC MANAGER WITH NUMBER OF MEGAWATTS TO BE REMOVED FROM SYSTEM
710
NOTIFY CUSTOMERS THAT POWER MANAGEMENT EVENT IN PROCESS
711
SET STATE OF EVENT AS "PENDING"
714
SEND "END EVENT" TRANSACTION TO ALC MANAGER
716
RECEIVE "EVENT ENDED" TRANSACTION FROM ALC MANAGER
718
SET STATE OF UTILITY TO "NOT MANAGED"
720
NOTIFY CUSTOMERS THAT POWER MANAGEMENT EVENT HAS ENDED
722
SEND "EVENT ENDED" TRANSACTION TO POWER SAVINGS APPLICATION
724
EXIT


*FIG. 6*


ENTER
800
802
TRACK STATE OF EVERY ALC HAVING AN IP ADDRESS WITHIN SPECIFIED UTILITY
804
LOG INFORMATION RECEIVED FROM EACH ALC IN ALS DATABASE IN RECORD CORRESPONDING TO SPECIFIC ALC
806
RECEIVE TRANSACTION
808
TRANSACTION?
"CUT"
"END EVENT"
"TURN ON"
810
ENTER "MANAGE STATE"
812
DETERMINE WHICH ALC AND ASSOCIATED DEVICES TO TURN OFF
814
SEND "TURN OFF" TRANSACTION TO SELECTED ALC'S WITH LIST OF INDICATED DEVICES TO TURN OFF
816
LOG AMOUNT OF POWER AND TIMESTAMP IN ALS DB FOR EACH ALC REDUCED
818
SCHEDULE "TURN ON" TRANSACTION TO ALC MANAGER
820
FIND ONE OR MORE ALC'S IN "ON" STATE WHICH WILL SAVE THE EQUIVALENT POWER AS ALC CURRENTLY IN "OFF" STATE
822
SEND "TURN OFF" TRANSACTION TO EACH ALC NECESSARY TO SAVE EQUIVALENT POWER
824
SEND "TURN ON" TRANSACTION TO ALC FOR WHICH ORIGINAL "TURN ON" TRANSACTION WAS RECEIVED
826
LOG "TURN ON" TRANSACTION TIME IN ALD DATABASE
828
SEND "TURN ON" TRANSACTION TO EACH ALC CURRENTLY IN "OFF" STATE
830
ALL ALC'S ON?
NO
YES
832
SEND "EVENT ENDED" TRANSACTION TO MASTER EVENT MANAGER
EXIT

*FIG. 7*


900
ENTER
902
RECEIVE "EVENT ENDED" TRANSACTION FROM MASTER EVENT MANAGER
904
ACCESS ALS DATABASE FOR EACH ALC MANAGED DURING "CUT" TRANSACTION
906
STORE TOTAL AMOUNT OF POWER SAVED AND RELATED INFORMATION FOR SPECIFIC UTILTY DURING PREVIOUS "CUT" TRANSACTION IN UTILITY P&C DATABASE
908
INVOKE CARBON SAVINGS APPLICATION
EXIT

*FIG. 8*

# METHOD AND APPARATUS FOR ACTIVELY MANAGING CONSUMPTION OF ELECTRIC POWER OVER AN ELECTRIC POWER GRID

## CROSS-REFERENCE TO RELATED APPLICATIONS

This non-provisional utility patent application claims priority from and is a continuation-in-part of U.S. application Ser. No. 13/172,389, filed Jun. 29, 2011, which is a continuation of U.S. application Ser. No. 12/715,195, filed Mar. 1, 2010, now U.S. Pat. No. 8,032,233, which is a divisional of U.S. application Ser. No. 11/895,909 filed Aug. 28, 2007, now U.S. Pat. No. 7,715,951, all of which are incorporated herein by reference in their entirety.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates generally to the field of electrical power load control systems and more particularly to a method and system for actively controlling power load management for individual customers and optionally tracking power savings for both the individual customer as well as the overall electric utility.

2. Description of Related Art

The increased awareness of the impact of carbon emissions from the use of fossil fueled electric generation combined with the increased cost of producing peak power during high load conditions has increased the need for alternative solutions utilizing load control as a mechanism to defer, or in some cases eliminate, the need for the deployment of additional generation capacity by electric utilities. Existing electric utilities are pressed for methods to defer or eliminate the need for construction of fossil-based electricity generation. Today, a patchwork of systems exist to implement demand response load management programs, whereby various radio subsystems in various frequency bands utilize "one-way" transmit only methods of communication. Under these programs, RF controlled relay switches are typically attached to a customer's air conditioner, water heater, or pool pump. A blanket command is sent out to a specific geographic area whereby all receiving units within the range of the transmitting station (e.g., typically a paging network) are turned off during peak hours at the election of the power utility. After a period of time when the peak load has passed, a second blanket command is sent to turn on those devices that have been turned off.

While tele-metering has been used for the express purpose of reporting energy usage, no techniques exist for calculating power consumption, carbon gas emissions, sulfur dioxide (SO.sub.2) gas emissions, and/or nitrogen dioxide (NO.sub.2) emissions, and reporting the state of a particular device under the control of a two-way positive control load management device. In particular, one way wireless communications devices have been utilized to de-activate electrical appliances, such as heating, ventilation, and air-conditioning (HVAC) units, water heaters, pool pumps, and lighting, from an existing electrical supplier or distribution partner's network. These devices have typically been used in combination with wireless paging receivers that receive "on" or "off" commands from a paging transmitter. Additionally, the one-way devices are typically connected to a serving electrical supplier's control center via landline trunks, or in some cases, microwave transmission to the paging transmitter. The customer subscribing to the load management program receives a discount for allowing the serving electrical supplier (utility)



to connect to their electrical appliances and deactivate those appliances during high energy usage periods.

While one-way devices are generally industry standard and relatively inexpensive to implement, the lack of a return path from the receiver, combined with the lack of information on the actual devices connected to the receiver, make the system highly inefficient for measuring the actual load shed to the serving utility. While the differential current draw is measurable on the serving electric utility's transmission lines, the actual load shed is approximate and the location of the load deferral is approximated at the control center of the serving utility.

One exemplary tele-metering system is disclosed in U.S. Pat. No. 6,891,838 B1. This patent describes details surrounding a mesh communication of residential devices and the reporting and control of those devices, via WANs, to a computer. The stated design goal in this patent is to facilitate the "monitoring and control of residential automation systems." This patent does not explain how a serving utility or customer could actively control the devices to facilitate the reduction of electricity. In contrast, this patent discloses techniques that could be utilized for reporting information that is being displayed by the serving utility's power meter (as do many other prior applications in the field of tele-metering).

An additional exemplary tele-metering system is disclosed in U.S. Patent Application Publication No. 2005/0240315 A1. The primary purpose of this published application is not to control utility loads, but rather "to provide an improved interactive system for remotely monitoring and establishing the status of a customer utility load." A stated goal of this publication is to reduce the amount of time utility field personnel have to spend in the field servicing meters by utilizing wireless technology.

Another prior art system is disclosed in U.S. Pat. No. 6,633,823 B2, which describes, in detail, the use of proprietary hardware to remotely turn off or turn on devices within a building or residence. While initially this prior art generally describes a system that would assist utilities in managing power load control, the prior art does not contain the unique attributes necessary to construct or implement a complete system. In particular, this patent is deficient in the areas of security, load accuracy of a controlled device, and methods disclosing how a customer utilizing applicable hardware might set parameters, such as temperature set points, customer preference information, and customer overrides, within an intelligent algorithm that reduces the probability of customer dissatisfaction and service cancellation or churn.

Attempts have been made to bridge the gap between one-way, un-verified power load control management systems and positive control verified power load control management systems. However, until recently, technologies such as smart breakers and command relay devices were not considered for use in residential and commercial environments primarily due to high cost entry points, lack of customer demand, and the cost of power generation relative to the cost of implementing load control.

One such gap-bridging attempt is described in U.S. Patent Application Publication No. US 2005/0065742 A1. This publication discloses a system and method for remote power management using IEEE 802 based wireless communication links. The system disclosed in this publication includes an on-premise processor (OPP), a host processor, and an end device. The host processor issues power management commands to the OPP, which in turn relays the commands to the end devices under its management. While the disclosed OPP does provide some intelligence in the power management system, it does not determine which end devices under its

control to turn-off during a power reduction event, instead relying on the host device to make such decision. For example, during a power reduction event, the end device must request permission from the OPP to turn on. The request is forwarded to the host device for a decision on the request in view of the parameters of the on-going power reduction event. The system also contemplates periodic reading of utility meters by the OPP and storage of the read data in the OPP for later communication to the host device. The OPP may also include intelligence to indicate to the host processor that the OPP will not be able to comply with a power reduction command due to the inability of a load under the OPP's control to be deactivated. However, neither the host processor nor the OPP determine which loads to remove in order to satisfy a power reduction command from an electric utility, particularly when the command is issued by one of several utilities under the management of a power management system. Further, neither the host processor nor the OPP tracks or accumulates power saved and/or carbon credits earned on a per customer or per utility basis for future use by the utility and/or customer. Still further, the system of this publication lacks a reward incentive program to customers based on their participation in the power management system. Still further, the system described in this publication does not provide for secure communications between the host processor and the OPP, and/or between the OPP and the end device. As a result, the described system lacks many features that may be necessary for a commercially viable implementation.

Therefore, a need exists for a system and method for active power load management for individual customers that is optionally capable of tracking power savings for the individual customer as well as the electric utility to thereby overcome the shortcomings of the prior art.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a block diagram of an IP-based active power load management system in accordance with an exemplary embodiment of the present invention.

FIG. **2** is a block diagram illustrating an exemplary active load director (ALD) server as shown in the system of FIG. **1**.

FIG. **3** is a block diagram illustrating an exemplary active load client and smart breaker module as shown in the system of FIG. **1**.

FIG. **4** is an operational flow diagram illustrating a method for automatically scheduling service calls in an active power load management system in accordance with one exemplary embodiment of the present invention.

FIG. **5** is an operational flow diagram illustrating a method for activating new subscribers in an active power load management system in accordance with another exemplary embodiment of the present invention.

FIG. **6** is an operational flow diagram illustrating a method for managing events occurring in an active power load management system in accordance with yet another exemplary embodiment of the present invention.

FIG. **7** is an operational flow diagram illustrating a method for actively reducing consumed power and tracking power savings on an individual customer basis in an active power load management system in accordance with another exemplary embodiment of the present invention.

FIG. **8** is an operational flow diagram illustrating a method for tracking cumulative power savings of an electric utility in an active power load management system during a power savings event in accordance with yet another exemplary embodiment of the present invention.

## DETAILED DESCRIPTION OF EXEMPLARY EMBODIMENTS

Before describing in detail exemplary embodiments that are in accordance with the present invention, it should be observed that the embodiments reside primarily in combinations of apparatus components and processing steps related to actively managing power loading on an individual subscriber basis and optionally tracking power savings incurred by both individual subscribers and an electric utility. Accordingly, the apparatus and method components have been represented where appropriate by conventional symbols in the drawings, showing only those specific details that are pertinent to understanding the embodiments of the present invention so as not to obscure the disclosure with details that will be readily apparent to those of ordinary skill in the art having the benefit of the description herein.

In this document, relational terms, such as "first" and "second," "top" and "bottom," and the like, may be used solely to distinguish one entity or element from another entity or element without necessarily requiring or implying any physical or logical relationship or order between such entities or elements. The terms "comprises," "comprising," or any other variation thereof are intended to cover a non-exclusive inclusion, such that a process, method, article, or apparatus that comprises a list of elements does not include only those elements, but may include other elements not expressly listed or inherent to such process, method, article, or apparatus. The term "plurality of" as used in connection with any object or action means two or more of such object or action. A claim element proceeded by the article "a" or "an" does not, without more constraints, preclude the existence of additional identical elements in the process, method, article, or apparatus that includes the element. Additionally, the term "ZigBee" refers to any wireless communication protocol adopted by the Institute of Electronics & Electrical Engineers (IEEE) according to standard 802.15.4 or any successor standard(s), the term "Wi-Fi" refers to any communication protocol adopted by the IEEE under standard 802.11 or any successor standard(s), the term "WiMax" refers to any communication protocol adopted by the IEEE under standard 802.16 or any successor standard(s), and the term "Bluetooth" refers to any short-range communication protocol implementing IEEE standard 802.15.1 or any successor standard(s). Additionally or alternatively to WiMax, other communications protocols may be used, including but not limited to a "1 G" wireless protocol such as analog wireless transmission, first generation standards based (IEEE, ITU or other recognized world communications standard), a "2-G" standards based protocoal such as "EDGE or CDMA 2000 also known as 1XRTT", a 3G based standard such as "High Speed Packet Access (HSPA) or Evolution for Data Only (EVDO), any accepted 4G standard such as "IEEE, ITU standards that include WiMax, Long Term Evolution "LTE" and its derivative standards, any Ethernet solution wireless or wired, or any proprietary wireless or power line carrier standards that communicate to a client device or any controllable device that sends and receives an IP based message.

It will be appreciated that embodiments of the invention described herein may be comprised of one or more conventional processors and unique stored program instructions that control the one or more processors to implement, in conjunction with certain non-processor circuits, some, most, or all of the functions for managing power load distribution and track-

ing individual subscriber power consumption and savings in one or more power load management systems as described herein. The non-processor circuits may include, but are not limited to, radio receivers, radio transmitters, antennas, modems, signal drivers, clock circuits, power source circuits, relays, meters, smart breakers, current sensors, and user input devices. As such, these functions may be interpreted as steps of a method to distribute information and control signals between devices in a power load management system. Alternatively, some or all functions could be implemented by a state machine that has no stored program instructions, or in one or more application specific integrated circuits (ASICs), in which each function or some combinations of functions are implemented as custom logic. Of course, a combination of the two approaches could be used. Thus, methods and means for these functions have been described herein. Further, it is expected that one of ordinary skill in the art, notwithstanding possibly significant effort and many design choices motivated by, for example, available time, current technology, and economic considerations, when guided by the concepts and principles disclosed herein, will be readily capable of generating such software instructions, programs and integrated circuits (ICs), and appropriately arranging and functionally integrating such non-processor circuits, without undue experimentation.

Recently, the IEEE has released improved WiMax wireless standards that have facilitated the consideration of new technologies to improve the response and control of power load control devices employing smart breaker technologies. Embodiments of the present invention expand upon and enhance prior technologies by, among other things, employing WiMax or IP-based load control in a system with the ability to monitor, in real time, the amount of power deferred (or carbon, SO.sub.2, or NO.sub.2 eliminated). These improvements allow new options for electric utilities to defer or invest in new power generation that is friendlier to the environment.

IP-based power management is advantageous over existing systems for many reasons. For example, positive control allows a system controller to receive a response from an end device installed at a customer location, which indicates that the actual target device has turned "off" or "on." Additionally, each equipment identifier is unique and each IP address is either dynamically assigned when the device is activated (e.g., through use of the dynamic host configuration protocol (DHCP)) or statically assigned by the serving IP network, thereby providing enhanced security to protect against an act of random terrorism or sabotage inadvertently shutting down power services. Existing power management systems, including those utilizing radio subsystems, do not address security problems adequately and thus are more likely susceptible to hostile or malicious acts.

IP-based systems are also bandwidth or network efficient. For example, IP devices are controlled via the 7-layer Open Systems Interconnection (OSI) model whereby the payload of each packet can contain a message or "change in state" and does not require synchronous communication. This method of transmission allows for very minimum overhead and low data rates on a broadband network. Additionally, IP devices can report many states, including "no power." For example, the active load client **300** may be implemented with a battery backup mechanism to provide backup or auxiliary power to the active load client **300** when AC power is lost. In this case, when battery backup is invoked, the active load client **300** can report a "no power" condition. Alternatively, a "no power" condition may be assumed if an active load client **300** fails to timely respond to a message (e.g., a poll or other message) from the ALD server **100**, particularly where multiple active load clients **300** in a geographic area fail to timely respond to the ALD server messaging. Because the geographic location of each customer premises and active load client **300** may be known at the time of installation or thereafter (e.g., using GPS coordinates), such network outages may be located on a per meter basis.

One of the most beneficial advantages of an IP-based power management system, as provided in one embodiment of the present invention, is accurate reporting of the actual amount of power saved by each customer on an individual basis. Embodiments of the present invention monitor and calculate precisely how many kilowatts (or carbon credits) are being generated or saved per customer instead of merely providing an estimate. Furthermore, embodiments of the present invention provide means for tracking the actual amount of deferred load and pollutants according to generation mix, serving utility and geographic area.

Embodiments of the present invention include an exemplary system for supporting a serving utility or power distributor (e.g., such as a municipality, electric cooperative, or any other wholesale or retail producer of electric power), methods for providing continuous, real time active power control in the system, and a method for determining how much actual load may be controlled at any given time for the purposes of conservation, alternative power generation and the creation of carbon (and other gaseous emissions) credits.

Additional embodiments of the present invention provide a system that implements the exemplary methods through the unique use of load information, location of customers consuming electricity, changes in state of controlled devices, current sensing, customer set points/preferences and artificial intelligence (e.g., as implemented through software) to optimize the presentation of load available to the serving utility for control.

Generally, the embodiments disclosed in the present invention are directed towards the real time (active) control of residential and commercial electrical devices that generally are 240V or less. However, specific features and functions may also be applicable to larger commercial installations that are greater than 240V. The description herein is intended to provide a practical implementation of real time load management for either voluntary or involuntary participants over large geographies and ideally for many serving electrical power producers, wholesalers or distributors. The exemplary methods and systems disclosed in the present invention may be implemented by an individual utility provider, or a third party monitoring service that tracks and manages power loading for one or more utilities. This application describes the necessary methods and generally describes software subsystems for both a host function (e.g., an active load director (ALD) server) and a companion active load client (ALC).

One embodiment of the present invention controls power distribution for a variety of electric utility companies or any other electric power grid operator(s) by actively monitoring the amount of power needed by each utility and supplying the required power by redirecting power from participating customers. In this embodiment, customers agree to allow the power management system to disable certain power-consuming devices during peak loading times of the day. Smart breakers, which have the ability to be switched on or off remotely, are installed for specific devices in an electric service control panel accessed by a known IP address. Alternatively, IP-addressable smart appliances may be used. The power management system determines the amount of steady-state power each device consumes when turned on and logs the information in a database for each subscriber. For

example, a current sensor on each smart appliance or within each smart breaker may measure the amount of current consumed by each monitored device. An active load client then multiplies the amount of current consumed by the operating voltage of the device to obtain the power consumption, and transmits the power consumption to the ALD server. When the serving utility needs more power than it is currently able to supply, the power load management system automatically adjusts the power distribution by turning off specific loads on an individual subscriber basis. Because the amount of power consumed by each specific load is known, the system can determine precisely which loads to turn off and tracks the power savings generated by each customer as a result of this short-term outage.

Furthermore, based upon the reduction in consumed power, the systems and methods of the present invention provide for generating at the control center a power supply value (PSV) corresponding to the reduction in consumed power by the power consuming device(s). Importantly, the PSV is an actual value that includes measurement and verification of the reduction in consumed power; such measurement and verification methods may be determined by the appropriate governing body or authority for the electric power grid(s). Power Supply Value (PSV) is calculated at the meter or submeter or at building control system or at any device or controller that measures power within the standard as supplied by the regulatory body(ies) that govern the regulation of the grid. PSV variations may depend on operating tolerances, operating standard for accuracy of the measurement. The PSV enables transformation of curtailment or reduction in power at the device level by any system that sends or receives an IP message to be related to or equated to supply as presented to the governing entity that accepts these values and award supply equivalence, for example of a power generating entity or an entity allowed to control power consuming devices as permitted by the governing body of the electric power grid, e.g., FERC, NERC, etc.

PSV may be provided in units of electrical power flow, monetary equivalent, and combinations thereof. Thus, the PSV provides an actual value that is confirmed by measurement and/or verification, thereby providing for a curtailment value as a requirement for providing supply to the power grid, wherein the supply to the power electric power grid is provided for grid stability, voltage stability, reliability, and combinations thereof, and is further provided as responsive to an energy management system or equivalent for providing grid stability, reliability, frequency as determined by governing authority for the electric power grid and/or grid operator(s).

The present invention can be more readily understood with reference to FIGS. **1-8**, in which like reference numerals designate like items. FIG. **1** depicts an exemplary IP-based active power load management system **10** in accordance with one embodiment of the present invention. The exemplary power management system **10** monitors and manages power distribution via an active load director (ALD) server **100** connected between one or more utility control centers (UCCs) **200** (one shown) and one or more active load clients (ALCs) **300** (one shown). The ALD server **100** may communicate with the utility control center **200** and each active load client **300** either directly or through a network **80** using the Internet Protocol (IP) or any other connection-based protocols. For example, the ALD server **100** may communicate using RF systems operating via one or more base stations **90** (one shown) using one or more wireless communication protocols, such as Global System for Mobile communications (GSM), Enhanced Data GSM Environment (EDGE), High Speed Packet Access (HSDPA), Time Division Multiple Access (TDMA), or Code Division Multiple Access data standards, including CDMA 2000, CDMA Revision A, and CDMA Revision B. Alternatively, or additionally, the ALD server **100** may communicate via a digital subscriber line (DSL) capable connection, cable television based IP capable connection, or any combination thereof. In the exemplary embodiment shown in FIG. **1**, the ALD server **100** communicates with one or more active load clients **300** using a combination of traditional IP-based communication (e.g., over a trunked line) to a base station **90** and a wireless channel implementing the WiMax protocol for the "last mile" from the base station **90** to the active load client **300**.

Each active load client **300** is accessible through a specified address (e.g., IP address) and controls and monitors the state of individual smart breaker modules or intelligent appliances **60** installed in the business or residence **20** to which the active load client **300** is associated (e.g., connected or supporting). Each active load client **300** is associated with a single residential or commercial customer. In one embodiment, the active load client **300** communicates with a residential load center **400** that contains smart breaker modules, which are able to switch from an "ON" (active) state to an "OFF" (inactive), and vice versa, responsive to signaling from the active load client **300**. Smart breaker modules may include, for example, smart breaker panels manufactured by Schneider Electric SA under the trademark "Square D" or Eaton Corporation under the trademark "Cutler-Hammer" for installation during new construction. For retro-fitting existing buildings, smart breakers having means for individual identification and control may be used. Typically, each smart breaker controls a single appliance (e.g., a washer/dryer **30**, a hot water heater **40**, an HVAC unit **50**, or a pool pump **70**).

Additionally, the active load client **300** may control individual smart appliances directly (e.g., without communicating with the residential load center **300**) via one or more of a variety of known communication protocols (e.g., IP, Broadband over PowerLine (BPL) in its various forms, including through specifications promulgated or being developed by the HOMEPLUG Powerline Alliance and the IEEE, Ethernet, Bluetooth, ZigBee, Wi-Fi, WiMax, etc.). Typically, a smart appliance **60** includes a power control module (not shown) having communication abilities. The power control module is installed in-line with the power supply to the appliance, between the actual appliance and the power source (e.g., the power control module is plugged into a power outlet at the home or business and the power cord for the appliance is plugged into the power control module). Thus, when the power control module receives a command to turn off the appliance **60**, it disconnects the actual power supplying the appliance **60**. Alternatively, a smart appliance **60** may include a power control module integrated directly into the appliance, which may receive commands and control the operation of the appliance directly (e.g., a smart thermostat may perform such functions as raising or lowering the set temperature, switching an HVAC unit on or off, or switching a fan on or off).

Referring now to FIG. **2**, the ALD server **100** may serve as the primary interface to customers, as well as to service personnel. In the exemplary embodiment depicted in FIG. **2**, the ALD server **100** includes a utility control center (UCC) security interface **102**, a UCC command processor **104**, a master event manager **106**, an ALC manager **108**, an ALC security interface **110**, an ALC interface **112**, a web browser interface **114**, a customer sign-up application **116**, customer personal settings **138**, a customer reports application **118**, a power savings application **120**, an ALC diagnostic manager **122**, an ALD database **124**, a service dispatch manager **126**, a trouble

ticket generator **128**, a call center manager **130**, a carbon savings application **132**, a utility P & C database **134**, a read meter application **136**, and a security device manager **140**.

Using the web browser interface **114**, in one embodiment, customers interact with the ALD server **100** and subscribe to some or all of the services offered by the power load management system **10** via a customer sign-up application **116**. In accordance with the customer sign-up application **116**, the customer specifies customer personal settings **138** that contain information relating to the customer and the customer's residence or business, and defines the extent of service to which the customer wishes to subscribe. Additional details of the customer sign-up application **116** are discussed below. Customers may also use the web browser interface **114** to access and modify information pertaining to their existing accounts.

The ALD server **100** also includes a UCC security interface **102** which provides security and encryption between the ALD server **100** and a utility company's control center **200** to ensure that no third party is able to provide unauthorized directions to the ALD server **100**. A UCC command processor **104** receives and sends messages between the ALD server **100** and the utility control center **200**. Similarly, an ALC security interface **110** provides security and encryption between the ALD server **100** and each active load client **300** on the system **10**, ensuring that no third parties can send directions to, or receive information from, the active load client **300**. The security techniques employed by the ALC security interface **110** and the UCC security interface **102** may include conventional symmetric key or asymmetric key algorithms, such as Wireless Encryption Protocol (WEP), Wi-Fi Protected Access (WPA and WPA2), Advanced Encryption Standard (AES), Pretty Good Privacy (PGP), or proprietary encryption techniques.

In one embodiment, the commands that can be received by the UCC command processor **104** from the electric utility's control center **200** include a "Cut" command, a "How Much" command, an "End Event" command, and a "Read Meters" command. The "Cut" command instructs the ALD server **100** to reduce a specified amount of power for a specified amount of time. The specified amount of power may be an instantaneous amount of power or an average amount of power consumed per unit of time. The "Cut" command may also optionally indicate general geographic areas or specific locations for power load reduction. The "How Much" command requests information for the amount of power (e.g., in megawatts) that can be reduced by the requesting utility control center **200**. The "End Event" command stops the present ALD server **100** transaction. The "Read Meters" command instructs the ALD server **100** to read the meters for all customers serviced by the requesting utility.

The UCC command processor **104** may send a response to a "How Much" command or an "Event Ended" status confirmation to a utility control center **200**. A response to a "How Much" command returns an amount of power that can be cut. An "Event Ended" acknowledgement message confirms that the present ALD server transaction has ended.

The master event manager **106** maintains the overall status of the power load activities controlled by the power management system **10**. The master event manager **106** maintains a separate state for each utility that is controlled and tracks the current power usage within each utility. The master event manager **106** also tracks the management condition of each utility (e.g., whether or not each utility is currently being managed). The master event manager **106** receives instructions in the form of transaction requests from the UCC command processor **104** and routes instructions to components necessary to complete the requested transaction, such as the ALC manager **108** and the power savings application **120**.

The ALC manager **108** routes instructions between the ALD server **100** and each active load client **300** within the system **10** through an ALC interface **112**. For instance, the ALC manager **108** tracks the state of every active load client **300** serviced by specified utilities by communicating with the active load client **300** through an individual IP address. The ALC interface **112** translates instructions (e.g., transactions) received from the ALC manager **108** into the proper message structure understood by the targeted active load client **300** and then sends the message to the active load client **300**. Likewise, when the ALC interface **112** receives messages from an active load client **300**, it translates the message into a form understood by the ALC manager **108** and routes the translated message to the ALC manager **108**.

The ALC manager **108** receives from each active load client **300** that it services, either periodically or responsive to polling messages sent by the ALC manager **108**, messages containing the present power consumption and the status (e.g., "ON" or "OFF") of each device controlled by the active load client **300**. Alternatively, if individual device metering is not available, then the total power consumption and load management status for the entire active load client **300** may be reported. The information contained in each status message is stored in the ALD database **124** in a record associated with the specified active load client **300**. The ALD database **124** contains all the information necessary to manage every customer account and power distribution. In one embodiment, the ALD database **124** contains customer contact information, such as names, addresses, phone numbers, email addresses, and associated utility companies for all customers having active load clients **300** installed at their residences or businesses, as well as a description of specific operating instructions for each managed device (e.g., IP-addressable smart breaker or appliance), device status, and device diagnostic history.

There are several types of messages that the ALC manager **108** may receive from an active load client **300** and process accordingly. One such message is a security alert message. A security alert message originates from an optional security or safety monitoring system installed in the residence or business and coupled to the active load client **300** (e.g., wirelessly or via a wired connection). When a security alert message is received, the ALC manager **108** accesses the ALD database **124** to obtain routing information for determining where to send the alert, and then sends the alert as directed. For example, the ALD manager **108** may be programmed to send the alert or another message (e.g., an electronic mail message or a pre-recorded voice message) to a security monitoring service company and/or the owner of the residence or business.

Another message communicated between an active load client **300** and the ALC manager **108** is a report trigger message. A report trigger message alerts the ALD server **100** that a predetermined amount of power has been consumed by a specific device monitored by an active load client **300**. When a report trigger message is received from an active load client **300**, the ALC manager **108** logs the information contained in the message in the ALD database **124** for the customer associated with the information-supplying active load client **300**. The power consumption information is then used by the ALC manager **108** to determine the active load client(s) **300** to which to send a power reduction or "Cut" message during a power reduction event.

Yet another message exchanged between an active load client **300** and the ALC manager **108** is a status response

message. A status response message reports the type and status of each device controlled by the active load client **300** to the ALD server **100**. When a status response message is received from an active load client **300**, the ALC manager **108** logs the information contained in the message in the ALD database **124**.

In one embodiment, upon receiving instructions (e.g., a "Cut" instruction) from the master event manager **106** to reduce power consumption for a specified utility, the ALC manager **108** determines which active load clients **300** and/or individually controlled devices to switch to the "OFF" state based upon present power consumption data stored in the ALD database **124**. The ALC manager **108** then sends a message to each selected active load client **300** containing instructions to turn off all or some of the devices under the active load client's control.

In another embodiment, a power savings application **120** may be optionally included to calculate the total amount of power saved by each utility during a power reduction event (referred to herein as a "Cut event"), as well as the amount of power saved for each customer whose active load client **300** reduced the amount of power delivered. The power savings application **120** accesses the data stored in the ALD database **124** for each customer serviced by a particular utility and stores the total cumulative power savings (e.g., in megawatts per hour) accumulated by each utility for each Cut event in which the utility participated as an entry in the utility Power and Carbon ("P&C") database **134**.

In a further embodiment, an optional carbon savings application **132** uses the information produced by the power savings application **120** to determine the amount of carbon saved by each utility and by each customer for every Cut event. Carbon savings information (e.g., type of fuel that was used to generate power for the customer set that was included in the just completed event, power saved in the prior event, governmental standard calculation rates, and/or other data, such as generation mix per serving utility and geography of the customer's location and the location of the nearest power source) is stored in the ALD database **124** for each active load client **300** (customer) and in the utility P&C database **134** for each utility. The carbon savings application **132** calculates the total equivalent carbon credits saved for each active load client **300** (customer) and utility participating in the previous Cut event, and stores the information in the ALD database **124** and the utility P&C database **134**, respectively.

Additionally, the ALC manager **108** automatically provides for smooth operation of the entire power load management system **10** by optionally interacting with a service dispatch manager **126**. For example, when a new customer subscribes to participate in the power load management system **10**, the service dispatch manager **126** is notified of the new subscription from the customer sign-up application **116**. The service dispatch manager **126** then sends an activation request to the ALC manager **108**. Upon receiving the activation request from the service dispatch manager **126**, the ALC manager **108** may sends a query request for information to the new active load client **300** and, upon receipt of the information, provides it to the service dispatch manager **126**. Additionally, if at any time the ALC manager **108** detects that a particular active load client **300** is not functioning properly, the ALC manager **108** may send a request for service to the service dispatch manager **126** to arrange for a service call to correct the problem.

In another embodiment, the service dispatch manager **126** may also receive requests for service from a call center manager **130** that provides support to an operations center (not shown), which receives telephone calls from customers of the power load management system **10**. When a customer calls the operations center to request service, the call center manager **130** logs the service call in the ALD database **124** and sends a "Service" transaction message to the service dispatch manager **126**. When the service call has been completed, the call center manager **130** receives a completed notification from the service dispatch manager **126** and records the original service call as "closed" in the ALD database **124**.

In yet another embodiment, the service dispatch manager **126** may also instruct an ALC diagnostic manager **122** to perform a series of diagnostic tests for any active load client **300** for which the service dispatch manager **126** has received a service request. After the ALC diagnostic manager **122** has performed the diagnostic procedure, it returns the results to the service dispatch manager **126**. The service dispatch manager **126** then invokes a trouble ticket generator **128** to produce a report (e.g., trouble ticket) that includes information (some of which was retrieved by the service dispatch manager **126** from the ALD database **124**) pertaining to the required service (e.g., customer name, address, any special consideration for accessing the necessary equipment, and the results of the diagnostic process). A residential customer service technician may then use the information provided in the trouble ticket to select the type of equipment and replacement parts necessary for performing a service call.

A read meter application **136** may be optionally invoked when the UCC command processor **104** receives a "Read Meters" or equivalent command from the utility control center **200**. The read meter application **136** cycles through the ALD database **124** and sends a read meter message or command to each active load client **300**, or those active load clients **300** specifically identified in the UCC's command, via the ALC manager **108**. The information received by the ALC manager **108** from the active load client **300** is logged in the ALD database **124** for each customer. When all the active load client meter information has been received, the information is sent to the requesting utility control center **200** using a business to business (e.g., ebXML) or other desired protocol.

The optional security device management block **140** includes program instructions for handling security system messages received by the security interface **110**. The security device management block **140** includes routing information for all security system messages and may further include messaging options on a per customer or service company basis. For example, one security service may require an email alert from the ALD server **100** upon the occurrence of a security event; whereas, another security service may require that the message sent from the in-building system be passed on by the active load client **300** and the ALD server **100** directly to the security service company.

In a further embodiment, the ALD server **100** also includes a customer reports application **118** that generates reports to be sent to individual customers detailing the amount of power saved during a previous billing cycle. Each report may contain a cumulative total of power savings over the prior billing cycle, details of the amount of power saved per controlled device (e.g., breaker or appliance), power savings from utility directed events, power savings from customer directed events, devices being managed, total carbon equivalents used and saved during the period, and/or specific details for each Cut event in which the customer's active load client **300** participated. Customers may also receive incentives and awards for participation in the power load management system **10** through a customer rewards program **150**. For example, the utilities or a third party system operator may enter into agreements with product and/or service providers to offer system participants discounts on products and ser-

vices offered by the providers based upon certain participation levels or milestones. The rewards program **150** may be setup in a manner similar to conventional frequent flyer programs in which points are accumulated for power saved (e.g., one point for each megawatt saved or deferred) and, upon accumulation of predetermined levels of points, the customer can select a product or service discount. Alternatively, a serving utility may offer a customer a rate discount for participating in the system **10**.

FIG. **3** illustrates a block diagram of an exemplary active load client **300** in accordance with one embodiment of the present invention. The depicted active load client **300** includes a Linux-based operating system **302**, a status response generator **304**, a smart breaker module controller **306**, a smart device interface **324**, a communications interface **308**, a security interface **310**, an IP-based communication converter **312**, a device control manager **314**, a smart breaker (B**1**-BN) counter manager **316**, a report trigger application **318**, an IP router **320**, a smart meter interface **322**, a security device interface **328**, and an IP device interface **330**. The active load client **300**, in this embodiment, is a computer or processor-based system located on-site at a customer's residence or business. The primary function of the active load client **300** is to manage the power load levels of controllable devices located at the residence or business, which the active load client **300** oversees on behalf of the customer. In an exemplary embodiment, the software running on the active load client **300** operates using the Linux embedded operating system **302** to manage the hardware and the general software environment. One skilled in the art will readily recognize that other operating systems, such as Microsoft's family of operating systems, Mac OS, and Sun OS, among others, may be alternatively used. Additionally, the active load client **300** may include DHCP client functionality to enable the active load client **300** to dynamically request IP addresses for itself and/or one or more controllable devices **402-412**, **420**, **460** managed thereby from a DHCP server on the host IP network facilitating communications between the active load client **300** and the ALD server **100**. The active load client **300** may further include router functionality and maintain a routing table of assigned IP addresses in a memory of the active load client **300** to facilitate delivery of messages from the active load client **300** to the controllable devices **402-412**, **420**, **460**.

A communications interface **308** facilitates connectivity between the active load client **300** and the ALD server **100**. Communication between the active load client **300** and the ALD server **100** may be based on any type of IP or other connection protocol, including but not limited to, the WiMax protocol. Thus, the communications interface **308** may be a wired or wireless modem, a wireless access point, or other appropriate interface.

A standard IP Layer-3 router **320** routes messages received by the communications interface **308** to both the active load client **300** and to any other locally connected device **440**. The router **320** determines if a received message is directed to the active load client **300** and, if so, passes the message to a security interface **310** to be decrypted. The security interface **310** provides protection for the contents of the messages exchanged between the ALD server **100** and the active load client **300**. The message content is encrypted and decrypted by the security interface **310** using, for example, a symmetric encryption key composed of a combination of the IP address and GPS data for the active load client **300** or any other combination of known information. If the message is not directed to the active load client **300**, then it is passed to the IP device interface **330** for delivery to one or more locally connected devices **440**. For example, the IP router **320** may be programmed to route power load management system messages as well as conventional Internet messages. In such a case, the active load client **300** may function as a gateway for Internet service supplied to the residence or business instead of using separate Internet gateways or routers.

An IP based communication converter **312** opens incoming messages from the ALD server **100** and directs them to the appropriate function within the active load client **300**. The converter **312** also receives messages from various active load client **300** functions (e.g., a device control manager **314**, a status response generator **304**, and a report trigger application **318**), packages the messages in the form expected by the ALD server **100**, and then passes them on to the security interface **310** for encryption.

The device control manager **314** processes power management commands for various controllable devices logically connected to the active load client **300**. The devices can be either smart breakers **402-412** or other IP based devices **420**, such as smart appliances with individual control modules (not shown). The device control manager **314** also processes "Query Request" or equivalent commands or messages from the ALD server **100** by querying a status response generator **304** which maintains the type and status of each device controlled by the active load client **300**, and providing the statuses to the ALD server **100**. The "Query Request" message may include information other than mere status requests, such as temperature set points for thermally controlled devices, time intervals during which load control is permitted or prohibited, dates during which load control is permitted or prohibited, and priorities of device control (e.g., during a power reduction event, hot water heater and pool pump are turned off before HVAC unit is turned off). If temperature set points or other non-status information are included in a "Query Request" message and there is a device attached to the active load client **300** that can process the information, the temperature set points or other information are sent to that device **420** via a smart device interface **324**.

The status response generator **304** receives status messages from the ALD server **100** and, responsive thereto, polls each controllable device **402-412**, **420**, **460** under the active load client's control to determine whether the controllable device **402-412**, **420**, **460** is active and in good operational order. Each controllable device **402-412**, **420**, **460** responds to the polls with operational information (e.g., activity status and/or error reports) in a status response message. The active load client **300** stores the status responses in a memory associated with the status response generator **304** for reference in connection with power reduction events.

The smart device interface **324** facilitates IP or other address-based communications to individual devices **420** (e.g., smart appliance power control modules) that are attached to the active load client **300**. The connectivity can be through one of several different types of networks, including but not limited to, BPL, ZigBee, Wi-Fi, Bluetooth, or direct Ethernet communications. Thus, the smart device interface **324** is a modem adapted for use in or on the network connecting the smart devices **420** to the active load client **300**. The smart device interface **324** also allows the device control manager **314** to manage those devices that have the capability to sense temperature settings and respond to temperature variations.

The smart breaker module controller **306** formats, sends, and receives messages, including power control instructions, to and from the smart breaker module **400**. In one embodiment, the communications is preferably through a BPL connection. In such embodiment, the smart breaker module controller **306** includes a BPL modem and operations software.

The smart breaker module **400** contains individual smart breakers **402-412**, wherein each smart breaker **402-412** includes an applicable modem (e.g., a BPL modem when BPL is the networking technology employed) and is preferably in-line with power supplied to a single appliance or other device. The B1-BN counter manager **316** determines and stores real time power usage for each installed smart breaker **402-412**. For example, the counter manager **316** tracks or counts the amount of power used by each smart breaker **402-412** and stores the counted amounts of power in a memory of the active load client **300** associated with the counter manager **316**. When the counter for any breaker **402-412** reaches a predetermined limit, the counter manager **316** provides an identification number corresponding to the smart breaker **402-412** and the corresponding amount of power (power number) to the report trigger application **318**. Once the information is passed to the report trigger application **318**, the counter manager **316** resets the counter for the applicable breaker **402-412** to zero so that information can once again be collected. The report trigger application **318** then creates a reporting message containing identification information for the active load client **300**, identification information for the particular smart breaker **402-412**, and the power number, and sends the report to the IP based communication converter **312** for transmission to the ALD server **100**.

The smart meter interface **322** manages either smart meters **460** that communicate using BPL or a current sensor **452** connected to a traditional power meter **450**. When the active load client **300** receives a "Read Meters" command or message from the ALD server **100** and a smart meter **460** is attached to the active load client **300**, a "Read Meters" command is sent to the meter **460** via the smart meter interface **322** (e.g., a BPL modem). The smart meter interface **322** receives a reply to the "Read Meters" message from the smart meter **460**, formats this information along with identification information for the active load client **300**, and provides the formatted message to the IP based communication converter **312** for transmission to the ALD server **100**.

A security device interface **328** transfers security messages to and from any attached security device. For example, the security device interface **328** may be coupled by wire or wirelessly to a monitoring or security system that includes motion sensors, mechanical sensors, optical sensors, electrical sensors, smoke detectors, carbon monoxide detectors, and/or other safety and security monitoring devices. When the monitoring system detects a security or safety problem (e.g., break-in, fire, excessive carbon monoxide levels), the monitoring system sends its alarm signal to the security interface **328**, which in turn forwards the alarm signal to the IP network through the ALD server **100** for delivery to the target IP address (e.g., the security monitoring service provider). The security device interface **328** may also be capable of communicating with the attached security device through the IP device interface to recognize a notification message from the device that it has lost its line based telephone connection. Once that notification has been received, an alert message is formatted and sent to the ALD server **100** through the IP based communication converter **312**.

Operation of the power management system **10** in accordance with exemplary embodiments will now be described. In one embodiment, customers initially sign up for power load management services using a web browser. Using the web browser, the customer accesses a power management system provider's website through the web browser interface **114** and provides his or her name and address information, as well as the type of equipment he or she would like to have controlled by the power load management system **10** to save energy at peak load times and to accumulate power savings or carbon credits (which may be used to receive reward incentives based upon the total amount of power or carbon saved by the customer). The customer may also agree to allow management of power consumption during non-peak times to sell back excess power to the utility, while simultaneously accumulating power savings or carbon credits.

The customer sign up application **116** creates a database entry for each customer in the ALD database **124**. Each customer's contact information and load management preferences are stored or logged in the database **124**. For example, the customer may be given several simple options for managing any number of devices or class of devices, including parameters for managing the devices (e.g., how long each type of device may be switched off and/or define hours when the devices may not be switched off at all). In particular, the customer may also be able to provide specific parameters for HVAC operations (e.g., set control points for the HVAC system specifying both the low and high temperature ranges). Additionally, the customer may be given an option of receiving a notification (e.g., an email message, Instant Message, Text Message, or recorded phone call, or any combination thereof) when a power management event occurs. When the customer completes entering data, a "New Service" or equivalent transaction message or command is sent to the service dispatch manager **126**.

FIG. **4** illustrates an exemplary operational flow diagram **500** providing steps executed by the ALD server **100** (e.g., as part of the service dispatch manager **126**) to manage service requests in the exemplary power load management system **10**, in accordance with one embodiment of the present invention. The steps of FIG. **4** are preferably implemented as a set of computer instructions (software) stored in a memory (not shown) of the ALD server **100** and executed by one or more processors (not shown) of the ALD server **100**. Pursuant to the logic flow, the service dispatch manager **126** receives (**502**) a transaction message or command and determines (**503**) the type of transaction. Upon receiving a "New Service" transaction message, the service dispatch manager **126** schedules (**504**) a service person (e.g., technician) to make an initial installation visit to the new customer. The service dispatch manager **126** then notifies (**506**) the scheduled service person, or dispatcher of service personnel, of an awaiting service call using, for example, email, text messaging, and/or instant messaging notifications.

In one embodiment, responsive to the service call notification, the service person obtains the new customer's name and address, a description of the desired service, and a service time from a service dispatch manager service log. The service person obtains an active load client **300**, all necessary smart breaker modules **402-412**, and all necessary smart switches to install at the customer location. The service person notes any missing information from the customer's database information (e.g., the devices being controlled, type make and model of each device, and any other information the system will need to function correctly). The service person installs the active load client **300** and smart breakers **402-412** at the new customer's location. A global positioning satellite (GPS) device may optionally be used by the service person to determine an accurate geographic location of the new customer building, which will be added to the customer's entry in the ALD database **124** and may be used to create a symmetric encryption key to facilitate secure communications between the ALD server **100** and the active load client **300**. The physical location of the installed active load client **300** is also entered into the customer's entry. Smart switch devices may be installed by the service person or left at the customer

location for installation by the customer. After the active load client **300** has been installed, the service dispatch manager **126** receives (**508**) a report from the service person, via a service log, indicating that the installation is complete. The service dispatch manager **126** then sends (**510**) an "Update" or equivalent transaction message to the ALC manager **108**.

Returning to block **503**, when a "Service" or similar transaction message or command is received, the service dispatch manager **126** schedules (**512**) a service person to make a service call to the specified customer. The service dispatch manager **126** then sends (**514**) a "Diagnose" or similar transaction to the ALC diagnostic manager **122**. The ALC diagnostic manager **122** returns the results of the diagnostic procedure to the service dispatch manager **126**, which then notifies (**516**) the service person of the service call and provides him or her with the results of the diagnostic procedure using a conventional trouble ticket. The service person uses the diagnostic procedure results in the trouble ticket to select the type of equipment and replacement parts necessary for the service call.

FIG. **5** illustrates an exemplary operational flow diagram **600** providing steps executed by the ALD server **100** (e.g., as part of the ALC manager **108**) to confirm customer sign-up to the power load management system **10**, in accordance with one embodiment of the present invention. The steps of FIG. **5** are preferably implemented as a set of computer instructions (software) stored in a memory (not shown) of the ALD server **100** and executed by one or more processors (not shown) of the ALD server **100**. In accordance with the logic flow, the ALC manager **108** receives (**602**) an "Update" or similar transaction message or command from the service dispatch manager **126** and uses the IP address specified in the "Update" message to send (**604**) out a "Query Request" or similar message or command to the active load client **300**. The "Query Request" message includes a list of devices the ALD server **100** expects to be managed. If the customer information input at customer sign-up includes temperature set points for one or more load-controllable devices, that information is included in the "Query Request" message. The ALC manager **108** receives (**606**) a query reply containing information about the active load client **300** (e.g., current WiMax band being used, operational state (e.g., functioning or not), setting of all the counters for measuring current usage (e.g., all are set to zero at initial set up time), status of devices being controlled (e.g., either switched to the "on" state or "off" state)). The ALC manager **108** updates (**608**) the ALD database **124** with the latest status information obtained from the active load client **300**. If the ALC manager **108** detects (**610**), from the query reply, that the active load client **300** is functioning properly, it sets (**612**) the customer state to "active" to allow participation in ALD server activities. However, if the ALC manager **108** detects (**610**) that the active load client **300** is not functioning properly, it sends (**614**) a "Service" or similar transaction message or command to the service dispatch manager **126**.

FIG. **6** illustrates an exemplary operational flow diagram **700** providing steps executed by the ALD server **100** (e.g., as part of the master event manager **106**) to manage events in the exemplary power load management system **10**, in accordance with one embodiment of the present invention. The steps of FIG. **6** are preferably implemented as a set of computer instructions (software) stored in a memory (not shown) of the ALD server **100** and executed by one or more processors (not shown) of the ALD server **100**. Pursuant to the logic flow, the master event manager **106** tracks (**702**) current power usage within each utility being managed by the ALD server **100**. When the master event manager **106** receives (**704**) a transaction message or command from the UCC command processor **104** or the ALC manager **108**, the master event manager **106** determines (**706**) the type of transaction received. Upon receiving a "Cut" transaction from the UCC command processor **104** (resulting from a "Cut" command issued by the utility control center **200**), the master event manager **106** places (**708**) the utility in a managed logical state. The master event manager then sends (**710**) a "Cut" transaction or event message or command to the ALC manager **108** identifying the amount of power (e.g., in megawatts) that must be removed from the power system supplied by the utility. The amount of power specified for reduction in a "Cut" command may be an instantaneous amount of power or an average amount of power per unit time. Finally, the master event manager **106** notifies (**711**) every customer that has chosen to receive a notification (e.g., through transmission of an email or other pre-established notification technique) that a power management event is in process.

Returning to block **706**, when the master event manager **106** receives a "How Much" or other equivalent power inquiry transaction message or command from the UCC command processor **104** (resulting from a "How Much" or equivalent power inquiry command issued by the utility control center **200**), the master event manager **106** determines (**712**) the amount of power that may be temporarily removed from a particular utility's managed system by accessing the current usage information for that utility. The current usage information is derived, in one embodiment, by aggregating the total available load for the serving utility, as determined from the customer usage information for the utility stored in the ALD database **124**, based on the total amount of power that may have to be supplied to the utility's customers in view of the statuses of each of the active load clients **300** and their respectively controllable load devices **402-412**, **420**, **460** during the load control interval identified in the "How Much" message.

Each utility may indicate a maximum amount of power or maximum percentage of power to be reduced during any power reduction event. Such maximums or limits may be stored in the utility P&C database **134** of the ALD server **100** and downloaded to the master event manager **106**. In one embodiment, the master event manager **106** is programmed to remove a default one percent (1%) of the utility's current power consumption during any particular power management period (e.g., one hour). In alternative embodiments, the master event manager **106** may be programmed to remove other fixed percentages of current power consumption or varying percentages of current power consumption based on the current power consumption (e.g., 1% when power consumption is at system maximum and 10% when power consumption is at only 50% of system maximum). Based on the amount of power to be removed, the master event manager **106** sends (**710**) a "Cut" or equivalent event message to the ALC manager **108** indicating the amount of power (e.g., in megawatts) that must be removed from the utility's power system (e.g., 1% of the current usage), and notifies (**711**) all customers that have chosen to receive a notification that a power management event is in process. The master event manager **106** also sends a response to the utility control center **200** via the UCC command processor **104** advising the utility control center **200** as to the quantity of power that can be temporarily reduced by the requesting utility.

Returning once again to block **706**, when the master event manager **106** receives an "End Event" or equivalent transaction message or command from the UCC command processor **104** (resulting from an "End Event" command issued by the utility control center **200**), the master event manager **106** sets

(**714**) the state of the current event as "Pending" and sends (**716**) an "End Event" or equivalent transaction message or command to the ALC manager **108**. When the ALC manager **108** has performed the steps necessary to end the present event (e.g., a power reduction or Cut event), the master event manager **106** receives (**718**) an "Event Ended" or equivalent transaction from the ALC manager **108** and sets (**720**) the utility to a logical "Not Managed" state. The master event manager **106** then notifies (**722**) each customer that has chosen to receive a notification (e.g., through transmission of an email or other pre-established notification mechanism) that the power management event has ended. Finally, the master event manager **106** sends an "Event Ended" or equivalent transaction message or command to the power savings application **120** and the utility control center **200** (via the UCC command processor **104**).

Turning now to FIG. **7**, exemplary operational flow diagram **800** illustrates steps executed by the ALD server **100** (e.g., as part of the ALC manager **108**) to manage power consumption in the exemplary power load management system **10**, in accordance with one embodiment of the present invention. The steps of FIG. **7** are preferably implemented as a set of computer instructions (software) stored in a memory of the ALD server **100** and executed by one or more processors of the ALD server **100**. In accordance with the logic flow, the ALC manager **108** tracks (**802**) the state of each managed active load client **300** by receiving messages, periodically or responsive to polls issued by the ALC manager **108**, from every active load client **300** that the ALC manager **108** manages. These messages indicate the present states of the active load clients **300**. The state includes the present consumption of power for each controllable device **402-412**, **420** controlled by the active load client **300** (or the total power consumption for all controllable devices **402-412**, **420** controlled by the active load client **300** if individual device metering is not available) and the status of each device **402-412**, **420** (e.g., either "Off" or "On"). The ALC manager **108** stores or logs (**804**) the power consumption and device status information in the ALD database **124** in a record corresponding to the specified active load client **300** and its associated customer and serving utility.

When the ALC manager **108** receives (**806**) a transaction message from the master event manager **106**, the ALC manager **108** first determines (**808**) the type of transaction received. If the ALC manager **108** receives a "Cut" or equivalent transaction message or command from the master event manager **106**, the ALC manager **108** enters (**810**) a "Manage" logical state. The ALC manager **108** then determines (**812**) which active load clients **300** and associated devices **402-412**, **420** operating on the utility specified in the "Cut" message to switch to the "Off" state. If a location (e.g., list of GPS coordinates, a GPS coordinate range, a geographic area, or a power grid reference area) is included in the "Cut" transaction message, only those active load clients **300** within the specified location are selected for switching to the "Off" state. In other words, the ALC manager **108** selects the group of active load client devices **300** to which the issue a "Turn Off" transaction message based at least partially on the geographic location of each active load client **300** as such location relates to any location identified in the received "Cut" transaction message. The ALD database **124** contains information on the present power consumption (and/or the average power consumption) for each controllable device **402-412**, **420** connected to each active load client **300** in the system **10**. The ALC manager **108** utilizes the stored power consumption information to determine how many, and to select which, devices **402-412**, **420** to turn off to achieve the power reduction required by the "Cut" message. The ALC manager **108** then sends (**814**) a "Turn Off" or equivalent transaction message or command to each active load client **300**, along with a list of the devices to be turned off and a "change state to off" indication for each device **402-412**, **420** in the list. The ALC manager **108** then logs (**816**) the amount of power (either actual or average), as determined from the ALD database **124**, saved for each active load client **300**, along with a time stamp indicating when the power was reduced. The ALC manager **108** then schedules (**818**) transactions for itself to "Turn On" each turned-off device after a predetermined period of time (e.g., which may have been set from a utility specified default, set by instructions from the customer, or otherwise programmed into the ALC manager **108**).



Returning back to block **808**, when the ALC manager **108** receives a "Turn On" or equivalent transaction message or command from the master event manager **106** for a specified active load client **300**, and the ALC manager's state is currently in a "Manage" state, the ALC manager **108** finds (**820**) one or more active load clients **300** that are in the "On" state and do not have any of their managed devices **402-412**, **420** turned off (and are in the specified location if so required by the original "Cut" transaction message), which, when one or more of such devices **402-412**, **420** are turned off, will save the same or substantially the same amount of power that is presently being saved by the specified active load clients that are in the "Off" state. Upon identifying new active load clients **300** from which to save power, the ALC manager **108** sends (**822**) a "Turn Off" or equivalent transaction message or command to each active load client **300** that must be turned off in order to save the same amount of power as the active load client(s) to be turned on (i.e. to have its or their managed devices **402-412**, **420** turned on) or to save an otherwise acceptable amount of power (e.g., a portion of the power previously saved by the active load client(s) to be turned back on). The ALC manager **108** also sends (**824**) a "Turn On" or equivalent transaction message or command to each active load client **300** to be turned back on. The "Turn On" message instructs all active load clients **300** to which the message was directed to turn on any controllable devices that have been turned off, and causes the affected active load clients **300** to instruct their controllable devices **402-412**, **420** to enable the flow of electric power to their associated power consuming devices (e.g., appliance, HVAC unit, and so forth). Finally, the ALC manager **108** logs (**826**) the time that the "Turn On" transaction message is sent in the ALD database **124**.

Returning once again to block **808**, when the ALC manager **108** receives an "End Event" or equivalent transaction message or command from the master event manager **106**, the ALC manager **108** sends (**828**) a "Turn On" or equivalent transaction message or command to every active load client **300** which is currently in the "Off" state and is served by the serving utility identified in the "End Event" message or to which the "End Event" message relates. Upon determining (**830**) that all the appropriate active load clients **300** have transitioned to the "On" state, the ALC manager **108** sends (**832**) an "Event Ended" or equivalent transaction message or command to the master event manager **106**.

Referring now to FIG. **8**, exemplary operational flow diagram **900** illustrates steps executed by the ALD server **100** (e.g., through operation of the power savings application **120**) to calculate and allocate power savings in the power load management system **10**, in accordance with one embodiment of the present invention. The power savings application **120** calculates the total amount of power saved by each utility for each Cut event and the amount of power saved by each customer possessing an active load client **300**.

According to the logic flow of FIG. **8**, the power savings application **120** receives (**902**) an "Event Ended" or equivalent transaction message or command from the master event manager **106** each time a "Cut" or power savings event has ended. The power savings application **120** then accesses (**904**) the ALD database **124** for each active load client **300** involved in the "Cut" event. The database record for each active load client **300** contains the actual amount (or average amount) of power that would have been used by the active load client **300** during the last "Cut" event, along with the amount of time that each controllable device **402**-**412**, **420** associated with the active load client **300** was turned off. The power savings application **120** uses this information to calculate the amount of power (e.g., in megawatts per hour) that was saved for each active load client **300**. The total power savings for each active load client **300** is stored in its corresponding entry in the ALD database **124**. A running total of power saved is kept for each "Cut" transaction. Each utility that is served by the ALD server **100** has an entry in the utility P&C database **134**. The power savings application **120** stores (**906**) the total amount of power (e.g., in megawatts per hour) saved for the specific utility in the utility's corresponding entry in the utility P&C database **134**, along with other information related to the power savings event (e.g., the time duration of the event, the number of active load clients required to reach the power savings, average length of time each device was in the off state, plus any other information that would be useful in fine tuning future events and in improving customer experience). When all active load client entries have been processed, the power savings application **120** optionally invokes (**908**) the carbon savings application **132** or, analogously, a sulfur dioxide savings application or a nitrogen dioxide savings application, to correlate the power savings with carbon credits, sulfur dioxide credits or nitrogen dioxide credits, respectively, based on the geographic locations of the particular serving utility and customer. Additionally, in one embodiment, the carbon savings application **132** determines carbon credits based on government approved or supplied formulas and stores the determined carbon credits on a per customer and/or per utility basis.

As described above, the present invention encompasses a method for managing and distributing power within a power management system based on real-time feedback from addressable and remotely controllable devices including the actual amount of power currently being individually or collectively consumed by the addressable devices. With this invention, a power management system may pinpoint specific areas of high power usage and more accurately distribute power loads to utilities in need. Additionally, the present invention provides optional participation incentives for customers based on the amount of their actual participation in the power management system.

In the foregoing specification, the present invention has been described with reference to specific embodiments. However, one of ordinary skill in the art will appreciate that various modifications and changes may be made without departing from the spirit and scope of the present invention as set forth in the appended claims. For example, the present invention is applicable for managing the distribution of power from utility companies to subscribing customers using any number of IP-based or other communication methods. Additionally, the functions of specific modules within the ALD server **100** and/or active load client **300** may be performed by one or more equivalent means. Accordingly, the specification and drawings are to be regarded in an illustrative rather than a restrictive sense, and all such modifications are intended to be included within the scope of the present invention.



Benefits, other advantages, and solutions to problems have been described above with regard to specific embodiments of the present invention. However, the benefits, advantages, solutions to problems, and any element(s) that may cause or result in such benefits, advantages, or solutions to become more pronounced are not to be construed as a critical, required, or essential feature or element of any or all the claims. The invention is defined solely by the appended claims including any amendments made during the pendency of this application and all equivalents of those claims as issued.

What is claimed is:

**1**. A method for a client device to manage a flow of power within an electric power grid to a plurality of power consuming devices, the client device being responsive to power control messages issued by a load management server and controlling one or more controllable devices that selectively enable and disable a flow of electric power to at least some of the plurality of power consuming devices, the method comprising:

receiving a power control message from the load management server, the power control message being responsive to a power reduction request issued by a control center of the electric utility and indicating at least one of an amount of electric power to be reduced and an identification of at least one controllable device to be instructed to enable or disable a flow of electric power to one or more associated power consuming devices;

responsive to the power control message, issuing a power management command to a controllable device, the power management command causing the controllable device to disable a flow of electric power to at least one associated power consuming device so as to achieve a reduction in consumed power as requested by the control center;

and based upon the reduction in consumed power, generating at the control center a power supply value (PSV) corresponding to the reduction in consumed power.

**2**. The method of claim **1**, wherein the power control message is encrypted, the method further comprising: decrypting the power control message responsive to receiving the power control message.

**3**. The method of claim **1**, further comprising: communicating a report message to the load management server, the report message including an indication of an amount of power consumed by at least one power consuming device indicated by the power supply value (PSV).

**4**. The method of claim **1**, wherein the control center is associated with a power generating entity or an entity permitted to control power consuming devices based upon a governing body of the electric power grid.

**5**. The method of claim **1**, further comprising: communicating a status message to the load management server, the status message indicating statuses of the one or more controllable devices.

**6**. The method of claim **5**, wherein the status message is communicated through the client device or independent of the client device.

**7**. The method of claim **1**, further comprising: communicating a status message to the load management server, the status message indicating a total amount of power consumed by power consuming devices under control of the one or more controllable devices, wherein the total amount of power consumed by power consuming devices is automatically associated with a corresponding power supply value.

**8**. The method of claim **1**, wherein the power supply value is associated with individual devices and/or aggregation of a multiplicity of power consuming devices.

**9**. The method of claim **1**, further comprising: subsequent to issuing the power management command, receiving a second power control message from the load management server, the second power control message instructing the client device to enable a flow of electric power to power consuming devices that had a flow of electric power previously disabled.

**10**. The method of claim **1**, wherein at least one smart meter is coupled to the client device, the method further comprising: receiving a control message from the load management server instructing the client device to read the at least one smart meter; responsive to receipt of the control message, issuing a command to the at least one smart meter requesting a power reading; and responsive to receipt of the power reading, communicating the power reading to the load management server.

**11**. The method of claim **1**, wherein a plurality of smart meters are constructed and configured for smart cross-communication with each other, collectively forming a smart-mesh, providing operational control by a single client device for the plurality of smartmeters.

**12**. The method of claim **11**, wherein the smart cross-communication operates with methods selected from wired network communication, wireless communication, and combinations thereof, and wherein wireless communication is selected from WiFI, Ethernet, IP- or non-IP-enabled communications by devices such as power line carrier.

**13**. The method of claim **1**, further comprising: receiving a status message from the load management server, the status message requesting status information for the one or more controllable devices; polling the one or more controllable devices responsive to the status message; receiving a status response message from each of the one or more controllable devices responsive to the polling, each status response message including operational information for a particular controllable device; and storing each status response message in a memory for reference in connection with power reduction events, wherein the power control message is associated with a power reduction event.

**14**. The method of claim **1**, wherein the client device includes a Layer-3 router and wherein at least one Internet-accessible device is coupled to the client device, the method further comprising: receiving, by the Layer-3 router, an Internet Protocol (IP) message that includes an IP address; determining, by the Layer-3 router, whether the IP message is directed to an Internet-accessible device coupled to the client device; and communicating the IP message to the Internet-accessible device responsive to a determination that the IP message is directed to the Internet-accessible device.

**15**. The method of claim **14**, wherein the IP message is encrypted, the method further comprising: determining, by the Layer-3 router, whether the IP message is directed to the client device instead of the Internet-accessible device; and decrypting the IP message responsive to a determination that the IP message is directed to the client device instead of the Internet-accessible device.

**16**. The method of claim **1**, wherein the client device is coupled to a host Internet Protocol (IP) network, the method further comprising: dynamically requesting IP addresses for at least one of the client device and the one or more controllable devices from a dynamic host configuration protocol server on the host IP network.

**17**. The method of claim **1**, wherein the power control message includes a list of controllable devices to be instructed to disable a flow electric power to associated power consuming devices and wherein the power management and causes controllable devices identified in the list to disable a flow of electric power to associated power consuming devices so as to achieve the reduction in consumed power as requested by the control center of the electric power grid controlling entity.

**18**. The method of claim **17**, wherein the power control message includes Internet Protocol addresses of the controllable devices in the list.

**19**. A client device for use in a system that manages electric power on an electric grid, wherein the power is supplied to a plurality of power consuming devices, wherein power flow over the electric grid to at least some of the plurality of power consuming devices is enabled and disabled by a plurality of controllable devices, wherein at least one controllable device operates under the control of the client device, and wherein the client device receives power control messages from a remote load management server, and wherein a power control message received from the load management server is responsive to a power reduction request issued by a control center,

the client device comprising:

at least one controllable device interface facilitating communication of power control instructions to the at least one controllable device,

the power control instructions causing the at least one controllable device to selectively enable and disable a flow of electric power to at least one power consuming device of the plurality of power consuming devices;

and a device control manager operably coupled to the at least one controllable device interface,

the device control manager issuing a power control instruction to the at least one controllable device through the at least one controllable device interface responsive to the received power control message,

the power control instruction causing the at least one controllable device to disable a flow of electric power to at least one associated power consuming device so as to achieve a reduction in consumed power as requested by the control center, and based upon the reduction in consumed power, generating at the control center a power supply value (PSV) corresponding to the reduction in consumed power.

**20**. The client device of claim **19**, wherein the power supply value indicates the compensation provided for power supply associated with the curtailment.

**21**. The client device of claim **20**, wherein the compensation includes capacity compensation, energy compensation, operating reserves compensation to include ancillary services and other grid stabilizing services (voltage support, black start, cold load pick up, conservation voltage reduction, or any other reserve.

**22**. The client device of claim **19**, wherein the power supply value (PSV) is generated based upon a governing entity for the power grid operating region and operational regulations.

**23**. The client device of claim **19**, wherein the received power control message indicates at least one of an amount of electric power to be reduced and an identification of a controllable device to be instructed to disable a flow of electric power to one or more associated power consuming devices.

**24**. The client device of claim **19**, further comprising: a communications interface facilitating communications between the load management server and the client device, wherein the device control manager communicates at least one power consumption indicator and at least one power management status to the load management server via the communications interface.

**25**. The client device of claim **19**, wherein the at least one power consumption indicator includes a power consumption indicator associated with each controllable device and wherein the at least one power management status includes a power management status associated with each controllable device.

**26**. The client device of claim **25**, wherein the communications interface comprises an IP-based interface.

**27**. The client device of claim **26**, wherein the IP-based interface is one of a WiMax interface, a "1 G" wireless protocol such as analog wireless transmission, first generation standards based (IEEE, ITU or other recognized world communications standard), a "2-G" standards based protocoal such as "EDGE or CDMA 2000 also known as 1XRTT", a 3G based standard such as "High Speed Packet Access (HSPA) or Evolution for Data Only (EVDO), any accepted 4G standard such as "IEEE, ITU standards that include WiMax, Long Term Evolution "LTE" and its derivative standards, any Ethernet solution wireless or wired, or any proprietary wireless or power line carrier standards that communicate to a client device or any controllable device that sends and receives an IP based message.

**28**. The client device of claim **19**, wherein the received power control message includes Internet Protocol addresses of one or more controllable devices to be instructed to disable a flow of electric power to one or more associated power consuming devices.

**29**. The client device of claim **19**, further comprising: a Layer-3 router operable to receive an Internet Protocol (IP) message that includes an IP address and determine whether the IP message is directed to the client device or an Internet-accessible device coupled to the client device; and an IP device interface, coupled to the Layer-3 router, that receives the IP message from the Layer-3 router when the IP message is directed to an Internet-accessible device coupled to the client device and communicates the IP message to the Internet-accessible device.

**30**. A client device for use in a system that manages power flow for an electric grid including electric power supplied to a plurality of power consuming devices, wherein power flow to at least some of the plurality of power consuming devices is selectively enabled and disabled by a plurality of controllable devices, wherein at least one controllable device operates under the control of the client device, and wherein the client device receives a plurality of power control messages from a remote load management server, the client device comprising:

a communications interface that receives the plurality of power control messages from the load management server,

a power control message of the plurality of power control messages being responsive to a power reduction request issued by a control center and indicating at least one of an amount of electric power to be reduced and an identification of at least one controllable device to be instructed to disable a flow of electric power to one or more associated power consuming devices;

at least one controllable device interface facilitating communication of power control instructions to the at least one controllable device, the power control instructions causing the at least one controllable device to selectively enable and disable a flow of electric power to at least one power consuming device of the plurality of power consuming devices;

and a device control manager operably coupled to the communications interface and the at least one controllable device interface, the device control manager issuing a power control instruction to the at least one controllable device through the at least one controllable device interface responsive to the power control message,

the power control instruction causing the at least one controllable device to disable a flow of electric power to at least one associated power consuming device so as to achieve a reduction in consumed power as requested by the control center and based upon the reduction in consumed power, generating at the control center a power supply value (PSV) associated with the power consuming device(s) and corresponding to the reduction in consumed power.

**31**. The client device of claim **30**, wherein the power control message includes a list of controllable devices to be instructed to disable a flow of electric power to associated power consuming devices.

**32**. The client device of claim **30**, wherein the power control message includes Internet Protocol addresses of the controllable devices in the list.

**33**. The client device of claim **32**, further comprising: a Layer-3 router operable to receive an Internet Protocol (IP) message that includes an IP address and determine whether the IP message is directs to the client device or an Internet-accessible device coupled to the client device; and an IP device interface, coupled to the Layer-3 router, that receives the IP message from the Layer-3 router when the IP message is directed to an Internet-accessible device coupled to the client device and communicates the IP message to the Internet-accessible device.

**34**. The client device of claim **33**, wherein the communications interface comprises an IP-based interface.

**35**. A client device for use in a system that manages power on an electric grid that including power supplied to a plurality of power consuming devices, wherein power flow to at least some of the plurality of power consuming devices is enabled and disabled by a plurality of controllable devices, wherein at least one controllable device operates under the control of the client device, and wherein the client device receives power control messages from a remote load management server, the client device comprising:

at least one controllable device interface facilitating communication of power control instructions to the at least one controllable device,

the power control instructions causing the at least one controllable device to selectively enable and disable a flow of electric power to at least one power consuming device of the plurality of power consuming devices and based upon the reduction in consumed power, generate a power supply value corresponding to the reduction in consumed power;

a device control manager operably coupled to the at least one controllable device interface, the device control manager generating the power control instructions responsive to the received power control messages;

a Layer-3 router operable to receive an Internet Protocol (IP) message that includes an IP address and determine whether the IP message is directed to the client device or an Internet-accessible device coupled to the client device, wherein the Internet-accessible device is a device other than the client device and the at least one controllable device;

and an IP device interface, coupled to the Layer-3 router, that receives the IP message from the Layer-3 router when the IP message is directed to the Internet-accessible device and communicates the IP message to the Internet-accessible device.

**36**. The client device of claim **35**, wherein a power supply value (PSV) is generated at the control center.

**37**. The client device of claim **35**, at the device level generating power supply value (PSV).

**38**. The client device of claim **35**, wherein a received power control message is responsive to a power reduction request issued by a control center of the electric utility and indicates at least one of an amount of electric power to be reduced and an identification of at least one controllable device to be instructed to disable a flow of electric power to one or more associated power consuming devices.

**39**. The client device of claim **38**, wherein the received power control message includes a list of controllable devices to be instructed to disable a flow of electric power to associated power consuming devices.

**40**. The client device of claim **39**, wherein the received power control message includes Internet Protocol addresses of the controllable devices in the list.

**41**. A client device for use in a system that manages power supplied to a plurality of power consuming devices, wherein power flow to at least some of the plurality of power consuming devices is selectively enabled and disabled by a plurality of controllable devices, wherein one or more of the plurality of controllable devices operates under the control of the client device, and wherein the client device receives a plurality of power control messages from a remote load management server, the client device comprising:

a communications interface that receives the plurality of power control messages from the load management server, a power control message of the plurality of power control messages indicating at least one of an amount of electric power to be reduced and an identification of at least one controllable device to be instructed to disable a flow of electric power to one or more associated power consuming devices, and based upon the amount of electric power to be reduced, generating at the control center a power supply value corresponding to the amount of electric power reduced;

at least one controllable device interface facilitating communication of a power control instruction to at least a first controllable device, the power control instruction causing the first controllable device to disable a flow of electric power to at least one power consuming device of the plurality of power consuming devices;

a device control manager operably coupled to the communications interface and the at least one controllable device interface, the device control manager generating the power control instruction responsive to the power control message;

an Internet Protocol (IP) message that includes an IP address and is directed to the client device or an Internet-accessible device coupled to the client device,

wherein the Internet-accessible device is a device other than the client device and the at least one controllable device; and an IP device interface, coupled to the Layer-3 router, that receives the IP message the IP message is directed to the Internet-accessible device and communicates the IP message to the Internet-accessible device.

**42**. The client device of claim **41**, wherein the power control message is responsive to a power reduction request issued by a control center.

* * * * *

# Exhibit 2

U 8084830

# THE UNITED STATES OF AMERICA

TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

April 05, 2021

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *9,678,522*
ISSUE DATE: *June 13, 2017*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

SYLVIA HOLLEY
Certifying Officer

US009678522B2

(12) **United States Patent**
**Forbes, Jr.**

(10) **Patent No.: US 9,678,522 B2**
(45) **Date of Patent: *Jun. 13, 2017**

(54) **METHOD AND APPARATUS FOR ACTIVELY MANAGING CONSUMPTION OF ELECTRIC POWER OVER AN ELECTRIC POWER GRID**

(71) Applicant: **Causam Energy, Inc.**, Raleigh, NC (US)

(72) Inventor: **Joseph W. Forbes, Jr.**, Raleigh, NC (US)

(73) Assignee: **Causam Energy, Inc.**, Raleigh, NC (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 368 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/456,306**

(22) Filed: **Aug. 11, 2014**

(65) **Prior Publication Data**

US 2014/0350745 A1 Nov. 27, 2014

**Related U.S. Application Data**

(60) Continuation of application No. 13/463,761, filed on May 3, 2012, now Pat. No. 8,805,552, which is a
(Continued)

(51) **Int. Cl.**
***G05F 1/66*** (2006.01)
***H04L 29/08*** (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ............... ***G05F 1/66*** (2013.01); ***G01D 4/004*** (2013.01); ***G06Q 10/06*** (2013.01); ***G06Q 50/06*** (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ... G05F 1/66; H04L 67/02; H02J 3/14; G06Q 50/06; G06Q 10/06; G01D 4/004;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,973,481 A 10/1999 Thompson et al.
6,018,690 A * 1/2000 Saito ......................... H02J 3/14
700/293

(Continued)

*Primary Examiner* — Ramesh Patel
(74) *Attorney, Agent, or Firm* — NEO IP

(57) **ABSTRACT**

A client device manages consumption of power supplied by an electric utility to multiple power consuming devices. Power flow to the power consuming devices is selectively enabled and disabled by one or more controllable devices controlled by the client device. The client device receives a power control message from a load management server. In one embodiment, the power control message indicates at least one of an amount of electric power to be reduced and an identification of at least one controllable device to be instructed to disable a flow of electric power to one or more associated power consuming devices. Responsive to the power control message, the client device issues a power management command or instruction to one or more controllable devices under the client device's control. The power management command causes the controllable device (s) to disable a flow of electric power to at least one associated power consuming device.

**29 Claims, 8 Drawing Sheets**



**Related U.S. Application Data**

continuation-in-part of application No. 13/172,389, filed on Jun. 29, 2011, now Pat. No. 8,315,717, which is a continuation of application No. 12/715,195, filed on Mar. 1, 2010, now Pat. No. 8,032,233, which is a division of application No. 11/895,909, filed on Aug. 28, 2007, now Pat. No. 7,715,951.

(51) **Int. Cl.**
***G01D 4/00*** (2006.01)
***G06Q 10/06*** (2012.01)
***G06Q 50/06*** (2012.01)
***H02J 3/14*** (2006.01)

(52) **U.S. Cl.**
CPC ................ ***H02J 3/14*** (2013.01); ***H04L 67/02*** (2013.01); *Y02B 70/3225* (2013.01); *Y02B 90/242* (2013.01); *Y02B 90/245* (2013.01); *Y04S 10/54* (2013.01); *Y04S 20/222* (2013.01); *Y04S 20/322* (2013.01); *Y04S 20/40* (2013.01)

(58) **Field of Classification Search**
CPC ...... Y04S 10/54; Y04S 20/322; Y04S 20/222; Y04S 20/40; Y02B 70/3225; Y02B 90/242; Y02B 90/245
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS


6,154,859 A * 11/2000 Norizuki ............... H04L 12/423 714/47.1
6,366,217 B1 4/2002 Cunningham et al.
6,529,839 B1 3/2003 Ness et al.
6,583,521 B1 6/2003 Lagod et al.
6,633,823 B2 10/2003 Bartone et al.
6,747,368 B2 6/2004 Jarrett, Jr.
6,891,838 B1 5/2005 Petite et al.
6,944,555 B2 9/2005 Blackett et al.
6,961,641 B1 * 11/2005 Forth ..................... G06Q 50/06 700/22
7,141,321 B2 11/2006 McArthur et al.
7,142,949 B2 11/2006 Brewster et al.
7,233,843 B2 6/2007 Budhraja et al.
7,263,450 B2 8/2007 Hunter
7,289,887 B2 10/2007 Rodgers
7,565,227 B2 * 7/2009 Richard ........... G06Q 10/06312 700/286
7,715,951 B2 * 5/2010 Forbes, Jr. ............. G01D 4/004 323/299
7,747,165 B2 6/2010 Emery et al.
7,940,901 B2 5/2011 Paraskevakos et al.
8,010,812 B2 * 8/2011 Forbes, Jr. ............. G01D 4/004 700/22
8,032,233 B2 * 10/2011 Forbes, Jr. ............. G01D 4/004 323/299
8,032,461 B2 10/2011 Winter et al.
8,068,938 B2 11/2011 Fujita
8,145,361 B2 * 3/2012 Forbes, Jr. ............. G06Q 10/00 700/286
8,260,468 B2 9/2012 Ippolito et al.
8,260,470 B2 * 9/2012 Forbes, Jr. ............. G06Q 10/00 340/870.02
8,307,225 B2 11/2012 Forbes, Jr. et al.
8,315,717 B2 * 11/2012 Forbes, Jr. ............. G01D 4/004 323/299
8,315,743 B2 11/2012 Sackman et al.
8,359,124 B2 1/2013 Zhou et al.
8,359,215 B1 1/2013 Robbins et al.
8,364,609 B2 1/2013 Ozog
8,407,252 B2 3/2013 Bennett et al.
8,417,569 B2 4/2013 Gross
8,428,752 B2 4/2013 Bennett et al.
8,442,917 B1 5/2013 Burke
8,457,802 B1 6/2013 Steven et al.
8,473,111 B1 6/2013 Shankar et al.
8,571,930 B1 10/2013 Galperin
8,583,520 B1 11/2013 Forbes
8,588,991 B1 * 11/2013 Forbes, Jr. ............. G05B 19/02 700/286
8,684,266 B2 4/2014 Bennett et al.
8,805,552 B2 * 8/2014 Forbes, Jr. ............. G01D 4/004 323/299
2002/0019758 A1 2/2002 Scarpelli
2002/0019802 A1 2/2002 Malme et al.
2002/0161648 A1 10/2002 Mason et al.
2002/0198629 A1 12/2002 Ellis
2003/0149937 A1 8/2003 Mcelfresh et al.
2003/0167178 A1 9/2003 Jarman et al.
2003/0176952 A1 9/2003 Collins et al.
2004/0024483 A1 2/2004 Holcombe
2004/0044571 A1 3/2004 Bronnimann et al.
2004/0095237 A1 5/2004 Chen et al.
2004/0107025 A1 6/2004 Ransom et al.
2004/0138834 A1 7/2004 Blackett et al.
2004/0225514 A1 11/2004 Greenshields et al.
2005/0021397 A1 1/2005 Cui et al.
2005/0065742 A1 3/2005 Rodgers
2005/0080772 A1 4/2005 Bem
2005/0096857 A1 * 5/2005 Hunter .................. G01D 4/004 702/60
2005/0096979 A1 5/2005 Koningstein
2005/0097204 A1 5/2005 Horowitz et al.
2005/0127680 A1 6/2005 Lof et al.
2005/0138432 A1 * 6/2005 Ransom ................ G01D 4/004 726/4
2005/0197742 A1 9/2005 Scott et al.
2005/0240315 A1 10/2005 Booth et al.
2005/0288954 A1 12/2005 Mccarthy et al.
2006/0020596 A1 1/2006 Liu et al.
2006/0069616 A1 3/2006 Bau
2006/0161310 A1 7/2006 Lal
2006/0190354 A1 8/2006 Meisel et al.
2006/0212350 A1 9/2006 Ellis et al.
2006/0224615 A1 10/2006 Korn et al.
2006/0271314 A1 11/2006 Hayes
2006/0276938 A1 12/2006 Miller
2006/0282328 A1 12/2006 Gerace et al.
2007/0038563 A1 2/2007 Ryzerski
2007/0100961 A1 5/2007 Moore
2007/0150353 A1 6/2007 Krassner et al.
2007/0156621 A1 7/2007 Wright et al.
2007/0156887 A1 7/2007 Wright et al.
2007/0174114 A1 7/2007 Bigby et al.
2007/0192333 A1 8/2007 Ali
2007/0214118 A1 9/2007 Schoen et al.
2007/0214132 A1 9/2007 Grubb et al.
2007/0260540 A1 11/2007 Chau et al.
2008/0010212 A1 1/2008 Moore et al.
2008/0040223 A1 2/2008 Bridges et al.
2008/0104026 A1 5/2008 Koran
2008/0109387 A1 5/2008 Deaver et al.
2008/0154801 A1 6/2008 Fein et al.
2008/0177678 A1 7/2008 Di Martini et al.
2008/0186202 A1 8/2008 Vaswani et al.
2008/0195462 A1 8/2008 Magdon-Ismail et al.
2008/0249832 A1 10/2008 Richardson et al.
2008/0263025 A1 10/2008 Koran
2008/0270223 A1 10/2008 Collins et al.
2008/0272934 A1 11/2008 Wang et al.
2008/0281473 A1 * 11/2008 Pitt ...................... G06Q 30/02 700/291
2008/0306824 A1 12/2008 Parkinson
2008/0306830 A1 12/2008 Lasa et al.
2008/0313632 A1 12/2008 Kumar et al.
2008/0319893 A1 12/2008 Mashinsky et al.
2009/0012996 A1 1/2009 Gupta et al.
2009/0024718 A1 1/2009 Anagnostopoulos et al.
2009/0045804 A1 2/2009 Durling et al.
2009/0055031 A1 * 2/2009 Slota ........................ H02J 3/42 700/287
2009/0055032 A1 2/2009 Rodgers

(56) **References Cited**

U.S. PATENT DOCUMENTS


2009/0088907 A1 4/2009 Lewis et al.
2009/0112701 A1 4/2009 Turpin et al.
2009/0124241 A1 5/2009 Krishnaswamy et al.
2009/0125462 A1 5/2009 Krishnaswamy et al.
2009/0135836 A1 5/2009 Veillette
2009/0138362 A1 5/2009 Schroedl et al.
2009/0157529 A1 6/2009 Ehlers et al.
2009/0187344 A1 7/2009 Brancaccio et al.
2009/0198384 A1 8/2009 Ahn
2009/0228335 A1 9/2009 Niyogi et al.
2009/0240677 A1 9/2009 Parekh et al.
2009/0281673 A1 11/2009 Taft
2009/0281674 A1 11/2009 Taft
2009/0313034 A1 12/2009 Ferro et al.
2009/0313103 A1 12/2009 Ambrosio et al.
2009/0319415 A1 12/2009 Stoilov et al.
2010/0076835 A1 3/2010 Silverman
2010/0094981 A1 4/2010 Cordray et al.
2010/0106641 A1 4/2010 Chassin et al.
2010/0138452 A1 6/2010 Henkin et al.
2010/0163634 A1 7/2010 Klein et al.
2010/0169175 A1 7/2010 Koran
2010/0179862 A1 7/2010 Chassin et al.
2010/0217452 A1 8/2010 Mccord et al.
2010/0217549 A1 8/2010 Galvin et al.
2010/0217550 A1 8/2010 Crabtree et al.
2010/0217642 A1 8/2010 Crubtree et al.
2010/0218108 A1 8/2010 Crabtree et al.
2010/0274407 A1 10/2010 Creed
2010/0293045 A1 11/2010 Burns et al.
2010/0306033 A1 12/2010 Oved et al.
2010/0324748 A1 12/2010 Voysey
2010/0328849 A1 12/2010 Ewing et al.
2010/0332373 A1 12/2010 Crabtree et al.
2011/0007824 A1 1/2011 Bridges et al.
2011/0025556 A1 2/2011 Bridges et al.
2011/0029655 A1 2/2011 Forbes, Jr. et al.
2011/0055036 A1 3/2011 Helfan
2011/0060474 A1 3/2011 Schmiegel et al.
2011/0080044 A1 4/2011 Schmiegel
2011/0106729 A1 5/2011 Billingsley et al.
2011/0115302 A1* 5/2011 Slota ........................ H02J 3/42 307/87
2011/0130982 A1 6/2011 Haag et al.
2011/0133655 A1* 6/2011 Recker ...................... H02J 9/02 315/159
2011/0145061 A1 6/2011 Spurr et al.
2011/0161250 A1 6/2011 Koeppel et al.
2011/0172841 A1* 7/2011 Forbes, Jr. ............. G01D 4/004 700/292
2011/0185303 A1 7/2011 Katagi et al.
2011/0196546 A1 8/2011 Muller et al.
2011/0196547 A1 8/2011 Park et al.
2011/0204717 A1 8/2011 Shaffer
2011/0204719 A1 8/2011 Sackman et al.
2011/0208366 A1 8/2011 Taft
2011/0208367 A1 8/2011 Sackman et al.
2011/0231028 A1 9/2011 Ozog
2011/0235656 A1 9/2011 Pigeon
2011/0251730 A1* 10/2011 Pitt ........................ G06Q 30/02 700/291
2011/0257809 A1* 10/2011 Forbes, Jr. ............. G01D 4/004 700/297
2011/0258022 A1* 10/2011 Forbes, Jr. ............. G01D 4/004 705/7.39
2011/0267202 A1 11/2011 Efthymiou et al.
2011/0270682 A1 11/2011 Valin
2012/0004872 A1 1/2012 Oh et al.
2012/0059532 A1 3/2012 Reifenhaeuser et al.
2012/0078427 A1 3/2012 Jang et al.
2012/0089263 A1 4/2012 Park et al.
2012/0095841 A1 4/2012 Luckerman et al.
2012/0101652 A1 4/2012 Shin et al.
2012/0131100 A1 5/2012 Van Olst et al.
2012/0146799 A1 6/2012 Bell et al.
2012/0153888 A1 6/2012 Jung
2012/0154171 A1 6/2012 Hurri et al.
2012/0196482 A1 8/2012 Stokoe
2012/0205977 A1 8/2012 Shin et al.
2012/0223840 A1 9/2012 Guymon et al.
2012/0232816 A1 9/2012 Oh et al.
2012/0239218 A1* 9/2012 Forbes, Jr. ............. G01D 4/004 700/295
2012/0259760 A1 10/2012 Sgouridis et al.
2012/0296799 A1 11/2012 Playfair et al.
2012/0310800 A1 12/2012 Xia et al.
2012/0316691 A1 12/2012 Boardman et al.
2012/0316697 A1 12/2012 Boardman et al.
2013/0006435 A1 1/2013 Berrios et al.
2013/0031201 A1 1/2013 Kagan et al.
2013/0035802 A1 2/2013 Khaitan et al.
2013/0038468 A1 2/2013 Wang et al.
2013/0079939 A1* 3/2013 Darden, II ........... G06Q 10/063 700/291
2013/0079943 A1* 3/2013 Darden, II ............ G06Q 50/06 700/297
2013/0110297 A1 5/2013 Reichmuth et al.
2013/0123998 A1 5/2013 King et al.
2013/0144768 A1 6/2013 Rohrbaugh
2013/0173360 A1 7/2013 Thatcher
2013/0191260 A1 7/2013 Michael
2014/0025486 A1 1/2014 Bigby et al.
2014/0039703 A1* 2/2014 Forbes, Jr. ............. G05B 19/02 700/286


* cited by examiner


10
90
20
80
400
BPL, Ethernet, or RF Control
Residential or Smart Breaker Load Center
Network
Active Load Client
300
60
Smart Appliance
100
Active Load Director Server
70
Washer/ Dryer
Hot Water Heater
HVAC Unit
Pool Pump
200
Utility (s) Data Energy Control Center
30
40
50

FIG. 1


100
Active Load Director Server
Security I/F
102
UCC Command Processor
104
Master Event Manager
106
Active Load Client Manager
108
Security Device Mgmt
140
Security Interface
110
Active Load Client Interface
112
Read Meter Application
136
Web Browser Interface
114
Customer Personal Settings
138
Customer Sign Up Application
116
Customer Reports Application
118
Active Load Director Data Base
124
Power Savings Application
120
Active Load Client Diagnostic Manager
122
Service Dispatch Manager
126
Trouble Ticket Generator
128
Call Center Manager
130
Carbon Savings Application
132
Utility P&C Data Base
134
Customer Rewards Program
150
Utility Control Center
200
Active Load Client
300

FIG. 2


To/From ALD Server 100
308
Communications Interface
IP Layer 3 Router
Security Interface
IP Based Communication Converter
320
310
312
Current Sensor
450
452
Smart Meter
460
300
322
Smart Meter Interface
328
Security Device Interface
330
IP Device Interface
440
Local IP Connected Device(s)
318
Report Trigger
Active Load Client
314
Device Control Manager
316
B1-BN Counter Manager
306
Smart Breaker Module Controller
400
SMART BREAKER MODULE
B1
402
B2
404
B3
406
B4
408
B5
410
B6
412
302
Linux
304
Status Response
324
Smart Device Interface
420
One or More Power Management Enabled Devices

FIG. 3


500
ENTER
502
RECEIVE TRANSACTION
503
TRANSACTION TYPE?
NEW SERVICE
SERVICE
504
SCHEDULE SERVICE PERSON FOR INITIAL INSTALLATION
506
NOTIFY SERVICE PERSON OF SERVICE CALL VIA EMAIL OR INSTANT MESSAGING
508
RECEIVE INSTALLATION COMPLETE REPORT FROM SERVICE PERSON
510
SEND "UPDATE" TRANSACTION TO ALC MANAGER
512
SCHEDULE SERVICE PERSON FOR SERVICE CALL
514
SEND "DIAGNOSE" TRANSACTION TO ALC DIAGNOSTIC MANAGER
516
NOTIFY SERVICE PERSON OF SERVICE CALL AND RESULTS OF DIAGNOSTIC PROCEDURE USING TROUBLE TICKET
EXIT

*FIG. 4*


600
ENTER
602
RECEIVE "UPDATE" TRANSACTION FROM SERVICE DISPATCH MANAGER
604
SEND QUERY REQUEST TO ALC AT SPECIFIED IP ADDRESS
606
RECEIVE REPLY TO QUERY REQUEST
608
UPDATE ALD DATABASE WITH LATEST STATUS INFORMATION OBTAINED FROM ALC
610
IS ALC FUNCTIONING PROPERLY?
NO
YES
612
SET CUSTOMER STATE TO ACTIVE
614
SEND "SERVICE" TRANSACTION TO SERVICE DISPATCH MANAGER
EXIT

*FIG. 5*



ENTER
700
702
TRACK CURRENT POWER USAGE WITHIN EACH UTILITY
704
RECEIVE TRANSACTION
706
TRANSACTION TYPE?
"CUT"
"END EVENT"
"HOW MUCH"
708
PLACE UTILITY IN MANAGED STATE
712
DETERMINE AMOUNT OF POWER THAT MAY BE REMOVED BY ACCESSING CURRENT USAGE INFORMATION FOR UTILITY
714
SET STATE OF EVENT AS "PENDING"
716
SEND "END EVENT" TRANSACTION TO ALC MANAGER
710
SEND "CUT" TRANSACTION TO ALC MANAGER WITH NUMBER OF MEGAWATTS TO BE REMOVED FROM SYSTEM
718
RECEIVE "EVENT ENDED" TRANSACTION FROM ALC MANAGER
720
SET STATE OF UTILITY TO "NOT MANAGED"
722
NOTIFY CUSTOMERS THAT POWER MANAGEMENT EVENT HAS ENDED
711
NOTIFY CUSTOMERS THAT POWER MANAGEMENT EVENT IN PROCESS
724
SEND "EVENT ENDED" TRANSACTION TO POWER SAVINGS APPLICATION
EXIT


FIG. 6



ENTER
800
802
TRACK STATE OF EVERY ALC HAVING AN IP ADDRESS WITHIN SPECIFIED UTILITY
804
LOG INFORMATION RECEIVED FROM EACH ALC IN ALS DATABASE IN RECORD CORRESPONDING TO SPECIFIC ALC
806
RECEIVE TRANSACTION
808
TRANSACTION?
"CUT"
"END EVENT"
"TURN ON"
810
ENTER "MANAGE STATE"
812
DETERMINE WHICH ALC AND ASSOCIATED DEVICES TO TURN OFF
814
SEND "TURN OFF" TRANSACTION TO SELECTED ALC'S WITH LIST OF INDICATED DEVICES TO TURN OFF
816
LOG AMOUNT OF POWER AND TIMESTAMP IN ALS DB FOR EACH ALC REDUCED
818
SCHEDULE "TURN ON" TRANSACTION TO ALC MANAGER
820
FIND ONE OR MORE ALC'S IN "ON" STATE WHICH WILL SAVE THE EQUIVALENT POWER AS ALC CURRENTLY IN "OFF" STATE
822
SEND "TURN OFF" TRANSACTION TO EACH ALC NECESSARY TO SAVE EQUIVALENT POWER
824
SEND "TURN ON" TRANSACTION TO ALC FOR WHICH ORIGINAL "TURN ON" TRANSACTION WAS RECEIVED
826
LOG "TURN ON" TRANSACTION TIME IN ALD DATABASE
828
SEND "TURN ON" TRANSACTION TO EACH ALC CURRENTLY IN "OFF" STATE
830
ALL ALC'S ON?
NO
YES
832
SEND "EVENT ENDED" TRANSACTION TO MASTER EVENT MANAGER
EXIT


FIG. 7


900
ENTER
902
RECEIVE "EVENT ENDED" TRANSACTION FROM MASTER EVENT MANAGER
904
ACCESS ALS DATABASE FOR EACH ALC MANAGED DURING "CUT" TRANSACTION
906
STORE TOTAL AMOUNT OF POWER SAVED AND RELATED INFORMATION FOR SPECIFIC UTILITY DURING PREVIOUS "CUT" TRANSACTION IN UTILITY P&C DATABASE
908
INVOKE CARBON SAVINGS APPLICATION
EXIT

*FIG. 8*

# METHOD AND APPARATUS FOR ACTIVELY MANAGING CONSUMPTION OF ELECTRIC POWER OVER AN ELECTRIC POWER GRID

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application relates to and claims priority from the following U.S. patent applications. This application is a continuation of U.S. application Ser. No. 13/463,761, filed May 3, 2012 and issued as U.S. Pat. No. 8,805,552, which is a continuation-in-part of U.S. application Ser. No. 13/172,389, filed Jun. 29, 2011 and issued as U.S. Pat. No. 8,315,717, which is a continuation of U.S. application Ser. No. 12/715,195, filed Mar. 1, 2010 and issued as U.S. Pat. No. 8,032,233, which is a divisional of U.S. application Ser. No. 11/895,909, filed Aug. 28, 2007 and issued as Pat. No. 7,715,951, each of which is herein incorporated by reference in its entirety.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates generally to the field of electrical power load control systems and more particularly to a method and system for actively controlling power load management for individual customers and optionally tracking power savings for both the individual customer as well as the overall electric utility.

2. Description of Related Art

The increased awareness of the impact of carbon emissions from the use of fossil fueled electric generation combined with the increased cost of producing peak power during high load conditions has increased the need for alternative solutions utilizing load control as a mechanism to defer, or in some cases eliminate, the need for the deployment of additional generation capacity by electric utilities. Existing electric utilities are pressed for methods to defer or eliminate the need for construction of fossil-based electricity generation. Today, a patchwork of systems exist to implement demand response load management programs, whereby various radio subsystems in various frequency bands utilize "one-way" transmit only methods of communication. Under these programs, RF controlled relay switches are typically attached to a customer's air conditioner, water heater, or pool pump. A blanket command is sent out to a specific geographic area whereby all receiving units within the range of the transmitting station (e.g., typically a paging network) are turned off during peak hours at the election of the power utility. After a period of time when the peak load has passed, a second blanket command is sent to turn on those devices that have been turned off

While tele-metering has been used for the express purpose of reporting energy usage, no techniques exist for calculating power consumption, carbon gas emissions, sulfur dioxide (SO.sub.2) gas emissions, and/or nitrogen dioxide (NO.sub.2) emissions, and reporting the state of a particular device under the control of a two-way positive control load management device. In particular, one way wireless communications devices have been utilized to de-activate electrical appliances, such as heating, ventilation, and air-conditioning (HVAC) units, water heaters, pool pumps, and lighting, from an existing electrical supplier or distribution partner's network. These devices have typically been used in combination with wireless paging receivers that receive "on" or "off" commands from a paging transmitter. Additionally, the one-way devices are typically connected to a serving electrical supplier's control center via landline trunks, or in some cases, microwave transmission to the paging transmitter. The customer subscribing to the load management program receives a discount for allowing the serving electrical supplier (utility) to connect to their electrical appliances and deactivate those appliances during high energy usage periods.



While one-way devices are generally industry standard and relatively inexpensive to implement, the lack of a return path from the receiver, combined with the lack of information on the actual devices connected to the receiver, make the system highly inefficient for measuring the actual load shed to the serving utility. While the differential current draw is measurable on the serving electric utility's transmission lines, the actual load shed is approximate and the location of the load deferral is approximated at the control center of the serving utility.

One exemplary tele-metering system is disclosed in U.S. Pat. No. 6,891,838 B1. This patent describes details surrounding a mesh communication of residential devices and the reporting and control of those devices, via WANs, to a computer. The stated design goal in this patent is to facilitate the "monitoring and control of residential automation systems." This patent does not explain how a serving utility or customer could actively control the devices to facilitate the reduction of electricity. In contrast, this patent discloses techniques that could be utilized for reporting information that is being displayed by the serving utility's power meter (as do many other prior applications in the field of tele-metering).

An additional exemplary tele-metering system is disclosed in U.S. Patent Application Publication No. 2005/0240315 A1. The primary purpose of this published application is not to control utility loads, but rather "to provide an improved interactive system for remotely monitoring and establishing the status of a customer utility load." A stated goal of this publication is to reduce the amount of time utility field personnel have to spend in the field servicing meters by utilizing wireless technology.

Another prior art system is disclosed in U.S. Pat. No. 6,633,823 B2, which describes, in detail, the use of proprietary hardware to remotely turn off or turn on devices within a building or residence. While initially this prior art generally describes a system that would assist utilities in managing power load control, the prior art does not contain the unique attributes necessary to construct or implement a complete system. In particular, this patent is deficient in the areas of security, load accuracy of a controlled device, and methods disclosing how a customer utilizing applicable hardware might set parameters, such as temperature set points, customer preference information, and customer overrides, within an intelligent algorithm that reduces the probability of customer dissatisfaction and service cancellation or churn.

Attempts have been made to bridge the gap between one-way, un-verified power load control management systems and positive control verified power load control management systems. However, until recently, technologies such as smart breakers and command relay devices were not considered for use in residential and commercial environments primarily due to high cost entry points, lack of customer demand, and the cost of power generation relative to the cost of implementing load control.

One such gap-bridging attempt is described in U.S. Patent Application Publication No. US 2005/0065742 A1. This publication discloses a system and method for remote power management using IEEE 802 based wireless communication

links. The system disclosed in this publication includes an on-premise processor (OPP), a host processor, and an end device. The host processor issues power management commands to the OPP, which in turn relays the commands to the end devices under its management. While the disclosed OPP does provide some intelligence in the power management system, it does not determine which end devices under its control to turn-off during a power reduction event, instead relying on the host device to make such decision. For example, during a power reduction event, the end device must request permission from the OPP to turn on. The request is forwarded to the host device for a decision on the request in view of the parameters of the on-going power reduction event. The system also contemplates periodic reading of utility meters by the OPP and storage of the read data in the OPP for later communication to the host device. The OPP may also include intelligence to indicate to the host processor that the OPP will not be able to comply with a power reduction command due to the inability of a load under the OPP's control to be deactivated. However, neither the host processor nor the OPP determine which loads to remove in order to satisfy a power reduction command from an electric utility, particularly when the command is issued by one of several utilities under the management of a power management system. Further, neither the host processor nor the OPP tracks or accumulates power saved and/or carbon credits earned on a per customer or per utility basis for future use by the utility and/or customer. Still further, the system of this publication lacks a reward incentive program to customers based on their participation in the power management system. Still further, the system described in this publication does not provide for secure communications between the host processor and the OPP, and/or between the OPP and the end device. As a result, the described system lacks many features that may be necessary for a commercially viable implementation.

Therefore, a need exists for a system and method for active power load management for individual customers that is optionally capable of tracking power savings for the individual customer as well as the electric utility to thereby overcome the shortcomings of the prior art.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a block diagram of an IP-based active power load management system in accordance with an exemplary embodiment of the present invention.

FIG. **2** is a block diagram illustrating an exemplary active load director (ALD) server as shown in the system of FIG. **1**.

FIG. **3** is a block diagram illustrating an exemplary active load client and smart breaker module as shown in the system of FIG. **1**.

FIG. **4** is an operational flow diagram illustrating a method for automatically scheduling service calls in an active power load management system in accordance with one exemplary embodiment of the present invention.

FIG. **5** is an operational flow diagram illustrating a method for activating new subscribers in an active power load management system in accordance with another exemplary embodiment of the present invention.

FIG. **6** is an operational flow diagram illustrating a method for managing events occurring in an active power load management system in accordance with yet another exemplary embodiment of the present invention.

FIG. **7** is an operational flow diagram illustrating a method for actively reducing consumed power and tracking power savings on an individual customer basis in an active power load management system in accordance with another exemplary embodiment of the present invention.

FIG. **8** is an operational flow diagram illustrating a method for tracking cumulative power savings of an electric utility in an active power load management system during a power savings event in accordance with yet another exemplary embodiment of the present invention.

## DETAILED DESCRIPTION OF EXEMPLARY EMBODIMENTS

Before describing in detail exemplary embodiments that are in accordance with the present invention, it should be observed that the embodiments reside primarily in combinations of apparatus components and processing steps related to actively managing power loading on an individual subscriber basis and optionally tracking power savings incurred by both individual subscribers and an electric utility. Accordingly, the apparatus and method components have been represented where appropriate by conventional symbols in the drawings, showing only those specific details that are pertinent to understanding the embodiments of the present invention so as not to obscure the disclosure with details that will be readily apparent to those of ordinary skill in the art having the benefit of the description herein.

In this document, relational terms, such as "first" and "second," "top" and "bottom," and the like, may be used solely to distinguish one entity or element from another entity or element without necessarily requiring or implying any physical or logical relationship or order between such entities or elements. The terms "comprises," "comprising," or any other variation thereof are intended to cover a non-exclusive inclusion, such that a process, method, article, or apparatus that comprises a list of elements does not include only those elements, but may include other elements not expressly listed or inherent to such process, method, article, or apparatus. The term "plurality of" as used in connection with any object or action means two or more of such object or action. A claim element proceeded by the article "a" or "an" does not, without more constraints, preclude the existence of additional identical elements in the process, method, article, or apparatus that includes the element. Additionally, the term "ZigBee" refers to any wireless communication protocol adopted by the Institute of Electronics & Electrical Engineers (IEEE) according to standard 802.15.4 or any successor standard(s), the term "Wi-Fi" refers to any communication protocol adopted by the IEEE under standard 802.11 or any successor standard (s), the term "WiMax" refers to any communication protocol adopted by the IEEE under standard 802.16 or any successor standard(s), and the term "Bluetooth" refers to any short-range communication protocol implementing IEEE standard 802.15.1 or any successor standard(s). Additionally or alternatively to WiMax, other communications protocols may be used, including but not limited to a "1G" wireless protocol such as analog wireless transmission, first generation standards based (IEEE, ITU or other recognized world communications standard), a "2-G" standards based protocoal such as "EDGE or CDMA 2000 also known as 1XRTT", a 3G based standard such as "High Speed Packet Access (HSPA) or Evolution for Data Only (EVDO)", any accepted 4G standard such as "IEEE, ITU" standards that include WiMax, Long Term Evolution "LTE" and its derivative standards, any Ethernet solution wireless or wired, or any proprietary wireless or power line carrier standards that

communicate to a client device or any controllable device that sends and receives an IP based message.

It will be appreciated that embodiments of the invention described herein may be comprised of one or more conventional processors and unique stored program instructions that control the one or more processors to implement, in conjunction with certain non-processor circuits, some, most, or all of the functions for managing power load distribution and tracking individual subscriber power consumption and savings in one or more power load management systems as described herein. The non-processor circuits may include, but are not limited to, radio receivers, radio transmitters, antennas, modems, signal drivers, clock circuits, power source circuits, relays, meters, smart breakers, current sensors, and user input devices. As such, these functions may be interpreted as steps of a method to distribute information and control signals between devices in a power load management system. Alternatively, some or all functions could be implemented by a state machine that has no stored program instructions, or in one or more application specific integrated circuits (ASICs), in which each function or some combinations of functions are implemented as custom logic. Of course, a combination of the two approaches could be used. Thus, methods and means for these functions have been described herein. Further, it is expected that one of ordinary skill in the art, notwithstanding possibly significant effort and many design choices motivated by, for example, available time, current technology, and economic considerations, when guided by the concepts and principles disclosed herein, will be readily capable of generating such software instructions, programs and integrated circuits (ICs), and appropriately arranging and functionally integrating such non-processor circuits, without undue experimentation.

Recently, the IEEE has released improved WiMax wireless standards that have facilitated the consideration of new technologies to improve the response and control of power load control devices employing smart breaker technologies. Embodiments of the present invention expand upon and enhance prior technologies by, among other things, employing WiMax or IP-based load control in a system with the ability to monitor, in real time, the amount of power deferred (or carbon, SO.sub.2, or NO.sub.2 eliminated). These improvements allow new options for electric utilities to defer or invest in new power generation that is friendlier to the environment.

IP-based power management is advantageous over existing systems for many reasons. For example, positive control allows a system controller to receive a response from an end device installed at a customer location, which indicates that the actual target device has turned "off" or "on." Additionally, each equipment identifier is unique and each IP address is either dynamically assigned when the device is activated (e.g., through use of the dynamic host configuration protocol (DHCP)) or statically assigned by the serving IP network, thereby providing enhanced security to protect against an act of random terrorism or sabotage inadvertently shutting down power services. Existing power management systems, including those utilizing radio subsystems, do not address security problems adequately and thus are more likely susceptible to hostile or malicious acts.

IP-based systems are also bandwidth or network efficient. For example, IP devices are controlled via the 7-layer Open Systems Interconnection (OSI) model whereby the payload of each packet can contain a message or "change in state" and does not require synchronous communication. This method of transmission allows for very minimum overhead and low data rates on a broadband network. Additionally, IP devices can report many states, including "no power." For example, the active load client **300** may be implemented with a battery backup mechanism to provide backup or auxiliary power to the active load client **300** when AC power is lost. In this case, when battery backup is invoked, the active load client **300** can report a "no power" condition. Alternatively, a "no power" condition may be assumed if an active load client **300** fails to timely respond to a message (e.g., a poll or other message) from the ALD server **100**, particularly where multiple active load clients **300** in a geographic area fail to timely respond to the ALD server messaging. Because the geographic location of each customer premises and active load client **300** may be known at the time of installation or thereafter (e.g., using GPS coordinates), such network outages may be located on a per meter basis.



One of the most beneficial advantages of an IP-based power management system, as provided in one embodiment of the present invention, is accurate reporting of the actual amount of power saved by each customer on an individual basis. Embodiments of the present invention monitor and calculate precisely how many kilowatts (or carbon credits) are being generated or saved per customer instead of merely providing an estimate. Furthermore, embodiments of the present invention provide means for tracking the actual amount of deferred load and pollutants according to generation mix, serving utility and geographic area.

Embodiments of the present invention include an exemplary system for supporting a serving utility or power distributor (e.g., such as a municipality, electric cooperative, or any other wholesale or retail producer of electric power), methods for providing continuous, real time active power control in the system, and a method for determining how much actual load may be controlled at any given time for the purposes of conservation, alternative power generation and the creation of carbon (and other gaseous emissions) credits.

Additional embodiments of the present invention provide a system that implements the exemplary methods through the unique use of load information, location of customers consuming electricity, changes in state of controlled devices, current sensing, customer set points/preferences and artificial intelligence (e.g., as implemented through software) to optimize the presentation of load available to the serving utility for control.

Generally, the embodiments disclosed in the present invention are directed towards the real time (active) control of residential and commercial electrical devices that generally are 240V or less. However, specific features and functions may also be applicable to larger commercial installations that are greater than 240V. The description herein is intended to provide a practical implementation of real time load management for either voluntary or involuntary participants over large geographies and ideally for many serving electrical power producers, wholesalers or distributors. The exemplary methods and systems disclosed in the present invention may be implemented by an individual utility provider, or a third party monitoring service that tracks and manages power loading for one or more utilities. This application describes the necessary methods and generally describes software subsystems for both a host function (e.g., an active load director (ALD) server) and a companion active load client (ALC).

One embodiment of the present invention controls power distribution for a variety of electric utility companies or any other electric power grid operator(s) by actively monitoring the amount of power needed by each utility and supplying the required power by redirecting power from participating

customers. In this embodiment, customers agree to allow the power management system to disable certain power-consuming devices during peak loading times of the day. Smart breakers, which have the ability to be switched on or off remotely, are installed for specific devices in an electric service control panel accessed by a known IP address. Alternatively, IP-addressable smart appliances may be used. The power management system determines the amount of steady-state power each device consumes when turned on and logs the information in a database for each subscriber. For example, a current sensor on each smart appliance or within each smart breaker may measure the amount of current consumed by each monitored device. An active load client then multiplies the amount of current consumed by the operating voltage of the device to obtain the power consumption, and transmits the power consumption to the ALD server. When the serving utility needs more power than it is currently able to supply, the power load management system automatically adjusts the power distribution by turning off specific loads on an individual subscriber basis. Because the amount of power consumed by each specific load is known, the system can determine precisely which loads to turn off and tracks the power savings generated by each customer as a result of this short-term outage.

Furthermore, based upon the reduction in consumed power, the systems and methods of the present invention provide for generating at the control center a power supply value (PSV) corresponding to the reduction in consumed power by the power consuming device(s). Importantly, the PSV is an actual value that includes measurement and verification of the reduction in consumed power; such measurement and verification methods may be determined by the appropriate governing body or authority for the electric power grid(s). Power Supply Value (PSV) is calculated at the meter or submeter or at building control system or at any device or controller that measures power within the standard as supplied by the regulatory body(ies) that govern the regulation of the grid. PSV variations may depend on operating tolerances, operating standard for accuracy of the measurement. The PSV enables transformation of curtailment or reduction in power at the device level by any system that sends or receives an IP message to be related to or equated to supply as presented to the governing entity that accepts these values and award supply equivalence, for example of a power generating entity or an entity allowed to control power consuming devices as permitted by the governing body of the electric power grid, e.g., FERC, NERC, etc.

.PSV may be provided in units of electrical power flow, monetary equivalent, and combinations thereof. Thus, the PSV provides an actual value that is confirmed by measurement and/or verification, thereby providing for a curtailment value as a requirement for providing supply to the power grid, wherein the supply to the power electric power grid is provided for grid stability, voltage stability, reliability, and combinations thereof, and is further provided as responsive to an energy management system or equivalent for providing grid stability, reliability, frequency as determined by governing authority for the electric power grid and/or grid operator(s).

The present invention can be more readily understood with reference to FIGS. **1**-**8**, in which like reference numerals designate like items. FIG. **1** depicts an exemplary IP-based active power load management system **10** in accordance with one embodiment of the present invention. The exemplary power management system **10** monitors and manages power distribution via an active load director (ALD) server **100** connected between one or more utility control centers (UCCs) **200** (one shown) and one or more active load clients (ALCs) **300** (one shown). The ALD server **100** may communicate with the utility control center **200** and each active load client **300** either directly or through a network **80** using the Internet Protocol (IP) or any other connection-based protocols. For example, the ALD server **100** may communicate using RF systems operating via one or more base stations **90** (one shown) using one or more wireless communication protocols, such as Global System for Mobile communications (GSM), Enhanced Data GSM Environment (EDGE), High Speed Packet Access (HSDPA), Time Division Multiple Access (TDMA), or Code Division Multiple Access data standards, including CDMA 2000, CDMA Revision A, and CDMA Revision B. Alternatively, or additionally, the ALD server **100** may communicate via a digital subscriber line (DSL) capable connection, cable television based IP capable connection, or any combination thereof. In the exemplary embodiment shown in FIG. **1**, the ALD server **100** communicates with one or more active load clients **300** using a combination of traditional IP-based communication (e.g., over a trunked line) to a base station **90** and a wireless channel implementing the WiMax protocol for the "last mile" from the base station **90** to the active load client **300**.

Each active load client **300** is accessible through a specified address (e.g., IP address) and controls and monitors the state of individual smart breaker modules or intelligent appliances **60** installed in the business or residence **20** to which the active load client **300** is associated (e.g., connected or supporting). Each active load client **300** is associated with a single residential or commercial customer. In one embodiment, the active load client **300** communicates with a residential load center **400** that contains smart breaker modules, which are able to switch from an "ON" (active) state to an "OFF" (inactive), and vice versa, responsive to signaling from the active load client **300**. Smart breaker modules may include, for example, smart breaker panels manufactured by Schneider Electric SA under the trademark "Square D" or Eaton Corporation under the trademark "Cutler-Hammer" for installation during new construction. For retro-fitting existing buildings, smart breakers having means for individual identification and control may be used. Typically, each smart breaker controls a single appliance (e.g., a washer/dryer **30**, a hot water heater **40**, an HVAC unit **50**, or a pool pump **70**).

Additionally, the active load client **300** may control individual smart appliances directly (e.g., without communicating with the residential load center **300**) via one or more of a variety of known communication protocols (e.g., IP, Broadband over PowerLine (BPL) in its various forms, including through specifications promulgated or being developed by the HOMEPLUG Powerline Alliance and the IEEE, Ethernet, Bluetooth, ZigBee, Wi-Fi, WiMax, etc.). Typically, a smart appliance **60** includes a power control module (not shown) having communication abilities. The power control module is installed in-line with the power supply to the appliance, between the actual appliance and the power source (e.g., the power control module is plugged into a power outlet at the home or business and the power cord for the appliance is plugged into the power control module). Thus, when the power control module receives a command to turn off the appliance **60**, it disconnects the actual power supplying the appliance **60**. Alternatively, a smart appliance **60** may include a power control module integrated directly into the appliance, which may receive commands and control the operation of the appliance directly (e.g., a smart

thermostat may perform such functions as raising or lowering the set temperature, switching an HVAC unit on or off, or switching a fan on or off).

Referring now to FIG. **2**, the ALD server **100** may serve as the primary interface to customers, as well as to service personnel. In the exemplary embodiment depicted in FIG. **2**, the ALD server **100** includes a utility control center (UCC) security interface **102**, a UCC command processor **104**, a master event manager **106**, an ALC manager **108**, an ALC security interface **110**, an ALC interface **112**, a web browser interface **114**, a customer sign-up application **116**, customer personal settings **138**, a customer reports application **118**, a power savings application **120**, an ALC diagnostic manager **122**, an ALD database **124**, a service dispatch manager **126**, a trouble ticket generator **128**, a call center manager **130**, a carbon savings application **132**, a utility P & C database **134**, a read meter application **136**, and a security device manager **140**.

Using the web browser interface **114**, in one embodiment, customers interact with the ALD server **100** and subscribe to some or all of the services offered by the power load management system **10** via a customer sign-up application **116**. In accordance with the customer sign-up application **116**, the customer specifies customer personal settings **138** that contain information relating to the customer and the customer's residence or business, and defines the extent of service to which the customer wishes to subscribe. Additional details of the customer sign-up application **116** are discussed below. Customers may also use the web browser interface **114** to access and modify information pertaining to their existing accounts.

The ALD server **100** also includes a UCC security interface **102** which provides security and encryption between the ALD server **100** and a utility company's control center **200** to ensure that no third party is able to provide unauthorized directions to the ALD server **100**. A UCC command processor **104** receives and sends messages between the ALD server **100** and the utility control center **200**. Similarly, an ALC security interface **110** provides security and encryption between the ALD server **100** and each active load client **300** on the system **10**, ensuring that no third parties can send directions to, or receive information from, the active load client **300**. The security techniques employed by the ALC security interface **110** and the UCC security interface **102** may include conventional symmetric key or asymmetric key algorithms, such as Wireless Encryption Protocol (WEP), Wi-Fi Protected Access (WPA and WPA2), Advanced Encryption Standard (AES), Pretty Good Privacy (PGP), or proprietary encryption techniques.

In one embodiment, the commands that can be received by the UCC command processor **104** from the electric utility's control center **200** include a "Cut" command, a "How Much" command, an "End Event" command, and a "Read Meters" command. The "Cut" command instructs the ALD server **100** to reduce a specified amount of power for a specified amount of time. The specified amount of power may be an instantaneous amount of power or an average amount of power consumed per unit of time. The "Cut" command may also optionally indicate general geographic areas or specific locations for power load reduction. The "How Much" command requests information for the amount of power (e.g., in megawatts) that can be reduced by the requesting utility control center **200**. The "End Event" command stops the present ALD server **100** transaction. The "Read Meters" command instructs the ALD server **100** to read the meters for all customers serviced by the requesting utility.



The UCC command processor **104** may send a response to a "How Much" command or an "Event Ended" status confirmation to a utility control center **200**. A response to a "How Much" command returns an amount of power that can be cut. An "Event Ended" acknowledgement message confirms that the present ALD server transaction has ended.

The master event manager **106** maintains the overall status of the power load activities controlled by the power management system **10**. The master event manager **106** maintains a separate state for each utility that is controlled and tracks the current power usage within each utility. The master event manager **106** also tracks the management condition of each utility (e.g., whether or not each utility is currently being managed). The master event manager **106** receives instructions in the form of transaction requests from the UCC command processor **104** and routes instructions to components necessary to complete the requested transaction, such as the ALC manager **108** and the power savings application **120**.

The ALC manager **108** routes instructions between the ALD server **100** and each active load client **300** within the system **10** through an ALC interface **112**. For instance, the ALC manager **108** tracks the state of every active load client **300** serviced by specified utilities by communicating with the active load client **300** through an individual IP address. The ALC interface **112** translates instructions (e.g., transactions) received from the ALC manager **108** into the proper message structure understood by the targeted active load client **300** and then sends the message to the active load client **300**. Likewise, when the ALC interface **112** receives messages from an active load client **300**, it translates the message into a form understood by the ALC manager **108** and routes the translated message to the ALC manager **108**.

The ALC manager **108** receives from each active load client **300** that it services, either periodically or responsive to polling messages sent by the ALC manager **108**, messages containing the present power consumption and the status (e.g., "ON" or "OFF") of each device controlled by the active load client **300**. Alternatively, if individual device metering is not available, then the total power consumption and load management status for the entire active load client **300** may be reported. The information contained in each status message is stored in the ALD database **124** in a record associated with the specified active load client **300**. The ALD database **124** contains all the information necessary to manage every customer account and power distribution. In one embodiment, the ALD database **124** contains customer contact information, such as names, addresses, phone numbers, email addresses, and associated utility companies for all customers having active load clients **300** installed at their residences or businesses, as well as a description of specific operating instructions for each managed device (e.g., IP-addressable smart breaker or appliance), device status, and device diagnostic history.

There are several types of messages that the ALC manager **108** may receive from an active load client **300** and process accordingly. One such message is a security alert message. A security alert message originates from an optional security or safety monitoring system installed in the residence or business and coupled to the active load client **300** (e.g., wirelessly or via a wired connection). When a security alert message is received, the ALC manager **108** accesses the ALD database **124** to obtain routing information for determining where to send the alert, and then sends the alert as directed. For example, the ALD manager **108** may be programmed to send the alert or another message (e.g., an electronic mail message or a pre-recorded voice

message) to a security monitoring service company and/or the owner of the residence or business.

Another message communicated between an active load client **300** and the ALC manager **108** is a report trigger message. A report trigger message alerts the ALD server **100** that a predetermined amount of power has been consumed by a specific device monitored by an active load client **300**. When a report trigger message is received from an active load client **300**, the ALC manager **108** logs the information contained in the message in the ALD database **124** for the customer associated with the information-supplying active load client **300**. The power consumption information is then used by the ALC manager **108** to determine the active load client(s) **300** to which to send a power reduction or "Cut" message during a power reduction event.

Yet another message exchanged between an active load client **300** and the ALC manager **108** is a status response message. A status response message reports the type and status of each device controlled by the active load client **300** to the ALD server **100**. When a status response message is received from an active load client **300**, the ALC manager **108** logs the information contained in the message in the ALD database **124**.

In one embodiment, upon receiving instructions (e.g., a "Cut" instruction) from the master event manager **106** to reduce power consumption for a specified utility, the ALC manager **108** determines which active load clients **300** and/or individually controlled devices to switch to the "OFF" state based upon present power consumption data stored in the ALD database **124**. The ALC manager **108** then sends a message to each selected active load client **300** containing instructions to turn off all or some of the devices under the active load client's control.

In another embodiment, a power savings application **120** may be optionally included to calculate the total amount of power saved by each utility during a power reduction event (referred to herein as a "Cut event"), as well as the amount of power saved for each customer whose active load client **300** reduced the amount of power delivered. The power savings application **120** accesses the data stored in the ALD database **124** for each customer serviced by a particular utility and stores the total cumulative power savings (e.g., in megawatts per hour) accumulated by each utility for each Cut event in which the utility participated as an entry in the utility Power and Carbon ("P&C") database **134**.

In a further embodiment, an optional carbon savings application **132** uses the information produced by the power savings application **120** to determine the amount of carbon saved by each utility and by each customer for every Cut event. Carbon savings information (e.g., type of fuel that was used to generate power for the customer set that was included in the just completed event, power saved in the prior event, governmental standard calculation rates, and/or other data, such as generation mix per serving utility and geography of the customer's location and the location of the nearest power source) is stored in the ALD database **124** for each active load client **300** (customer) and in the utility P&C database **134** for each utility. The carbon savings application **132** calculates the total equivalent carbon credits saved for each active load client **300** (customer) and utility participating in the previous Cut event, and stores the information in the ALD database **124** and the utility P&C database **134**, respectively.

Additionally, the ALC manager **108** automatically provides for smooth operation of the entire power load management system **10** by optionally interacting with a service dispatch manager **126**. For example, when a new customer subscribes to participate in the power load management system **10**, the service dispatch manager **126** is notified of the new subscription from the customer sign-up application **116**. The service dispatch manager **126** then sends an activation request to the ALC manager **108**. Upon receiving the activation request from the service dispatch manager **126**, the ALC manager **108** may sends a query request for information to the new active load client **300** and, upon receipt of the information, provides it to the service dispatch manager **126**. Additionally, if at any time the ALC manager **108** detects that a particular active load client **300** is not functioning properly, the ALC manager **108** may send a request for service to the service dispatch manager **126** to arrange for a service call to correct the problem.

In another embodiment, the service dispatch manager **126** may also receive requests for service from a call center manager **130** that provides support to an operations center (not shown), which receives telephone calls from customers of the power load management system **10**. When a customer calls the operations center to request service, the call center manager **130** logs the service call in the ALD database **124** and sends a "Service" transaction message to the service dispatch manager **126**. When the service call has been completed, the call center manager **130** receives a completed notification from the service dispatch manager **126** and records the original service call as "closed" in the ALD database **124**.

In yet another embodiment, the service dispatch manager **126** may also instruct an ALC diagnostic manager **122** to perform a series of diagnostic tests for any active load client **300** for which the service dispatch manager **126** has received a service request. After the ALC diagnostic manager **122** has performed the diagnostic procedure, it returns the results to the service dispatch manager **126**. The service dispatch manager **126** then invokes a trouble ticket generator **128** to produce a report (e.g., trouble ticket) that includes information (some of which was retrieved by the service dispatch manager **126** from the ALD database **124**) pertaining to the required service (e.g., customer name, address, any special consideration for accessing the necessary equipment, and the results of the diagnostic process). A residential customer service technician may then use the information provided in the trouble ticket to select the type of equipment and replacement parts necessary for performing a service call.

A read meter application **136** may be optionally invoked when the UCC command processor **104** receives a "Read Meters" or equivalent command from the utility control center **200**. The read meter application **136** cycles through the ALD database **124** and sends a read meter message or command to each active load client **300**, or those active load clients **300** specifically identified in the UCC's command, via the ALC manager **108**. The information received by the ALC manager **108** from the active load client **300** is logged in the ALD database **124** for each customer. When all the active load client meter information has been received, the information is sent to the requesting utility control center **200** using a business to business (e.g., ebXML) or other desired protocol.

The optional security device management block **140** includes program instructions for handling security system messages received by the security interface **110**. The security device management block **140** includes routing information for all security system messages and may further include messaging options on a per customer or service company basis. For example, one security service may require an email alert from the ALD server **100** upon the occurrence of a security event; whereas, another security

service may require that the message sent from the in-building system be passed on by the active load client **300** and the ALD server **100** directly to the security service company.

In a further embodiment, the ALD server **100** also includes a customer reports application **118** that generates reports to be sent to individual customers detailing the amount of power saved during a previous billing cycle. Each report may contain a cumulative total of power savings over the prior billing cycle, details of the amount of power saved per controlled device (e.g., breaker or appliance), power savings from utility directed events, power savings from customer directed events, devices being managed, total carbon equivalents used and saved during the period, and/or specific details for each Cut event in which the customer's active load client **300** participated. Customers may also receive incentives and awards for participation in the power load management system **10** through a customer rewards program **150**. For example, the utilities or a third party system operator may enter into agreements with product and/or service providers to offer system participants discounts on products and services offered by the providers based upon certain participation levels or milestones. The rewards program **150** may be setup in a manner similar to conventional frequent flyer programs in which points are accumulated for power saved (e.g., one point for each megawatt saved or deferred) and, upon accumulation of predetermined levels of points, the customer can select a product or service discount. Alternatively, a serving utility may offer a customer a rate discount for participating in the system **10**.

FIG. **3** illustrates a block diagram of an exemplary active load client **300** in accordance with one embodiment of the present invention. The depicted active load client **300** includes a Linux-based operating system **302**, a status response generator **304**, a smart breaker module controller **306**, a smart device interface **324**, a communications interface **308**, a security interface **310**, an IP-based communication converter **312**, a device control manager **314**, a smart breaker (B**1**-BN) counter manager **316**, a report trigger application **318**, an IP router **320**, a smart meter interface **322**, a security device interface **328**, and an IP device interface **330**. The active load client **300**, in this embodiment, is a computer or processor-based system located on-site at a customer's residence or business. The primary function of the active load client **300** is to manage the power load levels of controllable devices located at the residence or business, which the active load client **300** oversees on behalf of the customer. In an exemplary embodiment, the software running on the active load client **300** operates using the Linux embedded operating system **302** to manage the hardware and the general software environment. One skilled in the art will readily recognize that other operating systems, such as Microsoft's family of operating systems, Mac OS, and Sun OS, among others, may be alternatively used. Additionally, the active load client **300** may include DHCP client functionality to enable the active load client **300** to dynamically request IP addresses for itself and/or one or more controllable devices **402-412**, **420**, **460** managed thereby from a DHCP server on the host IP network facilitating communications between the active load client **300** and the ALD server **100**. The active load client **300** may further include router functionality and maintain a routing table of assigned IP addresses in a memory of the active load client **300** to facilitate delivery of messages from the active load client **300** to the controllable devices **402-412**, **420**, **460**.

A communications interface **308** facilitates connectivity between the active load client **300** and the ALD server **100**. Communication between the active load client **300** and the ALD server **100** may be based on any type of IP or other connection protocol, including but not limited to, the WiMax protocol. Thus, the communications interface **308** may be a wired or wireless modem, a wireless access point, or other appropriate interface.

A standard IP Layer-3 router **320** routes messages received by the communications interface **308** to both the active load client **300** and to any other locally connected device **440**. The router **320** determines if a received message is directed to the active load client **300** and, if so, passes the message to a security interface **310** to be decrypted. The security interface **310** provides protection for the contents of the messages exchanged between the ALD server **100** and the active load client **300**. The message content is encrypted and decrypted by the security interface **310** using, for example, a symmetric encryption key composed of a combination of the IP address and GPS data for the active load client **300** or any other combination of known information. If the message is not directed to the active load client **300**, then it is passed to the IP device interface **330** for delivery to one or more locally connected devices **440**. For example, the IP router **320** may be programmed to route power load management system messages as well as conventional Internet messages. In such a case, the active load client **300** may function as a gateway for Internet service supplied to the residence or business instead of using separate Internet gateways or routers.

An IP based communication converter **312** opens incoming messages from the ALD server **100** and directs them to the appropriate function within the active load client **300**. The converter **312** also receives messages from various active load client **300** functions (e.g., a device control manager **314**, a status response generator **304**, and a report trigger application **318**), packages the messages in the form expected by the ALD server **100**, and then passes them on to the security interface **310** for encryption.

The device control manager **314** processes power management commands for various controllable devices logically connected to the active load client **300**. The devices can be either smart breakers **402-412** or other IP based devices **420**, such as smart appliances with individual control modules (not shown). The device control manager **314** also processes "Query Request" or equivalent commands or messages from the ALD server **100** by querying a status response generator **304** which maintains the type and status of each device controlled by the active load client **300**, and providing the statuses to the ALD server **100**. The "Query Request" message may include information other than mere status requests, such as temperature set points for thermally controlled devices, time intervals during which load control is permitted or prohibited, dates during which load control is permitted or prohibited, and priorities of device control (e.g., during a power reduction event, hot water heater and pool pump are turned off before HVAC unit is turned off). If temperature set points or other non-status information are included in a "Query Request" message and there is a device attached to the active load client **300** that can process the information, the temperature set points or other information are sent to that device **420** via a smart device interface **324**.

The status response generator **304** receives status messages from the ALD server **100** and, responsive thereto, polls each controllable device **402-412**, **420**, **460** under the active load client's control to determine whether the controllable device **402-412**, **420**, **460** is active and in good

operational order. Each controllable device **402-412**, **420**, **460** responds to the polls with operational information (e.g., activity status and/or error reports) in a status response message. The active load client **300** stores the status responses in a memory associated with the status response generator **304** for reference in connection with power reduction events.

The smart device interface **324** facilitates IP or other address-based communications to individual devices **420** (e.g., smart appliance power control modules) that are attached to the active load client **300**. The connectivity can be through one of several different types of networks, including but not limited to, BPL, ZigBee, Wi-Fi, Bluetooth, or direct Ethernet communications. Thus, the smart device interface **324** is a modem adapted for use in or on the network connecting the smart devices **420** to the active load client **300**. The smart device interface **324** also allows the device control manager **314** to manage those devices that have the capability to sense temperature settings and respond to temperature variations.

The smart breaker module controller **306** formats, sends, and receives messages, including power control instructions, to and from the smart breaker module **400**. In one embodiment, the communications is preferably through a BPL connection. In such embodiment, the smart breaker module controller **306** includes a BPL modem and operations software. The smart breaker module **400** contains individual smart breakers **402-412**, wherein each smart breaker **402-412** includes an applicable modem (e.g., a BPL modem when BPL is the networking technology employed) and is preferably in-line with power supplied to a single appliance or other device. The B1-BN counter manager **316** determines and stores real time power usage for each installed smart breaker **402-412**. For example, the counter manager **316** tracks or counts the amount of power used by each smart breaker **402-412** and stores the counted amounts of power in a memory of the active load client **300** associated with the counter manager **316**. When the counter for any breaker **402-412** reaches a predetermined limit, the counter manager **316** provides an identification number corresponding to the smart breaker **402-412** and the corresponding amount of power (power number) to the report trigger application **318**. Once the information is passed to the report trigger application **318**, the counter manager **316** resets the counter for the applicable breaker **402-412** to zero so that information can once again be collected. The report trigger application **318** then creates a reporting message containing identification information for the active load client **300**, identification information for the particular smart breaker **402-412**, and the power number, and sends the report to the IP based communication converter **312** for transmission to the ALD server **100**.

The smart meter interface **322** manages either smart meters **460** that communicate using BPL or a current sensor **452** connected to a traditional power meter **450**. When the active load client **300** receives a "Read Meters" command or message from the ALD server **100** and a smart meter **460** is attached to the active load client **300**, a "Read Meters" command is sent to the meter **460** via the smart meter interface **322** (e.g., a BPL modem). The smart meter interface **322** receives a reply to the "Read Meters" message from the smart meter **460**, formats this information along with identification information for the active load client **300**, and provides the formatted message to the IP based communication converter **312** for transmission to the ALD server **100**.

A security device interface **328** transfers security messages to and from any attached security device. For example, the security device interface **328** may be coupled by wire or wirelessly to a monitoring or security system that includes motion sensors, mechanical sensors, optical sensors, electrical sensors, smoke detectors, carbon monoxide detectors, and/or other safety and security monitoring devices. When the monitoring system detects a security or safety problem (e.g., break-in, fire, excessive carbon monoxide levels), the monitoring system sends its alarm signal to the security interface **328**, which in turn forwards the alarm signal to the IP network through the ALD server **100** for delivery to the target IP address (e.g., the security monitoring service provider). The security device interface **328** may also be capable of communicating with the attached security device through the IP device interface to recognize a notification message from the device that it has lost its line based telephone connection. Once that notification has been received, an alert message is formatted and sent to the ALD server **100** through the IP based communication converter **312**.

Operation of the power management system **10** in accordance with exemplary embodiments will now be described. In one embodiment, customers initially sign up for power load management services using a web browser. Using the web browser, the customer accesses a power management system provider's website through the web browser interface **114** and provides his or her name and address information, as well as the type of equipment he or she would like to have controlled by the power load management system **10** to save energy at peak load times and to accumulate power savings or carbon credits (which may be used to receive reward incentives based upon the total amount of power or carbon saved by the customer). The customer may also agree to allow management of power consumption during non-peak times to sell back excess power to the utility, while simultaneously accumulating power savings or carbon credits.

The customer sign up application **116** creates a database entry for each customer in the ALD database **124**. Each customer's contact information and load management preferences are stored or logged in the database **124**. For example, the customer may be given several simple options for managing any number of devices or class of devices, including parameters for managing the devices (e.g., how long each type of device may be switched off and/or define hours when the devices may not be switched off at all). In particular, the customer may also be able to provide specific parameters for HVAC operations (e.g., set control points for the HVAC system specifying both the low and high temperature ranges). Additionally, the customer may be given an option of receiving a notification (e.g., an email message, Instant Message, Text Message, or recorded phone call, or any combination thereof) when a power management event occurs. When the customer completes entering data, a "New Service" or equivalent transaction message or command is sent to the service dispatch manager **126**.

FIG. **4** illustrates an exemplary operational flow diagram **500** providing steps executed by the ALD server **100** (e.g., as part of the service dispatch manager **126**) to manage service requests in the exemplary power load management system **10**, in accordance with one embodiment of the present invention. The steps of FIG. **4** are preferably implemented as a set of computer instructions (software) stored in a memory (not shown) of the ALD server **100** and executed by one or more processors (not shown) of the ALD server **100**. Pursuant to the logic flow, the service dispatch manager **126** receives (**502**) a transaction message or command and determines (**503**) the type of transaction. Upon receiving a

"New Service" transaction message, the service dispatch manager **126** schedules (**504**) a service person (e.g., technician) to make an initial installation visit to the new customer. The service dispatch manager **126** then notifies (**506**) the scheduled service person, or dispatcher of service personnel, of an awaiting service call using, for example, email, text messaging, and/or instant messaging notifications.

In one embodiment, responsive to the service call notification, the service person obtains the new customer's name and address, a description of the desired service, and a service time from a service dispatch manager service log. The service person obtains an active load client **300**, all necessary smart breaker modules **402-412**, and all necessary smart switches to install at the customer location. The service person notes any missing information from the customer's database information (e.g., the devices being controlled, type make and model of each device, and any other information the system will need to function correctly). The service person installs the active load client **300** and smart breakers **402-412** at the new customer's location. A global positioning satellite (GPS) device may optionally be used by the service person to determine an accurate geographic location of the new customer building, which will be added to the customer's entry in the ALD database **124** and may be used to create a symmetric encryption key to facilitate secure communications between the ALD server **100** and the active load client **300**. The physical location of the installed active load client **300** is also entered into the customer's entry. Smart switch devices may be installed by the service person or left at the customer location for installation by the customer. After the active load client **300** has been installed, the service dispatch manager **126** receives (**508**) a report from the service person, via a service log, indicating that the installation is complete. The service dispatch manager **126** then sends (**510**) an "Update" or equivalent transaction message to the ALC manager **108**.

Returning to block **503**, when a "Service" or similar transaction message or command is received, the service dispatch manager **126** schedules (**512**) a service person to make a service call to the specified customer. The service dispatch manager **126** then sends (**514**) a "Diagnose" or similar transaction to the ALC diagnostic manager **122**. The ALC diagnostic manager **122** returns the results of the diagnostic procedure to the service dispatch manager **126**, which then notifies (**516**) the service person of the service call and provides him or her with the results of the diagnostic procedure using a conventional trouble ticket. The service person uses the diagnostic procedure results in the trouble ticket to select the type of equipment and replacement parts necessary for the service call.

FIG. **5** illustrates an exemplary operational flow diagram **600** providing steps executed by the ALD server **100** (e.g., as part of the ALC manager **108**) to confirm customer sign-up to the power load management system **10**, in accordance with one embodiment of the present invention. The steps of FIG. **5** are preferably implemented as a set of computer instructions (software) stored in a memory (not shown) of the ALD server **100** and executed by one or more processors (not shown) of the ALD server **100**. In accordance with the logic flow, the ALC manager **108** receives (**602**) an "Update" or similar transaction message or command from the service dispatch manager **126** and uses the IP address specified in the "Update" message to send (**604**) out a "Query Request" or similar message or command to the active load client **300**. The "Query Request" message includes a list of devices the ALD server **100** expects to be managed. If the customer information input at customer sign-up includes temperature set points for one or more load-controllable devices, that information is included in the "Query Request" message. The ALC manager **108** receives (**606**) a query reply containing information about the active load client **300** (e.g., current WiMax band being used, operational state (e.g., functioning or not), setting of all the counters for measuring current usage (e.g., all are set to zero at initial set up time), status of devices being controlled (e.g., either switched to the "on" state or "off" state)). The ALC manager **108** updates (**608**) the ALD database **124** with the latest status information obtained from the active load client **300**. If the ALC manager **108** detects (**610**), from the query reply, that the active load client **300** is functioning properly, it sets (**612**) the customer state to "active" to allow participation in ALD server activities. However, if the ALC manager **108** detects (**610**) that the active load client **300** is not functioning properly, it sends (**614**) a "Service" or similar transaction message or command to the service dispatch manager **126**.

FIG. **6** illustrates an exemplary operational flow diagram **700** providing steps executed by the ALD server **100** (e.g., as part of the master event manager **106**) to manage events in the exemplary power load management system **10**, in accordance with one embodiment of the present invention. The steps of FIG. **6** are preferably implemented as a set of computer instructions (software) stored in a memory (not shown) of the ALD server **100** and executed by one or more processors (not shown) of the ALD server **100**. Pursuant to the logic flow, the master event manager **106** tracks (**702**) current power usage within each utility being managed by the ALD server **100**. When the master event manager **106** receives (**704**) a transaction message or command from the UCC command processor **104** or the ALC manager **108**, the master event manager **106** determines (**706**) the type of transaction received. Upon receiving a "Cut" transaction from the UCC command processor **104** (resulting from a "Cut" command issued by the utility control center **200**), the master event manager **106** places (**708**) the utility in a managed logical state. The master event manager then sends (**710**) a "Cut" transaction or event message or command to the ALC manager **108** identifying the amount of power (e.g., in megawatts) that must be removed from the power system supplied by the utility. The amount of power specified for reduction in a "Cut" command may be an instantaneous amount of power or an average amount of power per unit time. Finally, the master event manager **106** notifies (**711**) every customer that has chosen to receive a notification (e.g., through transmission of an email or other pre-established notification technique) that a power management event is in process.

Returning to block **706**, when the master event manager **106** receives a "How Much" or other equivalent power inquiry transaction message or command from the UCC command processor **104** (resulting from a "How Much" or equivalent power inquiry command issued by the utility control center **200**), the master event manager **106** determines (**712**) the amount of power that may be temporarily removed from a particular utility's managed system by accessing the current usage information for that utility. The current usage information is derived, in one embodiment, by aggregating the total available load for the serving utility, as determined from the customer usage information for the utility stored in the ALD database **124**, based on the total amount of power that may have to be supplied to the utility's customers in view of the statuses of each of the active load clients **300** and their respectively controllable load devices

**402-412**, **420**, **460** during the load control interval identified in the "How Much" message.

Each utility may indicate a maximum amount of power or maximum percentage of power to be reduced during any power reduction event. Such maximums or limits may be stored in the utility P&C database **134** of the ALD server **100** and downloaded to the master event manager **106**. In one embodiment, the master event manager **106** is programmed to remove a default one percent (1%) of the utility's current power consumption during any particular power management period (e.g., one hour). In alternative embodiments, the master event manager **106** may be programmed to remove other fixed percentages of current power consumption or varying percentages of current power consumption based on the current power consumption (e.g., 1% when power consumption is at system maximum and 10% when power consumption is at only 50% of system maximum). Based on the amount of power to be removed, the master event manager **106** sends (**710**) a "Cut" or equivalent event message to the ALC manager **108** indicating the amount of power (e.g., in megawatts) that must be removed from the utility's power system (e.g., 1% of the current usage), and notifies (**711**) all customers that have chosen to receive a notification that a power management event is in process. The master event manager **106** also sends a response to the utility control center **200** via the UCC command processor **104** advising the utility control center **200** as to the quantity of power that can be temporarily reduced by the requesting utility.

Returning once again to block **706**, when the master event manager **106** receives an "End Event" or equivalent transaction message or command from the UCC command processor **104** (resulting from an "End Event" command issued by the utility control center **200**), the master event manager **106** sets (**714**) the state of the current event as "Pending" and sends (**716**) an "End Event" or equivalent transaction message or command to the ALC manager **108**. When the ALC manager **108** has performed the steps necessary to end the present event (e.g., a power reduction or Cut event), the master event manager **106** receives (**718**) an "Event Ended" or equivalent transaction from the ALC manager **108** and sets (**720**) the utility to a logical "Not Managed" state. The master event manager **106** then notifies (**722**) each customer that has chosen to receive a notification (e.g., through transmission of an email or other pre-established notification mechanism) that the power management event has ended. Finally, the master event manager **106** sends an "Event Ended" or equivalent transaction message or command to the power savings application **120** and the utility control center **200** (via the UCC command processor **104**).

Turning now to FIG. **7**, exemplary operational flow diagram **800** illustrates steps executed by the ALD server **100** (e.g., as part of the ALC manager **108**) to manage power consumption in the exemplary power load management system **10**, in accordance with one embodiment of the present invention. The steps of FIG. **7** are preferably implemented as a set of computer instructions (software) stored in a memory of the ALD server **100** and executed by one or more processors of the ALD server **100**. In accordance with the logic flow, the ALC manager **108** tracks (**802**) the state of each managed active load client **300** by receiving messages, periodically or responsive to polls issued by the ALC manager **108**, from every active load client **300** that the ALC manager **108** manages. These messages indicate the present states of the active load clients **300**. The state includes the present consumption of power for each controllable device **402-412**, **420** controlled by the active load client **300** (or the



total power consumption for all controllable devices **402-412**, **420** controlled by the active load client **300** if individual device metering is not available) and the status of each device **402-412**, **420** (e.g., either "Off" or "On"). The ALC manager **108** stores or logs (**804**) the power consumption and device status information in the ALD database **124** in a record corresponding to the specified active load client **300** and its associated customer and serving utility.

When the ALC manager **108** receives (**806**) a transaction message from the master event manager **106**, the ALC manager **108** first determines (**808**) the type of transaction received. If the ALC manager **108** receives a "Cut" or equivalent transaction message or command from the master event manager **106**, the ALC manager **108** enters (**810**) a "Manage" logical state. The ALC manager **108** then determines (**812**) which active load clients **300** and associated devices **402-412**, **420** operating on the utility specified in the "Cut" message to switch to the "Off" state. If a location (e.g., list of GPS coordinates, a GPS coordinate range, a geographic area, or a power grid reference area) is included in the "Cut" transaction message, only those active load clients **300** within the specified location are selected for switching to the "Off" state. In other words, the ALC manager **108** selects the group of active load client devices **300** to which the issue a "Turn Off" transaction message based at least partially on the geographic location of each active load client **300** as such location relates to any location identified in the received "Cut" transaction message. The ALD database **124** contains information on the present power consumption (and/or the average power consumption) for each controllable device **402-412**, **420** connected to each active load client **300** in the system **10**. The ALC manager **108** utilizes the stored power consumption information to determine how many, and to select which, devices **402-412**, **420** to turn off to achieve the power reduction required by the "Cut" message. The ALC manager **108** then sends (**814**) a "Turn Off" or equivalent transaction message or command to each active load client **300**, along with a list of the devices to be turned off and a "change state to off" indication for each device **402-412**, **420** in the list. The ALC manager **108** then logs (**816**) the amount of power (either actual or average), as determined from the ALD database **124**, saved for each active load client **300**, along with a time stamp indicating when the power was reduced. The ALC manager **108** then schedules (**818**) transactions for itself to "Turn On" each turned-off device after a predetermined period of time (e.g., which may have been set from a utility specified default, set by instructions from the customer, or otherwise programmed into the ALC manager **108**).

Returning back to block **808**, when the ALC manager **108** receives a "Turn On" or equivalent transaction message or command from the master event manager **106** for a specified active load client **300**, and the ALC manager's state is currently in a "Manage" state, the ALC manager **108** finds (**820**) one or more active load clients **300** that are in the "On" state and do not have any of their managed devices **402-412**, **420** turned off (and are in the specified location if so required by the original "Cut" transaction message), which, when one or more of such devices **402-412**, **420** are turned off, will save the same or substantially the same amount of power that is presently being saved by the specified active load clients that are in the "Off" state. Upon identifying new active load clients **300** from which to save power, the ALC manager **108** sends (**822**) a "Turn Off" or equivalent transaction message or command to each active load client **300** that must be turned off in order to save the same amount of power as the active load client(s) to be turned on (i.e. to have

its or their managed devices **402-412**, **420** turned on) or to save an otherwise acceptable amount of power (e.g., a portion of the power previously saved by the active load client(s) to be turned back on). The ALC manager **108** also sends (**824**) a "Turn On" or equivalent transaction message or command to each active load client **300** to be turned back on. The "Turn On" message instructs all active load clients **300** to which the message was directed to turn on any controllable devices that have been turned off, and causes the affected active load clients **300** to instruct their controllable devices **402-412**, **420** to enable the flow of electric power to their associated power consuming devices (e.g., appliance, HVAC unit, and so forth). Finally, the ALC manager **108** logs (**826**) the time that the "Turn On" transaction message is sent in the ALD database **124**.

Returning once again to block **808**, when the ALC manager **108** receives an "End Event" or equivalent transaction message or command from the master event manager **106**, the ALC manager **108** sends (**828**) a "Turn On" or equivalent transaction message or command to every active load client **300** which is currently in the "Off" state and is served by the serving utility identified in the "End Event" message or to which the "End Event" message relates. Upon determining (**830**) that all the appropriate active load clients **300** have transitioned to the "On" state, the ALC manager **108** sends (**832**) an "Event Ended" or equivalent transaction message or command to the master event manager **106**.

Referring now to FIG. **8**, exemplary operational flow diagram **900** illustrates steps executed by the ALD server **100** (e.g., through operation of the power savings application **120**) to calculate and allocate power savings in the power load management system **10**, in accordance with one embodiment of the present invention. The power savings application **120** calculates the total amount of power saved by each utility for each Cut event and the amount of power saved by each customer possessing an active load client **300**.

According to the logic flow of FIG. **8**, the power savings application **120** receives (**902**) an "Event Ended" or equivalent transaction message or command from the master event manager **106** each time a "Cut" or power savings event has ended. The power savings application **120** then accesses (**904**) the ALD database **124** for each active load client **300** involved in the "Cut" event. The database record for each active load client **300** contains the actual amount (or average amount) of power that would have been used by the active load client **300** during the last "Cut" event, along with the amount of time that each controllable device **402-412**, **420** associated with the active load client **300** was turned off. The power savings application **120** uses this information to calculate the amount of power (e.g., in megawatts per hour) that was saved for each active load client **300**. The total power savings for each active load client **300** is stored in its corresponding entry in the ALD database **124**. A running total of power saved is kept for each "Cut" transaction. Each utility that is served by the ALD server **100** has an entry in the utility P&C database **134**. The power savings application **120** stores (**906**) the total amount of power (e.g., in megawatts per hour) saved for the specific utility in the utility's corresponding entry in the utility P&C database **134**, along with other information related to the power savings event (e.g., the time duration of the event, the number of active load clients required to reach the power savings, average length of time each device was in the off state, plus any other information that would be useful in fine tuning future events and in improving customer experience). When all active load client entries have been processed, the power savings application **120** optionally invokes (**908**) the carbon savings application **132** or, analogously, a sulfur dioxide savings application or a nitrogen dioxide savings application, to correlate the power savings with carbon credits, sulfur dioxide credits or nitrogen dioxide credits, respectively, based on the geographic locations of the particular serving utility and customer. Additionally, in one embodiment, the carbon savings application **132** determines carbon credits based on government approved or supplied formulas and stores the determined carbon credits on a per customer and/or per utility basis.

As described above, the present invention encompasses a method for managing and distributing power within a power management system based on real-time feedback from addressable and remotely controllable devices including the actual amount of power currently being individually or collectively consumed by the addressable devices. With this invention, a power management system may pinpoint specific areas of high power usage and more accurately distribute power loads to utilities in need. Additionally, the present invention provides optional participation incentives for customers based on the amount of their actual participation in the power management system.

In the foregoing specification, the present invention has been described with reference to specific embodiments. However, one of ordinary skill in the art will appreciate that various modifications and changes may be made without departing from the spirit and scope of the present invention as set forth in the appended claims. For example, the present invention is applicable for managing the distribution of power from utility companies to subscribing customers using any number of IP-based or other communication methods. Additionally, the functions of specific modules within the ALD server **100** and/or active load client **300** may be performed by one or more equivalent means. Accordingly, the specification and drawings are to be regarded in an illustrative rather than a restrictive sense, and all such modifications are intended to be included within the scope of the present invention.

Benefits, other advantages, and solutions to problems have been described above with regard to specific embodiments of the present invention. However, the benefits, advantages, solutions to problems, and any element(s) that may cause or result in such benefits, advantages, or solutions to become more pronounced are not to be construed as a critical, required, or essential feature or element of any or all the claims. The invention is defined solely by the appended claims including any amendments made during the pendency of this application and all equivalents of those claims as issued.

The invention claimed is:

**1**. A method for a client device to manage a flow of power within an electric power grid to a plurality of power consuming devices, the client device being responsive to power control messages issued by a load management server and controlling at least one controllable device that selectively enables and disables electric power to flow to at least one of a plurality of power consuming devices, the method comprising the steps of:

receiving a power control message from the load management server, the power control message being responsive to a power control request and indicating at least one of an amount of electric power to be reduced, disabled, or enabled and an identification of at least one controllable device to be instructed to enable or disable a flow of electric power to at least one associated power consuming device;

responsive to the power control message, issuing a power management command to a controllable device, the power management command causing the controllable device to disable a flow of electric power to at least one associated power consuming device to provide a reduction in consumed power; and

generating a power supply value (PSV) corresponding to the reduction in consumed power.

**2**. The method of claim **1**, further comprising communicating a report message to the load management server, the report message including an indication of an amount of power consumed by at least one power consuming device and the corresponding PSV.

**3**. The method of claim **1**, wherein the PSV is associated with individual devices and/or aggregation of a multiplicity of power consuming devices.

**4**. The method of claim **1**, wherein the PSV indicates a compensation provided for power supply associated with the reduction in consumed power.

**5**. The method of claim **1**, wherein the compensation includes at least one of capacity compensation, energy compensation, operating reserves compensation, compensation to include ancillary services, other grid stabilizing services, voltage support, black start, cold load pick up, conservation voltage reduction, and other reserve services.

**6**. The method of claim **1**, further comprising communicating a status message to the load management server, the status message indicating a status of the at least one controllable device.

**7**. The method of claim **1**, further comprising communicating a status message to the load management server, the status message indicating a total amount of power consumed by the power consuming devices under control of the at least one controllable device and the corresponding power supply value.

**8**. The method of claim **1**, further comprising receiving a subsequent power control message from the load management server, the subsequent power control message instructing the client device to enable the electric power flow to the power consuming devices that had the electric power flow previously disabled.

**9**. The method of claim **1**, wherein at least one smart meter is coupled to the client device, the method further comprising:

receiving a control message from the load management server instructing the client device to read the at least one smart meter;

responsive to receipt of the control message, issuing a command to the at least one smart meter requesting a power reading; and

responsive to receipt of the power reading, communicating the power reading to the load management server.

**10**. The method of claim **1**, further comprising:

receiving a status message from the load management server, the status message requesting status information for the one or more controllable devices;

receiving a status response message from the at least one controllable device; and

storing each status response message in a memory for reference in connection with power reduction events.

**11**. The method of claim **1**, wherein the client device includes a Layer-3 router and wherein at least one Internet-accessible device is coupled to the client device, the method further comprising:

receiving, by the Layer-3 router, an Internet Protocol (IP) message that includes an IP address;

determining, by the Layer-3 router, whether the IP message is directed to an Internet-accessible device coupled to the client device; and

communicating the IP message to the Internet-accessible device.

**12**. The method of claim **11**, wherein the IP message is encrypted, the method further comprising:

determining, by the Layer-3 router, whether the IP message is directed to the client device or the Internet-accessible device; and

decrypting the IP message.

**13**. The method of claim **1**, wherein the client device is coupled to an Internet Protocol (IP) network, the method further comprising requesting IP addresses for at least one of the client device and the at least one controllable device.

**14**. The method of claim **1**, wherein the power control message includes a list of controllable devices to be instructed to disable a flow electric power to associated power consuming devices and wherein the power management command causes controllable devices identified in the list to disable a flow of electric power to associated power consuming devices to achieve the reduction in consumed power.

**15**. A client device for use in a system that manages electric power on an electric grid, wherein the power is supplied to a plurality of power consuming devices, wherein power flow over the electric grid to at least some of the plurality of power consuming devices is enabled and disabled by a plurality of controllable devices, wherein at least one controllable device operates under the control of the client device, wherein the client device receives power control messages from a remote load management server, and wherein a power control message received from the load management server is responsive to a power reduction request, the client device comprising:

at least one controllable device interface facilitating communication of power control instructions to the at least one controllable device, the power control instructions operable to cause the at least one controllable device to selectively enable and disable a flow of electric power to at least one power consuming device of the plurality of power consuming devices; and

a device control manager operably coupled to the at least one controllable device interface, the device control manager operable to issue power control instructions to the at least one controllable device through the at least one controllable device interface responsive to the received power control message, the power control instruction operable to cause the at least one controllable device to disable or enable a flow of electric power to at least one associated power consuming device, and based upon the reduction in consumed power for disabled flow of electric power, generating a power supply value (PSV) corresponding to the reduction in consumed power.

**16**. The client device of claim **15**, wherein the power supply value indicates a compensation provided for power supply associated with the reduction in consumed power.

**17**. The client device of claim **16**, wherein the compensation includes at least one of capacity compensation, energy compensation, operating reserves compensation, compensation to include ancillary services, other grid stabilizing services, voltage support, black start, cold load pick up, conservation voltage reduction, and other reserve services.

**18**. The client device of claim **15**, wherein the PSV is generated based upon a governing entity for the power grid operating region and/or operational regulations.

**19**. The client device of claim **15**, wherein the received power control message indicates at least one of an amount of electric power to be reduced and an identification of a controllable device to be instructed to disable a flow of electric power to one or more associated power consuming devices.

**20**. The client device of claim **15**, further comprising a communications interface facilitating communications between the load management server and the client device, wherein the device control manager communicates at least one power consumption indicator and at least one power management status to the load management server via the communications interface.

**21**. The client device of claim **15**, wherein the at least one power consumption indicator includes a power consumption indicator associated with each controllable device and wherein the at least one power management status includes a power management status associated with each controllable device.

**22**. The client device of claim **15**, further including a communications interface comprising an Internet Protocol (IP)-based interface.

**23**. The client device of claim **15**, wherein the received power control message includes Internet Protocol (IP) addresses of one or more controllable devices to be instructed to disable a flow of electric power to one or more associated power consuming devices.

**24**. The client device of claim **15**, further comprising:

a Layer-3 router operable to receive an Internet Protocol (IP) message that includes an IP address and determine whether the IP message is directed to the client device or an Internet-accessible device coupled to the client device; and

an IP device interface, coupled to the Layer-3 router, that receives the IP message from the Layer-3 router when the IP message is directed to message to the Internet-accessible device.

**25**. A client device for use in a system that manages power flow for an electric grid including electric power supplied to a plurality of power consuming devices, wherein power flow to at least some of the plurality of power consuming devices is selectively enabled and disabled by a plurality of controllable devices, wherein at least one controllable device operates under the control of the client device, and wherein the client device receives a plurality of power control messages from a load management server, the client device comprising:

a communications interface that is operable to receive the plurality of power control messages from the load management server, a power control message of the plurality of power control messages being responsive to a power reduction request indicating at least one of an amount of electric power to be reduced and an identification of at least one controllable device to be instructed to disable a flow of electric power to one or more associated power consuming devices;

at least one controllable device interface facilitating communication of power control instructions to the at least one controllable device, the power control instructions causing the at least one controllable device to selectively enable and disable a flow of electric power to at least one power consuming device of the plurality of power consuming devices; and

a device control manager operably coupled to the communications interface and the at least one controllable device interface, the device control manager operable to issue a power control instruction to the at least one controllable device through the at least one controllable device interface responsive to the power control message, the power control instruction operable to cause the at least one controllable device to disable a flow of electric power to at least one associated power consuming device so as to achieve a reduction in consumed power as requested by the control center and based upon the reduction in consumed power, generating a power supply value (PSV) associated with the power consuming device(s) and corresponding to the reduction in consumed power.

**26**. The client device of claim **25**, wherein the PSV is generated at a control center or at the device level.

**27**. The client device of claim **25**, wherein a received power control message is responsive to a power reduction request issued by a control center of the electric utility.

**28**. A client device for use in a system that manages power supplied to a plurality of power consuming devices, wherein power flow to at least some of the plurality of power consuming devices is selectively enabled and disabled by a plurality of controllable devices, wherein one or more of the plurality of controllable devices operates under the control of the client device, and wherein the client device receives a plurality of power control messages from a remote load management server, the client device comprising:

a communications interface that receives the plurality of power control messages from the load management server, a power control message of the plurality of power control messages indicating at least one of an amount of electric power to be reduced and an identification of at least one controllable device to be instructed to disable a flow of electric power to one or more associated power consuming devices, and based upon the amount of electric power to be reduced, generating a power supply value (PSV) corresponding to the amount of electric power reduced;

at least one controllable device interface operable to facilitate communication of a power control instruction to at least a first controllable device, the power control instruction operable to cause the first controllable device to disable a flow of electric power to at least one power consuming device of the plurality of power consuming devices; and

a device control manager operably coupled to the communications interface and the at least one controllable device interface, the device control manager operable to generate the power control instruction responsive to the power control message.

**29**. The client device of claim **28**, wherein the PSV is generated at a control center or at the device level.

* * * * *

# Exhibit 3

U 8092892

# THE UNITED STATES OF AMERICA

TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

April 09, 2021

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *10,394,268*

ISSUE DATE: *August 27, 2019*

By Authority of the

Under Secretary of Commerce for Intellectual Property

and Director of the United States Patent and Trademark Office

R GLOVER

Certifying Officer

US010394268B2

(12) **United States Patent**
**Forbes, Jr.**

(10) **Patent No.: US 10,394,268 B2**
(45) **Date of Patent: *Aug. 27, 2019**

(54) **METHOD AND APPARATUS FOR ACTIVELY MANAGING CONSUMPTION OF ELECTRIC POWER OVER AN ELECTRIC POWER GRID**

(71) Applicant: **Causam Energy, Inc.**, Raleigh, NC (US)

(72) Inventor: **Joseph W. Forbes, Jr.**, Raleigh, NC (US)

(73) Assignee: **CAUSAM ENERGY, INC.**, Raleigh, NC (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 132 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/618,981**

(22) Filed: **Jun. 9, 2017**

(65) **Prior Publication Data**

US 2017/0277214 A1 Sep. 28, 2017

**Related U.S. Application Data**

(60) Continuation of application No. 14/456,306, filed on Aug. 11, 2014, now Pat. No. 9,678,522, which is a (Continued)

(51) **Int. Cl.**
***G05F 1/66*** (2006.01)
***G06Q 10/06*** (2012.01)
(Continued)

(52) **U.S. Cl.**
CPC ............... ***G05F 1/66*** (2013.01); ***G01D 4/004*** (2013.01); ***G06Q 10/06*** (2013.01); ***G06Q 50/06*** (2013.01);
(Continued)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,906,242 A 9/1975 Stevenson
4,023,043 A 5/1977 Stevenson
(Continued)

FOREIGN PATENT DOCUMENTS

EP 1729223 A 12/2006
JP 2000078748 A 3/2000
(Continued)

OTHER PUBLICATIONS

B.J. Kirby, Spinning Reserve from Responsive Loads, Oak Ridge National Laboratory, United States Dept. of Energy, Mar. 2003 (54 pages).

(Continued)

*Primary Examiner* — Ramesh B Patel
(74) *Attorney, Agent, or Firm* — Neo IP

(57) **ABSTRACT**

A client device manages consumption of power supplied by an electric utility to power consuming devices. Power flow to the power consuming devices is selectively enabled and disabled by one or more controllable devices controlled by the client device. The client device receives a power control message from a load management server. The power control message indicates at least one of an amount of electric power to be reduced and an identification of at least one controllable device to be instructed to disable a flow of electric power to one or more associated power consuming devices. Responsive to the power control message, the client device issues a power management command to one or more controllable devices under the client device's control. The power management command causes the one or more controllable devices to disable a flow of electric power to the one or more associated power consuming device.

**19 Claims, 8 Drawing Sheets**



**Related U.S. Application Data**

continuation of application No. 13/463,761, filed on May 3, 2012, now Pat. No. 8,805,552, which is a continuation-in-part of application No. 13/172,389, filed on Jun. 29, 2011, now Pat. No. 8,315,717, which is a continuation of application No. 12/715,195, filed on Mar. 1, 2010, now Pat. No. 8,032,233, which is a division of application No. 11/895,909, filed on Aug. 28, 2007, now Pat. No. 7,715,951.

(51) **Int. Cl.**
***H02J 3/14*** (2006.01)
***H04L 29/08*** (2006.01)
***G01D 4/00*** (2006.01)
***G06Q 50/06*** (2012.01)

(52) **U.S. Cl.**
CPC ................ ***H02J 3/14*** (2013.01); ***H04L 67/02*** (2013.01); *Y02B 70/3225* (2013.01); *Y02B 90/242* (2013.01); *Y02B 90/245* (2013.01); *Y04S 10/54* (2013.01); *Y04S 20/222* (2013.01); *Y04S 20/322* (2013.01); *Y04S 20/40* (2013.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS


4,589,075 A 5/1986 Buennagel
4,799,059 A 1/1989 Grindahl et al.
4,819,180 A 4/1989 Hedman et al.
4,819,229 A 4/1989 Pritty et al.
5,237,507 A 8/1993 Chasek
5,361,982 A 11/1994 Liebl et al.
5,388,101 A 2/1995 Dinkins
5,462,225 A 10/1995 Massara et al.
5,481,546 A 1/1996 Dinkins
5,502,339 A 3/1996 Hartig
5,544,036 A 8/1996 Brown et al.
5,570,002 A 10/1996 Castleman
5,592,491 A 1/1997 Dinkins
5,640,153 A 6/1997 Hildebrand et al.
5,644,173 A 7/1997 Elliason et al.
5,675,503 A 10/1997 Moe et al.
5,696,695 A 12/1997 Ehlers et al.
5,721,936 A 2/1998 Kikinis et al.
5,926,776 A 7/1999 Glorioso et al.
5,973,481 A 10/1999 Thompson et al.
6,018,690 A 1/2000 Saito et al.
6,037,758 A 3/2000 Perez
6,078,785 A 6/2000 Bush
6,102,487 A 8/2000 Oevreboe
6,107,693 A 8/2000 Mongia et al.
6,115,676 A 9/2000 Rector et al.
6,154,859 A 11/2000 Norizuki et al.
6,216,956 B1 4/2001 Ehlers et al.
6,233,327 B1 5/2001 Petite
6,254,009 B1 7/2001 Proffitt et al.
6,304,552 B1 10/2001 Chapman et al.
6,366,217 B1 4/2002 Cunningham et al.
6,374,101 B1 4/2002 Gelbien
6,437,692 B1 8/2002 Petite et al.
6,519,509 B1 2/2003 Nierlich et al.
6,529,839 B1 3/2003 Uggerud et al.
6,535,797 B1 3/2003 Bowles et al.
6,577,962 B1 6/2003 Afshari
6,583,521 B1 6/2003 Lagod et al.
6,601,033 B1 7/2003 Sowinski
6,602,627 B2 8/2003 Liu et al.
6,621,179 B1 9/2003 Howard
6,622,097 B2 9/2003 Hunter
6,622,925 B2 9/2003 Carner et al.
6,633,823 B2 10/2003 Bartone et al.
6,671,586 B2 12/2003 Davis et al.
6,681,154 B2 1/2004 Nierlich et al.
6,687,574 B2 2/2004 Pietrowicz et al.
6,718,761 B2 4/2004 Merswolke et al.
6,732,055 B2 5/2004 Bagepalli et al.
6,747,368 B2 6/2004 Jarrett
6,778,882 B2 8/2004 Spool et al.
6,784,807 B2 8/2004 Petite et al.
6,832,135 B2 12/2004 Ying
6,834,811 B1 12/2004 Huberman et al.
6,836,737 B2 12/2004 Petite et al.
6,862,498 B2 3/2005 Davis et al.
6,865,450 B2 3/2005 Masticola et al.
6,868,293 B1 3/2005 Schurr et al.
6,879,059 B2 4/2005 Sleva
6,891,838 B1 5/2005 Petite et al.
6,904,336 B2 6/2005 Raines et al.
6,906,617 B1 6/2005 der
6,909,942 B2 6/2005 Andarawis et al.
6,914,533 B2 7/2005 Petite
6,914,893 B2 7/2005 Petite
6,934,316 B2 8/2005 Cornwall et al.
6,944,555 B2 9/2005 Blackett et al.
6,961,641 B1 11/2005 Forth et al.
6,990,593 B2 1/2006 Nakagawa
7,003,640 B2 2/2006 Mayo et al.
7,019,667 B2 3/2006 Petite et al.
7,035,719 B2 4/2006 Howard et al.
7,039,532 B2 5/2006 Hunter
7,053,767 B2 5/2006 Petite et al.
7,088,014 B2 8/2006 Nierlich et al.
7,103,511 B2 9/2006 Petite
7,123,994 B2 10/2006 Welk et al.
7,133,750 B2 11/2006 Raines et al.
7,136,725 B1 11/2006 Paciorek et al.
7,141,321 B2 11/2006 McArthur et al.
7,142,949 B2 11/2006 Brewster et al.
7,177,728 B2 2/2007 Gardner
7,181,320 B2 2/2007 Whiffen et al.
7,184,861 B2 2/2007 Petite
7,200,134 B2 4/2007 Proctor et al.
7,206,670 B2 4/2007 Pimputkar et al.
7,209,804 B2 4/2007 Curt et al.
7,209,840 B2 4/2007 Petite et al.
7,233,843 B2 6/2007 Budhraja et al.
7,263,073 B2 8/2007 Petite et al.
7,263,450 B2 8/2007 Hunter
7,274,975 B2 9/2007 Miller
7,289,887 B2 10/2007 Rodgers
7,295,128 B2 11/2007 Petite
7,305,282 B2 12/2007 Chen
7,313,465 B1 12/2007 O'Donnell
7,343,341 B2 3/2008 Sandor et al.
7,345,998 B2 3/2008 Cregg et al.
7,346,463 B2 3/2008 Petite et al.
7,366,164 B1 4/2008 Habib et al.
7,397,907 B2 7/2008 Petite
7,406,364 B2 7/2008 Rissanen et al.
7,412,304 B2 8/2008 Uenou
7,424,527 B2 9/2008 Petite
7,440,871 B2 10/2008 McConnell et al.
7,451,019 B2 11/2008 Rodgers
7,468,661 B2 12/2008 Petite et al.
7,480,501 B2 1/2009 Petite
7,486,681 B2 2/2009 Weber
7,492,617 B2 2/2009 Petter et al.
7,528,503 B2 5/2009 Rognli et al.
7,536,240 B2 5/2009 McIntyre et al.
7,541,941 B2 6/2009 Bogolea et al.
7,565,227 B2 7/2009 Richard et al.
7,650,425 B2 1/2010 Davis et al.
7,697,492 B2 4/2010 Petite
7,711,796 B2 5/2010 Gutt et al.
7,715,951 B2 5/2010 Forbes et al.
7,738,999 B2 6/2010 Petite
7,739,378 B2 6/2010 Petite
7,747,165 B2 6/2010 Emery et al.
7,940,901 B2 5/2011 Paraskevakos et al.
8,010,812 B2 8/2011 Forbes et al.
8,032,233 B2 10/2011 Forbes et al.
8,032,461 B2 10/2011 Winter et al.
8,046,110 B2 10/2011 Mayor et al.

(56) **References Cited**

U.S. PATENT DOCUMENTS

8,068,938 B2 11/2011 Fujita
8,131,403 B2 3/2012 Forbes et al.
8,145,361 B2 3/2012 Forbes et al.
8,260,468 B2 9/2012 Ippolito et al.
8,260,470 B2 9/2012 Forbes et al.
8,295,989 B2 10/2012 Rettger et al.
8,307,225 B2 11/2012 Forbes et al.
8,315,717 B2 11/2012 Forbes et al.
8,315,743 B2 11/2012 Sackman et al.
8,359,124 B2 1/2013 Zhou et al.
8,359,215 B1 1/2013 Robbins et al.
8,364,609 B2 1/2013 Ozog
8,396,606 B2 3/2013 Forbes et al.
8,407,252 B2 3/2013 Bennett et al.
8,417,569 B2 4/2013 Gross
8,428,752 B2 4/2013 Bennett et al.
8,442,917 B1 5/2013 Burke
8,457,802 B1 6/2013 Steven et al.
8,463,449 B2 6/2013 Sanders
8,473,111 B1 6/2013 Shankar et al.
8,527,107 B2 9/2013 Forbes et al.
8,570,999 B1 * 10/2013 Nguyen ................. H04B 3/542
370/343
8,571,930 B1 10/2013 Galperin
8,583,520 B1 11/2013 Forbes
8,588,991 B1 * 11/2013 Forbes, Jr. ............. G05B 19/02
700/295
8,600,556 B2 12/2013 Nesler et al.
8,684,266 B2 4/2014 Bennett et al.
8,761,952 B2 6/2014 Forbes
8,805,552 B2 8/2014 Forbes
8,806,239 B2 8/2014 Forbes
8,890,505 B2 11/2014 Forbes
8,983,669 B2 * 3/2015 Forbes, Jr. ................ G05F 1/66
700/286
8,996,183 B2 3/2015 Forbes
9,177,323 B2 11/2015 Forbes
9,461,471 B2 * 10/2016 Forbes, Jr. ............. G05B 15/02
9,651,973 B2 * 5/2017 Forbes, Jr. ............. G06Q 10/00
9,952,611 B2 * 4/2018 Forbes, Jr. ............. G05B 15/02
9,989,982 B2 * 6/2018 Forbes, Jr. ............. G05B 15/02
2001/0030468 A1 10/2001 Anderson et al.
2001/0038343 A1 11/2001 Meyer et al.
2002/0019758 A1 2/2002 Scarpelli
2002/0019802 A1 2/2002 Malme et al.
2002/0035496 A1 3/2002 Fukushima et al.
2002/0036430 A1 3/2002 Welches et al.
2002/0109607 A1 8/2002 Cumeralto et al.
2002/0138176 A1 9/2002 Davis et al.
2002/0143693 A1 10/2002 Soestbergen et al.
2002/0161648 A1 10/2002 Mason et al.
2002/0198629 A1 12/2002 Ellis
2003/0009401 A1 1/2003 Ellis
2003/0009705 A1 1/2003 Thelander et al.
2003/0036820 A1 2/2003 Yellepeddy et al.
2003/0083980 A1 5/2003 Satake
2003/0144864 A1 7/2003 Mazzarella
2003/0149937 A1 8/2003 McElfresh et al.
2003/0158632 A1 8/2003 Nierlich et al.
2003/0167178 A1 9/2003 Jarman et al.
2003/0176952 A1 9/2003 Collins
2003/0225483 A1 12/2003 Santinato et al.
2003/0229572 A1 12/2003 Raines et al.
2003/0233201 A1 12/2003 Horst et al.
2004/0006439 A1 1/2004 Hunter
2004/0024483 A1 2/2004 Holcombe
2004/0044571 A1 3/2004 Bronnimann et al.
2004/0088083 A1 5/2004 Davis et al.
2004/0095237 A1 5/2004 Chen et al.
2004/0107025 A1 * 6/2004 Ransom ............ G05B 19/4185
700/286
2004/0117330 A1 6/2004 Ehlers et al.
2004/0128266 A1 7/2004 Yellepeddy et al.
2004/0138834 A1 7/2004 Blackett et al.
2004/0153170 A1 8/2004 Santacatterina et al.
2004/0158478 A1 8/2004 Zimmerman
2004/0158541 A1 8/2004 Notarianni et al.
2004/0162793 A1 8/2004 Scott et al.
2004/0193329 A1 9/2004 Ransom et al.
2004/0225514 A1 11/2004 Greenshields et al.
2004/0230533 A1 11/2004 Benco
2005/0021397 A1 1/2005 Cui et al.
2005/0033481 A1 2/2005 Budhraja et al.
2005/0055432 A1 3/2005 Rodgers
2005/0065742 A1 3/2005 Rodgers
2005/0080772 A1 4/2005 Bem
2005/0096856 A1 5/2005 Lubkeman et al.
2005/0096857 A1 5/2005 Hunter
2005/0096979 A1 5/2005 Koningstein
2005/0097204 A1 5/2005 Horowitz et al.
2005/0125243 A1 6/2005 Villalobos
2005/0127680 A1 6/2005 Lof et al.
2005/0138432 A1 * 6/2005 Ransom ................ G01D 4/004
726/4
2005/0192711 A1 9/2005 Raines et al.
2005/0192713 A1 9/2005 Weik et al.
2005/0197742 A1 9/2005 Scott et al.
2005/0216302 A1 9/2005 Raji et al.
2005/0216580 A1 9/2005 Raji et al.
2005/0234600 A1 10/2005 Boucher et al.
2005/0240314 A1 10/2005 Martinez
2005/0240315 A1 10/2005 Booth et al.
2005/0246190 A1 11/2005 Sandor et al.
2005/0267642 A1 12/2005 Whiffen et al.
2005/0276222 A1 12/2005 Kumar et al.
2005/0288954 A1 12/2005 McCarthy et al.
2006/0020544 A1 1/2006 Kaveski
2006/0020596 A1 1/2006 Liu et al.
2006/0022841 A1 2/2006 Hoiness et al.
2006/0025891 A1 2/2006 Budike
2006/0031934 A1 2/2006 Kriegel
2006/0064205 A1 3/2006 Ying
2006/0069616 A1 3/2006 Bau
2006/0106635 A1 5/2006 Ulrich et al.
2006/0142900 A1 6/2006 Rothman et al.
2006/0142961 A1 6/2006 Johnson et al.
2006/0161310 A1 7/2006 Lal
2006/0161450 A1 7/2006 Carey et al.
2006/0168191 A1 7/2006 Ives
2006/0190354 A1 8/2006 Meisel et al.
2006/0195334 A1 8/2006 Reeb et al.
2006/0212350 A1 9/2006 Ellis et al.
2006/0224615 A1 10/2006 Korn et al.
2006/0241244 A1 10/2006 Soeda et al.
2006/0241314 A1 10/2006 Sullivan et al.
2006/0271244 A1 11/2006 Cumming et al.
2006/0271314 A1 11/2006 Hayes
2006/0276938 A1 12/2006 Miller
2006/0282328 A1 12/2006 Gerace et al.
2007/0021874 A1 1/2007 Rognli et al.
2007/0038563 A1 2/2007 Ryzerski
2007/0058453 A1 3/2007 Shaffer et al.
2007/0058629 A1 3/2007 Luft
2007/0070895 A1 3/2007 Narvaez
2007/0085702 A1 4/2007 Walters et al.
2007/0091900 A1 4/2007 Asthana et al.
2007/0094043 A1 4/2007 Bannai et al.
2007/0100503 A1 5/2007 Balan et al.
2007/0100961 A1 5/2007 Moore
2007/0150353 A1 6/2007 Krassner et al.
2007/0156621 A1 7/2007 Wright et al.
2007/0156887 A1 7/2007 Wright et al.
2007/0174114 A1 7/2007 Bigby et al.
2007/0192333 A1 8/2007 Ali
2007/0203722 A1 8/2007 Richards et al.
2007/0204176 A1 8/2007 Shaffer et al.
2007/0213878 A1 9/2007 Chen
2007/0214118 A1 9/2007 Schoen et al.
2007/0214132 A1 9/2007 Grubb et al.
2007/0255457 A1 11/2007 Whitcomb et al.
2007/0260540 A1 11/2007 Chau et al.
2007/0282495 A1 12/2007 Kempton et al.
2007/0286210 A1 12/2007 Gutt et al.
2007/0291644 A1 12/2007 Roberts et al.

(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | |
|---|---|---|---|
| 2007/0299562 | A1 | 12/2007 | Kates |
| 2008/0010212 | A1 | 1/2008 | Moore et al. |
| 2008/0015976 | A1 | 1/2008 | Sandor et al. |
| 2008/0040223 | A1 | 2/2008 | Bridges et al. |
| 2008/0091625 | A1 | 4/2008 | Kremen |
| 2008/0104026 | A1 | 5/2008 | Koran |
| 2008/0109387 | A1 | 5/2008 | Deaver et al. |
| 2008/0130673 | A1 | 6/2008 | Cregg et al. |
| 2008/0147465 | A1 | 6/2008 | Raines et al. |
| 2008/0154801 | A1 | 6/2008 | Fein et al. |
| 2008/0165714 | A1 | 7/2008 | Dettinger et al. |
| 2008/0172312 | A1 | 7/2008 | Synesiou et al. |
| 2008/0177423 | A1 | 7/2008 | Brickfield et al. |
| 2008/0177678 | A1 | 7/2008 | Martini et al. |
| 2008/0186202 | A1 | 8/2008 | Vaswani et al. |
| 2008/0195462 | A1 | 8/2008 | Magdon-Ismail et al. |
| 2008/0224892 | A1 | 9/2008 | Bogolea et al. |
| 2008/0231114 | A1 | 9/2008 | Tolnar et al. |
| 2008/0238710 | A1 | 10/2008 | Tolnar et al. |
| 2008/0249832 | A1 | 10/2008 | Richardson et al. |
| 2008/0255899 | A1 | 10/2008 | McConnell et al. |
| 2008/0263025 | A1 | 10/2008 | Koran |
| 2008/0270223 | A1 | 10/2008 | Collins et al. |
| 2008/0272934 | A1 | 11/2008 | Wang et al. |
| 2008/0281473 | A1 | 11/2008 | Pitt |
| 2008/0306824 | A1 | 12/2008 | Parkinson |
| 2008/0306830 | A1 | 12/2008 | Lasa et al. |
| 2008/0313632 | A1 | 12/2008 | Kumar et al. |
| 2008/0319893 | A1 | 12/2008 | Mashinsky et al. |
| 2009/0012996 | A1 | 1/2009 | Gupta et al. |
| 2009/0018884 | A1 | 1/2009 | McConnell et al. |
| 2009/0024718 | A1 | 1/2009 | Anagnostopoulos et al. |
| 2009/0038343 | A1 | 2/2009 | Gibson |
| 2009/0043519 | A1 | 2/2009 | Bridges et al. |
| 2009/0043520 | A1 | 2/2009 | Pollack et al. |
| 2009/0045804 | A1 | 2/2009 | Durling et al. |
| 2009/0055031 | A1 | 2/2009 | Slota et al. |
| 2009/0055032 | A1 | 2/2009 | Rodgers |
| 2009/0062970 | A1 | 3/2009 | Forbes et al. |
| 2009/0063228 | A1 | 3/2009 | Forbes |
| 2009/0088907 | A1 | 4/2009 | Lewis et al. |
| 2009/0112701 | A1 | 4/2009 | Turpin |
| 2009/0112758 | A1 | 4/2009 | Herzig |
| 2009/0124241 | A1 | 5/2009 | Krishnaswamy et al. |
| 2009/0125462 | A1 | 5/2009 | Krishnaswamy et al. |
| 2009/0135836 | A1 | 5/2009 | Veillette |
| 2009/0138362 | A1 | 5/2009 | Schroedl et al. |
| 2009/0157529 | A1 | 6/2009 | Ehlers et al. |
| 2009/0187344 | A1 | 7/2009 | Brancaccio et al. |
| 2009/0187499 | A1 | 7/2009 | Mulder et al. |
| 2009/0198384 | A1 | 8/2009 | Ahn |
| 2009/0228335 | A1 | 9/2009 | Niyogi et al. |
| 2009/0240381 | A1 | 9/2009 | Lane |
| 2009/0240677 | A1 | 9/2009 | Parekh et al. |
| 2009/0281673 | A1 | 11/2009 | Taft |
| 2009/0281674 | A1 | 11/2009 | Taft |
| 2009/0313034 | A1 | 12/2009 | Ferro et al. |
| 2009/0313103 | A1 | 12/2009 | Ambrosio et al. |
| 2009/0319415 | A1 | 12/2009 | Stoilov et al. |
| 2010/0076835 | A1 | 3/2010 | Silverman |
| 2010/0082464 | A1 | 4/2010 | Keefe |
| 2010/0094981 | A1 | 4/2010 | Cordray et al. |
| 2010/0106575 | A1 | 4/2010 | Bixby |
| 2010/0106641 | A1 | 4/2010 | Chassin et al. |
| 2010/0138452 | A1 | 6/2010 | Henkin et al. |
| 2010/0163634 | A1 | 7/2010 | Klein et al. |
| 2010/0169175 | A1 | 7/2010 | Koran |
| 2010/0179862 | A1 | 7/2010 | Chassin et al. |
| 2010/0191862 | A1 | 7/2010 | Forbes et al. |
| 2010/0217452 | A1 | 8/2010 | McCord et al. |
| 2010/0217549 | A1 | 8/2010 | Galvin et al. |
| 2010/0217550 | A1 | 8/2010 | Crabtree et al. |
| 2010/0217642 | A1 | 8/2010 | Crubtree et al. |
| 2010/0218108 | A1 | 8/2010 | Crabtree et al. |
| 2010/0222935 | A1* | 9/2010 | Forbes, Jr. ............. G06Q 10/00 700/291 |
| 2010/0235008 | A1* | 9/2010 | Forbes, Jr. ............. G06Q 10/00 700/291 |
| 2010/0274407 | A1 | 10/2010 | Creed |
| 2010/0293045 | A1 | 11/2010 | Burns et al. |
| 2010/0306033 | A1 | 12/2010 | Oved et al. |
| 2010/0324748 | A1 | 12/2010 | Voysey |
| 2010/0328849 | A1 | 12/2010 | Ewing et al. |
| 2010/0332373 | A1 | 12/2010 | Crabtree et al. |
| 2011/0007824 | A1 | 1/2011 | Bridges et al. |
| 2011/0025556 | A1 | 2/2011 | Bridges et al. |
| 2011/0029655 | A1 | 2/2011 | Forbes et al. |
| 2011/0055036 | A1 | 3/2011 | Helfan |
| 2011/0060474 | A1 | 3/2011 | Schmiegel et al. |
| 2011/0080044 | A1 | 4/2011 | Schmiegel |
| 2011/0106729 | A1 | 5/2011 | Billingsley et al. |
| 2011/0115302 | A1 | 5/2011 | Slota et al. |
| 2011/0130982 | A1 | 6/2011 | Haag et al. |
| 2011/0133655 | A1 | 6/2011 | Recker et al. |
| 2011/0145061 | A1 | 6/2011 | Spurr et al. |
| 2011/0147360 | A1 | 6/2011 | Hammerstrom |
| 2011/0161250 | A1 | 6/2011 | Koeppel et al. |
| 2011/0172841 | A1 | 7/2011 | Forbes |
| 2011/0178610 | A1 | 7/2011 | Gamble et al. |
| 2011/0185303 | A1 | 7/2011 | Katagi et al. |
| 2011/0196546 | A1 | 8/2011 | Muller et al. |
| 2011/0196547 | A1 | 8/2011 | Park et al. |
| 2011/0204717 | A1 | 8/2011 | Shaffer |
| 2011/0204719 | A1 | 8/2011 | Sackman et al. |
| 2011/0208366 | A1 | 8/2011 | Taft |
| 2011/0208367 | A1 | 8/2011 | Sackman et al. |
| 2011/0231028 | A1 | 9/2011 | Ozog |
| 2011/0235656 | A1 | 9/2011 | Pigeon |
| 2011/0251730 | A1 | 10/2011 | Pitt |
| 2011/0257809 | A1 | 10/2011 | Forbes et al. |
| 2011/0258022 | A1 | 10/2011 | Forbes et al. |
| 2011/0267202 | A1 | 11/2011 | Efthymiou et al. |
| 2011/0270452 | A1 | 11/2011 | Lu et al. |
| 2011/0270682 | A1 | 11/2011 | Valin |
| 2012/0004872 | A1 | 1/2012 | Oh et al. |
| 2012/0029897 | A1 | 2/2012 | Cherian et al. |
| 2012/0059532 | A1 | 3/2012 | Reifenhaeuser et al. |
| 2012/0078427 | A1 | 3/2012 | Jang et al. |
| 2012/0089263 | A1 | 4/2012 | Park et al. |
| 2012/0095841 | A1 | 4/2012 | Luckerman et al. |
| 2012/0101652 | A1 | 4/2012 | Shin et al. |
| 2012/0131100 | A1 | 5/2012 | Van Olst et al. |
| 2012/0146799 | A1 | 6/2012 | Bell et al. |
| 2012/0153888 | A1 | 6/2012 | Jung |
| 2012/0154171 | A1 | 6/2012 | Hurri et al. |
| 2012/0196482 | A1 | 8/2012 | Stokoe |
| 2012/0205977 | A1 | 8/2012 | Shin et al. |
| 2012/0221162 | A1 | 8/2012 | Forbes |
| 2012/0223840 | A1 | 9/2012 | Guymon et al. |
| 2012/0226384 | A1 | 9/2012 | Forbes |
| 2012/0232816 | A1 | 9/2012 | Oh et al. |
| 2012/0239218 | A1 | 9/2012 | Forbes |
| 2012/0239219 | A1 | 9/2012 | Forbes |
| 2012/0245753 | A1 | 9/2012 | Forbes |
| 2012/0259760 | A1 | 10/2012 | Sgouridis et al. |
| 2012/0296799 | A1 | 11/2012 | Playfair et al. |
| 2012/0310800 | A1 | 12/2012 | Xia et al. |
| 2012/0316691 | A1 | 12/2012 | Boardman et al. |
| 2012/0316697 | A1 | 12/2012 | Boardman et al. |
| 2013/0006435 | A1 | 1/2013 | Berrios et al. |
| 2013/0031201 | A1 | 1/2013 | Kagan et al. |
| 2013/0035802 | A1 | 2/2013 | Khaitan et al. |
| 2013/0036311 | A1 | 2/2013 | Akyol et al. |
| 2013/0038468 | A1 | 2/2013 | Wang et al. |
| 2013/0079939 | A1 | 3/2013 | Thomas et al. |
| 2013/0079943 | A1 | 3/2013 | Darden |
| 2013/0090935 | A1* | 4/2013 | Uselton ................. G06Q 50/06 705/1.1 |
| 2013/0110297 | A1 | 5/2013 | Reichmuth et al. |
| 2013/0123998 | A1 | 5/2013 | King et al. |
| 2013/0144768 | A1 | 6/2013 | Rohrbaugh |
| 2013/0173360 | A1 | 7/2013 | Thatcher |
| 2013/0191260 | A1 | 7/2013 | Michael |

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2014/0018969 A1 | 1/2014 | Forbes |
| 2014/0025486 A1 | 1/2014 | Bigby et al. |
| 2014/0039699 A1 | 2/2014 | Forbes |
| 2014/0039701 A1 | 2/2014 | Forbes |
| 2014/0039703 A1 | 2/2014 | Forbes |
| 2015/0303691 A1 | 10/2015 | Forbes |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| JP | 2001306839 A | 11/2001 |
| JP | 2004180412 A | 6/2004 |
| JP | 2004248174 A | 9/2004 |
| JP | 2006060911 A | 3/2006 |
| JP | 2007132553 A | 5/2007 |
| KR | 20050011584 A | 1/2005 |
| KR | 20050045272 A | 5/2005 |
| KR | 20060011584 A | 2/2006 |
| KR | 20060036171 A | 4/2006 |
| KR | 20070008321 A | 1/2007 |
| KR | 100701298 B1 | 3/2007 |
| KR | 20070098172 A | 10/2007 |
| KR | 20080112692 A | 12/2008 |
| WO | 2007136456 A2 | 11/2007 |
| WO | 2008125696 A2 | 10/2008 |

OTHER PUBLICATIONS

Byers J. Risk Management and Monetizing the Commodity Storage Option. Natural Gas & Electricity [serial online]. Jul. 2005; 21 (12):1-8. Available from: Business Source Complete, Ipswich, MA.
C.W. Gellings and W.M. Smith, Integrating Demand-Side Management into Utility Planning, Proceedings of the IEEE, vol. 77, Issue: 6, Jun. 1989, pp. 908-918 (Abstract only).
Eric Hirst and Brendan Kirby, Opportunities for Demand Participation in New England Contingency-Reserve Markets, New England Demand Response Initiative, Feb. 2003 (15 pages).
Eric Hirst and Richard Cowart, Demand Side Resources and Reliability, New England Demand Response Initiative, Mar. 20, 2002 (32 pages).
Galvin Electricity Institute: Frequently Asked Questions, printed Apr. 23, 2014, same page available through archive.org unchanged Mar. 1, 2008.
GE Digital Energy Residential Electrical Metering Brochure. Sep. 12, 2012. https://web.archive.org/web/20120912144353/http://www.gedigitalenergy.com/products/brochures/1210-Family.pdf.
Illinois General Assembly: Public Act 094-0977, Effective Date: Jun. 30, 2006.
Kamat R., Oren S. Two-Settlement Systems for Electricity Markets under Network Uncertainty and Market Power Journal of Regulatory Economics [serial online]. Jan. 2004; 25(1):5-37.
Kathleen Spees and Lester B. Lave, Demand Response and Electricity Market Efficiency, The Electricity Journal, vol. 20, Issue 3, Apr. 2007 (online Mar. 27, 2007), pp. 69-85 (Abstract only).
L.T. Anstine, R.E. Burke, J.E. Casey, R. Holgate, R.S. John, and H.G. Stewart, Application of Probability Methods to the Determination of Spinning Reserve Requirements for the Pennsylvania-New Jersey-Maryland Interconnection; IEEE Transactions on Power Apparatus and Systems, vol. 82, Issue 68, Oct. 1963, pp. 726-735 (Abstract only).
Lobsenz G. Maryland Regulators Reject BG&E Smart Grid Proposal. Energy Daily [serial online]. Jun. 23, 2010; (118): 3. Available from: Business Source Complete, Ipswich, MA.
M. Rashidi-Nejad, Y.H. Song, and M.H. Javidi-Dasht-Bayaz, Operating Reserve Provision in Deregulated Power Markets, IEEE Power Engineering Society Winter Meeting, vol. 2, 2002, pp. 1305-1310 (Abstract only).
Michael Ahlheim and Friedrich Schneider; "Allowing for Household Preferences in Emission Trading, A Contribution to the Climate Policy Debate"; Environmental and Resource Economics, vol. 21, pp. 317-342; Kluwer Academic Publishers; The Netherlands; 2002.
Olivier Rousse; "Environmental and economic benefits resulting from citizens' participation in CO.sub.2 emissions trading: An efficient alternative solution to the voluntary compensation of CO.sub.2 emissions", Energy Policy 36(2008), pp. 388-397; Oct. 29, 2007 (online).
Pablo A. Ruiz and Peter W. Sauer, Valuation of Reserve Services, IEEE Proceedings of the 41 .sup.st Hawaii International Conference on System Sciences, 2008 (9 pages).
Paul Darbee, Insteon Compared, SmartLabs, Inc., Jan. 2, 2006, 69 pages.
Paul Darbee, Insteon The Details, Smarthome, Inc., Aug. 11, 2005, 68 pages.
Zhu Jinxiang, G. Jordan, and S. Ihara, The Market for Spinning Reserve and Its Impacts on Energy Prices, IEEE Power Engineering Society Winter Meeting, vol. 2, 2000, pp. 1202-1207 (Abstract Only).

* cited by examiner


10
90
20
80
400
BPL, Ethernet, or RF Control
Residential or Smart Breaker Load Center
Network
Active Load Client
300
60
100
Smart Appliance
Active Load Director Server
70
Washer/ Dryer
Hot Water Heater
HVAC Unit
Pool Pump
200
Utility (s) Data Energy Control Center
30
40
50

FIG. 1


100
Active Load Director Server
Utility Control Center
200
Security I/F
102
UCC Command Processor
104
Read Meter Application
136
Web Browser Interface
114
Customer Personal Settings
138
Customer Sign Up Application
116
Customer Reports Application
118
Master Event Manager
106
Active Load Client Manager
108
Security Device Mgmt
140
Active Load Director Data Base
124
Service Dispatch Manager
126
Trouble Ticket Generator
128
Call Center Manager
130
Power Savings Application
120
Carbon Savings Application
132
Utility P&C Data Base
134
Active Load Client Diagnostic Manager
122
Security Interface
110
Active Load Client Interface
112
Active Load Client
300
Customer Rewards Program
150

*FIG. 2*



Current Sensor
450
452
Smart Meter
460
300
To/From ALD Server 100
308
Communications Interface
IP Layer 3 Router
Security Interface
IP Based Communication Converter
320
310
312
322
Smart Meter Interface
Security Device Interface
328
IP Device Interface
330
Local IP Connected Device(s)
440
Report Trigger
318
Active Load Client
Device Control Manager
314
B1-BN Counter Manager
316
Smart Breaker Module Controller
306
Smart Device Interface
324
Linux
302
Status Response
304
400
B1
B2
B3
B4
B5
B6
402
404
406
408
410
412
SMART BREAKER MODULE
420
One or More Power Management Enabled Devices


FIG. 3



500
ENTER
502
RECEIVE TRANSACTION
503
TRANSACTION TYPE?
NEW SERVICE
SERVICE
504
SCHEDULE SERVICE PERSON FOR INITIAL INSTALLATION
506
NOTIFY SERVICE PERSON OF SERVICE CALL VIA EMAIL OR INSTANT MESSAGING
508
RECEIVE INSTALLATION COMPLETE REPORT FROM SERVICE PERSON
510
SEND "UPDATE" TRANSACTION TO ALC MANAGER
512
SCHEDULE SERVICE PERSON FOR SERVICE CALL
514
SEND "DIAGNOSE" TRANSACTION TO ALC DIAGNOSTIC MANAGER
516
NOTIFY SERVICE PERSON OF SERVICE CALL AND RESULTS OF DIAGNOSTIC PROCEDURE USING TROUBLE TICKET
EXIT


FIG. 4


ENTER
600
602
RECEIVE "UPDATE" TRANSACTION FROM SERVICE DISPATCH MANAGER
604
SEND QUERY REQUEST TO ALC AT SPECIFIED IP ADDRESS
606
RECEIVE REPLY TO QUERY REQUEST
608
UPDATE ALD DATABASE WITH LATEST STATUS INFORMATION OBTAINED FROM ALC
610
IS ALC FUNCTIONING PROPERLY?
NO
YES
612
SET CUSTOMER STATE TO ACTIVE
614
SEND "SERVICE" TRANSACTION TO SERVICE DISPATCH MANAGER
EXIT

*FIG. 5*


ENTER
700
702
TRACK CURRENT POWER USAGE WITHIN EACH UTILITY
704
RECEIVE TRANSACTION
706
TRANSACTION TYPE?
"CUT"
"HOW MUCH"
"END EVENT"
708
PLACE UTILITY IN MANAGED STATE
712
DETERMINE AMOUNT OF POWER THAT MAY BE REMOVED BY ACCESSING CURRENT USAGE INFORMATION FOR UTILITY
710
SEND "CUT" TRANSACTION TO ALC MANAGER WITH NUMBER OF MEGAWATTS TO BE REMOVED FROM SYSTEM
711
NOTIFY CUSTOMERS THAT POWER MANAGEMENT EVENT IN PROCESS
714
SET STATE OF EVENT AS "PENDING"
716
SEND "END EVENT" TRANSACTION TO ALC MANAGER
718
RECEIVE "EVENT ENDED" TRANSACTION FROM ALC MANAGER
720
SET STATE OF UTILITY TO "NOT MANAGED"
722
NOTIFY CUSTOMERS THAT POWER MANAGEMENT EVENT HAS ENDED
724
SEND "EVENT ENDED" TRANSACTION TO POWER SAVINGS APPLICATION
EXIT

*FIG. 6*


ENTER
800
802
TRACK STATE OF EVERY ALC HAVING AN IP ADDRESS WITHIN SPECIFIED UTILITY
804
LOG INFORMATION RECEIVED FROM EACH ALC IN ALS DATABASE IN RECORD CORRESPONDING TO SPECIFIC ALC
806
RECEIVE TRANSACTION
808
TRANSACTION?
"CUT"
"END EVENT"
"TURN ON"
810
ENTER "MANAGE STATE"
812
DETERMINE WHICH ALC AND ASSOCIATED DEVICES TO TURN OFF
814
SEND "TURN OFF" TRANSACTION TO SELECTED ALC'S WITH LIST OF INDICATED DEVICES TO TURN OFF
816
LOG AMOUNT OF POWER AND TIMESTAMP IN ALS DB FOR EACH ALC REDUCED
818
SCHEDULE "TURN ON" TRANSACTION TO ALC MANAGER
820
FIND ONE OR MORE ALC'S IN "ON" STATE WHICH WILL SAVE THE EQUIVALENT POWER AS ALC CURRENTLY IN "OFF" STATE
822
SEND "TURN OFF" TRANSACTION TO EACH ALC NECESSARY TO SAVE EQUIVALENT POWER
824
SEND "TURN ON" TRANSACTION TO ALC FOR WHICH ORIGINAL "TURN ON" TRANSACTION WAS RECEIVED
826
LOG "TURN ON" TRANSACTION TIME IN ALD DATABASE
828
SEND "TURN ON" TRANSACTION TO EACH ALC CURRENTLY IN "OFF" STATE
830
ALL ALC'S ON?
NO
YES
832
SEND "EVENT ENDED" TRANSACTION TO MASTER EVENT MANAGER
EXIT

*FIG. 7*


900
ENTER
902
RECEIVE "EVENT ENDED" TRANSACTION FROM MASTER EVENT MANAGER
904
ACCESS ALS DATABASE FOR EACH ALC MANAGED DURING "CUT" TRANSACTION
906
STORE TOTAL AMOUNT OF POWER SAVED AND RELATED INFORMATION FOR SPECIFIC UTILTY DURING PREVIOUS "CUT" TRANSACTION IN UTILITY P&C DATABASE
908
INVOKE CARBON SAVINGS APPLICATION
EXIT

*FIG. 8*

# METHOD AND APPARATUS FOR ACTIVELY MANAGING CONSUMPTION OF ELECTRIC POWER OVER AN ELECTRIC POWER GRID

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application relates to and claims priority from the following U.S. patent Applications. This application is a continuation of U.S. patent application Ser. No. 14/456,306 filed on Aug. 11, 2014, and issued as U.S Pat. No. 9,678,522, which is a continuation of U.S. patent application Ser. No. 13/463,761 filed on May 3, 2012 and issued as U.S. Pat. No. 8,805,552, which is a continuation-in-part of U.S. patent application Ser. No. 13/172,389 filed on Jun. 29, 2011 and issued as U.S. Pat. No. 8,315,717, which is a continuation of U.S. patent application Ser. No. 12/715,195 filed on Mar. 1, 2010 and issued as U.S. Pat. No. 8,032,233, which is a divisional of U.S. patent application Ser. No. 11/895,909 filed on Aug. 28, 2007 and issued as U.S. Pat. No. 7,715,951, all of which are incorporated herein by reference in their entirety.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates generally to the field of electrical power load control systems and more particularly to a method and system for actively controlling power load management for individual customers and optionally tracking power savings for both the individual customer as well as the overall electric utility.

2. Description of Related Art

The increased awareness of the impact of carbon emissions from the use of fossil fueled electric generation combined with the increased cost of producing peak power during high load conditions has increased the need for alternative solutions utilizing load control as a mechanism to defer, or in some cases eliminate, the need for the deployment of additional generation capacity by electric utilities. Existing electric utilities are pressed for methods to defer or eliminate the need for construction of fossil-based electricity generation. Today, a patchwork of systems exist to implement demand response load management programs, whereby various radio subsystems in various frequency bands utilize "one-way" transmit only methods of communication. Under these programs, RF controlled relay switches are typically attached to a customer's air conditioner, water heater, or pool pump. A blanket command is sent out to a specific geographic area whereby all receiving units within the range of the transmitting station (e.g., typically a paging network) are turned off during peak hours at the election of the power utility. After a period of time when the peak load has passed, a second blanket command is sent to turn on those devices that have been turned off

While tele-metering has been used for the express purpose of reporting energy usage, no techniques exist for calculating power consumption, carbon gas emissions, sulfur dioxide (SO.sub.2) gas emissions, and/or nitrogen dioxide (NO.sub.2) emissions, and reporting the state of a particular device under the control of a two-way positive control load management device. In particular, one way wireless communications devices have been utilized to de-activate electrical appliances, such as heating, ventilation, and air-conditioning (HVAC) units, water heaters, pool pumps, and lighting, from an existing electrical supplier or distribution partner's network. These devices have typically been used in combination with wireless paging receivers that receive "on" or "off" commands from a paging transmitter. Additionally, the one-way devices are typically connected to a serving electrical supplier's control center via landline trunks, or in some cases, microwave transmission to the paging transmitter. The customer subscribing to the load management program receives a discount for allowing the serving electrical supplier (utility) to connect to their electrical appliances and deactivate those appliances during high energy usage periods.



While one-way devices are generally industry standard and relatively inexpensive to implement, the lack of a return path from the receiver, combined with the lack of information on the actual devices connected to the receiver, make the system highly inefficient for measuring the actual load shed to the serving utility. While the differential current draw is measurable on the serving electric utility's transmission lines, the actual load shed is approximate and the location of the load deferral is approximated at the control center of the serving utility.

One exemplary tele-metering system is disclosed in U.S. Pat. No. 6,891,838 B1. This patent describes details surrounding a mesh communication of residential devices and the reporting and control of those devices, via WANs, to a computer. The stated design goal in this patent is to facilitate the "monitoring and control of residential automation systems." This patent does not explain how a serving utility or customer could actively control the devices to facilitate the reduction of electricity. In contrast, this patent discloses techniques that could be utilized for reporting information that is being displayed by the serving utility's power meter (as do many other prior applications in the field of tele-metering).

An additional exemplary tele-metering system is disclosed in U.S. Patent Application Publication No. 2005/0240315 A1. The primary purpose of this published application is not to control utility loads, but rather "to provide an improved interactive system for remotely monitoring and establishing the status of a customer utility load." A stated goal of this publication is to reduce the amount of time utility field personnel have to spend in the field servicing meters by utilizing wireless technology.

Another prior art system is disclosed in U.S. Pat. No. 6,633,823 B2, which describes, in detail, the use of proprietary hardware to remotely turn off or turn on devices within a building or residence. While initially this prior art generally describes a system that would assist utilities in managing power load control, the prior art does not contain the unique attributes necessary to construct or implement a complete system. In particular, this patent is deficient in the areas of security, load accuracy of a controlled device, and methods disclosing how a customer utilizing applicable hardware might set parameters, such as temperature set points, customer preference information, and customer overrides, within an intelligent algorithm that reduces the probability of customer dissatisfaction and service cancellation or churn.

Attempts have been made to bridge the gap between one-way, un-verified power load control management systems and positive control verified power load control management systems. However, until recently, technologies such as smart breakers and command relay devices were not considered for use in residential and commercial environments primarily due to high cost entry points, lack of customer demand, and the cost of power generation relative to the cost of implementing load control.

One such gap-bridging attempt is described in U.S. Patent Application Publication No. US 2005/0065742 A1. This publication discloses a system and method for remote power management using IEEE 802 based wireless communication links. The system disclosed in this publication includes an on-premise processor (OPP), a host processor, and an end device. The host processor issues power management commands to the OPP, which in turn relays the commands to the end devices under its management. While the disclosed OPP does provide some intelligence in the power management system, it does not determine which end devices under its control to turn-off during a power reduction event, instead relying on the host device to make such decision. For example, during a power reduction event, the end device must request permission from the OPP to turn on. The request is forwarded to the host device for a decision on the request in view of the parameters of the on-going power reduction event. The system also contemplates periodic reading of utility meters by the OPP and storage of the read data in the OPP for later communication to the host device. The OPP may also include intelligence to indicate to the host processor that the OPP will not be able to comply with a power reduction command due to the inability of a load under the OPP's control to be deactivated. However, neither the host processor nor the OPP determine which loads to remove in order to satisfy a power reduction command from an electric utility, particularly when the command is issued by one of several utilities under the management of a power management system. Further, neither the host processor nor the OPP tracks or accumulates power saved and/or carbon credits earned on a per customer or per utility basis for future use by the utility and/or customer. Still further, the system of this publication lacks a reward incentive program to customers based on their participation in the power management system. Still further, the system described in this publication does not provide for secure communications between the host processor and the OPP, and/or between the OPP and the end device. As a result, the described system lacks many features that may be necessary for a commercially viable implementation.

Therefore, a need exists for a system and method for active power load management for individual customers that is optionally capable of tracking power savings for the individual customer as well as the electric utility to thereby overcome the shortcomings of the prior art.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a block diagram of an IP-based active power load management system in accordance with an exemplary embodiment of the present invention.

FIG. **2** is a block diagram illustrating an exemplary active load director (ALD) server as shown in the system of FIG. **1**.

FIG. **3** is a block diagram illustrating an exemplary active load client and smart breaker module as shown in the system of FIG. **1**.

FIG. **4** is an operational flow diagram illustrating a method for automatically scheduling service calls in an active power load management system in accordance with one exemplary embodiment of the present invention.

FIG. **5** is an operational flow diagram illustrating a method for activating new subscribers in an active power load management system in accordance with another exemplary embodiment of the present invention.

FIG. **6** is an operational flow diagram illustrating a method for managing events occurring in an active power load management system in accordance with yet another exemplary embodiment of the present invention.



FIG. **7** is an operational flow diagram illustrating a method for actively reducing consumed power and tracking power savings on an individual customer basis in an active power load management system in accordance with another exemplary embodiment of the present invention.

FIG. **8** is an operational flow diagram illustrating a method for tracking cumulative power savings of an electric utility in an active power load management system during a power savings event in accordance with yet another exemplary embodiment of the present invention.

## DETAILED DESCRIPTION OF EXEMPLARY EMBODIMENTS

Before describing in detail exemplary embodiments that are in accordance with the present invention, it should be observed that the embodiments reside primarily in combinations of apparatus components and processing steps related to actively managing power loading on an individual subscriber basis and optionally tracking power savings incurred by both individual subscribers and an electric utility. Accordingly, the apparatus and method components have been represented where appropriate by conventional symbols in the drawings, showing only those specific details that are pertinent to understanding the embodiments of the present invention so as not to obscure the disclosure with details that will be readily apparent to those of ordinary skill in the art having the benefit of the description herein.

In this document, relational terms, such as "first" and "second," "top" and "bottom," and the like, may be used solely to distinguish one entity or element from another entity or element without necessarily requiring or implying any physical or logical relationship or order between such entities or elements. The terms "comprises," "comprising," or any other variation thereof are intended to cover a non-exclusive inclusion, such that a process, method, article, or apparatus that comprises a list of elements does not include only those elements, but may include other elements not expressly listed or inherent to such process, method, article, or apparatus. The term "plurality of" as used in connection with any object or action means two or more of such object or action. A claim element proceeded by the article "a" or "an" does not, without more constraints, preclude the existence of additional identical elements in the process, method, article, or apparatus that includes the element. Additionally, the term "ZigBee" refers to any wireless communication protocol adopted by the Institute of Electronics & Electrical Engineers (IEEE) according to standard 802.15.4 or any successor standard(s), the term "Wi-Fi" refers to any communication protocol adopted by the IEEE under standard 802.11 or any successor standard(s), the term "WiMax" refers to any communication protocol adopted by the IEEE under standard 802.16 or any successor standard(s), and the term "Bluetooth" refers to any short-range communication protocol implementing IEEE standard 802.15.1 or any successor standard(s). Additionally or alternatively to WiMax, other communications protocols may be used, including but not limited to a "1 G" wireless protocol such as analog wireless transmission, first generation standards based (IEEE, ITU or other recognized world communications standard), a "2-G" standards based protocoal such as "EDGE or CDMA 2000 also known as 1XRTT", a 3G based standard such as "High Speed Packet Access (HSPA) or Evolution for Data Only (EVDO), any accepted 4G standard such as "IEEE, ITU standards that

include WiMax, Long Term Evolution "LTE" and its derivative standards, any Ethernet solution wireless or wired, or any proprietary wireless or power line carrier standards that communicate to a client device or any controllable device that sends and receives an IP based message.

It will be appreciated that embodiments of the invention described herein may be comprised of one or more conventional processors and unique stored program instructions that control the one or more processors to implement, in conjunction with certain non-processor circuits, some, most, or all of the functions for managing power load distribution and tracking individual subscriber power consumption and savings in one or more power load management systems as described herein. The non-processor circuits may include, but are not limited to, radio receivers, radio transmitters, antennas, modems, signal drivers, clock circuits, power source circuits, relays, meters, smart breakers, current sensors, and user input devices. As such, these functions may be interpreted as steps of a method to distribute information and control signals between devices in a power load management system. Alternatively, some or all functions could be implemented by a state machine that has no stored program instructions, or in one or more application specific integrated circuits (ASICs), in which each function or some combinations of functions are implemented as custom logic. Of course, a combination of the two approaches could be used. Thus, methods and means for these functions have been described herein. Further, it is expected that one of ordinary skill in the art, notwithstanding possibly significant effort and many design choices motivated by, for example, available time, current technology, and economic considerations, when guided by the concepts and principles disclosed herein, will be readily capable of generating such software instructions, programs and integrated circuits (ICs), and appropriately arranging and functionally integrating such non-processor circuits, without undue experimentation.

Recently, the IEEE has released improved WiMax wireless standards that have facilitated the consideration of new technologies to improve the response and control of power load control devices employing smart breaker technologies. Embodiments of the present invention expand upon and enhance prior technologies by, among other things, employing WiMax or IP-based load control in a system with the ability to monitor, in real time, the amount of power deferred (or carbon, SO.sub.2, or NO.sub.2 eliminated). These improvements allow new options for electric utilities to defer or invest in new power generation that is friendlier to the environment.

IP-based power management is advantageous over existing systems for many reasons. For example, positive control allows a system controller to receive a response from an end device installed at a customer location, which indicates that the actual target device has turned "off" or "on." Additionally, each equipment identifier is unique and each IP address is either dynamically assigned when the device is activated (e.g., through use of the dynamic host configuration protocol (DHCP)) or statically assigned by the serving IP network, thereby providing enhanced security to protect against an act of random terrorism or sabotage inadvertently shutting down power services. Existing power management systems, including those utilizing radio subsystems, do not address security problems adequately and thus are more likely susceptible to hostile or malicious acts.

IP-based systems are also bandwidth or network efficient. For example, IP devices are controlled via the 7-layer Open Systems Interconnection (OSI) model whereby the payload of each packet can contain a message or "change in state" and does not require synchronous communication. This method of transmission allows for very minimum overhead and low data rates on a broadband network. Additionally, IP devices can report many states, including "no power." For example, the active load client **300** may be implemented with a battery backup mechanism to provide backup or auxiliary power to the active load client **300** when AC power is lost. In this case, when battery backup is invoked, the active load client **300** can report a "no power" condition. Alternatively, a "no power" condition may be assumed if an active load client **300** fails to timely respond to a message (e.g., a poll or other message) from the ALD server **100**, particularly where multiple active load clients **300** in a geographic area fail to timely respond to the ALD server messaging. Because the geographic location of each customer premises and active load client **300** may be known at the time of installation or thereafter (e.g., using GPS coordinates), such network outages may be located on a per meter basis.



One of the most beneficial advantages of an IP-based power management system, as provided in one embodiment of the present invention, is accurate reporting of the actual amount of power saved by each customer on an individual basis. Embodiments of the present invention monitor and calculate precisely how many kilowatts (or carbon credits) are being generated or saved per customer instead of merely providing an estimate. Furthermore, embodiments of the present invention provide means for tracking the actual amount of deferred load and pollutants according to generation mix, serving utility and geographic area.

Embodiments of the present invention include an exemplary system for supporting a serving utility or power distributor (e.g., such as a municipality, electric cooperative, or any other wholesale or retail producer of electric power), methods for providing continuous, real time active power control in the system, and a method for determining how much actual load may be controlled at any given time for the purposes of conservation, alternative power generation and the creation of carbon (and other gaseous emissions) credits.

Additional embodiments of the present invention provide a system that implements the exemplary methods through the unique use of load information, location of customers consuming electricity, changes in state of controlled devices, current sensing, customer set points/preferences and artificial intelligence (e.g., as implemented through software) to optimize the presentation of load available to the serving utility for control.

Generally, the embodiments disclosed in the present invention are directed towards the real time (active) control of residential and commercial electrical devices that generally are 240V or less. However, specific features and functions may also be applicable to larger commercial installations that are greater than 240V. The description herein is intended to provide a practical implementation of real time load management for either voluntary or involuntary participants over large geographies and ideally for many serving electrical power producers, wholesalers or distributors. The exemplary methods and systems disclosed in the present invention may be implemented by an individual utility provider, or a third party monitoring service that tracks and manages power loading for one or more utilities. This application describes the necessary methods and generally describes software subsystems for both a host function (e.g., an active load director (ALD) server) and a companion active load client (ALC).

One embodiment of the present invention controls power distribution for a variety of electric utility companies or any

other electric power grid operator(s) by actively monitoring the amount of power needed by each utility and supplying the required power by redirecting power from participating customers. In this embodiment, customers agree to allow the power management system to disable certain power-consuming devices during peak loading times of the day. Smart breakers, which have the ability to be switched on or off remotely, are installed for specific devices in an electric service control panel accessed by a known IP address. Alternatively, IP-addressable smart appliances may be used. The power management system determines the amount of steady-state power each device consumes when turned on and logs the information in a database for each subscriber. For example, a current sensor on each smart appliance or within each smart breaker may measure the amount of current consumed by each monitored device. An active load client then multiplies the amount of current consumed by the operating voltage of the device to obtain the power consumption, and transmits the power consumption to the ALD server. When the serving utility needs more power than it is currently able to supply, the power load management system automatically adjusts the power distribution by turning off specific loads on an individual subscriber basis. Because the amount of power consumed by each specific load is known, the system can determine precisely which loads to turn off and tracks the power savings generated by each customer as a result of this short-term outage.

Furthermore, based upon the reduction in consumed power, the systems and methods of the present invention provide for generating at the control center a power supply value (PSV) corresponding to the reduction in consumed power by the power consuming device(s). Importantly, the PSV is an actual value that includes measurement and verification of the reduction in consumed power; such measurement and verification methods may be determined by the appropriate governing body or authority for the electric power grid(s). Power Supply Value (PSV) is calculated at the meter or submeter or at building control system or at any device or controller that measures power within the standard as supplied by the regulatory body(ies) that govern the regulation of the grid. PSV variations may depend on operating tolerances, operating standard for accuracy of the measurement. The PSV enables transformation of curtailment or reduction in power at the device level by any system that sends or receives an IP message to be related to or equated to supply as presented to the governing entity that accepts these values and award supply equivalence, for example of a power generating entity or an entity allowed to control power consuming devices as permitted by the governing body of the electric power grid, e.g., FERC, NERC, etc.

PSV may be provided in units of electrical power flow, monetary equivalent, and combinations thereof. Thus, the PSV provides an actual value that is confirmed by measurement and/or verification, thereby providing for a curtailment value as a requirement for providing supply to the power grid, wherein the supply to the power electric power grid is provided for grid stability, voltage stability, reliability, and combinations thereof, and is further provided as responsive to an energy management system or equivalent for providing grid stability, reliability, frequency as determined by governing authority for the electric power grid and/or grid operator(s).

The present invention can be more readily understood with reference to FIGS. **1-8**, in which like reference numerals designate like items. FIG. **1** depicts an exemplary IP-based active power load management system **10** in accordance with one embodiment of the present invention. The exemplary power management system **10** monitors and manages power distribution via an active load director (ALD) server **100** connected between one or more utility control centers (UCCs) **200** (one shown) and one or more active load clients (ALCs) **300** (one shown). The ALD server **100** may communicate with the utility control center **200** and each active load client **300** either directly or through a network **80** using the Internet Protocol (IP) or any other connection-based protocols. For example, the ALD server **100** may communicate using RF systems operating via one or more base stations **90** (one shown) using one or more wireless communication protocols, such as Global System for Mobile communications (GSM), Enhanced Data GSM Environment (EDGE), High Speed Packet Access (HSDPA), Time Division Multiple Access (TDMA), or Code Division Multiple Access data standards, including CDMA 2000, CDMA Revision A, and CDMA Revision B. Alternatively, or additionally, the ALD server **100** may communicate via a digital subscriber line (DSL) capable connection, cable television based IP capable connection, or any combination thereof. In the exemplary embodiment shown in FIG. **1**, the ALD server **100** communicates with one or more active load clients **300** using a combination of traditional IP-based communication (e.g., over a trunked line) to a base station **90** and a wireless channel implementing the WiMax protocol for the "last mile" from the base station **90** to the active load client **300**.

Each active load client **300** is accessible through a specified address (e.g., IP address) and controls and monitors the state of individual smart breaker modules or intelligent appliances **60** installed in the business or residence **20** to which the active load client **300** is associated (e.g., connected or supporting). Each active load client **300** is associated with a single residential or commercial customer. In one embodiment, the active load client **300** communicates with a residential load center **400** that contains smart breaker modules, which are able to switch from an "ON" (active) state to an "OFF" (inactive), and vice versa, responsive to signaling from the active load client **300**. Smart breaker modules may include, for example, smart breaker panels manufactured by Schneider Electric SA under the trademark "Square D" or Eaton Corporation under the trademark "Cutler-Hammer" for installation during new construction. For retro-fitting existing buildings, smart breakers having means for individual identification and control may be used. Typically, each smart breaker controls a single appliance (e.g., a washer/dryer **30**, a hot water heater **40**, an HVAC unit **50**, or a pool pump **70**).

Additionally, the active load client **300** may control individual smart appliances directly (e.g., without communicating with the residential load center **300**) via one or more of a variety of known communication protocols (e.g., IP, Broadband over PowerLine (BPL) in its various forms, including through specifications promulgated or being developed by the HOMEPLUG Powerline Alliance and the IEEE, Ethernet, Bluetooth, ZigBee, Wi-Fi, WiMax, etc.). Typically, a smart appliance **60** includes a power control module (not shown) having communication abilities. The power control module is installed in-line with the power supply to the appliance, between the actual appliance and the power source (e.g., the power control module is plugged into a power outlet at the home or business and the power cord for the appliance is plugged into the power control module). Thus, when the power control module receives a command to turn off the appliance **60**, it disconnects the actual power supplying the appliance **60**. Alternatively, a smart appliance

**60** may include a power control module integrated directly into the appliance, which may receive commands and control the operation of the appliance directly (e.g., a smart thermostat may perform such functions as raising or lowering the set temperature, switching an HVAC unit on or off, or switching a fan on or off).

Referring now to FIG. **2**, the ALD server **100** may serve as the primary interface to customers, as well as to service personnel. In the exemplary embodiment depicted in FIG. **2**, the ALD server **100** includes a utility control center (UCC) security interface **102**, a UCC command processor **104**, a master event manager **106**, an ALC manager **108**, an ALC security interface **110**, an ALC interface **112**, a web browser interface **114**, a customer sign-up application **116**, customer personal settings **138**, a customer reports application **118**, a power savings application **120**, an ALC diagnostic manager **122**, an ALD database **124**, a service dispatch manager **126**, a trouble ticket generator **128**, a call center manager **130**, a carbon savings application **132**, a utility P & C database **134**, a read meter application **136**, and a security device manager **140**.

Using the web browser interface **114**, in one embodiment, customers interact with the ALD server **100** and subscribe to some or all of the services offered by the power load management system **10** via a customer sign-up application **116**. In accordance with the customer sign-up application **116**, the customer specifies customer personal settings **138** that contain information relating to the customer and the customer's residence or business, and defines the extent of service to which the customer wishes to subscribe. Additional details of the customer sign-up application **116** are discussed below. Customers may also use the web browser interface **114** to access and modify information pertaining to their existing accounts.

The ALD server **100** also includes a UCC security interface **102** which provides security and encryption between the ALD server **100** and a utility company's control center **200** to ensure that no third party is able to provide unauthorized directions to the ALD server **100**. A UCC command processor **104** receives and sends messages between the ALD server **100** and the utility control center **200**. Similarly, an ALC security interface **110** provides security and encryption between the ALD server **100** and each active load client **300** on the system **10**, ensuring that no third parties can send directions to, or receive information from, the active load client **300**. The security techniques employed by the ALC security interface **110** and the UCC security interface **102** may include conventional symmetric key or asymmetric key algorithms, such as Wireless Encryption Protocol (WEP), Wi-Fi Protected Access (WPA and WPA2), Advanced Encryption Standard (AES), Pretty Good Privacy (PGP), or proprietary encryption techniques.

In one embodiment, the commands that can be received by the UCC command processor **104** from the electric utility's control center **200** include a "Cut" command, a "How Much" command, an "End Event" command, and a "Read Meters" command. The "Cut" command instructs the ALD server **100** to reduce a specified amount of power for a specified amount of time. The specified amount of power may be an instantaneous amount of power or an average amount of power consumed per unit of time. The "Cut" command may also optionally indicate general geographic areas or specific locations for power load reduction. The "How Much" command requests information for the amount of power (e.g., in megawatts) that can be reduced by the requesting utility control center **200**. The "End Event" command stops the present ALD server **100** transaction. The "Read Meters" command instructs the ALD server **100** to read the meters for all customers serviced by the requesting utility.

The UCC command processor **104** may send a response to a "How Much" command or an "Event Ended" status confirmation to a utility control center **200**. A response to a "How Much" command returns an amount of power that can be cut. An "Event Ended" acknowledgement message confirms that the present ALD server transaction has ended.

The master event manager **106** maintains the overall status of the power load activities controlled by the power management system **10**. The master event manager **106** maintains a separate state for each utility that is controlled and tracks the current power usage within each utility. The master event manager **106** also tracks the management condition of each utility (e.g., whether or not each utility is currently being managed). The master event manager **106** receives instructions in the form of transaction requests from the UCC command processor **104** and routes instructions to components necessary to complete the requested transaction, such as the ALC manager **108** and the power savings application **120**.

The ALC manager **108** routes instructions between the ALD server **100** and each active load client **300** within the system **10** through an ALC interface **112**. For instance, the ALC manager **108** tracks the state of every active load client **300** serviced by specified utilities by communicating with the active load client **300** through an individual IP address. The ALC interface **112** translates instructions (e.g., transactions) received from the ALC manager **108** into the proper message structure understood by the targeted active load client **300** and then sends the message to the active load client **300**. Likewise, when the ALC interface **112** receives messages from an active load client **300**, it translates the message into a form understood by the ALC manager **108** and routes the translated message to the ALC manager **108**.

The ALC manager **108** receives from each active load client **300** that it services, either periodically or responsive to polling messages sent by the ALC manager **108**, messages containing the present power consumption and the status (e.g., "ON" or "OFF") of each device controlled by the active load client **300**. Alternatively, if individual device metering is not available, then the total power consumption and load management status for the entire active load client **300** may be reported. The information contained in each status message is stored in the ALD database **124** in a record associated with the specified active load client **300**. The ALD database **124** contains all the information necessary to manage every customer account and power distribution. In one embodiment, the ALD database **124** contains customer contact information, such as names, addresses, phone numbers, email addresses, and associated utility companies for all customers having active load clients **300** installed at their residences or businesses, as well as a description of specific operating instructions for each managed device (e.g., IP-addressable smart breaker or appliance), device status, and device diagnostic history.

There are several types of messages that the ALC manager **108** may receive from an active load client **300** and process accordingly. One such message is a security alert message. A security alert message originates from an optional security or safety monitoring system installed in the residence or business and coupled to the active load client **300** (e.g., wirelessly or via a wired connection). When a security alert message is received, the ALC manager **108** accesses the ALD database **124** to obtain routing information for determining where to send the alert, and then sends

the alert as directed. For example, the ALD manager **108** may be programmed to send the alert or another message (e.g., an electronic mail message or a pre-recorded voice message) to a security monitoring service company and/or the owner of the residence or business.

Another message communicated between an active load client **300** and the ALC manager **108** is a report trigger message. A report trigger message alerts the ALD server **100** that a predetermined amount of power has been consumed by a specific device monitored by an active load client **300**. When a report trigger message is received from an active load client **300**, the ALC manager **108** logs the information contained in the message in the ALD database **124** for the customer associated with the information-supplying active load client **300**. The power consumption information is then used by the ALC manager **108** to determine the active load client(s) **300** to which to send a power reduction or "Cut" message during a power reduction event.

Yet another message exchanged between an active load client **300** and the ALC manager **108** is a status response message. A status response message reports the type and status of each device controlled by the active load client **300** to the ALD server **100**. When a status response message is received from an active load client **300**, the ALC manager **108** logs the information contained in the message in the ALD database **124**.

In one embodiment, upon receiving instructions (e.g., a "Cut" instruction) from the master event manager **106** to reduce power consumption for a specified utility, the ALC manager **108** determines which active load clients **300** and/or individually controlled devices to switch to the "OFF" state based upon present power consumption data stored in the ALD database **124**. The ALC manager **108** then sends a message to each selected active load client **300** containing instructions to turn off all or some of the devices under the active load client's control.

In another embodiment, a power savings application **120** may be optionally included to calculate the total amount of power saved by each utility during a power reduction event (referred to herein as a "Cut event"), as well as the amount of power saved for each customer whose active load client **300** reduced the amount of power delivered. The power savings application **120** accesses the data stored in the ALD database **124** for each customer serviced by a particular utility and stores the total cumulative power savings (e.g., in megawatts per hour) accumulated by each utility for each Cut event in which the utility participated as an entry in the utility Power and Carbon ("P&C") database **134**.

In a further embodiment, an optional carbon savings application **132** uses the information produced by the power savings application **120** to determine the amount of carbon saved by each utility and by each customer for every Cut event. Carbon savings information (e.g., type of fuel that was used to generate power for the customer set that was included in the just completed event, power saved in the prior event, governmental standard calculation rates, and/or other data, such as generation mix per serving utility and geography of the customer's location and the location of the nearest power source) is stored in the ALD database **124** for each active load client **300** (customer) and in the utility P&C database **134** for each utility. The carbon savings application **132** calculates the total equivalent carbon credits saved for each active load client **300** (customer) and utility participating in the previous Cut event, and stores the information in the ALD database **124** and the utility P&C database **134**, respectively.



Additionally, the ALC manager **108** automatically provides for smooth operation of the entire power load management system **10** by optionally interacting with a service dispatch manager **126**. For example, when a new customer subscribes to participate in the power load management system **10**, the service dispatch manager **126** is notified of the new subscription from the customer sign-up application **116**. The service dispatch manager **126** then sends an activation request to the ALC manager **108**. Upon receiving the activation request from the service dispatch manager **126**, the ALC manager **108** may sends a query request for information to the new active load client **300** and, upon receipt of the information, provides it to the service dispatch manager **126**. Additionally, if at any time the ALC manager **108** detects that a particular active load client **300** is not functioning properly, the ALC manager **108** may send a request for service to the service dispatch manager **126** to arrange for a service call to correct the problem.

In another embodiment, the service dispatch manager **126** may also receive requests for service from a call center manager **130** that provides support to an operations center (not shown), which receives telephone calls from customers of the power load management system **10**. When a customer calls the operations center to request service, the call center manager **130** logs the service call in the ALD database **124** and sends a "Service" transaction message to the service dispatch manager **126**. When the service call has been completed, the call center manager **130** receives a completed notification from the service dispatch manager **126** and records the original service call as "closed" in the ALD database **124**.

In yet another embodiment, the service dispatch manager **126** may also instruct an ALC diagnostic manager **122** to perform a series of diagnostic tests for any active load client **300** for which the service dispatch manager **126** has received a service request. After the ALC diagnostic manager **122** has performed the diagnostic procedure, it returns the results to the service dispatch manager **126**. The service dispatch manager **126** then invokes a trouble ticket generator **128** to produce a report (e.g., trouble ticket) that includes information (some of which was retrieved by the service dispatch manager **126** from the ALD database **124**) pertaining to the required service (e.g., customer name, address, any special consideration for accessing the necessary equipment, and the results of the diagnostic process). A residential customer service technician may then use the information provided in the trouble ticket to select the type of equipment and replacement parts necessary for performing a service call.

A read meter application **136** may be optionally invoked when the UCC command processor **104** receives a "Read Meters" or equivalent command from the utility control center **200**. The read meter application **136** cycles through the ALD database **124** and sends a read meter message or command to each active load client **300**, or those active load clients **300** specifically identified in the UCC's command, via the ALC manager **108**. The information received by the ALC manager **108** from the active load client **300** is logged in the ALD database **124** for each customer. When all the active load client meter information has been received, the information is sent to the requesting utility control center **200** using a business to business (e.g., ebXML) or other desired protocol.

The optional security device management block **140** includes program instructions for handling security system messages received by the security interface **110**. The security device management block **140** includes routing information for all security system messages and may further

include messaging options on a per customer or service company basis. For example, one security service may require an email alert from the ALD server **100** upon the occurrence of a security event; whereas, another security service may require that the message sent from the in-building system be passed on by the active load client **300** and the ALD server **100** directly to the security service company.

In a further embodiment, the ALD server **100** also includes a customer reports application **118** that generates reports to be sent to individual customers detailing the amount of power saved during a previous billing cycle. Each report may contain a cumulative total of power savings over the prior billing cycle, details of the amount of power saved per controlled device (e.g., breaker or appliance), power savings from utility directed events, power savings from customer directed events, devices being managed, total carbon equivalents used and saved during the period, and/or specific details for each Cut event in which the customer's active load client **300** participated. Customers may also receive incentives and awards for participation in the power load management system **10** through a customer rewards program **150**. For example, the utilities or a third party system operator may enter into agreements with product and/or service providers to offer system participants discounts on products and services offered by the providers based upon certain participation levels or milestones. The rewards program **150** may be setup in a manner similar to conventional frequent flyer programs in which points are accumulated for power saved (e.g., one point for each megawatt saved or deferred) and, upon accumulation of predetermined levels of points, the customer can select a product or service discount. Alternatively, a serving utility may offer a customer a rate discount for participating in the system **10**.

FIG. **3** illustrates a block diagram of an exemplary active load client **300** in accordance with one embodiment of the present invention. The depicted active load client **300** includes a Linux-based operating system **302**, a status response generator **304**, a smart breaker module controller **306**, a smart device interface **324**, a communications interface **308**, a security interface **310**, an IP-based communication converter **312**, a device control manager **314**, a smart breaker (B1-BN) counter manager **316**, a report trigger application **318**, an IP router **320**, a smart meter interface **322**, a security device interface **328**, and an IP device interface **330**. The active load client **300**, in this embodiment, is a computer or processor-based system located on-site at a customer's residence or business. The primary function of the active load client **300** is to manage the power load levels of controllable devices located at the residence or business, which the active load client **300** oversees on behalf of the customer. In an exemplary embodiment, the software running on the active load client **300** operates using the Linux embedded operating system **302** to manage the hardware and the general software environment. One skilled in the art will readily recognize that other operating systems, such as Microsoft's family of operating systems, Mac OS, and Sun OS, among others, may be alternatively used. Additionally, the active load client **300** may include DHCP client functionality to enable the active load client **300** to dynamically request IP addresses for itself and/or one or more controllable devices **402-412**, **420**, **460** managed thereby from a DHCP server on the host IP network facilitating communications between the active load client **300** and the ALD server **100**. The active load client **300** may further include router functionality and maintain a routing table of assigned IP addresses in a memory of the active load client **300** to facilitate delivery of messages from the active load client **300** to the controllable devices **402-412**, **420**, **460**.

A communications interface **308** facilitates connectivity between the active load client **300** and the ALD server **100**. Communication between the active load client **300** and the ALD server **100** may be based on any type of IP or other connection protocol, including but not limited to, the WiMax protocol. Thus, the communications interface **308** may be a wired or wireless modem, a wireless access point, or other appropriate interface.

A standard IP Layer-3 router **320** routes messages received by the communications interface **308** to both the active load client **300** and to any other locally connected device **440**. The router **320** determines if a received message is directed to the active load client **300** and, if so, passes the message to a security interface **310** to be decrypted. The security interface **310** provides protection for the contents of the messages exchanged between the ALD server **100** and the active load client **300**. The message content is encrypted and decrypted by the security interface **310** using, for example, a symmetric encryption key composed of a combination of the IP address and GPS data for the active load client **300** or any other combination of known information. If the message is not directed to the active load client **300**, then it is passed to the IP device interface **330** for delivery to one or more locally connected devices **440**. For example, the IP router **320** may be programmed to route power load management system messages as well as conventional Internet messages. In such a case, the active load client **300** may function as a gateway for Internet service supplied to the residence or business instead of using separate Internet gateways or routers.

An IP based communication converter **312** opens incoming messages from the ALD server **100** and directs them to the appropriate function within the active load client **300**. The converter **312** also receives messages from various active load client **300** functions (e.g., a device control manager **314**, a status response generator **304**, and a report trigger application **318**), packages the messages in the form expected by the ALD server **100**, and then passes them on to the security interface **310** for encryption.

The device control manager **314** processes power management commands for various controllable devices logically connected to the active load client **300**. The devices can be either smart breakers **402-412** or other IP based devices **420**, such as smart appliances with individual control modules (not shown). The device control manager **314** also processes "Query Request" or equivalent commands or messages from the ALD server **100** by querying a status response generator **304** which maintains the type and status of each device controlled by the active load client **300**, and providing the statuses to the ALD server **100**. The "Query Request" message may include information other than mere status requests, such as temperature set points for thermally controlled devices, time intervals during which load control is permitted or prohibited, dates during which load control is permitted or prohibited, and priorities of device control (e.g., during a power reduction event, hot water heater and pool pump are turned off before HVAC unit is turned off). If temperature set points or other non-status information are included in a "Query Request" message and there is a device attached to the active load client **300** that can process the information, the temperature set points or other information are sent to that device **420** via a smart device interface **324**.

The status response generator **304** receives status messages from the ALD server **100** and, responsive thereto, polls each controllable device **402-412**, **420**, **460** under the active load client's control to determine whether the controllable device **402-412**, **420**, **460** is active and in good operational order. Each controllable device **402-412**, **420**, **460** responds to the polls with operational information (e.g., activity status and/or error reports) in a status response message. The active load client **300** stores the status responses in a memory associated with the status response generator **304** for reference in connection with power reduction events.

The smart device interface **324** facilitates IP or other address-based communications to individual devices **420** (e.g., smart appliance power control modules) that are attached to the active load client **300**. The connectivity can be through one of several different types of networks, including but not limited to, BPL, ZigBee, Wi-Fi, Bluetooth, or direct Ethernet communications. Thus, the smart device interface **324** is a modem adapted for use in or on the network connecting the smart devices **420** to the active load client **300**. The smart device interface **324** also allows the device control manager **314** to manage those devices that have the capability to sense temperature settings and respond to temperature variations.

The smart breaker module controller **306** formats, sends, and receives messages, including power control instructions, to and from the smart breaker module **400**. In one embodiment, the communications is preferably through a BPL connection. In such embodiment, the smart breaker module controller **306** includes a BPL modem and operations software. The smart breaker module **400** contains individual smart breakers **402-412**, wherein each smart breaker **402-412** includes an applicable modem (e.g., a BPL modem when BPL is the networking technology employed) and is preferably in-line with power supplied to a single appliance or other device. The B1-BN counter manager **316** determines and stores real time power usage for each installed smart breaker **402-412**. For example, the counter manager **316** tracks or counts the amount of power used by each smart breaker **402-412** and stores the counted amounts of power in a memory of the active load client **300** associated with the counter manager **316**. When the counter for any breaker **402-412** reaches a predetermined limit, the counter manager **316** provides an identification number corresponding to the smart breaker **402-412** and the corresponding amount of power (power number) to the report trigger application **318**. Once the information is passed to the report trigger application **318**, the counter manager **316** resets the counter for the applicable breaker **402-412** to zero so that information can once again be collected. The report trigger application **318** then creates a reporting message containing identification information for the active load client **300**, identification information for the particular smart breaker **402-412**, and the power number, and sends the report to the IP based communication converter **312** for transmission to the ALD server **100**.

The smart meter interface **322** manages either smart meters **460** that communicate using BPL or a current sensor **452** connected to a traditional power meter **450**. When the active load client **300** receives a "Read Meters" command or message from the ALD server **100** and a smart meter **460** is attached to the active load client **300**, a "Read Meters" command is sent to the meter **460** via the smart meter interface **322** (e.g., a BPL modem). The smart meter interface **322** receives a reply to the "Read Meters" message from the smart meter **460**, formats this information along with identification information for the active load client **300**, and provides the formatted message to the IP based communication converter **312** for transmission to the ALD server **100**.

A security device interface **328** transfers security messages to and from any attached security device. For example, the security device interface **328** may be coupled by wire or wirelessly to a monitoring or security system that includes motion sensors, mechanical sensors, optical sensors, electrical sensors, smoke detectors, carbon monoxide detectors, and/or other safety and security monitoring devices. When the monitoring system detects a security or safety problem (e.g., break-in, fire, excessive carbon monoxide levels), the monitoring system sends its alarm signal to the security interface **328**, which in turn forwards the alarm signal to the IP network through the ALD server **100** for delivery to the target IP address (e.g., the security monitoring service provider). The security device interface **328** may also be capable of communicating with the attached security device through the IP device interface to recognize a notification message from the device that it has lost its line based telephone connection. Once that notification has been received, an alert message is formatted and sent to the ALD server **100** through the IP based communication converter **312**.

Operation of the power management system **10** in accordance with exemplary embodiments will now be described. In one embodiment, customers initially sign up for power load management services using a web browser. Using the web browser, the customer accesses a power management system provider's website through the web browser interface **114** and provides his or her name and address information, as well as the type of equipment he or she would like to have controlled by the power load management system **10** to save energy at peak load times and to accumulate power savings or carbon credits (which may be used to receive reward incentives based upon the total amount of power or carbon saved by the customer). The customer may also agree to allow management of power consumption during non-peak times to sell back excess power to the utility, while simultaneously accumulating power savings or carbon credits.

The customer sign up application **116** creates a database entry for each customer in the ALD database **124**. Each customer's contact information and load management preferences are stored or logged in the database **124**. For example, the customer may be given several simple options for managing any number of devices or class of devices, including parameters for managing the devices (e.g., how long each type of device may be switched off and/or define hours when the devices may not be switched off at all). In particular, the customer may also be able to provide specific parameters for HVAC operations (e.g., set control points for the HVAC system specifying both the low and high temperature ranges). Additionally, the customer may be given an option of receiving a notification (e.g., an email message, Instant Message, Text Message, or recorded phone call, or any combination thereof) when a power management event occurs. When the customer completes entering data, a "New Service" or equivalent transaction message or command is sent to the service dispatch manager **126**.

FIG. **4** illustrates an exemplary operational flow diagram **500** providing steps executed by the ALD server **100** (e.g., as part of the service dispatch manager **126**) to manage service requests in the exemplary power load management system **10**, in accordance with one embodiment of the present invention. The steps of FIG. **4** are preferably implemented as a set of computer instructions (software) stored in

a memory (not shown) of the ALD server **100** and executed by one or more processors (not shown) of the ALD server **100**. Pursuant to the logic flow, the service dispatch manager **126** receives (**502**) a transaction message or command and determines (**503**) the type of transaction. Upon receiving a "New Service" transaction message, the service dispatch manager **126** schedules (**504**) a service person (e.g., technician) to make an initial installation visit to the new customer. The service dispatch manager **126** then notifies (**506**) the scheduled service person, or dispatcher of service personnel, of an awaiting service call using, for example, email, text messaging, and/or instant messaging notifications.

In one embodiment, responsive to the service call notification, the service person obtains the new customer's name and address, a description of the desired service, and a service time from a service dispatch manager service log. The service person obtains an active load client **300**, all necessary smart breaker modules **402-412**, and all necessary smart switches to install at the customer location. The service person notes any missing information from the customer's database information (e.g., the devices being controlled, type make and model of each device, and any other information the system will need to function correctly). The service person installs the active load client **300** and smart breakers **402-412** at the new customer's location. A global positioning satellite (GPS) device may optionally be used by the service person to determine an accurate geographic location of the new customer building, which will be added to the customer's entry in the ALD database **124** and may be used to create a symmetric encryption key to facilitate secure communications between the ALD server **100** and the active load client **300**. The physical location of the installed active load client **300** is also entered into the customer's entry. Smart switch devices may be installed by the service person or left at the customer location for installation by the customer. After the active load client **300** has been installed, the service dispatch manager **126** receives (**508**) a report from the service person, via a service log, indicating that the installation is complete. The service dispatch manager **126** then sends (**510**) an "Update" or equivalent transaction message to the ALC manager **108**.

Returning to block **503**, when a "Service" or similar transaction message or command is received, the service dispatch manager **126** schedules (**512**) a service person to make a service call to the specified customer. The service dispatch manager **126** then sends (**514**) a "Diagnose" or similar transaction to the ALC diagnostic manager **122**. The ALC diagnostic manager **122** returns the results of the diagnostic procedure to the service dispatch manager **126**, which then notifies (**516**) the service person of the service call and provides him or her with the results of the diagnostic procedure using a conventional trouble ticket. The service person uses the diagnostic procedure results in the trouble ticket to select the type of equipment and replacement parts necessary for the service call.

FIG. **5** illustrates an exemplary operational flow diagram **600** providing steps executed by the ALD server **100** (e.g., as part of the ALC manager **108**) to confirm customer sign-up to the power load management system **10**, in accordance with one embodiment of the present invention. The steps of FIG. **5** are preferably implemented as a set of computer instructions (software) stored in a memory (not shown) of the ALD server **100** and executed by one or more processors (not shown) of the ALD server **100**. In accordance with the logic flow, the ALC manager **108** receives (**602**) an "Update" or similar transaction message or command from the service dispatch manager **126** and uses the IP address specified in the "Update" message to send (**604**) out a "Query Request" or similar message or command to the active load client **300**. The "Query Request" message includes a list of devices the ALD server **100** expects to be managed. If the customer information input at customer sign-up includes temperature set points for one or more load-controllable devices, that information is included in the "Query Request" message. The ALC manager **108** receives (**606**) a query reply containing information about the active load client **300** (e.g., current WiMax band being used, operational state (e.g., functioning or not), setting of all the counters for measuring current usage (e.g., all are set to zero at initial set up time), status of devices being controlled (e.g., either switched to the "on" state or "off" state)). The ALC manager **108** updates (**608**) the ALD database **124** with the latest status information obtained from the active load client **300**. If the ALC manager **108** detects (**610**), from the query reply, that the active load client **300** is functioning properly, it sets (**612**) the customer state to "active" to allow participation in ALD server activities. However, if the ALC manager **108** detects (**610**) that the active load client **300** is not functioning properly, it sends (**614**) a "Service" or similar transaction message or command to the service dispatch manager **126**.

FIG. **6** illustrates an exemplary operational flow diagram **700** providing steps executed by the ALD server **100** (e.g., as part of the master event manager **106**) to manage events in the exemplary power load management system **10**, in accordance with one embodiment of the present invention. The steps of FIG. **6** are preferably implemented as a set of computer instructions (software) stored in a memory (not shown) of the ALD server **100** and executed by one or more processors (not shown) of the ALD server **100**. Pursuant to the logic flow, the master event manager **106** tracks (**702**) current power usage within each utility being managed by the ALD server **100**. When the master event manager **106** receives (**704**) a transaction message or command from the UCC command processor **104** or the ALC manager **108**, the master event manager **106** determines (**706**) the type of transaction received. Upon receiving a "Cut" transaction from the UCC command processor **104** (resulting from a "Cut" command issued by the utility control center **200**), the master event manager **106** places (**708**) the utility in a managed logical state. The master event manager then sends (**710**) a "Cut" transaction or event message or command to the ALC manager **108** identifying the amount of power (e.g., in megawatts) that must be removed from the power system supplied by the utility. The amount of power specified for reduction in a "Cut" command may be an instantaneous amount of power or an average amount of power per unit time. Finally, the master event manager **106** notifies (**711**) every customer that has chosen to receive a notification (e.g., through transmission of an email or other pre-established notification technique) that a power management event is in process.

Returning to block **706**, when the master event manager **106** receives a "How Much" or other equivalent power inquiry transaction message or command from the UCC command processor **104** (resulting from a "How Much" or equivalent power inquiry command issued by the utility control center **200**), the master event manager **106** determines (**712**) the amount of power that may be temporarily removed from a particular utility's managed system by accessing the current usage information for that utility. The current usage information is derived, in one embodiment, by aggregating the total available load for the serving utility, as

determined from the customer usage information for the utility stored in the ALD database **124**, based on the total amount of power that may have to be supplied to the utility's customers in view of the statuses of each of the active load clients **300** and their respectively controllable load devices **402-412**, **420**, **460** during the load control interval identified in the "How Much" message.

Each utility may indicate a maximum amount of power or maximum percentage of power to be reduced during any power reduction event. Such maximums or limits may be stored in the utility P&C database **134** of the ALD server **100** and downloaded to the master event manager **106**. In one embodiment, the master event manager **106** is programmed to remove a default one percent (1%) of the utility's current power consumption during any particular power management period (e.g., one hour). In alternative embodiments, the master event manager **106** may be programmed to remove other fixed percentages of current power consumption or varying percentages of current power consumption based on the current power consumption (e.g., 1% when power consumption is at system maximum and 10% when power consumption is at only 50% of system maximum). Based on the amount of power to be removed, the master event manager **106** sends (**710**) a "Cut" or equivalent event message to the ALC manager **108** indicating the amount of power (e.g., in megawatts) that must be removed from the utility's power system (e.g., 1% of the current usage), and notifies (**711**) all customers that have chosen to receive a notification that a power management event is in process. The master event manager **106** also sends a response to the utility control center **200** via the UCC command processor **104** advising the utility control center **200** as to the quantity of power that can be temporarily reduced by the requesting utility.

Returning once again to block **706**, when the master event manager **106** receives an "End Event" or equivalent transaction message or command from the UCC command processor **104** (resulting from an "End Event" command issued by the utility control center **200**), the master event manager **106** sets (**714**) the state of the current event as "Pending" and sends (**716**) an "End Event" or equivalent transaction message or command to the ALC manager **108**. When the ALC manager **108** has performed the steps necessary to end the present event (e.g., a power reduction or Cut event), the master event manager **106** receives (**718**) an "Event Ended" or equivalent transaction from the ALC manager **108** and sets (**720**) the utility to a logical "Not Managed" state. The master event manager **106** then notifies (**722**) each customer that has chosen to receive a notification (e.g., through transmission of an email or other pre-established notification mechanism) that the power management event has ended. Finally, the master event manager **106** sends an "Event Ended" or equivalent transaction message or command to the power savings application **120** and the utility control center **200** (via the UCC command processor **104**).

Turning now to FIG. **7**, exemplary operational flow diagram **800** illustrates steps executed by the ALD server **100** (e.g., as part of the ALC manager **108**) to manage power consumption in the exemplary power load management system **10**, in accordance with one embodiment of the present invention. The steps of FIG. **7** are preferably implemented as a set of computer instructions (software) stored in a memory of the ALD server **100** and executed by one or more processors of the ALD server **100**. In accordance with the logic flow, the ALC manager **108** tracks (**802**) the state of each managed active load client **300** by receiving messages, periodically or responsive to polls issued by the ALC manager **108**, from every active load client **300** that the ALC manager **108** manages. These messages indicate the present states of the active load clients **300**. The state includes the present consumption of power for each controllable device **402-412**, **420** controlled by the active load client **300** (or the total power consumption for all controllable devices **402-412**, **420** controlled by the active load client **300** if individual device metering is not available) and the status of each device **402-412**, **420** (e.g., either "Off" or "On"). The ALC manager **108** stores or logs (**804**) the power consumption and device status information in the ALD database **124** in a record corresponding to the specified active load client **300** and its associated customer and serving utility.

When the ALC manager **108** receives (**806**) a transaction message from the master event manager **106**, the ALC manager **108** first determines (**808**) the type of transaction received. If the ALC manager **108** receives a "Cut" or equivalent transaction message or command from the master event manager **106**, the ALC manager **108** enters (**810**) a "Manage" logical state. The ALC manager **108** then determines (**812**) which active load clients **300** and associated devices **402-412**, **420** operating on the utility specified in the "Cut" message to switch to the "Off" state. If a location (e.g., list of GPS coordinates, a GPS coordinate range, a geographic area, or a power grid reference area) is included in the "Cut" transaction message, only those active load clients **300** within the specified location are selected for switching to the "Off" state. In other words, the ALC manager **108** selects the group of active load client devices **300** to which the issue a "Turn Off" transaction message based at least partially on the geographic location of each active load client **300** as such location relates to any location identified in the received "Cut" transaction message. The ALD database **124** contains information on the present power consumption (and/or the average power consumption) for each controllable device **402-412**, **420** connected to each active load client **300** in the system **10**. The ALC manager **108** utilizes the stored power consumption information to determine how many, and to select which, devices **402-412**, **420** to turn off to achieve the power reduction required by the "Cut" message. The ALC manager **108** then sends (**814**) a "Turn Off" or equivalent transaction message or command to each active load client **300**, along with a list of the devices to be turned off and a "change state to off" indication for each device **402-412**, **420** in the list. The ALC manager **108** then logs (**816**) the amount of power (either actual or average), as determined from the ALD database **124**, saved for each active load client **300**, along with a time stamp indicating when the power was reduced. The ALC manager **108** then schedules (**818**) transactions for itself to "Turn On" each turned-off device after a predetermined period of time (e.g., which may have been set from a utility specified default, set by instructions from the customer, or otherwise programmed into the ALC manager **108**).

Returning back to block **808**, when the ALC manager **108** receives a "Turn On" or equivalent transaction message or command from the master event manager **106** for a specified active load client **300**, and the ALC manager's state is currently in a "Manage" state, the ALC manager **108** finds (**820**) one or more active load clients **300** that are in the "On" state and do not have any of their managed devices **402-412**, **420** turned off (and are in the specified location if so required by the original "Cut" transaction message), which, when one or more of such devices **402-412**, **420** are turned off, will save the same or substantially the same amount of power that is presently being saved by the specified active load clients that are in the "Off" state. Upon identifying new

active load clients **300** from which to save power, the ALC manager **108** sends (**822**) a "Turn Off" or equivalent transaction message or command to each active load client **300** that must be turned off in order to save the same amount of power as the active load client(s) to be turned on (i.e. to have its or their managed devices **402-412**, **420** turned on) or to save an otherwise acceptable amount of power (e.g., a portion of the power previously saved by the active load client(s) to be turned back on). The ALC manager **108** also sends (**824**) a "Turn On" or equivalent transaction message or command to each active load client **300** to be turned back on. The "Turn On" message instructs all active load clients **300** to which the message was directed to turn on any controllable devices that have been turned off, and causes the affected active load clients **300** to instruct their controllable devices **402-412**, **420** to enable the flow of electric power to their associated power consuming devices (e.g., appliance, HVAC unit, and so forth). Finally, the ALC manager **108** logs (**826**) the time that the "Turn On" transaction message is sent in the ALD database **124**.

Returning once again to block **808**, when the ALC manager **108** receives an "End Event" or equivalent transaction message or command from the master event manager **106**, the ALC manager **108** sends (**828**) a "Turn On" or equivalent transaction message or command to every active load client **300** which is currently in the "Off" state and is served by the serving utility identified in the "End Event" message or to which the "End Event" message relates. Upon determining (**830**) that all the appropriate active load clients **300** have transitioned to the "On" state, the ALC manager **108** sends (**832**) an "Event Ended" or equivalent transaction message or command to the master event manager **106**.

Referring now to FIG. **8**, exemplary operational flow diagram **900** illustrates steps executed by the ALD server **100** (e.g., through operation of the power savings application **120**) to calculate and allocate power savings in the power load management system **10**, in accordance with one embodiment of the present invention. The power savings application **120** calculates the total amount of power saved by each utility for each Cut event and the amount of power saved by each customer possessing an active load client **300**.

According to the logic flow of FIG. **8**, the power savings application **120** receives (**902**) an "Event Ended" or equivalent transaction message or command from the master event manager **106** each time a "Cut" or power savings event has ended. The power savings application **120** then accesses (**904**) the ALD database **124** for each active load client **300** involved in the "Cut" event. The database record for each active load client **300** contains the actual amount (or average amount) of power that would have been used by the active load client **300** during the last "Cut" event, along with the amount of time that each controllable device **402-412**, **420** associated with the active load client **300** was turned off. The power savings application **120** uses this information to calculate the amount of power (e.g., in megawatts per hour) that was saved for each active load client **300**. The total power savings for each active load client **300** is stored in its corresponding entry in the ALD database **124**. A running total of power saved is kept for each "Cut" transaction. Each utility that is served by the ALD server **100** has an entry in the utility P&C database **134**. The power savings application **120** stores (**906**) the total amount of power (e.g., in megawatts per hour) saved for the specific utility in the utility's corresponding entry in the utility P&C database **134**, along with other information related to the power savings event (e.g., the time duration of the event, the number of active load clients required to reach the power savings, average length of time each device was in the off state, plus any other information that would be useful in fine tuning future events and in improving customer experience). When all active load client entries have been processed, the power savings application **120** optionally invokes (**908**) the carbon savings application **132** or, analogously, a sulfur dioxide savings application or a nitrogen dioxide savings application, to correlate the power savings with carbon credits, sulfur dioxide credits or nitrogen dioxide credits, respectively, based on the geographic locations of the particular serving utility and customer. Additionally, in one embodiment, the carbon savings application **132** determines carbon credits based on government approved or supplied formulas and stores the determined carbon credits on a per customer and/or per utility basis.



As described above, the present invention encompasses a method for managing and distributing power within a power management system based on real-time feedback from addressable and remotely controllable devices including the actual amount of power currently being individually or collectively consumed by the addressable devices. With this invention, a power management system may pinpoint specific areas of high power usage and more accurately distribute power loads to utilities in need. Additionally, the present invention provides optional participation incentives for customers based on the amount of their actual participation in the power management system.

In the foregoing specification, the present invention has been described with reference to specific embodiments. However, one of ordinary skill in the art will appreciate that various modifications and changes may be made without departing from the spirit and scope of the present invention as set forth in the appended claims. For example, the present invention is applicable for managing the distribution of power from utility companies to subscribing customers using any number of IP-based or other communication methods. Additionally, the functions of specific modules within the ALD server **100** and/or active load client **300** may be performed by one or more equivalent means. Accordingly, the specification and drawings are to be regarded in an illustrative rather than a restrictive sense, and all such modifications are intended to be included within the scope of the present invention.

Benefits, other advantages, and solutions to problems have been described above with regard to specific embodiments of the present invention. However, the benefits, advantages, solutions to problems, and any element(s) that may cause or result in such benefits, advantages, or solutions to become more pronounced are not to be construed as a critical, required, or essential feature or element of any or all the claims. The invention is defined solely by the appended claims including any amendments made during the pendency of this application and all equivalents of those claims as issued.

What is claimed is:

**1**. A method for managing an electric power flow within an electric power grid, comprising:

a client device receiving a power control message from a load management server, the power control message indicating at least one of an amount of electric power to be reduced and an identification of at least one controllable device to be instructed to disable the electric power flow to at least one associated power consuming device;

the client device issuing a power management command to the at least one controllable device, the power management command causing the at least one con-

trollable device to disable the electric power flow to the at least one associated power consuming device to provide a reduction in consumed power; and

generating measurement and verification data corresponding to the reduction in consumed power.

**2**. The method of claim **1**, further comprising generating a power supply value (PSV) corresponding to the reduction in consumed power.

**3**. The method of claim **1**, further comprising communicating a report message to the load management server, the report message including an indication of an amount of power consumed by the at least one associated power consuming device corresponding to the measurement and verification data.

**4**. The method of claim **3**, wherein the report message indicates a compensation associated with the reduction in consumed power.

**5**. The method of claim **4**, wherein the compensation includes at least one of: capacity compensation, energy compensation, operating reserves compensation, ancillary services compensation, compensation for other grid stabilizing services, voltage support, black start, cold load pick up, conservation voltage reduction, and other reserve services.

**6**. The method of claim **1**, wherein the measurement and verification data is associated with individual power consuming devices.

**7**. The method of claim **1**, further including aggregating the measurement and verification data for a multiplicity of power consuming devices.

**8**. The method of claim **1**, further comprising communicating a status message to the load management server, the status message indicating a status of the at least one controllable device.

**9**. The method of claim **1**, further comprising communicating a status message to the load management server, the status message indicating a total amount of power consumed by the at least one associated power consuming device and the corresponding measurement and verification data.

**10**. The method of claim **1**, further comprising receiving a subsequent power control message from the load management server instructing the client device to enable the electric power flow to the at least one associated power consuming device with the electric power flow previously disabled.

**11**. The method of claim **1**, further comprising:

the client device receiving a status message from the load management server, the status message requesting status information for the at least one controllable device;

the client device receiving a status response message from the at least one controllable device; and

storing each status response message in a memory for reference in connection with power reduction events.

**12**. The method of claim **1**, wherein at least one Internet-accessible device is coupled to the client device, wherein the client device includes a Layer-3 router operable for:

receiving an Internet Protocol (IP) message that includes an IP address;

determining whether the IP message is directed to the Internet-accessible device coupled to the client device; and

communicating the IP message to the Internet-accessible device.

**13**. The method of claim **1**, wherein the power control message includes a list of controllable devices to be instructed to disable the electric power flow to associated power consuming devices, and wherein the power management command causes the controllable devices identified in the list to disable the electric power flow to the associated power consuming devices to achieve the reduction in consumed power.

**14**. A system for managing electric power on an electric power grid, comprising:

a client device comprising at least one controllable device interface facilitating communication of power control instructions to at least one controllable device, the power control instructions operable to cause the at least one controllable device to selectively enable and disable a flow of electric power to at least one power consuming device; and

a device control manager operably coupled to the at least one controllable device interface, the device control manager operable to issue power control instructions to the at least one controllable device through the at least one controllable device interface responsive to the received power control instructions, and based upon a reduction in consumed power for disabled flow of electric power, generate measurement and verification data corresponding to the reduction in consumed power;

wherein the client device receives a power control message from a remote load management server, and wherein the power control message received from the remote load management server is responsive to a power reduction request.

**15**. The system of claim **14**, wherein a power supply value (PSV) is generated corresponding to the reduction in consumed power, and wherein the PSV indicates a compensation provided for power supply associated with the reduction in consumed power.

**16**. The system of claim **15**, wherein the compensation includes at least one of capacity compensation, energy compensation, operating reserves compensation, compensation to include ancillary services, other grid stabilizing services, voltage support, black start, cold load pick up, conservation voltage reduction, and other reserve services.

**17**. The system of claim **15**, wherein the PSV is generated based upon a governing entity for the power grid operating region and/or operational regulations.

**18**. The system of claim **14**, wherein the power control message indicates at least one of an amount of electric power to be reduced and an identification of a controllable device to be instructed to disable the flow of electric power to the at least one power consuming device.

**19**. The system of claim **14**, further comprising a communications interface facilitating communications between the remote load management server and the client device, wherein the device control manager communicates at least one power consumption indicator and at least one power management status to the remote load management server via the communications interface.

* * * * *

# Exhibit 4

U 8092892

# THE UNITED STATES OF AMERICA

TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

April 09, 2021

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *10,396,592*

ISSUE DATE: *August 27, 2019*

By Authority of the

Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

R GLOVER

Certifying Officer

US010396592B2

(12) **United States Patent**
**Forbes, Jr.**

(10) **Patent No.: US 10,396,592 B2**
(45) **Date of Patent: *Aug. 27, 2019**

(54) **SYSTEM AND METHOD FOR ESTIMATING AND PROVIDING DISPATCHABLE OPERATING RESERVE ENERGY CAPACITY THROUGH USE OF ACTIVE LOAD MANAGEMENT**

(71) Applicant: **Causam Energy, Inc.**, Raleigh, NC (US)

(72) Inventor: **Joseph W. Forbes, Jr.**, Raleigh, NC (US)

(73) Assignee: **CAUSAM ENERGY, INC.**, Raleigh, NC (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 158 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/594,219**

(22) Filed: **May 12, 2017**

(65) **Prior Publication Data**

US 2017/0250567 A1 Aug. 31, 2017

**Related U.S. Application Data**

(60) Continuation of application No. 14/517,399, filed on Oct. 17, 2014, now Pat. No. 9,651,973, which is a

(Continued)

(51) **Int. Cl.**
***H02J 9/00*** (2006.01)
***H02J 13/00*** (2006.01)

(Continued)

(52) **U.S. Cl.**
CPC ................ ***H02J 9/005*** (2013.01); ***G05F 1/66*** (2013.01); ***G06Q 10/00*** (2013.01); ***H02J 3/14*** (2013.01);

(Continued)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,906,242 A 9/1975 Stevenson
4,023,043 A 5/1977 Stevenson

(Continued)

FOREIGN PATENT DOCUMENTS

EP 1729223 A 12/2006
JP 2000078748 A 3/2000

(Continued)

OTHER PUBLICATIONS

B.J. Kirby, Spinning Reserve from Responsive Loads, Oak Ridge National Laboratory, United States Dept. of Energy, Mar. 2003 (54 pages).

(Continued)

*Primary Examiner* — Ramesh B Patel
(74) *Attorney, Agent, or Firm* — NEO IP

(57) **ABSTRACT**

Systems for providing operating reserves to an electric power grid are disclosed. In one embodiment, a system comprises at least one power consuming device, at least one controllable device, and a client device constructed and configured in network communication. The at least one controllable device is operably coupled to the at least one power consuming device. The at least one controllable device is operable to control a power flow from the electric power grid to the at least one power consuming device responsive to power control instructions from the client device. Each of the at least one power consuming device has an actual value of power reduced and/or to be reduced based on revenue grade metrology, and confirmed by measurement and verification. The actual value of power reduced and/or

(Continued)



to be reduced is a curtailment value as supply equivalence and provides operating reserve for the electric power grid.

**20 Claims, 12 Drawing Sheets**

**Related U.S. Application Data**

division of application No. 13/466,725, filed on May 8, 2012, now Pat. No. 8,890,505, which is a continuation-in-part of application No. 13/019,867, filed on Feb. 2, 2011, now Pat. No. 8,996,183, which is a continuation-in-part of application No. 12/775,979, filed on May 7, 2010, now Pat. No. 8,396,606, which is a continuation-in-part of application No. 12/001,819, filed on Dec. 13, 2007, now abandoned, which is a continuation-in-part of application No. 11/895,909, filed on Aug. 28, 2007, now Pat. No. 7,715,951, said application No. 13/019,867 is a continuation-in-part of application No. 12/783,415, filed on May 19, 2010, now abandoned, which is a continuation-in-part of application No. 12/001,819, filed on Dec. 13, 2007, now abandoned, and a continuation-in-part of application No. 12/715,124, filed on Mar. 1, 2010, now Pat. No. 8,010,812, which is a division of application No. 11/895,909, filed on Aug. 28, 2007, now Pat. No. 7,715,951, said application No. 13/019,867 is a continuation-in-part of application No. 12/896,307, filed on Oct. 1, 2010, now Pat. No. 8,527,107, which is a continuation-in-part of application No. 12/715,124, filed on Mar. 1, 2010, now Pat. No. 8,010,812, and a continuation-in-part of application No. 12/715,195, filed on Mar. 1, 2010, now Pat. No. 8,032,233, which is a division of application No. 11/895,909, filed on Aug. 28, 2007, now Pat. No. 7,715,951, said application No. 12/896,307 is a continuation-in-part of application No. 12/702,640, filed on Feb. 9, 2010, now Pat. No. 8,131,403, which is a continuation-in-part of application No. 11/895,909, filed on Aug. 28, 2007, now Pat. No. 7,715,951, said application No. 13/019,867 is a continuation-in-part of application No. 12/715,124, filed on Mar. 1, 2010, now Pat. No. 8,010,812, and a continuation-in-part of application No. 12/715,195, filed on Mar. 1, 2010, now Pat. No. 8,032,233, said application No. 13/466,725 is a continuation-in-part of application No. 12/001,819, filed on Dec. 13, 2007, now abandoned, said application No. 13/019,867 is a continuation-in-part of application No. 12/001,819, filed on Dec. 13, 2007, now abandoned.

(60) Provisional application No. 61/215,725, filed on May 8, 2009, provisional application No. 61/216,712, filed on May 20, 2009, provisional application No. 61/279,072, filed on Oct. 15, 2009, provisional application No. 61/176,752, filed on May 8, 2009, provisional application No. 61/150,978, filed on Feb. 9, 2009.

(51) **Int. Cl.**

| | |
|---|---|
| ***H02J 9/06*** | (2006.01) |
| ***G06Q 10/00*** | (2012.01) |
| ***H02J 3/14*** | (2006.01) |
| ***G05F 1/66*** | (2006.01) |
| ***H02J 3/28*** | (2006.01) |
| *H02J 3/00* | (2006.01) |

(52) **U.S. Cl.**
CPC ................ ***H02J 3/28*** (2013.01); ***H02J 9/061*** (2013.01); ***H02J 13/0017*** (2013.01); *H02J 2003/003* (2013.01); *Y02B 70/3225* (2013.01); *Y04S 10/54* (2013.01); *Y04S 20/222* (2013.01); *Y04S 20/224* (2013.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,589,075 | A | 5/1986 | Buennagel |
| 4,799,059 | A | 1/1989 | Grindahl et al. |
| 4,819,180 | A | 4/1989 | Hedman et al. |
| 4,819,229 | A | 4/1989 | Pritty et al. |
| 5,237,507 | A | 8/1993 | Chasek |
| 5,361,982 | A | 11/1994 | Liebl et al. |
| 5,388,101 | A | 2/1995 | Dinkins |
| 5,462,225 | A | 10/1995 | Massara et al. |
| 5,481,546 | A | 1/1996 | Dinkins |
| 5,502,339 | A | 3/1996 | Hartig |
| 5,544,036 | A | 8/1996 | Brown et al. |
| 5,570,002 | A | 10/1996 | Castleman |
| 5,592,491 | A | 1/1997 | Dinkins |
| 5,640,153 | A | 6/1997 | Hildebrand et al. |
| 5,644,173 | A | 7/1997 | Elliason et al. |
| 5,675,503 | A | 10/1997 | Moe et al. |
| 5,696,695 | A | 12/1997 | Ehlers et al. |
| 5,721,936 | A | 2/1998 | Kikinis et al. |
| 5,926,776 | A | 7/1999 | Glorioso et al. |
| 5,973,481 | A | 10/1999 | Thompson et al. |
| 6,018,690 | A | 1/2000 | Saito et al. |
| 6,037,758 | A | 3/2000 | Perez |
| 6,078,785 | A | 6/2000 | Bush |
| 6,102,487 | A | 8/2000 | Oevreboe |
| 6,107,693 | A | 8/2000 | Mongia et al. |
| 6,115,676 | A | 9/2000 | Rector et al. |
| 6,154,859 | A | 11/2000 | Norizuki et al. |
| 6,216,956 | B1 | 4/2001 | Ehlers et al. |
| 6,233,327 | B1 | 5/2001 | Petite |
| 6,254,009 | B1 | 7/2001 | Proffitt et al. |
| 6,304,552 | B1 | 10/2001 | Chapman et al. |
| 6,366,217 | B1 | 4/2002 | Cunningham et al. |
| 6,374,101 | B1 | 4/2002 | Gelbien |
| 6,437,692 | B1 | 8/2002 | Petite et al. |
| 6,519,509 | B1 | 2/2003 | Nierlich et al. |
| 6,535,797 | B1 | 3/2003 | Bowles et al. |
| 6,577,962 | B1 | 6/2003 | Afshari |
| 6,583,521 | B1 | 6/2003 | Lagod et al. |
| 6,601,033 | B1 | 7/2003 | Sowinski |
| 6,602,627 | B2 | 8/2003 | Liu et al. |
| 6,621,179 | B1 | 9/2003 | Howard |
| 6,622,097 | B2 | 9/2003 | Hunter |
| 6,622,925 | B2 | 9/2003 | Carner et al. |
| 6,633,823 | B2 | 10/2003 | Bartone et al. |
| 6,671,586 | B2 | 12/2003 | Davis et al. |
| 6,681,154 | B2 | 1/2004 | Nierlich et al. |
| 6,687,574 | B2 | 2/2004 | Pietrowicz et al. |
| 6,718,761 | B2 | 4/2004 | Merswolke et al. |
| 6,732,055 | B2 | 5/2004 | Bagepalli et al. |
| 6,747,368 | B2 | 6/2004 | Jarrett |
| 6,778,882 | B2 | 8/2004 | Spool et al. |
| 6,784,807 | B2 | 8/2004 | Petite et al. |
| 6,832,135 | B2 | 12/2004 | Ying |
| 6,834,811 | B1 | 12/2004 | Huberman et al. |
| 6,836,737 | B2 | 12/2004 | Petite et al. |
| 6,862,498 | B2 | 3/2005 | Davis et al. |
| 6,865,450 | B2 | 3/2005 | Masticola et al. |
| 6,868,293 | B1 | 3/2005 | Schurr et al. |
| 6,879,059 | B2 | 4/2005 | Sleva |
| 6,891,838 | B1 | 5/2005 | Petite et al. |
| 6,904,336 | B2 | 6/2005 | Raines et al. |
| 6,906,617 | B1 | 6/2005 | Van der Meulen |
| 6,909,942 | B2 | 6/2005 | Andarawis et al. |
| 6,914,533 | B2 | 7/2005 | Petite |
| 6,914,893 | B2 | 7/2005 | Petite |
| 6,934,316 | B2 | 8/2005 | Cornwall et al. |
| 6,961,641 | B1 | 11/2005 | Forth et al. |

(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | | |
|---|---|---|---|---|
| 6,990,593 | B2 | 1/2006 | Nakagawa | |
| 7,003,640 | B2 | 2/2006 | Mayo et al. | |
| 7,019,667 | B2 | 3/2006 | Petite et al. | |
| 7,035,719 | B2 | 4/2006 | Howard et al. | |
| 7,039,532 | B2 | 5/2006 | Hunter | |
| 7,053,767 | B2 | 5/2006 | Petite et al. | |
| 7,088,014 | B2 | 8/2006 | Nierlich et al. | |
| 7,103,511 | B2 | 9/2006 | Petite | |
| 7,123,994 | B2 | 10/2006 | Weik et al. | |
| 7,133,750 | B2 | 11/2006 | Raines et al. | |
| 7,136,725 | B1 | 11/2006 | Paciorek et al. | |
| 7,141,321 | B2 | 11/2006 | McArthur et al. | |
| 7,142,949 | B2 | 11/2006 | Brewster et al. | |
| 7,177,728 | B2 | 2/2007 | Gardner | |
| 7,181,320 | B2 | 2/2007 | Whiffen et al. | |
| 7,184,861 | B2 | 2/2007 | Petite | |
| 7,200,134 | B2 | 4/2007 | Proctor et al. | |
| 7,206,670 | B2 | 4/2007 | Pimputkar et al. | |
| 7,209,804 | B2 | 4/2007 | Curt et al. | |
| 7,209,840 | B2 | 4/2007 | Petite et al. | |
| 7,233,843 | B2 | 6/2007 | Budhraja et al. | |
| 7,263,073 | B2 | 8/2007 | Petite et al. | |
| 7,274,975 | B2 | 9/2007 | Miller | |
| 7,289,887 | B2 | 10/2007 | Rodgers | |
| 7,295,128 | B2 | 11/2007 | Petite | |
| 7,305,282 | B2 | 12/2007 | Chen | |
| 7,313,465 | B1 | 12/2007 | O'Donnell | |
| 7,343,341 | B2 | 3/2008 | Sandor et al. | |
| 7,345,998 | B2 | 3/2008 | Cregg et al. | |
| 7,346,463 | B2 | 3/2008 | Petite et al. | |
| 7,366,164 | B1 | 4/2008 | Habib et al. | |
| 7,397,907 | B2 | 7/2008 | Petite | |
| 7,406,364 | B2 | 7/2008 | Rissanen et al. | |
| 7,412,304 | B2 | 8/2008 | Uenou | |
| 7,424,527 | B2 | 9/2008 | Petite | |
| 7,440,871 | B2 | 10/2008 | McConnell et al. | |
| 7,451,019 | B2 | 11/2008 | Rodgers | |
| 7,468,661 | B2 | 12/2008 | Petite et al. | |
| 7,480,501 | B2 | 1/2009 | Petite | |
| 7,486,681 | B2 | 2/2009 | Weber | |
| 7,492,617 | B2 | 2/2009 | Petter et al. | |
| 7,528,503 | B2 | 5/2009 | Rognli et al. | |
| 7,536,240 | B2 | 5/2009 | McIntyre et al. | |
| 7,541,941 | B2 | 6/2009 | Bogolea et al. | |
| 7,565,227 | B2 | 7/2009 | Richard et al. | |
| 7,650,425 | B2 | 1/2010 | Davis et al. | |
| 7,697,492 | B2 | 4/2010 | Petite | |
| 7,711,796 | B2 | 5/2010 | Gutt et al. | |
| 7,715,951 | B2 | 5/2010 | Forbes et al. | |
| 7,738,999 | B2 | 6/2010 | Petite | |
| 7,739,378 | B2 | 6/2010 | Petite | |
| 8,010,812 | B2 | 8/2011 | Forbes et al. | |
| 8,032,233 | B2 | 10/2011 | Forbes, Jr. et al. | |
| 8,046,110 | B2 | 10/2011 | Mayor et al. | |
| 8,131,403 | B2 | 3/2012 | Forbes et al. | |
| 8,145,361 | B2 | 3/2012 | Forbes, Jr. et al. | |
| 8,260,470 | B2 | 9/2012 | Forbes, Jr. et al. | |
| 8,295,989 | B2 | 10/2012 | Rettger et al. | |
| 8,307,225 | B2 | 11/2012 | Forbes, Jr. et al. | |
| 8,315,717 | B2 | 11/2012 | Forbes, Jr. et al. | |
| 8,359,124 | B2 | 1/2013 | Zhou et al. | |
| 8,364,609 | B2 | 1/2013 | Ozog | |
| 8,396,606 | B2 | 3/2013 | Forbes et al. | |
| 8,417,569 | B2 | 4/2013 | Gross | |
| 8,457,802 | B1 | 6/2013 | Steven et al. | |
| 8,463,449 | B2 | 6/2013 | Sanders | |
| 8,473,111 | B1 | 6/2013 | Shankar et al. | |
| 8,527,107 | B2 | 9/2013 | Forbes et al. | |
| 8,570,999 | B1 * | 10/2013 | Nguyen ................. | H04B 3/542 370/343 |
| 8,571,930 | B1 | 10/2013 | Galperin | |
| 8,583,520 | B1 | 11/2013 | Forbes | |
| 8,588,991 | B1 * | 11/2013 | Forbes, Jr. ............. | G05B 19/02 700/295 |
| 8,761,952 | B2 | 6/2014 | Forbes | |
| 8,890,505 | B2 | 11/2014 | Forbes | |
| 8,983,669 | B2 * | 3/2015 | Forbes, Jr. ................ | G05F 1/66 700/286 |
| 8,996,183 | B2 | 3/2015 | Forbes | |
| 9,177,323 | B2 | 11/2015 | Forbes | |
| 9,461,471 | B2 * | 10/2016 | Forbes, Jr. ............. | G05B 15/02 |
| 9,651,973 | B2 * | 5/2017 | Forbes, Jr. ............. | G06Q 10/00 |
| 9,952,611 | B2 * | 4/2018 | Forbes, Jr. ............. | G05B 15/02 |
| 9,989,982 | B2 * | 6/2018 | Forbes, Jr. ............. | G05B 15/02 |
| 2001/0030468 | A1 | 10/2001 | Anderson et al. | |
| 2001/0038343 | A1 | 11/2001 | Meyer et al. | |
| 2002/0019758 | A1 | 2/2002 | Scarpelli | |
| 2002/0019802 | A1 | 2/2002 | Malme et al. | |
| 2002/0035496 | A1 | 3/2002 | Fukushima et al. | |
| 2002/0036430 | A1 | 3/2002 | Welches et al. | |
| 2002/0109607 | A1 | 8/2002 | Cumeralto et al. | |
| 2002/0138176 | A1 | 9/2002 | Davis et al. | |
| 2002/0143693 | A1 | 10/2002 | Soestbergen et al. | |
| 2002/0161648 | A1 | 10/2002 | Mason et al. | |
| 2002/0198629 | A1 | 12/2002 | Ellis | |
| 2003/0009401 | A1 | 1/2003 | Ellis | |
| 2003/0009705 | A1 | 1/2003 | Thelander et al. | |
| 2003/0036820 | A1 | 2/2003 | Yellepeddy et al. | |
| 2003/0083980 | A1 | 5/2003 | Satake | |
| 2003/0144864 | A1 | 7/2003 | Mazzarella | |
| 2003/0149937 | A1 | 8/2003 | Mcelfresh et al. | |
| 2003/0158632 | A1 | 8/2003 | Nierlich et al. | |
| 2003/0176952 | A1 | 9/2003 | Collins et al. | |
| 2003/0225483 | A1 | 12/2003 | Santinato et al. | |
| 2003/0229572 | A1 | 12/2003 | Raines et al. | |
| 2003/0233201 | A1 | 12/2003 | Horst et al. | |
| 2004/0006439 | A1 | 1/2004 | Hunter | |
| 2004/0024483 | A1 | 2/2004 | Holcombe | |
| 2004/0044571 | A1 | 3/2004 | Bronnimann et al. | |
| 2004/0088083 | A1 | 5/2004 | Davis et al. | |
| 2004/0107025 | A1 * | 6/2004 | Ransom ............ | G05B 19/4185 700/286 |
| 2004/0117330 | A1 | 6/2004 | Ehlers et al. | |
| 2004/0128266 | A1 | 7/2004 | Yellepeddy et al. | |
| 2004/0153170 | A1 | 8/2004 | Santacatterina et al. | |
| 2004/0158478 | A1 | 8/2004 | Zimmerman | |
| 2004/0158541 | A1 | 8/2004 | Notarianni et al. | |
| 2004/0162793 | A1 | 8/2004 | Scott et al. | |
| 2004/0193329 | A1 | 9/2004 | Ransom et al. | |
| 2004/0225514 | A1 | 11/2004 | Greenshields et al. | |
| 2004/0230533 | A1 | 11/2004 | Benco | |
| 2005/0021397 | A1 | 1/2005 | Cui et al. | |
| 2005/0033481 | A1 | 2/2005 | Budhraja et al. | |
| 2005/0055432 | A1 | 3/2005 | Rodgers | |
| 2005/0065742 | A1 | 3/2005 | Rodgers | |
| 2005/0080772 | A1 | 4/2005 | Bem | |
| 2005/0096856 | A1 | 5/2005 | Lubkeman et al. | |
| 2005/0096857 | A1 | 5/2005 | Hunter | |
| 2005/0096979 | A1 | 5/2005 | Koningstein | |
| 2005/0097204 | A1 | 5/2005 | Horowitz et al. | |
| 2005/0125243 | A1 | 6/2005 | Villalobos | |
| 2005/0127680 | A1 | 6/2005 | Lof et al. | |
| 2005/0138432 | A1 * | 6/2005 | Ransom ................. | G01D 4/004 726/4 |
| 2005/0192711 | A1 | 9/2005 | Raines et al. | |
| 2005/0192713 | A1 | 9/2005 | Weik et al. | |
| 2005/0216302 | A1 | 9/2005 | Raji et al. | |
| 2005/0216580 | A1 | 9/2005 | Raji et al. | |
| 2005/0234600 | A1 | 10/2005 | Boucher et al. | |
| 2005/0240314 | A1 | 10/2005 | Martinez | |
| 2005/0240315 | A1 | 10/2005 | Booth et al. | |
| 2005/0246190 | A1 | 11/2005 | Sandor et al. | |
| 2005/0267642 | A1 | 12/2005 | Whiffen et al. | |
| 2005/0276222 | A1 | 12/2005 | Kumar et al. | |
| 2005/0288954 | A1 | 12/2005 | Mccarthy et al. | |
| 2006/0020544 | A1 | 1/2006 | Kaveski | |
| 2006/0020596 | A1 | 1/2006 | Liu et al. | |
| 2006/0022841 | A1 | 2/2006 | Hoiness et al. | |
| 2006/0025891 | A1 | 2/2006 | Budike | |
| 2006/0031934 | A1 | 2/2006 | Kriegel | |
| 2006/0064205 | A1 | 3/2006 | Ying | |
| 2006/0069616 | A1 | 3/2006 | Bau | |
| 2006/0106635 | A1 | 5/2006 | Ulrich et al. | |
| 2006/0142900 | A1 | 6/2006 | Rothman et al. | |

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2006/0142961 | A1 | 6/2006 | Johnson et al. |
| 2006/0161450 | A1 | 7/2006 | Carey et al. |
| 2006/0168191 | A1 | 7/2006 | Ives |
| 2006/0190354 | A1 | 8/2006 | Meisel et al. |
| 2006/0195334 | A1 | 8/2006 | Reeb et al. |
| 2006/0212350 | A1 | 9/2006 | Ellis et al. |
| 2006/0224615 | A1 | 10/2006 | Korn et al. |
| 2006/0241244 | A1 | 10/2006 | Soeda et al. |
| 2006/0241314 | A1 | 10/2006 | Sullivan et al. |
| 2006/0271244 | A1 | 11/2006 | Cumming et al. |
| 2006/0271314 | A1 | 11/2006 | Hayes |
| 2006/0276938 | A1 | 12/2006 | Miller |
| 2006/0282328 | A1 | 12/2006 | Gerace et al. |
| 2007/0021874 | A1 | 1/2007 | Rognli et al. |
| 2007/0038563 | A1 | 2/2007 | Ryzerski |
| 2007/0058453 | A1 | 3/2007 | Shaffer et al. |
| 2007/0058629 | A1 | 3/2007 | Luft |
| 2007/0070895 | A1 | 3/2007 | Narvaez |
| 2007/0085702 | A1 | 4/2007 | Walters et al. |
| 2007/0091900 | A1 | 4/2007 | Asthana et al. |
| 2007/0094043 | A1 | 4/2007 | Bannai et al. |
| 2007/0100503 | A1 | 5/2007 | Balan et al. |
| 2007/0100961 | A1 | 5/2007 | Moore |
| 2007/0150353 | A1 | 6/2007 | Krassner et al. |
| 2007/0156621 | A1 | 7/2007 | Wright et al. |
| 2007/0156887 | A1 | 7/2007 | Wright et al. |
| 2007/0174114 | A1 | 7/2007 | Bigby et al. |
| 2007/0192333 | A1 | 8/2007 | Ali |
| 2007/0203722 | A1 | 8/2007 | Richards et al. |
| 2007/0204176 | A1 | 8/2007 | Shaffer et al. |
| 2007/0213878 | A1 | 9/2007 | Chen |
| 2007/0214118 | A1 | 9/2007 | Schoen et al. |
| 2007/0214132 | A1 | 9/2007 | Grubb et al. |
| 2007/0255457 | A1 | 11/2007 | Whitcomb et al. |
| 2007/0260540 | A1 | 11/2007 | Chau et al. |
| 2007/0282495 | A1 | 12/2007 | Kempton et al. |
| 2007/0286210 | A1 | 12/2007 | Gutt et al. |
| 2007/0291644 | A1 | 12/2007 | Roberts et al. |
| 2007/0299562 | A1 | 12/2007 | Kates |
| 2008/0010212 | A1 | 1/2008 | Moore et al. |
| 2008/0015976 | A1 | 1/2008 | Sandor et al. |
| 2008/0040223 | A1 | 2/2008 | Bridges et al. |
| 2008/0091625 | A1 | 4/2008 | Kremen |
| 2008/0104026 | A1 | 5/2008 | Koran |
| 2008/0109387 | A1 | 5/2008 | Deaver et al. |
| 2008/0130673 | A1 | 6/2008 | Cregg et al. |
| 2008/0147465 | A1 | 6/2008 | Raines et al. |
| 2008/0154801 | A1 | 6/2008 | Fein et al. |
| 2008/0165714 | A1 | 7/2008 | Dettinger et al. |
| 2008/0172312 | A1 | 7/2008 | Synesiou et al. |
| 2008/0177423 | A1 | 7/2008 | Brickfield et al. |
| 2008/0177678 | A1* | 7/2008 | Di Martini ............. G01D 4/002 705/412 |
| 2008/0195462 | A1 | 8/2008 | Magdon-Ismail et al. |
| 2008/0224892 | A1 | 9/2008 | Bogolea et al. |
| 2008/0231114 | A1 | 9/2008 | Tolnar et al. |
| 2008/0238710 | A1 | 10/2008 | Tolnar et al. |
| 2008/0249832 | A1 | 10/2008 | Richardson et al. |
| 2008/0255899 | A1 | 10/2008 | McConnell et al. |
| 2008/0263025 | A1 | 10/2008 | Koran |
| 2008/0270223 | A1 | 10/2008 | Collins et al. |
| 2008/0281473 | A1 | 11/2008 | Pitt |
| 2008/0306824 | A1 | 12/2008 | Parkinson |
| 2008/0306830 | A1 | 12/2008 | Lasa et al. |
| 2008/0319893 | A1 | 12/2008 | Mashinsky et al. |
| 2009/0012996 | A1 | 1/2009 | Gupta et al. |
| 2009/0018884 | A1 | 1/2009 | McConnell et al. |
| 2009/0024718 | A1 | 1/2009 | Anagnostopoulos et al. |
| 2009/0043519 | A1 | 2/2009 | Bridges et al. |
| 2009/0043520 | A1 | 2/2009 | Pollack et al. |
| 2009/0045804 | A1 | 2/2009 | Durling et al. |
| 2009/0055031 | A1 | 2/2009 | Slota et al. |
| 2009/0062970 | A1 | 3/2009 | Forbes et al. |
| 2009/0063228 | A1 | 3/2009 | Forbes |
| 2009/0088907 | A1 | 4/2009 | Lewis et al. |
| 2009/0112701 | A1 | 4/2009 | Turpin et al. |
| 2009/0112758 | A1 | 4/2009 | Herzig |
| 2009/0124241 | A1 | 5/2009 | Krishnaswamy et al. |
| 2009/0125462 | A1 | 5/2009 | Krishnaswamy et al. |
| 2009/0135836 | A1 | 5/2009 | Veillette |
| 2009/0138362 | A1 | 5/2009 | Schroedl et al. |
| 2009/0187344 | A1 | 7/2009 | Brancaccio et al. |
| 2009/0187499 | A1 | 7/2009 | Mulder et al. |
| 2009/0198384 | A1 | 8/2009 | Ahn |
| 2009/0228335 | A1 | 9/2009 | Niyogi et al. |
| 2009/0240381 | A1 | 9/2009 | Lane |
| 2009/0240677 | A1 | 9/2009 | Parekh et al. |
| 2009/0281673 | A1 | 11/2009 | Taft |
| 2009/0281674 | A1 | 11/2009 | Taft |
| 2009/0319415 | A1 | 12/2009 | Stoilov et al. |
| 2010/0076835 | A1 | 3/2010 | Silverman |
| 2010/0082464 | A1 | 4/2010 | Keefe |
| 2010/0106575 | A1 | 4/2010 | Bixby |
| 2010/0106641 | A1 | 4/2010 | Chassin et al. |
| 2010/0138452 | A1 | 6/2010 | Henkin et al. |
| 2010/0169175 | A1 | 7/2010 | Koran |
| 2010/0191862 | A1 | 7/2010 | Forbes et al. |
| 2010/0217452 | A1 | 8/2010 | Mccord et al. |
| 2010/0217549 | A1 | 8/2010 | Galvin et al. |
| 2010/0217550 | A1 | 8/2010 | Crabtree et al. |
| 2010/0217642 | A1 | 8/2010 | Crubtree et al. |
| 2010/0218108 | A1 | 8/2010 | Crabtree et al. |
| 2010/0222935 | A1* | 9/2010 | Forbes, Jr. ............. G06Q 10/00 700/291 |
| 2010/0235008 | A1* | 9/2010 | Forbes, Jr. ............. G06Q 10/00 700/291 |
| 2010/0274407 | A1 | 10/2010 | Creed |
| 2010/0293045 | A1 | 11/2010 | Burns et al. |
| 2010/0306033 | A1 | 12/2010 | Oved et al. |
| 2010/0332373 | A1 | 12/2010 | Crabtree et al. |
| 2011/0025556 | A1 | 2/2011 | Bridges et al. |
| 2011/0055036 | A1 | 3/2011 | Helfan |
| 2011/0060474 | A1 | 3/2011 | Schmiegel et al. |
| 2011/0080044 | A1 | 4/2011 | Schmiegel |
| 2011/0106729 | A1 | 5/2011 | Billingsley et al. |
| 2011/0115302 | A1 | 5/2011 | Slota et al. |
| 2011/0133655 | A1 | 6/2011 | Recker et al. |
| 2011/0145061 | A1 | 6/2011 | Spurr et al. |
| 2011/0147360 | A1 | 6/2011 | Hammerstrom |
| 2011/0161250 | A1 | 6/2011 | Koeppel et al. |
| 2011/0172841 | A1 | 7/2011 | Forbes |
| 2011/0178610 | A1 | 7/2011 | Gamble et al. |
| 2011/0185303 | A1 | 7/2011 | Katagi et al. |
| 2011/0196546 | A1 | 8/2011 | Muller et al. |
| 2011/0204717 | A1 | 8/2011 | Shaffer |
| 2011/0208366 | A1 | 8/2011 | Taft |
| 2011/0235656 | A1 | 9/2011 | Pigeon |
| 2011/0251730 | A1 | 10/2011 | Pitt |
| 2011/0257809 | A1 | 10/2011 | Forbes et al. |
| 2011/0258022 | A1 | 10/2011 | Forbes, Jr. et al. |
| 2011/0270452 | A1 | 11/2011 | Lu et al. |
| 2012/0029897 | A1 | 2/2012 | Cherian et al. |
| 2012/0196482 | A1 | 8/2012 | Stokoe |
| 2012/0205977 | A1 | 8/2012 | Shin et al. |
| 2012/0221162 | A1 | 8/2012 | Forbes |
| 2012/0223840 | A1 | 9/2012 | Guymon et al. |
| 2012/0226384 | A1 | 9/2012 | Forbes |
| 2012/0232816 | A1 | 9/2012 | Oh et al. |
| 2012/0239218 | A1 | 9/2012 | Forbes |
| 2012/0239219 | A1 | 9/2012 | Forbes |
| 2012/0245753 | A1 | 9/2012 | Forbes |
| 2012/0259760 | A1 | 10/2012 | Sgouridis et al. |
| 2012/0296799 | A1 | 11/2012 | Playfair et al. |
| 2012/0316697 | A1 | 12/2012 | Boardman et al. |
| 2013/0035802 | A1 | 2/2013 | Khaitan et al. |
| 2013/0036311 | A1 | 2/2013 | Akyol et al. |
| 2013/0079939 | A1 | 3/2013 | Darden, II et al. |
| 2013/0079943 | A1 | 3/2013 | Darden, II et al. |
| 2013/0090935 | A1* | 4/2013 | Uselton ................. G06Q 50/06 705/1.1 |
| 2013/0144768 | A1 | 6/2013 | Rohrbaugh |
| 2014/0018969 | A1 | 1/2014 | Forbes |
| 2014/0025486 | A1 | 1/2014 | Bigby et al. |
| 2014/0039699 | A1 | 2/2014 | Forbes |

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2014/0039701 | A1 | 2/2014 | Forbes |
| 2014/0039703 | A1 | 2/2014 | Forbes |
| 2015/0303691 | A1 | 10/2015 | Forbes |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| JP | 2001306839 | A | 11/2001 |
| JP | 2004180412 | A | 6/2004 |
| JP | 2004248174 | A | 9/2004 |
| JP | 2006060911 | A | 3/2006 |
| JP | 2007132553 | A | 5/2007 |
| KR | 20050045272 | A | 5/2005 |
| KR | 20060036171 | A | 4/2006 |
| KR | 20070008321 | A | 1/2007 |
| KR | 100701298 | B1 | 3/2007 |
| KR | 20070098172 | A | 10/2007 |
| KR | 20080112692 | A | 12/2008 |
| WO | 2007136456 | A2 | 11/2007 |
| WO | 2008125696 | A2 | 10/2008 |

OTHER PUBLICATIONS

Byers J. Risk Management and Monetizing the Commodity Storage Option. Natural Gas & Electricity [serial online]. Jul. 2005; 21 (12):1-8. Available from: Business Source Complete, Ipswich, MA.

C.W. Gellings and W.M. Smith, Integrating Demand-Side Management into Utility Planning, Proceedings of the IEEE, vol. 77, Issue: 6, Jun. 1989, pp. 908-918 (Abstract only).

Eric Hirst and Brendan Kirby, Opportunities for Demand Participation in New England Contingency-Reserve Markets, New England Demand Response Initiative, Feb. 2003 (15 pages).

Eric Hirst and Richard Cowart, Demand Side Resources and Reliability, New England Demand Response Initiative, Mar. 20, 2002 (32 pages).

Galvin Electricity Institute: Frequently Asked Questions, printed Apr. 23, 2014, same page available through archive.org unchanged Mar. 1, 2008.

GE Digital Energy Residential Electrical Metering Brochure. Sep. 12, 2012. https://web.archive.org/web/20120912144353/http://www.gedigitalenergry.com/products/brochures/1210-Family.pdf.

Illinois General Assembly: Public Act 094-0977, Effective Date: Jun. 30, 2006.

Kamat R., Oren S. Two-Settlement Systems for Electricity Markets under Network Uncertainty and Market Power Journal of Regulatory Economics [serial online]. Jan. 2004; 25(1):5-37.

Kathleen Spees and Lester B. Lave, Demand Response and Electricity Market Efficiency, The Electricity Journal, vol. 20, Issue 3, Apr. 2007 (online Mar. 27, 2007), pp. 69-85 (Abstract only).

L.T. Anstine, R.E. Burke, J.E. Casey, R. Holgate, R.S. John, and H.G. Stewart, Application of Probability Methods to the Determination of Spinning Reserve Requirements for the Pennsylvania-New Jersey-Maryland Interconnection; IEEE Transactions on Power Apparatus and Systems, vol. 82, Issue 68, Oct. 1963, pp. 726-735 (Abstract only).

Lobsenz G. Maryland Regulators Reject BG&E Smart Grid Proposal. Energy Daily [serial online]. Jun. 23, 2010; (118):3. Available from: Business Source Complete, Ipswich, MA.

M. Rashidi-Nejad, Y.H. Song, and M.H. Javidi-Dasht-Bayaz, Operating Reserve Provision in Deregulated Power Markets, IEEE Power Engineering Society Winter Meeting, vol. 2, 2002, pp. 1305-1310 (Abstract only).

Michael Ahlheim and Friedrich Schneider; "Allowing for Household Preferences in Emission Trading, A Contribution to the Climate Policy Debate"; Environmental and Resource Economics, vol. 21, pp. 317-342; Kluwer Academic Jublishers; The Netherlands; 2002.

Olivier Rousse; "Environmental and economic benefits resulting from citizens' participation in CO.sub.2 emissions trading: An efficient alternative solution to the voluntary compensation of CO.sub.2 emissions", Energy Policy 36 (2008), pp. 388-397; Oct. 29, 2007 (online).

Pablo A. Ruiz and Peter W. Sauer, Valuation of Reserve Services, IEEE Proceedings of the 41 .sup.st Hawaii International Conference on System Sciences, 2008 (9 pages).

Paul Darbee, Insteon Compared, SmartLabs, Inc., Jan. 2, 2006, 69 pages.

Paul Darbee, Insteon The Details, Smarthome, Inc., Aug. 11, 2005, 68 pages.

Zhu Jinxiang, G. Jordan, and S. Ihara, The Market for Spinning Reserve and Its Impacts on Energy Prices, IEEE Power Engineering Society Winter Meeting, vol. 2, 2000, pp. 1202-1207 (Abstract Only).

* cited by examiner



Non-spinning or supplemental reserve
• Not connected to the grid
• Ready to go within minutes
Spinning reserve
• Connected to the grid
• Immediately available
• Ready to go within seconds
Regulating reserve
• Reserve responsive to normal demands via AGC
Base load
• Minimum load normally expected on the grid
Contingency reserve
Operating reserve
Firm demand or capacity under contract


FIG. 1


Non-spinning or supplemental reserve
Spinning reserve - Traditional
Spinning reserve - ALMS
Regulating reserve - Traditional
Regulating reserve - ALMS
Base load
With ALMS
Active Load Management System
Active Load Director
Active Load Client
Non-spinning or supplemental reserve
Spinning reserve
Regulating reserve
Base load
Without ALMS

FIG. 2


10
20
90
80
Network
100
Active Load Director
200
Utility(s) Data Energy Control Center
96
Power generating device
300
Active Load Client
94
Variability factor sensor
92
Customer Internet Application
60
Smart Appliance
98
Customer Dashboard
400
Residential or Smart Breaker Load Center
62
Power storage device
HVAC Unit
50
Hot Water Heater
40
Washer/ Dryer
30
Pool Pump
70

FIG. 3


100
Active Load Director
160
Processor
128
Trouble Ticket Generator
130
Call Center Manager
126
Service Dispatch Manager
Utility Power and Carbon Data Base
134
132
Carbon Savings Application
150
Customer Rewards Program
98
Customer Dashboard
114
Web Browser Interface
116
Customer Sign-Up Application
Customer Personal Settings
138
Active Load Director Data Base
124
Power Savings Application
120
118
Customer Reports Application
Active Load Client Diagnostic Manager
122
136
Read Meter Application
104
UCC Command Processor
102
Security Interface
106
Master Event Manager
144
Device Controller
108
Active Load Client Manager
140
Security Device Management
Security Interface
110
Active Load Client Interface
112
200
Utility Control Center
300
Active Load Client

FIG. 4



n-dimensional matrix
500
passive sampling
active sampling
40


FIG. 5



98
New Program:
Step 3: Manage HVAC
Cancel Setup
Previous Step
Next Step
For this device when using this program . . .
What do you consider a comfortable temperature?
70.0 °F
What temperature would you turn it to when no one is at home?
70.0 °F
What temperature would you turn it to when everyone is sleeping?
70.0 °F
What is the minimum temperature you would want to experience?
60.0 °F
What is the maximum temperature you would want to experience?
80.0 °F
Show Details


FIG. 6


98
New Program:
Step 2: Manage Water Heater
Cancel Setup
Previous Step
Next Step
For this device when using this program . . .
At what state would you normally leave the device at when you wake up?
ON
OFF
At what state would you normally leave the device at when the first person in your household returns home?
ON
OFF
At what state would you normally leave the device at when no one is at home?
ON
OFF
At what state would you normally leave the device at when everyone is sleeping?
ON
OFF
Show Details

FIG. 7



800
Enter
802
Did the device use energy?
no
yes
Calculate time duration, time duration when duty on, time duration when duty off
804
806
Is device environmentally dependent or not?
Environmentally-dependent
Environmentally-independent
Calculate the energy used per minute for the device
808
810
Is the device drifting?
no
yes
Calculate the power time rate
812
Calculate the drift rate
814
880
Does a record already exist for this device at this set point and same variability factors?
no
yes
Create a new matrix entry for the device using
• Record time
• Current set point
• Variability factors
• Energy used per minute
• Power time rate
• Drift rate
882
Update the record using more current data to calculate average energy usage, drift rate, and power time rate
884
842
Calculate the energy used per minute for the device
844
Calculate the energy saved per minute for the device
890
Does a record already exist for this device for this time period?
no
yes
Create a new matrix entry for the device using
• Record time
• Current time period
• Energy used per minute
• Energy saved per minute
892
Update the record using more current data
894
Exit


FIG. 8


900
Enter
Calculate the time period
902
904
Is device environmentally-dependent or not?
Environmentally-dependent
Environmentally-independent
Determine if the device is heating or cooling
920
Obtain the set points for the time period
922
Obtain the outside temperatures for the time period
924
Project how this device will behave during this time period. Sum the power determined in these projections.
926
Multiply the power used in the matching record by the time duration
928
Determine if the device setting is on or off
960
Obtain a list of time blocks in the sampling period
962
Project how this device will behave during this time period. Sum the power determined in these projections.
964
Multiply the power used in the matching record by the time duration
968
970
Is the device currently in a control event?
yes
no
Multiply the amount of power used by a control factor according to the device's duty cycle
972
Return the amount of power used for the time period
980
Exit

FIG. 9



Enter
1000
1002
Is device environmentally-dependent or not?
Environmentally-dependent
Environmentally-independent
Find sampling records that match the device's duty mode, set point temperature, and outside temperature
1004
1040
Find sampling records that match the device's duty mode and time of operation
1010
yes
Were records founds?
no
1070
yes
Were records founds?
no
1012
Obtain sampling records that match the device's duty mode, but incrementally vary the set point temperature and the outside temperature
1072
Obtain sampling records that match the device's duty mode, but incrementally vary the time of operation
Provide the records that were found
1060
Exit


FIG. 10



1100
Enter
1102
Project energy usage for device in normal operation
1104
Project energy usage for device during control event
1106
Calculate difference between energy usage during normal operation and control event
1108
Return energy savings
Exit


FIG. 11


1202
1204
1206
1208
400
350
300
250
200
150
100
50
0
0:00
2:00
4:00
6:00
8:00
10:00
12:00:00
14:00
16:00
18:00
20:00
22:00
24:00:00

FIG. 12



LOAD MANAGEMENT SYSTEM
10
100
LOAD CONTROLLER
PROCESSOR
160
80
NETWORK
90
20
300
400
Customer Base
VIRTUAL ELECTRIC UTILITY
1302
SERVING ELECTRIC UTILITY
1304
REQUESTING ELECTRIC UTILITY
1306


FIG. 13

# SYSTEM AND METHOD FOR ESTIMATING AND PROVIDING DISPATCHABLE OPERATING RESERVE ENERGY CAPACITY THROUGH USE OF ACTIVE LOAD MANAGEMENT

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application relates to and claims priority from the following U.S. Applications. This application is a continuation of U.S. application Ser. No. 14/517,399 filed Oct. 17, 2014 and issued as U.S. Pat. No. 9,651,973, which is a divisional of U.S. application Ser. No. 13/466,725 filed May 8, 2012 and issued as U.S. Pat. No. 8,890,505. U.S. application Ser. No. 13/466,725 is a continuation-in-part of U.S. application Ser. No. 13/019,867 filed Feb. 2, 2011 and issued as U.S. Pat. No. 8,996,183, is a continuation-in-part of U.S. application Ser. No. 12/775,979 filed May 7, 2010 and issued as U.S. Pat. No. 8,396,606, and is a continuation-in-part of U.S. application Ser. No. 12/001,819 filed Dec. 13, 2007 now abandoned. U.S. application Ser. No. 13/019,867 is a continuation-in-part of U.S. application Ser. No. 12/896,307 filed Oct. 1, 2010 and issued as U.S. Pat. No. 8,527,107, is a continuation-in-part of U.S. application Ser. No. 12/783,415 filed May 19, 2010 now abandoned, is a continuation-in-part of U.S. application Ser. No. 12/775,979 filed May 7, 2010 and issued as U.S. Pat. No. 8,396,606, is a continuation-in-part of U.S. application Ser. No. 12/715,195 filed Mar. 1, 2010 and issued as U.S. Pat. No. 8,032,233, is a continuation-in-part of U.S. application Ser. No. 12/715,124 filed Mar. 1, 2010 and issued as U.S. Pat. No. 8,010,812, is a continuation-in-part of U.S. application Ser. No. 12/001,819 filed Dec. 13, 2007 now abandoned. U.S. application Ser. No. 12/896,307 is a continuation-in-part of U.S. application Ser. No. 12/715,195 filed Mar. 1, 2010 and issued as U.S. Pat. No. 8,032,233, is a continuation-in-part of U.S. application Ser. No. 12/715,124 filed Mar. 1, 2010 and issued as U.S. Pat. No. 8,010,812, is a continuation-in-part of U.S. application Ser. No. 12/702,640 filed Feb. 9, 2010 and issued as U.S. Pat. No. 8,131,403. U.S. application Ser. No. 12/896,307 also claims priority from U.S. Provisional Application No. 61/279,072 filed Oct. 15, 2009. U.S. application Ser. No. 12/783,415 is a continuation-in-part of U.S. application Ser. No. 12/715,124 filed Mar. 1, 2010 and issued as U.S. Pat. No. 8,010,812. U.S. application Ser. No. 12/783,415 also claims priority from U.S. Provisional Application No. 61/216,712 filed May 20, 2009. U.S. application Ser. No. 12/775,979 is a continuation-in-part of U.S. application Ser. No. 12/001,819 filed Dec. 13, 2007 now abandoned, which is a continuation-in-part of U.S. application Ser. No. 11/895,909 filed on Aug. 28, 2007 and issued as U.S. Pat. No. 7,715,951. U.S. application Ser. No. 12/775,979 also claims the benefit of U.S. Provisional Application No. 61/215,725 filed May 8, 2009. U.S. application Ser. No. 12/715,195 is a division of U.S. application Ser. No. 11/895,909 filed Aug. 28, 2007 and issued as U.S. Pat. No. 7,717,951. U.S. application Ser. No. 12/715,124 is a division of U.S. application Ser. No. 11/895,909 filed Aug. 28, 2007 and issued as U.S. Pat. No. 7,717,951. U.S. application Ser. No. 12/702,640 is a continuation-in-part of U.S. application Ser. No. 11/895,909 filed Aug. 28, 2007 and issued as U.S. Pat. No. 7,717,951. U.S. application Ser. No. 12/702,640 also claims priority from U.S. Provisional Application No. 61/150,978 filed Feb. 9, 2009, and U.S. Provisional Application No. 61,176,752 filed May 8, 2009. U.S. application Ser. No. 12/001,819 is a continuation-in-part of U.S. application Ser. No. 11/895,909 filed Aug. 28, 2007 and issued as U.S. Pat. No. 7,717,951. Each of the above U.S. Applications is incorporated herein by reference in its entirety.



## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates generally to the field of electric power supply and generation systems and, more particularly, to a system and method for estimating and/or providing dispatchable operating reserve energy capacity for an electric utility using active load management so that the reserve capacity may be made available to the utility or to the general power market (e.g., via a national grid).

### 2. Description of Related Art

Energy demand within a utility's service area varies constantly. Such variation in demand can cause undesired fluctuations in line frequency if not timely met. To meet the varying demand, a utility must adjust its supply or capacity (e.g., increase capacity when demand increases and decrease supply when demand decreases). However, because power cannot be economically stored, a utility must regularly either bring new capacity on-line or take existing capacity off-line in an effort to meet demand and maintain frequency. Bringing new capacity online involves using a utility's reserve power, typically called "operating reserve." A table illustrating a utility's typical energy capacity is shown in FIG. **1**. As shown, operating reserve typically includes three types of power: so-called "regulating reserve," "spinning reserve," and "non-spinning reserve" or "supplemental reserve." The various types of operating reserve are discussed in more detail below.

Normal fluctuations in demand, which do not typically affect line frequency, are responded to or accommodated through certain activities, such as by increasing or decreasing an existing generator's output or by adding new generating capacity. Such accommodation is generally referred to as "economic dispatch." A type of power referred to as "contingency reserve" is additional generating capacity that is available for use as economic dispatch to meet changing (increasing) demand. Contingency reserve consists of two of the types of operating reserve, namely, spinning reserve and non-spinning reserve. Therefore, operating reserve generally consists of regulating reserve and contingency reserve.

As shown in FIG. **1**, spinning reserve is additional generating capacity that is already online (e.g., connected to the power system) and, thus, is immediately available or is available within a short period of time after a determined need (e.g., within ten (10) to fifteen (15) minutes, as defined by the applicable North American Electric Reliability Corporation (NERC) regulation). More particularly, in order for contingency reserve to be classified as "spinning reserve," the reserve power capacity must meet the following criteria:

a) be connected to the grid;

b) be measurable and verifiable; and

c) be capable of fully responding to load typically within 10-15 minutes of being dispatched by a utility, where the time-to-dispatch requirements of the spinning reserve are generally governed by a grid system operator or other regulatory body, such as NERC.

Non-spinning reserve (also called supplemental reserve) is additional generating capacity that is not online, but is required to respond within the same time period as spinning reserve. Typically, when additional power is needed for use

as economic dispatch, a power utility will make use of its spinning reserve before using its non-spinning reserve because (a) the generation methods used to produce spinning reserve capacity typically tends to be cheaper than the methods, such as one-way traditional demand response, used to produce non-spinning reserve or (b) the consumer impact to produce non-spinning reserve is generally less desirable than the options used to produce spinning reserve due to other considerations, such as environmental concerns. For example, spinning reserve may be produced by increasing the torque of rotors for turbines that are already connected to the utility's power grid or by using fuel cells connected to the utility's power grid; whereas, non-spinning reserve may be produced from simply turning off resistive and inductive loads such as heating/cooling systems attached to consumer locations. However, making use of either spinning reserve or non-spinning reserve results in additional costs to the utility because of the costs of fuel, incentives paid to consumers for traditional demand response, maintenance, and so forth.

If demand changes so abruptly and quantifiably as to cause a substantial fluctuation in line frequency within the utility's electric grid, the utility must respond to and correct for the change in line frequency. To do so, utilities typically employ an Automatic Generation Control (AGC) process or subsystem to control the utility's regulating reserve. To determine whether a substantial change in demand has occurred, each utility monitors its Area Control Error (ACE). A utility's ACE is equal to the difference in the scheduled and actual power flows in the utility grid's tie lines plus the difference in the actual and scheduled frequency of the supplied power multiplied by a constant determined from the utility's frequency bias setting. Thus, ACE can be written generally as follows:

ACE=(*NI*.sub.*A*-*NI*.sub.*S*)+(−10*B*.sub.1)(*F*.sub.*A*-*F*.sub.*S*), [Equation 1]

where:

NI.sub.A is the sum of actual power flows on all tie lines,
Ni.sub.S is the sum of scheduled flows on all tie lines,
B.sub.1 is the frequency bias setting for the utility,
F.sub.A is the actual line frequency, and
F.sub.S is the scheduled line frequency (typically 60 Hz).

In view of the foregoing ACE equation, the amount of loading relative to capacity on the tie lines causes the quantity (NI.sub.A-NI.sub.S) to be either positive or negative. When demand is greater than supply or capacity (i.e., the utility is under-generating or under-supplying), the quantity (NI.sub.A-NI.sub.S) is negative, which typically causes ACE to be negative. On the other hand, when demand is less than supply, the quantity (NI.sub.A-NI.sub.S) is positive (i.e., the utility is over-generating or over-supplying), which typically causes ACE to be positive. The amount of demand (e.g., load) or capacity directly affects the quantity (NI-.sub.A-NI.sub.S); thus, ACE is a measure of generation capacity relative to load. Typically, a utility attempts to maintain its ACE very close zero using AGC processes.

If ACE is not maintained close to zero, line frequency can change and cause problems for power consuming devices attached to the electric utility's grid. Ideally, the total amount of power supplied to the utility tie lines must equal the total amount of power consumed through loads (power consuming devices) and transmission line losses at any instant of time. However, in actual power system operations, the total mechanical power supplied by the utility's generators is seldom exactly equal to the total electric power consumed by the loads plus the transmission line losses. When the power supplied and power consumed are not equal, the



system either accelerates (e.g., if there is too much power in to the generators) causing the generators to spin faster and hence to increase the line frequency or decelerates (e.g., if there is not enough power into the generators) causing the line frequency to decrease. Thus, variation in line frequency can occur due to excess supply, as well as due to excess demand.

To respond to fluctuations in line frequency using AGC, a utility typically utilizes "regulating reserve," which is one type of operating reserve as illustrated in FIG. **1**. Regulating reserve is used as needed to maintain constant line frequency. Therefore, regulating reserve must be available almost immediately when needed (e.g., in as little as a few seconds to less than about five (5) minutes). Governors are typically incorporated into a utility's generation system to respond to minute-by-minute changes in load by increasing or decreasing the output of individual generators and, thereby, engaging or disengaging, as applicable, the utility's regulating reserve.

The Federal Energy Reliability Commission (FERC) and NERC have proposed the concept of Demand Side Management (DSM) as an additional approach to account for changes in demand. DSM is a method in which a power utility carries out actions to reduce demand during peak periods. Examples of DSM include encouraging energy conservation, modifying prices during peak periods, direct load control, and others.

Current approaches for using DSM to respond to increases in demand have included using one way load switches that interrupt loads, as well as statistics to approximate the average amount of projected load removed by DSM. A statistical approach is employed because of the utility's inability to measure the actual load removed from the grid as a result of a DSM load control event. In addition, current DSM approaches have been limited to use of a single power measuring meter among every one hundred (100) or more service points (e.g., residences and/or businesses). Accordingly, current DSM approaches are inadequate because they rely on statistical trends and sampling, rather than on empirical data, to make projections and measure actual load removal events.

More recently, FERC and NERC have introduced the concept of flexible load-shape programs as a component of DSM. These programs allow customers to make their preferences known to the utility concerning timing and reliability of DSM load control events. However, DSM approaches utilizing load-shaping programs do not meet all of the criteria for implementing regulating reserve or spinning reserve, such as being dispatchable within 15 minutes or less. Additionally, in order for a generating source to be considered dispatchable energy, it must be forecasted twenty-four (24) hours prior to being delivered to a utility. Current DSM approaches do not facilitate accurate forecasting twenty-four (24) hours in advance due to their heavy reliance on statistics.

Therefore, there is a need for utilities to be able to create operating reserve, especially regulating and/or spinning reserve, by using accurate forecasting and flexible load shaping techniques. There is a further need to involve the consumer in a two-way approach in which the consumer can make their energy consumption preferences known and the utility can make use of those preferences to respond to increased demand and maintain line frequency regulation.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a table showing the base load power requirements and operating reserve available to an electric power utility.

FIG. **2** is a block diagram illustrating how an active load management system in accordance with the present invention provides additional operating (e.g., regulating, spinning and/or non-spinning) reserve to a power utility.

FIG. **3** is a block diagram of an exemplary IP-based, active load management system in accordance with one embodiment of the present invention.

FIG. **4** is a block diagram illustrating an exemplary active load director as shown in the power load management system of FIG. **3**.

FIG. **5** is a block diagram illustrating generation of an exemplary sampling repository at the active load director of FIG. **4** or some other location in an electric utility.

FIG. **6** is a screen shot of an exemplary web browser interface through which a customer may designate his or her device performance and energy saving preferences for an environmentally-dependent, power consuming device in accordance with one embodiment of the present invention.

FIG. **7** is a screen shot of an exemplary web browser interface through which a customer may designate his or her device performance and energy saving preferences for an environmentally-independent, power consuming device in accordance with another embodiment of the present invention.

FIG. **8** is an operational flow diagram illustrating a method for empirically analyzing power usage of power consuming devices and populating a repository with data samples resulting from such power usage analysis, in accordance with an exemplary embodiment of the present invention.

FIG. **9** is an operational flow diagram illustrating a method for projecting energy usage for a power consuming device in accordance with an exemplary embodiment of the present invention.

FIG. **10** is an operational flow diagram illustrating a method for estimating power consumption behavior of a power consuming device in accordance with an exemplary embodiment of the present invention.

FIG. **11** is an operational flow diagram illustrating a method for projecting energy savings through power interruption to a power consuming device during a control event, in accordance with an exemplary embodiment of the present invention.

FIG. **12** is a graph that depicts a load profile of a utility during a projected time period, showing actual energy usage as well as projected energy usage determined with and without a control event, in accordance with an exemplary embodiment of the present invention.

FIG. **13** is a block diagram of a system for implementing a virtual electric utility in accordance with an exemplary embodiment of the present invention.

## DETAILED DESCRIPTION OF EXEMPLARY EMBODIMENTS

Before describing in detail exemplary embodiments that are in accordance with the present invention, it should be observed that the embodiments reside primarily in combinations of apparatus components and processing steps related to actively monitoring and managing power loading at an individual service point (e.g., on an individual subscriber basis) and throughout a utility's service area, as well as determining available or dispatchable operating reserve power derived from projected power savings resulting from monitoring and management of power loading. Accordingly, the apparatus and method components have been represented where appropriate by conventional symbols in the drawings, showing only those specific details that are pertinent to understanding the embodiments of the present invention so as not to obscure the disclosure with details that will be readily apparent to those of ordinary skill in the art having the benefit of the description herein.

In this document, relational terms, such as "first" and "second," "top" and "bottom," and the like, may be used solely to distinguish one entity or element from another entity or element without necessarily requiring or implying any physical or logical relationship or order between such entities or elements. The terms "comprises," "comprising," and any other variation thereof are intended to cover a non-exclusive inclusion, such that a process, method, article, or apparatus that comprises a list of elements does not include only those elements, but may include other elements not expressly listed or inherent to such process, method, article, or apparatus. The term "plurality of" as used in connection with any object or action means two or more of such object or action. A claim element proceeded by the article "a" or "an" does not, without more constraints, preclude the existence of additional identical elements in the process, method, article, or apparatus that includes the element.

Additionally, the term "ZigBee" refers to any wireless communication protocol adopted by the Institute of Electronics & Electrical Engineers (IEEE) according to standard 802.15.4 or any successor standard(s), the term "Wi-Fi" refers to any communication protocol adopted by the IEEE under standard 802.11 or any successor standard(s), the term "WiMax" refers to any communication protocol adopted by the IEEE under standard 802.16 or any successor standard(s), and the term "Bluetooth" refers to any short-range communication protocol implementing IEEE standard 802.15.1 or any successor standard(s). Additionally or alternatively to WiMax, other communications protocols may be used, including but not limited to a "1 G" wireless protocol such as analog wireless transmission, first generation standards based (IEEE, ITU or other recognized world communications standard), a "2-G" standards based protocoal such as "EDGE or CDMA 2000 also known as 1×RTT", a 3G based standard such as "High Speed Packet Access (HSPA) or Evolution for Data Only (EVDO), any accepted 4G standard such as "IEEE, ITU standards that include WiMax, Long Term Evolution "LTE" and its derivative standards, any Ethernet solution wireless or wired, or any proprietary wireless or power line carrier standards that communicate to a client device or any controllable device that sends and receives an IP based message.

The term "High Speed Packet Data Access (HSPA)" refers to any communication protocol adopted by the International Telecommunication Union (ITU) or another mobile telecommunications standards body referring to the evolution of the Global System for Mobile Communications (GSM) standard beyond its third generation Universal Mobile Telecommunications System (UMTS) protocols. The term "Long Term Evolution (LTE)" refers to any communication protocol adopted by the ITU or another mobile telecommunications standards body referring to the evolution of GSM-based networks to voice, video and data standards anticipated to be replacement protocols for HSPA. The term "Code Division Multiple Access (CDMA) Evolution Date-Optimized (EVDO) Revision A (CDMA EVDO Rev. A)" refers to the communication protocol adopted by the ITU under standard number TIA-856 Rev. A.

The terms "utility," "electric utility," "power utility," and "electric power utility" refer to any entity or system that generates, distributes, and/or resells electrical power, includ-

ing any market participant associated with an electric power grid, microgrid, etc., that purchases power from a power-generating entity and distributes the purchased power to end user customers, or that supplies electricity created either actually or virtually by alternative energy sources, such as solar power, wind power, load control, or otherwise, to power generation or distribution entities through the FERC electrical grid or otherwise, or that schedules the supply of energy or ancillary services, such as operating reserves. Therefore, as used herein and in the appended claims, an "electric utility" may be a power-generating entity, a power-distributing entity, a retail electric provider (REP), an independent system operator (ISO), an electrical grid operator, or any other market participant, such as any entity that performs the function of a load serving entity (LSE), a qualified scheduling entity (QSE), a resource entity (RE), or a transmission/distribution service provider (TDSP), as such entities and participants are understood by those of ordinary skill in the art in the electricity industry.

The terms "energy" and "power" are used interchangeably herein. The terms "operating reserve," "spinning reserve," "regulating reserve," "non-spinning reserve," "supplemental reserve," and "contingency reserve" are conventional in the art and their uses and inter-relations are described in hereinabove. The term "environment" refers to general conditions, such as air temperature, humidity, barometric pressure, wind speed, rainfall quantity, water temperature, etc., at or proximate a service point or associated with a device (e.g., water temperature of water in a hot water heater or a swimming pool).

The term "device," as used herein, means a power-consuming device, and there may generally be two different types of devices within a service point, namely, an environmentally-dependent device and an environmentally-independent device. An environmentally-dependent device is any power consuming device that turns on or off, or modifies its behavior, based on one or more sensors that detect characteristics, such as temperature, humidity, pressure, or various other characteristics, of an environment. An environmentally-dependent device may directly affect and/or be affected by the environment in which it operates. An environmentally-independent device is any power-consuming device that turns on or off, or modifies its behavior, without reliance upon inputs from any environmental sensors. Generally speaking, an environmentally-independent device does not directly affect, and is not typically affected by, the environment in which it operates, although, as one skilled in the art will readily recognize and appreciate, operation of an environmentally-independent device can indirectly affect, or occasionally be affected by, the environment. For example, as those skilled in the art readily understand, a refrigerator or other appliance generates heat during operation, thereby causing some heating of the ambient air proximate the device.

It will be appreciated that embodiments or components of the systems described herein may be comprised of one or more conventional processors and unique stored program instructions that control the one or more processors to implement, in conjunction with certain non-processor circuits, some, most, or all of the functions for determining an electric utility's available or dispatchable operating (e.g., regulating and spinning) reserve that is derived from projected power savings resulting from monitoring and management of loads in one or more active load management systems as described herein. The non-processor circuits may include, but are not limited to, radio receivers, radio transmitters, antennas, modems, signal drivers, clock circuits, power source circuits, relays, meters, memory, smart breakers, current sensors, and user input devices. As such, these functions may be interpreted as steps of a method to store and distribute information and control signals between devices in a power load management system. Alternatively, some or all functions could be implemented by a state machine that has no stored program instructions, or in one or more application specific integrated circuits (ASICs), in which each function or some combinations of functions are implemented as custom logic. Of course, a combination of the foregoing approaches could be used. Thus, methods and means for these functions have been described herein. Further, it is expected that one of ordinary skill in the art, notwithstanding possibly significant effort and many design choices motivated by, for example, available time, current technology, and economic considerations, when guided by the concepts and principles disclosed herein, will be readily capable of generating such software instructions, programs and integrated circuits (ICs), and appropriately arranging and functionally integrating such non-processor circuits, without undue experimentation.



Generally, the present invention encompasses a system and method for estimating operating reserve (e.g., spinning and/or regulating reserve) for a utility servicing one or more service points. In one embodiment, the utility or any market participant associated with the electric power grid, employs an active load management system (ALMS) to remotely determine, during at least one period of time, power consumed by at least one device located at the one or more service points and receiving power from the utility to produce power consumption data. The power consumption data is regularly stored and updated in a repository. The ALMS or a control component thereof, such as an active load director (ALD), determines an expected, future time period for a control event during which power is to be interrupted or reduced to one or more devices. Prior to commencement of the control event, the ALMS or its control component: (i) estimates power consumption behavior expected of the device(s) during the time period of the control event based at least on the stored power consumption data, (ii) determines projected energy savings resulting from the control event based at least on the estimated power consumption behavior of device(s), and determines operating (e.g., regulating and/or spinning) reserve based on the projected energy savings. The determined operating reserve may be made available to the current power utility or to the power market through the existing (e.g., Federal Energy Regulatory Commission) power grid. In one embodiment, the ALD populates an internal repository (e.g., database, matrix, or other storage medium) with measurement data indicating how individual devices within individual service points consume power or otherwise behave under normal operation and during control events. The power consumption data is updated through regular (e.g., periodic or otherwise) sampling of device operating conditions (e.g., current draw, duty cycle, operating voltage, etc.). When an ALD is first installed in an ALMS for an electric utility power grid, there is little data with which to create regulating and spinning reserve forecasts. However, over time, more and more data samples are used to improve the quality of the data in the repository. This repository is used to project both energy usage and energy savings. These projections can be aggregated for an entire service point, a group of service points, or the entire utility.

Furthermore, based upon the reduction in consumed power, the systems and methods of the present invention provide for generating at the control center a power supply

value (PSV) corresponding to the reduction in consumed power by the device(s). Importantly, the PSV is an actual value that includes measurement and verification of the reduction in consumed power; such measurement and verification methods may be determined by the appropriate governing body or authority for the electric power grid(s). Power Supply Value (PSV) is calculated at the meter or submeter or at building control system or at any device or controller that measures power within the standard as supplied by the regulatory body(ies) that govern the regulation of the grid. PSV variations may depend on operating tolerances, operating standard for accuracy of the measurement. The PSV enables transformation of curtailment or reduction in power at the device level by any system that sends or receives an IP message or power control-related message to be related to or equated to supply as presented to the governing entity that accepts these values and award supply equivalence, for example of a power generating entity or an entity allowed to control power consuming devices as permitted by the governing body of the electric power grid, e.g., FERC, NERC, etc.

PSV may be provided in units of electrical power flow, monetary equivalent, and combinations thereof. Also, PSV relates to the ability to reduce power by curtailment or by putting power back onto the grid, and the quality and value associated therewith. Thus, the PSV provides an actual value that is confirmed by measurement and/or verification, thereby providing for a curtailment value as a requirement for providing supply to the power grid, wherein the supply to the power electric power grid is provided for grid stability, voltage stability, reliability, and combinations thereof, and is further provided as responsive to an energy management system or equivalent for providing grid stability, reliability, frequency as determined by governing authority for the electric power grid and/or grid operator(s).

In an alternative embodiment, additional data may be used to help differentiate each data sample stored in the repository. The additional data is associated with variability factors, such as, for example, outside air temperature, day of the week, time of day, humidity, sunlight, wind speed, altitude, orientation of windows or doors, barometric pressure, energy efficiency rating of the service point, insulation used at the service point, and others. All of these variability factors can have an influence on the power consumption of a device. Some of the variability factor data may be obtained from public sources, such as local, state or national weather services, calendars, and published specifications. Other variability factor data may be obtained privately from user input and from sensors, such as humidity, altitude, temperature (e.g., a thermostat), and optical or light sensors, installed at or near a service point (e.g., within or at a residence or business).

FIG. **2** is a block diagram illustrating how an ALMS operating in accordance with the present invention provides additional operating (e.g., regulating, spinning, and/or non-spinning) reserve to a power utility. Without use of an ALMS operating in accordance with the present invention, the utility has capacity equal to its base load plus its regulating reserve, spinning reserve, and non-spinning reserve as shown on the left side of the figure. However, with use of an ALMS operating in accordance with the present invention, the utility has additional operating reserve, which may be preferably used as regulating, spinning and/or non-spinning reserve (as illustrated in FIG. **2**), by drawing power selectively from service points through the interruption or reduction of power to devices, such as air conditioners, furnaces, hot water heaters, pool pumps, washers, dryers, boilers, and/or any other inductive or resistive loads, at the service points.



The present invention can be more readily understood with reference to FIGS. **3-12**, in which like reference numerals designate like items. FIG. **3** depicts an exemplary IP-based active load management system (ALMS) **10** that may be utilized by an electric utility, which may be a conventional power-generating utility or a virtual utility, in accordance with the present invention. The below description of the ALMS **10** is limited to specific disclosure relating to embodiments of the present invention. A more general and detailed description of the ALMS **10** is provided in commonly-owned, co-pending U.S. application Ser. No. 11/895,909, which was filed on Aug. 28, 2007, was published as U.S. Patent Application Publication No. US 2009/0062970 A1 on Mar. 5, 2009, and is incorporated herein by this reference as if fully set forth herein. U.S. Patent Application Publication No. US 2009/0062970 A1 provides details with respect to the exemplary operational implementation and execution of control events to interrupt or reduce power to devices located at service points, such as residences and businesses. The use of an ALMS **10** to implement a virtual utility is described in detail in commonly-owned and co-pending U.S. application Ser. No. 12/001,819, which was filed on Dec. 13, 2007, was published as U.S. Patent Application Publication No. US 2009/0063228 A1 on Mar. 5, 2009, and is incorporated herein by this reference as if fully set forth herein.

The ALMS **10** monitors and manages power distribution via an active load director (ALD) **100** connected between one or more utility control centers (UCCs) **200** (one shown) and one or more active load clients (ALCs) **300** (one shown) installed at one or more service points **20** (one exemplary residential service point shown). The ALD **100** may communicate with the utility control center **200** and each active load client **300** either directly or through a network **80** using the Internet Protocol (IP) or any other (IP or Ethernet) connection-based protocols. For example, the ALD **100** may communicate using RF systems operating via one or more base stations **90** (one shown) using one or more wireless communication protocols, such as GSM, ANSI C12.22, Enhanced Data GSM Environment (EDGE), HSPA, LTE, Time Division Multiple Access (TDMA), or CDMA data standards, including CDMA 2000, CDMA Revision A, CDMA Revision B, and CDMA EVDO Rev. A. Alternatively, or additionally, the ALD **100** may communicate via a digital subscriber line (DSL) capable connection, cable television based IP capable connection, or any combination thereof. In the exemplary embodiment shown in FIG. **3**, the ALD **100** communicates with one or more active load clients **300** using a combination of traditional IP-based communication (e.g., over a trunked line) to a base station **90** and a wireless channel implementing the HSPA or EVDO protocol from the base station **90** to the active load client **300**. The distance between the base station **90** and the service point **20** or the active load client **300** is typically referred to as the "last mile" even though the distance may not actually be a mile. The ALD **100** may be implemented in various ways, including, but not limited to, as an individual server, as a blade within a server, in a distributed computing environment, or in other combinations of hardware and software. In the following disclosure, the ALD **100** will be described as embodied in an individual server to facilitate an understanding of the present invention. Thus, the server embodiment of the ALD **100** described below corresponds generally to the

description of the ALD **100** in US Patent Application Publication Nos. US 2009/0062970 A1 and US 2009/0063228 A1.

Each active load client **300** is preferably accessible through a specified address (e.g., IP address) and controls and monitors the state of individual smart breaker modules or intelligent appliances **60** installed at the service point **20** (e.g., in the business or residence) to which the active load client **300** is associated (e.g., connected or supporting). Each active load client **300** is preferably associated with a single residential or commercial customer. In one embodiment, the active load client **300** communicates with a residential load center **400** that contains smart breaker modules, which are able to switch from an "ON" (active) state to an "OFF" (inactive) state, and vice versa, responsive to signaling from the active load client **300**. Smart breaker modules may include, for example, smart breaker panels manufactured by Schneider Electric SA under the trademark "Square D" or Eaton Corporation under the trademark "Cutler-Hammer" for installation during new construction. For retro-fitting existing buildings, smart breakers having means for individual identification and control may be used. Typically, each smart breaker controls a single appliance (e.g., a washer/dryer **30**, a hot water heater **40**, an HVAC unit **50**, or a pool pump **70**). In an alternative embodiment, IP addressable relays or device controllers that operate in a manner similar to a "smart breaker" may be used in place of smart breakers, but would be installed coincident with the load under control and would measure the startup power, steady state power, power quality, duty cycle and energy load profile of the individual appliance **60**, HVAC unit **40**, pool pump **70**, hot water heater **40**, or any other controllable load as determined by the utility or end customer.

Additionally, the active load client **300** may control individual smart appliances directly (e.g., without communicating with the residential load center **400**) via one or more of a variety of known communication protocols (e.g., IP, Broadband over PowerLine (BPL) in its various forms, including through specifications promulgated or being developed by the HOMEPLUG Powerline Alliance and the Institute of Electrical and Electronic Engineers (IEEE), Ethernet, Bluetooth, ZigBee, Wi-Fi (IEEE 802.11 protocols), HSPA, EVDO, etc.). Typically, a smart appliance **60** includes a power control module (not shown) having communication abilities. The power control module is installed in-line with the power supply to the appliance, between the actual appliance and the power source (e.g., the power control module is plugged into a power outlet at the home or business and the power cord for the appliance is plugged into the power control module). Thus, when the power control module receives a command to turn off the appliance **60**, it disconnects the actual power supplying the appliance **60**. Alternatively, the smart appliance **60** may include a power control module integrated directly into the appliance, which may receive commands and control the operation of the appliance directly (e.g., a smart thermostat may perform such functions as raising or lowering the set temperature, switching an HVAC unit on or off, or switching a fan on or off).

The active load client **300** may further be coupled to one or more variability factor sensors **94**. Such sensors **94** may be used to monitor a variety of variability factors affecting operation of the devices, such as inside and/or outside temperature, inside and/or outside humidity, time of day, pollen count, amount of rainfall, wind speed, and other factors or parameters.



Referring now to FIG. **4**, the ALD **100** may serve as the primary interface to customers, as well as to service personnel, and operates as the system controller sending control messages or power control messages to, and collecting data from, installed active load clients **300** as described in detail below and in U.S. Patent Application Publication No. US 2009/0062970 A1, which is incorporated herein by reference in its entirety. In the exemplary embodiment depicted in FIG. **4**, the ALD **100** is implemented as an individual server and includes a utility control center (UCC) security interface **102**, a UCC command processor **104**, a master event manager **106**, an ALC manager **108**, an ALC security interface **110**, an ALC interface **112**, a web browser interface **114**, a customer sign-up application **116**, customer personal settings **138**, a customer reports application **118**, a power savings application **120**, an ALC diagnostic manager **122**, an ALD database **124**, a service dispatch manager **126**, a trouble ticket generator **128**, a call center manager **130**, a carbon savings application **132**, a utility power and carbon (P&C) database **134**, a read meter application **136**, a security device manager **140**, a device controller **144**, and one or more processors **160** (one shown). The operational details of several of the elements of the ALD **100** are described below with respect to their use in connection with the present invention. The operational details of the remaining elements of the ALD **100** may be found in U.S. Patent Application Publication Nos. US 2009/0062970 A1 and US 2009/0063228 A1, and US 2011/0172837, each of which are incorporated herein by reference in their entirety, including specification and figures or drawings, wherein the ALD **100** is also described in the context of an individual server embodiment.

In another embodiment, features, functions and/or components referred to in US Patent Application Publication No. 2010/0161148, Ser. No. 12/715,195 filed Mar. 1, 2010, by inventor Forbes, Jr., which is incorporated herein by reference in its entirety, are combined advantageously with the embodiments described herein.

In one embodiment according to the present invention, a sampling repository is used to facilitate the determination of dispatchable operating reserve power or energy (e.g., spinning and/or regulating reserve) for a utility. An exemplary sampling repository **500** is shown in block diagram form in FIG. **5**. As illustrated in FIG. **5**, the sampling repository **500** is a means for storing device monitoring data and other data that collectively details how devices (e.g., a hot water heater **40** as shown in FIG. **5**) have behaved under specific conditions. The repository **500** may be in various forms, including a matrix, a database, etc. In one embodiment, the sampling repository **500** is implemented in the ALD database **124** of the ALD **100**. Alternatively, the sampling repository **500** may reside elsewhere within the ALD **100** or be external to the ALD **100**. The sampling repository **500** contains all power consumption data for devices located at a device or service point **20** or within a utility and/or any market participant associated with the electric power grid. Power consumption data may include, but is not limited to: current reading, energy/power used or consumed, energy/power saved, drift or drift rate, power time, user settings for maximum environmental variances, time periods (e.g., hours of the day, days of the week, and calendar days). Taken collectively, this data is used to show how devices behaved during normal operation as well as during control events in which power is temporarily interrupted or reduced to one or more devices. The data may be obtained via passive sampling (e.g., regular monitoring of devices at a particular service point **20** by the active load client **300**

associated with the service point **20**) and/or active sampling (e.g., direct polling of the devices for the data by the active load client **300** or the ALD **100**). As discussed below, the sampling repository **500** is used by the ALD **100** or other components of the ALMS **10** to estimate or project power consumption behavior of the devices and to determine projected power/energy savings resulting from a control event. The projected power savings may be determined using the power savings application **120** based upon the power consumption data in the repository **500**.

FIG. **6** is an exemplary screen shot displayed to a user (e.g., customer) during execution of a customer personal settings application **138**. The illustrated screen shot shows a screen being used to set the customer preferences for an environmentally-dependent device, such as an HVAC unit **50**, a humidifier, or a pool heater. The illustrated screen shot may be provided to the customer in one embodiment via an Internet-accessible web portal **98** (referred to herein as the "customer dashboard") when such portal is accessed by the customer via a computer, smart phone, or other comparable device. As shown in FIG. **3**, the customer dashboard **98** may be connected to the ALD **100** via an Internet service provider for the service point **20** or may be implemented as a customer Internet application **92** when Internet service is supplied through the active load client **300** as described in U.S. Patent Application Publication No. US 2009/0063228 A1. The customer dashboard **98** effectively provides the customer with access into the ALD **100**. The ALD's web browser interface **114** accepts inputs from the customer dashboard **98** and outputs information to the customer dashboard **98** for display to the customer. The customer dashboard **98** may be accessed from the service point **20** or remotely from any Internet-accessible device, preferably through use of a user name and password. Thus, the customer dashboard **98** is preferably a secure, web-based interface used by customers to specify preferences associated with devices controlled by the ALD **100** and located at the customer's service point **20**, as well as to provide information requested by the customer personal settings application **138** or the customer sign-up application **116** in connection with controlled devices and/or service point conditions or parameters. Customer preferences may include, for example, control event preferences (e.g., times, durations, etc.), bill management preferences (e.g., goal or target for maximum monthly billing cost), maximum and minimum boundary settings for environmental characteristics, and others.

FIG. **7** is another exemplary screen shot displayed to a customer via the customer dashboard **98** during execution of a different portion of the customer personal settings application **138**. FIG. **7** shows how customer preferences could be set for an environmentally-independent device, such as a hot water heater **40**, a pool pump **70**, or a sprinkler system water pump (which may also be an environmentally-dependent device if it includes, for example, a rainfall sensor). Using the web browser interface **114**, customers interact with the ALD **100** and specify customer personal settings **138** that are recorded by the ALD **100** and stored in the ALD database **124** or other repository **500**. The personal settings **138** may specify time periods during which load control events are permitted, time periods during which load control events are prohibited, maximum allowable variances for an operating environment at a particular service point **20** (e.g., maximum and minimum temperature and/or humidity), normal operating conditions of devices at different times of day, and other personal preferences related to operation of



devices under the control of the ALD **100** through the active load client **300** at the service point **20**.

As alluded to above, the present invention optionally tracks and takes into account the "drift" of an environmentally-dependent device. Drift occurs when the environmental characteristic(s) (e.g., temperature) monitored by an environmentally-dependent device begins to deviate (e.g., heat up or cool down) from a set point that is to be maintained by the environmentally-dependent device. Such deviation or drift may occur both normally and during control events. Thus, drift is the time it takes for the monitored environmental characteristic to move from a set point to an upper or lower comfort boundary when power, or at least substantial power, is not being consumed by the device. In other words, drift is a rate of change of the monitored environmental characteristic from a set point without use of significant power (e.g., without powering an HVAC unit compressor, but while continuing to power an associated digital thermostat and HVAC unit control system). One of ordinary skill in the art will readily appreciate that devices, such as HVAC units **50**, which control one or more environmental characteristics at a service point **20**, are also influenced or affected by the environment at the service point **20** because their activation or deactivation is based on one or more sensed environmental characteristics at the service point **20**. For example, an HVAC unit **50** in cooling mode that attempts to maintain an inside temperature of 77 .degree. F. activates when the inside temperature is some temperature greater than 77 .degree. F. and, therefore, is influenced or affected by the environment in which the HVAC unit **50** operates.

The inverse of drift is "power time," which is the time it takes for the sensed environmental characteristic to move from a comfort boundary to a set point when significant or substantial power is being supplied to the environmentally-dependent device. In other words, "power time" is a rate of change of the monitored environmental characteristic from a comfort boundary to a set point with significant use of power. Alternatively, "drift" may be considered the time required for the monitored environmental characteristic to move to an unacceptable level after power is generally turned off to an environmentally-dependent device. By contrast, "power time" is the time required for the monitored environmental characteristic to move from an unacceptable level to a target level after power has been generally supplied or re-supplied to the environmentally-dependent device.

The power consumption data for an environmentally-dependent device, which may be gathered actively or passively as described above, may be used to empirically determine the drift and power time (rate of change, temperature slope, or other dynamic equation (f{x})) that defines an environmental characteristic's variation at a service point **20**, or at least within the operating area of the environmentally-dependent device, so as to permit the determination of a uniquely derived "fingerprint" or power usage/consumption pattern or behavior for the service point **20** or the environmentally-dependent device.

Customers define the upper and lower boundaries of comfort by inputting customer preferences **138** through the web browser interface **114**, with the set point optionally being in the middle of those boundaries. During normal operation, an environmentally-dependent device will attempt to keep the applicable environmental characteristic or characteristics near the device's set point or set points. However, all devices, whether environmentally-dependent or environmentally-independent, have a duty cycle that specifies when the device is in operation because many

devices are not continuously in operation. For an environmentally-dependent device, the duty cycle ends when the environmental characteristic(s) being controlled reaches the set point (or within a given tolerance or variance of the set point). After the set point has been reached, the environmentally-dependent device is generally turned off and the environmental characteristic is allowed to "drift" (e.g., upward or downward) toward a comfort boundary. Once the environmental characteristic (e.g., temperature) reaches the boundary, the environmentally-dependent device is generally activated or powered on again until the environmental characteristic reaches the set point, which ends the duty cycle and the power time.

Drift may also occur during a control event. A control event is an action that temporarily reduces, terminates, or otherwise interrupts the supply of power to a device. During a control event, the environmental characteristic (e.g., temperature) monitored and/or controlled by an environmentally-dependent device will drift toward a comfort boundary (e.g., upper or lower) until the environmental characteristic reaches that boundary. Once the environmental characteristic reaches the boundary, the ALMS **10** generally returns or increases power to the device to enable the environmental characteristic to reach the set point again.

For example, an HVAC unit **50** may have a set point of 72 .degree. F. and minimum and maximum comfort boundary temperatures of 68 .degree. F. and 76 .degree. F., respectively. On a cold day, a control event may interrupt power to the HVAC unit **50** causing the monitored temperature within the service point **20** to move toward the minimum comfort boundary temperature. Once the monitored temperature inside the service point **20** reaches the minimum comfort boundary temperature, the control event would end, and power would be restored or increased to the HVAC unit **50**, thus causing the monitored temperature to rise toward the set point. A similar, but opposite effect, may take place on a warm day. In this example, "drift" is the rate of change with respect to the time it takes the HVAC unit **50** to move from the set point to either the upper or lower comfort bounds. Analogously, "power time" is the rate of change with respect to the time required for the HVAC unit **50** to move the monitored temperature from the upper or lower comfort bounds to the set point. In one embodiment of the present invention, drift and power time are calculated and recorded for each environmentally-dependent or environmentally-independent device or for each service point **20**.

In another embodiment, drift and other measurement data available from the ALD database **124** are used to create a power consumption behavior or pattern for each environmentally-dependent or environmentally-independent device or for each service point **20**. The other measurement data may include vacancy times, sleep times, times in which control events are permitted, and/or other variability factors.

The environment within an energy-efficient structure will have a tendency to exhibit a lower rate of drift. Therefore, environmentally-dependent devices operating within such structures may be subject to control events for longer periods of time because the amount of time taken for the monitored environmental characteristic to reach a comfort boundary due to drift after being set to a set point is longer than for less efficient structures.

In another embodiment, the ALD **100** may identify service points **20** that have an optimum drift for power savings. The power savings application **120** calculates drift for each service point **20** and/or for each environmentally-dependent device at the service point **20**, and saves the drift information in the ALD database **124** as part of power consumption data



for the device and/or the service point **20**. Thus, power saved as a result of drift during a control event increases overall power saved by the environmentally-dependent device at the service point **20**.

FIG. **8** illustrates an exemplary operational flow diagram **800** providing steps executed by the ALD **100** to empirically analyze power usage of devices and populate a repository **500** with data samples resulting from such power usage analysis, in accordance with one embodiment of the present invention. The steps in FIG. **8** may be considered to implement a passive sampling algorithm. The steps of FIG. **8** are preferably implemented as a set of computer instructions (software) stored in memory (not shown) of the ALD **100** and executed by one or more processors **160** of the ALD **100**.

According to the logic flow, the active load client **300** polls devices within the service point **20**, such as a washer/dryer **30**, hot water heater **40**, HVAC unit **50**, smart appliance **60**, pool pump **70**, or other devices within the service point **20**, and obtains current readings. Upon receiving the current reading data from the active load client **300**, the ALC interface **112** sends the data to the ALC manager **108**. The ALC manager **108** stores the data to the sampling repository **500**, which may be implemented in the ALD database **124** using the operational flow illustrated in FIG. **8**.

The following information may be provided as parameters to the operational flow of FIG. **8**: an identification (ID) of the device, temperature mode (either "heating" or "cooling"), duty cycle, current temperature read by the device, and previous temperature read by the device. Each temperature reading includes a device ID, a set point (which is only useful for environmentally-dependent devices), and variability factor measurement data (as described previously).

Initially, the ALD **100** determines (**802**) whether the device used any, or at least any appreciable amount of, energy. If not, then the logic flow ends. Otherwise, the ALD **100** determines (**804**) the time duration of the data sample, the time duration when the device was on, and the time duration when the device was off based on the data sample. Next, the ALD **100** determines (**806**) whether the received data comes from an environmentally-dependent device or an environmentally-independent (e.g., binary state) device. If the received data comes from an environmentally-dependent device, then the ALD **100** determines (**808**) the energy used per minute for the device, and determines (**810**) whether the device is drifting or powering. The ALD **100** determines that the device is drifting if the environmental characteristic monitored by the device is changing in a manner opposite the mode of the device (e.g., the room temperature is rising when the device is set in cooling mode or the room temperature is decreasing when the device is set in heating mode). Otherwise, the device is not drifting.

If the device is drifting, then the ALD **100** determines (**814**) the drift rate (e.g., degrees per minute). On the other hand, if the device is not drifting, then the ALD **100** determines (**812**) the power time rate. Once either the drift rate or the power time rate has been calculated, the ALD **100** determines (**880**) whether there is already a record in the sampling repository **500** for the device being measured under the present operating conditions of the device (e.g., set point and other variability factors (e.g., outside temperature)). If there is no existing record, then the ALD **100** creates (**882**) a new record using, for example, the device's ID, time of record, current set point, current outside temperature, energy used per minute, power time rate, and drift rate (assuming that either a power time rate or a drift rate has been determined). However, if there is an existing record,

then the ALD **100** updates (**884**) the existing record by averaging the new data (including energy usage, drift rate, and power time rate) with the existing data and storing the result in the repository **500**.

If the ALD **100** determines (**806**) that the received data comes from an environmentally-independent device, then the ALD **100** determines (**842**) the energy used per minute for the device and further determines (**844**) the energy saved per minute for the device. The ALD **100** then searches the repository **500** (e.g., ALD database (**124**)) to determine (**890**) whether there is already a record for the device for the applicable time period. If there is no existing record, then the ALD **100** creates (**892**) a new record using the device's ID, time of record, current time block, energy used per minute, and energy saved per minute. However, if there is an existing record, then the ALD **100** updates (**894**) the existing record by averaging the new data (including energy usage and energy savings) for the time block with the existing data for the time block and stores the result in the repository **500**. For environmentally-independent devices, energy usage and energy savings are saved with respect to a block or period of time.

FIG. **9** illustrates an exemplary operational flow diagram **900** providing steps executed by the ALD **100** to project or estimate the energy usage expected of a device during a future time period in a given environment setting, in accordance with one embodiment of the present invention. The steps of FIG. **9** are preferably implemented as a set of computer instructions (software) stored in memory (not shown) of the ALD **100** and executed by one or more processors **160** of the ALD **100**. In accordance with one embodiment, the operational flow of FIG. **9** may be executed by the power savings application **120** of the ALD **100** when a utility operator, or other operator of the ALD **100**, wants to project the energy usage for a device over a specified time period in the future, such as during a period of time in which a control event is to occur.

The following information may be provided as parameters to the operational flow of FIG. **9**: the device ID, the start time of the future time period, the end time of the future time period, the manage mode of the device, and, for an environmentally-independent device, a binary control factor. The manage mode is either "control" or "normal" to indicate whether the device is being measured during a control event or during normal operation, respectively. The binary control factor is preferably utilized for environmentally-independent devices and represents the duty cycle of the device. For example, if a water heater **40** runs at 20% duty cycle, the binary control factor is 0.2.

Initially, the ALD **100** (e.g., power savings application **120**) determines (**902**) a future time period based on the start and stop times. The future time period may be set by the utility implementing the load control procedure of the present invention or a second utility that has requested delivery of operating reserve power from the utility implementing the load control procedure of the present invention. After the time period at issue is known, the power savings application **120** begins the procedure for projecting or estimating the amount of power that can be saved as the result of execution of a control event during the future time period. Accordingly, the power savings application **120** analyzes the devices to be controlled during the control event. Thus, the power savings application **120** determines (**904**) whether the devices include both environmentally-dependent and environmentally-independent (e.g., binary state) devices. For each environmentally-dependent device, the power savings application **120** determines (**920**) whether the device is in environment controlling (e.g., heating or cooling) mode. Next, the power savings application **120** retrieves (**922**) the anticipated set points for the device during the future time period of the control event and obtains (**924**) information regarding the outside environmental characteristic(s) (e.g., the outside temperatures) expected during the control event time period. The power savings application **120** then makes projections (**926**) about the device's expected power consumption behavior during the future time period. In one embodiment, the projection determination of block **926** is implemented using a best match algorithm, as described in detail below with respect to FIG. **10**, to find stored repository records that best match the behavior of the device for each combination of set points, outside environmental characteristics (e.g., temperatures), and time periods, as measured and stored using the logic flow of FIG. **8**. The power consumption behavior of the device is used to determine the amount of energy that would be expected to be used by the device if the control event did not occur and, thus, the amount of energy estimated or expected to be saved per unit time during the control event. The power savings application **120** multiplies (**928**) the saved power per unit time by the time duration of the future control event to determine the total amount of energy projected to be used by the device in the absence of the control event. The power savings application returns (**980**) the total projected amount of energy used by the device in the absence of the proposed control event.

However, if the power savings application **120** determines (**904**) that the proposed control event is to affect an environmentally-independent device, then the power savings application **120** determines (**960**) whether the device is currently scheduled to be on or off during the proposed time period of the control event. Next, the power savings application **120** creates, obtains, or otherwise determines (**962**) a list of time blocks for the specified control event time period. The power savings application **120** then makes projections (**964**) about the device's power consumption behavior during the future, control event time period. In one embodiment, the projection determination of block **964** is implemented using a best match algorithm, as described in detail below with respect to FIG. **10**, to find stored repository records that best match the behavior of the device for each combination of set points, outside environmental characteristics (e.g., temperatures), and time periods, as measured and stored using the logic flow of FIG. **8**. The power consumption behavior of the device is used to determine the amount of energy that would be expected to be used by the device if the control event did not occur and, thus, the amount of energy estimated or expected to be saved per unit time during the control event. Next, the power savings application **120** multiplies (**968**) the saved power per unit time by the time duration of the future control event to determine the total amount of energy projected to be used in the absence of the control event. If the projected energy savings is based on power consumption during a previous control event (**970**), then the power savings application **120** multiplies (**972**) the total amount of energy times the binary control factor to determine the amount of energy projected to be used by the device in the absence of the control event. The power savings application returns (**980**) the total projected amount of energy used by the device in the absence of the proposed control event.

One or ordinary skill in the art will readily recognize and appreciate that the operational flow of FIG. **9** may be used for each controlled device at a service point, for the controlled devices at multiple service points, or for all the controlled devices at all the service points supplied or

supported by a utility. The total projected energy usage by the devices may be aggregated across a single service point, for all service points within a group, and/or for all groups served by the utility.

FIG. **10** illustrates an exemplary operational flow diagram **1000** providing steps executed by the ALD **100** for estimating power consumption behavior of a device in accordance with an exemplary embodiment of the present invention. The algorithm or operational flow illustrated in FIG. **10** provides one embodiment for implementing steps **926** and **964** of FIG. **9**. The operational flow of FIG. **10** determines which record or records in the sampling repository **500** provides the closest match to a given environment or operational setting for use in projecting device energy usage/savings during a time period of a future control event, in accordance with one embodiment of the present invention. The steps of FIG. **10** are preferably implemented as a set of computer instructions (software) stored in memory (not shown) of the ALD **100** and executed by one or more processors **160** of the ALD **100**. The operational flow of FIG. **10** may be initiated by the ALD **100** when trying to identify or determine the sampling repository record or records that best match the power consumption behavior of a device in a specific setting.

In one embodiment, the operational flow of FIG. **10** is called during execution of the operational flow of FIG. **9** as noted above. When so called, the operational flow of FIG. **9** provides the operational flow of FIG. **10** with parameters that indicate the type of records to be searched. These parameters include, but are not limited to: a device ID, a duty mode (either on or off), a time period (e.g., corresponding to the time period of the proposed future control event), a set point delta, a delta or variance related to one or more environmental characteristics (e.g., outside temperature), and a time block delta. Duty mode signifies the duty cycle of the device. If the duty mode is TRUE or ON, significant power is being consumed. If the duty mode is FALSE or OFF, significant power is not being consumed (i.e., power is being saved). Duty cycle exists for switch-controlled, binary state, or environmentally-independent devices which go ON and OFF irrespective of the influence or affect of environment. For HVAC devices **50**, duty mode is always ON. Set point delta is the amount a set point may be varied during a search in order to find a matching repository record. Outside temperature/environmental characteristic delta is the number of temperature degrees or other change in environmental characteristics over which data relating to the outside temperature or other environmental characteristics may be varied during a search in order to find a matching repository record. Time block delta is the amount of time a time block may be varied during a search in order to find a matching repository record.

Initially, the ALD **100** determines (**1002**) whether the requested repository search relates to an environmentally-dependent device or an environmentally-independent device. If the search relates to an environmentally-dependent device, then the ALD **100** attempts to find (**1004**) power consumption records in the sampling repository **500** that match the device ID, duty mode, environmental characteristic (e.g., temperature) set point, and associated outside environmental characteristic data. Power consumption records include power consumption data, such as power consumed, current drawn, duty cycle, operating voltage, operating impedance, time period of use, set points, ambient and outside temperatures during use (as applicable), and/or various other energy use data. If a record exists that matches all the power consumption search criteria, such record would be considered the record that most closely matches the given environment setting. If no exact match is found (**1010**), then the ALD **100** begins looking for records that slightly differ from the given environment setting. In one embodiment, the ALD **100** incrementally increases or decreases (**1012**) the environment-related search criteria (e.g., temperature set point and/or outside/ambient temperature) using the set point delta and the outside temperature/environmental characteristic delta as a guide to look for relevant records. Such incremental/iterative modification of the search criteria continues until either relevant records are found or some applicable limit (e.g., as indicated by the set point delta and/or other parameter deltas) is reached.

If the ALD **100** determines (**1002**) that the search relates to an environmentally-independent device, then the ALD **100** attempts to find (**1040**) power consumption records in the sampling repository **500** that match the device ID, duty mode, and time of operation (corresponding to the expected, future time of the control event). If a record is not found that matches all the search criteria (**1070**), then the ALD **100** modifies its search to look for records that slightly differ from the given environment setting. In one embodiment, the ALD **100** modifies its search by incrementally increasing or decreasing (**1072**) the time of operation for a given duty mode. The iterative searching continues until either relevant records are found or some applicable limit (e.g., as indicated by the time block delta or other parameter deltas) is reached. Any records that were found as a result of the search are provided (**1060**) to the requesting program (e.g., the operational flow of FIG. **9**). The result of the operational flow of FIG. **10** is a set of one or more power consumption records from the sampling repository **500** that are the closest match to the given environment or proposed control event setting.

FIG. **11** illustrates an exemplary operational flow diagram **1100** providing steps executed by the ALD **100** to project energy savings through power interruption or reduction to a device during a control event, in accordance with one embodiment of the present invention. The steps of FIG. **11** are preferably implemented as a set of computer instructions (software) stored in memory (not shown) of the ALD **100** and executed by one or more processors **160** of the ALD **100**. As with the operational flow of FIG. **9**, the operational flow of FIG. **11** may be executed by the power savings application **120** when an operator of the utility or of the ALD **100** wants to project the energy savings for a device over a specified time period during operation of a control event.

The following information may be provided as parameters to the operational flow of FIG. **11**: a device ID, a start time of the control event, an end time of the control event, and a binary control factor, as described above in connection with FIG. **9**. Initially, the ALD **100** (e.g., power savings application **120**) projects (**1102**) the energy usage/power consumption for the device during normal operation within the expected time period of the control event using, for example, the operational flow of FIG. **9**. Next, the power savings application **120** projects (**1104**) the power consumption for the device during the control event using, for example, the operational flow of FIG. **9**. For example, depending on the duty cycle, set points, drift or drift rate, power time, and other parameters for the device, the device may be projected to be on and consuming power for some amount of time during the time period of the control event. Thus, both the expected amount of power consumed during normal operation (i.e., in the absence of any control event) and the expected amount of power consumed during the control event are determined to accurately assess any possible power savings as a result of the control event. After the two

projected power consumption values have been determined, the power savings application **120** calculates (**1106**) the difference between the two values, which is the projected power consumption for the device during the control event time period. Because the projected power consumption will not be realized during the control event, such power consumption corresponds directly to an amount of energy saved during the control event. The power savings application **120** returns (**1108**) the projected energy savings value. One of ordinary skill in the art will readily recognize and appreciate that the power savings application **120** may aggregate the projected power savings for all controlled devices at a service point **20**, for all controlled devices at service points within a group, or for controlled devices within all service point groups served by the utility to obtain an aggregate amount of power savings as a result of a control event.

Another context in which the ALMS **10** may be utilized is in conjunction with other renewable energy sources. A number of renewable energy sources, such as wind power and solar power, are variable in nature. That is, such energy sources do not generate power at a constant rate. For example, wind increases or decreases from moment to moment. Wind turbines can generate a large amount of power due to large winds or can stop generating completely due to lack of any wind. Solar panels may be able to generate a great deal of power on very sunny days, a little power on cloudy days, and virtually no power at night.

As a result, power utilities that make use of renewable energy must compensate for the under-generation or over-generation of power from those sources. When renewable energy sources are under-generating, the ALMS **10** may utilize the processes disclosed above to provide additional operating reserve to compensate for the lack of power generation by the renewable energy source and for the effects resulting therefrom, including output frequency instability. For example, a utility utilizing wind or solar energy sources may further incorporate the ALMS **10** into the utility distribution system to provide regulating reserve during time periods of under-generation.

FIG. **12** is a graph that depicts the "load profile" of a utility over a predetermined time period, showing actual energy usage as well as projected energy usage determined with and without a control event in accordance with an exemplary embodiment of the present invention. The load profile graph depicts the following:

a. Baseline power consumption **1202**. This is the total possible load of, or power consumed by, all controlled devices over a specified period of time.

b. Projected interruptible load usage **1204** (i.e., projected load or energy usage with a control event) for all controlled devices at all service points (or at selected service points) served by the utility in the absence of a control event. The projected interruptible load usage may be determined in one embodiment through execution of the operational flow of FIG. **9**. The projected interruptible load available **1204** indicates the load for all controlled devices if they are controlled 100% of the time using customer preferences.

c. Projected interruptible load available **1206** (i.e., projected energy used when no control events are used) for all controlled devices at all service points (or at selected service points) served by the utility during a control event. The projected interruptible load usage may be determined in one embodiment through execution of the operational flow of FIG. **11**.

d. Actual interruptible load usage **1208** for all controlled devices at all service points (or at selected service points) served by the utility. The actual interruptible load usage **1208** is the power that is currently being used by all controlled devices. This type of load profile graph may be generated for all controlled devices at a service point **20**, for controlled devices at all service points within a group, or for controlled devices at all groups served by the utility.

In the load profile graph of FIG. **12**, the capacity under contract is shown as a straight double line at the top of the graph and indicates the baseline power consumption **1202**. The baseline power consumption **1202** represents the total amount of power that the utility is obligated to provide. The actual interruptible load usage **1208** is the actual energy usage of all devices controlled by the utility. The projected interruptible load usage **1204** at the bottom of the load profile graph is the projected energy used when control events are used, and the projected interruptible load available **1206** is the projected energy usage when control events are not used. The difference between the projected interruptible load usage **1204** and the projected interruptible load available **1206** is the capacity that may be used for operating reserve, including regulating reserve, spinning reserve, and non-spinning reserve.

Normally, when a utility observes energy demand that is near its peak capacity, it will attempt to initiate control events for customers who voluntarily participate in power saving programs (i.e., flexible load-shape programs, as described earlier). Typically, these control events will provide sufficient capacity to prevent the utility from using non-spinning reserve. However, there are situations in which a sufficient number of customers may have manually decided to opt out of power saving programs and, as a result, the utility would be unable to recover enough energy to meet its spinning reserve needs from its remaining customers who voluntarily participate in the program. Such a situation could happen, for instance, on a very hot day when many people are home, such as on a holiday or a day over the weekend. In such a case, the utility would still be in danger of using non-spinning reserve or even running out of reserve capacity altogether. In such a situation, the utility would be in a "critical control" mode. In critical control mode, the utility may override all customer preferences, including both those who voluntarily participate in power saving programs and those who do not. During periods of critical control, the utility may utilize the ALD **100** to adjust settings of environmentally-dependent devices to settings outside of normal comfort preferences (but not life-threatening). Invoking critical control enables a utility to return power demand to acceptable levels.

Use of the ALMS **10** may help a utility mitigate the likelihood of critical control situations. For example, whenever a customer overrides or opts out of a control event, the ALMS **10**, using the techniques disclosed herein, finds additional customers who may be the target of a voluntary control event. Analogously, when controlled devices that are participating in a control event are required to exit the control event due to customer preferences (e.g., the amount of time that the customer's devices may participate in a control event), the ALD **100** may release such devices from the control event and replace them with other voluntarily controlled devices. The replacement devices would then preferably supply, through deferment, at least the same amount of reserve power as was being sourced by the devices that were released from the control event. Thus, the system **10** of the present invention increases the likelihood that a utility will be able to spread control events to other customers before invoking critical control.

In a further embodiment, the entire ALMS **10** described in FIG. **3** may also be implemented in a proprietary network

that is IP-based, real-time, temperature-derived, verifiable, interactive, two-way, and responsive to Automatic Generation Control (AGC) commands to produce operating reserve power through implementation of control events.

In an additional embodiment of the present invention, the sampling data stored in the repository **500** using the operational flow of FIG. **5** could also include other factors (called "variability factors") related to power consumption, such as day of the week, humidity, amount of sunshine, or number of people in the household. This additional data would allow the projected energy usage and projected energy savings to be more accurate based on these additional factors. To make use of this data, the ALD **100** may obtain the additional data from sources within and/or external to the ALMS **10**, such as weather databases, live weather feeds from sources such as National Weather Reporting stations, outdoor sensors **94**, or any weather related input device commercially available on a real time or predictive basis, calendars, and voluntary customer feedback. Some of the variability factor measurements are available from public sources, while others are available via private sources.

In another alternative embodiment of the present invention, transmission line loss may be included in the projected energy savings determination of FIG. **11**. As those of ordinary skill in the art will recognize and appreciate, the amount of power supplied by a utility to source a device remote from the utility equals the amount of power required by the device plus the amount of power lost in the transmission lines between the utility's power generation plant and the location of the device. Thus, the projected energy savings resulting from a control event may be determined by determining an amount of power expected to be consumed by the controlled device or devices at a service point, at multiple service points or throughout the entire service area of the utility during the time period of the control event absent occurrence of the control event to produce first energy savings, determining an amount of power that is not expected to be dissipated in transmission lines as a result of not delivering power to the controlled device or devices during the control event to produce second energy savings, and summing the first energy savings and the second energy savings.

In a further embodiment of the present invention, the operating reserve (e.g., spinning reserve or regulating reserve) determined by a utility using the techniques disclosed above can be sold to a requesting utility **1306**, as illustrated in FIG. **13**, which is essentially a replication of FIG. 9 of U.S. Patent Application Publication No. US 2009/0063228 A1, which is incorporated herein by reference in its entirety. As explained in U.S. Patent Application Publication No. US 2009/0063228 A1, the saved power may then be distributed to the requesting utility **1306** after commencement of the control event (e.g., during and/or after completion of the control event) conducted by the selling utility. The selling utility may be a virtual utility **1302** or a serving utility **1304** as illustrated in FIG. **13** and described in detail in U.S. Patent Application Publication No. US 2009/0063228 A1, which is incorporated herein by reference in its entirety. Alternatively, a third party may serve as a managing entity to manage operation of the ALMS **10** and the resultant distribution of operating reserve to a requesting utility **1306** subsequent to commencement of a control event.

In yet another embodiment, the ALD **100** for a utility may determine projected energy savings for each service point **20** served by the utility in accordance with the operational flow of FIG. **11** and aggregate the projected energy savings across all service points served by the utility to obtain the total projected energy savings from which operating reserve may be determined as described above.

In a further embodiment, instead of or in addition to using the operational flow of FIG. **10** in an attempt to find a best match data point in the repository **500** for use in estimating power consumption behavior of a device when the time period of the control event does not correspond to a time period in the repository **500**, the ALD **100** may determine whether the repository **500** includes power consumption data for the device during time periods before and after the expected time period of the control event and, if so, interpolate a value corresponding to an amount of power expected to be consumed by the device during the time period of the control event based on the power consumption data for the device during the time periods before and after the expected time period of the control event. However, more preferably, the power supply value (PSV) associated with each of the at least one power consuming device(s) is used to determine or generate the power consumption behavior and commercial value for the response to the control event associated with the power consuming device(s).

The present invention provides systems and methods that receive electric power from an electric power grid, the systems and methods including: at least one power consuming device that requires electric power to operate; at least one controllable device operably coupled to the at least one power consuming device, the at least one controllable device operable to control a flow of grid-supplied electric power to the at least one power consuming device responsive to power control instructions, wherein each of the at least one power consuming devices has a corresponding power supply value (PSV); a backup power subsystem operably coupled to the at least one power consuming device, the backup power subsystem operable to automatically supply electric power to the at least one power consuming device when a flow of grid-supplied electric power to the at least one power consuming device drops below a threshold; and a client device operable to receive power control messages from a remote system control component and provide power control instructions to the at least one controllable device responsive to the power control messages, wherein a first received power control message instructs the client device to disable a flow of grid-supplied electric power to the at least one power consuming device, and wherein a first power control instruction instructs the at least one controllable device to disable the flow of grid-supplied electric power to the at least one power consuming device and causing activation of the backup power subsystem.

Also, systems and methods for a client device at a base transceiver site to control a flow of electric power from an electric power grid to a collocated base transceiver system so as to provide operating reserve for to the electric power grid, the base transceiver system including at least one base transceiver unit operable to provide wireless communication capability, a controllable device operable to control a flow of grid-supplied electric power to the at least one base transceiver unit, and a backup power subsystem operable to supply electric power to the at least one base transceiver unit when a flow of grid-supplied electric power to the at least one base transceiver unit drops below a threshold, the method including the steps of: receiving power control messages from a remote system control component, at least a first received power control message instructing the client device to disable a flow of grid-supplied electric power to the at least one base transceiver unit; and providing a first

power control instruction to the at least one controllable device responsive to the first received power control message, the first power control instruction instructing the at least one controllable device to disable a flow of grid-supplied electric power to the at least one base transceiver unit, thereby causing activation of the backup power subsystem, wherein an amount of grid-supplied electric power saved as a result of disabling a flow of grid-supplied electric power to the at least one base transceiver unit provides operating reserve for the electric power grid.

Also, in another embodiment, method for a client device located at an electrical service point to control a flow of electric power from an electric power grid to the service point so as to provide operating reserve to the electric power grid, the service point including at least one power consuming device operable to consume electric power, at least one controllable device operable to control a flow of grid-supplied electric power to the at least one power consuming device, and a backup power subsystem operable to supply electric power to the at least one power consuming device when a flow of grid-supplied electric power to the at least one power consuming device is reduced below a threshold, the method including the steps of: receiving power control messages from a remote system control component, at least a first power control message instructing the client device to disable a flow of grid-supplied electric power to the at least one power consuming device; and providing a first power control instruction to the at least one controllable device responsive to the first power control message, the first power control instruction instructing the at least one controllable device to disable a flow of grid-supplied electric power to the at least one power consuming device, thereby causing activation of the backup power subsystem, wherein an amount of grid-supplied electric power saved as a result of disabling a flow of grid-supplied electric power to the at least one power consuming device provides operating reserve for the electric power grid based upon a power supply value (PSV) associated with each of the at least one power consuming device(s).

In yet another embodiment, a requesting utility may utilize a method for acquiring operating reserve power from a sourcing utility. According to this embodiment, the requesting utility requests operating reserve power from the sourcing utility sufficiently in advance of a transfer time at which the operating reserve power will be needed so as to facilitate measurable and verifiable load-controlled generation of the operating reserve power. The load-controlled generation of the operating reserve power results from a determination of operating reserve as detailed above with respect to FIGS. **7-12**. The requesting utility receives an acknowledgment from the sourcing utility indicating that the sourcing utility will supply the operating reserve power at the transfer time. Then, at the transfer time and for a time period thereafter, the requesting utility receives at least some of the operating reserve power from the sourcing utility.

In a further embodiment, the operating reserve determination techniques may be utilized by a virtual utility **1302** as disclosed in U.S. Patent Application Publication No. US 2009/0063228 A1, which is incorporated herein by reference in its entirety. For example, the virtual utility **1302** may be operable to at least offer energy to one or more requesting utilities **1306** for use as operating reserve for the requesting utilities **1306**. In such a case, the virtual utility **1302** may include, among other things, a repository **500** and a processor **160** (e.g., within an ALD **100**). In this embodiment, the processor **160** is operable to remotely determine, during at least one period of time, power consumed by at least one device to produce power consumption data. The processor **160** is further operable to store the power consumption data in the repository **500** and, at the appropriate time, determine an expected, future time period for a control event during which power is to be reduced to the device or devices. The processor **160** is also operable to estimate, prior to commencement of the control event, power consumption behavior expected of the device or devices during the time period of the control event based at least on the stored power consumption data. The processor **160** is further operable to determine, prior to commencement of the control event, projected energy savings resulting from the control event based at least on the estimated power consumption behavior of the device or devices. Still further, the processor **160** is operable to determine, prior to commencement of the control event, operating reserve based on the projected energy savings. After determination of the operating reserve, the processor **160** is operable to communicate an offer to supply the operating reserve to a requesting utility **1306** or utilities.



As described above, the present invention encompasses a system and method for determining operating reserve capacity using an ALD or comparable device, software, or combination thereof so that the operating reserve capacity may be made available to the power utility that generated the operating reserve through load control or to the power market generally (e.g., via the FERC grid). When a utility requires power beyond its native load, the utility must make use of its operating reserve or acquire the additional power via the FERC grid from other utilities. As discussed above, one type of operating reserve is spinning reserve. Spinning reserve is additional generating capacity that is already connected to the power system and, thus, is almost immediately available. In accordance with one embodiment of the present invention, the ALD makes spinning reserve available to a utility. Thus, through use of the ALD, a utility (power generating utility or a virtual utility) can determine or project spinning reserve or other operating reserve that is available through interruptible power savings at service points. The spinning reserve is measurable and verifiable, and can be projected for a number of days in advance, and such projections can be sold to other utilities on the open market.

As disclosed above, the ALD **100** may be considered to implement a type of flexible load-shape program. However, in contrast to conventional load control programs, the load-shape program implemented by the ALD **100** projects an amount of operating reserve resulting from selective control of devices (loads) based on known, real-time customer preferences. In addition, due to its communication and control mechanisms, the ALD **100** can project power savings, as well as operating reserve (e.g., regulating, spinning and/or non-spinning reserve) that is active, real-time, verifiable, and measurable so as to comply with protocols and treaties established for the determination of carbon credits and offsets, as well as renewable energy credits. The information acquired by the ALD **100** is not simply samples of customer preferences and data, but actual power consumption information.

In yet another embodiment, the at least one power consuming device is at least one of a data center, a mobile switching center, and a central telephone office switch.

In a further embodiment, the backup power subsystem is at least one of a battery backup system, a backup generator system, a backup solar power system, and a backup hydrogen fuel cell system.

In the foregoing specification, the present invention has been described with reference to specific embodiments.

However, one of ordinary skill in the art will appreciate that various modifications and changes may be made without departing from the spirit and scope of the present invention as set forth in the appended exemplary claims. For example, the passive sampling algorithm of FIG. **8**, the projected energy usage algorithm of FIG. **9**, the best sampling match algorithm of FIG. **10**, and the projected energy savings algorithm of FIG. **11** may be performed by one or more equivalent means. Accordingly, the specification and drawings are to be regarded in an illustrative rather than a restrictive sense, and all such modifications are intended to be included within the scope of the present invention.

Benefits, other advantages, and solutions to problems have been described above with regard to specific embodiments of the present invention. However, the benefits, advantages, solutions to problems, and any element(s) that may cause or result in such benefits, advantages, or solutions to become more pronounced are not to be construed as a critical, required, or essential feature or element of any or all the claims. The invention is defined solely by the appended claims including any amendments made during the pendency of this application and all equivalents of those claims as issued.

The invention claimed is:

**1**. A system for managing power on an electric power grid, comprising:

at least one power consuming device, at least one controllable device, and at least one client device constructed and configured in network communication;

wherein the at least one controllable device is operably coupled to the at least one power consuming device;

wherein the at least one controllable device is operable to control a power flow from the electric power grid to the at least one power consuming device responsive to power control instructions from the at least one client device;

wherein the at least one power consuming device has an actual value of power reduced based on revenue grade metrology, and confirmed by measurement and verification; and

wherein the actual value of power reduced is a curtailment value as supply equivalence and provides operating reserve for the electric power grid.

**2**. The system of claim **1**, further comprising a remote system control component, and wherein the remote system control component is operable for aggregating the actual value of power reduced and/or to be reduced from each of the at least one power consuming device.

**3**. The system of claim **2**, wherein the remote system control component is utility server.

**4**. The system of claim **1**, wherein the at least one client device is integrated into a smart meter.

**5**. The system of claim **1**, further comprising a backup power subsystem operable to automatically supply electric power to the at least one power consuming device when the power flow from the electric power grid to the at least one power consuming device drops below a threshold.

**6**. The system of claim **5**, wherein the backup power subsystem comprises at least one of a battery backup system, a backup generator system, a backup solar power system, and a backup hydrogen fuel cell system.

**7**. The system of claim **1**, wherein the client device is further operable to communicate with the at least one controllable device and the at least one power consuming device via at least one of Internet Protocol, Bluetooth, Broadband over PowerLine (BPL), ZigBee, High Speed Packet Access (HSPA), Evolution for Data Only (EVDO), Wi-Fi, 4G, Long Term Evolution (LTE) and its derivative standards.



**8**. The system of claim **1**, wherein the at least one client device is further operable to communicate with the at least one controllable device and the at least one power consuming device via at least one of Ethernet solution, wireless or wired communication.

**9**. The system of claim **1**, wherein the at least one power consuming device comprises at least one environmentally-dependent device, wherein the at least one environmentally-dependent device comprises at least one of a washer, a dryer, a hot water heater, a pool pump, and a smart appliance.

**10**. The system of claim **9**, wherein the smart appliance is integrated with a power control module, and wherein the power control module is selected from the group consisting of a smart thermostat, a Heating, ventilation and air conditioning (HVAC) control unit, and a fan control unit.

**11**. The system of claim **1**, wherein the operating reserve is operable to be sold to a utility.

**12**. The system of claim **1**, wherein the system is operable to implement a flexible load-shape program operable to:

project an operating reserve resulting from at least one selective disablement of the power flow from the electric power grid to the at least one power consuming device based on real-time preferences or preferences available within approximately less than 15 minutes of at least one customer; and

project power savings, the power savings being active, real-time, available within approximately less than 15 minutes, verifiable, and/or measurable.

**13**. The system of claim **1**, wherein the actual value of power to be reduced is a power supply value (PSV); wherein the PSV is generated at a control center, a meter, a submeter, a building control system, or any device or controller that measures power within the standard as supplied by regulatory bodies that govern regulation of the electric power grid.

**14**. The system of claim **13**, wherein the PSV is operable to determine a power consumption behavior and/or a commercial value for a response to a control event associated with the at least one power consuming device.

**15**. The system of claim **13**, wherein the PSV is provided in units of monetary equivalent, and wherein the PSV indicates a compensation for providing supply equivalence to the electric power grid.

**16**. The system of claim **1**, wherein the at least one controllable device is operable to:

estimate an expected power consumption of the at least one power consuming device during an expected time period during which the flow of grid-supplied electric power to the at least one power consuming device is to be interrupted or reduced, based on the expected time period and a measured power consumption of the at least one power consuming device during at least one past time period;

determine projected energy savings during the expected time period based on the estimated expected power consumption of the at least one power consuming device; and

determine an operating reserve based on the projected energy savings, wherein the operating reserve is a regulating and/or spinning operating reserve.

**17**. The system of claim **1**, further comprising a repository operable to store a measured power consumption of the at least one power consuming device during at least one past time period.

**18**. A system for managing power for an electric power grid, comprising:

at least one active load client and at least one load controlled by the at least one active load client;

wherein the at least one active load client is operable to receive at least one Internet Protocol (IP)-based power reduction message specifying an amount of electric power to be reduced for the at least one load;

wherein the at least one active load client is further operable to automatically reduce the amount of power supplied to the at least one load in response to the at least one IP-based power reduction message;

wherein an actual value of power reduced and/or to be reduced at each of the at least one load is calculated based on revenue grade metrology, and confirmed by measurement and verification;

wherein the actual value of power reduced and/or to be reduced is a curtailment value as supply equivalence and provides operating reserve for the electric power grid;



wherein the actual value of power reduced and/or to be reduced is provided in units of monetary equivalence indicating a compensation from utilities.

**19**. The system of claim **18**, wherein the at least one active load client is operable to send a load status message to a utility control center, wherein the load status message includes at least one of a real time electric power usage, an actual amount of electric power reduced, and a type of the at least one load for which electric power was reduced.

**20**. The system of claim **18**, wherein the at least one active load client is operable to store data relating to at least one time period during which power reduction is prohibited, wherein the at least one active load client is operable to maintain the amount of power supplied to the at least one load in response to the at least one IP-based power reduction message, and wherein the at least one IP-based power reduction message is received during the at least one time period during which power reduction is prohibited.

* * * * *