**No. 23-1769**

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

**CAUSAM ENTERPRISES, INC.,**
*Appellant,*

v.

**INTERNATIONAL TRADE COMMISSION,**
*Appellee,*

**ECOBEE TECHNOLOGIES ULC, dba ecobee, ITRON, INC., RESIDEO SMART HOMES TECHNOLOGY (TIANJIN), ADEMCO, INC., ALARM.COM HOLDINGS, INC., ALARM.COM INCORPORATED, ENERGYHUB, INC.,**
*Intervenors.*

On Appeal from the United States International Trade Commission,
Investigation No. 337-TA-1277

# NONCONFIDENTIAL RESPONSE BRIEF OF APPELLEE INTERNATIONAL TRADE COMMISSION

DOMINIC L. BIANCHI
General Counsel
Telephone (202) 205-3365

CATHY CHEN
Acting Assistant General Counsel
Telephone (202) 205-2392

PANYIN A. HUGHES
Attorney for Appellee
Office of the General Counsel
U.S. International Trade Commission
500 E Street SW, Suite 707
Washington, DC 20436
Telephone (202) 205-3042

Dated: February 21, 2024

# PATENT CLAIM

**Claim 1 of U.S. Patent No. 10,394,268 (Appx319)**

**1.** A method for managing an electric power flow within an electric power grid, comprising:

a client device receiving a power control message from a load management server, the power control message indicating at least one of an amount of electric power to be reduced and an identification of at least one controllable device to be instructed to disable the electric power flow to at least one associated power consuming device;

the client device issuing a power management command to the at least one controllable device, the power management command causing the at least one controllable device to disable the electric power flow to the at least one associated power consuming device to provide a reduction in consumed power; and

generating measurement and verification data corresponding to the reduction in consumed power.

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES ........ iv

STATEMENT OF RELATED CASES ........ 1

STATEMENT OF JURISDICTION ........ 1

STATEMENT OF THE ISSUES ........ 3

STATEMENT OF THE CASE ........ 4

I. PATENT AND PRODUCTS AT ISSUE ........ 5

A. Patent at Issue ........ 5

B. Products at Issue ........ 9

II. THE COMMISSION PROCEEDINGS ........ 13

A. The Commission Adopted the ALJ's Noninfringement Findings and Affirmed the ALJ's Finding of No Violation of Section 337 ........ 14

1. Causam Has Forfeited Its Allegation of Induced Infringement and Its Appeal Is Limited to the Commission's Findings That Resideo's Accused Thermostats Do Not Practice Claim 1 of the '268 Patent ........ 14

2. The Step of "Generating Measurement and Verification Data Corresponding to the Reduction in Consumed Power" ........ 15

3. The Step of "Receiving a Power Control Message" ........ 17

B. The Commission Took No Position on the ALJ's Findings on Patent Ownership, Domestic Industry, and Invalidity ........ 22

SUMMARY OF THE ARGUMENT ........ 23

ARGUMENT ........ 26

I. STANDARD OF REVIEW ........ 26

**TABLE OF CONTENTS (cont'd)**

**Page**

II. CAUSAM CONCEDES THAT THIS COURT HAS JURISDICTION UNDER 28 U.S.C. § 1295(A)(6) TO DECIDE CAUSAM'S APPEAL ARISING FROM THE COMMISSION'S FINAL DETERMINATION AND ITS ALLEGATIONS OF OWNERSHIP ARE SUFFICIENT TO CONFER STANDING ....................27

A. There Is No Dispute That Causam's Appeal Arising from the Commission's Final Determination Is Statutorily Authorized Under 19 U.S.C. § 1337(c) and This Court Has Exclusive Jurisdiction Under 28 U.S.C. § 1295(a)(6) ....................28

B. Causam Has Alleged Facts That Support a Case or Controversy Sufficient for Article III Standing to Maintain This Appeal....................30

C. The Court Should Not Decide Causam's Ownership Interest in the Asserted Patent Because That Issue Is Not Presented for Appellate Review....................35

III. THE COMMISSION CORRECTLY DETERMINED THAT RESIDEO'S ACCUSED THERMOSTATS DO NOT INFRINGE CLAIM 1 OF THE '268 PATENT....................37

A. Resideo's Accused Thermostats Do Not Perform the Step of "Generating Measurement and Verification Data Corresponding to the Reduction in Consumed Power" ....................38

1. The Intrinsic and Extrinsic Evidence Supports Construing the Generating Step to Require Actual Measurement of the Reduction in Consumed Power ....................38

2. Causam's Position That Runtime Data Alone Satisfies the Generating Step Is Contrary to the Intrinsic Evidence and This Court's Precedent ....................42

## TABLE OF CONTENTS (cont'd)

**Page**


3. Causam Does Not Dispute the Substantial Evidence Supporting the Commission's Finding That Resideo's Accused Thermostats Do Not Satisfy the Generating Step ....46

B. Resideo's Accused Thermostats Also Do Not Perform the Step of "Receiving a Power Control Message" Under Both Causam's and the Commission's Claim Constructions ....49

1. Causam Does Not Dispute That Resideo's Demand Response Message Does Not Indicate an Amount of Electric Power to be Reduced ....51

2. Substantial Evidence Shows Resideo's Demand Response Message Also Does Not Identify a Controllable Device or Instruct Such a Device to Disable Power to a Power Consuming Device ....52

CONCLUSION ....57


## CONFIDENTIAL MATERIAL OMITTED

Pursuant to Federal Circuit Rule 25.1(e) and the Protective Order issued in the underlying investigation, Appellee, International Trade Commission, is filing a confidential version of this brief that highlights the material marked confidential, and a non-confidential version that includes appropriate redactions. In the nonconfidential version of this brief, confidential material has been deleted on pages 11, 18, and 19. The general nature of the deleted material is confidential business information of Resideo regarding its proprietary product information.

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Amarin Pharma, Inc. v. Int'l Trade Comm'n*,
923 F.3d 959 (Fed. Cir. 2019) ....................................................28

*Beloit Corp. v. Valmet Oy*,
742 F.2d 1421 (Fed. Cir. 1984) ....................................................*passim*

*Bio-Rad Labs., Inc. v. Int'l Trade Comm'n*,
998 F.3d 1320 (Fed. Cir. 2021) ....................................................27

*Broadcom Corp. v. Int'l Trade Comm'n*,
542 F.3d 894 (Fed. Cir. 2008) ....................................................37, 56

*City of Arlington v. FCC*,
569 U.S. 290 (2013)....................................................36

*Corus Grp. PLC v. Int'l Trade Comm'n*,
352 F.3d 1351 (Fed. Cir. 2003) ....................................................29, 30

*Crucible Materials Corp. v. U.S. Int'l Trade Comm'n*,
127 F.3d 1057 (Fed. Cir. 1997) ....................................................28

*Cybersettle, Inc. v. Nat'l Arb. Forum, Inc.*,
243 F. App'x 603 (Fed. Cir. 2007) (unpublished)....................................................43

*Estee Lauder Inc. v. L'Oreal, S.A.*,
129 F.3d 588 (Fed. Cir. 1997) ....................................................41

*Finnigan Corp. v. Int'l Trade Comm'n*,
*180 F.3d 1354 (Fed. Cir. 1999)*....................................................37

*Krupp Int'l, Inc. v. Int'l Trade Comm'n*,
626 F.2d 844 (C.C.P.A. 1980)....................................................31

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014)....................................................33, 34

*Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*,
925 F.3d 1225 (Fed. Cir. 2019) .................................................... *passim*

## TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)** **Page(s)**

*Mayborn Grp., Ltd. v. Int'l Trade Comm'n*,
965 F.3d 1350 (Fed. Cir. 2020) ....................................................................30, 31

*Ormco Corp. v. Align Tech.*,
463 F.3d 1299 (Fed. Cir. 2006) ....................................................................42, 43

*Ritchie v. Simpson*,
170 F.3d 1092 (Fed. Cir. 1999) ........................................................................34

*Roku, Inc. v. Int'l Trade Comm'n*,
--- F.4th ---, 2024 WL 202033 (Fed. Cir. Jan. 19, 2024) ....................................33

*Schwendimann v. Arkwright Advanced Coating, Inc.*,
959 F.3d 1065 (Fed. Cir. 2020) ..............................................................2, 32, 33

*SiRF Tech., Inc. v. Int'l Trade Comm'n*,
601 F.3d 1319 (Fed. Cir. 2010) ........................................................................34

*SRI v. Matsushita Elec. Corp.*,
775 F.2d 1107 (Fed. Cir. 1985) ........................................................................27

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
574 U.S. 318 (2015)..........................................................................................27

*Tri-Star Elecs. Int'l, Inc. v. Prec-Dip Durtal SA*,
619 F.3d 1364 (Fed. Cir. 2010) ....................................................................33, 34

**Statutes**

5 U.S.C. § 706 ....................................................................................................27

19 U.S.C. § 1337 ........................................................................................*passim*

19 U.S.C. § 1337(a)(2)......................................................................................22

19 U.S.C. § 1337(c) .....................................................................................28, 31

19 U.S.C. § 1337(d) ..........................................................................................31

28 U.S.C. § 1295(a)(5)......................................................................................30

## TABLE OF AUTHORITIES (cont'd)

**Statutes (cont'd)** **Page(s)**

28 U.S.C. § 1295(a)(6) ........ *passim*

28 U.S.C. § 1581(i) ........ 30

35 U.S.C. § 261 ........ 33

35 U.S.C. § 281 ........ 26, 32, 33, 34

**Rules**

Fed. R. Civ. P. 12(b)(1) ........ 33, 34

Fed. R. Civ. P. 12(b)(6) ........ 34

**Code of Federal Regulations**

19 C.F.R. § 210.12(a)(7) ........ 34

19 C.F.R. § 210.12(a)(9)(ii) ........ 34

19 C.F.R. § 210.12(a)(9)(iv) ........ 34

19 C.F.R. § 210.43(b)(2) ........ 37, 56

## STATEMENT OF RELATED CASES

Other than the cases identified in the Statement of Related Cases by Appellant Causam Enterprises, Inc. ("Causam") in its principal brief, Appellee International Trade Commission ("Commission") is unaware of any other cases pending in this or any other court or agency that will directly affect or be directly affected by this Court's decision in the pending appeal.

## STATEMENT OF JURISDICTION

The Commission agrees with Causam that the "Commission had authority under Section 337 to investigate and reach a determination regarding Causam's allegations as to Intervenors' unfair trade practices" and that the "decision below is a final determination" and "so this Court has jurisdiction to review the Commission's order." Causam Br. at 3; *see infra*, Argument, Part II(A). The Commission's final determination found no violation of section 337. That negative finding was based solely on the ground of noninfringement, as permitted by this Court's decision in *Beloit Corp. v. Valmet Oy*, 742 F.2d 1421, 1423 (Fed. Cir. 1984). The Commission did not reach, and did not need to reach, any other issues in the case, including the merits of Causam's alleged ownership of the asserted patent. Causam does not fault the Commission for taking no position on ownership and concedes that, under *Beloit*, this Court does not sit to review what the Commission has not decided.

Yet, Causam contends that this Court must decide in the first instance Causam's ownership interest in the asserted patent in order for it to determine whether Causam has standing to bring this appeal. Causam Br. at 18. Causam's contention is contrary to this Court's precedent, which holds that "whether a party possesses all substantial rights in a patent does not implicate standing or subject matter jurisdiction." *Schwendimann v. Arkwright Advanced Coating, Inc.*, 959 F.3d 1065, 1071 (Fed. Cir. 2020) (citing *Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1235-36 (Fed. Cir. 2019)). As long as a party "alleges facts that support an arguable case or controversy under the Patent Act, the court has both the statutory and constitutional authority to adjudicate the matter." *Id.* (citing *Lone Star*, 925 F.3d at 1235). Here, Causam adequately alleged, and continues to allege on appeal, that it owns the asserted patent and that Intervenors infringe the patent. Those allegations are sufficient for Article III standing, *i.e.*, Causam's ability to bring and maintain this appeal. *Id.*; *see infra*, Argument, Part II(B).

Whether Causam actually owns the patent is not a requirement of Article III standing but relates to whether Causam is entitled to the relief it seeks. *See Lone Star*, 925 F.3d at 1235. The Commission did not reach, and did not need to reach, the merits of Causam's alleged ownership interest in the asserted patent because it found that Causam had failed to show infringement. *See infra*, Argument, Part III.

Thus, it is unnecessary and inappropriate for this Court to address "in the first instance" the merits of Causam's alleged ownership interest in the asserted patent. Causam Br. at 18. Moreover, as discussed below, this Court should not address Causam's alleged ownership interest in the asserted patent because the Commission took no position on that issue and this Court does not sit to review issues not decided by the Commission. *See infra*, Argument, Part II(C).

## STATEMENT OF THE ISSUES

The issues in the present appeal are properly framed as follows:

1. Whether this Court must resolve the merits of Causam's alleged ownership of U.S. Patent No. 10,394,268 ("the '268 patent") in this appeal—an issue the Commission took no position on—in order to determine whether Causam has Article III standing to bring this appeal arising from a final determination made under 19 U.S.C. § 1337 ("section 337") when this Court has exclusive jurisdiction pursuant to 28 U.S.C. § 1295(a)(6).

2. Whether the Commission correctly determined that the step of "generating measurement and verification data corresponding to the reduction in consumed power" in claim 1 of the '268 patent requires actual measurement of the reduction in consumed power, where Causam does not dispute Resideo's accused thermostats do not perform this step as construed.

3. Whether substantial evidence supports the Commission's finding that Resideo's accused thermostats do not satisfy the step of "receiving a power control message" in claim 1 of the '268 patent under both Causam's and the Commission's claim constructions.

## STATEMENT OF THE CASE

The Commission instituted the underlying investigation, Inv. No. 337-TA-1277, *Certain Smart Thermostats, Load Control Switches, and Components Thereof*, in 2021 based on a complaint filed by Causam. Appx23. The complaint alleged violations of section 337 by certain respondents[1] in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain smart thermostats, load control switches, and components thereof that purportedly infringe four U.S. patents, including the '268 patent. Appx23-24. Causam alleged in the complaint that it owned the '268 patent and submitted an assignment to support that allegation. Appx437; Appx452; Appx40000-40001. In this appeal, Causam only challenges the Commission's finding that Intervenor Resideo does not directly infringe claim 1 of the '268 patent. Causam Br. at 1.

[1] Respondents Ecobee Technologies ULC, dba ecobee, Itron, Inc., Resideo Smart Homes Technology (Tianjin), Ademco, Inc., Alarm.com Holdings, Inc., Alarm.com Incorporated, and Energyhub, Inc. have intervened in this appeal. The Commission's notice of investigation named other respondents, but those respondents were subsequently terminated from the investigation. Appx23-24.

# I. PATENT AND PRODUCTS AT ISSUE

## A. Patent at Issue

The ’268 patent relates generally to the field of electrical power load control systems. Appx333 (1:27-28). According to the patent, “[t]oday, a patchwork of systems exist to implement demand response load management programs, whereby various radio subsystems in various frequency bands utilize ‘one-way’ transmit only methods of communication.” Appx333 (1:43-47). Under these programs, “[a] blanket command is sent out to a specific geographic area whereby all receiving units within the range of the transmitting station (e.g., typically a paging network) are turned off during peak hours at the election of the power utility.” Appx333 (1:49-53). “After a period of time when the peak load has passed, a second blanket command is sent to turn on those devices that have been turned off.” Appx333 (1:53-55). The patent explains the drawbacks to these one-way devices:

> While one-way devices are generally industry standard and relatively inexpensive to implement, the lack of a return path from the receiver, combined with the lack of information on the actual devices connected to the receiver, make the system highly inefficient for measuring the actual load shed to the serving utility. While the differential current draw is measurable on the serving electric utility’s transmission lines, the actual load shed is approximate and the location of the load deferral is approximated at the control center of the serving utility.

Appx333 (2:12-21). Thus, the patent disparages the prior art system's lack of information on the devices, preventing it from accurately measuring and quantifying the actual amount of load shed.

The patent discloses that although two-way communication devices were known, "no techniques exist[ed] for calculating power consumption … and reporting the state of a particular device under the control of a two-way positive control load management device." Appx333 (1:54-63). The patent explains that "[a]ttempts have been made to bridge the gap between one-way, unverified power load control management systems and positive control verified power load control management systems," but that "until recently, technologies such as smart breakers and command relay devices were not considered in residential and commercial environments" because of cost. Appx333 (2:59-65).

The patent seeks to overcome the shortcomings of the prior art one-way devices by disclosing "a system and method for active power load management for individual customers that is optionally capable of tracking power savings for the individual customer as well as the electric utility." Appx333 (3:41-45). In particular, the patent describes incorporating into residential environments internet-connected devices that can measure and transmit actual amounts of power saved back to the utilities. Appx325 (Fig. 1). As shown in Fig. 1 (below), each active load client (ALC) **300** (e.g., a computer or processor-based system located at a

customer's residence or business (Appx339 (13:47-9)) "is accessible through a specified address (e.g., IP address) and controls and monitors the state of individual smart breaker modules or intelligent appliances" (Appx336 (8:29-32)) in order "to manage the power load levels of controllable devices located at the residence or business" (Appx339 (13:50-53)).




*FIG. 1*

The patent also describes power distribution for electric utility companies "by actively monitoring the amount of power needed by each utility and supplying the required power by redirecting power from participating customers." Appx335-336 (6:66-7:4). Customers in this distribution "agree to allow the power management system to disable certain power-consuming devices during peak loading times of the day" and "[s]mart breakers, which have the ability to be

switched on or off remotely, are installed for specific devices in an electric service control panel accessed by a known IP address." Appx336 (7:4-9). "The power management system determines the amount of steady-state power each device consumes when turned on" and that "[b]ecause the amount of power consumed by each specific load is known, the system can determine precisely which loads to turn off, and tracks the power savings generated by each customer as a result of this short-term outage." Appx336 (7:9-12, 7:23-27).

Significantly, the patent differentiates the prior art's approximation of both the actual load shed and the location of the load deferral from the accurate tracking of the actual load shed by each customer:

> One of the most beneficial advantages of an IP-based power management system, as provided in one embodiment of the present invention, is accurate reporting of the actual amount of power saved by each customer on an individual basis. Embodiments of the present invention monitor and calculate precisely how many kilowatts (or carbon credits) are being generated or saved per customer instead of merely providing an estimate. Furthermore, embodiments of the present invention provide means for tracking the actual amount of deferred load and pollutants according to generation mix, serving utility and geographic area.

Appx335 (6:20-30). Thus, the claimed invention includes the ability to accurately measure and quantify the amount of power reduced during a demand-response event, instead of merely estimating the reductions as was previously known in the art.

Claim 1, the only claim at issue, recites:

> **1.** A method for managing an electric power flow within an electric power grid, comprising:
>
> a client device receiving a power control message from a load management server, the power control message indicating at least one of an amount of electric power to be reduced and an identification of at least one controllable device to be instructed to disable the electric power flow to at least one associated power consuming device;
>
> the client device issuing a power management command to the at least one controllable device, the power management command causing the at least one controllable device to disable the electric power flow to the at least one associated power consuming device to provide a reduction in consumed power; and
>
> generating measurement and verification data corresponding to the reduction in consumed power.

Appx343-344 (22:55-23:5).

### B. Products at Issue

At the Commission, Causam accused numerous products of infringement, none of which were found to infringe any of the asserted patent claims. Appx36-37; Appx62-66. On appeal, Causam "seeks review only of the Commission's determination that Intervenor Resideo does not infringe claim 1 of the 268 Patent." Causam Br. at 1.

Resideo manufactures and sells thermostats, including Internet-connected thermostats. Appx67. Resideo's Internet-connected thermostats receive, from

several sources, information such as the current temperature, the selected temperature setpoint, scheduling information, the fan mode selected (on, off, or auto), and whether heat mode or cool mode has been selected, in order to control heating, ventilation, and air conditioning ("HVAC") equipment and maintain a desired temperature in a building. Appx67 (citing Appx40007 (Amundson WS at Q/A 14)). These thermostats connect to Resideo's cloud systems via one of two application programming interfaces, the Total Connect Comfort ("TCC") or the Lyric Connect Comfort ("LCC") cloud systems. Appx67 (citing Appx40007 (Amundson WS at Q/A 15)).

Resideo's Internet-connected thermostats that can receive demand response messages use a platform named "Connected Savings" to execute and process demand response programs to shift energy consumption to periods of lower overall energy demand. Appx67-68; Appx40007 (Amundson WS at Q/A 16); Appx22405 (Paradiso RWS at Q/A 93, 94). A demand response process begins with a message from a TCC or LCC server. Appx68 (citing Appx40009, Appx40011 (Amundson WS at Q/A 22, 30)). The processor on the customer's thermostat receives and processes the messages received from the TCC or LCC. Appx68; Appx40008 (Amundson WS at Q/A 19). The messages contain a complete set of parameters for the demand response event, including start time and duration, so that the thermostat can operate without further instruction or request. Appx68 (citing

Appx40008 (Amundson WS at Q/A 19)). Messages from either the TCC or LCC may alter the duty cycle of the HVAC equipment and change the temperature setpoint for the thermostat, but messages from neither system identify a particular thermostat nor include an amount of electric power to be reduced. Appx68 (citing Appx40008-40012 (Amundson WS at Q/A 21, 24-27, 29, 32-34); Appx20930 (632:1-25)).

Many of Resideo's thermostats contain electrical relays that open and close when voltage is applied to turn on and off aspects of the HVAC system. Appx69; Appx40018 (Amundson WS at Q/A 70, 73). In response to a demand, software within the processor of the thermostat called a "cycler" turns on or off product feature. Appx70; Appx22407-22408 (Paradiso RWS at Q/A 108, 109); Appx20930 (Amundson Tr. at 632:1-25). There are multiple product feature that map to a single physical relay and all the product feature must be off for the physical relay to be open. Appx70; Appx22408 (Paradiso RWS at Q/A 109); Appx20930 (Amundson Tr. at 632:1-25). In response to software operations, the processor applies voltage that will open or close the physical relays on the thermostat. Appx70; Appx22408 (Paradiso RWS at Q/A 109). Significantly, similar to prior art systems and methods, the thermostat does not have any information regarding the specifics of the HVAC equipment, including whether the HVAC is on or off, and therefore it

does not have any information regarding the amount of power that the HVAC equipment uses. Appx70; Appx40010 (Amundson WS at Q/A 27).

Resideo's thermostat relays do not send any information to the thermostat processor to confirm that a relay is actually open or closed. A voltage is simply applied to open or close the relay. Appx70; Appx4001 (Amundson WS at Q/A 74-75). The thermostat processor, however, knows that a voltage was applied to open or close a relay and this information is sent to the TCC or LCC cloud-based systems. Appx70; Appx40020 (Amundson WS at Q/A 87-88). This information can then be used to infer when an HVAC appliance was turned on and off and this inference can be used to estimate the runtime of an HVAC appliance connected to the thermostat. Appx70; Appx40020 (Amundson WS at 86-87).

Resideo's Connected Savings platform receives the information reported to the TCC and LCC cloud-based systems and uses this information to estimate the performance of a demand response event. Appx70 (citing Appx40020 (Amundson WS at Q/A 86)). However, Causam has accused only Resideo's Internet-connected thermostats, and not Resideo's Connected Savings platform, of infringement. Appx36-37 (listing the accused Resideo thermostats); Appx4077 (same). The performance metrics corresponding to a demand response event are calculated by source code on a Demand Response Management Server. Appx70-71 (citing Appx40030-40032 (Hashmi WS at Q/A 35-44)). This source code,

which is part of the Resideo Connected Savings platform, is separate and independent from the source code running on Resideo's thermostats. The performance metrics of a demand response event are estimated by comparing two numbers: an estimated runtime of an HVAC appliance during the current demand response event and an estimated baseline. Appx71 (citing Appx40030-400331 (Hashmi WS at Q/A 35-41)). The Demand Response Management Servers receive equipment status events from the thermostats and use this information to calculate the estimated runtime. Appx71 (citing Appx40031-400332 (Hashmi WS at Q/A 42)). The estimated runtimes of the participating thermostats are then multiplied by a single factor—a proxy—that applies to all thermostats, the details of which are explained in the final initial determination. Appx71 (citing Appx40031-40032 (Hashmi WS at Q/A 42)). This proxy is the same multiplier for every thermostat in a particular demand response event. Appx71 (citing Appx40031 (Hashmi WS at Q/A 43)).

## II. THE COMMISSION PROCEEDINGS

Relevant to this appeal, the Commission found no violation of section 337 by all Intervenors, including Resideo, based on a single dispositive issue—that the accused thermostats do not infringe any of the asserted patents, including the '268 patent. Appx20, Appx65, Appx74-80; Appx262.

### A. The Commission Adopted the ALJ's Noninfringement Findings and Affirmed the ALJ's Finding of No Violation of Section 337

#### 1. Causam Has Forfeited Its Allegation of Induced Infringement and Its Appeal Is Limited to the Commission's Findings That Resideo's Accused Thermostats Do Not Practice Claim 1 of the '268 Patent

In the proceedings below, Causam alleged Resideo induced its customers to infringe claim 1 of the '268 patent. Causam appears to have also alleged that Resideo directly infringed claim 1 of the '268 patent although the evidence that Causam presented at the evidentiary hearing pertained to allegations of direct infringement by Resideo's customers and not by Resideo itself. Appx4110-4112; Appx21262-21263 (Tr. at 963:25-964:23); *see, e.g.*, Appx4123 (citing Appx20948 (Robbins Tr. at 650:7-13)). The ALJ found that Causam failed to demonstrate that Resideo induced infringement because "there is no direct infringement" by Resideo's customers and "Resideo does not have the specific intent to induce its customers" to infringe. Appx83. Regarding direct infringement, the ALJ found that Causam failed to demonstrate Resideo's accused thermostats practice the steps of: (1) "generating measurement and verification data corresponding to the reduction in consumer power"; and (2) "receiving a power control message indicating at least one of an amount of electric power to be reduced and an identification of at least one controllable device to be instructed to disable the

electric power flow to at least one associated power consuming device." Appx74-80.

Causam asked the Commission to review the ALJ's direct infringement findings but did not ask for review of the ALJ's finding of lack of specific intent to induce infringement. Appx4374-4450. The Commission adopted the ALJ's noninfringement findings. Appx262. Causam does not challenge the Commission's adoption of that finding on appeal and it has forfeited its allegation of induced infringement by not petitioning for Commission review of the ALJ's finding of lack of specific intent to induce infringement. *See* 19 C.F.R. § 210.43(b)(2) ("Any issue not raised in a petition for review will be deemed to have been abandoned by the petitioning party").

#### 2. The Step of "Generating Measurement and Verification Data Corresponding to the Reduction in Consumed Power"

The parties did not dispute the meaning of "measurement and verification data" in the proceedings below.[2] Appx51. In its infringement analysis, the ALJ

---

[2] However, the parties disputed construction of the term "power supply value (PSV)" in dependent claim 2, which was asserted by Causam in the proceedings below but not challenged on appeal. Appx51. The ALJ found that the patent "expressly define[s] a 'power supply value' as "an actual value that includes measurement and verification of the reduction in consumed power." Appx51 (citing Appx336 (7:28-63)). In construing the limitation, the ALJ observed that "power supply value" (PSV) was not a known term of art and that Mr. Forbes, inventor of the patent, testified that generating a PSV was one of his purported innovations. Appx57 (citing Appx20604 (Madisetti Tr. at 307:4-11); Appx20354 (Forbes Tr. at 58:18-22)).

found that Resideo's accused thermostats do not perform the step of "generating measurement and verification data corresponding to the reduction in consumed power" "at least because it does not have access to meter data, and therefore cannot provide 'measurement and verification' or any accurate data regarding actual power savings." Appx78 (citing Appx22537 (Robbins WS at Q/A 42, 43); Appx22539 (Robbins WS at Q/A 56)). The ALJ pointed to the inventor's explanation "that 'measurement' is taking a raw measurement from a meter or submeter or from a device that's capable of performing measurement" and "that 'verification' is then taking that information and running it through an algorithm in order to verify the information." Appx78 (citing Appx20357-20358 (Forbes Tr. at 61:2-62:17); Appx40039 (Forbes Dep. Tr. at 637:21-638:18)).

To prove that Resideo performs the "generating" step, Causam relied on documents showing that Resideo calculates runtime data. Appx21641-21672 (demand response event report showing runtime data). The ALJ found that while Resideo's runtime data may indicate when a power consuming device was powered on or off during a demand response event, it "is insufficient for measurement and verification at least because measurement and verification requires an actual measurement of power." Appx79. The ALJ explained that "[m]easurement and verification is different than an estimate; it requires an actual measurement." Appx79. The ALJ stated that "Causam's expert Mr. Donohoe

agreed that runtime information is not sufficient to determine how much power has been reduced and that, instead, the amount of power reduced depends on the type of HVAC, its size, efficiency, and other parameters." Appx98 (citing Appx40036 (Donohoe Dep. Tr. at 211:20-212:13)).

The ALJ also found that "[m]easurement and verification is performed solely by the utility based on information that is only available to the utility (meter data) in order to meet the utilities' reporting obligations to the utility commission." Appx79 (citing Appx22537 (Robbins WS at Q/A 44)). "In contrast, although Resideo may execute demand response events at the request of utilities, it can only provide estimated information about the relative performance of any given event because, unlike the utilities, it does not have access to meter data." Appx79 (citing Appx22537 (Robbins WS at Q/A 44)).

#### 3. The Step of "Receiving a Power Control Message"

The ALJ interpreted the '"power control message' limitation [to] require (1) an identification of an amount of electric power to be reduced, disabled, or enabled and (2) an identification of at least one controllable device to be instructed to enable or disable a flow of electric power to one or more associated power consuming devices." Appx74 (citing Appx22434 (Paradiso RWS at Q/A 255)). The ALJ found that "[t]he accused Resideo thermostats do not meet this limitation as the accused power control message in those products has *neither* (1) an

identification of an amount of electric power to be reduced, disabled, or enabled *nor* (2) an identification of a controllable device" and "Causam cites no evidence to the contrary." Appx74 (emphasis by ALJ).

The ALJ observed that "Causam identifies instructions that alter duty cycle or alter temperature setback, but those messages do not specify an amount of power to be reduced" and, thus, Resideo's thermostats fail to indicate "an amount of electric power to be reduced." Appx74-75 (citing Appx22435-22436 (Robbins WS at Q/A 258-261); Appx22436-22437 (Paradiso RWS at Q/A 264-267)). Specifically, the ALJ rejected Causam's argument that Resideo's demand response message includes an amount of power to be reduced because the "TCC and LCC message[s] merely alter duty cycle or perform a temperature offset" and "do not include an amount of power to be reduced." Appx74-75. As an example, the ALJ pointed to the "TCC message used in the 9000 Wi-Fi Smart Thermostat and found that it conveys information related to three phases of a Resideo demand response event, labeled as P1, P2, and P3." Appx75 (citing Appx22436 (Paradiso RWS at Q/A 265)). The ALJ explained that in the diagram, "[redacted]" is the duty cycle amount which is an input to the control algorithm of the thermostat that will disable the control algorithm for a period of time and reenable it for the remaining time. Appx75. "[redacted]" refers to the scheduled start time of the demand response event. Appx75. "[redacted]" is how long a phase of the demand response

event should last. Appx75. “parameter” is the absolute heating setpoint and “parameter” is the absolute cooling setpoint. Appx75. “parameter” and “parameter” is an alternative demand response strategy where Resideo can offset the thermostat’s current setpoints for heat or cooling. Appx75. The ALJ found that “[n]one of these parameters include any amount of power to be reduced” and that in many scenarios there may be no power reduction at all in response to these messages. Appx75-76 (citing Appx22534 (Robbins WS at Q/A 23); Appx40029 (Hashmi WS at Q/A 26-27)).

The ALJ also found that the Resideo thermostats do not have “at least one controllable device” because the alleged controllable devices (relays) are connected to the alleged client device via a voltage line that does not have any communication-based protocol or networking capability.[3] Appx81 (citing Appx22449-22450 (Paradiso RWS at Q/A 344-349, 351)). The ALJ further found that “[i]n the context of the Asserted Patents, a relay cannot be a ‘controllable device.’” Appx94. The ALJ stated that “[t]he Asserted Patents contemplate that ‘the identification of at least one controllable device’ to be instructed is via an IP address.” Appx95 (citing Appx22439 (Paradiso RWS at Q/A 281)). The ALJ

[3] The ALJ made this finding while discussing U.S. Patent No. 8,805,552 (“the ’552 patent”), which Causam asserted at the Commission but has withdrawn on appeal. However, nothing in the record indicates that the “controllable device” recited in the ’552 patent is different from the controllable device recited in the ’268 patent as the two patents share a common specification.

found that "[t]he relays do not have any identifiers such as an IP address" but "merely have a voltage line for the relays to receive a voltage, or not, in order to open or close the relay." Appx95 (citing Appx22443 (Paradiso RWS at Q/A 304)).

Regarding Causam's doctrine of equivalents argument, the ALJ found that the "duty cycling and temperature setbacks perform a different function, in a different way, to achieve a different result, than indicating an amount of electric power to be reduced, as is required by the claims in question." Appx76-77 (citing Appx22438 (Paradiso RWS at Q/A 275)). The ALJ stated that "the function of duty cycling or implementing a temperature setback is not the same as the function of indicating 'an amount of electric power to be reduced,' as the claim requires." Appx77 (citing Appx22439 (Paradiso RWS at Q/A 279)). The ALJ added that "[a] message that merely indicates that a thermostat should perform duty cycling or temperature setbacks does not indicate any amount of power to be reduced" and that "there might be no power reduction at all." Appx77. The ALJ explained that "[t]his sort of message will at best do one of three things: (1) nothing at all (for example, if the setpoint of a thermostat is already beyond the requested setpoint), (2) cycle a device off as instructed during a portion of an event, or (3) shift a temperature setpoint" and that "[n]othing in any of these three options indicates the amount of power to be reduced." Appx77. The ALJ stated that "the Resideo documents cited by Causam specifically contemplate that the amount of power

used during an event can actually increase." Appx77 (citing Appx22536 (Robbins WS at Q/A 34-36)).

The ALJ also found that Causam's doctrine of equivalents theory fails the insubstantial differences test, finding that "[i]nstructing a device to participate in cycling-based control strategies or temperature-based control strategies is very different than instructing a device regarding 'an amount of electric power to be reduced,' as the claim requires." Appx77. The ALJ stated that "[a] message that requests duty cycling or temperature setback does not actually give any insight into whether any electric power will actually be reduced, and it certainly doesn't indicate 'an amount of electric power to be reduced,' as the claim requires." Appx77 (citing Appx22438 (Paradiso RWS at Q/A 277)). The ALJ added that "if a duty cycling message is sent to control a power consuming device that is not operating, there will be no power reduction at all" and that "if a temperature setback message is sent to control a thermostat that was off or already set at a higher temperature than the setback, there will be no power reduction at all." Appx77-78. The ALJ found that "[n]one of the Resideo Accused Products actually reduce a known amount of power" but that "[i]nstead, requests are made consistent with the normal operation of a thermostat, which may or may not affect the amount of power used or reduced." Appx78.

### B. The Commission Took No Position on the ALJ's Findings on Patent Ownership, Domestic Industry, and Invalidity

The ALJ chronicled the history of ownership of the intellectual property claimed in the '268 patent and found that Causam failed to show that it owned the patent and, thus, failed to demonstrate that it has standing to assert infringement of the patent. Appx39-48. On review, however, the Commission did not adopt the ALJ's findings on ownership and standing, but, rather, took no position on that issue, as permitted by this Court's decision in *Beloit*. Appx260; *Beloit*, 742 F.2d at 1423. The Commission also did not adopt the ALJ's findings that the asserted claims are not invalid for obviousness and the ALJ's finding that Causam proved the existence of a domestic industry as required by 19 U.S.C. § 1337(a)(2), taking no position on these issues as well. Appx260.

## SUMMARY OF THE ARGUMENT

This Court should affirm the Commission's finding of no violation of section 337 with respect to claim 1 of the '268 patent because Causam failed to prove infringement. Causam concedes that the Commission made a final determination by declining to issue remedial orders under section 337 in the underlying investigation, and that the Commission's final determination is appealable to this Court. Causam thus acknowledges that this Court has jurisdiction over this appeal.

Notwithstanding this concession and its statement that it has standing to bring this appeal, Causam presents a specious argument that its ownership interest in the '268 patent is a "threshold" jurisdictional issue that this Court must decide on the merits "in the first instance" in order to determine whether it has standing to maintain this appeal. Causam adequately and consistently alleged, and continues to allege, facts that support a case or controversy sufficient for this Court's jurisdiction. Specifically, Causam alleged, and continues to allege on appeal, that it owns the asserted patent and that the Commission's decision not to issue remedial orders has injured Causam. That allegation is sufficient for standing, *i.e.*, Causam's ability to bring and maintain this appeal. Whether Causam actually does own the patent is a factual matter for adjudication and relates to whether Causam is entitled to the relief it seeks. The Commission, however, did not reach the issue of

patent ownership because it found that Causam failed to show infringement. Causam does not fault the Commission for taking no position on ownership. Thus, there is no "standing" issue to be decided in this appeal and certainly not one that must be decided by this Court without the benefit of the Commission's position in the context of appellate review. Under *Beloit*, this Court does not sit to decide in the first instance issues that the Commission itself did not to reach or otherwise adopt from the ALJ's determination, a point conceded by Causam.

With respect to infringement, substantial evidence supports the Commission's finding that Resideo's thermostats do not perform the steps of: (1) "generating measurement and verification data corresponding to the reduction in consumer power" and (2) "receiving a power control message indicating at least one of an amount of electric power to be reduced and an identification of at least one controllable device to be instructed to disable the electric power flow to at least one associated power consuming device." Appx343-344 (22:58-62, 23:4-5). If the Court agrees with either of the Commission's noninfringement findings, the Court should affirm the Commission's finding of no violation.

Regarding the "generating" step, Causam presented only runtime data as practicing that step. The patent, however, makes clear that this step requires actual measurement of power corresponding to the amount of electric power reduced, which the patent deems as its major advantage over the prior art's approximation

of the reduction in power. Yet, as Causam admits, runtime data alone does not and cannot practice this step because runtime data is not a measurement of power. Causam admits that runtime data must be used in conjunction with actual measurement of power to practice the step, and there is no evidence that Resideo's accused thermostats measure the amount of power used by the HVAC devices that they are connected to.

As for the "receiving" step, Causam failed to show that Resideo's thermostats receive a "power control message" (1) that indicates an amount of electric power to be reduced and (2) that identifies at least one controllable device to disable the electric power flow to at least one associated power consuming device. On appeal, Causam concedes that Resideo's accused power control message does not indicate "an amount of electric power to be reduced." Causam Br. at 42. Causam, however, contends that the claimed "power control message" must identify either an "amount of electricity" or a "controllable device" but not both. Even if Causam is correct, substantial evidence supports the Commission's finding that Resideo's thermostats also do not identify a "controllable device."

# ARGUMENT

## I. STANDARD OF REVIEW

Notwithstanding Causam's use of the word "standing" as shorthand for whether it owns the '268 patent, the Commission rejects Causam's assertion in its Legal Standard section that this Court must resolve the merits of Causam's alleged ownership "in the first instance on a blank slate" in order to assure itself that Causam has standing. Causam Br. at 18. Causam confuses its Article III standing to bring and maintain this appeal with the requirements of 35 U.S.C. § 281, which establish when a party may obtain relief under the patent laws. Article III standing "establish[es] when a [party] may invoke the judicial power." *Lone Star*, 925 F.3d at 1235. Causam has such standing because it has properly alleged, and continues to allege on appeal, ownership of the asserted patent and that Resideo infringes that patent. *See id.* at 1234-35. Thus, it is neither necessary nor appropriate for this Court to determine the merits of Causam's alleged ownership for standing to exist.

It is also not appropriate for this Court to address Causam's ownership in the first instance as part of its appellate review of the Commission's final determination, as Causam recognizes. The Commission reached its no violation determination based only on the single issue of noninfringement, as it is permitted to do under *Beloit*, and did not decide the issue of ownership of the '268 patent.

This Court has stated that it does not sit to review issues not decided by the Commission. *Beloit*, 742 F.2d at 1423.

Pursuant to the Administrative Procedure Act, this Court reviews the Commission's legal conclusions *de novo*, and reviews the Commission's factual findings, including factual findings the Commission adopted from the ALJ, for substantial evidence. *Bio-Rad Labs., Inc. v. Int'l Trade Comm'n*, 998 F.3d 1320, 1327 (Fed. Cir. 2021) (citing 5 U.S.C. § 706). A finding is supported by substantial evidence if a reasonable mind might accept the evidence as adequate to support the finding in question. *Id*. (quotation omitted).

Claim construction is a question of law but may depend on subsidiary factual findings based on extrinsic evidence. *See Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331-32 (2015). Patent infringement is a question of fact. *SRI v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1125 (Fed. Cir. 1985).

## II. CAUSAM CONCEDES THAT THIS COURT HAS JURISDICTION UNDER 28 U.S.C. § 1295(A)(6) TO DECIDE CAUSAM'S APPEAL ARISING FROM THE COMMISSION'S FINAL DETERMINATION AND ITS ALLEGATIONS OF OWNERSHIP ARE SUFFICIENT TO CONFER STANDING

Causam concedes that the Commission has made a final determination and that such final determination is appealable to this Court. However, Causam contends that its alleged ownership interest in the '268 patent is a "threshold" jurisdictional issue that this Court must decide on the merits in the first instance in

order to determine whether Causam has standing to maintain this appeal. Causam Br. at 1, 4. Causam's argument is contrary to this Court's law. As discussed below, this Court has both the statutory and constitutional authority to entertain and decide Causam's appeal. That is because Causam adequately and consistently alleges facts that support a case or controversy and its standing to bring this appeal. Causam also does not dispute that this Court has statutory jurisdiction to review the Commission's final determination.

### A. There Is No Dispute That Causam's Appeal Arising from the Commission's Final Determination Is Statutorily Authorized Under 19 U.S.C. § 1337(c) and This Court Has Exclusive Jurisdiction Under 28 U.S.C. § 1295(a)(6)

As this Court has explained, "[o]ur jurisdictional statute gives this court exclusive jurisdiction 'to review the final determinations of the United States International Trade Commission relating to unfair practices in import trade, made under section 337.'" *Amarin Pharma, Inc. v. Int'l Trade Comm'n*, 923 F.3d 959, 962 (Fed. Cir. 2019) (quoting 28 U.S.C. §1295(a)(6) and *Crucible Materials Corp. v. U.S. Int'l Trade Comm'n*, 127 F.3d 1057, 1060 (Fed. Cir. 1997)). Here, Causam explicitly recognizes the Court's authority to decide this appeal. Specifically, the Commission agrees with Causam that the "Commission had authority under Section 337 to investigate and reach a determination regarding Causam's allegations regarding Intervenors' unfair trade practices" and that the "decision below is a final determination" and "so this Court has jurisdiction to review the

Commission's order" under 28 U.S.C. § 1295(a)(6). Causam Br. at 3; *see* 28 U.S.C. § 1295(a)(6) (granting this Court exclusive jurisdiction "to review the final determinations of the United States International Trade Commission relating to unfair practices in import trade, made under section 337 of the Tariff Act of 1930 (19 U.S.C. 1337)").

Moreover, there is no dispute that where the Commission makes a negative determination based on a single dispositive issue, as it did here, only that issue is before this Court on appellate review. *See* Causam Br. at 18 (citing *Beloit*, 742 F.2d at 1423). Thus, the only issue on review here is noninfringement, not ownership of the asserted patent, an issue on which the Commission took no position. But Causam, citing *Corus*, argues that this Court must nevertheless rule on the merits of Causam's ownership of the asserted patent in the first instance because such a ruling is necessary to determine whether Causam has standing to bring this appeal. Causam Br. at 18 (citing *Corus Grp. PLC v. Int'l Trade Comm'n*, 352 F.3d 1351, 1357 (Fed. Cir. 2003)).

The *Corus* case, however, does not call into question this Court's jurisdiction over this appeal or Causam's standing to bring this appeal. It simply holds that courts may *sua sponte* inquire into jurisdiction or standing. *See Corus*, 352 F.3d at 1358. In *Corus,* a group of foreign steel companies appealed the decision of the Court of International Trade ("CIT"), which dismissed their

challenge to the President's *ad valorem* duty on imported tin mill products under 28 U.S.C. § 1581(i). *Id.* at 1356-57. Even though no party contested jurisdiction, this Court stated that it had an obligation to resolve a jurisdictional issue that it had not previously addressed—whether the Commission's decision certifying that it had reached a divided vote and the President's action in relying on that vote to impose a duty was reviewable by the CIT. *Id.* at 1358. The Court found that the CIT did have jurisdiction except that the President should have been dismissed as a party. *Id.* at 1359-60. Accordingly, the Court held it had jurisdiction over the appeal pursuant to 28 U.S.C. § 1295(a)(5), except with respect to the President. *Id.* at 1360.

The inquiry that Causam seeks, however, is not an inquiry into standing but an inquiry into ownership on the merits, which is neither necessary nor appropriate here. As explained below, Causam's allegations of patent ownership are sufficient to confer standing.

### B. Causam Has Alleged Facts That Support a Case or Controversy Sufficient for Article III Standing to Maintain This Appeal

It is well established that "a party seeking judicial review of a Commission determination must establish that it presents a case or controversy for which the federal courts have jurisdiction under Article III of the United States Constitution." *Mayborn Grp., Ltd. v. Int'l Trade Comm'n*, 965 F.3d 1350, 1354 (Fed. Cir. 2020) (citations omitted). "A party has Article III standing to appeal from a decision of

an administrative agency when it has: (1) suffered a particularized, concrete injury in fact that is (2) fairly traceable to the challenged conduct of the defendant and is (3) likely to be redressed by a favorable judicial decision." *Id.* at 1354 (citations omitted).

Here, Causam has shown that it satisfies the requirements of Article III standing to appeal the Commission's final determination. *See Krupp Int'l, Inc. v. Int'l Trade Comm'n*, 626 F.2d 844, 845-46 (C.C.P.A. 1980) ("Under subsection (c) of section 337, only persons who are 'adversely affected' by a final determination of the ITC have standing to appeal to this court."); 19 U.S.C. § 1337(c) ("Any person adversely affected by a final determination of the Commission under subsection (d), (e), (f), or (g) of this section may appeal such determination … to the United States Court of Appeals for the Federal Circuit for review in accordance with chapter 7 of title 5."). Because Causam alleges that it owns the asserted patent allegedly infringed by Resideo, Appx437, Causam is undisputedly "adversely affected" within the meaning of section 337(c) by the Commission's final determination declining to exclude Resideo's accused products under subsection (d), 19 U.S.C. § 1337(d). That denial is the requisite injury for Causam's Article III standing in this appeal. A favorable decision from this Court remanding the case to the Commission for further proceedings could redress Causam's injury. Thus, the standing requirement to invoke this Court's Article III

jurisdiction is satisfied. Nothing more is required for Causam to show a case or controversy and for this Court to adjudicate Causam's appeal.

Causam appears to confuse Article III standing with the requirements of 35 U.S.C. § 281 when it argues that this Court must decide whether it owns the '268 patent for the Court to hear this appeal. Causam Br. at 18; *see Lone Star*, 925 F.3d at 1235 (distinguishing "the requirements of Article III—which establish when a plaintiff may invoke the judicial power—and the requirements of § 281—which establish when a party may obtain relief under the patent laws"). As discussed above, Causam alleged in proceedings below that it owns the patent allegedly infringed by Resideo and it continues to do so on appeal. Appx437. As long as a party "alleges facts that support an arguable case or controversy under the Patent Act, the court has both the statutory and constitutional authority to adjudicate the matter." *Schwendimann*, 959 F.3d at 1071 (citation omitted) ("Because Ms. Schwendimann's Complaint contained such allegations—that she is the owner by assignment of the '845 patent and Appellants infringed that patent—there is no 'standing' issue to be decided in this appeal."); *see Lone Star*, 925 F.3d at 1234 ("Lone Star alleged that it possesses the sort of exclusionary rights that confer Article III standing."). But whether Causam actually has substantial rights in the '268 patent under the Patent Act does not affect its Article III standing to present this appeal. *Schwendimann*, 959 F.3d at 1071 ("[W]hether a party possesses all

substantial rights in a patent does not implicate standing or subject-matter jurisdiction."); *Roku, Inc. v. Int'l Trade Comm'n*, --- F.4th ---, 2024 WL 202033, at *4 n.4 (Fed. Cir. Jan. 19, 2024) (agreeing with the Commission that "standing" is not the right term for whether the complainant had any ownership rights in the asserted patent).

*Tri-Star*, which predates this Court's decision in *Lone Star*, does not support Causam's argument that this Court must decide Causam's ownership interest in the '268 patent in the first instance in order for Causam to have standing to maintain this appeal. Causam Br. at 3 (citing 35 U.S.C. § 261; *Tri-Star Elecs. Int'l, Inc. v. Prec-Dip Durtal SA*, 619 F.3d 1364, 1366-67 (Fed. Cir. 2010)). In *Tri-Star*, the Court affirmed the district court's denial of defendant's motion under Federal Rules of Civil Procedure Rule 12(b)(1) (subject matter jurisdiction) to dismiss a patent infringement suit for "lack of standing," referring to 35 U.S.C. § 281. 619 F.3d at 1365, 1367. Applying the applicable law to that section's requirement that a party must be a "patentee" to "have remedy by civil action for patent infringement" and Ohio law (which governed the assignment at issue), the Court in *Tri-Star* held the plaintiff had standing to bring suit because the inventor had properly assigned the patent to his former employer and its successors, which included plaintiff. *Id.* at 1366-67 (citing 35 U.S.C. § 281). Under *Lone Star*, whose result was dictated by the Supreme Court's decision in *Lexmark*, a motion

like defendant's motion would have to be brought under Rule 12(b)(6) (failure to state a claim upon which relief can be granted), not Rule 12(b)(1). It would not involve Article III standing at all.[4] *See Lone Star*, 925 F.3d at 1235 (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014)). As discussed above, whether Causam owns and/or has substantial rights in the '268 patent under the Patent Act does not implicate this Court's subject matter jurisdiction or Causam's Article III standing on appeal. *See Lone Star*, 925 F.3d at 1234. *Tri-Star* is also inapplicable because the issue of patent ownership was decided in the district court's order and, thus, properly before the Court on appeal. Here, the Commission took no position on Causam's ownership interest in the asserted patent and, thus, the ownership issue is not part of the final determination on appeal.

[4] While 35 U.S.C. § 281 does not by its terms apply to the Commission, as a matter of regulation and practice, the Commission has long adopted its requirements established by courts in patent infringement cases. *See* 19 C.F.R. §§ 210.12(a)(7), 210.12(a)(9)(ii) (requiring the "identification of the ownership of each involved U.S. patent"), 210.12(a)(9)(iv) (requiring, in part, that a complainant alleging patent infringement provide a "copy of each license agreement that complainant relies upon to establish its standing to bring the complaint"); *see also SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1326 n.4 (Fed. Cir. 2010) (recognizing that "the Commission 'strictly read[s] the federal standing precedent into its rules'"). However, as discussed above, that standing requirement is, at most, a statutory standing requirement that does not implicate this Court's subject matter jurisdiction or Causam's Article III standing on appeal. *See Lone Star*, 925 F.3d at 1235; *Ritchie v. Simpson*, 170 F.3d 1092, 1095 (Fed. Cir. 1999) ("[T]he starting point for a standing determination for a litigant before an administrative agency is not Article III, but is the statute that confers standing before that agency.").

### C. The Court Should Not Decide Causam's Ownership Interest in the Asserted Patent Because That Issue Is Not Presented for Appellate Review

As discussed above, it is not necessary or appropriate for this Court to adjudicate the merits of Causam's alleged ownership in the first instance to determine whether Causam has standing to bring and maintain this appeal. Nor should the Court address Causam's alleged ownership on appeal as part of its review of the Commission's final determination because that issue is not presented for appellate review in this case. When it comes to review of Commission determinations, this Court's jurisdiction is limited to reviewing those matters for which the Commission has issued a final determination. *See* 28 U.S.C. § 1295(a)(6). Here, the Commission found no violation of section 337 based solely upon Causam's failure to prove infringement of the asserted patent claims, and this Court has approved that practice in the past. Appx72-80; Appx260. As this Court has explained:

> The Commission … is at perfect liberty to reach a "no violation" determination on a single dispositive issue. That approach may often save the Commission, the parties, and this court substantial unnecessary effort. Like many good things, that approach carries with it a risk—here the risk of a reversal, and a consequent need for the Commission to revisit one or more portions of the initial determination on which it had taken no position.
>
> The Commission should not be precluded from taking that risk, however, and, where [as here] the conclusion reached on one dispositive issue appears to it inevitable and

> unassailable, the risk would appear reduced to an acceptable level.

*Beloit*, 742 F.2d at 1423. Indeed, Causam acknowledges this Court '"does not sit to review what the Commission has not decided.'" Causam Br. at 18 (quoting *Beloit*, 742 F.2d at 1423).

In this case, the Court has jurisdiction to review the Commission's finding that Causam failed to prove infringement. However, since the Commission made no determination concerning Causam's ownership of the '268 patent, that issue is not before this Court, and it follows that this Court cannot review the issue of patent ownership. Because a determination of patent ownership on the merits is not a statutory prerequisite for the Commission to exercise its authority in section 337 investigations, the Commission acted within its authority in finding no violation on the basis of a single dispositive issue and to choose noninfringement as that single dispositive issue. *See Beloit*, 742 F.2d at 1423; *City of Arlington v. FCC*, 569 U.S. 290, 298 (2013) (holding that, with agencies, "there is no principled basis for carving out some arbitrary subset of . . . claims as 'jurisdictional'"). Nor does Causam contend otherwise.

If the Court reverses both of the Commission's noninfringement findings (both are discussed herein and are properly presented to the Court for review), the Court should remand the case to the Commission for further proceedings.

## III. THE COMMISSION CORRECTLY DETERMINED THAT RESIDEO'S ACCUSED THERMOSTATS DO NOT INFRINGE CLAIM 1 OF THE '268 PATENT[5]

The Commission correctly adopted the ALJ's findings that Resideo's accused thermostats do not infringe claim 1 of the '268 patent for two independent reasons. The ALJ found Resideo's thermostats do not perform the steps of: (1) "generating measurement and verification data corresponding to the reduction in consumer power"; and (2) "receiving a power control message indicating at least one of an amount of electric power to be reduced and an identification of at least one controllable device to be instructed to disable the electric power flow to at least one associated power consuming device." Appx74-80; Appx343-344 (22:56-23:5). If the Court agrees with either of the Commission's noninfringement findings, the Court should affirm the Commission's finding of no violation.

---

[5] Causam's appeal challenges only the Commission's findings that Resideo's accused thermostats do not practice the "generating" and "receiving" steps of claim 1 of the '268 patent. *See* Causam Br. at 1. As discussed in the Statement of the Case, Part II(A)(1), Causam did not petition for Commission review of the ALJ's finding of lack of specific intent to induce infringement and its opening brief does not challenge the Commission's adoption of that finding. Thus, Causam has forfeited its allegation of induced infringement and that issue is not subject to appeal. *See* 19 C.F.R. § 210.43(b)(2) ("Any issue not raised in a petition for review will be deemed to have been abandoned by the petitioning party."); *Broadcom Corp. v. Int'l Trade Comm'n*, 542 F.3d 894, 901 (Fed. Cir. 2008) (citing *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1362 (Fed. Cir. 1999)).

### A. Resideo's Accused Thermostats Do Not Perform the Step of "Generating Measurement and Verification Data Corresponding to the Reduction in Consumed Power"

#### 1. The Intrinsic and Extrinsic Evidence Supports Construing the Generating Step to Require Actual Measurement of the Reduction in Consumed Power

Claim 1 of the '268 patent does not merely require "an infringing device 'generat[e] measurement and verification data," as Causam argues. Causam Br. at 28; *see also id.* at 2, 30 ("[T]he plain English meaning of 'measurement and verification data' is 'data *for* measurement and verification.'"). Causam ignores that the claim requires the "measurement and verification data" to "correspond[] to the reduction in consumed power." Appx344 (23:4-5). The record evidence discussed below supports the Commission's understanding that "measurement and verification data corresponding to the reduction in consumed power" requires *actual* measurement and verification of the reduction in consumed power.

There is no dispute that the focus of the '268 patent is ensuring that the amount of power reduced during a demand response is accurately measured and verified, which requires actual measurement as opposed to merely an estimate of the reduction in consumed power. *See supra*, Statement of the Case, Part I(A). For example, the specification states that "[e]mbodiments of the present invention monitor and calculate precisely how many kilowatts (or carbon credits) are being generated or saved per customer, instead of merely providing an estimate."

Appx335 (6:24-27). The specification further states that "[b]ecause the amount of power consumed by each specific load is known, the system can determine precisely which loads to turn off[,] and tracks the power savings generated by each customer as a result of this short-term outage." Appx336 (7:23-27).

Consistent with this disclosure, Mr. Forbes, the named inventor of the patent testified that "measurement [data] is actually taken from a meter or a submeter or from a device that is capable of performing measurement." Appx20357-20358 (61:22-62:3 (Forbes)); *accord* Appx40039 (Forbes Dep. Tr. at 638:3-11 (same)). Causam contends that Mr. Forbes did not testify as such. Causam Br. at 34-35. But Mr. Forbes' testimony is unambiguous:

> Q. And, specifically, you said, with respect to power, that measurement is actually taken from a meter or from a submeter or from a device that is capable of performing measurement; is that right?
>
> A. That's in the specification.
>
> Q. And that's correct, right?
>
> A. That's correct.

Appx20357-20358 (61:22-62:3).

In addition, experts on both sides recognized the patent's requirement for accurate measurement and verification overcomes the shortcomings of the prior art's approximation of the reduction in power. Appx22390 (Paradiso RWS at Q/A 12) (testifying that the "patent[] require[s] that the power consumption of a device

be actually measured and verified”); Appx40034 (Donohoe Dep. Tr. at 115:17-116:1) (admitting that the patent “calculate[s] precisely how many kilowatts are being saved”). Likewise, Intervenors’ expert, Dr. Rosing, testified that “measurement and verification” “is a process to quantify, with statistical confidence, the value of a Demand Response load reduction” and that “an estimate is not a measurement.” Appx22475 (Rosing WS at Q/A 75, 76). Another of Intervenors’ experts, Mr. D’Andrade, explained that “one distinction between the asserted patents and other prior art is that the asserted patents disclose client devices capable of measuring and verifying the reduction in power due to disabling power consuming devices.” Appx40037-40039 (D’Andrade WS at Q/A 47).

Causam also recognizes that the specification only describes a measurement and verification process that calculates the actual amount of power reduced during a demand response. For instance, Causam acknowledges that “the specification only describes the ‘measurement and verification’ *process* used to ‘calculate the amount of power (*e.g.*, in megawatts per hour) that was saved for each active load client.’” Causam Br. at 31 (citing Appx336 (7:11-35); Appx343 (21:46-56)) (emphasis in original). Causam also acknowledges that the measurement and verification process described in the specification requires actual meter data. *See id.* (recognizing that measurement and verification “requires recording the baseline power consumption of each device” in order to determine the amount of power

reduced) (citing Appx336 (7:11-27)); *id.* at 37 (same); *id.* at 34 (admitting that "performing 'measurement and verification' (*e.g.*, calculating a PSV) does require some actual power measurements (*e.g.*, meter data).").

Causam relies almost entirely on attorney arguments to support its proposal that the plain meaning of "measurement and verification data" is "data *for* measurement and verification" and not "data *sufficient for* measurement and verification." Causam Br. at 30. Yet, Causam's newly proposed construction on appeal finds no support in the intrinsic evidence, and no amount of contrived attorney arguments can overcome the express claim language and the teachings of the patent. *See Estee Lauder Inc. v. L'Oreal, S.A.*, 129 F.3d 588, 595 (Fed. Cir. 1997) ("[A]rguments of counsel cannot take the place of evidence lacking in the record.") (citation omitted). The claim does not require "measurement and verification data" in a vacuum but recites "generating measurement and verification data corresponding to the reduction in consumed power." Appx344 (23:4-5). As discussed above, the Commission recognized that the intrinsic and extrinsic evidence shows that the claimed step of generating measurement and verification data requires an actual measurement of consumed power. That is, the patent discloses that actual measurement of power is needed to generate measurement and verification data corresponding to the reduction in consumed power. Appx58-59, Appx78-79. Causam does not argue otherwise. *See, e.g.*,

Causam Br. at 34 (admitting that "performing 'measurement and verification' (*e.g.*, calculating a PSV) does require some actual power measurements (*e.g.*, meter data).").

Nothing in the record suggests the claimed step of "generating measurement and verification data corresponding to the reduction in consumed power" can merely estimate the performance of a demand response event without an actual measurement of the reduction in consumed power. On appeal, Causam's infringement argument for the generating step hinges on its view that runtime data alone satisfies this limitation.[6] Causam Br. at 30. As discussed below, substantial evidence supports the Commission's finding that runtime data alone does not satisfy the limitation.

**2. Causam's Position That Runtime Data Alone Satisfies the Generating Step Is Contrary to the Intrinsic Evidence and This Court's Precedent**

Claim 1 is a method claim that recites a series of steps, each of which must be performed for infringement to occur. *See Ormco Corp. v. Align Tech.*, 463 F.3d

[6] Causam's college admissions analogy that "one input alone (*e.g.*, grades) is 'applicant evaluation data' … even though the grades *alone* are insufficient to fully evaluate an applicant" is inapt. Causam Br. at 30. The claim language, here, does not simply recite "measurement and verification data" but, rather, it recites such data must "correspond[] to the reduction in consumed power." Appx344 (23:4-5). A more apt analogy would be if a hypothetical claim requires "applicant evaluation data corresponding to improved test scores" and, in that case, information regarding only grades would clearly be insufficient.

1299, 1311 (Fed. Cir. 2006) ("Method claims are only infringed when the claimed process is performed, not by . . . an apparatus that is capable of infringing use."). Thus, contrary to Causam's assertion (Causam Br. at 36-38), merely showing that a claimed step is "capable" of being performed, is insufficient. *Cybersettle, Inc. v. Nat'l Arb. Forum, Inc.*, 243 F. App'x 603, 606-07 (Fed. Cir. 2007) (unpublished) ("A patented method is a series of steps, each of which must be performed for infringement to occur. It is not enough that a claimed step be "capable" of being performed.") (citation omitted).

As the ALJ found, and Causam admits, using runtime data to calculate power savings requires "two pieces of data . . . the [actual] power that a device consumes and the [actual] amount of time that a device is on." Appx4424; *see* Appx4425 (acknowledging that "timestamped runtime data *alone* cannot measure power savings" but that "a baseline power consumption rate for the monitored device is also necessary") (emphasis in original); *see also* Causam Br. at 31, 37 (admitting that "the specification requires recording the baseline power consumption of each device (Appx336 (7:11-27)) and later comparing that data to runtime date to determine the amount of power used"). Yet, Causam presented only runtime data as satisfying this limitation in its direct infringement presentation. Runtime data, however, is the amount of time that a device (*e.g.*, thermostat) is in a particular operating state. Appx22472 (Rosing WS at Q/A 60);

Appx97-98. This information alone does not "correspond[] to the reduction in consumed power" as the claimed "measurement and verification data" is required to do. Indeed, the unit of measurement for a device runtime is seconds or minutes, not watts or kilowatts. Appx20795 (498:8-25); Appx22472 (Rosing WS at Q/A 60); Appx22401 (Paradiso RWS at Q/A 65); Appx22402 (Paradiso RWS at Q/A 70); Appx40040-40041 (Zawacki WS at Q/A 39, 41, 42).

Having presented only runtime data as satisfying this step, Causam forges ahead and invites this Court to ignore established precedent and find that data that can merely be used for "measurement and verification" constitutes actual practice of the claimed step. Causam Br. at 30-31. Causam asserts that this is so because the patent discloses "recording the baseline power consumption of each device . . . and later comparing that data to runtime data to determine the amount of power used." Causam Br. at 31 (emphasis removed). Yet, the portions of the specification upon which Causam relies provide no support.

One portion of the specification discloses that actual power must be measured in order to satisfy the claimed step:

> The power management system determines the amount of steady-state power each device consumes when turned on and logs the information in a database for each subscriber. For example, a current sensor on each smart appliance or within each smart breaker may measure the amount of current consumed by each monitored device. An active load client then multiplies the amount of current consumed by the operating voltage of the device to obtain the power

> consumption, and transmits the power consumption to the ALD server.

Appx336 (7:11-20). The specification explains that "[b]ecause the amount of power consumed by each specific load is known, the system can determine precisely which loads to turn off and tracks the power savings generated by each customer ... ." Appx336 (7:23-26). This disclosure makes clear that the "generating measurement and verification data" step requires actual measurement of power and not simply the runtime.

Another portion of the specification upon which Causam relies also supports the Commission's finding that runtime data is used in conjunction with measured power to satisfy the claimed step:

> The database record for each active load client **300** contains the actual amount (or average amount) of power that would have been used by the active load client **300** during the last "Cut" event, along with the amount of time that each controllable device **402-412**, **420** associated with the active load client **300** was turned off. The power savings application **120** uses this information to calculate the amount of power (e.g., in megawatts per hour) that was saved for each active load client **300**.

Appx343 (21:48-56). Thus, this disclosure shows that runtime data alone is not sufficient.

Causam's reliance on the "International Performance Measurement and Verification Protocol" fares no better. As Causam admits, the protocol discloses that '"runtime' data may be used alongside 'power measurement[s]' to perform

measurement and verification as described in the patent." Causam Br. at 32 (citing Appx22759). That is, runtime data alone does not satisfy the claimed step.

Finally, Causam's assertion that the Commission applied inconsistent constructions of the claimed step for infringement and domestic industry is baseless. Causam Br. at 17. The ALJ did not find that the domestic industry product '"generates measurement and verification data' because it generates 'runtime data,' which is '*for* measurement and verification,'" as Causam contends. Causam Br. at 13, 17 (quoting Appx155-156) (emphasis in Causam Brief). Rather, the ALJ found that, unlike the accused Resideo products, the domestic industry product has a metrology processor that actually measures power consumption. Appx154 (finding that the domestic industry products "[are] equipped with a metrology processor that is designed to measure voltages, current and power consumption"). In other words, the ALJ did not find that the runtime data from the domestic industry product alone satisfies this step. Causam overlooks this critical distinction in its brief.

### 3. Causam Does Not Dispute the Substantial Evidence Supporting the Commission's Finding That Resideo's Accused Thermostats Do Not Satisfy the Generating Step

Causam's infringement position hinges on this Court adopting its view that runtime data alone satisfies the "generating" step. Causam Br. at 30, 36. Causam does not challenge the substantial evidence discussed below that support the

Commission's finding that the Resideo's accused thermostats do not meet the "generating" step under the Commission's claim construction. And even if the Court agrees with Causam's proposed construction, the evidence shows that Resideo's thermostats themselves do not even generate runtime data.

The accused Resideo thermostats are similar to the prior art systems and methods that do not have access to meter data or any information regarding the specifics of the HVAC equipment, including whether the HVAC is on or off. Appx40010 (Amundson WS at Q/A 27). Therefore, the Resideo thermostats cannot provide "measurement and verification data" or any accurate data regarding actual power savings. Appx22537, Appx22539 (Robbins WS at Q/A 42-43, 56); Appx22435-22436 (Paradiso WS at Q/A 258-261); Appx22436-22437 (Paradiso RWS at Q/A 264-267); Appx78. Causam's own expert, Mr. Donohoe, testified that the amount of power reduced depends on the type of HVAC, its size, efficiency, and other parameters and that runtime information alone is insufficient to determine how much power has been reduced. Appx40036 (Donohoe Dep. Tr. at 211:20-212:13). But the Resideo thermostats know nothing about the appliances they are connected to. Appx40020 (Amundson WS at Q/A 84-85 ("[T]he thermostat does not have any information regarding the HVAC appliance to which it is connected. As a result, the Resideo thermostats cannot provide any information regarding power consumption.")). Instead, it uses proxy values to

estimate the performance of a demand response event. Appx22535 (Robbins WS at Q/A 30) ("Resideo … estimates the performance of the event and the baseline by multiplying the calculated runtime by a factor … ."); Appx40031-40032 (Hashmi WS at Q/A 42) ("Runtimes of the participating thermostats are … multiplied by a single factor that applies to all thermostats … .").

In particular, the Resideo thermostats use the same proxy value for every customer in a particular demand response event regardless of the actual size of the HVAC appliance. Appx22535 (Robbins WS at Q/A 30-31) ("Resideo uses the same factor for all of the thermostats participating in a demand response event."). Resideo's approximation of the amount of power reduced during a demand-response event falls far short of generating measurement and verification data that corresponds to the *actual* reduction in consumed power. Substantial evidence shows that the accused Resideo thermostats do not provide actual power measurements. Appx22537; *see* Appx22539 (Robbins WS at Q/A 43, 56) (testifying that Resideo does not have access to meter data); Appx21001 (Paradiso Tr. at 703:10-14) (testifying that Resideo thermostats estimate power reductions).

Moreover, the evidence shows that Resideo's thermostats themselves do not even generate runtime data. Instead, the thermostats generate relay status information that is sent to the Connected Savings platform cloud-based systems, which Causam did not accuse of infringement. While the relay status information

can be used by the Connected Savings platform to infer when an HVAC appliance was turned on and off, it is the Connected Savings platform and not the Resideo thermostats that generates the estimated runtime data. Appx22408-22409 (Paradiso RWS at Q/A 116-17) ("[T]he performance of a demand response event is estimated by comparing two numbers that are calculated based on multiplying the runtime of an HVAC device by the assumed size (proxy) of a HVAC device. This estimate is performed by Resideo's Connected Savings platform."); Appx70-71; Appx40020 (Amundson WS at Q/A 83, 86-87); Appx40030-40032(Hashmi WS at Q/A 35-44).

Simply put, the record evidence is bereft of any showing that the Resideo thermostats practice the step of "generating measurement and verification data corresponding to the reduction in consumed power" under the Commission's claim construction.

### B. Resideo's Accused Thermostats Also Do Not Perform the Step of "Receiving a Power Control Message" Under Both Causam's and the Commission's Claim Constructions

Claim 1 recites "a client device receiving a power control message … indicating at least one of an amount of electric power to be reduced and an identification of at least one controllable device to be instructed to disable the electric power flow to at least one associated power consuming device." Appx343 (22:58-64). Causam asserts that the phrase "at least one of" means that the claimed

"power control message" identifies either an "amount of electricity" or a "controllable device" but not both. Causam Br. at 47. The Commission adopted the ALJ's requirement that the claimed "power control message" identify both and it found Resideo's power control message does not identify either.[7] Appx74.

On appeal, Causam does not challenge the Commission's finding that the demand response message received by Resideo's accused thermostats, which Causam asserts satisfies the claimed "power control message," does not indicate "an amount of electric power to be reduced." Causam Br. at 41-42. Thus, if the claimed "power control message" is required to identify an "amount of electricity," as interpreted by the ALJ, then the Court should affirm the Commission's finding that Resideo's thermostats do not infringe claim 1 of the '268 patent.

Even if the "power control message" is construed to require identification of *either* an "amount of electricity" *or* a "controllable device," as Causam argues, substantial evidence supports the Commission's finding that "[t]he accused Resideo products do not meet this limitation" because the accused power control message in the Resideo thermostats has "*neither* (1) an identification of an amount of electric power to be reduced, disabled, or enabled *nor* (2) an identification of a

[7] Causam also asserts that the Commission's interpretation of "at least one of" to mean both is inconsistent with the ALJ's application of this limitation to the domestic industry analysis. Causam Br. at 43. The Commission, however, did not adopt the ALJ's domestic industry findings and, therefore, those findings are not subject to appeal. Appx260.

controllable device" and "Causam cites no evidence to the contrary." Appx74 (emphasis by ALJ); Appx22434-22435 (Paradiso RWS at Q/A 255).

### 1. Causam Does Not Dispute That Resideo's Demand Response Message Does Not Indicate an Amount of Electric Power to be Reduced

Causam does not dispute the substantial evidence supporting the Commission's finding that the demand response message received by Resideo's thermostats does not identify an amount of electric power to be reduced. Appx74-Appx78. As the evidence shows, while Resideo's demand response message may alter duty cycle or perform temperature setpoint offsets, it does not indicate an amount of electric power to be reduced. Appx68-69; Appx22406 (Paradiso RWS at Q/A 96-98); Appx22436-22437 (Paradiso RWS at Q/A 264-67). Not only does Resideo's demand response message not indicate any amount of power to be reduced, but the evidence shows that it can even result in an increased amount of consumed power. Appx22536 (Robbins WS at Q/A 34-35); Appx77.

Similar to the prior art disparaged in the '268 patent, Appx333 (2:12-21), Resideo's thermostats do not have any information about the power consumption rates of the HVAC appliances that they are connected to, including whether the appliances are on or off. Appx40019-40020 (Amundson WS at Q/A 80-82, 84-85). While the Resideo thermostats contain internal relays that open and close when voltage is applied to them, no data is passed from the thermostat processor to the

relays and no status information is exchanged between the Resideo thermostat (or its internal relays) and the HVAC appliance that it is connected to. Appx40019 (Amundson WS at Q/A 75). Indeed, Resideo's thermostats do not even know whether and to what degree the HVAC appliances that they are connected to will operate in response to a demand response message because the HVAC appliances have their own separate processors. Appx40019-40020 (Amundson WS at Q/A 81-83, 86). Thus, substantial evidence supports the Commission's finding that Resideo's demand response message does not indicate an amount of power to be reduced and Causam does not argue otherwise.

### 2. Substantial Evidence Shows Resideo's Demand Response Message Also Does Not Identify a Controllable Device or Instruct Such a Device to Disable Power to a Power Consuming Device

Resideo's demand response message neither identifies a controllable device nor instructs it to disable power to an associated power consuming device. Causam admits that Resideo's demand response message does not identify any controllable device by "name and address." *See* Causam Br. at 49. That admission should doom Causam's infringement case given that claim 1 expressly requires "identification of at least one controllable device." Appx343 (22:61-62). Indeed, the '268 patent touts the benefits of using a "unique" IP address to identify each controllable device. Appx335 (5:49-60); *see* Appx337 (10:25-28) ("[T]he ALC manager **108** tracks the state of every active load client **300** serviced by specified

utilities by communicating with the active load client **300** through an individual IP address.”).

Nevertheless, Causam argues that “implicit” identification of a group of relays within Resideo’s thermostat, the “client device,” satisfies the “identification of at least one controllable device” limitation. Causam Br. at 49-52. As explained below, Causam’s “implicit” infringement theory fails for two reasons. First, in the context of the asserted claim and the ’268 patent, a relay within Resideo’s thermostat cannot be a “controllable device.” Second, even if Resideo’s relay can be a “controllable device,” it is not instructed to disable the electric power flow to a power consuming device.[8]

In the context of the asserted claim and the ’268 patent, the evidence shows that “a relay cannot be a controllable device.” Appx94-95 (internal quotations omitted) (citing Appx22439-22440 (Paradiso RWS at Q/A 281-284)); *see* Appx21012-21013 (Paradiso Tr. at 714:18-715:9) (“I think you’re taking this patent totally out of where it belongs to say that the relays are controllable devices … .”). The ALJ found that relays within the thermostat cannot be a controllable

[8] Causam argues the Commission provided no rationale for construing “‘an identification of at least one controllable device’ to exclude an identification of multiple controllable devices.” Causam Br. at 48. But the Commission’s construction does not exclude identification of multiple controllable devices. Rather, Causam failed to show Resideo’s demand response message identifies *any* controllable device, let alone multiple controllable devices.

device because (1) the relays are not a separate device from the thermostat (*i.e.*, the client device and controllable device cannot be the same device as the claim and the patent distinguishes between those two devices); and (2) the relays are not capable of IP communication. *See* Appx80-81; Appx94-95. Looking at the claim language first, claim 1 requires "the client device [to] issu[e] a power management command to the at least one controllable device." Appx343 (22:65-66). Causam's contention that the relays in the thermostat, *i.e.*, client device, are also controllable devices would result in an absurdity—the client device issuing a command to itself.

Moreover, the patent distinguishes between a client device and a controllable device and touts the benefits of each device having its own IP address. Appx335 (5:49-60); Appx337 (10:25-28). In particular, the patent discloses the active load client may be enabled "to dynamically request IP addresses for itself and/or one or more controllable devices" and may further include a table of assigned IP addresses in memory to facilitate delivery of messages from the active load client to the controllable devices. Appx339 (13:60-14:4). The evidence, however, shows that the relays in the Resideo thermostats are not capable of IP communication. Appx68 (citing Appx40008-40012 (Amundson WS at Q/A 21, 24-27, 29, 32-34) (finding that messages from TCC and LCC do not identify a particular thermostat or identify any relays on the thermostat)); *see* Appx94-95 (citing Appx22439

(Paradiso RWS at Q/A 281) ("The Asserted Patents contemplate that 'the identification of at least one controllable device' to be instructed is via an IP address. The relays within the Itron and Resideo Accused Products … do not have an IP address.")); Appx95 (finding that a relay cannot be a controllable device because "relays do not have any identifiers such as an IP address").

In addition, even if a relay can be a "controllable device," Resideo's thermostats do not instruct the relay "to disable the electric power flow" to a "power consuming device," such as an HVAC, as required by claim 1. Appx343-344 (22:66-23:2). As the ALJ found, HVAC appliances "have their own logic systems and [] a thermostat (unlike a smart breaker) cannot disable the electric power flow." Appx109; *see* Appx40020 (Amundson WS at Q/A 88) ("[T]he thermostat does not know anything about the HVAC appliance, and the HVAC appliance has its own controller and processor."); Appx69 (citing Appx22406 (Paradiso RWS at Q/A 101) (testifying that Resideo thermostats cannot execute duty cycle of 100% (*i.e.*, turn off or disable client device))). Resideo's engineer, Mr. Amundson, explained even if the thermostat has its relays set for an HVAC appliance to be off, the HVAC appliance may continue to run (and thus consume electric power) as a result of its own control logic. Appx40019-40020 (Amundson WS at Q/A 81-82). Thus, the signals that Resideo's thermostats send to HVAC

appliances do not result in disabling the electric power flow to a power consuming device.

Finally, Causam argues that the Commission "analyzed neither [its] literal infringement argument respecting the identification of a controllable device nor [its] doctrine of equivalents argument." Causam Br. at 53-54. But the ALJ's noninfringement determination, which the Commission adopted, adequately explained why Causam failed to show Resideo's thermostats practice the claimed "power control message." Appx74-78. Moreover, Causam's petition for Commission review (Appx4431-4437) did not seek review of the ALJ's doctrine of equivalents findings for "controllable device" and, thus, Causam has waived the right to do so on appeal. 19 C.F.R. § 210.43(b)(2); *Broadcom*, 542 F.3d at 901.

As discussed above, substantial evidence supports the Commission's finding that Resideo's demand response message neither identifies a controllable device nor instructs it to disable power to an associated power consuming device as required by the claimed "power control message." Apparently, Causam believes that mere inferences are sufficient to prove infringement. *See* Causam Br. at 54. Infringement, however, must be proven by a preponderance of the evidence, and for a method claim, as here, Causam was required to show actual practice of the claimed steps. Causam failed to do so below.

## CONCLUSION

For the foregoing reasons, the Commission respectfully requests that the Court affirm the Commission's determination.

Respectfully submitted,

*/s/ Panyin A. Hughes*

Dominic L. Bianchi
General Counsel
Cathy Chen
Acting Assistant General Counsel
Panyin A. Hughes
Attorney Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street SW, Suite 707
Washington, DC 20436
Tel: (202) 205-3042
Fax: (202) 205-3111
panyin.hughes@usitc.gov

*Counsel for Appellee*
*International Trade Commission*

Date: February 21, 2024

## CERTIFICATE OF SERVICE

I, Panyin A. Hughes, hereby certify that, on February 21, 2024, I caused a copy of the foregoing **RESPONSE BRIEF OF APPELLEE INTERNATIONAL TRADE COMMISSION**, to be served on counsel of record via the Court's CM/ECF system. In addition, pursuant to an agreement among the parties, the confidential version of the Commission's brief was served by email attachment.

*/s/ Panyin A. Hughes*

Panyin A. Hughes
Attorney Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street SW, Suite 707
Washington, DC 20436
Tel: (202) 205-3042
Fax: (202) 205-3111
panyin.hughes@usitc.gov

*Counsel for Appellee*
*International Trade Commission*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g)(1) of the Federal Rules of Appellate Procedure and Federal Circuit Rule 32(b)(3), I hereby certify that the attached brief complies with the type-volume limitation and typeface requirements Federal Rule of Appellate Procedure 32(a)(7) and Federal Circuit Rules 32(b)(1) and 32(b)(2). The brief has been prepared in a proportionally spaced typeface using Microsoft Office 365, in Times New Roman 14-point font. The brief contains a total of 12,500 words including 12,465 words obtained from the word-count function of the word-processing system, including all footnotes, annotations, and claim language, and a manual count of 35 words appearing in the graphics and figures.

*/s/ Panyin A. Hughes*

Panyin A. Hughes
Attorney Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street SW, Suite 707
Washington, DC 20436
Tel: (202) 205-3042
Fax: (202) 205-3111
panyin.hughes@usitc.gov

*Counsel for Appellee*
*International Trade Commission*

Date: February 21, 2024

## CERTIFICATE OF COMPLIANCE WITH CONFIDENTIALITY REQUIREMENTS

Pursuant to Fed. Cir. R. 25.1(e)(2), I hereby certify that the attached brief, which contains material marked as confidential under Fed. Cir. R. 25.1(d)(1), complies with the limitations and requirements related to confidential information set forth in Fed. Cir. R. 25.1(d) and 28(d). This brief contains nine unique words marked as confidential, not including words or images marked as confidential in Appellant's principal brief. All such confidential material has been properly identified with required bracketing, page headers, and labeled redactions (in the non-confidential version of the brief).

*<u>/s/ Panyin A. Hughes</u>*
Panyin A. Hughes
Attorney Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street SW, Suite 707
Washington, DC 20436
Tel: (202) 205-3042
Fax: (202) 205-3111
panyin.hughes@usitc.gov

*Counsel for Appellee*
*International Trade Commission*

Date: February 21, 2024