No. 2023-1769

# United States Court of Appeals

*for the*

# Federal Circuit

CAUSAM ENTERPRISES, INC.,

*Appellant,*

*v.*

INTERNATIONAL TRADE COMMISSION,

*Appellee,*

ECOBEE TECHNOLOGIES ULC, DBA ECOBEE, ITRON, INC., RESIDEO SMART HOMES TECHNOLOGY (TIANJIN), ADEMCO, INC., ALARM.COM HOLDINGS, INC., ALARM.COM INCORPORATED, ENERGYHUB, INC.,

*Intervenors.*

*On Appeal from the United States International Trade Commission in Investigation No. 337-TA-1277*

## BRIEF OF INTERVENORS

Kirk T. Bradley
S. Benjamin Pleune
M. Scott Stevens
Lauren N. Griffin
ALSTON & BIRD LLP
Vantage South End
1120 South Tryon Street, Suite 300
Charlotte, NC 28203
(704) 444-1000

*Counsel for Itron, Inc.,*
*Resideo Smart Homes Technology (Tianjin),*
*and Ademco, Inc.*

Manny Caixeiro
Laura A. Wytsma
VENABLE LLP
2049 Century Park East, Suite 2300
Los Angeles, CA 90067
310-229-9900

Megan S. Woodworth
VENABLE LLP
600 Massachusetts Avenue, NW
Washington, DC 2001
202-334-4000

*Counsel for ecobee Technologies ULC, dba ecobee*

Keith Hummel
Sharonmoyee Goswami
CRAVATH SWAINE & MOORE LLP
Worldwide Plaza
825 Eight Avenue
New York, NY 10019
212-474-1000

*Counsel for Alarm.com Holdings, Inc.,*
*Alarm.com Incorporated, and EnergyHub, Inc.*

FEBRUARY 21, 2024

**PATENT CLAIM (U.S. PATENT NO. 10,394,268)**

1. A method for managing an electric power flow within an electric power grid, comprising:

> a client device receiving a power control message from a load management server, the power control message indicating at least one of an amount of electric power to be reduced and an identification of at least one controllable device to be instructed to disable the electric power flow to at least one associated power consuming device;

> the client device issuing a power management command to the at least one controllable device, the power management command causing the at least one controllable device to disable the electric power flow to the at least one associated power consuming device to provide a reduction in consumed power; and

> generating measurement and verification data corresponding to the reduction in consumed power.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2023-1769

**Short Case Caption** Causam Enterprises, Inc. v. ITC

**Filing Party/Entity** Itron, Inc.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/18/2023

Signature: /s/ Kirk T. Bradley

Name: Kirk T. Bradley

| 1. Represented Entities.<br>Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest.<br>Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders.<br>Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Itron, Inc. | | BlackRock Fund Advisors |
| | | The Vanguard Group, Inc. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable            ☐   Additional pages attached

| | | |
|---|---|---|
| Matthew M. Turk | Bradley W. Micsky | |
| Christopher TL Douglas | Dennis C. Bremer | |
| Monique Mead | Carlson Caspers Vandenburgh & Lindquist, PA | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below)     ☐   No     ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable            ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2023-1769

**Short Case Caption** Causam Enterprises, Inc. v. ITC

**Filing Party/Entity** Resideo Smart Homes Technology (Tianjin), Ademco Inc.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/18/2023

Signature: /s/ Kirk T. Bradley

Name: Kirk T. Bradley

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☐ None/Not Applicable |
| Resideo Smart Homes Technology (Tianjin) | | Blackrock Fund Advisors |
| Ademco Inc. | | Vanguard Group, Inc. |
| | | Resideo Technologies, Inc. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

FORM 9. Certificate of Interest

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable       ☐ Additional pages attached

| Matthew M. Turk | Dennis C. Bremer | |
| John W. McGrath | Carlson Caspers Vandenburgh & Lindquist, PA | |
| Bradley C. Micsky | Monique Mead | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below)   ☐ No   ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable       ☐ Additional pages attached

| | | |
| | | |

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2023-1769 |
| **Short Case Caption** | Causam Enterprises, Inc. v. ITC |
| **Filing Party/Entity** | Alarm.com Holdings, Inc., Alarm.com Incorporated, EnergyHub, Inc. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/18/2023

Signature: /s/Sharonmoyee Goswami

Name: Sharonmoyee Goswami

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Alarm.com Holdings, Inc. | | Alarm.com Holdings, Inc. |
| Alarm.com Incorporated | | |
| EnergyHub, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

FORM 9. Certificate of Interest

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable          ☑   Additional pages attached

| See attached list of counsel | | |
|---|---|---|
| | | |
| | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below)    ☐   No    ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| | | |

Attachment to Form 9, 4.  Legal Representatives

## LIST OF COUNSEL

**Cravath, Swaine & Moore LLP**

Keith R. Hummel
Richard J. Stark
Sharonmoyee Goswami
Marc J. Khadpe
Matthew J. Boggess
Allison N. Kempf
Kalana Kariyawasm
Retley G. Locke, Jr.

**Polsinelli Law Firm**

Deanna Tanner Okun
Daniel Smith

**Adduci, Mastriani & Schaumberg, LLP**

Michael R. Doman, Jr.
John W. McGrath

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2023-1769 |
| **Short Case Caption** | Causam Enterprises, Inc. v.  ITC |
| **Filing Party/Entity** | ecobee Technologies ULC d/b/a ecobee (intervenor) |

<table>
<tr><td>

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

</td></tr>
</table>

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 02/21/2024

Signature:  Manny J. Caixeiro

Name:  Manny J. Caixeiro

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☐ None/Not Applicable |
| ecobee Technologies ULC d/b/a ecobee | | Generac Holdings, Inc. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐     Additional pages attached

FORM 9. Certificate of Interest

---

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| Daniel A. Apgar - Venable LLP | Nicole E. Feldman - Venable LLP | Abby M. Neu - Venable LLP |
| Matthew R. Alsip -Venable LLP | Leslie A. Lee - Venable LLP | Justin J. Oliver - Venable LLP |
| Jared A. Boone - Venable LLP<br>Ashley N. Barnett - Venable LLP | Steven M. Lubezny - Venable LLP<br>Elizabeth M. Manno - Venable LLP | Vivian Sandoval - Venable LLP<br>Catherine N. Taylor  - Venable LLP |

---

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below)    ☐   No    ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

---

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

PATENT CLAIM (U.S. PATENT NO. 10,394,268) ..................................................i

CERTIFICATE OF INTEREST .............................................................. ii

TABLE OF AUTHORITIES ............................................................ xviii

TABLE OF ABBREVIATIONS AND CONVENTIONS ...................................xxi

STATEMENT OF RELATED CASES .............................................. xxii

STATEMENT OF THE ISSUES................................................................1

STATEMENT OF THE CASE.................................................................4

I.    The '268 Patent. ..................................................................4

II.   The Accused Resideo Method. ........................................................7

      A.    The Alleged Step of "Receiving a Power Control Message." ..................8

      B.    The Alleged Step of "Generating Measurement and Verification
            Data Corresponding to the Reduction in Consumed Power."...................9

III.  The CALJ's Final Initial Determination Finding No Violation. .....................10

      A.    The CALJ Found Multiple Reasons Why Resideo Does Not Infringe
            Claim 1. ...............................................................................10

            1.    The CALJ Found That Resideo Lacks the Specific Intent
                  Required for Induced Infringement. .................................................11

            2.    The CALJ Found That Resideo Does Not Perform the Step of
                  "Receiving a Power Control Message." ...........................................12

            3.    The CALJ Found That Resideo Does Not Perform the Step of
                  "Generating Measurement and Verification Data
                  Corresponding to the Reduction in Consumed Power."...................17

      B.    The CALJ Found That Causam Does Not Own the '268 Patent. ............20

IV.  The Commission's Decision Affirming the Finding of No Violation. ............24

SUMMARY OF THE ARGUMENT .......................................................25

ARGUMENT .......................................................................................29

I.  The Applicable Standards of Review...............................................29

II.  This Court Should Affirm the Finding of No Induced Infringement Because Substantial Evidence Supports the Finding and Because Causam Has Not Challenged Resideo's Lack of Specific Intent to Induce Infringement. .....................................................................................29

III.  Substantial Evidence Supports the Commission's Finding That There Is No Direct Infringement. ...................................................................32

    A.  Substantial Evidence Supports the Commission's Finding That "Generating Measurement and Verification Data Corresponding to the Reduction in Consumed Power" Is Not Performed. ..........................32

        1.  The Commission Correctly Found No Infringement Because the Resideo Thermostats Do Not Use or Determine Actual Reductions in Consumed Power.......................................................33

        2.  The Commission Correctly Found No Infringement Because Runtime Data Does Not Qualify as "Measurement and Verification Data Corresponding to the Reduction in Consumed Power." .......................................................................................37

    B.  Substantial Evidence Supports the Commission's Finding That "Receiving a Power Control Message" Is Not Performed. ......................41

        1.  The Claimed "Power Control Message" Must Indicate an "Amount of Electric Power to Be Reduced" and Must Identify a "Controllable Device" to Be Instructed...........................................42

        2.  Substantial Evidence Supports the Commission's Finding That Neither Requirement Is Met. ...........................................................45

            i.  The Accused Demand-Response Message Does Not Indicate an Amount of Electric Power to Be Reduced.............46

            ii.  The Accused Demand-Response Message Does Not Indicate a Controllable Device to Be Instructed......................47

IV. This Court Need Not Address Ownership of the '268 Patent, But if It Does This Court Should Uphold the CALJ's Finding That Causam Does Not Own the Patent. ...........................................................................49

    A.  This Court Has Jurisdiction to Hear Causam's Appeal Without Resolving the Question of Ownership of the '268 Patent. .......................49

    B.  Causam Does Not Own the '268 Patent. ...................................................52

        1.  The CALJ Accurately Analyzed the Assignment History in Finding That Mr. Forbes Assigned Away His Ownership Rights in 2007. ...........................................................................................53

        2.  Causam's Ownership Arguments Are Meritless and Its New Arguments Forfeited. ........................................................................55

CONCLUSION .....................................................................................................62

Certificate of Compliance with Type–Volume Limitation.....................................64

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*A123 Sys. v. Hydro-Quebec*,
626 F.3d 1213 (Fed. Cir. 2010) ............................................................ 50

*Amarin Pharma, Inc. v. Int'l Trade Comm'n*,
923 F.3d 959 (Fed. Cir. 2019) .............................................................. 49

*Beloit Corp. v. Valmet Oy*,
742 F.2d 1421 (Fed. Cir. 1984) ............................................................ 52

*Broadcom Corp. v. Int'l Trade Comm'n*,
542 F.3d 894 (Fed. Cir. 2008) ........................................................ 30, 49

*CACI Inc.-Federal v. United States*,
67 F.4th 1145 (Fed. Cir. 2023) ............................................................ 51

*Dasher v. RBC Bank (USA)*,
745 F.3d 1111 (11th Cir. 2014) ............................................................ 59

*Film-Tec Corp. v. Allied-Signal, Inc.*,
939 F.2d 1568 (Fed. Cir. 1991) ............................................................ 61

*Finnigan Corp. v. ITC*,
180 F.3d 1354 (Fed. Cir. 1999) ...................................................... 29, 30

*In re Google Tech. Holdings LLC*,
980 F.3d 858 (Fed. Cir. 2020) .............................................................. 49

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) ............................................................................ 51

*Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*,
925 F.3d 1225 (Fed. Cir. 2019) ...................................................... 51, 52

*Mayborn Grp., Ltd. v. Int'l Trade Comm'n*,
965 F.3d 1350 (Fed. Cir. 2020) ............................................................ 51

*McIntosh v. Dep't of Def.*,
53 F.4th 630 (Fed. Cir. 2022) ........................................................ 31, 33

*MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*,
   420 F.3d 1369 (Fed. Cir. 2005) .............................................................30

*Motorola Mobility, LLC v. ITC*,
   737 F.3d 1345 (Fed. Cir. 2013) .............................................................29

*Omni MedSci, Inc. v. Apple Inc.*,
   7 F.4th 1148 (Fed. Cir. 2021) .................................................29, 57, 61

*Philip Morris Prods. S.A. v. Int'l Trade Comm'n*,
   63 F.4th 1328 (Fed. Cir. 2023) ..............................................20, 49, 55

*Regents of University of New Mexico v. Knight*,
   321 F.3d 1111 (Fed. Cir. 2003) .............................................................57

*Ritchie v. Simpson*,
   170 F.3d 1092 (Fed. Cir. 1999) .............................................................51

*Roku, Inc. v. Int'l Trade Comm'n*,
   --- F.4th ---, 2024 WL 202033 (Fed. Cir. Jan. 19, 2024) ...................50

*SiRF Tech., Inc. v. ITC*,
   601 F.3d 1319 (Fed. Cir. 2010) .............................................................29

*Smithkline Beecham Corp. v. Apotex Corp.*,
   439 F.3d 1312 (Fed. Cir. 2006) .............................................................31

*SuperGuide Corp. v. DirecTV Enterprises*,
   358 F.3d 870, 886 (Fed. Cir. 2004). ...............................................43, 44

*Surface Tech., Inc. v. ITC*,
   801 F.2d 1336 (Fed. Cir. 1986) .............................................................29

*Univ. of W. Va., Bd. of Trs. v. VanVoorhies*,
   278 F.3d 1288 (Fed. Cir. 2002) .............................................................56

*Univ. of W. Va., Bd. of Trs. v. VanVoorhies*,
   342 F.3d 1290 (Fed. Cir. 2003) .............................................................56

*Wildfire Prods., L.P. v. Team Lemieux LLC*,
   C.A. No. 2021-1072-PAF, 2022 WL 2342335 (Del. Ch. June 29, 2022)..........58

**STATUTES**

19 U.S.C. § 1337(c) ................................................................51

28 U.S.C. § 1295(a)(6)........................................................49, 50

## TABLE OF ABBREVIATIONS AND CONVENTIONS

| | |
|---|---|
| '268 patent | U.S. Patent No. 10,394,268 |
| Ademco | Intervenor Ademco, Inc. |
| Alarm.com | Intervenors Alarm.com Holdings, Inc. and Alarm.com Incorporated |
| Blue Br. *xx* | Opening Brief of Appellant, page *xx* |
| CALJ | Chief Administrative Law Judge |
| Causam | Appellant Causam Enterprises, Inc. |
| Commission or ITC | U.S. International Trade Commission |
| ecobee | Intervenor ecobee Technologies ULC, dba ecobee |
| EnergyHub | Intervenor EnergyHub, Inc. |
| ID | Initial Determination On Violation of Section 337 and Recommended Determination on Remedy and Bond |
| Itron | Intervenor Itron Inc. |
| Resideo | Intervenor Resideo Smart Homes Technology (Tianjin) |
| section 337 | 19 U.S.C. § 1337 |
| USPTO | U.S. Patent and Trademark Office |

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5(a), counsel for Intervenors state that no appeal in or from the same proceeding in the originating tribunal was previously before this Court or any other appellate court. The following cases may be directly affected by this Court's decision in this appeal: *Causam Enterprises, Inc. v. Alarm.com Incorporated*, No. 6:21-cv-00751; *Causam Enterprises, Inc. v. Itron, Inc.*, No. 6:21-cv-00750; *Causam Enterprises, Inc. v. Resideo Technologies, Inc.*, No. 6:21-cv-00749; and *Causam Enterprises, Inc. v. ecobee, Inc.*, No. 6:21-cv-00748. These cases are currently stayed.

Additionally, an inter partes review was instituted against the '268 patent at issue in this appeal. The proceeding is pending before the USPTO. *See ecobee Technologies ULC, dba ecobee v. Causam Enterprises Inc.*, IPR2022-01339.

Additionally, an appeal is currently pending before this Court regarding U.S. Patent No. 10,396,592, which is related to the '268 patent at issue in this appeal. *See Causam Enterprises, Inc. v. Unified Patents, LLC*, No. 23-2410. That appeal arises from an inter partes review proceeding where the Patent Trial and Appeal Board found all challenged claims unpatentable as obvious.

## STATEMENT OF THE ISSUES

1.    Causam's theory of infringement by Resideo for method claim 1 of the '268 patent concerned only induced infringement, not direct infringement.  Adopting the findings of the CALJ, the Commission found that Resideo does not infringe claim 1 for three independent reasons—lack of intent to induce infringement, and lack of two steps required for an underlying act of direct infringement.  This Court may affirm by resolving any of the following issues in Resideo's favor:

a.    Whether substantial evidence supports the Commission's finding of no induced infringement, where (i) the CALJ found that Resideo "does not have the specific intent to induce its customers" (Appx83); (ii) Causam failed to seek Commission review of that finding, thereby forfeiting the issue; (iii) the Commission adopted the finding, and (iv) Causam failed to present the issue in its principal appeal brief, thereby forfeiting it a second time?

b.    Whether substantial evidence supports the Commission's finding of no underlying act of direct infringement because no entity performs the step of "generating measurement and verification data corresponding to the reduction in consumed power" in method claim 1 of the '268 patent because (i) Resideo "does not have access to meter data, and therefore cannot provide 'measurement and verification' or any accurate data regarding actual power savings" (Appx78); (ii) Resideo merely calculates runtime data, which "is

– 1 –

insufficient for measurement and verification" (Appx79); and (iii) Resideo merely provides estimates of measurements, contrary to the patent which "requires an actual measurement" (Appx79)?

      c.     Whether substantial evidence supports the Commission's finding of no underlying act of direct infringement because no entity performs the step of "receiving a power control message" in method claim 1 of the '268 patent, where the claim recites "two requirements [for the power control message]: (1) an identification of an amount of electric power to be reduced, disabled, or enabled, and (2) an identification of at least one controllable device to be instructed to enable or disable a flow of electric power to one or more associated power consuming devices" (Appx74), and where the Commission found that Resideo's accused power control message "has *neither*" requirement (Appx74)?

      2.     In the Final Initial Determination, the CALJ found that Causam does not own the '268 patent because the named inventor "Mr. Forbes had no ownership [of] the Asserted Patents when he attempted to assign them to Causam." Appx42. The Commission reviewed that finding but took no position. On appeal, Causam presents the question of ownership of the '268 patent as a "threshold" question for this Court to resolve, despite that the Commission took no position on it and despite that it is a distinct question from whether Causam has standing to bring this appeal.

The question presented is whether this Court should "not sit to review what the Commission has not decided" (Blue Br. 18), particularly where, even if this Court were to review it, the CALJ's underlying findings are supported by substantial evidence?

## STATEMENT OF THE CASE

In the Investigation, Causam asserted four patents against Ademco, Inc. Alarm.com,[1] ecobee Technologies ULC (dba ecobee), EnergyHub, Inc., Itron, Inc., and Resideo Smart Homes Technology (Tianjin). Following an evidentiary hearing, the CALJ found that none of the Respondents infringed any of the asserted claims for a host of independent reasons. Appx62–66 (summary tables showing the many claim limitations "not proved" to be infringed). In this appeal, Causam challenges only one claim of one patent against one Respondent: "Causam seeks review only of the Commission's determination that Intervenor Resideo does not infringe claim 1 of the 268 Patent." Blue Br. 1. Causam has not appealed the Commission's noninfringement findings as to Respondents Ademco, Alarm.com, ecobee, EnergyHub, and Itron.

## I.    The '268 Patent.

The '268 patent is directed to a method of measuring and quantifying the amount of power actually reduced during "demand-response" events, i.e., events designed to reduce peak electricity consumption for a designated period of time. The patented method calculates the power savings "precisely"—"instead of merely providing an estimate." Appx335, 6:24–27 ("Embodiments of the present invention

---

[1] Alarm.com Holdings, Inc. and Alarm.com Incorporated.

monitor and calculate precisely how many kilowatts (or carbon credits) are being generated or saved per customer instead of merely providing an estimate."). These "precise[]" calculations are achieved by "measurement and verification" of the amount of power reduced. Appx336, 7:32–34.

The '268 patent did not invent the concept of "demand response." Mr. Forbes—the named inventor on the '268 patent—acknowledged that demand response "has existed for a very long time." Appx40037, 1:6–10. As the patent explains, prior-art demand-response programs used one-way devices that transmitted messages from the electric utility to devices at their customers' homes, with the messages telling the devices how much power to shed. Because those systems used one-way devices, the utility did not know the actual amount shed, and instead could only get an approximation:

> While one-way devices are generally industry standard and relatively inexpensive to implement, the lack of a return path from the receiver, combined with the lack of information on the actual devices connected to the receiver, make the system **highly inefficient for measuring the actual load shed** to the serving utility. While the differential current draw is measurable on the serving electric utility's transmission lines, **the actual load shed is approximate** and the location of the load deferral is approximated at the control center of the serving utility.

Appx333, 2:12–20 (emphasis added).

To overcome the limitations of systems in which "the actual load shed is approximate" (Appx333, 2:19), the alleged solution of the '268 patent "determines

the amount of steady-state power each device consumes when turned on," and uses sensors to "measure the amount of current consumed by each monitored device." Appx336, 7:11–16. Then, "[w]hen the serving utility needs more power . . . the power load management system automatically adjusts the power distribution by turning off specific loads on an individual subscriber basis." Appx336, 7:20–23.

The system knows the actual amounts of power being consumed by providing "means for tracking the actual amount of deferred load." Appx335, 6:28–29. The patent covers "a method for determining how much actual load may be controlled at any given time." Appx335, 6:36–37; *see also, e.g.*, Appx336, 7:33–34 ("an actual value that includes measurement and verification of the reduction in consumed power"); Appx343, 22:16–21 ("As described above, the present invention encompasses a method . . . [that] includ[es] the actual amount of power currently being individually or collectively consumed by the addressable devices.").

Under claim 1, a "client device" (a thermostat at a residence, for example) receives a "power control message" from a "load management server" (a utility's server, for example). The client device (thermostat) receives a "power control message" from the server that both "indicat[es] at least one of an amount of electric power to be reduced" and provides "identification of at least one controllable device to be instructed." Appx343, cl. 1. Once the client device (thermostat) receives the power control message, the device issues an instruction to a "controllable device."

– 6 –

*Id.*  The instruction tells the controllable device "to disable the electric power flow to at least one associated power consuming device" (such as an HVAC).  Appx343–344, cl. 1.

Claim 1 also requires "generating measurement and verification data corresponding to the reduction in consumed power."  *Id.*  The named inventor, Mr. Forbes, explained that to determine the reduction in consumed power, "[y]ou have to measure it and verify it," and to do that "you have to have an accurate power measurement."  Appx40038, 305:9–306:7.  Mr. Forbes explained that in the context of the '268 patent, "[m]easurement is actually taking a raw measurement from a meter or from a submeter or from a device that's capable of performing measurement."  Appx40039, 637:21–638:11.  He continued that "[v]erification is then taking that information and running it through an algorithm to verify that the data has got no gaps in it, so that the data is complete and so that the data make sense."  *Id.*

## II.    The Accused Resideo Method.

Resideo sells internet-connected thermostats that can process and execute demand-response messages sent by utility companies through Resideo's "Connected Savings" platform.  Appx67.  The goal of the Connected Savings platform is to shift energy consumption to periods of lower overall energy demand.  Appx67–68.  In the Investigation, Causam accused only Resideo's imported thermostats—not any part

of the Connected Savings platform, which resides in the U.S. and is not imported. *See* Appx36–37 (identifying only thermostats as accused products per a stipulation between Causam and Resideo).

### A.    The Alleged Step of "Receiving a Power Control Message."

During a demand-response event, Resideo's Connected Savings platform supports two events for attempting to reduce electricity usage—temperature setpoint-offset events and duty-cycle events.  Appx68–69 (citing Appx22405–22406, Q/A 95–97 (Paradiso)).  A setpoint-offset event changes the thermostat's temperature setpoint by a predetermined number of degrees. *Id.*  A duty-cycle event sets a duty-cycle for the thermostat's operation during the event, restricting the periods when the thermostat can allow the associated HVAC to operate normally. *Id.*

A utility company can access Resideo's Connected Savings platform to select the parameters of a demand-response event.  Appx68.  When a utility makes such a request, one of Resideo's two application programming interfaces ("TCC" and "LCC") sends a demand-response message to the thermostats.  Appx68.  The message instructs the thermostat to change the temperature setpoint or to alter the duty cycle.  Appx68 (citing Appx40008–40012 (Resideo's John Amundson); Appx20930, 632:1–25 (Amundson)).  The messages never identify a particular

device that can be instructed to disable power flow to an HVAC, nor do the messages include any indication of an amount of electric power to be reduced.  *Id*.

**B.    The Alleged Step of "Generating Measurement and Verification Data Corresponding to the Reduction in Consumed Power."**

When a Resideo thermostat receives a demand-response message, it uses the information in the message along with operational parameters (such as indoor temperature, humidity, and temperature limits) to determine whether to apply a voltage to open or close physical relays in the thermostat (to turn off or on certain aspects of the HVAC).   Appx69–70 (citing Appx22407–22408, Q/A 108–109 (Paradiso)).  The thermostat knows whether a relay has been signaled to open or close (called "relay status information"), but the thermostat has no way to know or determine whether the relay is actually opened or closed or whether the HVAC is actually off or on.  Appx70 (citing Appx40020 (Amundson)).  The thermostat also has no information about the amount of power used by the HVAC.  Appx70 (citing Appx40010, Q/A 27 (Amundson)).

Resideo's thermostats send the inferred relay status information to Resideo's unaccused Connected Savings platform, which can use the relay status information

to estimate runtime information for the HVAC.[2]   Appx70 (citing Appx40020
(Amundson)).   The Connected Savings platform then multiplies the estimated
runtime by a "proxy" value that generically assumes a single value for all HVAC
appliances in the geographic area (without regard for HVAC size, efficiency, or any
other characteristic), and the result is considered to estimate the overall performance
of a demand-response event.  Appx71.  The Resideo system has no ability to measure
or verify actual reductions in consumed power during demand-response events.
Appx78–79.  No part of Resideo's system has access to meter data.  Appx78 (citing
Appx22539, Q/A 56 (Resideo's Matthew Robbins)).

## III.   The CALJ's Final Initial Determination Finding No Violation.

### A.   The CALJ Found Multiple Reasons Why Resideo Does Not Infringe Claim 1.

Causam accused Resideo of inducing infringement of method claim 1 of the
'268 patent.  Appx4110–4111 (Causam's statement of "Complainant's Theories of
Infringement," identifying only induced infringement for claim 1 of the '268 patent);
Appx4137; Appx83.  After the evidentiary hearing, Causam never asserted direct

---

[2]  Causam incorrectly states that Resideo's **thermostats** generate runtime
information.  Blue Br. 7, 11–12.  Only the unaccused Connected Savings platform
does so.  *See* Appx73 ("the Resideo Accused Products themselves [i.e., thermostats]
perform no calculations").  The functionality performed by the Connected Savings
platform uses source code separate and independent of the source code running on
the thermostats.  Appx70–71 (citing Appx40030–40032 (Hashmi)).

infringement by Resideo. Instead, Causam asserted direct infringement by Resideo's customers—utility providers who use Resideo's Connected Savings platform, none of whom were named Respondents—and Causam asserted that Resideo induced those customers to infringe. Appx4136–4138.

As summarized below, the CALJ found that Resideo did not induce infringement of claim 1 for three independent reasons. First, Resideo lacked specific intent to induce its customers to infringe. Second, Resideo's accused thermostats do not generate the required "measurement and verification data corresponding to the reduction in consumed power." Third, Resideo's accused thermostats never receive the required "power control message." In this appeal, Causam addresses only the latter two reasons, ignoring the first.

### 1. The CALJ Found That Resideo Lacks the Specific Intent Required for Induced Infringement.

As noted above, for method claim 1 of the '268 patent, Causam did not present a theory of direct infringement against Resideo. Instead, Causam asserted only induced infringement. *E.g.*, Appx4110–4111.

In addition to the CALJ's finding that no entity performs two of the required method steps, thus foreclosing direct infringement (*see* Sections III.A.2 and III.A.3, *infra*), the CALJ also found that Resideo lacked the intent needed for indirect infringement. As the ID explains:

Causam alleges Resideo induces its customers to infringe claim 1 of the '268 patent. Resideo does not indirectly infringe for two reasons. [Appx22455–22456, Q/A 372–381 (Paradiso)]. First, there is no direct infringement. [*Id.*, Q/A 373]. Second, ***Resideo does not have the specific intent to induce its customers***, as Resideo obtained an opinion of counsel concluding that it does not infringe any of the Asserted Patents. [*Id.*, Q/A 379–381; *see also* Appx20953–20965, 655:18–667:4 (Robbins)].

Appx83 (emphasis added). The CALJ's finding that Resideo lacked specific intent to induce infringement served as an independent basis for noninfringement. Causam never sought Commission review of this factual finding, nor does Causam address it in the Blue Brief.

## 2. The CALJ Found That Resideo Does Not Perform the Step of "Receiving a Power Control Message."

Claim 1 requires that a client device receive a "power control message" that "indicat[es] at least one of an amount of electric power to be reduced and an identification of at least one controllable device to be instructed to disable the electric power flow to at least one associate power consuming device." Appx343–344, cl. 1. The CALJ explained that this limitation has "two requirements: (1) an identification of an amount of electric power to be reduced, disabled, or enabled, and (2) an identification of at least one controllable device to be instructed to enable or disable a flow of electric power to one or more associated power consuming devices." Appx74 (citing Appx22434, Q/A 255 (Paradiso)). The CALJ found that the "accused Resideo products do not meet this limitation as the accused power

control message in those products has *neither* (1) an identification of an amount of electric power to be reduced, disabled, or enabled *nor* (2) an identification of a controllable device." Appx74 (emphasis in original). The CALJ also found that "Causam cites no evidence to the contrary." *Id.*

For the first requirement, Causam alleged that the demand-response message instructs a thermostat to alter duty cycle or offset the temperature setpoint. Appx74. Crediting the testimony of Resideo's expert, Dr. Joseph Paradiso, the CALJ found that the accused Resideo method does "not have any message that indicates 'an amount of electric power to be reduced.'" Appx74. Dr. Paradiso testified that in the message there "must be an actual amount [of power] to be reduced, such as an amount in megawatts." Appx74 (citing Appx22435, Q/A 259). The CALJ further relied on Dr. Paradiso's explanation that messages altering temperature setpoints or duty cycles do not satisfy the claim requirement because they do not "reflect any amount of power." Appx74 (citing Appx22436, Q/A 261).

To confirm the finding, the CALJ analyzed each field in the two accused demand-response messages (Resideo's "TCC" and "LCC" messages). Appx75–76. For the TCC message, the CALJ found that "[n]one of these parameters include any amount of power to be reduced." Appx75 (citing Appx22436, Q/A 265 (Paradiso)). Similarly, the CALJ found that the "LCC message . . . also does not have any indication of an amount of power to be reduced." Appx75 (citing Appx22437, Q/A

266 (Paradiso)).   The CALJ found that the messages "merely alter duty cycle or perform a temperature offset."  Appx75.

The CALJ also found that "in many scenarios there may be no power reduction at all in response to these messages."  Appx76 (providing two example scenarios).   The CALJ credited the testimony of Resideo's witness Mr. Robbins, who explained that there "could actually be an increase in the amount of energy used during the demand response event."  Appx22536, Q/A 34; *see* Appx77 (relying on Mr. Robbins).

The CALJ also rejected Causam's alternative argument that this limitation is met under the doctrine of equivalents.  Appx76–78.  The CALJ found that, "[f]irst, duty cycling and temperature setbacks perform a different function, in a different way, to achieve a different result, than indicating an amount of electric power to be reduced, as is required by the claims in question."  Appx76–77 (citing Appx22438, Q/A 275 (Paradiso)).   The CALJ relied on Dr. Paradiso's testimony, including the following:

> A message that merely indicates that a load control switch or thermostat should perform duty cycling or temperature setbacks does not indicate any amount of power to be reduced. In fact, as I've explained, there might be no power reduction at all. This sort of message will at best do one of three things: (1) nothing at all (for example, if the power-consuming device was already off during the demand response event, or if the setpoint of a thermostat is already beyond the requested setpoint), (2) cycle a device off as instructed during the duration of an event, or (3) shift a temperature setpoint. Nothing in any of these three

> options indicates the amount of power to be reduced. And in fact, in the
> first scenario, there would be no power reduction at all.

Appx22439, Q/A 279.   The CALJ expressly adopted Dr. Paradiso's testimony,

reciting verbatim much of the testimony quoted above.  *See* Appx77.

Second, again crediting and quoting Dr. Paradiso's testimony, the CALJ

found that "Causam's doctrine of equivalents theory also fails the insubstantial

differences test."  *Id*.  The CALJ reasoned that "[i]nstructing a device to participate

in cycling-based control strategies or temperature-based control strategies is very

different than instructing a device regarding 'an amount of electric power to be

reduced,' as the claim requires."  Appx77 (citing Appx22438, Q/A 276 (Paradiso)).

The CALJ continued by explaining that "[a] message that requests duty cycling or

temperature setback does not actually give any insight into whether any electric

power will be reduced, and it certainly doesn't indicate 'an amount of electric power

to be reduced.'"  Appx77 (citing Appx22438, Q/A 277 (Paradiso)).   The CALJ

further found that "if a duty cycling message is sent to control a power consuming

device that is not operating, there will be no power reduction at all."  Appx77 (citing

Appx22438–22439, Q/A 278 (Paradiso)).   The CALJ also reasoned that "if a

temperature setback message is sent to control a thermostat that was off or already

set at a higher temperature than the setback, there will be no power reduction at all."

Appx77–78 (citing Appx22438–22439, Q/A 278 (Paradiso)).

For the second requirement—that the power control message must provide "an identification of at least one controllable device to be instructed to disable the electric power flow to at least one associated power consuming device"—Causam alleged that the limitation is satisfied by demand-response messages identifying relays within the thermostat. Appx4201. The CALJ found to the contrary for two reasons. First, the CALJ found that the accused messages neither "identify any relays on the thermostat" nor even "identify a particular thermostat." Appx68; *see also* Appx74 (the messages do not have "an identification of a controllable device"); Appx40009–40010 (Amundson).

Second, the CALJ found that, in the context of the '268 patent, "a relay cannot be a 'controllable device.'" Appx94. The CALJ credited Dr. Paradiso's testimony:

> [I]t's very clear that the patent envisioned this invention to be a distributed invention where you had the client device separate, in the home, from the controllable device. And it talks about the kinds of commands it sends [being] Internet protocol commands, IP commands.
>
> So, clearly, there are commands that have some structure. This is not just a relay. I think you're taking this patent totally out of where it belongs to say that the relays are controllable devices and [that] things going down a line, a voltage that asserted a pin up and down [that] drives that coil on a relay is a command. It is not. Especially not in the context of this patent.

Appx21012–21013, 714:23–715:9. Dr. Paradiso explained that the patent "contemplates that 'the identification of at least one controllable device' to be instructed is via an IP address." Appx95 (citing Appx22439, Q/A 281). He

explained that simple relays such as those in Resideo's accused thermostats are incapable of IP communication. Appx22443, Q/A 304. The CALJ agreed, finding that Resideo's accused thermostats lack any controllable device. Appx81 (citing Appx22450, Q/A 348 (Paradiso)).

The CALJ also found that Causam's doctrine-of-equivalents theory fails because it did no more than "mimic[] the claim language with no explanation or discussion." Appx95.

### 3. The CALJ Found That Resideo Does Not Perform the Step of "Generating Measurement and Verification Data Corresponding to the Reduction in Consumed Power."

Claim 1 also requires "generating measurement and verification data corresponding to the reduction in consumed power." Appx344, cl. 1. Causam alleged that estimated runtime data (which is generated only by Resideo's unaccused Connected Savings platform) satisfied this limitation. The CALJ disagreed, both because the actual "Resideo Accused Products [i.e., the thermostats] themselves perform no calculations" (including runtime calculations) (Appx73) and because, regardless, runtime information does not qualify as "measurement and verification data corresponding to the reduction in consumed power" (Appx78–79).

In finding that runtime information is insufficient, the CALJ relied on testimony by the named inventor, Joseph Forbes, and by the Respondents' expert, Dr. Paradiso. Mr. Forbes addressed the claim phrase "measurement and

verification," explaining that "measurement" "is taking a raw measurement from a meter or a submeter or from a device that's capable of performing measurement," and that "verification" "is then taking that information and running it through an algorithm in order to verify that the data has got no gaps in it." Appx78 (citing Appx40039, 637:21–638:18). Dr. Paradiso agreed, testifying that "[m]easurement and verification typically requires an actual measurement," and "runtime data is insufficient for measurement and verification." Appx22428, Q/A 228; Appx79 (relying on Dr. Paradiso). Dr. Paradiso also explained that "estimates" are "something entirely different" than measurement and verification. Appx22429, Q/A 229; Appx79 (relying on Dr. Paradiso).

Armed with this testimony, the CALJ made three key findings about "measurement and verification." First, the CALJ found that "Resideo does not infringe claims requiring measurement and verification at least because it does not have access to meter data, and therefore cannot provide 'measurement and verification' or any accurate data regarding actual power savings." Appx78. The CALJ supported his finding with testimony by Mr. Robbins that "Resideo does not have access to meter data." Appx22537, Q/A 43; Appx78.

Second, the CALJ found that "the documents and source code Causam relied on do not establish that Resideo performs 'measurement and verification.'" Appx78–79. Relying on testimony by both Dr. Paradiso and another technical

– 18 –

expert, Dr. Hashmi, the CALJ found that the source code function Causam relied on "is not used by the Resideo Accused Products at all." Appx79; *see also* Appx73 ("the Resideo Accused Products themselves perform no calculations"). Next, addressing "runtime" information calculated by the unaccused Connected Savings platform, the CALJ found that the runtime data "is merely an estimated calculation." Appx79. The CALJ relied on testimony by Dr. Paradiso that Causam's evidence simply showed "send[ing] relay status information, and in particular whether a voltage has been applied to open or close the relays," where the relay status information can be "used to calculate runtime." Appx22408, Q/A 113. Dr. Paradiso explained that such "runtime data is insufficient for measurement and verification" because measurement and verification "requires an actual measurement." Appx22428, Q/A 228.

Lastly, the CALJ found that Resideo only "provides estimated information about the relative performance of any given event" to utilities. Appx79. The CALJ explained that "measurement and verification" is performed only by the utility, using its own data—not by Resideo, and not using Resideo data: "Measurement and verification is performed solely by the utility based on information that is only available to the utility (meter data)." Appx79 (citing Appx22537, Q/A 44 (Robbins)). The CALJ supported this finding with testimony by Mr. Robbins that "Resideo only provides sufficient information so that it can be determined that one

demand response scheme works better or worse than another. It is then the responsibility of the utility to use meter data to measure and verify the amount of energy that was actually saved." *Id*.

### B.   The CALJ Found That Causam Does Not Own the '268 Patent.

The CALJ analyzed the assignment history of the '268 patent, starting with its parent U.S. Patent Application No. 11/895,909 filed in 2007 ("the '909 Application"). In the end, the CALJ[3] concluded that the named inventor, Mr. Forbes, "gave up his rights in the '909 Application and all its progeny in 2007 and never got them back." Appx48. Accordingly, "Mr. Forbes had no ownership in the ['268 patent] when he attempted to assign [it] to Causam" years later. Appx42. The pertinent assignment history for the '268 patent, and the CALJ's analysis of that history, is recounted below.

In 2007, Mr. Forbes worked at a company he founded, America Connect, Inc. Appx39–40. In August 2007, Mr. Forbes and another employee, Joel Webb, together filed the '909 Application. Appx40. That same month, they jointly executed an Assignment of Application to Be Filed, assigning their rights in the '909

---

[3] The Commission never addressed this issue, and so it is not properly before this Court. *See, e.g.*, *Philip Morris Prods. S.A. v. Int'l Trade Comm'n*, 63 F.4th 1328, 1336–37 (Fed. Cir. 2023). But the Blue Brief addresses it, so Intervenors summarize the relevant facts.

Application and its progeny to their employer, America Connect. *Id.*; Appx21594–

21597 ("the 2007 Assignment"). The 2007 Assignment covered the '909

Application as well as "all divisions, reissues, continuations and extensions thereof":

> [T]he Inventors have sold, assigned, and transferred, and by these presents **do sell, assign and transfer**, unto said Assignee **the full and exclusive right to** the said Invention in the United States and its territorial possessions and in all foreign countries and the entire right, title, and interest in and to **any and all patents which may be granted therefor** in the United States and its territorial possessions and in any and all foreign countries **and in and to all divisions, reissues, continuations and extensions thereof**.

Appx21595 (emphasis added).

In 2008, America Connect assigned these rights to a new and different

company that Mr. Forbes co-founded, Cleartricity, which was later renamed Consert.

Appx40; Appx20378, 82:9–23 (Forbes).[4]

After Consert fired Mr. Forbes in 2011, he formed two more companies—

Causam (the appellant here) and a holding company called BCIP. Appx40–42;

Appx22320, Appx22328, Appx22330. In May 2012, without the permission of

Consert, Mr. Forbes filed new patent applications that claimed priority to the '909

---

[4] In 2010, while working at Consert, Mr. Forbes entered into another assignment agreement, a purported "catch-all" under which he "assigned to Consert the rights to all intellectual property that [he] had developed or would develop while at Consert." Appx20381–20382, 85:25–86:8 (Forbes). This 2010 agreement had no impact on the ownership of the '909 Application or its progeny, which had already been assigned in 2007. Appx43–44.

Application.  Appx40–41; Appx20401, 105:9–20 (Forbes).  One of those eventually

issued as the '268 patent at issue in this appeal.

In January 2013, Toshiba Corporation acquired Consert and merged it into a

Toshiba subsidiary, Landis+Gyr.  Appx41; *see also* Appx21774–21879.  As a result

of the acquisition and merger, Landis+Gyr acquired Consert's rights in the '909

Application and its progeny.  *See* Appx41, Appx48, Appx198.

In May 2013, Mr. Forbes, BCIP, and Consert entered into a Patent

Assignment and License Agreement.  Appx41; Appx21880–21890 ("the 2013

Agreement").  The 2013 Agreement does not assign any patent rights ***from*** Consert

***to*** Mr. Forbes or BCIP.[5]  *See* Appx44 ("The 2013 Assignment did *not* transfer

ownership in the '909 Application back to Mr. Forbes.").  Instead, Mr. Forbes and

BCIP assigned certain of their patent rights to Consert, while purporting to exclude

from the assignment certain "Excluded Patents":

> Assignor [Mr. Forbes and BCIP] hereby assigns to Assignee [Consert],
> any and all ownership rights in the above listed Consert Patents, any
> continuations or divisionals related to any of the listed patents and
> applications, including the right to claim priority under all applicable
> international treaties, arrangements and agreements … and all related
> intellectual property, excluding the Excluded Patents.

---

[5] Mr. Forbes admitted that "Consert was the only assignee in the 2013 agreement." Appx20405, 109:18–110:1 (Forbes).

Appx21885, ¶ 4; *see also* Appx41–42.  The 2013 Agreement states that it grants "[n]o rights, express or implied . . . except as stated therein."  Appx21886, ¶ 7.

In February 2022, Landis+Gyr assigned its rights in the '268 patent (and certain other patents) to Respondents Resideo and Itron.  Appx21714–21719.

Based on these events, the CALJ found that through the 2007 Assignment, "Mr. Forbes and Mr. Webb assigned to America Connect their entire right, title, and interest to the '909 Application and all progeny thereof."  Appx43.  He found that "[t]he record contains no assignment of any intellectual property, patents, or applications from America Connect back to Mr. Forbes," and "nothing in the record indicates he had personal title to the '909 Application after 2007."  *Id.*

The CALJ rejected Causam's arguments based on the language of the 2013 Agreement where Mr. Forbes's assignment of certain rights to Consert excluded the "Excluded Patents" (which Causam argued included the '268 patent).  The CALJ found that "Mr. Forbes had no rights in the '909 Application in 2013; he had already given up those rights in the 2007 Assignment."  Appx46.  The CALJ continued:

> The fact that Mr. Forbes's assignment to Consert [in the 2013 Agreement] does not include a transfer of rights to the Excluded Patents does not resolve who in fact owns the Excluded Patents.  To illustrate this point, if the agreement stated that the assignment from Mr. Forbes did not include an assignment of ownership of the Statue of Liberty, that carve-out would not confirm that Mr. Forbes owned the Statue of Liberty.

*Id.*; *see also* Appx48 ("Consert owned the rights to the '909 Application and all progeny of the '909 Application the day before and the day after the 2013 Assignment Agreement."). Thus, because "Mr. Forbes gave up his rights in the '909 Application and all its progeny in 2007 and never got them back" (Appx42), the CALJ found that Causam does not own the asserted patents, including the '268 patent.

## IV.    The Commission's Decision Affirming the Finding of No Violation.

Causam filed a petition for review of the final ID, and the Respondents filed a contingent petition for review.  Appx259.  The Commission reviewed, and ultimately took no position on, the CALJ's (1) finding that Causam does not own the asserted patents, including the '268 patent; (2) findings on obviousness; and (3) findings on domestic industry.  Appx260.  The Commission affirmed the final ID by adopting all findings not inconsistent with the Commission's determination, which included adopting all findings regarding noninfringement of all asserted patents by all Respondents.  *Id.*[6]

---

[6] Because the Commission adopted the CALJ's findings on these issues, the findings are hereinafter referred to as the Commission's findings.

## SUMMARY OF THE ARGUMENT

Causam has dropped most of its case, leaving just a single issue: whether substantial evidence supports the Commission's finding that Resideo does not infringe claim 1 of the '268 patent.  Claim 1 covers a method for managing power flow where a "client device" (e.g., thermostat) receives a message that both indicates an amount of power to be reduced and identifies a "controllable device" for disabling power flow to a power-consuming device (e.g., HVAC).  The claim requires generating "measurement and verification data" that "correspond[s] to the reduction in consumed power."  The goal of the patent is to provide "accurate reporting of the ***actual*** amount of power saved . . . ***instead of merely providing an estimate***."  Appx335, 6:22–27 (emphasis added).

The Commission identified many reasons why Resideo does not infringe, and this Court can affirm in any of five independent ways.

***First***, Causam's lone infringement theory was induced infringement, and Causam's principal brief fails to address or dispute the Commission's finding that "Resideo does not have the specific intent to induce its customers" to commit direct infringement.  Appx83.  Claim 1 is a method claim, and Causam asserted that Resideo's customers perform the method when using Resideo thermostats.  This Court can affirm for this reason alone.

***Second***, substantial evidence supports the Commission's finding that "Resideo does not infringe [claim 1] requiring measurement and verification at least because [Resideo] does not have access to meter data, and therefore cannot provide 'measurement and verification' or any accurate data regarding actual power savings." Appx78. The Commission found that "measurement and verification" in claim 1 "requires an actual measurement of power." Appx79. Causam agrees. *See* Blue Br. 34 ("performing 'measurement and verification' . . . does require some actual power measurements (*e.g.*, meter data)"). But there is no dispute that Resideo's thermostats lack that capability. Appx78.

***Third***, Causam asserted that absent actual meter data, device "runtime" data is sufficient. But substantial evidence supports the Commission's finding that "[r]untime data is insufficient for measurement and verification at least because measurement and verification requires an ***actual*** measurement of power." Appx79 (emphasis added). As Resideo's expert explained, "runtime data is insufficient for measurement and verification" because "[m]easurement and verification typically requires an actual measurement." Appx22428, Q/A 228. Moreover, only ***unaccused*** cloud servers—not the accused Resideo thermostats—calculate the runtime information, providing yet another reason why Causam's "runtime" theory fails.

*Fourth*, the Commission properly interpreted the "power control message" in claim 1 as having "two requirements": the message must indicate "at least one" amount of power to be reduced and it must identify "at least one" controllable device to be instructed. Appx74. Causam argues that only one or the other is required—not both—but the claim uses the phrase "at least one" before both requirements, and it connects the two requirements with the conjunctive term "and." Notably, the Commission found that the accused message "has *neither*" of the requirements, and the Commission found that "Causam cites no evidence to the contrary." Appx74 (emphasis in original). In fact, Causam does not even challenge the Commission's finding that the accused message never identifies the first requirement—an amount of electric power to be reduced—providing an independent basis for affirmance.

*Fifth*, substantial evidence supports the Commission's finding that the accused power control messages do not identify any "controllable device." Causam relied on relays within the thermostats as the "controllable devices," but the Commission found that the accused messages never "identify any relays on the thermostat." Appx68. Also, in the context of the '268 patent "a relay cannot be a 'controllable device.'" Appx94. The controllable device (the alleged relay) must be separate from the client device (the alleged thermostat) and the two devices need to be in IP communication. That never happens, providing yet another basis for affirmance.

**Lastly**, separate from the substantive issues, Causam asks this Court to resolve a dispute over whether it even owns the '268 patent. The CALJ found that Causam never owned the patent because the named inventor "Mr. Forbes gave up his rights in the [parent] '909 Application and all its progeny [including the '268 patent] in 2007 and never got them back." Appx48. Thus, Mr. Forbes could not later assign those rights to Causam, as he had already assigned them to another company years earlier. Causam argues that this is a "threshold" issue for this Court to resolve, even while acknowledging that "the Commission . . . took no position on Causam's ownership of the asserted patent[]" and that "[t]his Court 'does not sit to review what the Commission has not decided.'" Blue Br. 18. This Court should decline to resolve the issue in the first instance, but if it does, the CALJ had it right: Causam has never owned the patent.

# ARGUMENT

## I.     The Applicable Standards of Review.

This Court "reviews the Commission's legal determinations without deference and its factual findings for substantial evidence." *Motorola Mobility, LLC v. ITC*, 737 F.3d 1345, 1348 (Fed. Cir. 2013); *see Finnigan Corp. v. ITC*, 180 F.3d 1354, 1361 (Fed. Cir. 1999). Under the substantial evidence standard, this Court "will not disturb the Commission's factual findings if they are supported by 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Finnigan*, 180 F.3d at 1361 (quoting *Surface Tech., Inc. v. ITC*, 801 F.2d 1336, 1340–41 (Fed. Cir. 1986)).

Interpretation of an agreement for patent ownership is a legal question of contract interpretation, reviewed de novo. *See Omni MedSci, Inc. v. Apple Inc.*, 7 F.4th 1148, 1151–52 (Fed. Cir. 2021). Underlying factual determinations are reviewed for substantial evidence. *SiRF Tech., Inc. v. ITC*, 601 F.3d 1319, 1325 (Fed. Cir. 2010).

## II.     This Court Should Affirm the Finding of No Induced Infringement Because Substantial Evidence Supports the Finding and Because Causam Has Not Challenged Resideo's Lack of Specific Intent to Induce Infringement.

Causam's appeal suffers from a critical flaw—it fails to address the specific intent requirement for ***induced*** infringement, Causam's lone theory of infringement for claim 1 of the '268 patent. *See, e.g.*, Appx4110–4111 (Causam's post-hearing

statement of "Complainant's Theories of Infringement," identifying only induced infringement for claim 1 of the '268 patent); Appx4137 (asserting that Resideo "induce[s] [its] customers to perform the methods recited in claims 1, 2, 6, and 7 of the '268 Patent"); Appx83 ("Causam alleges Resideo induces its customer to infringe claim 1 of the '268 patent.").

To prove induced infringement, Causam had to prove not only underlying direct infringement by Resideo's customers (according to Causam's theory), but also that Resideo had the specific intent to induce those customers to infringe. *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1378 (Fed. Cir. 2005). Causam failed on both fronts. First, the Commission found that "there is no direct infringement." Appx83. And second, the Commission separately found that "Resideo does not have the specific intent to induce its customers" to commit direct infringement. *Id.*

After the CALJ so ruled, Causam sought Commission review but challenged only the CALJ's findings relating to the underlying act of direct infringement. Causam never challenged the separate finding that Resideo lacked specific intent to induce its customers. Thus, Causam forfeited the issue. *See Finnigan*, 180 F.3d at 1362 ("A party seeking review [at the Federal Circuit] of a determination by the Commission must 'specifically assert' the error made by the ALJ in its petition for review to the Commission."); *Broadcom Corp. v. Int'l Trade Comm'n*, 542 F.3d 894,

900 (Fed. Cir. 2008).    In response to Causam's petition for review, Resideo specifically emphasized this "crucial and fatal flaw"—that is, Causam's failure to even address the finding that Resideo lacked the intent needed for induced infringement.  *See* Appx40118; *see also* Appx40056 (explaining that, "for method claims 1 and 2 of the '268 Patent[], one of th[e] [CALJ's] reasons [for no infringement] was because Causam failed to demonstrate the requisite intent for purposes of Causam's indirect infringement allegations").

The Commission adopted the CALJ's findings on Resideo's lack of intent. Appx260.  Causam then forfeited the issue a second time by not challenging the finding in its principal brief to this Court.  *See, e.g.*, *McIntosh v. Dep't of Def.*, 53 F.4th 630, 641 (Fed. Cir. 2022) ("'Our law is well established that arguments not raised in the opening brief are' forfeited." (quoting *Smithkline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006)).

Even if Causam had not forfeited the issue—twice—affirmance is warranted because the finding is supported by substantial evidence.  The Commission relied on uncontroverted evidence of Resideo's lack of intent, including testimony by Mr. Robbins, testimony by Dr. Paradiso, and an opinion of counsel regarding noninfringement.  Because resolving this issue in Resideo's favor is dispositive, this Court can affirm without addressing Causam's remaining arguments.

**III.    Substantial Evidence Supports the Commission's Finding That There Is No Direct Infringement.**

Along with finding that Resideo lacked specific intent to induce infringement, the Commission found no underlying act of direct infringement.  The Commission found that two steps of claim 1 are not satisfied: (1) the system does not generate "measurement and verification data corresponding to the reduction in consumed power"; and (2) the accused thermostats do not receive the required "power control message."  As discussed below, substantial evidence supports both findings, providing independent bases for affirmance (in addition to the lack of specific intent, discussed *supra*).

**A.    Substantial Evidence Supports the Commission's Finding That "Generating Measurement and Verification Data Corresponding to the Reduction in Consumed Power" Is Not Performed.**

The Commission found no direct infringement of claim 1 because the limitation requiring "generating measurement and verification data corresponding to the reduction in consumed power" is not performed.  The Commission identified at least two separate reasons.  First, the accused Resideo thermostats do not generate "measurement and verification data" corresponding to power reductions because the thermostats do not measure power or even have access to meter data regarding the actual amounts of power used or reduced during demand-response events.  And second, the accused Resideo thermostats merely know whether a relay has been

signaled to open or close, which Resideo's Connected Savings platform uses to estimate device runtime during demand-response events. Resideo's thermostats have no way of knowing whether the relays are actually opened or closed or whether the HVAC is on or off. The Commission correctly found that the device runtime estimates do not qualify as "measurement and verification data corresponding to the reduction in consumed power."

> **1. The Commission Correctly Found No Infringement Because the Resideo Thermostats Do Not Use or Determine Actual Reductions in Consumed Power.**

Claim 1 requires that a "client device" (e.g., thermostat) issue "a power management command" that causes a "controllable device" to disable electric power flow to an associated power-consuming device (e.g., HVAC) "to provide a reduction in consumed power." Appx343–344, cl. 1. That last requirement provides antecedent basis for the final step of claim 1, requiring "generating measurement and verification data corresponding to the reduction in consumed power." *Id.*

The Commission properly interpreted "measurement and verification data corresponding to the reduction in consumed power" as requiring "an actual measurement of power." Appx79. Causam admits the same, acknowledging in the Blue Brief that "performing 'measurement and verification' (*e.g.*, calculating a PSV) ***does require some actual power measurements (e.g., meter data)*.**" Blue Br. 34 (emphasis added).

This matches the disclosures in the specification. The '268 patent emphasizes "accurate reporting of the actual amount of power saved" during demand-response events. Appx335, 6:22–23. The alleged invention overcame limitations of known systems in which "the actual load shed is approximate." Appx333, 2:19. The specification thus states that, unlike the known systems, "[e]mbodiments of the present invention monitor and calculate *precisely* how many kilowatts (or carbon credits) are being generated or saved per customer *instead of merely providing an estimate*." Appx335, 6:24–27 (emphasis added). It continues by explaining that "[b]ecause the amount of power consumed by each specific load is known, the system can determine precisely which loads to turn off, and tracks the power savings generated by each customer as a result of this short-term outage." Appx336, 7:23–27. The specification consistently reiterates the importance of actual power measurements. *See, e.g.*, Appx335, 6:28–29 (the invention provides "means for tracking the *actual* amount of deferred load" (emphasis added)); Appx335, 6:36–37 ("a method for determining how much *actual* load may be controlled at any given time" (emphasis added)); Appx336, 7:33–34 ("an *actual* value that includes measurement and verification of the reduction in consumed power" (emphasis added)); Appx343, 22:16–21 ("As described above, the present invention encompasses a method . . . [that] includ[es] the *actual* amount of power currently being individually or collectively consumed by the addressable devices." (emphasis

added)).  Mr. Forbes admitted the same, testifying that "measurements" in the context of the patent are "actually taken from a meter or from a submeter or from a device that is capable of performing measurement."  Appx20357–20358, 61:22–62:3; *see* Appx78.

Because the specification (and inventor testimony) were clear, no construction was needed for this term.  Neither the CALJ nor the Commission construed it, and no party ever asked them to do so.  Causam, however, now asserts that the Commission misconstrued the claim to require "data *sufficient for* measurement and verification."  Blue Br. 29 (emphasis in original).  Causam's argument is a red herring.  Whether the data is "sufficient for" measurement and verification or is merely "for" measurement and verification makes no difference.[7]  What matters is that measurement and verification data must correspond to the ***actual*** reduction in consumed power of the power-consuming device—not a mere estimate of the reduction.  It was this requirement that the Commission found missing from the

---

[7] Causam's analogy—that although a college admissions office might evaluate applicants using inputs of "grades" and "test scores," just a single one of those would qualify as measurement and verification data—misses the mark.  *See* Blue Br. 30.  Both "grades" and "test scores" can correspond to the students' ***actual*** performance.  By comparison, if an input is merely the amount of time it took students to finish their tests, that metric—much like runtime information here—would not correspond to the students' ***actual*** performance.

accused Resideo method, and so Causam's newly raised claim construction argument is of no moment.

The Commission correctly found that "Resideo does not infringe claims requiring measurement and verification at least because it does not have access to meter data, and therefore cannot provide 'measurement and verification' or any accurate data regarding actual power savings."   Appx78 (citing Appx22537, Appx22539, Q/A 43, 56 (Robbins)).   There is no factual dispute about the capabilities of the accused imported thermostats or the unaccused, not imported Connected Savings platform.  The system "is unable to identify an amount of energy that is used or saved during a demand response event."  Appx22539, Q/A 56.

Because the system cannot measure or determine actual power measurements (or reductions in consumed power), Causam relied on estimates of the reductions. But the Commission correctly found that "[m]easurement and verification is different than an estimate; it requires an actual measurement."  Appx79 (citing Appx22429, Q/A 229 (Paradiso)).  The Commission credited Dr. Paradiso's expert testimony that "measurement and verification is something entirely different than estimates . . . .  Measurement and verification must be precise and typically involves an actual measurement."  Appx22429, Q/A 229.  Mr. Forbes himself admitted that "one of the problems" with the prior art one-way systems was that "they had to do estimation" of power reductions.  Appx20352–20353, 56:24–57:1.  And Causam's

own expert, Dr. Madisetti, likewise acknowledged that the '268 patent involves "methods and systems to precisely measure – to the kilowatt hour, and in dollar and cents – the reduction in load on the grid." Appx22017, Q/A 26; *see also id.*, Q/A 24 ("the claimed invention here can calculate with precision the amount of operating reserves or load reduced on the grid").

As the patent and record evidence make clear, and as the Commission found, "generating measurement and verification data" refers to data regarding actual measurements of the reduction in consumed power of the power-consuming device. Mere estimates, as in Resideo's system, do not satisfy this limitation. This Court may affirm the noninfringement finding on this basis alone.

> **2.    The Commission Correctly Found No Infringement Because Runtime Data Does Not Qualify as "Measurement and Verification Data Corresponding to the Reduction in Consumed Power."**

Because the accused Resideo system cannot measure or determine actual amounts of power (or actual amounts of power reduction), Causam relied on runtime information. The (unaccused) Resideo Connected Savings platform can estimate the performance of demand-response events by estimating runtime—i.e., estimating how long a device (e.g., HVAC) was on or off. The Commission correctly found, however, that estimated runtime data is not "measurement and verification" data

because it is not a measurement of consumed power. Appx79.[8] This provided another basis for noninfringement.

As an initial matter, the Commission recognized that the generated runtime information is not actual runtime, but merely estimated runtime. Appx71. The thermostats obtain information about the status of relays in the thermostats themselves, knowing nothing about the status of anything in the actual HVAC system or whether the HVAC's own relays are denying or permitting electric power flow. Resideo's Connected Savings platform then uses the thermostat relay status information to estimate device runtime during demand-response events.

No part of the Resideo system knows the actual amounts of power consumed or reduced (if any). Appx22539, Q/A 56 (Robbins). The Connected Savings platform relies on proxy values for HVACs—i.e., values that approximate typical power usage for typical HVACs in a geographic area. The proxy values do not indicate the power consumption of any actual HVAC; instead, they allow mere assumptions or estimates of possible power reductions. Appx71; Appx79.

Substantial evidence supports the Commission's finding that estimated runtime data does not infringe. For example, relying on the testimony of

---

[8] The unit of measurement for device runtime is seconds or minutes, not watts or kilowatts, and thus runtime does not correspond to a reduction in consumed power as required by the claim. Appx20795, 498:8–25.

Dr. Paradiso and Mr. Forbes, the Commission found that "[r]untime data is insufficient for measurement and verification at least because measurement and verification requires an actual measurement of power." Appx79 (citing Appx22428, Q/A 226–228 (Paradiso); Appx40039, 637:21–638:18 (Forbes)). The Commission relied on Dr. Paradiso's expert testimony that "runtime data is insufficient for measurement and verification" because "[m]easurement and verification typically requires an actual measurement," which Resideo's system cannot do. Appx22428, Q/A 228.[9]

Resideo's system—even had Causam accused Resideo's Connected Savings platform, which Causam did not and could not do since it is not imported—effectively embodies the prior-art demand response systems that Mr. Forbes and the '268 patent specification disparaged. The Commission found that, using the estimated runtime information, Resideo's unaccused platform "only provides estimated information about the relative performance of any given event." Appx79. The platform estimates the reductions in power consumption by using the estimated runtime information together with the proxy values that estimate power usage by

---

[9] Causam repeatedly cites testimony by an Itron witness about Itron's runtime information (Blue Br. 28, 32, 39), ignoring that the witness was neither a designated expert nor knowledgeable about Resideo's system. In any event, Causam omits the witness's clarification of his earlier testimony, saying Causam's view of it "is not the intent." Appx20887. The witness made clear that "[r]untime is not an accepted parameter for doing M&V." Appx22528, Q/A 111.

typical HVACs. Appx71; Appx22535, Q/A 30 (Robbins) ("Resideo therefore estimates the performance of the event and the baseline by multiplying the calculated runtime by a factor that assumes the size of the HVAC equipment based on the geographic location of the demand response event").

Those estimates say nothing about the amount of power actually reduced, or even whether there was any power reduction at all. Consider the difference between a small, new, efficient HVAC system and a large, old, inefficient system. If both are running, the former would no doubt use much less power than the latter, but knowing only the runtime data (i.e., Causam's theory) says nothing about the amount of actual power consumed or reduced.

Resideo's estimation process is thus inherently different from actual measurements, like those taken by a meter. Both Mr. Forbes and a Causam expert, Mr. Donohoe, confirmed this. Mr. Forbes testified that multiplying the amount of time a demand-response event lasted by an "assign[ed] proxy amount of power" (e.g., a proxy value that assumes every appliance uses 1 kW of power each hour it is on) "would not comply with the [patent] specification." Appx20424–20425, 128:7–129:4. Mr. Donohoe likewise testified that to perform measurement and verification "the amount of load reduction in kilowatts" needs to be "measured at the devices." Appx40035, 157:16–22. And he agreed that actual power consumption of an HVAC "[d]epends on the type of HVAC piece of equipment," and that "[y]ou would need

to know the type of HVAC, its size, efficiency, things like that." Appx40035, 211:20–212:7. The Commission agreed, finding that the estimated runtime information "is insufficient for measurement and verification at least because measurement and verification requires an actual power measurement" and not "merely an estimated calculation." Appx79. That finding is supported by substantial evidence and provides another basis for affirming the Commission's determination of no violation.

### B.     Substantial Evidence Supports the Commission's Finding That "Receiving a Power Control Message" Is Not Performed.

The Commission found that the accused Resideo thermostats do not infringe claim 1 of the '268 patent because the messages they receive have "*neither* (1) an identification of an amount of electric power to be reduced, disabled, or enabled *nor* (2) an identification of a controllable device." Appx74 (emphasis in original). The Commission found that "Causam cites no evidence to the contrary." *Id.*

Under the correct construction of the "power control message" in claim 1, the message must indicate at least one amount of power to be reduced and must identify

at least one controllable device.[10]   Causam asserts that the message need contain only one of these, not both, and so Causam challenges only the Commission finding that the messages received by Resideo's thermostats do not have an identification of at least one controllable device.  *See* Blue Br. 48–54.  Causam ignores the other requirement of the message (that it identify an amount of electric power to be reduced).  This Court should affirm under either interpretation of the claim, since the Commission found that "the accused power control message . . . has *neither*" requirement (Appx74 (emphasis in original)), and those findings are supported by substantial evidence.

### 1. The Claimed "Power Control Message" Must Indicate an "Amount of Electric Power to Be Reduced" and Must Identify a "Controllable Device" to Be Instructed.

The Commission correctly interpreted the claim phrase.  The claim recites that the client device (i.e., thermostat) receives a "power control message" that "indicat[es] [(1)] *at least one* of an amount of electric power to be reduced *and* [(2)] an identification of *at least one* controllable device to be instructed to disable

---

[10] Causam confusingly argues that the Commission misconstrued "identification of at least one controllable device" to "require an explicit identification of *only one* controllable device" and to "exclude an identification of multiple controllable devices."  Blue Br. 48 (emphasis in original).  Causam's only support—Appx74— shows the opposite.  The language was construed to "requir[e] . . . an identification of *at least one* controllable device."  Appx74 (emphasis added).

the electric power flow to at least one associated power consuming device." Appx343, cl. 1 (emphasis added). The Commission correctly ruled that this message has these "two requirements." Appx74.

Causam's reading of the claim—that the message requires one or the other, but not both—defeats the purpose of the claimed invention and renders other claim language superfluous.[11] The controllable device must disable the electric power flow to the associated power-consuming device "to provide a reduction in consumed power." Under Causam's reading of the claim, a message that identified only an amount of electric power to be reduced without also identifying the controllable device for disabling power flow would have the "power management command" delivering a message to nowhere.

The Commission's view of the claim aligns with precedent. In *SuperGuide Corp. v. DirecTV Enterprises*, this Court considered what the phrase "at least one of" modifies. 358 F.3d 870, 886 (Fed. Cir. 2004). The claim recited "television program schedule information comprising *at least one of* program start time, program end time, program service, *and* program type for a plurality of television programs." *Id.* at 884 (emphasis in original). This Court observed that there are

---

[11] Causam argues that the Commission's construction (adopting the CALJ's construction) "contradicts the CALJ's construction of that same phrase in the DI analysis." Blue Br. 42. But the Commission reviewed and took no position on the CALJ's domestic industry analysis, effectively vacating it.

four categories (program start time, program end time, program service, and program type) and that "[e]ach category is further comprised of many possible values." *Id.* at 886. This Court ultimately held that the "phrase 'at least one of' modifies each member of the list, i.e., each category in the list," reasoning that the "phrase 'at least one of' precedes a series of categories of criteria, and the patentee used the term 'and' to separate the categories of criteria, which connotes a conjunctive list." *Id.*

The disputed claim phrase here is even clearer. The power control message "indicat[es] *at least one* of an amount of electric power to be reduced *and* an identification of *at least one* controllable device to be instructed to disable the electric power flow to at least one associated power consuming device." Appx343, cl. 1 (emphasis added). The claim uses the phrase "at least one" before both requirements of the message, and it separates those requirements with the conjunctive term "and."

Causam argues that the claim language recites "at least one of an amount of electric power to be reduced" without providing more "member[s] of the group following that phrase." Blue Br. 44. But this particular claim language is merely an artifact of claims in related patents, where additional members were in fact recited. *See, e.g.*, Appx315, cl. 1 (claiming a message "indicating at least one of an amount of electric power to be *reduced, disabled, or enabled*" (emphasis added)). Thus, even though there is only one member in the first requirement of the message (i.e.,

an amount of electric power to be *reduced*), skilled artisans would recognize that the use of "at least one" before both the indication of the amount of electric power to be reduced and the identification of the controllable device(s) means that the message has "at least one" of both things. This disposes of Causam's argument about the embodiments in the specification. Causam argues that one of the embodiments "receives only 'a list of the devices to be turned off and a 'change state to off' indication for each device in the list.'" Blue Br. 46. This fits the claim language—it receives a list of devices (i.e., at least one controllable device) and an indication to disable the power (i.e., at least one of electric power to be reduced, *disabled*, or enabled). Thus, the claimed "power control message" was correctly viewed as having two requirements. But this Court need not resolve this dispute because, as discussed below, the Commission correctly found that the power control messages received by Resideo's thermostats have neither requirement.

### 2.   Substantial Evidence Supports the Commission's Finding That Neither Requirement Is Met.

The Commission correctly found that the message received by a Resideo thermostat is not a "power control message" under claim 1 because the message "has *neither*" required part of the message. Appx74 (emphasis in original). As discussed below, substantial evidence supports the Commission's findings, warranting affirmance of the noninfringement finding.

– 45 –

### i. The Accused Demand-Response Message Does Not Indicate an Amount of Electric Power to Be Reduced.

Causam does not dispute the Commission's finding that the accused demand-response message does not indicate an amount of electric power to be reduced. To be sure, the Commission's findings are supported by substantial evidence, including the testimony of Dr. Paradiso, Mr. Robbins, and Dr. Hashmi, as well as documentary evidence—none of which Causam challenges on appeal. Appx74–78.

The Commission found that the messages received by Resideo's thermostats merely request altering duty cycle or offsetting a temperature setpoint, and these "do not specify an amount of power to be reduced." Appx74 (citing Appx22435–22437, Q/A 258–261, 264–267 (Paradiso)). The instructions in the message can result "in no power reduction at all." Appx77 (citing Appx22439, Q/A 279 (Paradiso)). For example, the Commission explained that a message indicating a temperature offset may do nothing at all "if the setpoint of a thermostat is already beyond the requested setpoint." *Id.* Similarly, the Commission found that the thermostat may "override" a duty cycle event when "the current room temperature has exceeded the temperature limits associated with the duty cycle event, and for such a case, the thermostat reverts the HVAC to the operational state prior to the duty cycle event." Appx76. In both circumstances, no power is reduced at all. Appx77.

Put simply, as the Commission found, "[n]one of the Resideo [thermostats] actually reduce a known amount of power," and the messages sent to the thermostats never instruct them to reduce an amount of power. Appx78 (citing Appx22438–22439, Q/A 278 (Paradiso)). Instead, "requests are made consistent with the normal operation of a thermostat, which may or may not affect the amount of power used or reduced." *Id.* Substantial evidence, including witness testimony and documents, supports the Commission's findings, and Causam does not argue otherwise.

### ii. The Accused Demand-Response Message Does Not Indicate a Controllable Device to Be Instructed.

Substantial evidence also supports the Commission's finding that the accused demand-response messages do not identify "at least one controllable device to be instructed to disable the electric power flow to at least one associated power consuming device." First, the accused messages do not "identify any relays [the alleged 'controllable devices'] on the thermostat." Appx68. Second, in the context of the '268 patent "a relay cannot be a 'controllable device.'" Appx94.

At the evidentiary hearing, Causam argued exclusively that the relays within the accused Resideo thermostats are the alleged "controllable devices." *See, e.g.*, Appx4201 (Causam: "Resideo's TCC and LCC demand response messages indicate an identification of at least one relay (controllable device) to be instructed to disable the electric power flow to at least one associated power consuming device in both cycling-based and temperature-based control messages."). The Commission

rejected Causam's theory. Appx94–95. The relays are not controllable devices at least because the '268 patent recites a controllable device and a client device as two separate devices that communicate with each other via Internet Protocol messages, and a relay within a thermostat cannot so communicate. Appx94–95; *see also* Appx22439–22440, Q/A 281–283. As the Commission found, (1) the relays are not a separate device from the thermostat, and (2) the relays are not capable of IP communication. *Id.*; *see also* Appx339, 13:60–14:4.

Causam asserts for the first time on appeal that the demand-response messages received by the thermostats "include an IP address identifying the target thermostat, and by implication, the internal relays the thermostat uses 'to disable the electric power flow to at least one associated power consuming device.'" Blue Br. 50. This theory is new and untimely, and thus forfeited by Causam. Although Causam asserts that it made this argument to the Commission, that is simply not true. Causam's lone record citation is its Post-Hearing Brief (Appx4201), which makes no mention of any IP address in any message, much less an IP address of a thermostat that "by implication" is an IP address for individual relays within the thermostat. In fact, Causam's Post-Hearing Brief asserted the opposite—that "none of the Asserted Claims expressly requires that the client device or the controllable device be capable of IP communication." Appx4105. Because this argument is entirely new, it is forfeited. *Philip Morris*, 63 F.4th at 1336–37. At any rate, the Commission found—

correctly—that the accused power control message does not "identify a particular thermostat." Appx68 (citing evidence).

Causam also forfeited its new theory that the requirement of a message identifying a controllable device is satisfied under the doctrine of equivalents. First, Causam did not raise any doctrine-of-equivalents theory in its petition for Commission review, thus forfeiting it. *Broadcom*, 542 F.3d at 900. Separately, the doctrine-of-equivalents theory that Causam had raised before the CALJ (but not to the Commission) (*see, e.g.*, Appx4202) never included any mention of an equivalent to an IP address, thus forfeiting the new theory now presented for the first time on appeal. *In re Google Tech. Holdings LLC*, 980 F.3d 858, 862–63 (Fed. Cir. 2020).

## IV. This Court Need Not Address Ownership of the '268 Patent, But if It Does This Court Should Uphold the CALJ's Finding That Causam Does Not Own the Patent.

### A. This Court Has Jurisdiction to Hear Causam's Appeal Without Resolving the Question of Ownership of the '268 Patent.

Under 28 U.S.C. § 1295(a)(6), this Court has exclusive subject matter jurisdiction "to review the final determinations of the United States International Trade Commission relating to unfair practices in import trade, made under section 337." *See Amarin Pharma, Inc. v. Int'l Trade Comm'n*, 923 F.3d 959, 962 (Fed. Cir. 2019) ("[o]ur jurisdictional statute gives this court exclusive jurisdiction 'to review the final determinations of the United States International Trade Commission

relating to unfair practices in import trade, made under section 337'" (quoting § 1295(a)(6))).  Any jurisdictional question should end there.

Conflating several distinct principles that have no bearing on this Court's jurisdiction, Causam asserts that its appeal "addresses the question of **standing**" even though the "Commission . . . took no position on Causam's **ownership** of the asserted patents" because this Court must "assure itself of its **subject-matter jurisdiction** over this appeal."  Blue Br. 18 (emphasis added).  First, Causam misinterprets the question of patent ownership as being the same as a question of "standing" to prosecute an appeal, when these are two different issues.  *See Roku, Inc. v. Int'l Trade Comm'n*, --- F.4th ---, 2024 WL 202033, at *4 n.4 (Fed. Cir. Jan. 19, 2024) ("Throughout its briefs, Roku refers to this argument as a 'standing' challenge.  We agree with the Commission that 'standing' is not the right term.  Rather, Roku is actually challenging whether [the patentee] had rights to the '196 patent when it filed its complaint against Roku.").  Resolving a question of ownership requires assessing "whether the party alleging effective ownership has in fact received all substantial rights from the patent owner."  *A123 Sys. v. Hydro-Quebec*, 626 F.3d 1213, 1218 (Fed. Cir. 2010).  That is distinct from whether a party has standing to prosecute an appeal.

Second, Causam conflates the question of statutory standing to appear before the ITC with the question of Article III standing to appeal a Commission final

determination. Statutory standing involves determining "whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *CACI Inc.-Federal v. United States*, 67 F.4th 1145, 1151 (Fed. Cir. 2023) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014)); *see also Ritchie v. Simpson*, 170 F.3d 1092, 1095 (Fed. Cir. 1999) (explaining that "the starting point for a standing determination for a litigant before an administrative agency is not Article III, but is the statute that confers standing before that agency").

Causam's statutory standing (or lack thereof) to bring a case in the ITC "do[es] not implicate [this] [C]ourt's jurisdiction" to adjudicate an appeal. *CACI*, 67 F.4th at 1151 (quoting *Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1235 (Fed. Cir. 2019)). Rather, Article III standing for prosecuting an appeal depends on whether "a party seeking judicial review of a Commission determination" can show there is a "case or controversy." *Mayborn Grp., Ltd. v. Int'l Trade Comm'n*, 965 F.3d 1350, 1353–54 (Fed. Cir. 2020) ("A party has Article III standing to appeal from a decision of an administrative agency when it has: (1) suffered a particularized, concrete injury in fact that is (2) fairly traceable to the challenged conduct of the defendant and is (3) likely to be redressed by a favorable judicial decision."); *see also* 19 U.S.C. § 1337(c). Here, Causam alleges that it owns the '268 patent and that Resideo infringes it. Appx437. Those allegations are enough for this Court to hear Causam's appeal. *Lone Star*, 925 F.3d at 1235 ("As

long as a plaintiff alleges facts that support an arguable case or controversy under the Patent Act, the court has both the statutory and constitutional authority to adjudicate the matter."). The other questions surrounding patent ownership, which Causam asks this Court to decide, are unnecessary to resolve for this Court to have jurisdiction over the only substantive question on appeal (i.e., Resideo's noninfringement).

In any event, Causam's alleged ownership of the '268 patent is not properly presented by Causam's appeal, and it would be inappropriate for this Court to adjudicate the merits of the issue. Causam acknowledges that "the Commission . . . took no position on Causam's ownership of the asserted patents." Blue Br. 18. And Causam also acknowledges that "[t]his Court 'does not sit to review what the Commission has not decided.'" *Id.* (citing *Beloit Corp. v. Valmet Oy*, 742 F.2d 1421, 1423 (Fed. Cir. 1984)). The Commission based its Final Determination solely on Causam's failure to prove infringement. Accordingly, the only determination ripe for appellate review is whether the noninfringement finding is supported by substantial evidence.

## B.    Causam Does Not Own the '268 Patent.

Should this Court reach the question of ownership of the '268 patent, the CALJ's determination that Causam does not own the '268 patent should be affirmed.

1.　　　**The CALJ Accurately Analyzed the Assignment History in Finding That Mr. Forbes Assigned Away His Ownership Rights in 2007.**

Causam does not dispute that on August 24, 2007, Mr. Forbes and Mr. Webb executed a joint Assignment of Application to Be Filed (Appx42; Appx21594–21597 (2007 Assignment)), covering the '909 Application and its progeny. Appx20375–20376, 79:16–19, 80:4–6 (Forbes). Causam also does not dispute that the '268 patent "ultimately claim[s] priority, in whole or in part, to the '909 Application." Appx42. The 2007 Assignment states:

> [T]he Inventors have sold, assigned, and transferred, and by these presents **do sell, assign and transfer**, unto said Assignee **the full and exclusive right to** the said Invention in the United States and its territorial possessions and in all foreign countries and the entire right, title, and interest in and to **any and all patents which may be granted therefor** in the United States and its territorial possessions and in any and all foreign countries **and in and to all divisions, reissues, continuations and extensions thereof**.

Appx21595 (emphasis added).

Relying on this assignment, the CALJ found that Mr. Forbes and Mr. Webb assigned to America Connect their entire right, title, and interest to the '909 Application and all progeny thereof. Appx43. The 2007 Assignment of "all divisions, reissues, continuations and extensions thereof," combined with the undisputed evidence that the '268 patent falls into this category, ends the inquiry. Mr. Forbes assigned his interest in the '268 patent away at that time, and it was never assigned back to him through any future agreements.

In 2008, America Connect assigned its rights to a new and different company that Mr. Forbes had founded, Cleartricity, which was later renamed Consert. Appx40; Appx20378, 82:9–23 (Forbes). There was never any assignment of patent rights back to Mr. Forbes. Appx43.

In 2013, Mr. Forbes assigned certain patent rights to Consert, but crucially the 2013 Agreement did not assign any rights *to* Mr. Forbes, a fact that Mr. Forbes readily admitted. *See* Appx21885, ¶¶ 4–5 (2013 Agreement); Appx20405–20406, 109:18–110:1 (admitting that "Consert was the only assignee in the 2013 agreement"). Moreover, the 2013 Agreement contains an express provision stating that the agreement grants "[n]o rights, express or implied . . . except as stated herein." Appx21886, ¶ 7. Thus, the 2013 Agreement confirms that it did not impliedly create or transfer any patent ownership (or other) rights to Mr. Forbes.

After analyzing this assignment history, the CALJ found, correctly, that "the 2007 Assignment vested ownership of the '909 Application and any progeny [which includes the '268 patent] with America Connect." Appx43. "[N]othing in the record indicates that he [Mr. Forbes] had personal title to the '909 Application after 2007." *Id.* Following the 2008 Assignment from America Connect to Consert (Appx40), "Consert owned the rights from the 2007 Assignment, which included title to the '909 Application and all progeny of the '909 Application [which includes the '268 patent]." Appx43. The CALJ recognized that the 2013 Agreement contains an

assignment of "certain patent rights to Consert," but properly found that it "does not contain any language . . . that transfers ownership of any patents, patent applications, or inventions *from* Consert *to* Mr. Forbes or BCIP."  Appx45 (emphasis added). "Thus, Mr. Forbes did not obtain ownership of any patents or applications through the 2013 Assignment Agreement." *Id.*

### 2.    Causam's Ownership Arguments Are Meritless and Its New Arguments Forfeited.

Causam offers a variety of arguments (many raised for the first time on appeal), none of which explain how Mr. Forbes supposedly reacquired ownership of the '268 patent after he assigned it away in 2007.

*First*, Causam argues that the 2007 Assignment cannot reach the '268 patent because the assignment covers only the invention embodied in the '909 Application and its "*immediate* lineal descendants."  Blue Br. 20–22 (emphasis in original). Causam never made this argument to the CALJ (or in its petition for Commission review), and thus forfeited it.  *Philip Morris*, 63 F.4th at 1336–37 ("This [C]ourt recognizes that failure to raise an issue before an ALJ during an investigation constitutes forfeiture of that issue . . . [and] that a party's failure to make a specific argument in its petition for review of the FID before the Commission [also] constitutes forfeiture.").

Even if not forfeited, the argument has no merit.  Causam relies on this Court's *VanVoorhies* decision where the assignment covered the parent application, its

reissues or extensions, and "its immediate lineal descendants, including divisionals, continuations, continuations-in-part, or substitute applications." *Univ. of W. Va., Bd. of Trs. v. VanVoorhies*, 342 F.3d 1290, 1295 (Fed. Cir. 2003). In referencing "immediate lineal descendants," this Court merely limited the assignment's reach to patents within the same family, distinguishing patents in a different family embodying the same subject matter as continuations-in-part that were not designated as such (i.e., not "immediate lineal descendants"). *See id.*; *see also Univ. of W. Va., Bd. of Trs. v. VanVoorhies*, 278 F.3d 1288, 1298–99 (Fed. Cir. 2002). Thus, *VanVoorhies* does not support Causam's view. Here, the 2007 Assignment expressly assigned "the entire right, title, and interest in and to any and all patents which may be granted therefor . . . and in and to all divisions, reissues, continuations and extensions thereof." Appx21595. As the CALJ correctly found, this constituted an assignment to the "entire right, title, and interest to the '909 Application and all progeny thereof." Appx43.

Causam adds that the 2007 Assignment "cannot reach the '268 patent because the 2007 Assignment omitted continuations-in-part from its scope." Blue Br. 22–23. But the language used in the 2007 Assignment is identical to language this Court has held encompasses continuations-in-part. In *Regents of University of New Mexico v. Knight*, this Court held that assignment language reciting "all divisions, reissues, continuations, and extensions thereof" was "more than sufficient" to encompass

continuation-in-part applications. 321 F.3d 1111, 1119–20 (Fed. Cir. 2003). At minimum, the continuation-in-part application that issued as the '268 patent fell within the assignment because it was an "extension" of the '909 Application—i.e., it added to the contents of the '909 Application with new material.

*Second*, Causam argues that the 2013 Agreement's integration clause "supersedes" the 2007 Assignment and therefore, the argument goes, the patent rights Mr. Forbes and Mr. Webb assigned away in 2007 were returned to them. Blue Br. 10, 16, 20, 25. As explained earlier, and as admitted by Mr. Forbes, the 2013 Agreement contained no assignment of rights *to* Mr. Forbes. Appx20405–20406, 109:18–110:1 (Forbes). The 2013 Agreement contained no "active verbal expression of present execution" of rights from Consert to Mr. Forbes. *Omni MedSci*, 7 F.4th at 1158–59. The CALJ recognized the flaws in Causam's argument, ruling that the 2013 Agreement "did not simply return the parties to some supposed status quo ante." Appx48.

Moreover, the 2013 Agreement stated that, apart from the 2010 Agreement, the 2013 Agreement superseded only "*inconsistent terms* in any prior agreement *between the parties*." Appx21888, ¶ 21 (emphasis added). The 2007 Assignment was not an "agreement between the parties" to the 2013 Agreement. Mr. Webb was a party to the 2007 Assignment but not to the 2013 Agreement, and Consert was a party to the 2013 Agreement but not to the 2007 Assignment. *See Wildfire Prods.,*

*L.P. v. Team Lemieux LLC*, C.A. No. 2021-1072-PAF, 2022 WL 2342335, at *7 (Del. Ch. June 29, 2022) ("As a matter of black letter contract law, parties cannot modify a contract without the 'assent' of 'all . . . parties to the contract.'"). The CALJ agreed, holding that "the 2013 Assignment Agreement was not reached with the consent of Mr. Webb" and that "Consert and Mr. Forbes could not agree among themselves to undo Mr. Webb's assignment to America Connect in 2007." Appx48.

Moreover, the 2013 Agreement states that it supersedes only "inconsistent terms" in prior agreements between the parties. Appx21888, ¶ 21. There is nothing inconsistent between the 2013 Agreement and the 2007 Assignment relative to the ownership of the '268 patent; the two agreements are in harmony and collectively confirm that, as of 2013, Consert owned the '268 patent.[12]

Finally, Causam's theory is particularly flawed because it tries to apply an integration clause retroactively, i.e., to "undo" actions taken in the past. But when parties intend to "retroactively" supersede an agreement, the new agreement must expressly say so—otherwise any superseding occurs only prospectively. *See Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1125 (11th Cir. 2014). Thus, even if the 2013 Agreement superseded anything in the 2007 Assignment, it certainly did not "undo"

---

[12] To the extent that Causam argues that the 2007 Assignment or 2013 Agreement is ambiguous (*see* Blue Br. 26), the argument is forfeited as it was raised for the first time in Causam's petition for Commission review.

what had already been done (including Mr. Forbes's prior assignment to America Connect, which later assigned the rights to Consert).

*Third*, Causam argues that the 2013 Agreement conveyed or vested ownership of the '268 patent with Mr. Forbes. Not so. The express terms of the 2013 Agreement prohibit it from being interpreted to implicitly grant ownership rights in the Excluded Patents or the '268 patent; the only rights provided in the 2013 Agreement are those stated therein. Appx21886, ¶ 7. To be sure, in the 2013 Agreement, ***Mr. Forbes assigned to Consert*** whatever rights he had to a group of patents called the "Consert Patents," which included the ancestor '909 Application and "any and all related rights of" those patents and applications, including "any patent applications which are divisions, continuations or continuations-in-part of such patents." Appx21885, ¶ 4. Thus, if anything, Mr. Forbes again assigned away his patent rights to the '268 patent. In any event, the so-called Excluded Patents, which Causam claims created an implicit right for Mr. Forbes, were limited to "new" inventions—i.e., those not already disclosed in the Consert Patents. Appx21881–21884, ¶¶ 1.3–1.4. Because Causam claims priority to the "old" inventions (i.e., the '909 Application), Causam's assertion that the '268 patent is a "new" invention has no merit.

Furthermore, the CALJ considered, and properly rejected, Causam's "Excluded Patents" argument: "The fact that Mr. Forbes' assignment to Consert does

not include a transfer of rights to the Excluded Patents does not resolve who in fact owns the Excluded Patents." Appx46.  The CALJ drew an apt analogy: "To illustrate the point, if the agreement stated that the assignment from Mr. Forbes did not include an assignment of ownership to the Statue of Liberty, that carve-out would not confirm that Mr. Forbes owned the Statue of Liberty." *Id.*  The CALJ is correct.

Causam next advances the untenable argument that Consert impliedly agreed that Mr. Forbes owned the Excluded Patents because the 2013 Agreement contains a ***representation*** by Mr. Forbes that the "Excluded Patents were Mr. Forbes's property" because he has "owned them from the time he invented them."  Blue Br. 24, 26; Appx21884–21885, ¶ 2 (2013 Agreement).  But Mr. Forbes's representation was not an agreement by Consert about anything at all; it was merely a representation made exclusively by Mr. Forbes.  The representation did not and could not bind Consert to anything, much less to an agreement that Mr. Forbes owns the '268 patent.

***Fourth***, Causam appears to rely on the fact that the 2007 Assignment was entered into before Mr. Forbes applied for the Asserted Patents.  *See* Blue Br. 23 ("Resideo's contention—that the 2007 Assignment reached inventions Mr. Forbes did not invent until over half a decade after that assignment was executed—cannot stand.").  This is a red herring, as Causam does not and cannot dispute that a valid assignment of patent rights can (and often does) occur before the patents exist.  In such circumstances, "[o]nce the invention is made and an application for patent is

filed . . . legal title to the rights accruing thereunder would be in the assignee . . . and the assignor-inventor would have nothing remaining to assign." *Film-Tec Corp. v. Allied-Signal, Inc.*, 939 F.2d 1568, 1572 (Fed. Cir. 1991).

Finally, for the first time in its petition for review and now on appeal, Causam argues that evidence of Mr. Forbes's ownership of the '268 patent is that "[i]n the years since the 2013 Agreement, it has been Mr. Forbes—not Consert—who has paid the patent maintenance fees for the Excluded Patents." Blue Br. 26–27. But such a scenario does not create an assignment, for anyone can pay a patent's maintenance fees. Causam offers no legal authority otherwise, nor does Causam support the notion that payment of maintenance fees establishes ownership, that Consert and Landis+Gyr had notice and an obligation to object to such payments, or that the lack of such an objection has any legal impact regarding patent ownership. Instead, as described earlier, this Court has made clear that an actual assignment is needed—and specifically "an active verbal expression of present execution" of that assignment. *Omni MedSci*, 7 F.4th at 1158.

\* \* \*

In sum, this Court should not reach the question of ownership, but if it does, substantial evidence supports the CALJ's determination that "Mr. Forbes gave up his rights in the '909 Application and all its progeny [including the '268 patent] in 2007 and never got them back." Appx48. Thus, Mr. Forbes never later assigned

those rights to Causam, meaning Causam does not own, and has never owned, the

'268 patent.

## CONCLUSION

For the foregoing reasons, this Court should affirm the Commission's

determination of no violation of Section 337.


Dated: February 21, 2024

*/s/ Kirk T. Bradley*
Kirk T. Bradley
S. Benjamin Pleune
M. Scott Stevens
Lauren N. Griffin
ALSTON & BIRD LLP
Vantage South End
1120 South Tryon Street, Suite 300
Charlotte, NC 28203
(704) 444-1000

*Counsel for Itron, Inc.,*
*Resideo Smart Homes Technology (Tianjin),*
*and Ademco, Inc.*

*/s/ Manny Caixeiro*
Manny Caixeiro
Laura A. Wytsma
VENABLE LLP
2049 Century Park East, Suite 2300
Los Angeles, CA 90067
310-229-9900

Megan S. Woodworth
VENABLE LLP
600 Massachusetts Avenue, NW

Washington, DC 2001
202-334-4000

*Counsel for ecobee Technologies ULC, dba
ecobee*

*/s/ Keith Hummel*
Keith Hummel
Sharonmoyee Goswami
CRAVATH SWAINE & MOORE LLP
Worldwide Plaza
825 Eight Avenue
New York, NY 10019
212-474-1000

*Counsel for Alarm.com Holdings, Inc.,
Alarm.com Incorporated, and EnergyHub,
Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2023-1769

**Short Case Caption:** Causam Enterprises, Inc. v. ITC

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑  the filing has been prepared using a proportionally-spaced typeface and includes 13,887 words.

☐  the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐  the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 02/21/2024

Signature: /s/ Kirk T. Bradley

Name: Kirk T. Bradley

Save for Filing